# EXHIBIT A

Case #2026-03871

| | |
|---|---|
| **Case Number** | 2026-03871 |
| **Commencement Date** | 2/27/2026 |
| **Last Filing Date** | 5/27/2026 |
| **Days Open** | 102 |
| **Case Type** | Summons Civil Action |
| **PFA Number** | |
| **Caption Plaintiff** | COUNTY OF MONTGOMERY PENNSYLVANIA |
| **Caption Defendant** | DRC EMERGENCY SERVICES LLC |
| **Lis Pendens Indicator** | No |
| **Status** | 2 - OPEN |
| **Judge** | JEFFREY S. SALTZ |
| **Remarks** | |
| **Sealed** | No |
| **Interpreter Needed** | |

## Plaintiffs

| Name | Address | Country | Counsel | Notify | Sequence | Status |
|---|---|---|---|---|---|---|
| COUNTY OF MONTGOMERY PENNSYLVANIA | 425 SWEDE STREET 8TH FLOOR NORRISTOWN, PA 19404 UNITED STATES | UNITED STATES | FORD, TIMOTHY DESIDERATO, JERRY R Ponson, Stanford B | Yes | 1 | |

## Defendants

| Name | Address | Country | Counsel | Notify | Sequence | Status |
|---|---|---|---|---|---|---|
| DRC EMERGENCY SERVICES LLC | 2 NORTH JACKSON STREET SUITE 605 MONTGOMERY, AL 36104 UNITED STATES | UNITED STATES | | Yes | 1 | |
| DEBRISTECH LLC | 923 GOODYEAR BOULEVARD PICAYUNE, MS 39466 UNITED STATES | UNITED STATES | FUGA, ANDREW J TOTARO, ALEXANDRA MCMEEKIN, JOHN C II WALLS, ORVILLE R | Yes | 2 | |

## Docket Entries

| Seq. | | Filing Date | Docket Type | Docket Text | Sealed | Filing ID |
|---|---|---|---|---|---|---|
| 0 | E | 2/27/2026 | Summons Civil Action | | No | 15289124 |
| 1 | E | 3/18/2026 | Entry of Appearance | OF ANDREW J. FUGA FOR DEBRISTECH, LLC | No | 15314409 |
| 2 | E | 3/18/2026 | Affidavit/Certificate of Service of | ENTRY OF APPEARANCE ON 03/18/2026 TO PLAINTIFF AND CO-DEFENDANTS | No | 15314411 |
| 3 | E | 3/18/2026 | Entry of Appearance | OF ALEXANDRA C. TOTARO FOR DEBRISTECH, LLC | No | 15314488 |
| 4 | E | 3/18/2026 | Affidavit/Certificate of Service of | ENTRY OF APPEARANCE ON 03/18/2026 TO PLAINTIFF AND CO-DEFENDANTS | No | 15314495 |
| 5 | E | 3/18/2026 | Demand for Jury Trial by | DEBRISTECH LLC | No | 15314500 |
| 6 | E | 3/18/2026 | Demand for Jury Trial by | DEBRISTECH LLC | No | 15314756 |
| 7 | E | 3/18/2026 | Affidavit/Certificate of Service of | ENTRY OF APPEARANCE ON 03/18/2026 TO PLAINTIFF AND CO-DEFENDANTS | No | 15314758 |
| 8 | E | 3/20/2026 | Entry of Appearance | OF JOHN C. MCMEEKIN II FOR DEBRISTECH, LLC | No | 15318510 |
| 9 | E | 3/20/2026 | Affidavit/Certificate of Service of | ENTRY OF APPEARANCE ON 03/20/2026 TO ALL COUNSEL OF RECORD | No | 15319123 |
| 10 | E | 3/24/2026 | Entry of Appearance | OF STANFORD B PONSON FOR PLAINTIFF | No | 15322693 |
| 11 | E | 3/24/2026 | Affidavit/Certificate of Service of | ENTRY OF APPEARANCE ON 03/24/2026 TO ALL PARTIES | No | 15322701 |

| Seq. | | Filing Date | Docket Type | Docket Text | Sealed | Filing ID |
|---|---|---|---|---|---|---|
| 13 | | 4/30/2026 | Order - Other | (CIVIL CASE MANAGEMENT) OF 4/30/26 KEHS, CA  ALL FACT DISCOVERY SHALL BE COMPLETED WITHIN 18 MONTHS  RULE 236 NOTICE PROVIDED ON 04/30/2026 | No | 15382243 |
| 14 | E | 5/27/2026 | Complaint In | | No | 15427038 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

COUNTY OF MONTGOMERY PENNSYLVANIA

vs.

DRC EMERGENCY SERVICES LLC

NO. 2026-03871

## NOTICE TO DEFEND – CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCIATION
100 West Airy Street (REAR)
NORRISTOWN, PA

19404-0268 (610) 279-9660, EXTENSION 201

PRIF0034
R 10/11

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS
## OF MONTGOMERY COUNTY, PENNSYLVANIA

|  |  |  |
|---|---|---|
| COUNTY OF MONTGOMERY, | : | CIVIL DIVISION |
| *Plaintiff,* | : | |
| | : | No. <u>2026-03871</u> |
| v. | : | |
| | : | |
| DEBRIS TECH, LLC and | : | JURY TRIAL DEMANDED |
| DRC EMERGENCY SERVICES LLC, | : | |
| *Defendants.* | : | |
| | : | |

## <u>NOTICE TO DEFEND – CIVIL</u>

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing a writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCIATION
100 West Airy Street (Rear)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXT. 201

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DILWORTH PAXSON LLP**
Jerry R. DeSiderato (Pa. Id. 201097)
Timothy J. Ford (Pa. Id. 325290)
Stanford B. Ponson (Pa Id. 322548)
1650 Market Street, Suite 1200
Philadelphia, PA 19103
Tel.: (215) 575-7000
Fax: (215) 754-4603
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
sponson@dilworthlaw.com
*Attorneys for Plaintiff, County of Montgomery*

| | | |
|---|---|---|
| COUNTY OF MONTGOMERY, | : | **MONTGOMERY COUNTY** |
| *Plaintiff,* | : | **COURT OF COMMON PLEAS** |
| | : | |
| v. | : | CIVIL DIVISION |
| | : | |
| DEBRIS TECH, LLC and | : | No. <u>2026-03871</u> |
| DRC EMERGENCY SERVICES LLC, | : | |
| *Defendants.* | : | JURY TRIAL DEMANDED |
| | : | |

<u>COMPLAINT</u>

Plaintiff County of Montgomery, Pennsylvania (the "County"), through its undersigned

attorneys, hereby files this Complaint against DRC Emergency Services, LLC and DebrisTech,

LLC for breach of contract and violation of Pennsylvania's Environmental Rights Amendment. In

support thereof, Plaintiff states as follows:

<u>INTRODUCTION</u>

1.      Major disasters like hurricanes, floods, and tornados require large, complex

recovery operations. Local governments rely on the expertise and consultation of disaster recovery

contractors to mobilize equipment, staff experienced manpower, and collect and remove disaster

debris quickly and efficiently to ensure the safety of residents and communities. Montgomery

County, Pennsylvania is no different. The County's disaster preparedness and recovery relies on

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

external service providers for these tasks which require specialized knowledge, experience, and expertise. DRC Emergency Services, LLC ("DRC") and DebrisTech, LLC ("DebrisTech") are two such experts: a disaster debris removal contractor and a monitoring contractor, both with broad experience managing major disaster recovery efforts across the country. Their professed pedigrees include efficiently and cost-effectively overseeing all aspects of natural and manmade disaster recovery and reimbursement so governmental entities can focus on the everyday work they do for their constituents.

2.     On September 1, 2021, Hurricane Ida ripped through the County and caused historic flooding and destruction. Over the course of the disaster recovery operations, DRC and DebrisTech collected, documented, and removed various types of debris across the County: trees and limbs, vegetative debris, white goods (household-related debris), and waterway debris. In total, the County paid over $14,028,597.82 to DRC and DebrisTech for their work after Hurricane Ida. Unfortunately for the County, FEMA's Public Assistance Grant Program concluded that DRC and DebrisTech conducted significant unnecessary removal activities and reimbursed the County for *less than half* of the cost, leaving County taxpayers responsible for the remaining $7,513,536.35 that was paid to DRC and DebrisTech.

3.     When the County authorized DRC and DebrisTech to begin disaster recovery cleanup, the respective contracts established DRC's and DebrisTech's responsibility only to remove debris that was eligible for FEMA reimbursement. The County relied on its contractors' expertise to decipher what debris should be removed based explicitly on whether FEMA would reimburse those costs. DRC and DebrisTech strayed far from that mark and, throughout the disaster recovery process, DRC and DebrisTech overharvested trees from the County's parks and nature preserves. Their overzealous clearing of County lands not only resulted in over half of the

2

#125658674v1

County's reimbursement request getting denied, but it also caused environmental harm that requires extensive remediation.

4.    In one striking example, DRC and DebrisTech clearcut a protected wetland. That site in Whitemarsh Township (the "Whitemarsh Site") was once an 11-acre nature preserve cherished by local residents for its parklike setting and proximity to Wissahickon Creek. DRC removed nearly all trees from the Whitemarsh Site, transforming a natural parkland into a pile of dirt. DRC admitted responsibility for the clearcutting at the time, and implemented limited emergency measures to protect against soil erosion into the creek. At the time, DRC promised to pay to restore the Whitemarsh Site. DRC has since then reneged on its promise.

5.    In another example, DRC and DebrisTech overharvested trees and vegetation at a nature preserve at John James Audubon Park ("Audubon Park") and left sensitive parkland as a mud pit.

6.    The dispute regarding environmental harms at County parklands is additional to the FEMA reimbursement dispute.

7.    In February 2022, when the County submitted its application for reimbursement to FEMA, over 88% of costs associated with tree and limb removal was denied; nearly 30% of vegetative hauling, reduction, and disposal was denied; nearly 30% of DebrisTech's monitoring costs were denied; and 100% of waterway debris costs were denied.  In the aggregate, this meant that of the County's reimbursement application for $14,028,597.81, 54% was denied, resulting in expending the County's general funds to pay DRC and DebrisTech $7,513,536.35 for their collective failure to provide the very expertise they promised to provide.

8.    The County entrusted taxpayer funds to DRC and DebrisTech with a singular focus: to execute disaster debris collection and removal from authorized locations in accordance with

3

#125658674v1

FEMA's eligibility guidelines and regulations. That trust carries with it an obligation that is both contractual and public in nature. Service providers hired for their claimed expertise are not free to accept public funds and then fail to perform, divert resources, or withhold services while retaining payment. To permit such conduct undermines fiscal accountability, erodes public confidence, and converts taxpayers' dollars into a risk-free subsidy for contractual non-performance—an outcome the law cannot tolerate.

9.　This present Complaint arises from DRC's and DebrisTech's systemic failure to perform disaster debris removal and monitoring services in accordance with their contractual obligations and governing FEMA regulations following Hurricane Ida. As a direct and foreseeable consequence of those failures, the County suffered more than $7.5 million in damages due to ineligible and unreimbursed FEMA costs, severe and irreparable environmental damage to County-owned parkland, and substantial additional remediation expenses. Ultimately, FEMA's subsequent determinations confirm that DRC and DebrisTech repeatedly removed ineligible debris from unimproved natural areas and fail to document eligibility in a manner required by FEMA's guidelines, both contrary to what the County hired them to do.

## PARTIES

10.　Plaintiff, Montgomery County, Pennsylvania is a Second Class "A" County with its principal place of business located in Norristown, Pennsylvania.

11.　Defendant DRC Emergency Services, LLC is a Texas limited liability company with its principal place of business located in Galveston, Texas.

12.　Defendant DebrisTech, LLC is a Mississippi limited liability company with its principal place of business in Picayune, Mississippi.

4

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## JURISDICTION AND VENUE

13.    Both DRC and DebrisTech have consented to jurisdiction and venue in the Court of Common Pleas of Montgomery County, Pennsylvania.

14.    The DRC Contract states, "The Contractor consents to the jurisdiction of the Court of Common Pleas of the County of Montgomery, Pennsylvania and the United States District Court for the Eastern District of Pennsylvania, waiving any claim or defense that such forum is not convenient or proper. DRC agrees that such court shall have in personam jurisdiction over it, and consents to service of process in any manner authorized by Pennsylvania law." *See* Contract for Disaster Debris Clearance and Removal Services ¶ 32, attached hereto as **Exhibit "1"** ("DRC Contract").

15.    The DebrisTech Contract states, "Any disputes shall be brought to the Court of Common Pleas in Montgomery County, Pennsylvania." *See* DebrisTech's Independent Contractor Agreement ¶ 10(b), attached hereto as **Exhibit "2"** ("DebrisTech Contract").

## FACTUAL BACKGROUND

16.    Montgomery County, Pennsylvania is the third-most populous county in the Commonwealth of Pennsylvania. The County is the most populous county in Pennsylvania without a major city.  With its large population—estimated to be around 850,000 people as of 2022—the County is also home to wide network of public parks and nature preserves, including over 62 miles of public trails. The County is geographically diverse, ranging from farms and open land in the extreme north, to densely populated suburban neighborhoods in the south and central portions of the County.

17.    In September 2019, the County issued a request for proposal related to disaster debris clearance and removal services. *See* Request for Proposal #19-23 (Disaster Debris

#125658674v1

Clearance and Removal Services for Montgomery County), a true and correct copy of which is attached hereto as **Exhibit "3"** (the "Disaster Recovery RFP"); DRC's Disaster Recovery RFP Response attached as **Exhibit "4"**; Debris Management Contract Recommendation Letter (Sept. 26, 2019), a true and correct copy of which is attached hereto as **Exhibit "5"** ("DRC Contract Recommendation Letter").

18.     In the wake of Hurricane Ida's destruction, the County embarked on a months-long journey to cleanup and restore public and private property devastated by tornado-force winds, rampant flooding, and power outages to tens of thousands of County residents.

19.     To manage its disaster debris cleanup efforts, the County activated its storm debris management contract with DRC to facilitate a large-scale debris removal operation of eligible disaster debris from public roadways and public rights of way. *See generally* Ex. 1. DRC had the manpower, equipment, and technical expertise to safely coordinate large-scale debris removal operations after destructive events like Hurricane Ida.

20.     In the weeks prior to Hurricane Ida—unrelated to the impending storm—the County also issued RFP #21-43 seeking qualified applications for a disaster debris removal monitoring firm. Similar to the Disaster Recovery RFP, the County sought a "no-cost standby contract with a Disaster Debris Monitoring Service to complement activation of the current Debris Management Plan and to work alongside the County's Debris Removal Contractor [DRC]." *See* Montgomery County RFP #21-43, p. 1, attached as **Exhibit "6"** ("Disaster Monitoring RFP").

21.     A disaster debris monitor ensures that the debris collected meets Federal Emergency Management Agency ("FEMA") standards and ensures that the debris collected and removed is appropriate and eligible for reimbursement through FEMA's Public Assistance Grant Program. *See* FEMA's *Public Assistance Program and Policy Guide*, FP-104-009-02, at 107

6

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

(FEMA "Policy Guide"), attached hereto as **Exhibit "7"**. Together, the debris removal contractor and debris monitoring contractor work in tandem as industry experts alongside the County to ensure that full-service disaster recovery services are provided to governmental entities reeling from the effects of widespread destruction.

22.     The Disaster Monitoring RFP specifically sought qualified contractors to "orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract requirements, and safety procedures." *Id*. "Collection monitors must carefully document debris collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement." *Id*. DebrisTech submitted a proposal pursuant to RFP #21-43 on September 6, 2021. *See* DebrisTech's Response to RFP #21-43, attached hereto as **Exhibit "8"** ("DebrisTech's RFP Response").

23.     Thus, the Disaster Recovery RFP and the Disaster Monitoring RFP functioned jointly under the County's disaster management plan to provide the County with qualified contractors for large-scale debris removal operations that exceeded the County's capacity and/or expertise to handle internally. Indeed, County personnel lack significant experience with FEMA reimbursement standards and eligibility determinations.

24.     Soon after RFP #21-43 was issued, however, Hurricane Ida hit the County. Given the scale of the disaster recovery efforts that stood before it, the County issued an emergency declaration alongside the Governor's Proclamation of Disaster Emergency. *See* County's Emergency Declaration and Governor's Proclamation of Disaster Emergency, attached as **Exhibit "9"** (the "Disaster Declarations"). With the Disaster Declarations in place, the County availed

7

#125658674v1

itself to certain emergency procurement procedures, which allowed it to bypass the customary request for proposal process and enter into disaster-related contracts on an as-needed basis.

25.    On September 5, 2021, the County entered into the Disaster Debris Monitoring Contract with DebrisTech pursuant to its emergency procurement authority. *See* Ex. 2.

26.    At all times, DebrisTech represented itself as a capable monitoring firm whose primary purpose was to ensure FEMA eligibility for the debris collected and removed by DRC. With County officials reeling from the recent disaster, the County executed the DebrisTech Contract as a necessity for immediate disaster response, but DebrisTech misrepresented the true scope of its contractual offerings and failed to deliver on its promised services to ensure that DRC's debris collection and removal activities were FEMA eligible.

27.    Indeed, FEMA requires that all contracted debris operations be monitored "to ensure that the quantities and work claimed" for reimbursement "are accurate and eligible." Ex. 7 at 107. According to FEMA, many counties elect to hire outside contractors for monitoring services because self-monitoring "jeopardizes" funding due to the complexity and detailed documentation required for disaster relief reimbursement. *See id.*

28.    Instead of protecting the County's interests, throughout the disaster debris recovery work, DRC and DebrisTech overcut trees, including trees located in unimproved nature preserves and woodland areas (which are expressly ineligible for FEMA reimbursement), mismanaged their respective oversight responsibilities, and failed to document their work in a manner that complied with FEMA's regulations governing disaster debris operations. Monitoring recovery operations for FEMA compliance was material to the parties' transactions.

29.    DRC and DebrisTech held themselves out as experts in FEMA-compliant debris removal and monitoring services. The County specifically relied on DRC and DebrisTech as

8

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

leaders in the disaster recovery industry and experts when it came to compliance with FEMA regulations and eligibility with FEMA's reimbursement protocols.

30.     In its response to the Disaster Recovery RFP, DRC touted its "technical expertise in managing large-scale disaster events." DRC claimed that its key personnel and staff were familiar with industry-standards including rules and regulations set by U.S. Army Corps of Engineers, FEMA, and Federal Highway Administration, in addition to "the Stafford Act and 44CFR as they relate to emergency response, recovery, and reimbursement." Ex. 4 at 20.

31.     DebrisTech expressly represented that all of its clients had received 100% FEMA reimbursement for monitored work and that its electronic ticketing system ensured "absolute compliance" with FEMA requirements. Ex. 8 at 3.

32.     The County reasonably relied on these representations, entrusting its disaster recovery operations to DRC and DebrisTech. But when the County submitted its application for FEMA reimbursement, FEMA refused to reimburse over $7.5 million, reflecting inadequate debris eligibility determinations and/or failures in documentation by DRC and DebrisTech.

### A.     The Disaster Recovery RFP Demanded FEMA Compliance.

33.     When the County issued its Disaster Recovery RFP in September 2019, it demanded several requirements:

(a) Eligible disaster debris removal from roadways and public right of ways [sic];

(b) Transportation of eligible disaster debris;

(c) Debris Management Site ("DMS") coordination and operation;

(d) Debris reduction and grinding (including haul out to final disposal sites; and,

(e) Completion of FEMA paperwork required for reimbursement.

Ex. 3 at 3.

9

#125658674v1

34.     The Disaster Recovery RFP further established that "eligible" debris means "qualifying for and meeting the most current stipulated requirements (at the time the written Notice to Proceed is issued and executed by the County to the Contractor) of the FEMA Public Assistance Grant Program, FEMA Publication 321, FEMA Publication 322, FEMA Publication 323, FEMA Publication 325, and all current FEMA fact sheets, guidance documents, and [Disaster-Specific Guidance]." *Id.* § 12.0.

35.     "Eligible also includes meeting any changes in definition, rules, or requirements regarding debris removal reimbursement as stipulated by FEMA during the course of a debris removal project." *Id.* The Disaster Recovery RFP also establishes that debris removal must comply with the Stafford Act:

> The Debris Management Guide [Publication 325] provides the framework for the debris removal process authorized by the Stafford Act including the following:
>
> 14.1    Eliminating immediate threats to lives, public health, and safety
>
> 14.2    Eliminating immediate threats of significant damage to improved public or private property
>
> 14.3    Ensuring economic recovery of the affected community to the benefit of the community at large

Ex. 3 § 14.0. Thus, all disaster debris management, clearance, and removal activities were at all times required to abide by FEMA's Policy Guide and related guidance.

**B.     DRC's Contract Incorporated FEMA's Eligibility Requirements.**

36.     Of the proposals received by the County, "it became apparent that DRC offers more in terms of resources and personnel," Ex. 5 at 3, to adequately assist the County with a "large-scale debris management operation[s] resulting from a destructive incident." *Id.* at 1. Thus, the County selected DRC to serve as its general contractor for disaster debris collection and removal.

10

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

37.     The County and DRC executed the Contract for Disaster Debris Clearance and Removal Services on December 5, 2019. *See generally* DRC Contract (Ex. 1).

38.     Among other provisions, the DRC Contract contained a scope of work that established "the Contractor's responsibility to provide assistance to the County for completion of all documentation required for reimbursement from FEMA for all associated debris management related costs." *Id.* § 2.1.1 ("Scope of Work"). The Scope of Work incorporates the requirement set forth in the Disaster Recovery RFP, principally that all disaster debris collection and removal activities comply with FEMA's eligibility standards.

39.     The DRC Contract required that any disaster-related vegetative debris removal impeded of a public right of way and be removed in accordance with all "Federal, State, and Local regulations." *Id.* § 2.3. The DRC Contract considered "eligible hazardous leaning trees" as "six (6) inches or greater in diameter, measured fo[u]r and a half (4.5) feet from the base of the tree or chest height." *Id.* § 2.11. "Eligible hazardous hanging limbs" must be two (2) inches or greater in diameter at the point of break and in the Public [right of way]." *Id.*

40.     The DRC Contract established criteria for removing "hazardous leaning trees":

For hazardous leaning trees to be removed and eligible for reimbursement, the tree must satisfy a minimum of one (1) of the following requirements:

(a) The tree has more than fifty (50) percent of the crown damaged or destroyed (requires written documentation from an arborist).
(b) The tree has a split trunk or broken branches that expose the heartwood.
(c) The tree has fallen or been uprooted within a public use area.
(d) The tree is leaning at an angle greater than thirty (30) degrees.

*Id.* § 2.11.1 (Eligible Hazardous Leaning Trees). The County specifically stated that it "will not compensate [DRC] for cutting leaning trees less than six (6) inches in diameter on a unit base rate." *Id.* § 2.11.

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

41. For "hazardous hanging limbs" to be eligible for payment, the limb must satisfy all of the following requirements:

    (a) The limb is two (2) inches or greater in diameter at the point of the break.
    (b) The limb is still hanging in a tree and threatening a public use area.
    (c) The limb is located on improved public property.

*Id.* § 2.11.2 (Eligible Hazardous Hanging Limbs).

42. For "hazardous stumps" to be removed and eligible for payment, the stump must satisfy the following requirements:

    a) Over fifty (50) percent of the tree crown is damaged or broken and heartwood is exposed.
    b) Fifty (50) percent or more of the root ball is exposed.
    c) The stump is on Public ROW and poses an immediate threat to public health, safety or welfare.

*Id.* § 2.12.1 (Removal of Hazardous Stumps).

43. The requirements for hazardous leaning trees, hazardous hanging limbs, and hazardous stumps in the DRC Contract mirror the guidelines established in the FEMA Policy Guide, which establishes the criteria for eligible expense reimbursement for disaster recovery operations. On February 23, 2022, the County extended the DRC Contract for a total amount of $9,500,000.

### C. DebrisTech's Contract Established an Obligation to Collect Accurate Documentation to Support FEMA Reimbursement.

44. The County issued the Disaster Monitoring RFP on August 23, 2021, as part of executing on its disaster management plan. *See* Ex. 6 at 1. The Disaster Monitoring RFP required that any monitoring firm retained would "orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract requirements, and safety procedures. Collection

12

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

monitors must carefully document debris collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement." *Id.*

45.     Before the Disaster Monitoring RFP process could be completed, but after DebrisTech submitted its Disaster Monitoring RFP Response, disaster struck. Upon DRC's recommendation and in light of DebrisTech's representations in its Disaster Monitoring RFP Response regarding its qualifications, capabilities, and historical performance as a disaster debris monitoring contractor, the County immediately retained DebrisTech as its debris collection and removal monitoring firm through the County's emergency procurement processes.

46.     To obtain the County's business, DebrisTech portrayed itself as a disaster recovery consultant "utilizing [its] in-house Electronic Debris Management System[,]" which allows it to provide "quality personnel management and debris monitoring services." *See* **Exhibit "10"** (Screenshot of DebrisTech website as of December 2021, *after* Hurricane Ida). On its website, DebrisTech further represented that "all of [its] clients have received 100% of their reimbursement for all work [DebrisTech] performed." *Id.*

47.     Indeed, one of the requirements under the Disaster Monitoring RFP was that the selected monitoring firm would ensure compliance with FEMA's public assistance eligibility, and DebrisTech represented that it was capable of "oversee[ing] documentation requirements as outlined by FEMA." *Id.*

48.     In its Disaster Monitoring RFP Response, DebrisTech "certifie[d] that it ha[d] the specific experience providing disaster debris monitoring following natural or manmade disasters." Ex. 8 at 5.

49.     Similar to representations made on its website, DebrisTech also established in its Disaster Monitoring RFP Response that it was "not currently involved in and has not had any

13

#125658674v1

claims, arbitrations, administrative hearings, or lawsuits related to debris monitoring, disaster recovery, or consulting brought against [it]." *Id.*

50.    As a result of DebrisTech's representations, the County understood DebrisTech's role as a "monitor" to include responsibility for ensuring that debris removal activities were properly documented and limited to FEMA-eligible work sufficient to support reimbursement—a result that DebrisTech ensured the County it received for 100% of its past customers. Even more, based on DebrisTech's representations, the County believed the DebrisTech Contract imposed these responsibilities on DebrisTech.

51.    Therefore, DebrisTech's prior representations that 100% of its past clients received full reimbursement for disaster recovery operations and that it had never been sued, supported the County's decision to retain DebrisTech. *See also* **Exhibit "11"** (DebrisTech Bid Tabulation demonstrating County's evaluation of DebrisTech's representative experience).

52.    DebrisTech's representations defined the nature of the services it would provide to the County and the overall reliability of its disaster debris removal monitoring functions. Therefore, these representations were made specifically for the purpose of inducing the County to enter into the DebrisTech Contract and to accept DebrisTech's interpretation of its monitoring obligations.

53.    The Disaster Monitoring RFP followed FEMA's Policy Guide to establish the responsibilities expected from a disaster debris monitoring contractor.

54.    The Disaster Monitoring RFP required that any monitoring firm retained would "orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract requirements, and safety procedures. Collection monitors must carefully document debris

14

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement." *Id.*

55.    The FEMA Policy Guide outlines what activities are associated with debris monitoring services:

- Field supervisory oversight;
- Monitoring contracted debris removal at both loading and disposal sites;
- Compiling documentation, such as load tickets and monitor reports, to substantiate eligible debris; and,
- Training debris monitors on debris removal operations, monitoring responsibilities and documentation processes, and FEMA debris eligibility criteria.

Ex. 7 at 107.

56.    Thus according to the Disaster Monitoring RFP and FEMA's Policy Guide, at all times the County's chosen disaster debris monitoring contractor was required to monitor disaster debris removal activities for FEMA eligibility and conduct field supervisory oversight to ensure that eligible debris was properly documented at both loading and disposal sites.

57.    As a result of DebrisTech's representations, the County understood and reasonably believed that DebrisTech would:

a.    Exercise active field oversight over debris removal operations;

b.    Ensure that debris removal operations complied with FEMA eligibility reimbursement standards; and

c.    Generate and verify documentation sufficient to support FEMA reimbursement.

58.    When the DebrisTech Contract was signed on September 10, 2021, the County understood that the DebrisTech Contract required DebrisTech to exercise active oversight of disaster debris monitoring functions consistent with the terms established in its Scope of Services to ensure FEMA-compliant documentation to support reimbursement.

15

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

59.     The DebrisTech Contract also contained internally inconsistent provisions regarding the true scope of DebrisTech's monitoring responsibilities.

60.     On the one hand, the Contract provides that *the County* must establish project-related scope through its authorized representative, and DebrisTech had no control over what trees and debris actually got removed by the debris removal contractor. *See* Ex. 2 (DebrisTech Contract), §§ 5(a), 11.

61.     On the other hand, the Contract's Scope of Services expressly provides that DebrisTech "will provide disaster debris monitoring services" for debris generated from public rights-of-way, private property, waterways, and other eligible areas, including responsibilities related to documentation, oversight, and FEMA reimbursement support. *See id.*, Scope of Services § II.A.

62.     These provisions create a material ambiguity as to whether DebrisTech bore any responsibility for actively monitoring debris removal operations for FEMA eligibility, or whether such responsibility was effectively disclaimed and shifted to another party. *See id.*

63.     While the County needed monitoring assistance immediately to recover from Hurricane Ida and expected DebrisTech would provide those services, DebrisTech knowingly drafted contract language that limited its express control over debris removal operations while simultaneously representing that it would conduct FEMA-compliant monitoring.

64.     For example, as part of its responsibilities to monitor field activities, DebrisTech hired field monitors with zero prior experience in disaster debris monitoring or removal services. Many of the field monitors hired by DebrisTech to oversee the complex nuances demanded for effective monitoring had never worked in the industry, were poorly trained to understand the technical nature of the work they were being asked to perform, and improperly classified debris

16

#125658674v1

when logging information into DebrisTech's documentation collection platform. *Compare id. with* Ex. 8 at 7 (DebrisTech fully understands "accurate and objective estimation of debris quantities;" "accurate differentiation of debris types;" and "effective and efficient communication.").

65.     The County justifiably relied on DebrisTech's representations in entering into the DebrisTech Contract and adopting the understanding that DebrisTech was responsible for monitoring debris removal operations and substantiating eligible debris.

66.     The County's reliance was reasonable in light of the ambiguity in the DebrisTech Contract's provisions regarding its monitoring responsibilities, DebrisTech's superior knowledge and expertise in disaster debris monitoring, and DebrisTech's affirmative representations regarding its role, capabilities, and historical performance for past customers.

67.     Indeed, as an industry leader in disaster monitoring and documentation services, DebrisTech was responsible for overseeing DRC's operations, "making/implementing recommendations to improve efficiency and speed up recovery work[,]" and overseeing recordkeeping activities to "provide the County with complete documentation of every load of debris generated for auditing and reimbursement purposes." Ex. 2 at Scope of Services § II.A(i). Thus, DebrisTech's work must first and foremost comply with the Policy Guide.

68.     The primary purpose for retaining a disaster debris monitoring contractor is to document debris collection and removal and substantiating the eligible debris for FEMA reimbursement.

69.     Absent DebrisTech's representations, the County would not have entered into a contract that allowed a purported monitoring contractor to evade responsibility and accountability for the exact services it was supposed to provide.

17

#125658674v1

70.     Since FEMA's Public Assistance is a reimbursement-based program, the County was required to front the costs associated with the disaster debris collection, removal, and monitoring services.

71.     DebrisTech, as the monitor, was also responsible for reconciling DRC's invoices to ensure the debris collection and removal costs were appropriate and ultimately reimbursable.

72.     Therefore, in certifying DRC's invoices for payment, DebrisTech was also certifying that the debris collected and removed by DRC was properly documented and eligible for reimbursement. Similarly, by submitting its own invoices for payment, DebrisTech was certifying it services complied with FEMA standards.

73.     To the extent the DebrisTech Contract is interpreted as limiting DebrisTech's monitoring obligations, DebrisTech nevertheless undertook and performed *some* monitoring functions and assumed responsibility for preparing FEMA-compliant documentation in practice.

74.     Lastly, to the extent the DebrisTech Contract is not ambiguous, it nonetheless omits material terms from the Scope of Services that imposes any contractual responsibility for DebrisTech to actually monitor disaster debris removal activities for FEMA compliance. *See generally* Ex. 2.

75.     DebrisTech also agreed to prepare project worksheets and "other pertinent report preparation required for reimbursement by FEMA, FHWA and any other applicable agency for disaster recovery efforts by County staff and designated debris removal contractors." *Id.* at Scope of Services § II.A(m). By and large, DebrisTech failed to collect proper documentation and make appropriate determinations about what disaster debris was eligible for reimbursement which resulted in the County's FEMA reimbursement to be partially denied.

18

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

76. The County paid DebrisTech $1,510,166.92, of which only $1,067,230.05 was reimbursed by FEMA.

**D.    FEMA's Policy Guide Establishes Operational Standards for Disaster Recovery Contractors and Monitors.**

77. Under Title IV of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5191, *et seq.*, as amended (the "Stafford Act"), FEMA is authorized to provide major disaster assistance programs. The Policy Guide articulates the agency's intent and direction in applying statutory and regulatory authority to provide high-level program information to assist applicants and their contractors with complying with FEMA's guidelines for disaster relief activities and cost reimbursements. *See* Ex. 7 (FEMA Policy Guide).

78. The Policy Guide establishes what types of debris removal activities are eligible for FEMA reimbursement. For example, hazardous leaning trees, hazardous hanging limbs, and hazardous stumps are eligible for FEMA reimbursement if "damaged to the extent they pose an immediate threat." *Id.* at 101. These items are "ineligible if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over improved property or public-use areas, such as trails, sidewalks or playgrounds." *Id.*

79. FEMA specifically cautions that a failure to provide sufficient documentation of removed debris jeopardizes public assistance funding. The Policy Guide therefore establishes what debris is eligible and ineligible for reimbursement. For example, "[p]runing, maintenance, trimming, and landscaping are ineligible" for reimbursement. *Id.*

80. Other types of debris are eligible only if the debris meets FEMA's exacting requirements:

1.  Broken Limbs or Branch Removal

Removal of broken limbs or branches that are 2 inches or larger in diameter (measured at the point of break) that pose an immediate threat are eligible.

19

#125658674v1

An example is a broken limb or branch that is hanging over improved property or public-use areas, such as trails, sidewalks, or playgrounds if it could fall and cause injury or damage to improved property.

2. Tree Removal

FEMA considers incident-damaged trees to be hazardous and eligible if the tree has a diameter of 6 inches or greater measured 4.5 feet above ground level, and the tree:

- Has a split trunk;
- Has a broken canopy; or
- Is leaning at an angle greater than 30 degrees.

3. Stump Removal

For stumps that have 50 percent or more of the root-ball exposed, removal of the stump and filling the root-ball hole are eligible. If grinding a stump in-place is less costly than extraction, grinding the stump in-place is eligible.

*Id.* at 101–02.

81.    FEMA also establishes that debris removal classified as "waterway debris" must be removed "*from waterways* that is necessary to eliminate the immediate threat to life, public health and safety, or improved property." *Id.* at 103 (emphasis added).

82.    "Removal of debris in a waterway that does not meet this criterion in ineligible, even if the debris was deposited by the incident." *Id.*

83.    Many of the County's waterways impacted by Hurricane Ida are considered "non-navigable waterways":

In these cases, removal of debris from the non-navigable waterway channel is eligible if the debris poses an immediate threat, such as when the debris:

- Obstructs, or could obstruct, intake structures;
- Could cause damage to structures, such as bridges and culverts; or
- Is causing, or could cause, flooding to improved public or private property during the occurrence of a 5-year flood.

20

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*Id.* at 104. Importantly, FEMA requires that applicants "distinguish between incident-related debris versus pre-existing debris and debris generated by other incidents." *Id.* at 268.

84.    Indeed, one of the expectations of a debris removal monitoring contractor is to properly document the debris removed that is specifically associated with the triggering disaster, including whether "waterway debris" was removed from an actual waterway.

85.    FEMA also details the documentation required to support the eligibility of contracted work to remove tree limbs, stumps, branches or trees that are still in place:

- Specifics of the immediate threat with the location (geographical coordinates in latitude, longitude) and photograph or video documentation that establishes the item is on public property (required, FEMA reviews a representative sample);
- Quantity removed (Note: If a contractor charged an individual price for each limb, tree, or stump removed, FEMA requires the diameter of each item removed. For stumps, the measurement must be 2 feet up the trunk from the ground. For trees, it must be 4.5 feet up from the ground.) (required);
- Quantity, location, and source of material to fill root-ball holes (required); and
- Equipment used to perform the work (required).

*Id.* at 103.

86.    FEMA requires that "all contracted debris operations" are monitored "to ensure that the quantities and work claimed are accurate and eligible." *Id.* at 107. The FEMA Policy Guide outlines what activities are associated with debris monitoring services:

- Field supervisory oversight;
- Monitoring contracted debris removal at both loading and disposal sites;
- Compiling documentation, such as load tickets and monitor reports, to substantiate eligible debris; and,
- Training debris monitors on debris removal operations, monitoring responsibilities and documentation processes, and FEMA debris eligibility criteria.

*Id.* These activities align with the Disaster Monitoring RFP and the scope of services in DebrisTech's Contract. *Compare id.* with Ex. 2, Scope of Services § II.

21

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**E.      DRC and DebrisTech Failed to Abide by Their Respective Contracts.**

87.     Almost immediately after Hurricane Ida, DRC and DebrisTech staged equipment to undertake the massive debris collection and removal project ahead of them. On August 31, 2021, Governor Tom Wolf issued a major disaster declaration authorizing Pennsylvania's Emergency Management Agency to provide public assistance to twelve Pennsylvania counties, including Montgomery County. *See* Ex. 9. The federal government subsequently issued a Public Assistance Disaster Declaration 4618-DR-PA, which authorized the County to seek FEMA reimbursement.

88.     Between September 5, 2021 and February 5, 2022, DRC and DebrisTech completed the vast majority of their purported debris identification, collection, removal and monitoring services—first collecting curbside debris and piles accumulated from public rights of way. During this time, DRC and DebrisTech worked their way through the County's public roadways and rights of way, clearing felled trees and other disaster-related vegetative debris.

89.     After DRC and DebrisTech worked their way through public roadways and rights of way, a second phase of disaster debris removal occurred when the County instructed DRC and DebrisTech to remove eligible debris from County parks and waterways.

90.     While the County directed the locations *where* work should occur, it did not direct *how* the work was to be performed, and instead relied on Defendants' expertise. Thus, DRC and DebrisTech exercised on-site discretion to determine, in real time, what debris and activities were eligible for FEMA reimbursement.

91.     However, DRC, including through its subcontractors, actively encouraged the expansion of work into County parks and additional sites, including by proposing additional cleanup work and advocating for broader project scope, in part because DRC (and its

22

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

subcontractors) were compensated by the pound—the more debris removed, the more DRC and its subcontractors got paid.

92.    At the time the disaster debris removal work was being performed, the County was led to believe by Defendants that the debris removal activities in parks and waterways were eligible for FEMA reimbursement and authorized this phase of work based on that understanding.

93.    The County submitted its application for FEMA public assistance through Pennsylvania Emergency Management Agency on February 11, 2022, requesting reimbursement of $14,028,597.81 for completed county-wide debris removal costs based on load ticket information collected, compiled, and audited by DebrisTech as the County's disaster debris monitoring contractor.

94.    Unfortunately, both DRC and DebrisTech failed to adequately perform under their respective scopes of work, resulting in (1) gross deforestation of trees from the County's public parks and nature preserves, and (2) partial denial of the County's application for Public Assistance related to its disaster recovery cost reimbursements for failure to collect the proper documentation supporting eligible cost reimbursement.

95.    In its September 22, 2023 Determination Memorandum, attached as **Exhibit "12"**, FEMA partially denied the County's project reimbursement in the amount of $7,513,536.36. FEMA questioned (1) whether the claimed damages were eligible for public assistance funding; (2) whether certain facilities were eligible for public assistance funding; and (3) whether the debris removal work was necessary to eliminate an immediate threat to life, public health, safety, or improved public or private property. The County promptly appealed FEMA's decision. *See* Montgomery County Appeal, Notice of First Appeal (dated Nov. 20, 2023), attached hereto as **Exhibit "13"**.

23

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

96.    In FEMA's First Appeal Determination, FEMA analyzed a sample of reimbursement requests and made the following findings:

- Tree and Limb Direct Related Costs: 88.36 percent of the sample was found to be ineligible, resulting in a reduction of $2,099,150.60 from claimed cost of $2,235,620.00.
- Veg. Hauling, Reduction, and Disposal Indirect Related Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $1,678,842.92 from claimed costs of $5,723,915.10.
- Monitoring Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $442,936.87 from a claimed cost of $1,510,166.92.
- Construction & Demolition Related Costs: No reduction from claimed costs of $1,126,289.84.
- Waterway Debris Costs: One hundred percent of the sample was found to be ineligible resulting in $3,292,605.96 being subtracted from claimed costs, effectively reducing eligibility of Waterway Debris Costs to zero. 38,421.80 Cubic Yards of Debris.

FEMA First Appeal Determination Memorandum (June 25, 2024) at 4, attached hereto as **Exhibit "14"**.

97.    Ultimately, FEMA's determination was made based on improper documentation— and by extension, improper monitoring—to support the County's cost reimbursements. From the documentation collected by DebrisTech, FEMA determined that "debris removal operations at issue in this appeal were performed . . . in natural unimproved forested lands adjacent to improved and maintained trail systems, in unincorporated and incorporated areas of Montgomery County, and along natural water channel embankments." *Id*. at 5.

98.    FEMA also stated that public assistance funding for debris removal from publicly owned lands is authorized "when it is necessary to eliminate the immediate threat to life, public health, and safety, or improved property." *Id*. at 6. FEMA determined that the vast majority of debris removal reimbursement requests submitted by the County was improperly documented and ineligible for reimbursement. *Id*. at 7.

24

#125658674v1

99.     For example, in several load tickets prepared by DebrisTech, it is clear that the removed debris existed prior to Hurricane Ida. In other load tickets prepared by DebrisTech, DRC contractors can be seen traversing into wooded areas to remove trees that are clearly unrelated to disaster recovery. *See, e.g.*, true and correct copies of DebrisTech Hurricane Ida Debris Removal E-Tickets, attached hereto as **Exhibit "15"**.

100.    As set forth above, only certain types of debris are "eligible" for FEMA reimbursement. *See supra* ¶¶ 80–86. FEMA also requires that classification of debris as "waterway debris" must be removed from the channel of water, *not* from the embankment flanking the channel. *See* Ex. 7 (Policy Guide), at 104. The documentation prepared by DebrisTech failed to establish that waterway debris was collected from waterways.

101.    The County submitted a Second Appeal on September 20, 2024. *See* **Exhibit "16"**. In FEMA's Second Appeal Determination, it again determined the unreimbursed disaster recovery expenses were "not eligible" for reimbursement because the debris was in "a natural area and [did] not extend over improved property or public-use areas." FEMA Second Appeal Determination Memorandum (Mar. 4, 2025) at 2, attached hereto as **Exhibit "17"**.

102.    In effect, DebrisTech failed to properly monitor debris removal operations and additionally failed to collect documentation to ensure compliance with FEMA's reimbursement protocols such that the debris collected and removed from the County was eligible for reimbursement under the Policy Guide.

103.    Additionally, DRC vastly over-harvested trees and other debris that was located in unimproved natural woodlands within the County's parks and nature preserves. In at least one meeting with County officials, DRC and its subcontractors appeared overzealous and actively pushed for more work.

25

#125658674v1

104.    The County relied on DRC and DebrisTech as its contracted experts in debris removal and monitoring, respectively, to follow FEMA's Policy Guide requirements and conduct the disaster recovery collection, removal, and monitoring functions in compliance with FEMA's rules and regulations.

105.    Nonetheless, FEMA's "examination of the removed debris indicated the debris was removed from natural unimproved forested lands which does not demonstrate an immediate threat existed and therefore the debris removal is ineligible" for reimbursement. Ex. 14 at 7.

106.    DRC breached its Contract with the County by failing to abide by the established Scope of Work. Any debris removal activities under the DRC Contract were required to be performed either on improved property or overhanging improved property or areas designated as for public use (i.e., improved trails, sidewalks, playgrounds). By removing trees and debris in unimproved natural woodlands, DRC far exceeded both its Scope of Work and FEMA's guidelines. *See* Ex. 1 § 2.1.1.

107.    DebrisTech breached its Contract with the County by failing to abide by the Scope of Services, including failure to "provide disaster relief monitoring services" and failure to capture appropriate digital records "for auditing and reimbursement purposes." Ex. 2, Scope of Services.

108.    After FEMA denied the County's reimbursement application, the County reviewed DebrisTech's purported reimbursement documentation. The County determined that (1) DRC and DebrisTech far exceeded the scopes of work under their respective contracts and/or (2) failed to otherwise meet the minimum standard of performance required, (3) over-harvested vegetation on unimproved property and woodlands across the County, and (4) caused the County to expend millions of dollars in presumptive disaster relief cleanup costs that was not reimbursable by FEMA.

26

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

109.    DRC's Contract and DebrisTech's Contract incorporated FEMA's Policy Guide, Stafford Act requirements, and evolving FEMA guidance. Therefore, compliance with FEMA's regulations was not collateral to the parties' contracts—it was the central contractual performance metric underpinning the County's retention of DRC and DebrisTech for its disaster recovery operations.

**F.  DRC and DebrisTech Clearcut Environmentally Sensitive Nature Preserves.**

110.    In addition to Defendants' failure to abide by FEMA's regulations, DRC and DebrisTech also clearcut at least two County-owned nature preserves, leaving environmentally sensitive parkland bereft of trees and vegetation. As a trustee to public natural resources, the County maintained and preserved the Whitemarsh Site and Audubon Park as a natural resource for the benefit of future generations. The Whitemarsh Site was—but is no longer—a largely wooded, 11-acre property in Whitemarsh Township adjacent to Fort Washington State Park. Compare the below images of the Whitemarsh Site before and after:



27

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



111.   DRC, under DebrisTech's supervision, removed nearly every tree and other vegetation at the Whitemarsh Site without proper notice or approval from the County.

112.   Lower Perkiomen Valley Park occupies approximately 107 acres bordered by Perkiomen Creek in the southernmost section of Upper Providence Township.

113.   In Audubon Park (located inside Lower Perkiomen Valley Park), DRC and DebrisTech turned it into a mud pit:

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



114.     Further, DRC's removal activities far exceeded the Scope of Work for removing "hazardous leaning trees" set forth in § 2.11 of the DRC Contract, since the entirety of the Whitemarsh Site and Audubon Park are considered unimproved natural woodlands.

115.     The vast majority of load ticket documentation prepared by DebrisTech also categorized debris from the Whitemarsh Site as "waterway debris" despite the fact that the site itself is not a waterway but is only bordered by a local creek. Therefore, the debris collected and removed from the Whitemarsh Site was improperly classified.

116.     The County first learned of the devastation at the Whitemarsh Site caused by DRC and DebrisTech from public observation. The Pennsylvania Department of Environmental Protection and the Montgomery County Conservation District also raised serious concerns with the County about DRC's adverse environmental impact at the Whitemarsh Site. The County made these complaints and concerns known to DRC, and DRC admitted responsibility for its damage to the Whitemarsh Site in several ways:

29

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Mark Stafford, a Vice President of DRC, acknowledged DRC's responsibility by memorably exclaiming, "I'll tote the note!" during a meeting with County officials.
- DRC implemented limited emergency soil erosion controls and seeded and mulched the Site in an insufficient effort to mitigate the environmental damage they caused.
- Mark Stafford also agreed in an email dated January 3, 2022 that DRC would pay for the work of an engineering firm hired by the County (RK&K Engineering) to develop an erosion control plan and a restoration plan for the approximately 11 acre Site.

117. Email from Mark Stafford to Colleen Carmichael (Jan. 8, 2022), attached as **Exhibit "18"**.

118. DRC has since reneged on its promise to restore the Whitemarsh Site.

119. The County has since incurred additional expense of developing erosion control and restoration plans for Whitemarsh and Audubon Park, not including the cost of implementing erosion control measures and ultimate restoration. Moreover, irreparable damage has occurred to a natural resource devoted to the public's use and enjoyment. Due to the Whitemarsh Site's and Audubon Park's proximity to local creeks, erosion and runoff damage has impacted other natural areas along these creeks, causing further damage to public property.

120. Defendants' conduct resulted in unreasonable degradation of public natural resources and interfered with the County's obligations as trustee under Article I, Section 27 of the Pennsylvania Constitution.

## G. Procedural Posture and Mediation.

121. Under the DebrisTech Contract, "[s]hould any dispute between the Parties arise under this Agreement (a 'Dispute'), written notice of such Dispute shall be delivered from one party to the other and thereafter, the parties . . . shall first meet and attempt to resolve the Dispute in face-to-face negotiations. This meeting shall occur within thirty (30) days of the date on which

30

#125658674v1

a written notice of such Dispute is received from the complaining party." Ex. 2, DebrisTech Contract ¶ 10(a).

122.    On February 8, 2024, the County sent Notice of Dispute Letters to DRC and DebrisTech concerning the destruction at the Whitemarsh Site. Whitemarsh Notice of Dispute Letters to DRC and DebrisTech, attached as **Exhibit "19"**. The DebrisTech Contract further provides, "If no resolution is reached through the informal process set forth in Section 10(a) above, the parties shall engage in a period of non-binding mediation for a period of no less than sixty (60) days (or such longer period as may be mutually agreed by the parties)." Ex. 2, DebrisTech Contract ¶ 10(b).

123.    On April 9, 2024, the County sent a letter to DebrisTech to request non-binding mediation under paragraph 10(b) of their contract and further request that the mediation also include DRC. *See* O'Beirne Letter Requesting Mediation (Apr. 9, 2024), attached hereto at **Exhibit "20"**.

124.    On August 4, 2025, the County sent another Notice of Dispute Letter to DRC and DebrisTech concerning the gross deforestation efforts and failed monitoring and documentation collection that resulted in FEMA's $7.5 million reimbursement denial. Notice of Dispute Letters to DRC and DebrisTech (Aug. 4, 2025), attached as **Exhibit "21"**.

125.    On September 2, 2025, the County, DRC, and DebrisTech entered into a tolling agreement that tolled any claims or defenses arising out of or related to issues raised in the Notice of Dispute Letters dated February 8, 2024 or August 4, 2025 for a period of six months to allow time for mediation.

126.    The parties conducted mediation on February 4, 2026, which failed and resulted in this present Complaint.

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## LEGAL CLAIMS

### COUNT I
### *DRC's Breach of Contract*

127.    The foregoing paragraphs are incorporated by reference as if set forth herein.

128.    The DRC Contract was executed on December 5, 2019, on a standby basis pending a large-scale disaster cleanup initiative. The DRC Contract was activated on September 5, 2021, after Hurricane Ida devastated Montgomery County, leaving in its wake significant debris.

129.    The DRC Contract established its essential terms in Section 2.0, the Scope of Work:

a.    Section 2.1.1 established that DRC was responsible for providing assistance to the County for "completion and documentation required for reimbursement from FEMA from all associated debris management related costs."

b.    Section 2.11 established the "eligible hazardous leaning trees and hanging limbs" must impact a public right of way, threatening an area of public use, or be located on "improved public property."

130.    The DRC Contract incorporated the Disaster Recovery RFP into its Scope of Work. Therefore, the DRC Contract further established that "eligible" debris means "qualifying for and meeting the most current stipulated requirements (at the time the written Notice to Proceed is issued and executed by the County to the Contractor) of the FEMA Public Assistance Grant Program, FEMA Publication 321, FEMA Publication 322, FEMA Publication 323, FEMA Publication 325, and all current FEMA fact sheets, guidance documents, and [Disaster-Specific Guidance]." Ex. 3 § 12.0.

131.    "Eligible also includes meeting any changes in definition, rules, or requirements regarding debris removal reimbursement as stipulated by FEMA during the course of a debris removal project." *Id.*

132.    The DRC Contract also established that debris removal must comply with the Stafford Act:

32

#125658674v1

The Debris Management Guide [Publication 325] provides the framework for the debris removal process authorized by the Stafford Act including the following:

14.1    Eliminating immediate threats to lives, public health, and safety

14.2    Eliminating immediate threats of significant damage to improved public or private property

14.3    Ensuring economic recovery of the affected community to the benefit of the community at large

Ex. 1 § 14.0, pp. 54–55. Thus, under the DRC Contract, all disaster debris management, clearance, and removal activities were at all times required to abide by FEMA's Policy Guide and related guidance.

133.    DRC breached its Contract with the County by removing vastly more debris than the Scope of Work established, including trees and vegetation in unimproved parks and nature preserves, in areas not within an established "hazardous" zone, and/or that were not eligible for FEMA reimbursement.

134.    Additionally, DRC also entered County-owned nature preserves and *clear-cut* entire protected parklands, leaving environmentally sensitive creek-side nature preserves bereft of trees and vegetation. *See supra* ¶ 110.    As a trustee to public natural resources, the County preserved the unimproved Whitemarsh Site and Audubon Park as natural resources for the benefit of future generations.

135.    The Whitemarsh Site was once an 11-acre nature preserve cherished by local residents for its parklike setting and proximity to Wissahickon Creek. DRC removed nearly all trees from the Whitemarsh Site, transforming a natural parkland into a pile of dirt. DRC admitted responsibility for the clearcutting at the time, and implemented limited emergency measures to

33

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

protect against soil erosion into the creek. At the time, DRC promised to pay to restore the Whitemarsh Site. DRC has since then reneged on its promise.

136. In another example, DRC overharvested trees and vegetation at a nature preserve at Audubon Park and left sensitive parkland as a mud pit. *See e.g.*, Ex. 21 (detailing parks where overharvesting trees occurred).

137. DRC removed nearly every tree and other vegetation at Whitemarsh Site and Audubon Park without proper notice to the County. Further, DRC's removal activities far exceeded the Scope of Work for removing "hazardous leaning trees" set forth in Section 2.11 of DRC's Contract, since the entirety of the Whitemarsh Site and Audubon Park are considered unimproved natural woodlands.

138. The County first learned of the devastation caused by DRC from complaints raised by the public. The Pennsylvania Department of Environmental Protection and the Montgomery County Conservation District also raised serious concerns with the County about DRC's adverse environmental impact within the Whitemarsh Site and Audubon Park. The County made these complaints and concerns known to DRC, and DRC admitted responsibility for its damage to the Whitemarsh Site:

- Mark Stafford, a Vice President of DRC, acknowledged DRC's responsibility by memorably exclaiming, "I'll tote the note!" during a meeting with County officials.
- DRC implemented limited emergency soil erosion controls and seeded and mulched the Site in an insufficient effort to mitigate the environmental damage they caused.
- Mark Stafford also agreed in an email dated January 3, 2022 that DRC would pay for the work of an engineering firm hired by the County (RK&K Engineering) to develop an erosion control plan and a restoration plan for the approximately 11 acre Site.

Ex. 18 (Email from Mark Stafford to Colleen Carmichael (Jan. 8, 2022)).

34

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

139.    DRC has since refused to take the actions stated by Mark Stafford in Exhibit 18, thereby reneging on its promise to restore the Whitemarsh Site.

140.    The County has since incurred additional expense of developing erosion control and restoration plans for Whitemarsh and Audubon Park, not including the cost of implementing immediate erosion control measures. Moreover, irreparable damage has occurred to a natural resource devoted to the public's use and enjoyment. Due to the Whitemarsh Site's and Audubon Park's proximity to local creeks, erosion and runoff damage has impacted other natural areas along the creeks, causing further damage to public property.

141.    The County has been damaged by the destruction to the Whitemarsh Site and Audubon Park in incurred costs for emergency repair, erosion control, and basic restoration, plus expected future costs for remediation necessary to prevent further destruction to these delicate ecosystems. Given these sites' designation as, and proximity to other, protected nature preserves, the County has also been irreparably damaged by the loss in value to the community's wooded parcels of mature trees that were once open for the public's enjoyment and recreation.

142.    Due to DRC's breach, the County has been damaged by at least $7.5 million of unreimbursable costs related to debris removal and collection activities.

143.    The dispute regarding environmental harms at County nature preserves, including Whitemarsh Site and Audubon Park, is additional to the FEMA reimbursement dispute.

144.    These damages are not attributable to FEMA's discretion or County error. FEMA's determinations repeatedly cite DRC's removal of ineligible debris as the basis for denial. The County relied on DRC for guidance in disaster debris removal and contracted to follow FEMA reimbursement requirements. Therefore, DRC breached its contract by exceeding its authorized

35

#125658674v1

scope, removing ineligible debris, damaging protected County property, and failing to ensure FEMA-eligible operations.

145. DRC knew or should have known that the central purpose of its Contract was to ensure FEMA-compliant debris removal after a federally declared disaster. As a direct and foreseeable consequence of DRC's breaches, the County incurred consequential damages including unreimbursed disaster recovery costs, environmental remediation expenses, consulting and administrative costs associated with FEMA appeals and compliance efforts, and substantial expenditures of County funds necessary to address and remediate DRC's deficient performance.

## COUNT II
### *DebrisTech's Breach of Contract*

146. The foregoing paragraphs are incorporated by reference as if set forth herein.

147. Right after Hurricane Ida hit Montgomery County, the County entered into its Independent Contractor Agreement with DebrisTech to act as the County's contracted debris removal monitor to oversee debris management activities. The DebrisTech Contract established its essential terms in Exhibit A, the "Scope of Services." Among other things, DebrisTech was required to "coordinate daily briefings, work progress, staffing, and other key items with the County." Ex. 2, Scope of Services, § A(b).

148. DebrisTech, more importantly, was hired to monitor recovery contractor operations and make/implement recommendations to improve efficiency and speed up recovery work. *Id.* § A(f).

149. DebrisTech established itself as an expert in debris management functions, including monitoring services, and the DebrisTech Contract further touted its "Electronic Ticketing System" with a primary purpose of "providing the County with complete documentation of every load of debris generated for auditing and reimbursement purposes."

36

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

150.    DebrisTech portrayed itself as a disaster recovery consultant "utilizing [its] in-house Electronic Debris Management System[,]" which allows it to provide "quality personnel management and debris monitoring services." *See* Ex. 10 (Screenshot of DebrisTech website as of December 2021). On its website, DebrisTech further represented that "all of [its] clients have received 100% of their reimbursement for all work [DebrisTech] performed." *Id.*

151.    While FEMA obligates reimbursement applicants (i.e., the County) to monitor disaster debris collection and removal, FEMA also permits—even encourages—applicants to outsource monitoring to hired contractors. Thus, the County hired DebrisTech to monitor its disaster debris collection and removal functions to first and foremost comply with the FEMA Policy Guide to ensure that the collected and removed disaster debris complied with FEMA's cost reimbursement protocols. The DebrisTech Contract further recognized this expectation. *See* Ex. 2, Scope of Services, § II.A (Disaster Debris Monitoring Services).

152.    In its Scope of Services, the DebrisTech Contract outlines numerous functions DebrisTech would be responsible for to support FEMA reimbursement activities. *Id.* For example, in subsection A(f) of the Scope of Services, DebrisTech represented it would "[m]onitor recovery contractor operations and mak[e]/implement[] recommendations to improve efficiency and speed up recovery work. *Id.*, Scope of Services, § II.A(f). And, in subsection A(i), DebrisTech stated it "shall utilize an Electronic Ticketing System to generate debris load tickets for each load of debris generated." "The purpose of the Electronic Ticketing System is to provide the County with complete documentation of every load of debris generated for auditing and reimbursement purposes." *Id.*, Scope of Services, § II.A(i).

153.    Since FEMA's Public Assistance is a reimbursement-based program, the County was required to front the costs associated with the disaster debris collection, removal, and

37

#125658674v1

monitoring services. DebrisTech, as the debris monitor, was responsible for reconciling DRC's invoices to ensure the debris collection and removal costs were appropriate and ultimately reimbursable.

154.    Therefore, in certifying DRC's invoices for payment, DebrisTech was also certifying that the debris collected and removed was properly documented and eligible for reimbursement. Similarly, by submitting its own invoices for payment, DebrisTech was certifying its services complied with FEMA standards.

155.    DebrisTech also agreed to prepare project worksheets and "other pertinent report preparation required for reimbursement by FEMA, FHWA and any other applicable agency for disaster recovery efforts by County staff and designated debris removal contractors." *Id.*, Scope of Services § II.A(m). DebrisTech represented it would assist the County with its final report preparations and appeal assistance in the unlikely chance of FEMA reimbursement denials.

156.    DebrisTech failed to abide by its Contract terms. The County did not receive complete documentation to support reimbursable recovery operations, nor did DebrisTech assist the County in preparing its report or subsequent appeals.  Lastly, due to the vast deforestation conducted by DRC and the denial of over half of the County's FEMA reimbursement requests, DebrisTech failed to properly monitor disaster relief operations across the County.

157.    Under DebrisTech's supervision, DRC removed nearly every tree and other vegetation at the Whitemarsh Site and Audubon Park without proper notice to the County. DebrisTech failed to abide by its own Scope of Services (*see e.g. id.* at §§ II.A(b), (e), (f), (i), (l)), since the entirety of the Whitemarsh Site and Audubon Park are considered unimproved natural woodlands and would have been ineligible for FEMA reimbursement in their entirety.

38

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

158.    Furthermore, the vast majority of load ticket documentation prepared by DebrisTech also categorized debris from the Whitemarsh Site as "waterway debris" despite the fact that the site itself is not a waterway but is only bordered by a local creek. Therefore, not only was the Whitemarsh Site not eligible for disaster debris removal, but the debris collected and removed was improperly classified.

159.    The County has since incurred additional expenses developing erosion control and restoration plans for Whitemarsh and Audubon Park, not including the cost of implementing erosion control measures and ultimate restoration. Moreover, irreparable damage has occurred to a natural resource devoted to the public's use and enjoyment. Due to the Whitemarsh Site's and Audubon Park's proximity to local creeks, erosion and runoff damage has impacted other natural areas along the creeks, causing further damage to public property.

160.    The County has been damaged by the destruction to the Whitemarsh Site and Audubon Park in incurred costs for emergency repair, erosion control, and basic restoration, plus expected future costs for remediation necessary to prevent further destruction to these delicate ecosystems. Given these sites' designation as, and proximity to other, protected nature preserves, the County has also been irreparably damaged by the loss in value to the community's wooded parcels of mature trees that were once open for the public's enjoyment and recreation.

161.    These damages are not attributable to FEMA's discretion or County error. FEMA's determinations repeatedly cite DebrisTech's improper classification of ineligible debris as the basis for denial. The County relied on DebrisTech as its contracted monitor to follow FEMA reimbursement requirements. Therefore, DebrisTech breached its contract by failing to monitor disaster recovery operations, damaging protected County property, and failing to ensure FEMA-eligible operations.

39

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

162.    In its First Appeal Determination, FEMA denied reimbursement as follows:

- Tree and Limb Direct Related Costs: 88.36 percent of the sample was found to be ineligible, resulting in a reduction of $2,099,150.60 from claimed cost of $2,235,620.00.
- Veg. Hauling, Reduction and Disposal Indirect Related Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $1,678,842.92 from claimed costs of $5,723,915.10.
- Monitoring Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $442,936.87 from claimed costs of $1,510,166.92.
- Waterway Debris Costs: One hundred percent of the sample was found to be ineligible resulting in $3,292,605.96 being subtracted from claimed costs, effectively reducing reimbursement eligibility of Waterway Debris Costs to zero. 38,421.80 Cubic Yards of Debris.

Ex. 14 at 2 (First Appeal Determination).

163.    "FEMA identified costs totaling $7,513,536.36 which the Applicant did not provide sufficient documentation to demonstrate were related to emergency measures necessary to address an immediate threat or justify the need for specialized equipment and labor." *Id*. Due to DebrisTech's failure to document whether the expenses were reimbursable, the County has been damaged by at least $7,513,536.36 of unreimbursable costs. The County has also expended significant funds in administrative, legal, and consulting costs associated with the FEMA appeals and dispute resolution.

164.    DebrisTech knew or should have known that the central purpose of its Contract was to ensure FEMA-compliant debris removal, monitoring, documentation, and reimbursement eligibility following a federally declared disaster. As a direct and foreseeable consequence of DebrisTech's breaches, the County incurred consequential damages including unreimbursed disaster recovery costs, environmental remediation expenses, consulting and administrative costs associated with FEMA appeals and compliance efforts, and substantial expenditure of County funds necessary to address and remediate DebrisTech's deficient performance.

40

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## COUNT III
### *DebrisTech's Fraud in the Inducement of Contract (in the alternative)*

165. The foregoing paragraphs are incorporated by reference as if set forth herein.

166. The DebrisTech Contract contains internally inconsistent provisions regarding the scope of DebrisTech's monitoring responsibilities.

167. On the one hand, the Contract provides that *the County* must establish project-related scope and eligibility through its authorized representative, and DebrisTech has no control over what trees and debris actually gets removed by the debris removal contractor. *See* Ex. 2 (DebrisTech Contract), §§ 5(a), 11.

168. On the other hand, the Contract's Scope of Services expressly provides that DebrisTech "will […] provide disaster debris monitoring services" for debris generated from public rights-of-way, private property, waterways, and other eligible areas, including responsibilities related to documentation, oversight, and FEMA reimbursement support. *See id.*, Scope of Services § II.A.

169. These provisions create a material ambiguity as to whether DebrisTech bore responsibility for actively monitoring debris removal operations for FEMA eligibility, or whether such responsibility was effectively disclaimed and shifted to third parties. *See id.*

170. For example, as part of its responsibilities to monitor field activities, DebrisTech hired field monitors with zero prior experience in disaster debris monitoring or removal services. Many of the field monitors hired by DebrisTech to oversee the complex nuances demanded for effective monitoring had never worked in the industry, were poorly trained to understand the technical nature of the work they were being asked to perform, and improperly classified debris when logging information into DebrisTech's documentation collection platform. *Compare id. with*

41

#125658674v1

Ex. 8 at 7 (DebrisTech fully understands "accurate and objective estimation of debris quantities;" "accurate differentiation of debris types;" and "effective and efficient communication.").

171.    Prior to executing the DebrisTech Contract, DebrisTech made specific representations to the County regarding the nature and scope of its monitoring responsibilities.

172.    In particular, DebrisTech represented that:

a.  It would actively monitor debris removal operations to ensure compliance with FEMA eligibility requirements;

b.  Its monitoring services would ensure that debris collected and removed was properly documented and eligible for reimbursement;

c.  Its systems and personnel would provide "absolute compliance" with FEMA documentation and reimbursement standards; and

d.  It's monitoring services had historically resulted in 100% reimbursement for previous clients.

Ex. 2 (DebrisTech Contract).

173.    DebrisTech presented these representations as defining the functional role it would perform under its contract with the County and the scope of responsibility it would assume as the County's disaster debris monitoring contractor.

174.    DebrisTech's representations were made for the purpose of inducing the County to enter into the DebrisTech Contract and to accept DebrisTech's interpretation of its monitoring obligations under that agreement.

175.    As a result of DebrisTech's representations, the County understood and reasonably believed that DebrisTech would:

a.  Exercise active field oversight over debris removal operations;

b.  Ensure that debris removal operations complied with FEMA eligibility reimbursement standards; and

c.  Generate and verify documentation sufficient to support FEMA reimbursement.

42

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

176. DebrisTech's prior representations resolve any ambiguity in favor of an interpretation whereby DebrisTech, as the retained debris monitoring contractor, bore primary responsibility for monitoring debris removal operations for FEMA compliance.

177. At the time these representations were made, DebrisTech knew that its contract did not clearly impose such monitoring responsibilities on DebrisTech.

178. Certain provisions of the DebrisTech Contract were drafted to limit or disclaim responsibility over debris monitoring operations. Thus, DebrisTech did not intend to assume the level of monitoring responsibility it represented to the County.

179. The County justifiably relied on DebrisTech's representations in entering into the DebrisTech Contract and adopting the understanding that DebrisTech was responsible for monitoring debris removal operations for FEMA Policy Guide compliance.

180. The County's reliance was reasonable in light of the ambiguity in the DebrisTech Contract's provisions regarding its monitoring responsibilities, DebrisTech's superior knowledge and expertise in disaster debris monitoring, and DebrisTech's affirmative representations regarding its role, capabilities, and historical performance for past customers.

181. Indeed, as an industry leader in disaster monitoring and documentation services, DebrisTech was responsible for overseeing DRC's operations, "making/implementing recommendations to improve efficiency and speed up recovery work[,]" and overseeing recordkeeping activities to "provide the County with complete documentation of every load of debris generated for auditing and reimbursement purposes." Ex. 2 at Scope of Services § II.A(i). Thus, DebrisTech's work must first and foremost comply with the Policy Guide.

182. The singular purpose for retaining a disaster debris monitoring contractor is to document debris collection and removal for FEMA reimbursement. Absent DebrisTech's

43

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

representations, the County would not have entered into a contract that allowed a purported monitoring contractor to evade responsibility and accountability for the exact services it was promising to provide.

183. As a direct and proximate result of DebrisTech's misrepresentations and the County's reliance on its induced interpretation of the DebrisTech Contract, FEMA denied reimbursement of approximately $7.5 million in disaster-related costs.

184. Because the DebrisTech Contract is ambiguous as to the scope of DebrisTech's monitoring obligations, parol evidence (including DebrisTech's pre-contract representations, the Disaster Monitoring RFP, and DebrisTech's Monitoring RFP Response) is admissible to establish the parties' understanding and intent.

185. Due to DebrisTech's fraud in the inducement, the County is entitled to resolve the ambiguity in the DebrisTech Contract to support its breach of contract claim. The County has been harmed by paying DebrisTech $1,510,166.92 for services that resulted in $7,513,536.36 of unreimbursable costs that failed FEMA's eligibility standards.

## COUNT IV
### *DebrisTech's Fraud in the Execution of Contract (in the alternative)*

186. The foregoing paragraphs are incorporated by reference as if set forth herein.

187. On August 25 2021, the County issued RFP #21-43, requesting sealed proposals for "Disaster Debris Monitoring Services." *See* Ex. 6 (Disaster Monitoring RFP).

188. The Disaster Monitoring RFP mirrored FEMA's Policy Guide to establish the responsibilities expected from a disaster debris monitoring contractor.

189. The Disaster Monitoring RFP required that any monitoring firm retained would "orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract

44

#125658674v1

requirements, and safety procedures. Collection monitors must carefully document debris collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement." *Id.*

190.    The FEMA Policy Guide outlines what activities are associated with debris monitoring services:

- Field supervisory oversight;
- Monitoring contracted debris removal at both loading and disposal sites;
- Compiling documentation, such as load tickets and monitor reports, to substantiate eligible debris; and,
- Training debris monitors on debris removal operations, monitoring responsibilities and documentation processes, and FEMA debris eligibility criteria.

Ex. 7 at 107.

191.    Thus according to the Disaster Monitoring RFP and FEMA's Policy Guide, at all times the County's chosen disaster debris monitoring contractor was required to monitor disaster debris removal activities for FEMA eligibility and conduct field supervisory oversight to ensure that eligible debris was properly documented at both loading and disposal sites.

192.    In early September 2021, in the wake of Hurricane Ida's destruction, as the County embarked on its months-long journey to cleanup and restore public and private property devastated by tornado-force winds, rampant flooding, and power outages to tens of thousands of County residents, the County was authorized to hire DebrisTech as its debris collection and removal monitoring firm through Resolution 21-C.492. This allowed the County to expedite retention of a disaster debris monitoring contractor under emergency procurement processes.

193.    On September 6, 2021, DebrisTech formally responded to RFP #21-43. In its response, DebrisTech represented that its debris removal monitoring process "ensur[es] FEMA compliance." *See* Ex. 8, DebrisTech RFP Response at 3. "DebrisTech's Debris Monitoring System

45

Documentation will verify to FEMA that your debris removal operations are eligible for reimbursement, costs are reasonable, contract and procurement processes are appropriate, quantification of the debris is accurate, and the tracking of debris to its final disposition is recorded and in absolute compliance with all regulatory requirements." *Id.*

194. To obtain the County's business, DebrisTech portrayed itself as a disaster recovery consultant "utilizing [its] in-house Electronic Debris Management System[,]" which allows it to provide "quality personnel management and debris monitoring services." Ex. 10 (Screenshot of DebrisTech website as of December 2021). On its website, DebrisTech further represented that "all of [its] clients have received 100% of their reimbursement for all work [DebrisTech] performed." *Id.*

195. Indeed, one of the requirements under the Disaster Monitoring RFP was that the selected monitoring firm would ensure compliance with FEMA's public assistance eligibility, and DebrisTech represented that it was capable of "oversee[ing] documentation requirements as outlined by FEMA." *Id.*

196. In its Disaster Monitoring RFP Response, DebrisTech "certifie[d] that it ha[d] the specific experience providing disaster debris monitoring following natural or manmade disasters." Ex. 8 at 5.

197. Similar to representations made on its website, DebrisTech also established in its Disaster Monitoring RFP Response that it was "not currently involved in and has not had any claims, arbitrations, administrative hearings, or lawsuits related to debris monitoring, disaster recovery, or consulting brought against [it]." *Id.*

46

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

198. DebrisTech did not present these statements as mere marketing material. These statements defined the nature of the services it would provide to the County and the overall reliability of its disaster debris removal monitoring functions.

199. As a result of DebrisTech's representations, the County understood DebrisTech's role as a "monitor" to include responsibility for ensuring that debris removal activities were properly documented and limited to FEMA-eligible work sufficient to support reimbursement—a result that DebrisTech ensured the County it received for 100% of its past customers.

200. Therefore, DebrisTech's prior representations that 100% of its past clients received full reimbursement for disaster recovery operations, and that it had never been sued, further supported the County's decision to retain DebrisTech. *See also* Ex. 11 (DebrisTech Bid Tabulation).

201. The DebrisTech RFP Response further established that "[its] debris monitors understand FEMA policies and guidelines, including eligibility issues and specifically those relating to debris." Ex. 8 at 3.

202. "DebrisTech will identify possible health/safety risks, verify operational compliance with FEMA eligibility criteria, check debris loading, staging, reduction, and disposal sites to ensure compliance with [Public Assistance] eligibility criteria, validate truck and trailer capacity certifications, evaluate operational efficiency, and oversee documentation requirements as outlined by FEMA." *Id.*

203. At the time of execution, the DebrisTech Contract did not contain any express provision assigning responsibility to DebrisTech for ensuring that debris removal activities complied with FEMA eligibility requirements, that monitoring documentation would be sufficient

47

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

to support reimbursement, or that DebrisTech would bear responsibility for reimbursement denial resulting from deficient monitoring.

204.    Indeed, when the DebrisTech Contract was signed on September 10, 2021, notably absent from its Scope of Services was any definitive responsibility for DebrisTech to actually monitor disaster debris removal activities for FEMA compliance. *See generally* Ex. 2.

205.    In other sections throughout the Contract, DebrisTech intentionally shifts its responsibilities to perform under its own contract to the County and DRC. *See id.* § 11; Scope of Services § II.A. Despite the contract being framed as providing disaster debris monitoring services, DebrisTech phrased its Scope of Services as optional ("Specific services may include[,]" *id.*).

206.    By intentionally removing itself from liability under its own contract, DebrisTech has evaded the spirit of the bargain. The underlying and material purpose of the DebrisTech Contract based on the initial Disaster Monitoring RFP and DebrisTech's RFP Response required that any debris removed and monitored would be done in compliance with FEMA standards to support later reimbursement efforts. The County specifically relied on DebrisTech's representations when it signed the DebrisTech Contract. Thus, DebrisTech's intent to shield itself from contractual liability for its failure to perform violates public policy, is a material misrepresentation based on its prior representations, and cannot stand.

207.    The DebrisTech Contract did not expressly allocate responsibility to DebrisTech to ensure FEMA-compliant monitoring.

208.    Therefore, DebrisTech did not disclose to the County, at or before execution, that the agreement omitted provisions requiring DebrisTech to do its job or that the risk of non-reimbursement would remain entirely with the County.

#125658674v1

209. In another example, instead of providing proper field oversight, DebrisTech hired field monitors with zero prior experience in disaster debris monitoring or removal services. Many of the field monitors hired by DebrisTech to oversee the complex nuances demanded for effective monitoring had never worked in the industry and were poorly trained to understand the technical nature of the work they were being asked to perform. *Compare id. with* Ex. 8 at 7 (DebrisTech fully understands "accurate and objective estimation of debris quantities;" "accurate differentiation of debris types;" and "effective and efficient communication.").

210. As drafted, the DebrisTech Contract does not impose any express obligation on DebrisTech to ensure reimbursement eligibility, guarantee documentation sufficiency, or bear responsibility for reimbursement denials resulting from substandard monitoring.

211. DebrisTech further failed to disclose to the County that, notwithstanding its representations regarding "100% reimbursement" for past clients and its monitoring expertise, the DebrisTech Contract did not obligate DebrisTech to achieve or ensure FEMA-compliant outcomes or reimbursement eligibility.

212. These above omissions are material because they relate to the essential purpose underlying the DebrisTech Contract.

213. The County reasonably believed that the DebrisTech Contract reflected DebrisTech's represented role as an expert in the disaster relief industry capable of properly monitoring for FEMA-eligible debris removal and capturing sufficient documentation to support the County's reimbursement efforts. The County justifiably relied on DebrisTech's ability to deliver accurate monitoring services under the DebrisTech Contract.

49

#125658674v1

214.    In fact, the DebrisTech Contract, as drafted, did not embody that understanding and instead left the County exposed to the precise risk that DebrisTech previously represented it would mitigate.

215.    The County would not have executed the DebrisTech Contract had DebrisTech disclosed the true nature and effect of its Contract at the time of execution. *See, e.g.*, Ex. 11 (DebrisTech Bid Tabulation detailing factors the County considered important for a monitoring contractor).

216.    Due to DebrisTech's fraud in the execution of its contract, the County seeks reformation of the DebrisTech Contract to add fraudulently omitted terms establishing DebrisTech's responsibility to monitor the County's disaster debris removal activities for FEMA compliance.

## COUNT V
### *Violations of Pennsylvania's Environmental Rights Amendment, Pa. Const. art. I, § 27*

217.    The foregoing paragraphs are incorporated by reference as if set forth herein.

218.    Through their above-described acts and omissions, DRC and DebrisTech acted to deprive the people of Montgomery County of their constitutional rights to access public natural resources.

219.    Article I, section 27 of the Pennsylvania Constitution, known as the Environmental Rights Amendment ("ERA"), declares:

> The people have a right to clean air, pure water, and to the preservation of the natural scenic, historic, and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As a trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

50

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

220. The ERA establishes a common law trust, with all agencies and entities of the Commonwealth government, both statewide and local, as trustees and the public natural resources of the Commonwealth as the corpus of the trust. The people, including future generations, are the named beneficiaries of that trust.

221. The ERA charges the trustees with the duty to conserve and maintain the public natural resources.

222. Public natural resources include, for example, groundwater, surface water, trees, soil, and wildlife living in dedicated nature preserves, like the Whitemarsh Site and Audubon Park.

223. The County, as a local government entity of the Commonwealth, is a trustee of the public natural resources of the Commonwealth and is vested with the fiduciary duty to conserve and maintain them for the benefit of the people of Montgomery County.

224. As contractors hired to work on behalf of the County, Defendants DRC and DebrisTech owed a duty to the County and its constituents to exercise due care and restraint in executing their disaster debris removal obligations.

225. Despite Defendants' vast proclaimed knowledge, expertise, and experience in the disaster debris recovery industry, Defendants' actions within the County caused a significant loss in public natural resources by overharvesting trees and improperly monitoring to "verify operational compliance with FEMA eligibility criteria." *See* Ex. 8 at 3. These actions yielded over $7.5 million in denied FEMA reimbursement claims—in other words, Defendants charged the County, and its taxpayers, over $7.5 million to remove improperly documented trees and protected natural resources. Defendants' actions interfered with the County's trustee obligations.

226. Additionally, Defendants' acts caused irreparable harm to the Whitemarsh Site and Audubon Park, two dedicated nature preserves that would not have been eligible for FEMA

51

#125658674v1

reimbursement due to their classification as unimproved natural areas. The Whitemarsh Site and Audubon Park contained many hundreds of mature trees that are incapable of being replaced within this generation.

227.    As a trustee of the public natural resources, the County has been damaged as a result of Defendants' destruction and removal of the above-described resources; therefore, Defendants' actions and/or inactions as described herein constitute an unlawful violation of the ERA and demonstrate a wholly wanton disregard of the rights of the beneficiaries to the natural trust.

228.    As a direct and proximate result of Defendants' actions, the County has incurred, and continues to incur, costs and damages related to remediation, preservation, and ongoing maintenance costs, and legal fees.

229.    Additionally, because Defendants acted with wonton disregard of the consequences of their conduct and its foreseeable impact upon the County's natural resources, the County is entitled to punitive damages.

### PRAYER FOR RELIEF

230.    The foregoing paragraphs are incorporated by reference as if set forth.

231.    The County prays for judgment against Defendants DRC and DebrisTech, jointly and severally, as follows:

    a.    Enter an Order, requiring DRC and DebrisTech to reimburse the County $7,513,536.35 in excess costs that was determined to be ineligible for FEMA reimbursement due to Defendants' failure to follow FEMA's Policy Guide and/or properly document eligible debris;

    b.    Enter an Order requiring DRC and DebrisTech to restore the Whitemarsh Site, Audubon Park, and other nature preserved referenced in the County's Aug. 4, 2025

52

#125658674v1

Notice of Dispute Letter (Ex. 21), including costs associated with soil grading and draining, structure repair, landscaping for soil protection, habitat remediation, and tree and vegetation replacement;

c. Such other and further relief as the Court deems just and proper.

232. The County further seeks the following:

a. (In the alternative) An Order resolving the ambiguity in the DebrisTech Contract to unequivocally establish that DebrisTech was responsible for determining FEMA eligibility for all disaster debris removed;

b. (In the alternative) An Order reforming the DebrisTech Contract to add fraudulently omitted terms establishing DebrisTech's responsibility to monitor the County's disaster debris removal activities for FEMA eligibility.

c. Compensatory damages, including costs and expenses related to the damage caused to the County's public natural resources, including but not limited to, the Whitemarsh Site and Audubon Park, including the value of any and all trees removed from County properties that were deemed ineligible for FEMA reimbursement;

d. Consequential damages;

e. Punitive damages,

f. Costs, disbursements, and attorneys' fees of this lawsuit;

g. Pre-judgment and post-judgment interest;

h. Any other and further relief as the Court deems just, proper, and equitable.

53

#125658674v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Date: May 27, 2026

Respectfully submitted,

**OFFICE OF THE SOLICITOR
MONTGOMERY COUNTY, PA**
Benjamin H. Field, Esquire
Philip W. Newcomer, Esquire
Alexa Levy, Esquire
Montgomery County Courthouse
P.O. Box 311
Norristown, Pennsylvania 19404
Tel.: (610) 278-3033
Fax: (610) 278-3069
benjamin.field@montgomerycountypa.gov
philip.newcomer@montgomerycountypa.gov
alexa.levy@montgomerycountypa.gov

**DILWORTH PAXSON LLP**
Jerry R. DeSiderato (Pa. ID No. 201097)
Timothy J. Ford (Pa. ID No. 325290)
Stanford B. Ponson (Pa ID No. 322548)
1650 Market Street, Suite 1200
Philadelphia, Pennsylvania 19103
Tel.: (215) 575-7000
Fax: (215) 574-4603
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
sponson@dilworthlaw.com

*Attorneys for Plaintiff, County of Montgomery*

54

#125658674v1

Docusign Envelope ID: 18F794BC-6B94-8648-8306-C505A8EAE9A0

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VERIFICATION

I, _Lee Soltysiak_____, verify that the statements made in the foregoing

Complaint are true and correct to the best of my knowledge, information, and belief. I make this

verification subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to

authorities.


Dated: _5/27/2026_____

Signed by:

*Lee Soltysiak*

3B66B931C326408...

Name: Lee Soltysiak

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT

# 1

Resolution No. __19 C.349____

# CONTRACT
# FOR
## Disaster Debris Clearance and Removal Services

**THIS CONTRACT** for the provision of **Disaster Debris Clearance and Removal Services** ("Contract") is entered into this _____ day of _____, 201_, by and between the **County of Montgomery** ("County"), and **DRC Emergency Services LLC** ("Contractor").

**WHEREAS,** The County issued a Request For Proposals ("RFP") for the provision of **Disaster Debris Clearance and Removal Services** for County, RFP No. 19-23; and

**WHEREAS,** Contractor submitted a proposal in response to the RFP; and

**WHEREAS,** the County Commissioners determined that Contractor's proposal was the most advantageous to the County after taking into consideration all of the evaluation factors set forth in the RFP and selected Contractor for award; and

**WHEREAS,** the County Commissioners memorialized the award through the passage of Resolution No. 19 C.349; and

**WHEREAS,** County and Contractor have negotiated this Contract as their final and entire agreement in regard to providing **Disaster Debris Clearance and Removal Services** to the County.

**NOW THEREFORE,** intending to be legally bound hereby, County and Contractor agree as follows:

1.     The Term of this contract shall be for two (2) years beginning December 1, 2019 to November 30, 2021, with three (3) one (1) year optional renewals.

2.     Event pricing is as per the Logistical Services fee schedule submitted with Contractor shall, in accordance with the terms and conditions of this Contract, provide **Disaster Debris Clearance and Removal Services** to the County as more fully defined in the attached Statement of Work, attached hereto as Exhibit B, and the corresponding PublicPurchase.com bid site, including all posted questions and answers, addendums, drawings etc.

3.     Contractor agrees to provide the **Disaster Debris Clearance and Removal Services** at the price listed in its Cost Submittal, which is attached hereto as Exhibit C.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

4.      The County's Standard Terms and Conditions contained in Exhibit A shall apply to this contract.

5.      The Contract between the parties is comprised of the following documents, which are listed in order of precedence in the event of a conflict between these documents:

     a)    This Contract document.

     b)    The Standard Contract Terms and Conditions contained in Exhibit A.

     c)    The Contractor's Cost Submittal contained in Exhibit C.

     d)    The Statement of Work contained in Exhibit B.

     e)    The Contractor's Technical Submittal contained in Exhibit C.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN WITNESS WHEREOF**, the parties hereto have signed this Contract the day and year first above written.  Execution by the County will be as described in the Standard Contract Terms and Conditions.

Attest

COUNTY OF MONTGOMERY     (SEAL)

By.................................................

.................................................

.................................................

Montgomery County Commissioners

Chief Clerk

DRC Emergency Services, LLC
.................................................
Contractor

(x)
By.................................................
Contractor                    Co-Partner

(x) .................................................
Witness to Principal

Approved as to Form:
.................................................
County Solicitor

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

**STANDARD CONTRACT
TERMS AND CONDITIONS FOR SERVICES
– ELECTRONIC CONTRACT –**

**1. SCOPE**

This form has been pre-approved by the Montgomery County Solicitor as indicated by the version number indicated in the header. Provided that that the County's Standard Contract and Signature page is used to memorialize this contract, and that no changes have been made to the text below, no additional Solicitor approval is required.

The version number contained on the header of this document shall govern the contents of these Terms and Conditions, and in the event of any discrepancy between the official version contained on the County's website and the text below, the version on the website shall control unless the signature of the Montgomery County Solicitor or his designee accompanies the change.

Note that failure to include this paragraph without a Solicitor signature shall not relieve Contractor of the terms below, provided this document was included in the advertised solicitation or procurement that gave rise to this Contract or was otherwise publically advertised in a manner such that the Contractor knew or should have known that these provisions are applicable to the Contract.

**2. DEFINITIONS**

As used in this Contract, these words shall have the following meanings:

a. County: The department, board, commission, row office or other agency of the County of Montgomery listed as the Purchasing Agency.

b. Contracting Officer: The person authorized to administer this Contract for the County and to make written determinations with respect to the Contract.

c. Days: Unless specifically indicated otherwise, days mean calendar days.

d. Developed Materials: All documents, sketches, drawings, designs, works, papers, files, reports, computer programs, computer documentation, data, records, software, samples or any other tangible material without limitation authored or prepared by Contractor as the work product covered in the scope of work for the Project.

e. Documentation: All materials required to support and convey information about the Services required by this Contract. It includes, but is not necessarily restricted to, written reports and analyses, diagrams, maps, logical and physical designs, system designs, computer programs, flow charts, disks, and/or other machine-readable storage media.

f. Services: All Contractor activity necessary to satisfy the Contract.

g. Statement of Work: Shall refer to any statement of work attached to the contract, as well as all material posted to the PublicPurchase.com or other website used to advertise the Invitation for Bid, Request for Proposal, Statement of Interest or other solicitation that resulted in this Contract, including any and all questions and answers.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

    h.  Supplies:  All tangible and intangible property including, but not limited to materials and equipment, provided by the Contractor to satisfy the Contract.

**3.  TERM OF CONTRACT**

The term of the Contract shall commence on the Effective Date (as defined below) and shall end on the Expiration Date identified in the Contract, subject to the other provisions of the Contract. If no Expiration Date is specified, the Term of the Contract shall be one year from the Effective Date and shall be extendable up to five years on terms negotiated between the parties.

The Effective Date shall be: a) the Effective Date printed on the Contract after the Contract has been fully executed by the Contractor and the County; or b) the "Valid from" date printed in the Statement of Work/Specification, whichever is later.

**4.  EXTENSION OF CONTRACT TERM**

The County reserves the right, upon notice to the Contractor, to extend the term of the Contract for up to three (3) months upon the same terms and conditions.

**5.  SIGNATURES**

This Contract shall not be a legally binding contract until the fully-executed Contract has been sent to the Contractor. No County employee has the authority to verbally direct commencement of any work or delivery of any supply under this Contract prior to the Effective Date. The Contractor hereby waives any claim or cause of action for any services or work performed prior to the Effective Date.

The fully-executed Contract may be sent to the Contractor via facsimile, email, first class mail or other means as agreed to between the parties. The Contract will not be considered fully-executed unless it has a resolution number written across the top of it, Contractor's signature, and the signature of a Commissioner or Commissioner Designee. If the enabling resolution for this Contract does not have a resolution number at the time the County needs to start work, the Contract will be considered valid if the top of the contract indicates that a resolution number is pending and states the date the resolution was passed. The Contract may be updated to include the resolution number without notice unless prior written objection has been provided.

Neither party shall contest the admissibility of copies of a genuine Contract or acknowledgements under either the business records exception to the hearsay rule or the best evidence rule on the basis that the Contract or acknowledgement were not in writing or signed by the parties. A Contract or acknowledgment shall be deemed to be genuine for all purposes if it is transmitted to the location designated for such documents. Each party will immediately take steps to verify any document that appears to be obviously garbled in transmission or improperly formatted to include re-transmission of any such document if necessary.

**6.  INDEPENDENT PRIME CONTRACTOR**

In performing its obligations under the Contract, the Contractor will act as an independent contractor and not as an employee or agent of the County. The Contractor will be responsible for all Services in this Contract whether or not Contractor provides them directly. Further, the Contractor is the sole point of contact with regard to all contractual matters, including payment of any and all charges resulting from the Contract.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**7. SUBCONTRACTS**

The Contractor may subcontract any portion of the Services described in this Contract to third parties selected by Contractor if the Subcontractor is approved in writing by the County or the Subcontractor(s) and their role were disclosed in the Contractor's bid/proposal, and the bid/proposal was accepted without reservation as to the issue of Subcontractor(s). Approval for Subcontractor(s) will not be unreasonably withheld by the County.

Upon request of the County, the Contractor must provide the County with a copy of the subcontract agreement between the Contractor and Subcontractor(s). The County reserves the right, for good cause, to require that the Contractor remove a subcontractor from the project. The County will not be responsible for any costs incurred by the Contractor in replacing the subcontractor if good cause exists.

**8. OTHER CONTRACTORS**

The County may undertake or award other contracts for additional, alternate or related work or supplies, and the Contractor shall fully cooperate with other contractors and County employees, and coordinate its Services with such additional work as may be required.

**9. DELIVERY**

**Delivery of Services:** The Contractor shall proceed with all due diligence in the performance of the Services with qualified personnel, in accordance with the completion criteria set forth in the Contract.

**10. PRODUCT CONFORMANCE**

The County reserves the right to require any and all Contractors to:

a. Provide certified data from laboratory testing performed by the Contractor, or performed by an independent laboratory, as specified by the County.

b. Supply published manufacturer product Documentation.

c. Permit a County representative to witness testing at the Contractor's location or at an independent laboratory.

**11. ACCEPTANCE**

**Services:** Acceptance of Developed Materials will occur in accordance with a Deliverable Approval Plan submitted by the Contactor and approved by the County. Upon approval of the plan by the County, the Deliverable Approval Plan becomes part of this Contract.

**12. ESTIMATED QUANTITIES**

Unless explicitly stated, it shall be understood and agreed that any quantities listed in the Contract are estimated only and may be increased or decreased in accordance with the actual requirements of the County and that the County in accepting any bid or portion thereof, contracts only and agrees to purchase only the materials and services in such quantities as represent the actual requirements of the County.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

13. **WARRANTIES**

    a. The Contractor warrants all Services performed by the Contractor, its agents and subcontractors shall conform in all material respects to the functional specifications and requirements of the Contract. If any supplies are provided, Contractor agrees to extend to the County all manufacturer warranties covering those supplies to the best of Contractor's ability.

    b. The Contractor hereby represents and warrants to the County that the Contractor will not cause, or take any action that may directly or indirectly cause a disruption of the County's operations that is not clearly envisioned by the Contract.

    c. Contractor warrants that it has the necessary legal rights, including licenses to third party products, tools or materials, to perform the Services and deliver the Supplies and Developed Materials under this Contract.

    d. THE FOREGOING EXPRESS WARRANTIES ARE THE CONTRACTOR'S SOLE AND EXCLUSIVE WARRANTIES AND NO OTHER WARRANTIES, EXPRESS OR IMPLIED, SHALL APPLY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

    e. All warranties shall survive final acceptance.

14. **COMPENSATION**

**Compensation for Services:** The Contractor shall be required to perform the specified Services at the price(s) quoted in the Contract. All Services shall be performed within the time period(s) specified in the Contract. The Contractor shall be compensated only for work performed to the satisfaction of the County. The Contractor shall not be allowed or paid travel or per diem expenses except as specifically set forth in the Contract.

15. **PAYMENT**

Unless stated otherwise, payments shall be made to the Contractor within thirty (30) days of receipt of invoice, after inspection and acceptance of the material and/or work by an authorized representative of the   Commissioners, and approval of the invoice by the Controller.  Where partial delivery is made, invoice for such part shall be made upon delivery, and payment made within thirty (30) days under conditions as above. County shall have the right to offset from all payments any amounts owed to the County for back taxes or other delinquent fees, fines or liens owed to the County.

16. **TAXES**

The County is exempt from State and Local Sales and Use Taxes.

17. **INSURANCE**

    a. Contractor shall maintain adequate public liability, property damage, malpractice and workers compensation insurances, insuring as they may appear in the interest of all parties to said contract.  CERTIFICATION OF SAID INSURANCE COVERAGE SHALL BE SUBMITTED TO THE COUNTY AT THE TIME OF THE EXECUTION OF THE CONTRACT BY CONTRACTOR.  County shall be named as an additional insured on certificate of insurance provided.  If the additional

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

insured requirement must be endorsed then the endorsement must accompany the insurance certificate.

b.  Contractor shall upon request annually provide the County with a certificate of insurance as noted below in paragraph G, with the Contract Number or Solicitation (Specification or RFP) Number clearly noted on said certificate of insurance.

c.  Contractor will notify County immediately in writing when it knows or should have known that its insurance policy is or will be canceled, not renewed, or reduced.

d.  If Contractor desires to self-insure any or all of the coverage listed in this section, except where prohibited by law, it shall provide to the County documentation that such self-insurance has received all the approvals required by law or regulations, as well as the most recent audited financial statement of the Contractor's insurance. Any coverage, which is self-insured, shall provide the same coverage limits and benefits as the coverage listed in this section.

e.  If Contractor fails to provide such required insurance coverage and/or adequate proof of current coverage in amounts required, the County shall have the right to treat such failure as a material breach of the contract and to exercise all appropriate rights and remedies.

f.  The County reserves the right to review categories and levels of insurance coverage held by the Contractor in an ongoing program of risk management. The Contractor will be notified, in writing, of coverage requirements as determined by this review and Contractor agrees to secure such requested coverage.

g.  Unless either: (1) general industry practice calls for amounts less than those listed below and such practice can be demonstrated, or (2) the amounts are changed through mutual written agreement, Contractor should have the insurance detailed below:

Commercial General Liability - Each policy and Certificate of Insurance shall contain an endorsement naming the County of Montgomery as an additional insured party.

> $1,000,000 Each Occurrence
> $2,000,000 General Aggregate
> $2,000,000 Products/Completed Operations Aggregate
> $1,000,000 Personal/Advertising Injury
>
> (Any restrictive endorsements must be included)

Workers Compensation
> PA Statutory Coverage
> Employers Liability - Basic Limits

Business Automobile Policy (required only if contract involves transportation of goods or persons)
> $1,000,000 Each Accident Limit

PAGE 5 of 15

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

Professional Errors and Omissions Liability (required only if contract involves performance of a recognized professional service)

$1,000,000 Each Occurrence
$1,000,000 Each Aggregate

Medical Malpractice Insurance (required only if contract involves performance of a member of the medical profession. Those in the medical professions must also provide evidence of participation in the MCARE in the amounts noted below)

$ 1,000,000.00 Each Occurrence
$ 3,000,000.00 Each Aggregate

18. **CONFIDENTIALITY**
   a. The Contractor agrees to protect the confidentiality of the County's confidential information. The County agrees to protect the confidentiality of Contractor's confidential information.

   b. The Contractor shall use the following process when submitting information to the County it believes to be confidential and/or proprietary information or trade secrets:

      1) Prepare an un-redacted version of the appropriate document, and;

      2) Prepare a redacted version of the document that redacts the information that is asserted to be confidential or proprietary information or a trade secret.

   c. Prepare a signed written statement that states:

      1) The attached document contains confidential or proprietary information or trade secrets;

      2) the Contractor is submitting the document in both redacted and un-redacted format in accordance with 65 P.S. § 67.707(b); and

      3) the Contractor is requesting that the document be considered exempt under 65 P.S. § 67.708(b)(11) from public records requests.

   d. Submit the two documents along with the signed written statement to the County.

19. **SENSITIVE INFORMATION**
   a. The Contractor shall not publish or otherwise disclose, except to the County or the Contractor's subcontractors and except matters of public record (which is to be determined entirely in the discretion of the County), any information or data obtained hereunder from private individuals, organizations, or public agencies.

   b. The parties shall not use or disclose any information about a recipient receiving services from, or otherwise enrolled in, a County program affected by or benefiting from Services under this Contract for any purpose not connected with the parties' Contract responsibilities except with consent pursuant to applicable state and federal law and regulations. All documents

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

associated with direct disclosures of this kind must be announced to and open for inspection by the County.

c.  Rights and obligations of the parties under this Section survive the expiration or termination of this Contract

## 20.  COUNTY HELD HARMLESS

a.  The Contractor shall hold the County harmless from and indemnify the County against any and all third party claims, demands and actions based upon or arising out of any activities performed by the Contractor and its employees and agents under this Contract, provided the County gives Contractor prompt notice of any such claim of which it learns.

b.  Notwithstanding the above, neither party shall enter into any settlement without the other party's written consent, which shall not be unreasonably withheld. The County may, in its sole discretion, allow the Contractor to control the defense and any related settlement negotiations. In addition to the foregoing indemnity obligation, Contractor shall indemnify the County for any and all costs associated with establishing or enforcing this indemnity obligation.

## 21.  DEFAULT

a.  The County may, subject to the Force Majeure provisions of this Contract, and in addition to its other rights under the Contract, declare the Contractor in default by written notice thereof to the Contractor, and terminate (as provided in the Termination Provisions of this Contract) the whole or any part of this Contract or any Purchase Order for any of the following reasons:

1)  Failure to begin work within the time specified in the Contract or Purchase Order or as otherwise specified;

2)  Failure to perform the work with sufficient labor, equipment, or material to insure the completion of the specified work in accordance with the Contract or Purchase Order terms;

3)  Unsatisfactory performance of the work;

4)  Failure to deliver the awarded item(s) within the time specified in the Contract or Purchase Order or as otherwise specified;

5)  Improper delivery;

6)  Failure to provide an item(s) which is in conformance with the specifications referenced in the Contract or Purchase Order;

7)  Delivery of a defective item;

8)  Failure or refusal to remove material, or remove and replace any work rejected as defective or unsatisfactory;

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

9) Discontinuance of work without approval;

10) Failure to resume work, which has been discontinued, within a reasonable time after notice to do so;

11) Insolvency or bankruptcy;

12) Assignment made for the benefit of creditors;

13) Failure or refusal within 10 days after written notice by the Contracting Officer, to make payment or show cause why payment should not be made, of any amounts due for materials furnished, labor supplied or performed, for equipment rentals, or for utility services rendered;

14) Failure to protect, to repair, or to make good any damage or injury to property;

15) Breach of any provision of the Contract;

16) Failure to comply with representations made in the Contractor's bid/proposal;

17) Failure to comply with applicable industry standards, customs, and practice.

b. In the event that the County terminates this Contract or any Purchase Order in whole or in part as provided in Subparagraph a. above, the County may procure, upon such terms and in such manner as it determines, Supplies and/or Services similar or identical to those so terminated, and the Contractor shall be liable to the County for any reasonable excess costs for such similar or identical items included within the terminated part of the Contract or Purchase Order.

c. If the Contract or a Purchase Order is terminated as provided in Subparagraph a. above, the County, in addition to any other rights provided in this paragraph, may require the Contractor to transfer title and deliver immediately to the County in the manner and to the extent directed by the Contracting Officer, such partially completed items, including, where applicable, reports, working papers and other Documentation, as the Contractor has specifically produced or specifically acquired for the performance of such part of the Contract or Purchase Order as has been terminated. Except as provided below, payment for completed work accepted by the County shall be at the Contract price. Except as provided below, payment for partially completed items including, where applicable, reports and working papers, delivered to and accepted by the County shall be in an amount agreed upon by the Contractor and Contracting Officer. The County may withhold from amounts otherwise due the Contractor for such completed or partially completed works, such sum as the Contracting Officer determines to be necessary to protect the County against loss.

d. The rights and remedies of the County provided in this paragraph shall not be exclusive and are in addition to any other rights and remedies provided by law or under this Contract.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

e.  The County's failure to exercise any rights or remedies provided in this paragraph shall not be construed to be a waiver by the County of its rights and remedies in regard to the event of default or any succeeding event of default.

22. **FORCE MAJEURE**

Neither party will incur any liability to the other if its performance of any obligation under this Contract is prevented or delayed by causes beyond its control and without the fault or negligence of either party. The Contractor shall notify the County orally within five (5) days and in writing within ten (10) days of the date on which the Contractor becomes aware, or should have reasonably become aware, that such cause would prevent or delay its performance. After receipt of such notification, the County may elect to cancel the Contract, cancel the Purchase Order, or to extend the time for performance as reasonably necessary to compensate for the Contractor's delay.

In the event of a declared emergency by competent governmental authorities, the County by notice to the Contractor, may suspend all or a portion of the Contract or Purchase Order.

23. **TERMINATION PROVISIONS**

The County has the right to terminate this Contract or any Purchase Order for any reason as detailed more fully below. Termination shall be effective upon written notice to the Contractor.

a.  **TERMINATION FOR CONVENIENCE:** The County shall have the right to terminate the Contract or a Purchase Order for its convenience if the County determines termination to be in its best interest. The Contractor shall be paid for work satisfactorily completed prior to the effective date of the termination, but in no event shall the Contractor be entitled to recover loss of profits.

b.  **NON-APPROPRIATION:** The County's obligation to make payments during any fiscal year succeeding the current fiscal year shall be subject to availability and appropriation of funds. When funds (county, state and/or federal) are not appropriated or otherwise made available to support continuation of performance in a subsequent fiscal year period, the County shall have the right to terminate the Contract or a Purchase Order. The Contractor shall be reimbursed for the reasonable value of any nonrecurring costs incurred but not amortized in the price of the Supplies or Services delivered under the Contract. Such reimbursement shall not include loss of profit, loss of use of money, or administrative or overhead costs. The reimbursement amount may be paid from any appropriations available for that purpose

c.  **TERMINATION FOR CAUSE:** The County shall have the right to terminate the Contract or a Purchase Order for Contractor default under the Default Clause upon written notice to the Contractor. The County shall also have the right, upon written notice to the Contractor, to terminate the Contract or a Purchase Order for other cause as specified in the Contract or by law. If it is later determined that the County erred in terminating the Contract or a Purchase Order for cause, then, at the County discretion, the Contract or Purchase Order shall be deemed to have been terminated for convenience under Subparagraph a.

24. **ASSIGNABILITY AND SUBCONTRACTING**

a.  Except as provided for in subsection b, the Contractor may not assign, in whole or in part, this Contract or its rights, duties, obligations, or responsibilities hereunder without the prior

written consent of the Contracting Officer, which consent may be withheld at the sole and absolute discretion of the Contracting Officer.

b.  If another entity acquires all or substantially all of Contractor's assets, Contractor may assign this Contract in whole to the new entity without prior consent, provided that notice is provided once the acquisition becomes public knowledge. Contemporaneous consent must still be obtained if the Contractor will not be transferring the whole Contract. Additionally, County may terminate the Contract without penalty upon receiving notice of the assignment.

## 25.  AUDIT PROVISIONS

The County shall have the right, at reasonable times and at a site designated by the County, to audit the books, documents and records of the Contractor to the extent that the books, documents and records relate to costs or pricing data for the Contract. The Contractor agrees to maintain records which will support the prices charged and costs incurred for the Contract. The Contractor shall preserve books, documents, and records that relate to costs or pricing data for the Contract for a period of three (3) years from date of final payment. The Contractor shall give full and free access to all records to the County and/or their authorized representatives.

## 26.  OWNERSHIP RIGHTS

The County shall have unrestricted authority to reproduce, distribute, and use any submitted report, data, or material, and any software or modifications and any associated Documentation that is designed or developed and delivered to the County as part of the performance of the Contract.

## 27.  NONDISCRIMINATION/SEXUAL HARASSMENT CLAUSE

The Contractor agrees:

a.  In the hiring of any employee(s) for the manufacture of supplies, performance of work, or any other activity required under the contract or any subcontract, the Contractor, each subcontractor, or any person acting on behalf of the Contractor or subcontractor shall not discriminate by reason of race, gender, creed, color, sexual orientation, gender identity or expression, or in violation of the *Pennsylvania Human Relations Act* (PHRA) and applicable federal laws, against any citizen of this Commonwealth who is qualified and available to perform the work to which the employment relates.

b.  Neither the Contractor nor any subcontractor nor any person on their behalf shall in any manner discriminate by reason of race, gender, creed, color, sexual orientation, gender identity or expression, or in violation of the PHRA and applicable federal laws, against or intimidate any employee involved in the manufacture of supplies, the performance of work, or any other activity required under the contract.

c.  The Contractor and each subcontractor shall establish and maintain a written nondiscrimination and sexual harassment policy and shall inform their employees in writing of the policy. The policy must contain a provision that sexual harassment will not be tolerated and employees who practice it will be disciplined. Posting this Nondiscrimination/Sexual Harassment Clause conspicuously in easily-accessible and well-lighted places customarily frequented by employees and at or near where the contracted services are performed shall satisfy this requirement for employees with an established work site.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

d. The Contractor and each subcontractor shall not discriminate by reason of race, gender, creed, color, sexual orientation, gender identity or expression, or in violation of PHRA and applicable federal laws, against any subcontractor or supplier who is qualified to perform the work to which the contract relates.

e. The Contractor and each subcontractor represents that it is presently in compliance with and will maintain compliance with all applicable federal, state, and local laws, regulations and policies relating to nondiscrimination and sexual harassment. The Contractor and each subcontractor further represents that it has filed a Standard Form 100 Employer Information Report ("EEO-1") with the U.S. Equal Employment Opportunity Commission ("EEOC") and shall file an annual EEO-1 report with the EEOC as required for employers' subject to *Title VII* of the *Civil Rights Act of 1964*, as amended, that have 100 or more employees and employers that have federal government contracts or first-tier subcontracts and have 50 or more employees. The Contractor and each subcontractor shall, upon request and within the time periods requested by the County, furnish all necessary employment documents and records, including EEO-1 reports, and permit access to their books, records, and accounts by the contracting agency and the Bureau of Diversity, Inclusion and Small Business Opportunities for purpose of ascertaining compliance with provisions of this Nondiscrimination/Sexual Harassment Clause.

f. The Contractor shall include the provisions of this Nondiscrimination/Sexual Harassment Clause in every subcontract so that those provisions applicable to subcontractors will be binding upon each subcontractor.

g. The Contractor's and each subcontractor's obligations pursuant to these provisions are ongoing from and after the effective date of the contract through the termination date thereof. Accordingly, the Contractor and each subcontractor shall have an obligation to inform the County if, at any time during the term of the contract, it becomes aware of any actions or occurrences that would result in violation of these provisions.

h. The County may cancel or terminate the contract and all money due or to become due under the contract may be forfeited for a violation of the terms and conditions of this Nondiscrimination/Sexual Harassment Clause. In addition, the agency may proceed with debarment or suspension and may place the Contractor in the Contractor Responsibility File.

**28. CONTRACTOR RESPONSIBILITY PROVISIONS**
For the purpose of these provisions, the term Contractor is defined as any person, including, but not limited to, a bidder, offeror, loan recipient, grantee or lessor, who has furnished or performed or seeks to furnish or perform, goods, supplies, services, leased space, construction or other activity, under a contract, grant, lease, purchase order or reimbursement agreement with the County of Montgomery (County). The term Contractor includes a permittee, licensee, or any agency, political subdivision, instrumentality, public authority, or other public entity in the Commonwealth.

a. The Contractor certifies, in writing, for itself and its subcontractors required to be disclosed or approved by the County, that as of the date of its execution of this Bid/Contract, that neither the Contractor, nor any such subcontractors, are under suspension or debarment by the Commonwealth of Pennsylvania, County or any governmental entity, instrumentality, or authority and, if the Contractor cannot so certify, then it agrees to submit, along with its Bid/Contract, a written explanation of why such certification cannot be made.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

b.  The Contractor also certifies, in writing, that as of the date of its execution of this Bid/Contract it has no tax liabilities or other County obligations, or has filed a timely administrative or judicial appeal if such liabilities or obligations exist, or is subject to a duly approved deferred payment plan if such liabilities exist. If the Contractor cannot so certify because of the scope and nature of its organizational structure, then it agrees to make such certification to the best extent possible and to submit, along with its Bid/Contract, a written explanation of why such certification cannot be made in full.

c.  The Contractor's obligations pursuant to these provisions are ongoing from and after the effective date of the Contract through the termination date thereof. Accordingly, the Contractor shall have an obligation to inform the County if, at any time during the term of the Contract, it becomes delinquent in the payment of taxes, or other County obligations, or if it or, to the best knowledge of the Contractor, any of its subcontractors are suspended or debarred by the Commonwealth of Pennsylvania, County, the federal government, or any other state or governmental entity. Such notification shall be made within 15 days of the date of suspension or debarment.  To the extent the size or nature of the Contractor prevents it from carrying out this obligation in full, it shall provide written documentation explaining why this obligation cannot be fully complied with, and shall have a continuing obligation to report to the greatest extent possible.

d.  The failure of the Contractor to notify the County of its suspension or debarment by the Commonwealth of Pennsylvania, County, any other state, any other county or the federal government shall constitute an event of default of the Contract with the Commonwealth.

e.  The Contractor agrees to reimburse the County for the reasonable costs of investigation incurred by any investigate office of the County for investigations of the Contractor's compliance with the terms of this or any other agreement between the Contractor and the County that results in the suspension or debarment of the Contractor. Such costs shall include, but shall not be limited to, salaries of investigators, including overtime; travel and lodging expenses; and expert witness and documentary fees. The Contractor shall not be responsible for investigative costs for investigations that do not result in the Contractor's suspension or debarment.

29.  **AMERICANS WITH DISABILITIES ACT**

a.  Pursuant to federal regulations promulgated under the authority of The Americans With Disabilities Act, 28 C.F.R. § 35.101 et seq., the Contractor understands and agrees that it shall not cause any individual with a disability to be excluded from participation in this Contract or from activities provided for under this Contract on the basis of the disability. As a condition of accepting this contract, the Contractor agrees to comply with the "General Prohibitions Against Discrimination," 28 C.F.R. § 35.130, and all other regulations promulgated under Title II of The Americans With Disabilities Act which are applicable to all benefits, services, programs, and activities provided by the County through contracts with outside contractors.

b.  The Contractor shall be responsible for and agrees to indemnify and hold harmless the County from all losses, damages, expenses, claims, demands, suits, and actions brought by any party against the County as a result of the Contractor's failure to comply with the provisions of subparagraph a above.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**30. RIGHT TO KNOW LAW**

    a. The Pennsylvania Right-to-Know Law, 65 P.S. §§ 67.101-3104, ("RTKL") applies to this Contract.

    b. If the County needs the Contractor's assistance in any matter arising out of the RTKL related to this Contract, it shall notify the Contractor using the legal contact information provided in this Contract. The Contractor, at any time, may designate a different contact for such purpose upon reasonable prior written notice to the County.

    c. Upon written notification from the County that it requires the Contractor's assistance in responding to a request under the RTKL for information related to this Contract that may be in the Contractor's possession, constituting, or alleged to constitute, a public record in accordance with the RTKL ("Requested Information"), the Contractor shall:

        1) Provide the County, within ten (10) calendar days after receipt of written notification, access to, and copies of, any document or information in the Contractor's possession arising out of this Contract that the County reasonably believes is Requested Information and may be a public record under the RTKL; and

        2) Provide such other assistance as the County may reasonably request, in order to comply with the RTKL with respect to this Contract.

    d. If the Contractor considers the Requested Information to include a request for a Trade Secret or Confidential Proprietary Information, as those terms are defined by the RTKL, or other information that the Contractor considers exempt from production under the RTKL, the Contractor must notify the County and provide, within seven (7) calendar days of receiving the written notification, a written statement signed by a representative of the Contractor explaining why the requested material is exempt from public disclosure under the RTKL.

    e. The County will rely upon the written statement from the Contractor in denying a RTKL request for the Requested Information unless the County determines that the Requested Information is clearly not protected from disclosure under the RTKL. Should the County determine that the Requested Information is clearly not exempt from disclosure, the Contractor shall provide the Requested Information within five (5) business days of receipt of written notification of the County's determination.

    f. If the Contractor fails to provide the Requested Information within the time period required by these provisions, the Contractor shall indemnify and hold the County harmless for any damages, penalties, costs, detriment or harm that the County may incur as a result of the Contractor's failure, including any statutory damages assessed against the County.

    g. The County will reimburse the Contractor for any costs associated with complying with these provisions only to the extent allowed under the fee schedule established by the Office of Open Records or as otherwise provided by the RTKL if the fee schedule is inapplicable.

    h. The Contractor may file a legal challenge to any County decision to release a record to the public with the Office of Open Records, or in the Pennsylvania Courts, however, the

Contractor shall indemnify the County for any legal expenses incurred by the County as a result of such a challenge and shall hold the County harmless for any damages, penalties, costs, detriment or harm that the County may incur as a result of the Contractor's failure, including any statutory damages assessed against the County, regardless of the outcome of such legal challenge. As between the parties, the Contractor agrees to waive all rights or remedies that may be available to it as a result of the County's disclosure of Requested Information pursuant to the RTKL.

i.  The Contractor's duties relating to the RTKL are continuing duties that survive the expiration of this Contract and shall continue as long as the Contractor has Requested Information in its possession.

## 31.  COVENANT AGAINST CONTINGENT FEES

The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure the Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the County shall have the right to terminate the Contract without liability or in its discretion to deduct from the Contract price or consideration, or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee.

## 32.  APPLICABLE LAW

This Contract shall be governed by and interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania (without regard to any conflict of laws provisions) and the decisions of the Pennsylvania courts. The Contractor consents to the jurisdiction of the Court of Common Pleas of the County of Montgomery, Pennsylvania and the United States District Court for the Eastern District of Pennsylvania, waiving any claim or defense that such forum is not convenient or proper. The Contractor agrees that any such court shall have in personam jurisdiction over it, and consents to service of process in any manner authorized by Pennsylvania law.

## 33.  COMPLIANCE WITH LAW

The Contractor shall comply with all applicable federal and state laws and regulations and local ordinances in the performance of the Contract.

## 34.  INTEGRATION

This Contract, including all referenced documents and any Purchase Order, constitutes the entire agreement between the parties. No negotiations between the parties, nor any custom or usage, shall be permitted to modify or contradict any of the terms and conditions of the Contract. No modifications, alterations, changes, or waiver to the Contract or any of its terms shall be valid or binding unless accomplished by a written amendment signed by both parties.

## 35.  ORDER OF PRECEDENCE

In the event there is a conflict among the documents comprising this Contract, the County and the Contractor agree on the following order of precedence: the Contract; the solicitation; and the Contractor's response to the solicitation.

## 36.  CHANGES

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Services Terms and Conditions - Solicitor Approved v.1 (Last Edited 08/28/18)

The County reserves the right to make changes at any time during the term of the Contract or any renewals or extensions thereof: 1) to increase or decrease the quantities resulting from variations between any estimated quantities in the Contract and actual quantities; 2) to make changes to the Services within the scope of the Contract; 3) to notify the Contractor that the County is exercising any Contract renewal or extension option; or 4) to modify the time of performance that does not alter the scope of the Contract to extend the completion date beyond the Expiration Date of the Contract or any renewals or extensions thereof. Any such change shall be made by the Contracting Officer by notifying the Contractor in writing. The change shall be effective as of the date of the change, unless the notification of change specifies a later effective date. Such increases, decreases, changes, or modifications will not invalidate the Contract, nor, if performance security is being furnished in conjunction with the Contract, release the security obligation. The Contractor agrees to provide the service in accordance with the change order.

37. **NOTICE**

Any written notice to any party under this Contract shall be deemed sufficient if delivered personally, or by facsimile, telecopy, electronic or digital transmission (provided such delivery is confirmed), or by a recognized overnight courier service (e.g., DHL, Federal Express, etc.) with confirmed receipt, or by certified or registered United States mail, postage prepaid, return receipt requested, and sent to following:

1) If to the Contractor: the Contractor's address as recorded in the bid, proposal or vendor system used by the County.

2) If to the County: the address of the Issuing Office as set forth on the Contract.

38. **CONTROLLING TERMS AND CONDITIONS**

The terms and conditions of this Contract shall be the exclusive terms of agreement between the Contractor and the County. All quotations requested and received from the Contractor are for obtaining firm pricing only. Other terms and conditions or additional terms and conditions included or referenced in the Contractor's quotations, invoices, business forms, or other documentation shall not become part of the parties' agreement and shall be disregarded by the parties, unenforceable by the Contractor and not binding on the County.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)**

## FEDERAL GRANT ADDENDUM TO MONTGOMERY COUNTY STANDARD TERMS AND CONDITIONS – ELECTRONIC CONTRACT –

**1.   SCOPE**

Unless otherwise noted, this Grant Addendum fully incorporates all definitions and terms from the Montgomery County Standard Terms and Conditions.  In the event of a conflict, this Grant Addendum shall control over the Standard Terms and Conditions.

This form has been pre-approved by the Montgomery County Solicitor as indicated by the version number indicated in the header.  Provided that that the County's Standard Contract and Signature page is used to memorialize this contract, and that no changes have been made to the text below, no additional Solicitor approval is required.

The version number contained on the header of this document shall govern the contents of these Terms and Conditions, and in the event of any discrepancy between the official version contained on the County's website and the text below, the version on the website shall control unless the signature of the Montgomery County Solicitor or his designee accompanies the change.

Note that failure to include this paragraph without a Solicitor signature shall not relieve Contractor of the terms below, provided this document was included in the advertised solicitation or procurement that gave rise to this Contract or was otherwise publically advertised in a manner such that the Contractor knew or should have known that these provisions are applicable to the Contract.

**2.   FEDERAL GRANT REQUIREMENTS**

a.   The funds being expended or provided under this contract comprise in whole or in part federal grant funds.  As a result, unless otherwise stated, all expenditures are subject to the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards and supporting documents.

b.   To the extent any monies under this contract originate from a particular federal instrumentality, any and all regulations, laws, or

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)**

guidance that apply to those funds are hereby incorporated into this contract unless otherwise stated.

c. Any subcontracts entered into by Contractor that relate to this Contract, must also explicitly incorporate the provisions of this section into the subcontract's scope of work or terms and conditions.

## 3. NONDISCRIMINATION/SEXUAL HARASSMENT CLAUSE

The Contractor agrees:

a. In the hiring of any employee(s) for the manufacture of supplies, performance of work, or any other activity required under the contract or any subcontract, the Contractor, each subcontractor, or any person acting on behalf of the Contractor or subcontractor shall not, by reason of gender, race, creed, or color, discriminate against any citizen of this County or the Commonwealth of Pennsylvania who is qualified and available to perform the work to which the employment relates.

b. Neither the Contractor nor any subcontractor nor any person on their behalf shall in any manner discriminate against or intimidate any employee involved in the manufacture of supplies, the performance of work, or any other activity required under the contract on account of gender, race, creed, or color.

c. The Contractor and each subcontractor shall establish and maintain a written sexual harassment policy and shall inform their employees of the policy. The policy must contain a notice that sexual harassment will not be tolerated and employees who practice it will be disciplined.

d. The Contractor and each subcontractor shall not discriminate by reason of gender, race, creed, or color against any subcontractor or supplier who is qualified to perform the work to which the contract relates.

e. The Contractor shall include the provisions of this Nondiscrimination/Sexual Harassment Clause in every subcontract so that those provisions applicable to subcontractors will be binding upon each subcontractor. If a Contractor cannot fully comply with this subsection due to the nature or scope of its organization, it must use best efforts to do so and provide a written explanation as to why it unable to fully comply.

f. The County may cancel or terminate the contract and all money due or to become due under the contract may be forfeited for a violation of

Grant Addendum – Solicitor Approved v.1 (Last Edited 10/1/2015)

the terms and conditions of this Nondiscrimination/Sexual Harassment Clause. In addition, the agency may proceed with debarment or suspension and may place the Contractor in the Commonwealth's and County's Contractor Responsibility File.

## 4.    RIGHT TO KNOW LAW

a.    The Pennsylvania Right-to-Know Law, 65 P.S. §§ 67.101-3104, ("RTKL") applies to this Contract.

b.    If the County needs the Contractor's assistance in any matter arising out of the RTKL related to this Contract, it shall notify the Contractor using the legal contact information provided in this Contract. The Contractor, at any time, may designate a different contact for such purpose upon reasonable prior written notice to the County.

c.    Upon written notification from the County that it requires the Contractor's assistance in responding to a request under the RTKL for information related to this Contract that may be in the Contractor's possession, constituting, or alleged to constitute, a public record in accordance with the RTKL ("Requested Information"), the Contractor shall:

   1)    Provide the County, within ten (10) calendar days after receipt of written notification, access to, and copies of, any document or information in the Contractor's possession arising out of this Contract that the County reasonably believes is Requested Information and may be a public record under the RTKL; and

   2)    Provide such other assistance as the County may reasonably request, in order to comply with the RTKL with respect to this Contract.

d.    If the Contractor considers the Requested Information to include a request for a Trade Secret or Confidential Proprietary Information, as those terms are defined by the RTKL, or other information that the Contractor considers exempt from production under the RTKL, the Contractor must notify the County and provide, within seven (7) calendar days of receiving the written notification, a written statement signed by a representative of the Contractor explaining why the requested material is exempt from public disclosure under the RTKL.

e.    The County will rely upon the written statement from the Contractor in denying a RTKL request for the Requested Information unless the County determines that the Requested Information is clearly not

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

protected from disclosure under the RTKL. Should the County determine that the Requested Information is clearly not exempt from disclosure, the Contractor shall provide the Requested Information within five (5) business days of receipt of written notification of the County's determination.

f.  If the Contractor fails to provide the Requested Information within the time period required by these provisions, the Contractor shall indemnify and hold the County harmless for any damages, penalties, costs, detriment or harm that the County may incur as a result of the Contractor's failure, including any statutory damages assessed against the County.

g.  The County will reimburse the Contractor for any costs associated with complying with these provisions only to the extent allowed under the fee schedule established by the Office of Open Records or as otherwise provided by the RTKL if the fee schedule is inapplicable.

h.  The Contractor may file a legal challenge to any County decision to release a record to the public with the Office of Open Records, or in the Pennsylvania Courts, however, the Contractor shall indemnify the County for any legal expenses incurred by the County as a result of such a challenge and shall hold the County harmless for any damages, penalties, costs, detriment or harm that the County may incur as a result of the Contractor's failure, including any statutory damages assessed against the County, regardless of the outcome of such legal challenge. As between the parties, the Contractor agrees to waive all rights or remedies that may be available to it as a result of the County's disclosure of Requested Information pursuant to the RTKL.

i.  The Contractor's duties relating to the RTKL are continuing duties that survive the expiration of this Contract and shall continue as long as the Contractor has Requested Information in its possession.

## 5.  RECORDS RETENTION

a.  Unless otherwise indicated or required by law, all records relating to this Contract, including financial, statistical, property, equipment, participant, and supporting documentation, shall be retained by the Contractor for at least three (3) years after final disposition for records relating to purchased equipment or real property, or the date of submission of the closeout reports for each program year for all other records.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

b.    Contractors or grant recipients that not able to meet the retention requirements above shall, unless otherwise required by the County and after retaining the records for as long as possible, transmit to the County in an orderly fashion any documents still subject to retention. The transferred documents must be properly labeled and filed and in acceptable condition for storage.

c.    If the Contractor or grant recipient has knowledge of any potential upcoming audit, litigation or claim, all records will be retained until the audit or other proceedings has been concluded or the threat of litigation has been removed.

d.    Any additional audit requirements contained in the applicable Commonwealth or federal rules and law governing the grant funds received or expended under this Contract shall also apply to the Contract.

e.    The retention period for grants involving UASI or SHSGP grants shall be 7 years unless otherwise indicated.

f.    The retention period for grants involving the County Department of Health shall be 4 years unless otherwise indicated.

## 6.    AUDIT PROVISIONS

a.    The County, along with any Commonwealth or federal agency from which these grant funds originated, all shall have the right, at reasonable times and at a site designated by the auditor, to audit the books, documents and records of the Contractor to the extent that the books, documents and records relate to the grant funds received or expended under this Contract.

b.    The Contractor agrees to maintain records which may be subject to audit for the periods specified in the Records Retention provisions of the Contract.

c.    The Contractor shall give full and free access to all records to the County and/or their authorized representatives. This right of access shall also include timely and reasonable access to the Contractor's personnel so the auditor may interview and discuss any records covered by this section.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

**7.    CONTRACTOR RESPONSIBILITY PROVISIONS (DEBARMENT or SUSPENSION CERTIFICATION)**

For the purpose of this section, the term Contractor is defined as any person, including, but not limited to, a bidder, offeror, loan recipient, grantee or lessor, who has furnished or performed or seeks to furnish or perform, goods, supplies, services, leased space, construction or other activity, under a contract, grant, lease, purchase order or reimbursement agreement with the County of Montgomery (County) either as direct grantee/purchaser or as a pass-through grantee/purchaser. The term Contractor includes a permittee, licensee, or any agency, political subdivision, instrumentality, public authority, or other public entity in the Commonwealth.

a.    The Contractor certifies, in writing, for itself and its subcontractors required to be disclosed or approved by the County, that as of the date of its execution of this Bid/Contract, that neither the Contractor, nor any such subcontractors, are under suspension or debarment by the Commonwealth of Pennsylvania, County or any governmental entity, instrumentality, or authority and, if the Contractor cannot so certify, then it agrees to submit, along with its Bid/Contract, a written explanation of why such certification cannot be made.

b.    The Contractor also certifies, in writing, that as of the date of its execution of this Bid/Contract it has no tax liabilities or other County obligations, or has filed a timely administrative or judicial appeal if such liabilities or obligations exist, or is subject to a duly approved deferred payment plan if such liabilities exist. If the Contractor cannot so certify because of the scope and nature of its organizational structure, then it agrees to make such certification to the best extent possible and to submit, along with its Bid/Contract, a written explanation of why such certification cannot be made in full.

c.    The Contractor's obligations pursuant to these provisions are ongoing from and after the effective date of the Contract through the termination date thereof. Accordingly, the Contractor shall have an obligation to inform the County if, at any time during the term of the Contract, it becomes delinquent in the payment of taxes, or other County obligations, or if it or, to the best knowledge of the Contractor, any of its subcontractors are suspended or debarred by the Commonwealth of Pennsylvania, County, the federal government, or

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

any other state or governmental entity. Such notification shall be made within 15 days of the date of suspension or debarment. To the extent the size or nature of the Contractor prevents it from carrying out this obligation in full, it shall provide written documentation explaining why this obligation cannot be fully complied with, and shall have a continuing obligation to report to the greatest extent possible.

d. The failure of the Contractor to notify the County of its suspension or debarment by the Commonwealth of Pennsylvania, County, any other state, any other county or the federal government shall constitute an event of default of the Contract with the Commonwealth.

e. The Contractor agrees to reimburse the County for the reasonable costs of investigation incurred by any investigate office of the County for investigations of the Contractor's compliance with the terms of this or any other agreement between the Contractor and the County that results in the suspension or debarment of the Contractor. Such costs shall include, but shall not be limited to, salaries of investigators, including overtime; travel and lodging expenses; and expert witness and documentary fees. The Contractor shall not be responsible for investigative costs for investigations that do not result in the Contractor's suspension or debarment. For purposes of this paragraph, "reasonable" shall be defined as within GSA guidelines.

## 8. CHILD LABOR

The Contractor agrees to follow all applicable child labor laws in accordance with the Fair Labor Standard Act of 1938. No participating employee under 18 years of age will be employed in any occupation which the U.S. Secretary of Labor has found to be particularly hazardous for persons between 16 and 18 years of age.

The County may cancel or terminate this Contract and all money due or to become due under the Contract may be forfeited for a violation of the terms and conditions of this section. In addition, the County may proceed with debarment or suspension and may place the Contractor in the Commonwealth's and County's Contractor Responsibility File and take such other action as appropriate.

## 9. DRUG-FREE WORKPLACE

a. Definitions. As used in this clause,

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

1) 'Controlled substance' means a controlled substance in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in regulation at 21 CFR 1308.11-1308.15.

2) 'Conviction' means a finding of guilt (including a plea of nolo contendere) or imposition of sentence, or both, by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes.

3) 'Criminal drug statute' means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, possession or use of any controlled substance.

4) 'Drug-free workplace' means the site(s) for the performance of work done in connection with a specific contract at which employees of the contractor are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

5) 'Employee' means an employee of a contractor directly engaged in the performance of work under a Government contract. 'Directly engaged' is defined to include all direct cost employees who has other than a minimal impact or involvement in contract performance.

6) 'Individual' means an offeror/contractor that has no more than one employee including the offeror/contractor.

b. The Contractor, if other than an individual, shall-- within 30 calendar days after award (unless a longer period is agreed to in writing for contracts of 30 calendar days or more performance duration); or as soon as possible for contracts for less than 30 calendar days performance duration--

1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibition;

2) Establish an ongoing drug-free awareness program to inform such employees about--

i. The dangers of drug abuse in the workplace;

ii. The contractor's policy of maintaining a drug-free workplace;

iii. Any available drug counseling, rehabilitation, and employee assistance programs; and

iv. The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause, that as a condition of continued employment on this contract, the employee will--

    i. Abide by the terms of the statement; and

    ii. Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than five (5) calendar days after such conviction;

5) Notify the Contracting Officer in writing within 10 calendar days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction;

6) Within 30 calendar days after receiving notice under subdivision (b)(4)(ii) of this clause of a conviction, take one of following actions with respect to any employee who is convicted of drug abuse violations occurring in the workplace:

    i. Taking appropriate personnel action against such employee, up to and including termination; or

    ii. Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency.

7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) through (b)(6) of this clause.

c. The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in the performance of this contract.

d. In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraphs (b) or (c) of this clause may, pursuant to FAR 23.506, render the contractor subject to suspension of contract payments, termination of the contract for default, and suspension or debarment.

## 10. WAGE REQUIREMENTS

When required by Federal program legislation, all construction contracts awarded by the County, Contractor or subcontractors of more than $2000

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)**

shall include a provision for compliance with the Davis-Bacon Act (40 U.S.C. § 276a to a-7) and as supplemented by Department of Labor regulations (29 CFR part 5, "Labor Standards Provisions Applicable to Contracts Governing Federally Financed and Assisted Construction"). Under this Act, contractors shall be required to pay wages to laborers and mechanics at a rate not less than the minimum wages specified in a wage determination made by the Secretary of Labor. In addition, contractors shall be required to pay wages not less than once a week. The recipient shall place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation and the award of a contract shall be conditioned upon the acceptance of the wage determination. The recipient shall report all suspected or reported violations to the Federal awarding agency.

## 11. WORKSITE PROVIDER RESPONSABILITIES AND SAFETY RULES

Where applicable, all contracts awarded by County or Contractor in excess of $2,000 for construction contracts and in excess of $2,500 for other contracts that involve the employment of mechanics or laborers shall include a provision for compliance with sections 102 and 107 of the Contract Work Hours and Safety Standards Act (40 U.S.C. § 327-333), as supplemented by Department of Labor regulations (29 CFR part 5). Under section 102 of the Act, each contractor shall be required to compute the wages of every mechanic and laborer on the basis of a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not less than 11/2times the basic rate of pay for all hours worked in excess of 40 hours in the work week. Section 107 of the Act is applicable to construction work and provides that no laborer or mechanic shall be required to work in surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

## 12. LOBBYING

Contractor agrees to obey all applicable County, Commonwealth and federal lobbying laws and agrees to truthfully and fully complete all required lobbying certifications.

## 13. WORKFORCE INVESTMENT FUNDS

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

For grants involving On-the-Job Training or which are otherwise subject to the Workforce Investment Act of 1998, funds must not be used to directly or indirectly assist, promote or deter union organizing.

## 14.   PROCUREMENT REQUIREMENTS

Any Contractor or subcontractor procuring property or services with grant funding obtained under this Contract must adhere to all procurement requirements specified in the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. See § 200.318-330.

## 15.   REPORTING REQUIREMENTS

Contractor must meet all reporting requirements specified in the OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. See § 200.328, 329 & 331.

## 16.   TERMINATION PROVISIONS

The County has the right to terminate this Contract or any Purchase Order for any reason as detailed more fully below. Termination shall be effective upon written notice to the Contractor.

a.   **TERMINATION FOR CONVENIENCE:** The County shall have the right to terminate the Contract or a Purchase Order for its convenience if the County determines termination to be in its best interest. The Contractor shall be paid for work satisfactorily completed prior to the effective date of the termination, but in no event shall the Contractor be entitled to recover loss of profits.

b.   **NON-APPROPRIATION:** The County's obligation to make payments during any fiscal year succeeding the current fiscal year shall be subject to availability and appropriation of funds. When funds (county, state and/or federal) are not appropriated or otherwise made available to support continuation of performance in a subsequent fiscal year period, the County shall have the right to terminate the Contract, grant or Purchase Order. The Contractor shall be reimbursed for the reasonable value of any nonrecurring costs incurred but not amortized in the price of the Supplies or Services delivered under the Contract. Such reimbursement shall not include loss of profit, loss of use of

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)

money, or administrative or overhead costs. The reimbursement amount may be paid from any appropriations available for that purpose

c. **TERMINATION FOR CAUSE**: The County shall have the right to terminate the Contract or a Purchase Order for Contractor default under the Default Clause upon written notice to the Contractor. The County shall also have the right, upon written notice to the Contractor, to terminate the Contract or a Purchase Order for other cause as specified in the Contract or by law. If it is later determined that the County erred in terminating the Contract or a Purchase Order for cause, then, at the County discretion, the Contract or Purchase Order shall be deemed to have been terminated for convenience under Subparagraph a.

d. **NOTICE OF TERMINATION BY FEDERAL AGENCY:** The Contract may be terminated pursuant to federal notice as specified in OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. See § 200.339.

17. **PAYMENT**

a. **GRANT FUNDING:** The Contractor shall not be reimbursed or funded beyond all allocated monies set forth in the grant, supplemented by any additional County money as indicated by the Contract price, without prior written consent. Additionally the County shall not be liable for any unauthorized expenditures or financial commitments, claims, or obligations incurred by the Contractor beyond the Contract amount. To the extent that the amount of allocated grant monies are lowered by the federal or Commonwealth government, the County will not be liable for the additional funds without prior consent, although Contractor and County will use their best efforts to limit the scope of work to reflect the lesser funds available. The County shall use best efforts to timely notify the Contractor of any change in grant funding allocation.

b. **REIMBURSEMENT GRANTS:**

1) Where a federal grant is specifically designated a cost reimbursement grant, no payment shall be made in advance of services rendered. Each request is subject to the Project Manager's or County Agent's approval. Payments shall be made to the provider only for undisputed invoices. An undisputed invoice is an invoice executed by the Provider for project expenditures, that meets all payment conditions of the agreement, and for which additional evidence is not required to

**Grant Addendum - Solicitor Approved v.1 (Last Edited 10/1/2015)**

make payment. The invoice may be disputed if all of the products due for the grant performance period have not been received and approved, if the invoice is inaccurate, or if it does not comply with the terms of this Agreement. Final invoices must be received prior to the close date of the applicable grant, under which this project is funded.

2) A request for payment relating to a Contract using reimbursable grants must contain the following information or payment will not be made:

    i. An invoice that includes a list of actual expenses incurred during the billing period.

    ii. Backup documentation is required at time of invoice submittal. Backup documentation includes, but is not limited to;

        (1) Providers actual labor expenditures including rates, hours worked and benefits.

        (2) Itemized list of operating expenses, including travel, equipment, supplies, and other.

        (3) Receipts for travel, materials, miscellaneous travel, and other direct costs.

    iii. Written progress report that documents evidence of projects forward progression or progress.

c. **ADVANCE PAYMENT GRANTS:** Where the grant funds underling the Contract allow for advance payments, Contractor must use best efforts to request advance payments as close as possible to the actual expenditure of the funds. Contractor must also use best efforts to consolidate requests for anticipated funding. The rules specified in OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, § 200.305 shall be applicable to the contract.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

## 1.0  INTRODUCTION

The County of Montgomery (herein referred to as "County") is requesting Proposals from qualified firms who have the necessary expertise to provide Disaster Debris Clearance and Removal Services.

Montgomery County is located approximately twenty (20) miles west of Center City Philadelphia, PA. Montgomery County is governed by a three (3) member Board of Commissioners and is home to 62 incorporated municipalities.

1.2.1 Incorporated Montgomery County Municipalities are as follows:

**Boroughs:**

| | |
|---|---|
| Ambler | Norristown |
| Bridgeport | North Wales |
| Bryn Athyn | Pennsburg |
| Collegeville | Pottstown |
| Conshohocken | Red Hill |
| East Greenville | Rockledge |
| Green Lane | Royersford |
| Hatboro | Schwenksville |
| Hatfield | Souderton |
| Jenkintown | Telford |
| Lansdale | Trappe |
| Narberth | West Conshohocken |

**Townships:**

| | |
|---|---|
| Abington | Plymouth |
| Cheltenham | Salford |
| Douglass | Skippack |
| East Norriton | Springfield |
| Franconia | Towamencin |
| Hatfield | Upper Dublin |
| Horsham | Upper Frederick |
| Limerick | Upper Gwynedd |
| LowerFrederick | Upper Hanover |
| LowerGwynedd | Upper Merion |
| Lower Merion | Upper Moreland |
| Lower Moreland | Upper Pottsgrove |
| Lower Pottsgrove | Upper Providence |
| Lower Providence | Upper Salford |
| Lower Salford | West Norriton |
| Marlborough | West Pottsgrove |
| Montgomery | Whitemarsh |
| New Hanover | Whitpain |
| Perkiomen | Worcester |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

1.2.2   With approximately 850,000 residents, Montgomery County is the third most populated county in the Commonwealth of Pennsylvania.  Montgomery County is geographically diverse, ranging from farms and open land in the extreme north of the county to densely populated suburban neighborhoods in the southern and central portions of the county.

1.2.3   FEMA encourages municipalities to identify disaster debris clearance and removal service providers prior to an emergency.  With this in  mind, Montgomery County wishes to contract with one or more firms to provide services related to collection, reduction, recycling, hazardous waste management, demolition, processing, hauling and final disposition of disaster related debris

## 2.0  SCOPE OF WORK
2.1   The Contractor shall have the capacity to manage a major workforce with multiple Sub-contractors and to cover the expenses of a major recovery prior to being paid by the County.  Established management teams must be in place. The Contractor shall have the resources to provide the equipment and personnel necessary to cover a disaster.

2.1.1   It shall be the Contractors responsibility to load, transport, reduce and properly dispose of all disaster generated debris once the County issues a Notice to Proceed to the Contractor, unless otherwise directed in writing by the County.

2.1.1   It shall be the Contractors responsibility to provide assistance to the County for completion of all documentation required for reimbursement from FEMA for all associated debris management related costs.

2.1.2   Payment for disposal costs (such as tipping fees) incurred by the Contractor at a County approved final disposal site that meet Local, State and Federal regulations for disposal will be reimbursed by the County as a pass-through cost.  Prior to reimbursement by the County, the Contractor must furnish an invoice in hard copy and electronic formats, all scale or load ticket issued by the disposal facility and proof of Contractor payment to the disposal facility.

### 2.2   Emergency Road Clearance
Work shall consist of all labor, equipment, fuel and miscellaneous costs Necessary to clear and remove debris from County roadways and waterways to make them passable immediately following a declared disaster.  All roadways designated by the County shall be clear and passable within seventy (70) working hours of the issuance of a Notice to Proceed from the County to conduct emergency roadway clearance work. The county may choose to extend the Contractor's seventy (70) hour limit through written request.  This may include roadways in municipalities with in County.  Roadways will be cleared as directed by the County.   The Contractor shall assist the County and its representative in ensuring proper documentation of emergency road clearance activities by documenting the type of equipment and/or labor utilized (that is, certification), starting and ending times and zones/areas cleared.  Services performed will be compensated using a mutually agreed upon hourly labor and equipment price schedule.

### 2.3   Right of Way (ROW) Vegetative Debris Removal
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to pick up and transport eligible disaster related  vegetative debris from the Public ROW to a County

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

approved DMS or approved final disposal site in accordance with all Federal, State and Local regulations.

2.3.1    Vegetative debris in the Public (ROW) is defined as debris, resulting from a hurricane or other natural or human caused disaster, which has been or will be placed along public ROW's easements, County parks, alleys, County debris staging areas and other areas as designated by the County.

2.3.2    Eligible vegetative debris that is piled in immediate proximity to the actual legal street ROW and is accessible from the ROW line with loading equipment (that is, not behind a fence or other physical obstacle) will be deemed to be on the ROW, and is to be removed.

2.3.3    The Contractor will remove vegetative debris as directed by the County.

2.3.4    All eligible debris will be removed from each location before proceeding to the next location, unless otherwise directed by the County or its authorized representative.

2.3.5    The Contractor must provide traffic control as conditions require or as directed by the County.

2.3.6    Entry onto private property for the removal of eligible vegetative debris will only be permitted when directed by the County or its authorized representative.  The County will provide specific right-of-entry (ROE) legal and operational procedures.

**2.4   ROW Construction and Demolition (C&D) Debris Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to pick up and transport eligible C&D debris from the Public ROW to a County approved final disposal site in accordance with Federal, State and Local regulations.

2.4.1    C&D debris in the Public Row is defined as disaster generated debris that has been or will be placed along public ROW, easements, County Parks, alleys and County debris staging areas.

2.4.2    Eligible C&D debris that is piled in immediate proximity to the ROW and that is accessible from the ROW line with loading equipment (that's, not behind a fence or other physical obstacle) will be deemed to be on the ROW, and is to be removed.

2.4.3    The Contractor will remove C&D debris from the ROW as directed by the County.

2.4.4    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site.  The debris removal vehicle will not collect additional debris once a load ticket has been issued.

2.4.5    All eligible debris will be removed from each location before proceeding to the next location, unless otherwise directed by the County or its authorized representative.

2.4.6    The Contractor must provide traffic control as conditions require or as direct by the County.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.4.7    Entry into private property for the removal of eligible C&D debris will only be permitted when directed by the County or its authorized representative.  The County will prove specific ROE legal and operational procedures.

2.4.8    C&D debris must be monitored for the collection, complete haul and delivery at the approved final disposal site.  The County or authorized representative will obtain the original copy of the disposal or scale ticket showing the inbound and outbound collection vehicle weights.

**2.5    Demolition, Removal, Transport and Disposal of Non-RACM Structures**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to decommission, demolish and dispose of eligible non regulated asbestos containing material (non-RACM) structures on private property within the jurisdictional limits of the County.  Under this service, work will include asbestos-containing material (ACM) testing, decommissioning, structural demolition, debris removal and site remediation.  Further, eligible debris generated from the demolition of non-RACM structures as well as scattered C&D debris on private property will be transported to a County approved final disposal site in accordance with all Federal, State and Local regulations.

2.5.1    Removal and transportation of demolished structures and scattered C&D debris on private property will be performed as identified by the County.

2.5.2    Entry onto private property will only be permitted when directed by the County. The County will provide specific ROE legal and operational procedures.

2.5.3    The Contractor is required to strictly adhere to all Local, State, and Federal regulations (such as obtaining demolition permits) for the demolition, handling, and transportation of non-RACM structures.

2.5.4    Decommissioning consists of the removal and disposal of all household hazardous waste (HHW), used electronics, white goods, and scrap tires from a non-RACM structure at a properly sanctioned facility in accordance with all applicable Federal, State, and Local regulations.

2.5.5    Any structurally unsound and unsafe structures will be identified and presented to the County for direction regarding decommissioning.

2.5.6    Removal and transportation of eligible non-RACM demolished structures and eligible scattered C&D debris on private property will be performed as directed in writing by the County's authorized representative.

2.5.7    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site. The debris removal vehicle will not collect additional debris once a load ticket has been issued.

2.5.8    Entry onto private property for the removal of eligible C&D debris will only be permitted when directed in writing by the County or its authorized representative. The County will provide specific ROE legal and operational procedures for private property debris removal programs if requested.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**2.6    Demolition, Removal, Transport and Disposal of RACM Structures**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to decommission, demolish and dispose of eligible RACM structures on private property within the jurisdictional limits of the County.. Under this service, work will include ACM testing, decommissioning, structural demolition, debris removal and site remediation.  Further, eligible scattered C& D debris on private property will be transported to a County approved final disposal site in accordance with a ll Federal, State and Local regulations.

2.6.1    The Contractor is required to strictly adhere to all Local, State and Federal regulatory requirements (such as obtaining demolition permits, burrito wrapping of debris, etc.) for demolition, handling and transportation of RACM structures.

2.6.2    Decommissioning consists of the removal and disposal of all HHW, e-waste, white goods and scrap tires from an RACM structure at a properly sanctioned facility in accordance with all applicable Local, State and Federal regulation.

2.6.3    Any structurally unsound and unsafe structures will be identified and presented to the County for direction regarding decommissioning.

2.6.4    Removal and transportation of eligible RACM demolished structures and eligible scattered C&D debris on private property will be performed as directed in writing by the County's authorized representative.

2.6.5    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site that accepts RACM debris.  The debris removal vehicle will no collect additional debris once a load ticket has been issued.

2.6.6    Entry onto private property for the removal of eligible C&D debris will only be permitted when directed in writing by the County or its authorized representative.  The County will provide specific ROE legal and operational procedures for private property debris removal programs if requested.

**2.7    DMS Management and Operations**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to manage and operate DMS(s) for the acceptance, management, segregation, staging and reduction of disaster debris.  Reduction methods must be approved the County prior to commencement of reduction activities.  DMS layouts and ingress and egress plans must be approved by the County

2.7.1    Managing DMS location includes helping to obtain necessary Local, State and Federal permits or approval and operating in accordance with all rules and regulation of Local, State and Federal regulatory agencies, which may include but are not limited to the U.S. Environmental Protection Agency (EPS), Pennsylvania Department of Environmental Protection (DEP), Pennsylvania Historical and Museum Commission (PHMC), Pennsylvania Department of Conservation and Natural Resources (DCNR)  or other State agencies.  The Contractor shall also be responsible for all costs associated with third-party groundwater and soil testing.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.7.2    Debris at the DMS(s) will be clearly segregated and managed independently by debris type (C&D, vegetative, white goods and other scope of service items), program (ROW collection, private property debris removal, etc.) and County as outlined in Definitions of Key terms, Item 10.0 - Description of Designated Area Item.

2.7.3    The Contractor shall obtain, install and operate scales for weighing incoming debris.  Scales shall be installed and certified within five (5) business days of receiving the Notice to Proceed or written notice that the County intends to use the alternate tonnage price schedule of this RFP.  The Contractor shall provide a sufficient number of scales meeting the County's specifications to provide for the efficient delivery of waste streams without excessive wait times.  To the extent the County determines that additional scales are required certified scales must be operational within five (5) business days of the County's written request.

2.7.4    The Contractor is responsible for maintaining the DMS(s) approach and interior road(s) for all weather conditions for the entire period of debris hauling, including provision of crushed concrete for any roads that require stabilization for ingress and egress.

2.7.5    The Contractor is responsible for all associated costs necessary to provide DMS(s) traffic control (for example, traffic cones and staff with traffic flags).

2.7.6    The Contractor is responsible for all associated costs necessary to provide DMS(s) dust control and erosion control (for example, an operational water truck, silt fencing and other best management practices).

2.7.7    The Contractor is responsible for providing twenty-four (24) hour security at DMS(s).

2.7.8    The Contractor will only permit Contractor vehicles and others specifically authorized by the County or its authorized representative on DMS locations.

2.7.9    The Contractor is responsible for all associated costs necessary to provide DMS9s) utilities (for example, water, lighting and portable toilets).
2.7.10   The Contractor is responsible for all associated costs necessary to provide DMS(s) fire protection (for example, an operational water truck [sufficient and equipped for fire protection], fire breaks and a site foreman).

2.7.11   The Contractor is responsible for all associated costs to provide qualified personnel as well as lined containers or containment areas for the segregation of visible HHW/contaminants that may be mixed with disaster debris.  The cost associated with qualified personnel and lined containers/containment areas for HHW/contaminant segregation is reflected in this scope of work.  The County will be responsible for disposing of HHW/contaminant material segregated and stored in lined containers at the SMS(s).

2.7.12   The Contractor shall provide tower(s) from which the County or its authorized representative can make volumetric load calls.  The tower provided by the Contractor will meet required minimum specifications.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.7.13   The Contractor is responsible for operating the DMS(s) in accordance with Occupation Health and Safety Administration (OSHA), EPS EPA and DEP.

2.7.14   Upon completion of haul out activities, the Contractor shall restore the site to its original condition prior to site use at their own expense, abide by all Local, State and Federal environmental regulatory requirements and obtain a written release from the County or its authorized representative. Site remediation will include but is not limited to returning the original site grade, sod and other physical features. Site remediation does not include restoring fencing, concession stands, lighting and other permanent structures that may have been demolished at the County's direction for DMS(s) operations. All debris, mulch and other residual materials is to be removed adequately; fill dirt and/or other base material (if required) must meet standards for intended use; and new sod or seeding must meet standards for intended use. Site remediation will also include returning all utilized sites to their original condition as verified through soil and groundwater samples. Site remediation will abide by all State and Federal environmental regulatory requirements and is subject to final approval by County and DEP.

**2.8    DMS Management and Reduction by Grinding**
Work shall consist of all labor, equipment, fuel and miscellaneous costs necessary to reduce disaster debris by grinding. Reduction methods are at the discretion of the County. Grinding must be approved by the County prior to commencement of reduction activities.

2.8.1 All unreduced disaster debris must be staged separately from reduced debris at the SMS(s).

2.8.2    The Contractor must obtain the County's approval to reduce C&D debris. If approved for reduction by the County, C&D debris must be reduced via grinding in order for the County to compensate the Contractor for reduction. Incineration or mauling of C&D are not acceptable methods of C&D reduction.

**2.9    DMS Management and Reduction by Incineration**
Work shall consist of all labor, equipment, fuel and miscellaneous costs necessary to reduce disaster debris by incineration. Reduction methods (controlled open air incineration and air curtain burning) are at the discretion of the County. Incineration must be approved by the County prior to commencement of reduction activities.

2.9.1    All unreduced disaster debris must be staged separately from reduced debris at the DMS(s).

**2.10   Haul-Out of Reduced Debris to Final Disposal Site**
Work shall consist of all labor, equipment, fuel, traffic control costs and associated costs necessary to load and transport reduced eligible material (such as ash, compacted C&D or mulch) from a County approved DMS(s) to a County approved final disposal site in accordance with all Local, State and Federal regulations.

2.10.1   All unreduced disaster debris must be transported to a final disposal site separately from reduced debris.

2.10.2   The Contractor shall provide the name and address of each disposal site to be used along with the name and telephone number of a responsible party for each site, prior to commencing the work.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.10.3   The Contractor shall not use any disposal site without the written consent of the County. All costs and fees associated with the disposal of debris shall be reviewed for reasonableness by the County prior to issuing any such authorization.

2.10.4   The Contractor shall initiate and manage the execution of a written three party agreement between the disposal site owner/operator, the Contractor and the County for permission to post a County inspector at the site for verification of each load disposed.

2.10.5   The Contractor shall provide a sufficient number of debris site towers and/or certified scales meeting County specifications to provide for the efficient delivery of waste streams without excessive wait times. The County shall decide what constitutes an excessive wait time. To the extent that the County determines that additional towers and/or scales are required, additional towers must be operation within forty-eight (48) hours of the County's request and certified scales must be operational within five (5) business days of the County's request.

2.10.6   At the completion of disposal operations, each disposal site will issue a written summary of the quantity, type and origin of waste delivered.

2.10.7   The Contractor shall not receive any payment from the County for haul-out or load tickets related to reduced or unreduced debris transported and disposed of at a final disposal site that was not approved by the County.

**2.11    Removal of Hazardous Leaning Trees and Hanging Limbs**
Work shall consist of all labor, equipment, fuel, control costs and other associated costs necessary to remove all eligible hazardous leaning trees six (6) inches or greater in diameter, measured for and a half (4.5) feet from the base of the tree or chest height, and eligible hazardous hanging limbs two (2) inches or greater in diameter at the point of the break and in the Public ROW. Further, debris generated from the removal of eligible hazardous leaning trees and eligible hazardous handing limbs two (2) inches or greater in diameter at the point of break and in the Public ROW will be placed in the safest possible location on the Public ROW and subsequently removed in accordance with Section of 2.2 of this RFP. Eligible hazardous leaning trees less than six (6) inches in diameter, measured four and a half (4.5) feet from the base of the tree or at chest height, will be flush cut, loaded and removed in accordance with Section 2.2 of this RFP. The County will not compensate the Contractor for cutting leaning trees less than six (6) inches in diameter on a unit rate basis. The collection of all eligible hazardous leaning trees and eligible hazardous hanging limbs must be performed on the same day as the cut work. If there is insufficient room for safe placement along the Public ROW, then the Contractor must load the resulting debris as eligible hazardous leaning trees or eligible hazardous hanging limbs as they are removed.

2.11.1   Eligible hazardous leaning trees will be identified by the County or its authorized representative for removal. Removal and transportation of hazardous leaning trees six (6) inches or greater in diameter on the /Public RPW or private property will be performed as identified by the County or authorized representative.. All disaster specific eligibility guidelines regarding size and diameter of hazardous leaning trees will be communicated to the Contractor in writing by the County or authorized representative. For hazardous leaning trees to be removed and eligible for reimbursement, the tree must satisfy a minimum of one (1) of the following requirements:
a. The tree has more than fifty (50) percent of the crown damaged or destroyed (requires written documentation form an arborist).

b. The tree has a split trunk or broken branches that expose the heartwood.
c. The tree has fallen or been uprooted within a public use area.
d. The tree is leaning at an angle greater than thirty (30) degrees.

2.11.2   Eligible hazardous hanging limbs will be identified by the County or its authorized representative for removal.  Removal and replacement of eligible hazardous hanging limbs tow (2) inches or greater in diameter at the point of the break and on the Public ROW or private property will e performed as identified by the County's authorized representative.  All disaster specific eligibility guidelines regarding size and diameter of limbs will be communicated to the Contractor in writing by the County's authorized representative.  For hazardous hanging limbs to be removed and eligible for payment, the limb must satisfy all the following requirements:
a The limb is two (2) inches or greater in diameter at the point of the  break.
b. The limb is still hanging in a tree and threatening a public use area.
c. The limb is located on improved public property

**2.12     Removal of Hazardous Stumps**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to remove all hazardous uprooted stumps greater than twenty-four (24) inches in diameter, measured twenty-four (24) inches from the base of the tree, in the Public ROW.  Any voids not backfilled immediately following hazardous stump removal must have measures taken I order to protect public health and safety.  Further debris generated from the removal of eligible hazardous uprooted stumps in the Public ROW will be placed in the safest possible location on the ROW and subsequently removed in accordance with Section 2.3 of this RFP.  Stumps measured twenty-four (24) inches in diameter will be considered normal vegetative debris and will be removed in accordance with Section 2.2 of this RFP.  The County will not compensate the Contractor for removing hazardous stumps less than twenty-four (24) inches in diameter on a unite rate basis and instead will be considered normal vegetative debris.  The diameter of stumps less than twenty-four (24) inches will be converted into a cubic yardage volume based on the published FEMA Stump Conversion Table (see Attachment 1) and will be removed under the terms and conditions of Section 2.3 of this RFP.

2.12.1   Eligible hazardous stumps will be identified by the County for removal.  Removal and transportation of hazardous uprooted stumps in the Public ROW and private property will be performed as identified by the County.  All disaster specific eligibility guidelines regarding size and diameter of hazardous stumps will be communicated to the Contractor in writing by the County.  For hazardous stumps to be removed and edible for reimbursement, the stump must satisfy the following requirements:
a.Over fifty (50) percent of the tree crown is damaged or broken and heartwood is exposed.
b. Fifty (50) percent or more of the root ball is exposed.
c. The stump is on Public ROW and poses an immediate threat to public health, safety or welfare.

2.12.2   Stumps that are not attached to the ground will be considered normal vegetative debris and will be subject to removal under the terms and conditions of Section 2.3.  Stumps with less than fifty (50) percent of the root ball exposed shall be flush cut to the ground.  The stump portion of the tree will not be removed but the residual debris (that is, tree trunk) will be removed under the terms and conditions of Section 2.3.  The cubic yard volume of the unattached stump will be based on the diameter conversion using the published FEMA Stump Conversion Table (see Attachment 1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.12.3  The County or its representative will measure and certify all stumps before removal.

2.12.4  Stumps shall only be collected after the County and the Contractor document and perform the following:
a. Location – Determine that the uprooted stump is located on improved public property or a public ROW.  Record and document the location using photography, map depiction and specific descriptive notations.
b.  Size – Measure and record the diameter of the stump to be removed at the appropriate location.
c.  Marking – Eligible stumps will be marked and uniquely numbered with green paint.  Ineligible stumps will be marked with red paint.
d.  Stump Worksheet – Hazardous Stump Worksheet provided by the monitoring firm(s) will be completed in full for each stump to capture and following information: 1) names and signatures of parties present; 2) physical location (street address, road cross streets, etc.); 3) stump number; 4) size of the stump; and 5) date of stump removal.

2.12.5  The unit stump price shall include but not be limited to stump extraction, stump cavity filling with compacted soils and installation of seed and/or sod, stump hauling and stump reduction.

**2.13    ROW White Goods Debris Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the collection of white goods from the ROW, removal of refrigerants, transportation to a County approved DMS, decontamination and transportation to the County's approved final disposal site.

2.13.1  White goods containing refrigerants must first have such refrigerants removed by the Contractor's qualified technicians prior to mechanical loading.  White goods can be collected without first having refrigerants removed if the white goods are manually placed into a hauling vehicle with lifting equipment so that the elements containing refrigerants are not damaged.

2.13.2  The removal, transportation and disposal of white goods includes obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with the Local, State and Federal regulatory agencies.

2.13.3  There are no disposal fees for residential white goods.

**2.14    Used Electronics**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and proper disposal of eligible used electronics from the ROW to the County approved final disposal site.  Eligible used electronics includes but is not limited to disaster damaged televisions, computers, computer monitors and microwaves in areas identified and approved by the County.  The County will refer to the State Department of Environmental Protection for disaster specific guidance on electronic waste criteria and eligibility. The Contractor shall recycle or dispose of all eligible used electronics in accordance with all Local, State and Federal regulations.

**2.15    Household Hazardous Waste Removal, Transport and Disposal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and disposal of HHW.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.15.1   The removal, transportation and disposal of HHW included obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

2.15.2   The collection methods shall include collection vehicles supplied by the Contractor, which shall be capable of transporting HHW materials from the curb to the approved final disposal sites.  All hazardous waste collection personnel shall wear level D personal protective equipment (PPE) and carry a means of communication (for example, cell phone or radio) for safety and operational purpose.  Contractor personnel shall observe all applicable safety requirements for the handling of HHW in accordance with applicable regulations.  All HHW shall be examined prior to collection to ensure it is free of other more serious contaminants, including PCBs.  Such serious and non-qualifying non-HHW waste shall be noted and scheduled for separate recovery by the County or Contractor as directed by the County.  Debris identified as HHW shall be collected and placed in poly bags for temporary storage during transport to the approved final disposal site.

2.15.3   There may be a need for HHW to be segregated for other debris at the DMS.  Contractor personnel at the DMS shall observe all applicable safety requirements for the handling of HHW in accordance with applicable regulations.  Debris identified as HHW shall be collected and place in poly bags for temporary storage at the DMS and during transport to the approved final disposal site.

**2.16    Abandoned Vessel and Vehicle Removal**
Work shall consist of all the labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal and haul out of eligible vessels and vehicles in areas identified and approved by the County.  The removed eligible vehicles will be hauled to a County approve staging area and subsequently disposed of by the appropriate regulatory agency.

2.16.1   The removal, transportation and disposal required for abandoned vessel and vehicle removal includes obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

**2.17    Animal Carcass Removal and Disposal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and lawful disposal of dead animal carcasses in areas identified and approved by the County to an approved final disposal site.  The carcasses will be hauled to a County approved staging area and subsequently disposed of ty the appropriate regulatory agency.

2.17.1   The Contractor will coordinate activities with the appropriate Local animal control agency.

2.17.2   The removal, transportation and disposal of Animal Carcasses included obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

**2.18    Snow Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated cost necessary associated with the plowing, salting, sanding and related emergency snow removal work on County maintained roads and other roads within the disaster area as directed by the County.  All roadways designated by the County for snow removal shall be clear and passable within forty-eight (48) working hours of the issuance of a Notice to Proceed form the County to conduct emergency snow removal

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

work. The County may choose to extend the Contractor's forty-eight (48) hour limit through a written request. This may include roadways in municipalities within the County. Roadways will be cleared as directed by the County. The Contractor shall assist the County and its representative in ensuring proper documentation of emergency snow removal activities by documenting the type of equipment and/or labor utilized (that is, certification), starting and ending times, and zones/areas cleared. Services performed will be compensated using a mutually agreed upon hourly labor and equipment price schedule.

### 2.19    Other Debris Removal Work
Neither the Contractor nor any Sub-Contractor shall solicit work from private citizens or others to be performed in the designated work areas during the term of this Contract. The County reserves the right to require the Contractor to dismiss or remove from the project any workers as the County sees necessary. Any debris removal vehicles dismissed from the project must have their issued placard removed and destroyed.

### 2.20    Use of Local Resources
The Contractor will be able to use their own Sub-contractor resources to meet the obligations of the contract. FEMA encourages using local resources. The County will establish the extent to which Contractor must use local resources. It is expected that the awarded Contractor will encourage at least thirty (30) percent of Sub-contractors are resources located within the disaster area, including but not limited to procuring supplies and equipment, awarding subcontracts and employing workmen at the County's discretion.

### 2.21    Working Hours
Working hours of the contract shall only be during daylight hours, Monday through Sunday or as otherwise directed by the County. No work outside these hours shall be allowed unless approved in advance by the County.

2.21.1   The Contractor shall conduct debris removal operations that generate noise levels above that normally associated with routine traffic flow during daylight hours only. Work may be performed seven (7) days per week. Adjustments to work hours as local conditions may dictate shall be coordinated between the County and the Contractor. Unless otherwise directed, the Contractor must be capable of conducting volumetric reduction operations at DMS locations on a twenty-four (24) hour, seven (7) day a week basis.

### 2.22    Debris Site Tower Specifications
The Contractor shall provide as many towers as designated by the County at each disposal site for the use of County representative during their inspection of dumping operations.

2.22.1   If ingress and egress of the DMS(s) is of significant distance that the County or its authorized representative are unable to verify the entering and exiting trucks, then the Contractor may be required to provide a second tower.

2.22.2   The inspection platform of the tower shall be constructed at a minimum height of ten (10) feet from surrounding grade to finish floor level, have a minimum eight (8) feet by eight (8) feet of usable floor area, be covered by a roof with tow (2) feet overhangs on all sides and be provided with appropriate railings and a stairway. The platform shall be enclosed, starting from the platform floor

level and extending up four (4) feet on all four (4) sides.  The expense incurred by the Contractor for the construction of towers is an overhead expense considered part of the Contractor's compensation under the terms and conditions of Section 2.0.

2.22.3   The Contractor shall provide a minimum of one (1) portable toilet at each dumpsite for the use of County authorized representatives during their inspection of dumping operations.  The toilet shall be provided prior to start of any dumping operations and will be kept in a sanitary condition by the Contractor throughout dumping operations.  The expense incurred by the Contractor for the operation of portable toilets is an overhead expense considered part of the Contractor's compensation under the terms and conditions of Section 2.0.

2.22.4   Care shall be taken to place tower at a sufficient distance away from any reduction/dumping operations.  If necessary, dumping operations may be temporarily suspended by the County due to unsuitable conditions at the tower.

## 2.23   Equipment

2.23.1   All trucks and other equipment must comply with all applicable Local, State and Federal regulations.  Any truck used to haul debris must be capable of rapidly dumping its load without the assistance of other equipment and must be equipped with a tailgate that will effectively contain the debris during transport and permit the truck to be filled to capacity.

2.23.2   Sideboards or other extensions to the bed are allowable provided they meet all applicable regulations, cover the front and both sides, and are constructed to withstand severe operating conditions. The sideboards are to be constructed of two (2) inch by six (6) inch boards or greater and not to extend more than two (2) feet above the metal bedsides. Trucks or equipment certified with sideboards must maintain such sideboards and keep them in good repair. To ensure compliance, equipment will be inspected by the County or authorized representative prior to its use by the Contractor.

2.23.3   Trucks or equipment designated for use under this contract shall not be used for any other work during the working hours of this contract. The Contractor shall not solicit work from private citizens or others to be performed in the designated area during the period of this contract. Under no circumstances will the Contractor mix debris hauled for others with debris hauled under this contract.

2.23.4   Debris shall be reasonably compacted into the hauling vehicle. Any debris extending above the top of the bed shall be secured in place to prevent it from falling off. Measures must be taken to prevent debris from blowing out of the hauling vehicle during transport to an approved DMS or an approved final disposal site.

2.23.5   Equipment used under this contract shall be rubber tired and sized properly to fit loading conditions. Excessively large equipment (100 cubic yards and up) and non-rubber tired equipment must be approved for use on the road by the County.

2.23.6   Hand-loaded vehicles are prohibited unless pre-authorized in writing by the County following the event. All hand-loaded vehicles will receive an automatic fifty (50) percent deduction for lack of compaction.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

### 2.24    Traffic Control

2.24.1    The Contractor shall mitigate the effects of their operations on local traffic to the fullest extent practical. The Contractor is responsible for establishing and maintaining appropriate traffic controls in all work areas, including DMS(s) and debris collection sites.

2.24.2    The Contractor shall provide, erect, and maintain all necessary barricades, suitable and sufficient lights, danger signals, signs, and other traffic control devices at all Contractor work areas to ensure the safety of vehicular and pedestrian traffic.

2.24.3    The Contractor shall provide qualified flag personnel where necessary to direct the traffic and shall take all necessary precautions to protect the designated area and the safety of the public.

2.24.4    All work shall comply with all applicable Local, State, and Federal regulations governing personnel, equipment, and workplace safety. Any notification of a deficiency in traffic control or other safety items shall be immediately corrected by the Contractor. No further work shall take place until the deficiency is corrected. Neither the County nor the County's
authorized representative shall sign any additional load or unit rate tickets until the safety item is corrected.

2.24.5    Highways, streets, or parts of the designated area closed to through traffic shall be protected by effective barricades, and obstructions shall be illuminated during the hours from sunset to sunrise. Suitable warning signs shall be provided to properly control and direct traffic.

2.24.6    All barricades, warning signs, lights, temporary signals, other protective devices, flag persons, and signaling devices shall meet the minimum requirements established in the Manual on Uniform Traffic Control Devices for Streets and Highways, Part VI, prepared by the National Joint Committee on Uniform Traffic Control Devices and current at the time bids are received. Traffic control will conform to the State's most current roadway and traffic design standards and the Federal Highway Administration's (FHWA) Manual on Uniform Traffic Control Devices (MUTCD) for Streets and Highways. The foregoing requirements are to be considered as minimum and the Contractor's compliance shall in no way relieve the Contractor of final responsibility for providing adequate traffic control devices for the protection of the public and Contractor's employees throughout the designated area.

2.24.7    The expenses incurred by the Contractor for traffic control shall be compensated under the terms and conditions of Section 5.

### 2.25    Damage to Public or Private Property

2.25.1    All items damaged as a result of Contractor or Sub-Contractor operations (for example, sidewalks, seating, curbs, pipes, drains, water mains, pavement, mail boxes, and turf) shall be repaired or replaced by the Contractor, at their expense, in a manner prescribed by and at the sole satisfaction of the County. The Contractor will be responsible for any invoices submitted to the County (such as by utility companies or landowners) that are determined to be the result of damage done by the Contractor. The County reserves the right to pay any such invoices and deduct the cost from the Contractor's invoice. Repairs or receipt of repairs shall be completed and submitted to the County prior to submission of the Contractor's invoice for work accomplished. If the Contractor fails to repair any damaged property, the County may have the work performed and charge the Contractor.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**2.25.2**  The Contractor shall restore all disturbed areas to their original condition, including re-grading, use of rye grass and permanent grass, and any other means necessary.

**2.25.3**  The Contractor's failure to restore damage to public or private property to the satisfaction of the County will result in the County withholding retainage money in an amount sufficient to make necessary repairs.

**2.26    Existing Utilities**
**2.26.1**  Some trees and debris that are to be removed under this contract may be blocked or entangled with overhead power, telephone, and television cables. In this case, it shall be Contractor's responsibility to coordinate directly with the utility owners to arrange for the removal of the debris without damage to the overhead and underground utility lines. The Contractor shall pay all such costs to the utility company for any adjustments.
.
**2.26.2**  The Contractor shall make the necessary repairs or pay all costs incurred to repair damaged utilities, as determined by the affected utility company. Repairs to all municipal and privately owned water and sewer facilities shall be made by the Contractor.

**2.27    Environmental Protection**
**2.27.1**  All chemicals of whatever nature used during project construction or furnished for project operations must be state and federally certified. Their use and disposal of all residues shall strictly comply with instructions.

**2.27.2**  The Contractor shall, at their own expense, ensure that noise and dust pollution is minimized to comply with all Local and State regulations and the approval of the County. The Contractor shall comply in a timely manner with all directions of the County regarding the use of a water truck or other approved dust abatement measures.

**2.27.3**  The Contractor shall comply with all laws, rules, regulations, and ordinances regarding environmental protection.

**2.28    Documentation and Measurement**
**2.28.1**  Prior to beginning any work, the County or its authorized representative shall clearly number each truck hauling debris or piece of equipment loading debris. All vehicles must be certified by the County or its authorized representative prior to debris collection. If a vehicle is working under multiple contracts or for multiple communities, it must be re-certified by a County authorized representative each time it returns to work from other contracts or communities.

**2.28.2**  The Contractor is responsible for ensuring that all Sub-Contractor's maintain valid driver's licenses and equipment legally fit for travel on the road.

**2.28.3**  The Contractor shall designate one Project Manager. The Project Manager shall provide the County with a telephone number at which the Project Manager can be reached throughout the project.

**2.28.4**  Load tickets will be provided by the County or its authorized representative for recording volumes of debris removal.
Each load ticket shall consist of one original and four carbon-copy duplicates.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

Load tickets will be issued by a County authorized representative at the loading site. The County will keep one copy of the ticket, and give four copies to the vehicle operator. Upon arrival at the dumpsite, the vehicle operator will give the four copies to the County authorized representative at the dumpsite. Trucks with less than full capacities will be adjusted down by visual inspection. This determination will be made by the County authorized representative present at the dumpsite. The County authorized representative will validate, enter the estimated debris quantity, and sign the load tickets. The County will keep the original copy and the three remaining duplicate copies will be returned to the vehicle operator for the Contractor's records.

The Contractor shall give written notice of the location for work scheduled twenty-four (24) hours in advance to the County.

**2.29    Ownership of Debris**

All debris residing in the Public ROW and County provided DMS(s) shall be the property of the County until final disposal at a properly permitted disposal site. The Contractor shall be responsible removing debris up to the point where debris can only be described as light litter and additional collection can be facilitated only by sweeping and raking. In addition to debris stored on the ROW as the result of road clearing, the County will direct residents to place debris in segregated piles along the ROW, separated as to the waste category. There may be a need to perform some curbside separation of the different waste materials. Different waste materials will be collected in separate vehicles and may require disposal at different locations, which will be approved by the County. Any items requiring disposal at special sites shall be required to be monitored for the collection, complete haul, and delivery at the approved special site with the monitor obtaining an original copy of the disposal ticket showing inbound and outbound collection vehicle weights.

2.29.1   All bagged and bundled waste and debris smaller than two (2) inches in diameter and shorter than two (2) feet in length are outside the scope of this contract unless specifically directed by the County. Collection of municipal solid waste (MSW) is outside the scope of this contract. All debris handled by the Contractor shall become the property of the Contractor upon collection.

2.29.2   It is recognized that C&D debris might contain small amounts of asbestos, lead-based paints, treated wood or similar materials. Pennsylvania DEP may issue orders for the classification and disposition of all disaster debris. Based on the mandates of DEP and other applicable State and Federal reimbursement agencies, the character and disposal of waste streams will be determined. The Contractor and County will establish a final disposal plan based on these mandates.

**3.0   CONTRACTOR REQUIREMENTS**

3.1   Contractor must have the necessary expertise in providing services required in this RFP.

3.2   Contractor will direct any questions regarding County standards policies or procedures while performing assigned tasks, the assignee should discuss with designated County personnel.

3.3   Contractor shall be solely responsible for maintaining safety at all work sites. Contractor shall take all reasonable steps to insure safety for both workers and visitors to the site(s) to include traffic control. Contractor will also be solely responsible to ensure that all OSHA requirements are met and a safety officer assigned to the projection for the duration of the contract.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

## 4.0    QUALIFICATION OF PROPOSER

4.1    Each Proposer shall demonstrate its qualification by providing the County with a proposal that includes at a minimum, the following information,

4.1.1    Background with specific detail to similar projects performed in excess of 500,000 cubic yards.

4.1.2 Technical experience regarding large scale debris removal operation associated with ice storms, snow removal, tornadoes, flooding, tropical events or other natural or manmade disasters.

4.1.3    Staffing – must provide listing of key personnel who would be assigned to the project, including their training, certification and years of experience.  Also indicated which personnel will be primary contacts, which will be dedicated staff and what role each staff member will play in execution of the contracted services.  Organizational chart including proposed points of contact and full-time project manager required to report to the County.

4.1.4    Contractor must furnish a "Certificate of Registration" that identifies the Contractor is authorized to conduct business in the State of Pennsylvania.

4.1.5    Listing of existing or past clients from the successful completion of five (5) debris removal projects, in which three (3) completed projects were in excess of 500,000 cubic yards. Include names and contact information from the referral customers that the County may contact.  Also, list of existing contracts within 250 miles of the County.

4.1.6    Discuss the brief history of the firm, including any predecessor firms and the current parent/subsidiary relationship with any other firm(s). Indicate how long the current firm has been in continuous operation and how long it has been providing services. Provide any significant information about the firm relevant to demonstrating its experience and how it is uniquely qualified to provide services. Indicate whether your firm has been the subject of any disciplinary action by federal, state government or by a professional association. If yes, explain the disciplinary action.

4.1.7    A list of Sub-contractors showing/including primary operating location.

4.1.8    Detailed listing of equipment and resources – list of on-site and off-site equipment that will be available at the collection site or facility.  List should include all fire prevention, safety, personal protective equipment n and other equipment that would be suitable or necessary for the project..

4.1.9    Mobilization and operations plan.

4.1.10   Construction drawings for OSHA compliant temporary inspection towers.

4.1.11   Spill and Fire Prevention Plan – submit spill prevention and fire prevention plans tailored to on-site activities at the debris management site (DMS) or facility.

4.1.12   Contingency Plan – submit a format for a contingency plan and provide a description of notification procedures to the participants of on-site emergencies and evacuation of the participants in case of an emergency on-site.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

4.1.13   Contractor shall submit information regarding their standard health and Safety Plan.

4.1.14   Description of Safety Record – submit listing of all warning notifications, violations and/or citations received from pertinent federal and/or state agencies in the past three (3) years.

4.1.15   Submit a listing of all Third party certifications such as ISO 9000 Series, ISO 14000 Series.

4.1.16   Contractor must submit the most current, unqualified, audited financial statement or SEC Form 10K for the proposing organization.

4.1.17   Public Information Plan – Public Information Representative provided by the Contractor in interface with the County's Public Information Officer (PIO).

## 5.0   COUNTY RESPONSIBILITIES
County responsibilities will vary depending on County needs and resources. The County at a minimum will be responsible for the following:

5.1   Coordinating collection activities with the Contractor.

5.2   Completing County service request forms.

5.3   Identifying suitable DMS activities.

5.4   Promote debris management activities.

5.5   Provide educational materials.

5.6   Submit post-collection DMS(s) data reports to DEP.

5.7   Recruiting and coordinating volunteers.

5.8   Coordinate with local police, fire, emergency medical services (EMS) and other appropriate agencies.

5.9   Provide emergency contact information

5.10   Issuance of a written Notice to Proceed, with a not to exceed amount at the appropriate time.

### Special Conditions
### Vendor Interview/Presentation
Upon review of the Proposals, the County reserves the right to request and schedule meeting(s) at a designated time, date and location for an interview and/or presentation.

### Subcontracts
Intended use of subcontracted services for any part of this RFP must be identified in your proposal.  The Contractor shall retain total responsibility for the performance of the contract.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**Child Abuse Clearances Required**
Proposers are required to complete and return the PA Protective Services Compliance Verification Form with their Proposal. Copies of Pennsylvania Child Abuse Clearances (Childline) are required for all employees and subcontractors.

**Identification**
Contractor employees must wear company uniform with company name and visibly wear/display a company identification badge. Contractor's employees deemed to be disruptive, unqualified or under the influence will have their security withdrawn and be permanently removed from the Facility.

**Invoicing/Payments**
The County will pay the amount due to the Contractor within thirty days after receipt of a correct invoice. Any invoices older than six (6) months, the County reserves the option to deduct ten percent (10%) per month from the payment due for processing fees subject to a twenty-five dollar minimum on any outstanding request(s) for payment. The County assumes no liability for any payment request older than six (6) months from the delivery or completion of work.

In the event any portion of this scope of work is to be funded by state or federal funds, the Contractor will comply with all requirements of the state or federal government applicable to the use of the funds. The County will only pay for those items deemed eligible by the federal funding agency, unless the County otherwise agrees in writing.

Invoices shall be submitted to the County or authorized representative on a bi-weekly basis. All invoices must be submitted with a hard copy and electronic copy (Microsoft Excel format) of the invoice detail. The invoice detail must consist of a tabular report listing all ticket information required by the County. Invoice detail submittals will be checked against County records. County records are the basis of all payment approvals. Only one hundred percent (100%) accurate and complete invoices shall be approved for payment.

Contractor must submit a final invoice within thirty (30) days of completion of scope of work. Completion of scope of work will be acknowledged, in writing, by the County. The final invoice must be marked "FINAL INVOICE" and no additional payments will be made after the Contractor's final invoice. The County, or an authorized representative, will monitor, verify, and document with load tickets or unit rate tickets the completion of all work, as defined in the scope of work. The Contractor will be provided copies of this documentation. These documents will be used by the Contractor as backup data for invoice submittals. Work not ticketed or not authorized by the County will not be approved for payment. Additionally, any ticket submitted for payment must be properly completed. Tickets missing loading address, truck number, certified capacity, collection monitor signature, disposal site, load call or disposal monitor signature will not be paid, nor will the County be responsible for unpaid incomplete tickets.

The County reserves the right to request that private property debris removal operations will be invoiced separately from right-of-way collection removal operations. The County reserves the right to request additional invoice separation by debris type (construction and demolition, vegetative debris, household hazardous waste, etc.), program (right-of-way collection, private property debris removal, etc.) and/or applicant(s) (entities located within the jurisdiction).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

A ten percent (10%) retainage will be withheld from each reconciled invoice until the end of the project. In order to recover the retainage, the Contractor must successfully complete and receive a letter of completion from the County for all work zones. Retainage will be held until final reconciliation is complete. Portions of the retainage may be held by the County to repair damage caused by the Contractor to public or private property.

The Contractor is responsible for payment to all subcontractors utilized for the services rendered within this scope of work. The Contractor shall execute release waivers with all subcontractors to release the County from payment to subcontractors directly. The release waivers for all subcontractors shall be provided to the County prior to final retainage release.

No separate payment will be made for mobilization and demobilization operations. These costs are to be included in the respective unit prices bid for debris removal and will not be adjusted based on the total amount of debris actually removed in the contract.

## DEFINITIONS OF KEY TERMS
**1.0   Site Approved Final Disposal**
A final disposal site approved in writing by the COUNTY.

**2.0   Authorized Representative**
County employees and/or contracted individuals designated by the County or County Debris Manager.

**3.0   Cleanup Crew**
A group of individuals or an individual employed by the Contractor to collect disaster debris.

**4.0   Construction and Demolition (C&D) Debris**
FEMA Publication 325 defines eligible C&D debris as damaged components of buildings and structures such as lumber/wood, gypsum wallboard, glass, metal, roofing material, tile, carpeting and floor coverings, window coverings, plastic pipe, concrete, fully cured asphalt, heating, ventilation and air conditioning systems and their components, light fixtures, small consumer appliances, equipment, furnishings and other residential contents that are a result of a disaster. (Note: This definition of C&D debris is for disaster recovery purposes and is not the same definition commonly used in other solid waste documents.) Current eligibility criteria include the following:

4.1 Debris must be located within a designated area and be removed from an eligible applicant's improved property or right-of-way (ROW).

4.2 Debris removal must be the legal responsibility of the applicant.

4.3 Debris must be a result of a major disaster.

**5.0   Debris**
Items and materials broken, destroyed, or displaced by a natural or human-caused federally declared disaster. Examples of debris include but are not limited to trees, C&D debris, and personal property.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**6.0  Debris Management Site (DMS)**
A location to temporarily store, reduce, segregate, and/or process debris before it is hauled to a final disposal site. May also be referred to as a temporary debris storage and reduction site (TDSRS) or temporary debris staging and processing facility (TDSPF).

**7.0  Debris Manager**
The County will designate a Debris Manager, who will provide oversight for all phases of debris removal operations.

**8.0  Debris Removal**
Picking up debris and taking it to a DMS, composting facility, recycling facility, permitted landfill, or other reuse or end-use facility.

**9.0  Demolition**
Demolition is the act or process of reducing a structure, as defined by the State of Texas or local code, to a collapsed state. It contrasts with deconstruction, which is the taking down of a building while carefully preserving valuable elements for reuse.

**10.0  Description of Designated Area**
10.1  The designated area for debris removal is bounded by County limits and includes all public ROWs, easements, parks, and debris staging areas within the areas of the County. Debris clearance and removal on roadways in  municipalities within the County's limits may assign debris removal  responsibilities to the Contractor. The Contractor will remove debris from municipal roadways at the direction of the County. The County may also authorize the Contractor to remove debris from Non-County roadways or other  areas as directed in writing by the County.

10.2  All debris identified by the County shall be removed. The Contractor shall make up to two complete passes through the County's limits, removing all debris  along each ROW. The County may or may not require the Contractor to perform a third pass. Partial removal of debris piles is strictly prohibited. The Contractor shall not move from one designated area to another designated area without prior approval from the County or its representative. Any eligible debris  (such as fallen trees) that extends onto the ROW from private property shall be cut at the point where it enters the ROW, and the part of the debris that lies within the ROW shall be removed. The Contractor shall not enter onto private property during the performance of this contract unless specifically authorized in writing by the County.

10.3  The Contractor shall deliver debris to disposal sites that have been permitted to receive disaster debris and will adhere to all State, Local, and Federal regulations.

10.4  Debris shall be reasonably compacted into the hauling vehicle. No limbs shall be allowed to protrude more than six (6) inches beyond the sides of the truck bed. Any debris extending above the top of the truck bed shall be secured in place to prevent it from falling off. Measures must be taken to prevent debris from blowing out of the hauling vehicle during transport to the disposal site.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

10.5  All debris will be mechanically loaded. Hauling vehicles that are hand-loaded or that require mechanical assistance for dumping will not be permitted to dump at DMS(s), unless approved in advance by the County.

10.6  Loose leaves and small debris in excess of one bushel basket shall be removed within the designated area. No debris shall be left on the road surface. No single piece of debris larger than six (6) inches in any dimension shall be left on-site. Hand crews and rakes will be required.\

10.7  The Contractor will provide an on-site Project Manager to the County. The Project Manager shall provide the County with a telephone number at which the Project Manager can be reached throughout the project. The Project Manager will be expected to have daily meetings with County representatives. Daily meeting topics will include but will not be limited to volume of debris collected, completion progress, local coordination, and damage repairs. The County may adjust the frequency of meetings. The Contractor Project Manager must be available 24 hours-a-day, or as required by the County.

10.8  The County may provide the Contractor with potential DMS(s). The Contractor will be responsible for returning the DMS(s) to its original condition, abiding by all State and Federal environmental regulatory requirements.

10.8.1   DMS locations to be determined within the County service request form.

10.8.2   Once DMS locations are identified, the Contractor will be provided with the address, GPS coordinates, and estimated acreage of each DMS.

10.8.3   Based on the severity of the disaster, the County may task the Contractor with locating additional sites available to be used as DMS(s).

10.8.4   The County does not warrant or guarantee the availability or use of any dump sites. The Contractor must coordinate directly with owners of all final disposal sites. All final disposal sites must be approved in writing by the County. The Contractor will remain legally responsible for the handling, reduction, and final haul-out and disposal of all reduced and unreduced debris. DMS(s) operations and remediation must comply with all Local, State, and Federal safety and environmental standards. Contractor reduction, handling, disposal, and remediation operations must be approved in writing by the County.

10.8.5   Payment for disposal costs (such as tipping fees) incurred by the Contractor at permitted disposal facilities, or other County approved sites that meet Local, State, and Federal regulations for disposal, will be made at the cost incurred by the Contractor. The Contractor must furnish a copy of the invoice received by the disposal facility, all scale or load tickets issued by the disposal facility, and proof of CONTRACTOR payment to the disposal facility.

10.09  The Contractor shall conduct the work so as not to interfere with the disaster  response and recovery activities of Federal, State, and Local governments or agencies, or of any public utilities.

10.10  The County reserves the right to inspect the DMS(s), verify quantities, and review operations at any time.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

10.11 The Contractor shall be capable of assembling, directing, and managing a workforce that can be fully operational in debris management operations in a maximum of seventy-two (72) hours, or sooner depending on the extent of the disaster. Operations must begin within twenty-four (24) hours of notification by the County. Depending on the category of the event, the County may request immediate mobilization.

10.12 Debris management activities reimbursed through federal disaster programs may occur in areas protected by the Endangered Species Act. For any project that requires a federal permit or receives federal funding is subject to Section 7. The Contractor and County will comply with the findings of the Section 7 consultation, if applicable.

**11.0   Disaster-Specific Guidance (DSG)**
DSG is a policy statement issued in response to a specific post-event situation or need in a state or region. Each DSG is issued a number and is generally referred to by its numerical identification.

**12.0   Eligible**
Eligible means qualifying for and meeting the most current stipulated requirements (at the time the written Notice to Proceed is issued and executed by the County to the Contractor) of the FEMA Public Assistance Grant Program, FEMA Publication 321, FEMA Publication 322, FEMA Publication 323, FEMA Publication 325, and all current FEMA fact sheets, guidance documents, and DSGs. Eligible also includes meeting any changes in definition, rules, or requirements regarding debris removal reimbursement as stipulated by FEMA during the course of a debris removal project.

**13.0   Endangered Species Act**
13.1 Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires all Federal agencies to consult with the National Marine Fisheries Service (NMFS) for marine and anadromous species, or the United States Fish and Wildlife Service (FWS) for fresh-water and wildlife, if they are proposing an action that may affect listed species or their designated habitat. "Action" is defined broadly to include funding, permitting, and other regulatory actions. (See 50 C.F.R. §402.02.)

13.2 Each Federal agency is to ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of a designated critical habitat. This is done through consultation. If such species may be present, the Local government must conduct a biological assessment (BA) to analyze the potential effects of the project on listed species and critical habitat in order to establish and justify an effect determination (assistance and coordination may be available from the State of Texas, especially with transportation projects). The Federal agency reviews the BA and, if it concludes that the project may adversely affect a listed species or its habitat, it prepares a biological opinion. The biological opinion may recommend reasonable and prudent alternatives to the proposed action to avoid jeopardizing or adversely modifying the habitat.

**14.0   FEMA Publication 325 Debris Management Guide**
This publication is specifically dedicated to the rules, regulations, and policies associated with the debris removal process. Familiarity with this publication and any revisions can help a Local government limit the amount of non-reimbursable expenses. The Debris Management Guide provides the framework for the debris removal process authorized by the Stafford Act, including the following:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

14.1 Eliminating immediate threats to lives, public health, and safety

14.2 Eliminating immediate threats of significant damage to improved public or private property

14.3 Ensuring the economic recovery of the affected community to the benefit of the community at large

**15.0   Grinding**
Reduction of disaster-related vegetative debris through mechanical means into small pieces to be used as mulch or fuel. Grinding may also be referred to as chipping or mulching.

**16.0   Hazardous Hanging Limbs**
A limb that poses significant threat to the public. The current eligibility requirements for hazardous hangers according to FEMA Publication 325 are:

16.1 Located on improved public property;

16.2 Greater than two inches in diameter at the point of breakage; and

16.3 Still hanging in a tree and threatening a public use area, e.g. trails, sidewalks, golf cart path.

**17.0   Hazardous Leaning Tree**
A tree is considered hazardous if its condition was caused by the disaster; it is an immediate threat to lives, public health and safety, or improved property; it has a diameter breast height of six inches or greater; and one or more of the following criteria are met: according to FEMA Publication 325 include:

17.1 The tree has more than 50 percent of the crown damaged or destroyed.

17.2 The tree has a split trunk or broken branches that expose the heartwood.

17.3 The tree has fallen or been uprooted within a public use area.

17.4 The tree is leaning at an angle greater than thirty (30) degrees.

**18.0   Hazardous Stump**
A stump is defined as hazardous and eligible for reimbursement if all of the following criteria are met. The current eligibility requirements for hazardous hangers according to FEMA Publication 325 are:

18.1 The stump has fifty (50) percent or more of the root ball exposed.

18.2 The stump is greater than twenty-four (24) inches in diameter when measured twenty-four (24) inches from the ground.

18.3 The stump is located on a public ROW.

18.4 The stump poses an immediate threat to public health and safety.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

### 19.0    Historic Preservation
In certain instances, debris operations may occur in designated areas (for example, DMS locations or private property) that are subject to historical preservation rules and regulations.

### 20.0    Household Hazardous Waste (HHW)
20.1 The Resource Conservation and Recovery Act (RCRA) defines hazardous waste as materials that are ignitable, reactive, toxic, corrosive, or meet other listed criteria. Examples of eligible HHW include items such as paints, cleaners, pesticides, etc. The eligibility criteria for HHW are as follows:

20.1.1  HHW must be located within a designated area and be removed from an eligible applicant's improved property or ROW.

20.1.2  HHW removal must be the legal responsibility of the applicant.

20.1.3  HHW must be a result of a major disaster.

20.2  The collection of commercial disaster-related hazardous waste is generally not eligible for reimbursement. Commercial hazardous waste will only be collected by the Contractor with written authorization by the County. Hazardous waste must be disposed of in accordance with all rules and regulations of Local, State, and Federal regulatory agencies.

### 21.0    Monitor
Person that observes day-to-day operations of debris removal crews to ensure they are performing eligible work, meeting the COUNTY'S expectations and contractual requirements, and complying with all applicable Federal, State, and Local regulations. May also be referred to as a field inspector.

### 22.0    Personal Protective Equipment (PPE)
Equipment worn to minimize exposure to a variety of hazards.

### 23.0    RACM
Regulated Asbestos-Containing Material" (RACM) is:

23.1  Friable asbestos material

23.2  Category I non-friable ACM that has become friable

23.3  Category I non-friable ACM that will be or has been subjected to sanding, grinding, cutting or abrading

23.4  Category II non-friable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**24.0   Recycling**
The recovery or use of wastes as a raw material for making products of the same or different nature as the original product.

**25.0   Refrigerant**
Ozone-depleting compound that must be removed from white goods or other refrigerant-containing items prior to recycling or disposal.

**26.0   Right-of-Entry (ROE)**
As used by FEMA, the document by which a property owner confers to the County or its Contractor or the United States Army Corps of Engineers the right to enter onto private property for a specific purpose without committing trespass.

**27.0   Right-of-Way (ROW)**
The portions of land over which facilities such as highways, railroads, or power lines are built. It includes land on both sides of the facility up to the private property line.

**28.0   Scale/Weigh Station**
A scale used to weigh trucks as they enter and leave a landfill. The difference in weight determines the tonnage dumped and a tipping fee is charged accordingly. It also may be used to determine the quantity of debris picked up and hauled.

**29.0   Tipping Fee**
A fee charged by landfills or other waste management facilities based on the weight or volume of debris dumped. May also be referred to as a disposal fee.

**30.0   Used Electronics**
End-of-life electronics (typically televisions, computers, and related components) that have been damaged by the disaster. May also be referred to as e-waste.

**31.0   Vegetative Debris**
31.1 Damaged and disturbed trees, tree limbs, bushes, shrubs, brush, untreated lumber, and wood products.
31.2 Remains of standing trees that are clearly damaged beyond salvage.

**32.0   White Goods**
As outlined in FEMA Publication 325, eligible white goods are defined as discarded disaster-related household appliances such as refrigerators, freezers, air conditioners, heat pumps, ovens, ranges, washing machines, clothes dryers, and water heaters. White goods can contain ozone-depleting refrigerants, mercury, or compressor oils that the federal Clean Air Act prohibits from being released into the atmosphere. The Clean Air Act specifies that only qualified technicians can extract refrigerants from white goods before they can be recycled. The eligibility criteria for white goods are as follows:

32.1 White goods must be located within a designated area and be removed from an eligible applicant's improved property or ROW.

32.2 White goods removal must be the legal responsibility of the applicant.

32.3 White goods must be a result of a major disaster

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## DRC Emergency Services, LLC.

### Pricing Schedule

| ROW Vegetative Debris Removal | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of the collection and transportation of eligible vegetative debris on the ROW or public property to a End User approved debris management site (DMS). | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| 0 to 15 miles | Cubic Yard | $ | 11.45 | $ | 10.45 | $ | 9.95 | $ 91.60 |
| 16 to 30 miles | Cubic Yard | $ | 12.45 | $ | 10.95 | $ | 10.45 | $ 99.60 |
| 31 to 60 miles | Cubic Yard | $ | 12.45 | $ | 10.95 | $ | 10.45 | $ 99.60 |
| Greater than 60 miles | Cubic Yard | $ | 12.45 | $ | 10.95 | $ | 10.45 | $ 99.60 |

| ROW C&D Debris Removal | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of the collection and transportation of eligible C&D on the ROW or public property to a End User approved final disposal site. | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| 0 to 15 miles | Cubic Yard | $ | 12.25 | $ | 11.25 | $ | 10.25 | $ 85.75 |
| 16 to 30 miles | Cubic Yard | $ | 12.95 | $ | 11.95 | $ | 10.95 | $ 90.65 |
| 31 to 45 miles | Cubic Yard | $ | 15.75 | $ | 14.75 | $ | 13.75 | $ 110.25 |
| 46 to 60 miles | Cubic Yard | $ | 16.55 | $ | 15.55 | $ | 14.55 | $ 115.85 |
| 61 to 75 miles | Cubic Yard | $ | 17.35 | $ | 16.35 | $ | 15.35 | $ 121.45 |
| 76 to 100 miles | Cubic Yard | $ | 18.35 | $ | 17.35 | $ | 16.35 | $ 128.45 |
| Greater than 100 miles | Cubic Yard | $ | 19.35 | $ | 18.35 | $ | 17.35 | $ 135.45 |

| Demolition, Removal, Transport and Disposal of Non-RACM Structures | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of the decommissioning, demolition, and disposal of eligible Non-RACM structures on public or private property and | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| 0 to 15 miles | Cubic Yard | $ | 34.15 | $ | 33.15 | $ | 32.15 | $ 239.05 |
| 16 to 30 miles | Cubic Yard | $ | 35.15 | $ | 34.15 | $ | 33.15 | $ 246.05 |
| 31 to 45 miles | Cubic Yard | $ | 38.15 | $ | 37.15 | $ | 36.15 | $ 267.05 |
| 46 to 60 miles | Cubic Yard | $ | 39.15 | $ | 38.15 | $ | 37.15 | $ 274.05 |
| 61 to 75 miles | Cubic Yard | $ | 40.15 | $ | 39.15 | $ | 38.15 | $ 281.05 |
| 76 to 100 miles | Cubic Yard | $ | 41.15 | $ | 40.15 | $ | 39.15 | $ 288.05 |
| Greater than 100 miles | Cubic Yard | $ | 42.15 | $ | 41.15 | $ | 40.15 | $ 295.05 |

| Demolition, Removal, Transport and Disposal of RACM Structures | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of the decommissioning, demolition, and disposal of eligible RACM structures on public or private property and hauling the | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| 0 to 15 miles | Cubic Yard | $ | 47.15 | $ | 46.15 | $ | 45.15 | $ 330.05 |
| 16 to 30 miles | Cubic Yard | $ | 48.15 | $ | 47.15 | $ | 46.15 | $ 337.05 |
| 31 to 45 miles | Cubic Yard | $ | 51.15 | $ | 50.15 | $ | 49.15 | $ 358.05 |
| 46 to 60 miles | Cubic Yard | $ | 52.15 | $ | 51.15 | $ | 50.15 | $ 365.05 |
| 61 to 75 miles | Cubic Yard | $ | 53.15 | $ | 52.15 | $ | 51.15 | $ 372.05 |
| 76 to 100 miles | Cubic Yard | $ | 54.15 | $ | 53.15 | $ | 52.15 | $ 379.05 |
| Greater than 100 miles | Cubic Yard | $ | 55.15 | $ | 54.15 | $ | 53.15 | $ 386.05 |

| DMS Management and Operations | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of managing and operating DMS for acceptance of eligible vegetative disaster related debris. The costs associated with acquiring, processing, leasing, renting, operating, and remediating land used as DMS is reflected in this bid. | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| | Cubic Yard | $ | 1.95 | $ | 1.95 | $ | 1.95 | $ 18.50 |

| DMS Management and Reduction by Grinding | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of operating DMS for acceptance and reduction of eligible vegetative disaster related debris through grinding | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| | Cubic Yard | $ | 4.55 | $ | 4.45 | $ | 3.45 | $ 52.35 |

| DMS Management and Reduction by Air Curtain Incineration | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of operating DMS for acceptance and reduction of eligible vegetative disaster related debris through air curtain incinerators. | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| | Cubic Yard | $ | 3.75 | $ | 3.25 | $ | 2.75 | $ 30.85 |

| DMS Management and Reduction of C&D Debris by Grinding | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of operating DMS for acceptance and reduction of eligible C&D disaster related debris through grinding. | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| | Cubic Yard | $ | 7.45 | $ | 6.75 | $ | 5.95 | $ 64.15 |

| Haul-Out of Reduced Debris to a End User Approved Final Disposal Site | Unit | Low Range | | Mid Range | | High-Range | | $ Per Ton (Alternate) |
|---|---|---|---|---|---|---|---|---|
| Work consists of loading and transporting reduced eligible disaster related debris at an End User approved DMS to an End User | | 0-100k CY | | 100k-500k CY | | 500k+ CY | | |
| 0 to 15 miles | Cubic Yard | $ | 8.50 | $ | 7.50 | $ | 6.50 | $ 42.50 |
| 16 to 30 miles | Cubic Yard | $ | 9.00 | $ | 8.00 | $ | 7.00 | $ 45.00 |
| 31 to 45 miles | Cubic Yard | $ | 10.25 | $ | 9.25 | $ | 8.25 | $ 51.25 |
| 46 to 60 miles | Cubic Yard | $ | 11.50 | $ | 10.50 | $ | 9.50 | $ 57.50 |
| 61 to 75 miles | Cubic Yard | $ | 12.75 | $ | 11.75 | $ | 10.75 | $ 63.75 |
| 76 to 100 miles | Cubic Yard | $ | 14.00 | $ | 13.00 | $ | 12.00 | $ 70.00 |
| Greater than 100 miles | Cubic Yard | $ | 16.00 | $ | 15.00 | $ | 14.00 | $ 80.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| SCHEDULE 1 - UNIT RATE PRICE (CONT'D) | | |
|---|---|---|
| **Removal of Hazardous Trees and Limbs**<br>Work consists of removing eligible hazardous trees or limbs and placing them on the safest possible location on the End User ROW for collection under the terms and conditions of Scope of Services, Vegetative Debris Removal. | **$ Per Tree** | |
| 6 inch to 12.99 inch diameter | $ | 85.00 |
| 13 inch to 24.99 inch diameter | $ | 175.00 |
| 25 inch to 36.99 inch diameter | $ | 295.00 |
| 37 inch to 48.99 inch diameter | $ | 495.00 |
| 49 inch and larger diameter | $ | 625.00 |
| Hanger Removal (per Tree) | $ | 85.00 |
| **Removal of Hazardous Stumps**<br>Work consists of removing eligible hazardous stumps and transporting resulting debris from the ROW to a End User approved | **$ Per Stump** | |
| 24.1 inch to 36.99 inch diameter | $ | 150.00 |
| 37 inch to 48.99 inch diameter | $ | 280.00 |
| 49 inch and more diameter | $ | 670.00 |
| **ROW White Goods Debris Removal**<br>Work consists of the removal of eligible White Goods from the ROW to a End User approved DMS site or End User approved facility for | **$ Per Unit** | |
| Refrigerators and freezers requiring refrigerant recovery and disposal (each unit) | $ | 100.00 |
| Washers, dryers, stoves, ovens, AC units and hot water heaters | $ | 50.00 |
| **Used Electronics Removal**<br>Work consists of the recovery and disposal of eligible damaged televisions, computers, computer monitors, and microwaves unless otherwise specified in writing by the End User. | **$ Per Unit** | |
| | $ | 35.00 |
| **Household Hazardous Waste Removal, Transport, and Disposal**<br>Work consists of the collection, transportation, and disposal of household hazardous waste from the ROW to a End User approved permitted hazardous waste disposal facility (each unit) | **$ Per Pound** | |
| | $ | 8.85 |
| **Abandoned Vehicle and Vessel Removal**<br>Work consists of the removal and transport of eligible abandoned vehicles and vessels. | **$ Per Unit** | |
| Passenger Car | $ | 500.00 |
| Single Axle | $ | 750.00 |
| Double Axle | $ | 1,500.00 |
| **Dead Animal Carcasses**<br>Work consists of the recovery and disposal of dead animal carcasses | **$ Per Pound** | |
| | $ | 4.00 |

| 18. Storm Drains, Canals and Ditches | $ Per Linear Foot | |
|---|---|---|
| Storm Deposited Silt-Canals and Ditches.  Ditch width 0-4 feet | $ | 14.15 |
| Storm Deposited Silt-Canals and Ditches.  Ditch width 4.1-8 feet | $ | 28.15 |
| Storm Deposited Silt-Canals and Ditches.  Ditch width 8.1-12 feet | $ | 34.15 |
| Storm Deposited Silt-Canals and Ditches.  Ditch width 12.1-16 feet | $ | 38.15 |
| Storm Deposited Silt-Canals and Ditches.  Ditch width 16.1-20 feet | $ | 42.15 |
| Storm Deposited Silt-Canals and Ditches.  Ditch width 20.1-30 feet | $ | 46.15 |
| Cleaning and Clearing of Storm Drain Lines. Drain Line Diameter 0-15 inches | $ | 22.25 |
| Cleaning and Clearing of Storm Drain Lines. Drain Line Diameter 15.01 and greater inches | $ | 32.25 |
| **19.. Cleaning of Catch Basins** | **$ Per Each** | |
| Cleaning and Clear of Cath Basins and Inlets. 4' x 4 | $ | 400.00 |
| Cleaning and Clear of Cath Basins and Inlets. 8' x 8 | $ | 550.00 |
| Cleaning and Clear of Cath Basins and Inlets. 10' x 10 | $ | 700.00 |
| Cleaning and Clear of Cath Basins and Inlets. 20' x 20 | $ | 850.00 |

**Notes**

The Contractor will pay Tipping Fee at Final Disposal Site(s) and invoice the County at direct cost with no markup.  Disposal costs are treated as a pass-through expense and are not included in the proposed unit rates above.

| DRC Emergency Services, LLC | |
|---|---|
| Montgomery County, PA- RFP 19-23 Disaster Debris Mgmt., Clearance & Removal Services | |
| Hourly Pricing Schedule | |
| EQUIPMENT TYPE | EQUIPMENT HOURLY RATE |
| Air Curtain Pit Burner | $225.00 |
| Air Curtain Refractory Incinerator | $245.00 |
| Bobcat Loader | $135.00 |
| Bucket Truck w/Operator | $245.00 |
| Chipper/Mulcher (8" throat) | $245.00 |
| Chipper/Mulcher (12" throat) | $265.00 |
| Crash Truck w/Impact Attenuator | $185.00 |
| Dozer, Tracked, D5 or similar | $220.00 |
| Dozer, Tracked, D6 or similar | $340.00 |
| Dozer, Tracked, D7 or similar | $450.00 |
| Dozer, Tracked, D8 or similar | $500.00 |
| Dump Truck, 18 CY-20 CY | $120.00 |
| Dump Truck, 21 CY-30 CY | $130.00 |
| Generator and Lighting | $100.00 |
| Grader w/12' Blade | $260.00 |
| Hydraulic Excavator, 1.5 CY | $180.00 |
| Hydraulic Excavator, 2.5 CY | $190.00 |
| Knuckleboom Loader | $270.00 |
| Lowboy Trailer w/Tractor | $150.00 |
| Log Skidder | $250.00 |
| Mobile Crane (Adequate for hanging limbs/leaning trees) | $245.00 |
| Pickup Truck, ½ Ton unmanned | $40.00 |
| Soil Compactor 81 HP+ | $195.00 |
| Soil Compactor 80 HP | $175.00 |
| Soil Compactor, Towed Unit | $125.00 |
| Stump Grinder 30" diameter or less | $225.00 |
| Stump Grinder greater than 30" diameter | $265.00 |
| Traffic Control, Temporary Single Lane Closure | $245.00 |
| Tub Grinder, 800 to 1,000 HP | $645.00 |
| Waste Collection Rear Loader Truck | $245.00 |
| Water Truck | $135.00 |
| Wheel Loader, 2.5 CY, 950 or similar | $185.00 |
| Wheel Loader, 3.5 – 4.0 CY, 966 or similar | $195.00 |
| Wheel Loader, 4.5 CY, 980 or similar | $205.00 |
| Wheel Loader-Backhoe, 1.0 – 1.5 CY | $175.00 |
| Weighing Scales, Truck, Portable and Certified | $250.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| LABOR TYPE | EQUIPMENT HOURLY RATE | |
|---|---|---|
| Project Manager with Cell Phone and Vehicle | $80.00 | |
| Operations Manager with Cell Phone and vehicle | $90.00 | |
| Crew Foreman with Cell Phone and Vehicle | $75.00 | |
| Tree Climber with Chainsaw and Gear | $90.00 | |
| Laborer with Chainsaw | $45.00 | |
| Laborer with small tools, traffic control or flag person | $40.00 | |
| Bonded and Certified Security Personnel | $85.00 | |

| DESCRIPTION | UNITS | UNIT PRICE |
|---|---|---|
| **Dehumidifier Equipment** | | |
| Dehumidifiers | DAY | $ 150.00 |
| Large Dehumidifiers | DAY | $ 250.00 |
| Air Movers | DAY | $ 55.00 |
| **VEHICLES/TRANSPORTATION** | | |
| PICKUP TRUCK | DAY | $ 350.00 |
| PICKUP TRUCK EXTENDED CAB | DAY | $ 350.00 |
| PICKUP TRUCK 4 X 4 | DAY | $ 400.00 |
| PICKUP TRUCK 1 TON | DAY | $ 450.00 |
| BOX TRUCK | DAY | $ 650.00 |
| PASSENGER CAR | DAY | $ 300.00 |
| 20' RESPONSE TRAILER | DAY | $ 595.00 |
| 36' RESPONSE TRAILER | DAY | $ 695.00 |
| OFFICE TRAILER | DAY | $ 650.00 |
| FLATBED TRAILER | DAY | $ 250.00 |
| VEHICLE USE- PICKUPS, VANS, CARS | MILE | $ 3.50 |
| VEHICLE USE- TRAILERS, HEAVY TRUCKS | MILE | $ 4.50 |
| 12' WORK BOAT W/MOTOR | DAY | $ 450.00 |
| 12' WORK BOAT W/O MOTOR | DAY | $ 400.00 |
| VACUUM TRUCK 3500 GALLON | DAY | $ 2,980.00 |
| **PERSONAL PROTECTIVE EQUIPMENT (PPE)** | | |
| LEVEL A EMPLOYEE FULLY ENCAPSULATED SUIT, SCBA, 1 SCBA BOTTLE, GLOVES AND BOOTS (DOES NOT INCLUDE SUIT, GLOVE, OR BOOT REPLACEMENT) | DAY | $ 758.00 |
| LEVEL B EMPLOYEE PROTECTIVE COVERALL, SCBA OR AIRLINE RESPIRATOR, GLOVES, BOOTS, AND HARD HATS (DOES NOT INCLUDE COVERALL OR GLOVE REPLACE.) | DAY | $ 380.00 |
| LEVEL C EMPLOYEE PROTECTIVE COVERALL, HALF OR FULL FACE RESPIRATOR, CARTRIDGES, GLOVES, BOOTS, AND HARD HATS (DOES NOT INCLUDE COVERALL, CARTRIDGE, OR GLOVE REPLACEMENT) | DAY | $ 235.00 |
| SCBA BOTTLES REFILL- AFTER THE FIRST INCLUDED IN LEVEL A & B CHARGE ABOVE | EACH | $ 57.00 |
| CASCADE AIR SYSTEM PER EMPLOYEE | DAY | $ 119.00 |
| AIR FILTRATION PANAL | DAY | $ 230.00 |
| AIRLINE RESPIRATOR EACH INCLUDES 150 FEET OF AIRLINE | DAY | $ 100.00 |
| RESPIRATOR AIRLINE 50' SECTION | EACH | $ 20.50 |
| RESPIRATOR CARTRIDGES | PAIR | $ 40.00 |
| LEVEL A SUIT- KAPPLER RESPONDER OR EQUAL | EACH | $ 995.00 |
| LEVEL B SUIT- KAPPLER RESPONDER OR EQUAL | EACH | $ 610.00 |
| TYVEK | EACH | $ 7.95 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Item | Unit | Price |
|------|------|-------|
| PROSHIELD | EACH | $ 12.60 |
| SARANEX | EACH | $ 23.80 |
| ACID SUIT | EACH | $ 144.00 |
| RAIN SUIT | EACH | $ 147.80 |
| NEOPRENE GLOVES | PAIR | $ 19.00 |
| NITRILE GLOVES | PAIR | $ 22.40 |
| SILVERSHIELD GLOVES | PAIR | $ 40.25 |
| PVC GLOVES | PAIR | $ 12.80 |
| COTTON OR LATEX GLOVES | PAIR | $ 3.20 |
| LEATHER WORK GLOVES | PAIR | $ 19.10 |
| PVC BOOTS (HAZMAX) | PAIR | $ 29.92 |
| BOOT COVERS | PAIR | $ 10.92 |
| HEARING PROTECTION | PAIR | $ 3.17 |
| HIGH HAZARD PERSONNEL DECONTAMINATION | DAY | $ 515.00 |
| LOW HAZARD PERSONNEL DECONTAMINATION | DAY | $ 280.00 |
| PORTABLE EYEWASH STATION | DAY | $ 56.00 |
| FIRST AID STATION | DAY | $ 30.50 |
| PERSONNEL RETRIEVAL SYSTEM | DAY | $ 450.00 |
| PERSONNEL RETRIEVAL HARNESS | DAY | $ 98.00 |
| **MONITORING/SAMPLING EQUIPMENT** | | |
| COMBUSTIBLE GAS INDICATOR | DAY | $ 105.00 |
| TOXIC GAS DETECTOR | DAY | $ 95.00 |
| PHOTOIONIZATION DETECTOR | DAY | $ 160.00 |
| HAZCAT KIT | DAY | $ 80.00 |
| DETECTOR TUBES | TEN PACK | $ 80.00 |
| PH PAPER | PACK | $ 15.90 |
| SPILL CLASSIFIER | STRIP | $ 35.00 |
| PERSONNEL AIR SAMPLING PUMP | DAY | $ 65.00 |
| ASBESTOS BULK SAMPLE | EACH | $ 39.50 |
| HAND AUGER STAINLESS STEEL | DAY | $ 56.00 |
| **RECOVERY EQUIPMENT** | | |
| HAND OPERATED TRANSFER PUMP | DAY | $ 1,000.00 |
| 1" DIAPHRAGM PUMP | DAY | $ 1,600.00 |
| 2" DIAPHRAGM PUMP | DAY | $ 2,150.00 |
| 2" DIAPHRAGM PUMP S. S. | DAY | $ 3,100.00 |
| 3" DIAPHRAGM PUMP | DAY | $ 2,800.00 |
| 1" SUCTION OR DISCHARGE HOSE | DAY | $ 720.00 |
| 2" SUCTION OR DISCHARGE HOSE | DAY | $ 950.00 |
| 3" SUCTION OR DISCHARGE HOSE | DAY | $ 1,500.00 |
| 2" CHEMICAL SUCTION OR DISCHARGE HOSE | DAY | $ 2,800.00 |
| 3" CHEMICAL SUCTION OR DISCHARGE HOSE | DAY | $ 5,950.00 |
| SMALL COMPRESSOR | DAY | $ 950.00 |
| 185 CFM COMPRESSOR | DAY | $ 590.00 |
| AIRHOSE SECTION | DAY | $ 310.00 |
| **MISCELLANEOUS EQUIPMENT** | | |
| SPIKE BAR | DAY | $ 58.00 |
| AIRLESS SPRAYER | DAY | $ 170.00 |
| PRESSURE WASHER | DAY | $ 152.00 |
| WATER HOSE SECTION (GARDEN) | EACH | $ 73.00 |
| CUTTING TORCH | DAY | $ 105.00 |
| WIRE WELDER | DAY | $ 157.00 |
| AIR BLOWER | DAY | $ 90.00 |
| HEPA VAC | DAY | $ 145.00 |
| BARREL CART | DAY | $ 74.00 |
| WHEELBARROW | DAY | $ 63.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | | |
|---|---|---|---|
| OIL DRY SPREADER | DAY | $ | 73.00 |
| TRAFFIC CONTROL VESTS, CONESS, FLAGS, BARRELS, ETC. (one crew) | DAY | $ | 335.00 |
| DRILL WITH BITS | DAY | $ | 65.00 |
| GROUNDING CABLE AND ROD | DAY | $ | 113.00 |
| CIRCULAR SAW | DAY | $ | 85.00 |
| HAND TOOLS PER EMPLOYEE SHOVELS, SCOOPS, BROOMS, RAKES, HOES, ETC. | DAY | $ | 90.00 |
| TOOL KIT HAMMERS, PLIERS, SCREWDRIVERS, ETC. | DAY | $ | 120.00 |
| WRENCH KIT BUNG WRENCH, SPEED WRENCH, PIPE WRENCH, SOCKETS, CHANNEL LOCKS | DAY | $ | 120.00 |
| STEP LADDERS | DAY | $ | 65.00 |
| EXTENSION LADDERS | DAY | $ | 90.00 |
| PHOTOGRAPHIC EQUIPMENT | DAY | $ | 95.00 |
| FLASHLIGHTS | EACH | $ | 25.00 |
| HANDHELD RADIOS | DAY | $ | 325.00 |
| MATERIALS/DISPOSABLES | | | |
| 5" X 10' ABSORBENT BOOM- PETROLEUM | EACH | $ | 78.00 |
| 8" X 10' ABSORBENT BOOM- PETROLEUM | EACH | $ | 135.00 |
| 3" X 12' ABSORBENT BOOM- UNIVERSAL | EACH | $ | 48.00 |
| ABSORBENT PADS BUNDLE- PETROLEUM | EACH | $ | 140.00 |
| ABSORBENT PADS BUNDLE- UNIVERSAL | EACH | $ | 190.00 |
| ABSORBENT CLAY BAG | EACH | $ | 15.00 |
| OIL DRY | EACH | $ | 10.00 |
| PEAT MOSS | EACH | $ | 16.00 |
| VERMICULITE | EACH | $ | 25.00 |
| SODA ASH BAG | EACH | $ | 15.00 |
| 4 MIL 20 X 100 POLYETHYLENE | EACH | $ | 63.00 |
| 6 MIL 20 X 100 POLYETHYLENE | ROLL | $ | 88.00 |
| 6 MIL BAGS | EACH | $ | 2.00 |
| DUCT TAPE | ROLL | $ | 11.00 |
| 55-GALLON DRUMS | EACH | $ | 72.00 |
| 55-GALLON DRUM LINERS 10 MIL | EACH | $ | 55.00 |
| FIBER DRUMS | EACH | $ | 45.00 |
| 30-GALLON OVERPACK | EACH | $ | 150.00 |
| 95-GALLON POLY OVERPACK | EACH | $ | 350.00 |
| DOT HAZARDOUS WASTE LABELS | EACH | $ | 3.00 |
| FIRE EXTINGUISHER | EACH | $ | 64.00 |
| CAUTION/HAZARD TAPE | EACH | $ | 48.00 |
| RESPIRATOR WIPES | EACH | $ | 4.00 |
| KAPPLER TAPE | ROLL | $ | 72.00 |
| High Volume Diesel Powered suction lift trash pump with speed adjustment 4X4 | per Month | $ | 7,400.00 |
| High Volume Diesel Powered suction lift trash pump with speed adjustment 6X6 | per Month | $ | 11,025.00 |
| High Volume Diesel Powered suction lift trash pump with speed adjustment 8X8 | per Month | $ | 15,425.00 |
| High Volume Diesel Powered suction lift trash pump with speed adjustment 12X12 | per Month | $ | 19,350.00 |
| Composite Quick Connect Suction Hose, 8 ft length, 20psi 4 inch | per Month | $ | 1,160.00 |
| Composite Quick Connect Suction Hose, 8 ft length, 20psi 6 inch | per Month | $ | 1,440.00 |
| Composite Quick Connect Suction Hose, 8 ft length, 20psi 8 inch | per Month | $ | 1,840.00 |
| Composite Quick Connect Suction Hose, 8 ft length, 20psi 126 inch | per Month | $ | 2,360.00 |
| Quick Connect Discharge Hose, 50 ft length, 50psi 4 inch | per Month | $ | 1,160.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | |
|---|---|---|
| Quick Connect Discharge Hose, 50 ft length, 50psi 6 inch | per Month | $ 1,320.00 |
| Quick Connect Discharge Hose, 50 ft length, 50psi 8 inch | per Month | $ 2,240.00 |
| Quick Connect Rigid Piping, 10 ft length, 175psi, 4 inch | per Month | $ 1,000.00 |
| Quick Connect Rigid Piping, 10 ft length, 175psi, 6 inch | per Month | $ 1,400.00 |
| Quick Connect Rigid Piping, 10 ft length, 175psi, 8 inch | per Month | $ 1,800.00 |
| Quick Connect Rigid Piping, 10 ft length, 175psi, 12 inch | per Month | $ 2,600.00 |

**DRC Emergency Services, LLC**
**Montgomery County, PA Rap 19-23 Disaster Debris Mgmt, Clearance & Removal Services**
**Generator Pricing Schedule**

| Equipment | KW | Hourly | Daily | Weekly | Monthly | Delivery/Pickup Fee | Standby/Demobilization Month |
|---|---|---|---|---|---|---|---|
| Generator | up to 25 | $ 51.00 | $ 510.00 | $ 2,805.00 | $ 9,817.50 | $ 51.00 | $ 510.00 |
| Generator | 56 | $ 60.00 | $ 600.00 | $ 3,300.00 | $ 11,550.00 | $ 60.00 | $ 600.00 |
| Generator | 100 | $ 72.00 | $ 720.00 | $ 3,960.00 | $ 13,860.00 | $ 72.00 | $ 720.00 |
| Generator | 175 | $ 145.50 | $ 1,455.00 | $ 8,002.50 | $ 28,008.75 | $ 145.50 | $ 1,455.00 |
| Generator | 250 | $ 207.00 | $ 2,070.00 | $ 11,385.00 | $ 39,847.50 | $ 207.00 | $ 2,070.00 |
| Generator | 500 | $ 367.50 | $ 3,675.00 | $ 20,212.50 | $ 70,743.75 | $ 367.50 | $ 3,675.00 |
| Generator | 800 | $ 540.00 | $ 5,400.00 | $ 29,700.00 | $ 103,950.00 | $ 540.00 | $ 5,400.00 |
| Generator | 1000 | $ 696.00 | $ 6,960.00 | $ 38,280.00 | $ 133,980.00 | $ 696.00 | $ 6,960.00 |
| Generator | 1500 | $ 1,059.00 | $ 10,590.00 | $ 58,245.00 | $ 203,857.50 | $ 1,059.00 | $ 10,590.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC Emergency Services, LLC**

**Montgomery County, PA RFP 19-23 Disaster Debris Mgmt. Clearance & Removal Services**

**Logistical Services Fee Schedule**

**SATELLITE COMMUNICATIONS** - The Proposer shall furnish satellite equipment on a rental basis and service. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | UOM | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE | |
|---|---|---|---|---|
| Rental of Equipment – Capability of calling nationwide from Pennsylvania – no additional roaming or long distance charges | Per Unit | $ 250.00 | $ 950.00 | |
| Per Minute Charge for Usage | Per Minute | $ 1.50 | | |

**TEMPORARY SANITARY/HOUSING FACILITIES** - The Proposer shall furnish temporary sanitary facilities on a rental basis and service for maintenance. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services.

| EQUIPMENT/LABOR DESCRIPTION | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE | MAXIMUM CEILING UNIT PRICE PER SERVICE |
|---|---|---|---|---|
| Portable Toilet Units | $ 350.00 | $ 750.00 | $ 4,500.00 | $ 4,500.00 |
| Portable Toilet Units (ADA accessible) | $ 450.00 | $ 1,000.00 | $ 5,000.00 | $ 5,000.00 |
| Hand Wash Stations, self contained, free standing, single basin, cold water and hand soap dispenser | $ 400.00 | $ 800.00 | $ 4,750.00 | $ 4,750.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Description | | | | |
|---|---|---|---|---|
| Hand Wash Stations, self contained, free standing, single basin, cold water and hand soap dispenser, ADA accessible | $ 500.00 | $ 1,000.00 | $ 5,000.00 | $ 5,000.00 |
| Shower/Rest Room Container Unit or Trailer Unit, Mens/Womens section, minimum 2 shower stalls per side, dressing area, 1 sink per side, hot/cold water, heated/air conditioned. | $ 10,000.00 | $ 17,500.00 | $ 55,000.00 | $ 55,000.00 |
| Shower Unit, Single, ADA accessi | $ 15,000.00 | $ 15,000.00 | $ 37,500.00 | $ 37,500.00 |
| Bunk House, Climate Controlled, minimum 6 people | $ 30,000.00 | $ 30,000.00 | $ 95,000.00 | |
| Laundry Unit, minimum 4 each washer and dryers, self-contained with cold/hot water and climate control, folding table (preferred) | $ 31,500.00 | $ 31,500.00 | $ 98,000.00 | |

*(If required, licensed electrician will make all required connections)*

**REEFER & REFRIGERATED CONTAINERS & ICE DELIVERY** - The Proposer shall furnish freezer and refrigerator containers on a rental basis, maintenance and repair. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services. Labor and fuel for fueling the fuel powered unit shall be in accordance with Hourly Pricing Schedule.

| EQUIPMENT/LABOR DESCRIPTION | INDICATE MINIMUM SIZE OF UNITS | MAXIMUM UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|
| Refrigeration Containers - 1 temperature setting (refrigerate or freeze) | 53' - 3675 CF capacity - | | $ 7,000.00 | $ 24,000.00 |
| Indicate minimum size of unit: 1) # feet long and Cubic Foot Capacity | 15,000 lb capacity | | | |
| Refrigeration Containers - Dual temperature settings (refrigerate and freeze) | 53' - 3675 CF capacity - | | $ 8,000.00 | $ 26,000.00 |

Case 2:26-cv-03945    Document 1-1    Filed 06/09/26    Page 128 of 811

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | | | $  8,000.00 | $  26,000.00 |
|---|---|---|---|---|---|
| Indicate minimum size of unit: 1) # feet long and Cubic Foot Capacity | 15,000 lb capacity | | | | |
| Reefer Container - normally a tractor trailer, fuel powered | 53' - 3675 CF capacity - 15,000 lb capacity | | | $  8,000.00 | $  26,000.00 |
| Indicate minimum size of unit: 1) # feet long and Cubic Foot Capacity | | | | | |
| Bagged Ice, cubed and made of potable water, 5 to 10 pound bags, palletized - UNIT PRICE PER BAG | 7 pound bag - varies by supplier | $  4.20 | | | |
| Indicate # pounds per bag and #bags per pallet | | | | | |

If required a licensed electrician will make all required connections

**POTABLE WATER TRUCK AND DRINKING WATER** - The Proposer shall furnish POTABLE WATER TRUCK equipment on a rental basis, maintenance and repair and bottled water. Labor for refilling trucks shall be compensated based on Hourly Pricing Schedule. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | INDICATE MINIMUM SIZE OF UNITS | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|
| Potable Water Tank | 500 Gallon | $  7,500.00 | $  25,000.00 | $  50,000.00 |
| State the minimum gallon capacity of unt proposed | | | | |
| | | | MAXIMUM CEILING UNIT PRICE | |
| Refilling of Potable Water Tanks - PRICE PER GALLON | | | $  2.00 | |
| Bottled Water Delivery, size 16 - 24 oz plastic bottles, palletized - Price per bottle | 16.9 Oz Bottles - 72 cases per pallet | | $  12.49 | |
| State the minimum ounce per bottle and number of bottles per pallet | | | | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

POWERING AND/OR DISPENSING NEEDS, IF ANY, TO OPERATE AND DISPENSE WATER FROM TANK WILL BE MANUAL

**MOBILE FLEET REPAIR FACILITIES/ASSISTANCE** - The Proposer shall furnish equipment and portable facility on a rental basis, maintenance and repair. Labor, parts and materials for fleet repair services shall be compensated based on this schedule. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|
| Mobile Fleet Repair Unit inclusive of all required equipment, self contained and self powered to perform fleet repair services | | $ 1,500.00 | $ 10,500.00 | $ 42,000.00 |
| Mechanic/Technician/ Price per man hour | | $ 750.00 | $ 5,250.00 | $ 21,000.00 |
| Mobile Mechanic with truck and tools | | $ 850.00 | $ 5,950.00 | $ 23,800.00 |
| Minimum discount for Materials & Parts (i.e. supplies, oil, etc) from List or Mfg Retail | 0% | | | |

Contractor shall have mechanics available at secure location. Roving mechanic with truck will be available as needed.

**TEMPORARY SIGNAGE & TRAFFIC CONTROL** - The Proposer shall furnish traffic signage and control equipment on a rental basis, maintenance and repair. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | UOM | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|
| Safety Cade Type II Barricades with flashing lights inclusive of maintenance and battery replacement | each | $ 175.00 | $ 1,225.00 | $ 4,900.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | | | |
|---|---|---|---|---|
| DOT Black Base 36" traffic cones with two (2) each reflective bands | each | $ 80.00 | $ 560.00 | $ 2,240.00 |
| Diamond Grade 8 gauge Aluminum 36" x 36" Stop signs | each | $ 150.00 | $ 1,050.00 | $ 4,200.00 |
| A-Frame stands for 36" signs | each | $ 100.00 | $ 700.00 | $ 2,800.00 |

**CANTEEN, TENTS, FURNISHINGS** - The Proposer shall furnish equipment and portable facilities and furnishings on a rental basis, maintenance and repair of equipment furnished and set up. Labor for staffing shall be compensated based on Hourly Pricing Schedule. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | UOM | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|
| Canopy, pole type or pop up without sides, 10' x 10' | each | $ 500.00 | $ 750.00 | $ 4,000.00 |
| Canopy, pole type or pop up without sides, 20' x 20' | each | $ 1,000.00 | $ 1,500.00 | $ 6,000.00 |
| Canopy, pole type or pop up without sides, 30' x 30' | each | $ 6,000.00 | $ 7,500.00 | $ 30,000.00 |
| Tent, pole type or pop up with sides, 15 x 15 | each | $ 1,500.00 | $ 2,500.00 | $ 7,500.00 |
| Tent, pole type or pop up with sides, 20 x 20 | each | $ 2,500.00 | $ 3,000.00 | $ 12,000.00 |
| Tent, pole type or pop up with sides, 20 x 40 | each | $ 5,000.00 | $ 7,500.00 | $ 30,000.00 |
| Canteen Tents for eating purposes, pole type or frame type with sides and equipped with tables and chairs, 20' x 40' | each equipped unit | $ 12,500.00 | $ 15,000.00 | $ 65,000.00 |
| Canteen Tents for eating purposes, pole type or frame type with sides and equipped with tables and chairs, 30' x 40' | each equipped unit | $ 19,500.00 | $ 25,000.00 | $ 90,000.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | | | |
|---|---|---|---|---|
| Canteen Tent fully equipped with tables, chairs, cooking equipment and cooking utensils to included, but not be limited to, stove refrigeration, hot food serving table and equipment, cold food serving table, pots/pans and cooking utensils, 20' x 40' | each equipped unit | $ 35,000.00 | $ 40,000.00 | $ 150,000.00 |
| Canteen Tent fully equipped with tables, chairs, cooking equipment and cooking utensils to included, but not be limited to, stove refrigeration, hot food serving table and equipment, cold food serving table, pots/pans and cooking utensils, 30' x 40' | each equipped unit | $ 45,000.00 | $ 55,000.00 | $ 190,000.00 |
| Evaporative Cooling Systems, minimum 24" cooler with cycle control, battery or electric operated, water source shall be from a water tank, self contained, indoor. | each | $ 5,000.00 | $ 7,500.00 | $ 25,000.00 |
| Evaporative Cooling Systems, minimum 24" cooler with cycle control, battery or electric operated, water source shall be either from hose or water tank, outdoor. | each | $ 4,500.00 | $ 5,500.00 | $ 22,500.00 |
| Contractor not responsible for sitework or leveling of site. Price does not include drilling fees, power/water to site provided site | | | | |

**PORTABLE LIGHTING** - The Proposer shall furnish portable lighting equipment on a rental basis, maintenance and repair. The preferable term is a weekly rental as a minimum. Unit prices shall include all labor, equipment, materials, transportation, service, parts and all other incidental fees to complete the services

| EQUIPMENT/LABOR DESCRIPTION | UOM | DAILY MAXIMUM CEILING UNIT PRICE | WEEKLY MAXIMUM CEILING UNIT PRICE | MONTHLY MAXIMUM CEILING UNIT PRICE |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Portable Power Light Towers with the following minimum requirements:<br>- four (4) 1000 watt metal halide fixtures in a NEMA 6 design<br>- 3-section telescoping mast extends 12 – 30 ft<br>- 360° rotation capability<br>- outriggers and jacks for stability<br>- low oil/high temperature auto shut down system<br>- built-in circuit breakers for the lights | EACH | $ 1,000.00 | $ 5,000.00 | $ 12,500.00 |
| Generator for light tower will be provided | | | | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Appendix A

### SUBMISSION FORMS

The following forms must be submitted and uploaded with the proposal. Failure to include these forms may lead to rejection of the proposal as non-responsive. Each form must be signed by a person authorized to bind the company. Electronic signatures are acceptable.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## PUBLIC DISCLOSURE STATEMENT

Provide a YES or NO answer to the following three (3) questions. If you responded "yes" to any question, please explain (responding "yes" does not necessarily disqualify you from doing business with the County).

In the past five (5) years,

1. Has your firm referred any business (whether or not compensated) or otherwise had any financial dealings with any County elected official or County officer?
   No.

2. Have any officers or principals of your firm engaged in any dealings of a financial or personal nature with any County elected official or County officer?
   No.

3. Have any officers or principals of your firm been solicited for a campaign contribution by or on behalf of any County elected official or County officer?
   No.

[X] Confirm that you will comply in all respects with the Pennsylvania Public Official and Employees Ethics Act 65 Pa C S. § 1101 et seq

_____
Signature & Date

Kristy Fuentes
_____
Typed/Printed Name

Vice President/ Secretary/ Treasurer
_____
Title

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## CERTIFICATION AND REPRESENTATIONS OF OFFERORS

1. Certification of Eligibility

   a. The bidder certifies that neither the offeror, nor any person or firm which has an interest in the proposal or the offeror's firm:

   (1) ~~Has been suspended, debarred or otherwise restricted by the County or any Department or Agency of the Federal Government or of any State Government from doing business with such County, Department, Agency or State for the period beginning 5 years prior to the date of this certification;~~

   (2) Has experienced default or noncompliance under any contract with any governmental agency with which it has contracts for the period beginning 10 years prior to the date of this certification; or

   (3) Has unresolved findings raised as a result of federal, state or local government audits, or any other governmental investigations concerning the offeror or any person or firm which has an interest in the offeror's firm under any of the offeror's contracts;

   (4) Has defaulted on an obligation covered by a bond, and has not been the subject of a claim under any fidelity bond.

   (5) Has been found by the Commonwealth of Pennsylvania to be in noncompliance with any applicable civil rights laws.

   (6) Is a County Commissioner, County employee, or otherwise prohibited or limited by law from contracting with the County.

   (7) Has been convicted of a felony and is not presently the subject of a complaint or indictment charging a felony. (A felony is any offense punishable by imprisonment for more than one year, but does not include any offense classified as a misdemeanor under the laws of a State and punishable by imprisonment of two years or less.)

   (8) Has been convicted or found liable for any act prohibited by state or federal law involving conspiracy or collusion with respect to proposing or bidding on any public contract within the last three years. If offeror has been convicted of any act prohibited by State or Federal law involving collusion with respect to proposing or bidding on any public contract within the past three years, offeror should attach an explanation of the circumstances surrounding that conviction.

   b. Statements above to which the offeror cannot certify (if any) have been deleted by striking through the words with a pen. The offeror has initialed each deletion (if any) and has attached a true and accurate signed statement (if applicable) to explain the facts and circumstances which qualify the offeror as a responsible offeror for participation in this project.

   c. The certification in paragraph (a) above is a material representation of fact upon which reliance was placed when making the award. If it is later determined that the

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

offeror knowingly rendered an erroneous certification, the contract may be terminated for default.

2. Contingent Fee Representation and Agreement

a. The bidder/offeror represents and certifies as part of its bid/offer that, except for full-time bona fide employees working solely for the bidder/offeror, the bidder/offeror:

(1) [ ] has, [X] has not employed or retained any person or company to solicit or obtain this contract; and

(2) [ ] has, [X] has not paid or agreed to pay to any person or company employed or retained to solicit or obtain this contract any commission, percentage, brokerage, or other fee contingent upon or resulting from the award of this contract.

b. If the answer to either (a) (1) or (a) (2) above is affirmative, the bidder/offeror shall make an immediate and full written disclosure to the Chief Procurement Officer.

c. Any misrepresentation by the bidder/offeror shall give the County the right to (1) terminate the resultant contract; (2) at its discretion, to deduct from contract payments the amount of any commission, percentage, brokerage, or other contingent fee; or (3) take other remedy pursuant to the contract.

3. Certificate of Independent Price Determination

a. The bidder/offeror certifies that:

(1) The prices in this bid/offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other bidder/offeror or competitor relating to (i) those prices, (ii) the intention to submit a bid/offer, or (iii) the methods or factors used to calculate the prices offered;

(2) The prices in this bid/offer have not been and will not be knowingly disclosed by the bidder/offeror, directly or indirectly, to any other bidder/offeror or competitor before bid opening (in the case of a sealed bid solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law;

(3) No attempt has been made or will be made by the bidder/offeror to induce any other concern to submit or not to submit a bid/offer for the purpose of restricting competition; and

b. Each signature on the bid/offer is considered to be a certification by the signatory that the signatory:

(1) Is the person in the bidder/offeror's organization responsible for determining the prices being offered in this bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a)(l) through (a)(3) above; or

(2) (i) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a)(l) through (a)(3) above.

Kristy Fuentes, Vice President/ Secretary/ Treasurer _____ [insert full name of person(s) in the bidder/offeror's organization responsible for determining

the prices offered in this bid or proposal, and the title of his or her position in the bidder/offeror's organization];

(ii) As an authorized agent, does certify that the principals named in subdivision (b)(2)(i) above have not participated, and will not participate, in any action contrary to subparagraphs (a)(l) through (a)(3) above; and

(iii) As an agent, has not personally participated, and will not participate in any action contrary to subparagraphs (a)(l) through (a)(3) above.

c.     If the bidder/offeror deletes or modifies subparagraph (a)2 above, the bidder/offeror must furnish with its bid/offer a signed statement setting forth in detail the circumstances of the disclosure.

4.     Organizational Conflicts of Interest Certification

a.   The Contractor warrants that to the best of its knowledge and belief and except as otherwise disclosed, it does not have any organizational conflict of interest which is defined as a situation in which the nature of work under a proposed contract and a prospective contractor's organizational, financial, contractual or other interest are such that:

(1)   Award of the contract may result in an unfair competitive advantage;

(2)   The Contractor's objectivity in performing the contract work may be impaired; or

(3)   That the Contractor has disclosed all relevant information and requested the County to make a determination with respect to this Contract.

b.    The Contractor agrees that if after award he or she discovers an organizational conflict of interest with respect to this contract, he or she shall make an immediate and full disclosure in writing to the County which shall include a description of the action which the Contractor has taken or intends to eliminate or neutralize the conflict. The County may, however, terminate the Contract for the convenience of the County if it would be in the best interest of the County.

c.    In the event the Contractor was aware of an organizational conflict of interest before the award of this Contract and intentionally did not disclose the conflict to the County, the County may terminate the Contract for default.

d.    The Contractor shall require a disclosure or representation from subcontractors and consultants who may be in a position to influence the advice or assistance rendered to the County and shall include any necessary provisions to eliminate or neutralize conflicts of interest in consultant agreements or subcontracts involving performance or work under this Contract.

[ X ]    In the absence of any actual or apparent conflict, I hereby certify that to the best of my knowledge and belief, no actual or apparent conflict of interest exists with regard to my possible performance of this procurement.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**5.**    Authorized Negotiators

The offeror represents that the following persons are authorized to negotiate on its behalf with the County in connection with this request for proposals:
(list names, titles, and telephone numbers of the authorized negotiators):

John Sullivan, President

Kristy Fuentes, Vice President/ Secretary/ Treasurer

**6.**    Conflict of Interest

In the absence of any actual or apparent conflict, the offeror, by submission of a proposal, hereby warrants that to the best of its knowledge and belief, no actual or apparent conflict of interest exists with regard to my possible performance of this procurement, as described in the clause in this solicitation titled "Organizational Conflict of Interest."
Offeror's Signature

The offeror hereby certifies that the information contained in these certifications and representations is accurate, complete, and current.

Signature & Date

Kristy Fuentes
Typed/Printed Name

Vice President/ Secretary/ Treasurer
Title

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CERTIFICATION AND REPRESENTATIONS OF OFFERORS CONTINUED

In September 2014, DRC Emergency Services was suspended for 22 business days relating to a project in Joplin, Missouri. Following a detailed response by DRC's new Ownership and Management, the suspension was lifted without any fine or penalty. DRC maintains a robust Corporate compliance, safety and ethics program and operates in good standing with all branches of Government.



Not Applicable

## LOCAL, SMALL, AND DISADVANTAGED BUSINESS CONCERN CERTIFICATION

Submit if any below are applicable

The Provider represents and certifies as part of its proposal that it:

[  ] is a local business concern. A "Local business concern" as used in this provision, means a person, partnership, corporation or other business entity authorized to transact business in this County and having a bona fide establishment for transacting business in this County at which it was transacting business on the date when bids or proposals for the public contract were first solicited.

[  ] is a small business concern. "Small business concern," as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding, and qualified as a small business under the criteria and size standards in 13 CFR 121.

Certifying Agency & Certification Number (if applicable):_____

[  ] is a women-owned small business concern. "Women-owned," as used in this provision, means a small business that is at least 51 percent owned by a woman or women who are U.S. citizens and who also control and operate the business.

Certifying Agency & Certification Number (if applicable):_____

[  ] is a minority enterprise which, pursuant to Executive Order 11625, is defined as a business which is at least 51 percent owned by one or more minority group members or, in the case of a publicly owned business, at least 51 percent of its voting stock is owned by one or more minority group members, and whose management and daily operations are controlled by one or more such individuals.

For the purpose of this definition, minority group members are:
(Check the block applicable to you)
[  ] Black Americans          [  ] Asian Pacific Americans
[  ] Hispanic Americans       [  ] Asian Indian Americans
[  ] Native Americans         [  ] Hasidic Jewish Americans

Certifying Agency & Certification Number (if applicable) _____

_____

Signature & Date

_____

Typed/Printed Name

_____

Title

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT

# 2

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made and entered into effective as of the 5th day of September, 2021 (the "Effective Date"), by and between the COUNTY OF MONTGOMERY, PENNSYLVANIA (the "County") and DEBRISTECH, LLC, a Mississippi limited liability company (the "Contractor").

## RECITALS

WHEREAS, the County desires to engage Contractor to perform certain Contractor Services (as hereinafter defined) and Contractor desires to perform such Contractor Services, all on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Duties of Contractor.  Effective as of the date of this Agreement, Contractor agrees to supply personnel as specifically requested in writing by the County to perform the services described in Exhibit A attached hereto (collectively, the "Contractor Services").

2.      Independent Contractor Relationship. Contractor is an independent contractor and is solely responsible for all taxes, withholdings, and other similar statutory obligations in connection with the personnel supplied and services provided by Contractor pursuant to this Agreement, including, but not limited to, workers' compensation insurance and unemployment insurance. Nothing in this Agreement shall be deemed to create an agency, partnership, or joint venture between the parties, nor shall this Agreement be interpreted or construed as creating or establishing the relationship of employer and employee between the County and Contractor.  Neither party hereto has the authority to act on behalf of or to enter into any contract, incur any liability or make any representation on behalf the other party.  It is expressly understood that the Contractor is an independent contractor in every respect.

3.      No Exclusive Duty.  The Contractor shall devote sufficient time, attention, personnel and other resources to perform the Contractor Services, provided, however, the Contractor shall not be required to perform work exclusively for the County and Contractor may have other business interests and may engage in other activities in addition to those relating to the County.

4.      Term.  The term of this Agreement shall commence on the Effective Date and terminate upon completion of the emergency debris removal and disposal documentation requirements. It is anticipated that this contract will last approximately **45 days** subject to the provisions of Paragraphs 5 and 6 (the "Initial Term"). Therefore, the Initial Term shall terminate on October 19, 2021.  Upon expiration of the Initial Term, this Agreement can be extended in 30 day increments pursuant to mutually agreeable written terms.

DocuSign Envelope ID: A97E3D2E-37BF-4A4F-9205-30854576C1D9

5.    Termination.    Either party shall have the right to terminate this Agreement immediately upon written notice thereof to the other party, if such other party breaches any of the material terms of this Agreement or fails to perform or observe any of its material obligations hereunder, and such breach or failure is not cured within a period of thirty (30) days after the receipt by such party of written notice of such breach or failure specifying the nature of the breach or failure. The County or Contractor may terminate this Agreement without cause and at any time for any reason without any further obligation to the other party by providing the other party with thirty (30) days written notice.  In the event of termination in accordance with this Paragraph, the County shall pay Contractor for services rendered (as set forth in Paragraph 6 of this Agreement) through the effective termination date and the County shall be liable for the same until such amounts are fully and finally settled.

(a)    Authority to Modify, Change or Direct Work. The County understands and agrees it is important for Contractor to receive any and all Project directives, changes, guidance and other scope-related correspondence (collectively "Directives") from authorized representatives of the County. As such, the County designates the below listed individuals as County representatives authorized to issue Directives to Contractor on the County's behalf. In the event any additional County representatives are designated for this Project, the County shall promptly notify Contractor of such designation(s) in writing.
Owner-designated representative:
Jason Wilson, Deputy Director for Emergency Management by email at jwilson@montcopa.org

6.    Compensation.    The County will pay Contractor an hourly rate for the personnel provided by Contractor pursuant to the payment schedule attached to Exhibit B.  For each hour of services provided by any Contractor personnel in excess of forty (40) hours per week, the County will pay Contractor at one and one-half times (1.5x) the hourly rate on Exhibit B.  In addition, the County shall reimburse Contractor for all vehicle mileage and per diem expenses (including lodging and meals) incurred by the Contractor's personnel. Contractor agrees to track the number of hours worked per week and to provide invoices for services rendered to the County on a weekly basis. Payment shall be due from the County to the Contractor within fifteen (15) days of the regular meeting of the County's Board of Commissioners immediately following receipt of the invoice. For any amounts more than sixty (60) days overdue, Contractor shall have the right to suspend its provision of the Contractor Services until such payment is received. In no event shall the amount payable under this Agreement exceed **$500,000.00** (the "Cap"). If the Contractor performs services such that the amount payable under this Agreement reaches the Cap, this Agreement shall automatically terminate unless the parties agree to amend this Agreement to increase the amount of the Cap.

7.    Taxes.  Contractor shall be solely responsible for the payment of all taxes and/or assessments imposed on the payments of compensation for the performance of services outlined herein, including, without limitation, any unemployment insurance or tax, self-employment tax, federal, state and foreign income taxes, and any federal social security payment or similar taxes (and Contractor shall provide evidence to the County, upon the County's request, that such have been paid).  Notwithstanding, the County may withhold from any amounts payable under this Agreement such federal, state, local or foreign taxes as shall be required to be withheld pursuant to any applicable

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

law or regulation; provided, however, that the County shall provide the Contractor with written substantiation of withholding and remittance of such taxes upon Contractor's request.

8.    <u>No Breach</u>.  Each party hereby represents and warrants to the other party that: (a) it has all right, power and authority to grant the rights granted herein and to perform all of its obligations hereunder; (b) by entering into this Agreement and performing the obligations herein, it will not breach or violate any agreement, charter, instrument or other document to which it is a party or otherwise bound; and (c) it is currently in compliance and, throughout the term of this Agreement, it shall comply, in all material respects, with all applicable laws, rules and regulations.

9.    <u>Non-Disclosure</u>.  In connection with the Contractor Services, the County may be exposed to certain information that Contractor considers to be confidential or proprietary, or which is otherwise designated by the Contractor as confidential or secret (collectively, "<u>Confidential Information</u>").  During the term of this Agreement and for three (3) years thereafter, the County: (a) shall use reasonable care to protect all Confidential Information it receives; (b) shall not use Confidential Information for any purpose unrelated to the Contractor Services; and (c) shall not, directly or indirectly, disclose any Confidential Information to any third party except to such of the County's employees, agents and representatives who have a need to know such information for purposes of the Contractor Services and are bound by confidentiality obligations no less restrictive than those imposed on the County under this Agreement.  The County shall be responsible for any unauthorized disclosure or use of Confidential Information by the County's employees, agents and representatives.

The obligations set forth in this Paragraph 9 shall not apply to such Confidential Information which (i) is or becomes generally available to the public other than as a result of a disclosure by the County; (ii) was available to County on a non-confidential basis prior to its disclosure by the Contractor or its agents; or (iii) becomes available to County on a non-confidential basis from a source other than the Contractor or its agents.

Notwithstanding the foregoing, if County is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, County shall promptly notify the Contractor of such request(s) so that the Contractor may seek an appropriate protective order or waive compliance with the provisions of this Agreement. County agrees to cooperate fully with the Contractor in seeking any protective order.  If, in the absence of a protective order or the receipt of a waiver hereunder, County is, nonetheless, in the reasonable opinion of their counsel, compelled to disclose any such Confidential Information or else stand liable for contempt or suffer other censure or penalty, then it may disclose such information pursuant to such request or requirement without liability hereunder.

10.    <u>Dispute Resolution</u>.

(a)    Should any dispute between the Parties arise under this Agreement (a "Dispute"), written notice of such Dispute shall be delivered from one party to the other and thereafter, the parties, through their appointed representatives or designees (each an "<u>Authorized Representative</u>"), shall first meet and attempt to resolve the Dispute in face-to-

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

face negotiations. This meeting shall occur within thirty (30) days of the date on which a written notice of such Dispute is received from the complaining party.

(b)     If no resolution is reached through the informal process set forth in Section 10(a) above, at the direction of either party's Authorized Representative, the parties shall engage in non-binding mediation for a period of no less than sixty (60) days (or such longer period as may be mutually agreed by the parties) (the "Mediation Period"). The mediation shall be conducted in Norristown, Pennsylvania by a single mediator mutually selected by the parties. The parties shall share equally in the fees of the mediator. If the Dispute remains unresolved following the Mediation Period, either party may seek any remedy at law or in equity that may be available. Any disputes shall be brought to the Court of Common Pleas in Montgomery County, Pennsylvania.

11.    Relationship with Debris Removal Contractor. The County acknowledges and understands that the Contractor's relationship with the debris removal contractor is limited to documenting the work that is performed by the debris removal contractor. The County further acknowledges that the Contractor does not direct the operations of the debris removal contractor nor does the Contractor have any control over the acts or operations of the debris removal contractor.

12.    Insurance.    Contractor shall maintain as a condition precedent to this Agreement an approved and satisfactory general comprehensive liability insurance policy in the minimum amount of $1,000,000.00, and naming the County, its employees and elected officials as additional insureds. Such general comprehensive insurance, the premiums for which have been paid by the Contractor, shall cover any claim for damages of whatever nature brought by any person, corporation or business entity against the Contractor, the County, its employees, named insureds, or additional insureds, or any of them arising out of or in any manner connected with the services provided to the County. A certificate of insurance shall be provided by its producing agent to the County prior to the Contractor's beginning work under this Agreement.

Contractor shall furnish the County as a condition precedent to this Agreement evidence of approved and satisfactory workers' compensation insurance providing workers' compensation insurance to Contractor's employees, unless Contractor is not required by law to have such insurance coverage.

13.    Assignment. This Agreement shall not be assigned, in whole or in part, by Contractor without the prior written consent of the County, which shall not be unreasonably withheld.

14.    Solid Waste Disposal Act. During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable provisions of The Solid Waste Disposal Act of 1965, as amended (42 USCA § 6901, et seq.).

15.    Contract Work Hours and Safety Standards Act. During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable provisions of The Contract Work Hours and Safety Standards Act, as amended (40 United States Code, Chapter 37).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

16.     Clean Air Act.  During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable provisions of the Clean Air Act, as amended (42 U.S.C. §7401, et seq.).

17.     Federal Water Pollution Control Act (Clean Water Act.  During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable provisions of the Federal Water Pollution Control Act (Clean Water Act), as amended (33 U.S.C. § 1251 et seq.).

18.     Energy Policy and Conservation Act.  During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable federal, state and local laws pertaining to energy efficiency, including but not limited to, the Energy Policy and Conservation Act, as amended (42 U.S.C.A § 6201 et seq.).

(a)     The Contractor shall comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR Part 247 that contain the highest percentage of recovered material practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired by the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

19.     Byrd Anti-Lobbying Amendment.  During the term of this Agreement and any extensions thereof, the Contractor shall at all times comply with all applicable provisions of the Byrd Anti-Lobbying Amendment (42 U.S.C. § 1352, et seq.).

20.     Non-Discrimination.  The Contractor will not discriminate against any person, employee or applicant for work or employment because of race, color, religion, sex, sexual orientation, or national origin.  The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, sexual orientation or national origin.  Such action shall include, but not be limited to the following: employment, upgrading demotion or transfer; recruitment or recruitment advertising; layoffs or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.  The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices as required by applicable law setting forth the provisions of this nondiscrimination clause.

The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will received consideration for employment without regard to race, color, religion, sex, sexual orientation or national origin.

The Contractor, with regard to the work performed by it during the term of this Agreement, shall not discriminate on the grounds of race, color, sex, sexual orientation or national origin in the

DebrisTech 000032

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

selection and retention of subcontractors, including procurements of materials and leases of equipment.

In all solicitations ether by competitive bidding or negotiation made by the Contractor for work to be performed under subcontract, including procurements of materials or leases of equipment, each potential subcontractor or supplier shall be notified by the Contractor of the Contractor's obligations under this Agreement and applicable regulations relative to nondiscrimination on the grounds of race, color, sex, sexual orientation or national origin

The Contractor will furnish all information and reports required by Executive Order 11246 and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts for purposes of investigation to ascertain compliance with such rules, regulations, and relevant orders of the Secretary of Labor.

The Contractor will comply with all provisions of Executive Order 11246 and of the rules, regulations and relevant orders of the Secretary of Labor.

The Contractor will comply with all provisions of Executive Order 12250 Coordination of Grant-Related Civil Rates Statutes.

The Contractor will take steps to solicit employment, subcontractor, vendor, volunteer and other employment opportunities with respect to services provided to County under this Agreement from minority and women owned businesses.

21.    Force Majeure. Except with respect to payment obligations under this Agreement, neither party hereto shall be liable for any failure to perform due to strikes, riots, civil disturbances, acts of terrorism, wars, failures or fluctuations in electrical power or telecommunications equipment, or any other cause beyond such party's reasonable control (each an "Event of Force Majeure"). The parties shall use their commercially reasonable efforts to minimize the consequences of any Event of Force Majeure.

22.    Miscellaneous.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Pennsylvania, without reference to principles of conflict of laws. The captions of this Agreement are not part of the provisions hereof and shall have no force or effect. This Agreement may not be amended or modified otherwise than by a written agreement executed by the parties hereto or their respective successors and legal representatives.

(b)    All notices and other communications hereunder shall be in writing and shall be given by hand delivery to the other party or by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

DocuSign Envelope ID: A97E3D2E-37BF-4A4F-9205-30854576C1D9

If to Contractor:
DebrisTech, LLC
Attn: Brooks Wallace
925 Goodyear Boulevard
Picayune, Mississippi 39466


If to the County:
Montgomery County Board of Commissioners
Attn: Dr. Valerie Arkoosh, Chair
P.O. Box 311
or
One Montgomery Plaza
425 Swede Street, 8th Floor Board Room
Norristown, Pennsylvania 19404

or to such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

(c)    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(d)    The parties' respective rights under this Agreement are cumulative and either party's exercise or enforcement of any right or remedy under this Agreement will not preclude such party's exercise or enforcement of any other right or remedy which such party is entitled to enforce at law or in equity.

(e)    Contractor's or the County's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right Contractor or the County may have hereunder shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(f)    If any provision of this Agreement shall be deemed unlawful, void or unenforceable for any reason, it shall be deemed severable, and in no way shall effect the validity or enforceability of, the remaining provisions of this Agreement.

(g)    This Agreement shall not be construed or interpreted in favor of or against Contractor or the County on the basis of draftsmanship or preparation of the Agreement.

(h)    From and after the date this Agreement is signed by both County and Contractor, this Agreement shall supersede all prior and contemporaneous agreements and understandings between Contractor and the County, whether written or oral, with respect to the subject matter hereof.

(i)    This Agreement can only be amended or modified in a written document signed by both Contractor and the County.

(j)    All rights and obligations of the parties hereto that either expressly, or by their nature, survive the expiration or termination of this Agreement shall survive such expiration or termination.

(k)    This Agreement and any amendment, waiver, approval or consent relating hereto may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. The delivery by any party of an executed signature page to this Agreement or any amendment, waiver, approval or consent relating hereto by facsimile transmission or by electronic email in Adobe Corporation's Portable Document Format (or PDF) shall be deemed to be, and shall be enforceable to the same extent as, an original signature page hereto or thereto. Any party who delivers such a signature page agrees to later deliver an original counterpart to any party that requests it.

IN WITNESS WHEREOF, the parties have executed this Independent Contractor Agreement as of the date first written above.

-CONTRACTOR-

DEBRISTECH, LLC

By: _Brooks Wallace_____
Brooks R. Wallace, Manager

-COUNTY-

MONTGOMERY COUNTY BOARD OF COMMISIONERS

By: _Valerie A. Arkoosh_____
Dr. Valerie Arkoosh, Chair

_Lee A. Soltysiak_
Lee Soltysiak

COO

Approved as to form.

DebrisTech 000035

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT A

## SCOPE OF SERVICES

### I. BACKGROUND

The County requires management, recovery, and consulting services related to disaster recovery. Upon request of the County other services may include, but not limited to, facilitating communication with FEMA, FHWA, the State of Pennsylvania and other agencies, coordination with insurance representatives, pre-event planning, and post-event reconstruction, grant funding, and reimbursement services.

### II. SCOPE

**A.    DISASTER DEBRIS MONITORING SERVICES**

The selected firm will be expected to provide disaster debris monitoring services to include debris generated from the public rights-of-way, private property, drainage areas/canals, waterways, and other areas designated as eligible by the County. Specific services may include:

a.  Providing technical support and guidance in selecting a debris removal contractor. This shall include the preparation, review and recommendations of Request for Proposals and/or Bids for debris removal.

b.  Coordinating daily briefings, work progress, staffing, and other key items with the County.

c.  Support with the selection and permitting of Temporary Debris Storage and Reduction Site (TDSRS) locations and other permitting/regulatory issues as requested.

d.  Scheduling work for team members and contractors on a daily basis.

e.  Hiring, scheduling, and managing field staff.

f.  Monitoring recovery contractor operations and making/implementing recommendations to improve efficiency and speed up recovery work.

g.  Assisting the County with responding to public concerns and comments.

h.  Certifying contractor vehicles for debris removal using methodology and documentation practices appropriate for contract monitoring.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

i.  The Debris monitoring company shall utilize an Electronic Ticketing System to generate electronic debris load tickets for each load of debris generated. The Electronic Ticketing System shall capture a digital photograph, GPS coordinates, Electronic Signature, and a timestamp for each load of debris generated as it is loaded and as it dumped. The System shall also capture before and after photos of each Leaner, Hanger, and Stump removed along with GPS coordinates and timestamps. This information shall be transmitted electronically to a central information database that provides real time access to debris removal activities via a web-based interface. Along with the digital records, the system shall also have the ability to generate paper receipts in the field for redundancy and debris removal crew validation if requested by the County at no additional cost. The System shall also be capable of providing a real time connection to the County's GIS system and shall be customizable to meet specific needs of the County with no additional cost to the County. The purpose of the Electronic Ticketing System is to provide the County with complete documentation of every load of debris generated for auditing and reimbursement purposes.

j.  Developing daily operational reports to keep the County informed of work progress.

k.  Development of maps, GIS applications, etc. as necessary.

l.  Comprehensive review, reconciliation, and validation of debris removal contractor(s) invoices prior to submission to the County for processing.

m.  Project Worksheet and other pertinent report preparation required for reimbursement by FEMA, FHWA and any other applicable agency for disaster recovery efforts by County staff and designated debris removal contractors.

n.  Final report and appeal preparation and assistance.

END OF SCOPE

DebrisTech 000037

DocuSign Envelope ID: A97E3D2E-37BF-4A4F-9205-30854576C1D9

# EXHIBIT B
# PAYMENT SCHEDULE

The hourly labor rates shall include all applicable overhead and profit. All non-labor related project costs will be billed to the County at cost without mark-up. All Per Diem Expenses shall be billed directly to the County at a rate not to exceed the GSA Per Diem Allowance for the project area. The rates listed below shall be straight time rates. All hours in excess of 40 per week shall be billed at 1.5 times the straight time rate.

## DISASTER DEBRIS MONITORING SERVICES

| POSITIONS | HOURLY RATES |
|---|---|
| Project Manager | $85.00 |
| Operations Manager | $75.00 |
| Field Supervisors | $65.00 |
| Load Site Monitors | $45.00 |
| Debris Site/Tower Monitors | $45.00 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DebrisTech 000038

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## EXHIBIT C

### CERTIFICATION REGARDING DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS

CERTIFICATION REGARDING DEBARMENT, SUSPENSION, AND OTHER RESPONSIBILITY MATTERS -Certification in accordance with Section 29.510 Appendix A, C.F.R./Vol. 53, No. 102, page 19210 and 19211:

(1)     The CONTRACTOR certifies to the best of its knowledge and belief that it and its principals:

    (a)     are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any federal department or agency;

    (b)     have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state or local) transaction or contract under a public transaction, violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

    (c)     are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state or local) with commission of any of the offenses enumerated in paragraph (1)(b) of this certification: and

    (d)     have not within a three-year period preceding this application/proposal had one or more public transactions (federal, state or local) terminated for cause or default;

    (e)     has not either directly or indirectly entered into any agreement participated in any collusion; or otherwise taken any action in restraint of free competitive negotiation in connection with this CONTRACT.

(2)     The CONTRACTOR further certifies, to the best of his/her knowledge and belief, that:

    (f)     No federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any Federal agency, a member of Congress, an officer or employee of Congress, or employee of a member of Congress in connection with the awarding of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

    (g)     If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer of employee of Congress, or any employee of a member of Congress in connection with this CONTRACT, Standard Form-LLL, "Disclosure Form to Report Lobbying", in accordance with its instructions will be completed and submitted.

The certification contained in (1) and (2) above is a material representation of fact upon which reliance is placed and a pre-requisite imposed by Section 1352, Title 31, U. S. Code prior to entering into this CONTRACT. Failure to comply shall be subject to a civil penalty of not less than $10,000 and not more than $100,000. The CONTRACTOR shall include the language of the certification in all subcontracts exceeding $100,000 and all sub-contractors shall certify and disclose accordingly.

I hereby certify that I am the duly authorized representative of the CONTRACTOR for purposes of making this certification, and that neither I, nor any principal, officer, shareholder or employee of the above firm has:

(a) employed or retained for commission, percentages, brokerage, contingent fee, or other consideration, any firm or person (other than a bona fide employee working solely for me or the above CONTRACTOR) to solicit or secure this agreement,

(b) agreed, as an express or implied condition for obtaining this CONTRACT, to employ or retain the services of any firm or person in connection with carrying out the agreement, or

(c) paid, or agreed to pay, to any firm, organization or person (other than a bone fide employee working solely for me or the above CONTRACTOR) any fee, contribution, donation, or consideration of any kind for, or in connection with, procuring or carrying out the agreement; except as herein expressly stated (if any).

I acknowledge that this Agreement may be furnished to the Federal Emergency Management Agency, in connection with the Agreement involving participation of federal disaster relief funds, and is subject to applicable state and federal laws, both criminal and civil.

SO CERTIFIED this day of _____ , 20___ .

DebrisTech, LLC

BY: _Brooks Wallace_____
Brooks Wallace

ATTEST:_____

My Commission Expires: _____

Notary

DebrisTech 000040

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# DISASTER DECLARATION

WHEREAS, on September 1, 2021, heavy rains as a result of remnants of Hurricane Ida are expected to significantly affect the County causing flooding, severe damage and the potential for suffering to the persons and property of Montgomery County; and

WHEREAS, the potential flooding throughout the County may endanger the health, safety and welfare of a substantial number of persons and businesses residing in Montgomery County and threatens to create problems greater in scope than Montgomery County may be able to resolve; and

WHEREAS, emergency management measures are required to reduce the severity of this disaster and to protect the health, safety and welfare or affected residents in Montgomery County;

NOW, THEREFORE, we the undersigned Commissioners of Montgomery County, pursuant to the provisions of Section 7501 of the Pennsylvania Emergency Management Services Code, (35 PA C.S.), as amended do hereby declare the existence of a disaster emergency in Montgomery County.

FURTHER, we direct the Montgomery County Department of Public Safety to coordinate the activities of the emergency response, to take all appropriate action needed too alleviate the effects of this disaster, to aid in the restoration of essential public services, and to take any other emergency response action deemed necessary to respond to this disaster emergency.

This Declaration shall take effect on September 2, 2021 at 0900 hrs.

Commissioners:

Attest

_Lee A. Soltysiak_

Lee A. Soltysiak, Chief Operating Officer

_Valerie A. Arkoosh_

Valerie A. Arkoosh, MD, MPH, Chair

_Kenneth Lawrence_

Kenneth E, Lawrence, Jr., Vice Chair

_Joseph C. Gale_

Joseph C. Gale

DebrisTech 000041

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## Commonwealth of Pennsylvania

## Governor's Office

### PROCLAMATION OF DISASTER EMERGENCY

*August 31, 2021*

WHEREAS, ongoing monitoring and projections made at my discretion by associated state and national weather services have disclosed that the Commonwealth of Pennsylvania will experience the aftereffects of Hurricane Ida; and

WHEREAS, Hurricane Ida has the potential to cause widespread and heavy rains throughout Pennsylvania, which in turn poses a serious threat of flash and riverine flooding and other adverse impacts throughout the Commonwealth; and

WHEREAS, Hurricane Ida's heavy rains, and risk of flooding may result in extensive damage to roads, streets, bridges, private homes, businesses, utilities, and may cause other adverse impacts upon the general population of Pennsylvania; and

WHEREAS, this emergency event caused by Hurricane Ida is of such magnitude or severity as to render essential the Commonwealth's supplementation of county and municipal efforts and resources and the activation of all applicable state, county, and municipal emergency response plans; and

WHEREAS, the Commonwealth of Pennsylvania has enacted the Emergency Management Assistance Compact (EMAC) into law and codified it at 35 Pa. C.S. §§ 7601-7604, in order to provide for mutual aid between states during an emergency that is duly declared by the Governor of the affected state.

NOW THEREFORE, pursuant to Article IV, Section 20 of the Pennsylvania Constitution, I do hereby proclaim the existence of a general disaster emergency related to the after effects of Hurricane Ida in the entirety of the Commonwealth and authorize and direct that the Pennsylvania Emergency Management Agency Director, or designee, assume command and control of all statewide emergency operations and that all Commonwealth departments and agencies, under the direction of the Pennsylvania Emergency Management Agency Director, or designee, utilize all available resources and personnel as is deemed necessary to cope with the magnitude and severity of this emergency event pursuant to the provisions of section 7301 of the Emergency Management Services Code, 35 Pa. C.S. § 7301.

FURTHER, I hereby transfer $2,000,000 in unused appropriated funds to the Pennsylvania Emergency Management Agency for Emergency Management Assistance Compact expenses related to this emergency, to be increased or decreased as conditions require pursuant to the provisions of section 7604(a) of the Emergency Management Services Code, 35 Pa. C.S. § 7604(a). In addition, I hereby transfer $5,000,000 in unused appropriated funds, to be increased or decreased as conditions require, to the Pennsylvania Emergency Management Agency pursuant to section 1508 of the Act of

1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*April 9, 1929, P.L.343, No. 176 (the Fiscal Code), 72 P.S. § 1508. The aforementioned funds shall be used for expenses authorized and incurred related to this emergency. These funds shall be credited to a special account established by the Office of the Budget. I hereby direct that any funds transferred herein that remain unused after all costs related to this emergency have been satisfied shall be returned to the General Fund.*

*FURTHER, all Commonwealth agencies purchasing supplies or services in response to this emergency are authorized to utilize the emergency procurement procedures set forth in section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. § 516. This Proclamation shall serve as the written determination of the basis for the emergency under 62 Pa. C.S. § 516; and*

*FURTHER, I hereby direct the Pennsylvania Emergency Management Agency to staff the Commonwealth Response Coordination Center for the duration of this emergency event, and to augment it with personnel from other Commonwealth agencies and departments. I also authorize the Pennsylvania Emergency Management Agency to direct and coordinate the emergency response, recovery, and mitigation activities of other Commonwealth agencies and departments as deemed necessary to deal with the exigencies of this disaster emergency through implementation of the State Emergency Operations Plan; and*

*FURTHER, I hereby authorize the Secretary of Transportation to use all available equipment, resources, and personnel of the Department of Transportation, in whatever manner that she deems necessary, to ensure that all federal-aid and state highways in the areas that may be affected by the emergency event are cleared of debris and any other obstructions resulting from this event and to ensure that highways, bridges, roadbeds, and related facilities and structures that may sustain damage in the disaster affected areas are immediately repaired, maintained, reconstructed, or replaced, or that new construction is undertaken where necessary. In addition, I hereby waive any laws or regulations that would restrict the application and use of the Department's equipment, resources, and personnel to assist local jurisdictions in the repairs and clearing and removal of debris and other types of obstructions from non-state-owned highways. This assistance to local jurisdictions may be provided solely at the discretion of the Secretary of Transportation. This assistance, however, does not apply to privately owned highways, roads, streets, or other types of property; and I hereby authorize the Secretary of Transportation, in her sole discretion, to waive any provision of the Vehicle Code or any other law or regulation which she is authorized by law to administer or enforce as may be necessary to respond to this emergency event; and*

*FURTHER, if investigations made on my behalf determine that the Commonwealth is in need of greater flexibility in the application of state and federal motor carrier regulations to accommodate utility operators and truck drivers in the transporting of fuel, food or other commodities across the state to provide emergency relief and repairs during this event, I hereby direct the Department of Transportation to waive any laws or federal or state regulations related to drivers of commercial vehicles; and*

*FURTHER, pursuant to the powers vested in me by the Constitution and laws of this Commonwealth, specifically 51 Pa. C.S. § 508, I hereby authorize the Adjutant General of Pennsylvania to place on state active duty for the duration of this disaster emergency proclamation, such individuals and units of the Pennsylvania National Guard, as requested by the Pennsylvania Emergency Management Agency, to alleviate the danger to public health and safety caused by this emergency event; and*

*FURTHER, I hereby authorize the Commissioner of the Pennsylvania State Police to use all available resources and personnel of the Pennsylvania State Police, in whatever manner he deems necessary, to aid in the recovery aspects related to all interstate and other federal and state highways in the Commonwealth to address this emergency event; and*

*FURTHER, I hereby direct that the emergency response, recovery, and mitigation aspects of the Commonwealth and all applicable county, municipal, and other*

emergency response plans be activated and that all state, county, and municipal actions taken to implement those plans be coordinated through the Pennsylvania Emergency Management Agency; and

*FURTHER, I hereby suspend the provisions of any other regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder, or delay necessary action in coping with this emergency event. All Commonwealth agencies may implement their emergency assignments without regard to procedures required by other laws, except mandatory constitutional requirements, pertaining to the performance of public work, entering into contracts, incurring of obligations, employment of temporary workers, rental of equipment, purchase of supplies and materials, and expenditures of public funds; and*

*STILL FURTHER, I hereby urge the governing bodies and executive officers of all political subdivisions that may be affected by this emergency event to act as necessary to meet the current exigencies as legally authorized under this proclamation, including by the employment of temporary workers; by the rental of equipment; and by entering into such contracts and agreements as may be required to meet the emergency, all without regard to those time-consuming procedures and formalities normally prescribed by law, mandatory constitutional requirements excepted.*



*GIVEN under my hand and the Seal of the Governor this thirty-first day of August in the year of our Lord two thousand twenty-one, and of the Commonwealth the two hundred and forty-sixth.*

**TOM WOLF**
**Governor**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DocuSign**

## Certificate Of Completion

Envelope Id: A97E3D2E37DF4A4F920530854576C1D9
Subject: Please DocuSign: C21-701 Independent Contractor Agreement (DebrisTech_Montgomery Co PA) (002).p..,
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 17 | Signatures: 5 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Lauren Raikowski |
| AutoNav: Enabled | | LRaikowski@montcopa.org |
| EnvelopeId Stamping: Enabled | | IP Address: 98.115.113.198 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | |

Status: Completed

### Record Tracking

Status: Original
    9/7/2021 7:04:59 PM

Holder: Lauren Raikowski
    LRaikowski@montcopa.org

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Brooks Wallace | *Brooks Wallace* | Sent: 9/7/2021 7:09:02 PM |
| brooks@debristech.com | 3B0DE8ED44B7459 | Resent: 9/7/2021 8:18:44 PM |
| Security Level: Email, Account Authentication (None) | | Viewed: 9/8/2021 9:04:36 AM |
| | | Signed: 9/8/2021 9:05:12 AM |
| | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 50.243.47.185 | |

Electronic Record and Signature Disclosure:
    Accepted: 9/8/2021 9:04:36 AM
    ID: a0c1facc-a116-483e-88ee-894312a091ba

| | | |
|---|---|---|
| Josh Stein | | Sent: 9/8/2021 9:06:29 AM |
| JStein1@montcopa.org | 39S4862E3CE74CA | Viewed: 9/8/2021 9:56:19 AM |
| Solicitor | | Signed: 9/8/2021 9:57:18 AM |
| Montgomery County | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: 198.52.11.78 | |
| | Signed using mobile | |

Electronic Record and Signature Disclosure:
    Not Offered via DocuSign

| | | |
|---|---|---|
| Lee Soltysiak | | Sent: 9/8/2021 9:57:19 AM |
| lsoltysi@montcopa.org | 865CEA86410541A | Resent: 9/8/2021 10:51:47 AM |
| COO | | Viewed: 9/10/2021 4:52:30 PM |
| Montgomery County PA | | Signed: 9/10/2021 4:52:36 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Drawn on Device | |
| | Using IP Address: 198.7.132.21 | |

Electronic Record and Signature Disclosure:
    Not Offered via DocuSign

| | | |
|---|---|---|
| Valerie A. Arkoosh | *Valerie A. Arkoosh* | Sent: 9/10/2021 4:52:38 PM |
| VArkoosh@montcopa.org | 81AD77E866FC4B7 | Viewed: 9/12/2021 8:38:49 PM |
| Chair, Montgomery County Commission | | Signed: 9/12/2021 8:38:58 PM |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 173.49.159.110 | |

Electronic Record and Signature Disclosure:
    Accepted: 9/12/2021 8:38:49 PM
    ID: 189d1fb4-5989-4dc1-9f43-b10347e28d33

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|
| Bridget Briddes<br>BBriddes@montcopa.org<br>Executive Paralegal<br>Montgomery County<br>Security Level: Email, Account Authentication (None) | **VIEWED**<br><br>Using IP Address: 198.7.141.2 | Sent: 9/8/2021 9:05:14 AM<br>Viewed: 9/8/2021 9:06:29 AM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/7/2021 7:09:02 PM |
| Certified Delivered | Security Checked | 9/12/2021 8:38:49 PM |
| Signing Complete | Security Checked | 9/12/2021 8:38:58 PM |
| Completed | Security Checked | 9/12/2021 8:38:58 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

DebrisTech 000046

Electronic Record and Signature Disclosure created on: 12/29/2020 6:13:31 PM
Parties agreed to: Brooks Wallace, Valerie A. Arkoosh

Case 2.26-cv-03945    Document 1-1    Filed 06/09/26    Page 162 of 811

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Montgomery County PA (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

DebrisTech 000047

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Montgomery County PA:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: jcoco@montcopa.org

**To advise Montgomery County PA of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at jcoco@montcopa.org and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Montgomery County PA**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to jcoco@montcopa.org and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Montgomery County PA**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jcoco@montcopa.org and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Montgomery County PA as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Montgomery County PA during the course of your relationship with Montgomery County PA.

DebrisTech 000049

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT
# 3

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

## 1.0  INTRODUCTION

The County of Montgomery (herein referred to as "County") is requesting Proposals from qualified firms who have the necessary expertise to provide Disaster Debris Clearance and Removal Services.

Montgomery County is located approximately twenty (20) miles west of Center City Philadelphia, PA. Montgomery County is governed by a three (3) member Board of Commissioners and is home to 62 incorporated municipalities.

1.2.1  Incorporated Montgomery County Municipalities are as follows:

**Boroughs:**

| | |
|---|---|
| Ambler | Norristown |
| Bridgeport | North Wales |
| Bryn Athyn | Pennsburg |
| Collegeville | Pottstown |
| Conshohocken | Red Hill |
| East Greenville | Rockledge |
| Green Lane | Royersford |
| Hatboro | Schwenksville |
| Hatfield | Souderton |
| Jenkintown | Telford |
| Lansdale | Trappe |
| Narberth | West Conshohocken |

**Townships:**

| | |
|---|---|
| Abington | Plymouth |
| Cheltenham | Salford |
| Douglass | Skippack |
| East Norriton | Springfield |
| Franconia | Towamencin |
| Hatfield | Upper Dublin |
| Horsham | Upper Frederick |
| Limerick | Upper Gwynedd |
| LowerFrederick | Upper Hanover |
| LowerGwynedd | Upper Merion |
| Lower Merion | Upper Moreland |
| Lower Moreland | Upper Pottsgrove |
| Lower Pottsgrove | Upper Providence |
| Lower Providence | Upper Salford |
| Lower Salford | West Norriton |
| Marlborough | West Pottsgrove |
| Montgomery | Whitemarsh |
| New Hanover | Whitpain |
| Perkiomen | Worcester |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

1.2.2    With approximately 850,000 residents, Montgomery County is the third most populated county in the Commonwealth of Pennsylvania.  Montgomery County is geographically diverse, ranging from farms and open land in the extreme north of the county to densely populated suburban neighborhoods in the southern and central portions of the county.

1.2.3    FEMA encourages municipalities to identify disaster debris clearance and removal service providers prior to an emergency.  With this in  mind, Montgomery County wishes to contract with one or more firms to provide services related to collection, reduction, recycling, hazardous waste management, demolition, processing, hauling and final disposition of disaster related debris

**2.0  SCOPE OF WORK**
2.1    The Contractor shall have the capacity to manage a major workforce with multiple Sub-contractors and to cover the expenses of a major recovery prior to being paid by the County.  Established management teams must be in place. The Contractor shall have the resources to provide the equipment and personnel necessary to cover a disaster.

2.1.1    It shall be the Contractors responsibility to load, transport, reduce and properly dispose of all disaster generated debris once the County issues a Notice to Proceed to the Contractor, unless otherwise directed in writing by the County.

2.1.1    It shall be the Contractors responsibility to provide assistance to the County for completion of all documentation required for reimbursement from FEMA for all associated debris management related costs.

2.1.2    Payment for disposal costs (such as tipping fees) incurred by the Contractor at a County approved final disposal site that meet Local, State and Federal regulations for disposal will be reimbursed by the County as a pass-through cost.  Prior to reimbursement by the County, the Contractor must furnish an invoice in hard copy and electronic formats, all scale or load ticket issued by the disposal facility and proof of Contractor payment to the disposal facility.

**2.2    Emergency Road Clearance**
Work shall consist of all labor, equipment, fuel and miscellaneous costs Necessary to clear and remove debris from County roadways and waterways to make them passable immediately following a declared disaster.  All roadways designated by the County shall be clear and passable within seventy (70) working hours of the issuance of a Notice to Proceed from the County to conduct emergency roadway clearance work.  The county may choose to extend the Contractor's seventy (70) hour limit through written request.  This may include roadways in municipalities with in County.  Roadways will be cleared as directed by the County.   The Contractor shall assist the County and its representative in ensuring proper documentation of emergency road clearance activities by documenting the type of equipment and/or labor utilized (that is, certification), starting and ending times and zones/areas cleared.  Services performed will be compensated using a mutually agreed upon hourly labor and equipment price schedule.

**2.3    Right of Way (ROW) Vegetative Debris Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to pick up and transport eligible disaster related  vegetative debris from the Public ROW to a County

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

approved DMS or approved  final disposal site in accordance with all Federal, State and Local regulations.

2.3.1    Vegetative debris in the Public (ROW) is defined as debris, resulting from a hurricane or other natural or human caused disaster, which has been or will be placed along public ROW's easements, County parks, alleys, County debris staging areas and other areas as designated by the County.

2.3.2    Eligible vegetative debris that is piled in immediate proximity to the actual legal street ROW and is accessible from the ROW line with loading equipment (that is, not behind a fence or other physical obstacle) will be deemed to be on the ROW, and is to be removed.

2.3.3    The Contractor will remove vegetative debris as directed by the County.

2.3.4    All eligible debris will be removed from each location before proceeding to the next location, unless otherwise directed by the County or its authorized representative.

2.3.5    The Contractor must provide traffic control as conditions require or as  directed by the County.

2.3.6    Entry onto private property for the removal of eligible vegetative debris will only be permitted when directed by the County or its authorized representative.  The County will provide specific right-of-entry (ROE) legal and operational procedures.

**2.4   ROW Construction and Demolition (C&D) Debris Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to pick up and transport eligible C&D debris from the Public ROW to a County approved final disposal site in accordance with Federal, State and Local regulations.

2.4.1    C&D debris in the Public Row is defined as disaster generated debris that has been or will be placed along public ROW, easements, County Parks, alleys and County debris staging areas.

2.4.2    Eligible C&D debris that is piled in immediate proximity to the ROW and that is accessible from the ROW line with loading equipment (that's, not behind a fence or other physical obstacle) will be deemed to be on the ROW, and is to be removed.

2.4.3    The Contractor will remove C&D debris from the ROW as directed by the County.

2.4.4    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site.  The debris removal vehicle will not collect additional debris once a load ticket has been issued.

2.4.5    All eligible debris will be removed from each location before proceeding to the next location, unless otherwise directed by the County or its authorized representative.

2.4.6    The Contractor must provide traffic control as conditions require or as direct by the County.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.4.7    Entry into private property for the removal of eligible C&D debris will only be permitted when directed by the County or its authorized representative.  The County will prove specific ROE legal and operational procedures.

2.4.8    C&D debris must be monitored for the collection, complete haul and delivery at the approved final disposal site.  The County or authorized representative will obtain the original copy of the disposal or scale ticket showing the inbound and outbound collection vehicle weights.

**2.5    Demolition, Removal, Transport and Disposal of Non-RACM Structures**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to decommission, demolish and dispose of eligible non regulated asbestos containing material (non-RACM) structures on private property within the jurisdictional limits of the County.  Under this service, work will include asbestos-containing material (ACM) testing, decommissioning, structural demolition, debris removal and site remediation.  Further, eligible debris generated from the demolition of non-RACM structures as well as scattered C&D debris on private property will be transported to a County approved final disposal site in accordance with all Federal, State and Local regulations.

2.5.1    Removal and transportation of demolished structures and scattered C&D debris on private property will be performed as identified by the County.

2.5.2    Entry onto private property will only be permitted when directed by the County. The County will provide specific ROE legal and operational procedures.

2.5.3    The Contractor is required to strictly adhere to all Local, State, and Federal regulations (such as obtaining demolition permits) for the demolition, handling, and transportation of non-RACM structures.

2.5.4    Decommissioning consists of the removal and disposal of all household hazardous waste (HHW), used electronics, white goods, and scrap tires from a non-RACM structure at a properly sanctioned facility in accordance with all applicable Federal, State, and Local regulations.

2.5.5    Any structurally unsound and unsafe structures will be identified and presented to the County for direction regarding decommissioning.

2.5.6    Removal and transportation of eligible non-RACM demolished structures and eligible scattered C&D debris on private property will be performed as directed in writing by the County's authorized representative.

2.5.7    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site. The debris removal vehicle will not collect additional debris once a load ticket has been issued.

2.5.8    Entry onto private property for the removal of eligible C&D debris will only be permitted when directed in writing by the County or its authorized representative. The County will provide specific ROE legal and operational procedures for private property debris removal programs if requested.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**2.6    Demolition, Removal, Transport and Disposal of RACM Structures**

Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to decommission, demolish and dispose of eligible RACM structures on private property within the jurisdictional limits of the County.. Under this service, work will include ACM testing, decommissioning, structural demolition, debris removal and site remediation.  Further, eligible scattered C& D debris on private property will be transported to a County approved final disposal site in accordance with a ll Federal, State and Local regulations.

2.6.1    The Contractor is required to strictly adhere to all Local, State and Federal regulatory requirements (such as obtaining demolition permits, burrito wrapping of debris, etc.) for demolition, handling and transportation of RACM structures.

2.6.2    Decommissioning consists of the removal and disposal of all HHW, e-waste, white goods and scrap tires from an RACM structure at a properly sanctioned facility in accordance with all applicable Local, State and Federal regulation.

2.6.3    Any structurally unsound and unsafe structures will be identified and presented to the County for direction regarding decommissioning.

2.6.4    Removal and transportation of eligible RACM demolished structures and eligible scattered C&D debris on private property will be performed as directed in writing by the County's authorized representative.

2.6.5    Once the debris removal vehicle has been issued a load ticket from the County's authorized representative, the debris removal vehicle will proceed immediately to a County approved final disposal site that accepts RACM debris.  The debris removal vehicle will no collect additional debris once a load ticket has been issued.

2.6.6    Entry onto private property for the removal of eligible C&D debris will only be permitted when directed in writing by the County or its authorized representative.  The County will provide specific ROE legal and operational procedures for private property debris removal programs if requested.

**2.7    DMS Management and Operations**

Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to manage and operate DMS(s) for the acceptance, management, segregation, staging and reduction of disaster debris.  Reduction methods must be approved the County prior to commencement of reduction activities.  DMS layouts and ingress and egress plans must be approved by the County

2.7.1    Managing DMS location includes helping to obtain necessary Local, State and Federal permits or approval and operating in accordance with all rules and regulation of Local, State and Federal regulatory agencies, which may include but are not limited to the U.S. Environmental Protection Agency (EPS), Pennsylvania Department of Environmental Protection (DEP), Pennsylvania Historical and Museum Commission (PHMC), Pennsylvania Department of Conservation and Natural Resources (DCNR)  or other State agencies.  The Contractor shall also be responsible for all costs associated with third-party groundwater and soil testing.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.7.2     Debris at the DMS(s) will be clearly segregated and managed independently by debris type (C&D, vegetative, white goods and other scope of service items), program (ROW collection, private property debris removal, etc.) and County as outlined in Definitions of Key terms, Item 10.0 - Description of Designated Area Item.

2.7.3     The Contractor shall obtain, install and operate scales for weighing incoming debris.  Scales shall be installed and certified within five (5) business days of receiving the Notice to Proceed or written notice that the County intends to use the alternate tonnage price schedule of this RFP.  The Contractor shall provide a sufficient number of scales meeting the County's specifications to provide for the efficient delivery of waste streams without excessive wait times.  To the extent the County determines that additional scales are required certified scales must be operational within five (5) business days of the County's written request.

2.7.4     The Contractor is responsible for maintaining the DMS(s) approach and interior road(s) for all weather conditions for the entire period of debris hauling, including provision of crushed concrete for any roads that require stabilization for ingress and egress.

2.7.5     The Contractor is responsible for all associated costs necessary to provide DMS(s) traffic control (for example, traffic cones and staff with traffic flags).

2.7.6     The Contractor is responsible for all associated costs necessary to provide DMS(s) dust control and erosion control (for example, an operational water truck, silt fencing and other best management practices).

2.7.7     The Contractor is responsible for providing twenty-four (24) hour security at DMS(s).

2.7.8     The Contractor will only permit Contractor vehicles and others specifically authorized by the County or its authorized representative on DMS locations.

2.7.9     The Contractor is responsible for all associated costs necessary to provide DMS9s) utilities (for example, water, lighting and portable toilets).
2.7.10   The Contractor is responsible for all associated costs necessary to provide DMS(s) fire protection (for example, an operational water truck [sufficient and equipped for fire protection], fire breaks and a site foreman).

2.7.11   The Contractor is responsible for all associated costs to provide qualified personnel as well as lined containers or containment areas for the segregation of visible HHW/contaminants that may be mixed with disaster debris.  The cost associated with qualified personnel and lined containers/containment areas for HHW/contaminant segregation is reflected in this scope of work.  The County will be responsible for disposing of HHW/contaminant material segregated and stored in lined containers at the SMS(s).

2.7.12   The Contractor shall provide tower(s) from which the County or its authorized representative can make volumetric load calls.  The tower provided by the Contractor will meet required minimum specifications.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2.7.13   The Contractor is responsible for operating the DMS(s) in accordance with Occupation Health and Safety Administration (OSHA), EPS EPA and DEP.

2.7.14   Upon completion of haul out activities, the Contractor shall restore the site to its original condition prior to site use at their own expense, abide by all Local, State and Federal environmental regulatory requirements and obtain a written release from the County or its authorized representative. Site remediation will include but is not limited to returning the original site grade, sod and other physical features.  Site remediation does not include restoring fencing, concession stands, lighting and other permanent structures that may have been demolished at the County's direction for DMS(s) operations. All debris, mulch and other residual materials is to be removed adequately; fill dirt and/or other base material (if required) must meet standards for intended use; and new sod or seeding must meet standards for intended use.  Site remediation will also include returning all utilized sites to their original condition as verified through soil and groundwater samples.  Site remediation will abide by all State and Federal environmental regulatory requirements and is subject to final approval by County and DEP.

**2.8    DMS Management and Reduction by Grinding**
Work shall consist of all labor, equipment, fuel and miscellaneous costs necessary to reduce disaster debris by grinding.  Reduction methods are at the discretion of the County.  Grinding must be approved by the County prior to commencement of reduction activities.

2.8.1  All unreduced disaster debris must be staged separately from reduced debris at the SMS(s).

2.8.2    The Contractor must obtain the County's approval to reduce C&D debris.  If approved for reduction by the County, C&D debris must be reduced via grinding in order for the County to compensate the Contractor for reduction.  Incineration or mauling of C&D are not acceptable methods of C&D reduction.

**2.9    DMS Management and Reduction by Incineration**
Work shall consist of all labor, equipment, fuel and miscellaneous costs necessary to reduce disaster debris by incineration.  Reduction methods (controlled open air incineration and air curtain burning) are at the discretion of the County.  Incineration must be approved by the County prior to commencement of reduction activities.

2.9.1    All unreduced disaster debris must be staged separately from reduced debris at the DMS(s).

**2.10    Haul-Out of Reduced Debris to Final Disposal Site**
Work shall consist of all labor, equipment, fuel, traffic control costs and associated costs necessary to load and transport reduced eligible material (such as ash, compacted C&D or mulch) from a County approved DMS(s) to a County approved final disposal site in accordance with all Local, State and Federal regulations.

2.10.1   All unreduced disaster debris must be transported to a final disposal site separately from reduced debris.

2.10.2   The Contractor shall provide the name and address of each disposal site to be used along with the name and telephone number of a responsible party for each site, prior to commencing the work.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.10.3   The Contractor shall not use any disposal site without the written consent of the County.  All costs and fees associated with the disposal of debris shall be reviewed for reasonableness by the County prior to issuing any such authorization.

2.10.4   The Contractor shall initiate and manage the execution of a written three party agreement between the disposal site owner/operator, the Contractor and the County for permission to post a County inspector at the site for verification of each load disposed.

2.10.5   The Contractor shall provide a sufficient number of debris site towers and/or certified scales meeting County specifications to provide for the efficient delivery of waste streams without excessive wait times.  The County shall decide what constitutes an excessive wait time.  To the extent that the County determines that additional towers and/or scales are required, additional towers must be operation within forty-eight (48) hours of the County's request and certified scales must be operational within five (5) business days of the County's request.

2.10.6   At the completion of disposal operations, each disposal site will issue a written summary of the quantity, type and origin of waste delivered.

2.10.7   The Contractor shall not receive any payment from the County for haul-out or load tickets related to reduced or unreduced debris transported and disposed of at a final disposal site that was not approved by the County.

**2.11      Removal of Hazardous Leaning Trees and Hanging Limbs**
Work shall consist of all labor, equipment, fuel, control costs and other associated costs necessary to remove all eligible hazardous leaning trees six (6) inches or greater in diameter, measured for and a half (4.5) feet from the base of the tree or chest height, and eligible hazardous hanging limbs two (2) inches or greater in diameter at the point of the break and in the Public ROW.  Further, debris generated from the removal of eligible hazardous leaning trees and eligible hazardous handing limbs two (2) inches or greater in diameter at the point of break and in the Public ROW will be placed in the safest possible location on the Public ROW and subsequently removed in accordance with Section of 2.2 of this RFP. Eligible hazardous leaning trees less than six (6) inches in diameter, measured four and a half (4.5) feet from the base of the tree or at chest height, will be flush cut, loaded and removed in accordance with Section 2.2 of this RFP.  The County will not compensate the Contractor for cutting leaning trees less than six (6) inches in diameter on a unit rate basis.  The collection of all eligible hazardous leaning trees and eligible hazardous hanging limbs must be performed on the same day as the cut work.  If there is insufficient room for safe placement along the Public ROW, then the Contractor must load the resulting debris as eligible hazardous leaning trees or eligible hazardous hanging limbs as they are removed.

2.11.1   Eligible hazardous leaning trees will be identified by the County or its authorized representative for removal.  Removal and transportation of hazardous leaning trees six (6) inches or greater in diameter on the /Public RPW or private property will be performed as identified by the County or authorized representative..  All disaster specific eligibility guidelines regarding size and diameter of hazardous leaning trees will be communicated to the Contractor in writing by the County or authorized representative.  For hazardous leaning trees to be removed and eligible for reimbursement, the tree must satisfy a minimum of one (1) of the following requirements:
a. The tree has more than fifty (50) percent of the crown damaged or destroyed (requires written documentation form an arborist).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

b. The tree has a split trunk or broken branches that expose the heartwood.
c. The tree has fallen or been uprooted within a public use area.
d. The tree is leaning at an angle greater than thirty (30) degrees.

2.11.2   Eligible hazardous hanging limbs will be identified by the County or its authorized representative for removal.  Removal and replacement of eligible hazardous hanging limbs tow (2) inches or greater in diameter at the point of the break and on the Public ROW or private property will e performed as identified by the County's authorized representative.  All disaster specific eligibility guidelines regarding size and diameter of limbs will be communicated to the Contractor in writing by the County's authorized representative.  For hazardous hanging limbs to be removed and eligible for payment, the limb must satisfy all the following requirements:
a The limb is two (2) inches or greater in diameter at the point of the  break.
b. The limb is still hanging in a tree and threatening a public use area.
c. The limb is located on improved public property

**2.12     Removal of Hazardous Stumps**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary to remove all hazardous uprooted stumps greater than twenty-four (24) inches in diameter, measured twenty-four (24) inches from the base of the tree, in the Public ROW.  Any voids not backfilled immediately following hazardous stump removal must have measures taken I order to protect public health and safety.  Further debris generated from the removal of eligible hazardous uprooted stumps in the Public ROW will be placed in the safest possible location on the ROW and subsequently removed in accordance with Section 2.3 of this RFP.  Stumps measured twenty-four (24) inches in diameter will be considered normal vegetative debris and will be removed in accordance with Section 2.2 of this RFP.  The County will not compensate the Contractor for removing hazardous stumps less than twenty-four (24) inches in diameter on a unite rate basis and instead will be considered normal vegetative debris.  The diameter of stumps less than twenty-four (24) inches will be converted into a cubic yardage volume based on the published FEMA Stump Conversion Table (see Attachment 1) and will be removed under the terms and conditions of Section 2.3 of this RFP.

2.12.1   Eligible hazardous stumps will be identified by the County for removal.  Removal and transportation of hazardous uprooted stumps in the Public ROW and private property will be performed as identified by the County.  All disaster specific eligibility guidelines regarding size and diameter of hazardous stumps will be communicated to the Contractor in writing by the County.  For hazardous stumps to be removed and edible for reimbursement, the stump must satisfy the following requirements:
a.Over fifty (50) percent of the tree crown is damaged or broken and heartwood is exposed.
b. Fifty (50) percent or more of the root ball is exposed.
c. The stump is on Public ROW and poses an immediate threat to public health, safety or welfare.

2.12.2   Stumps that are not attached to the ground will be considered normal vegetative debris and will be subject to removal under the terms and conditions of Section 2.3.  Stumps with less than fifty (50) percent of the root ball exposed shall be flush cut to the ground.  The stump portion of the tree will not be removed but the residual debris (that is, tree trunk) will be removed under the terms and conditions of Section 2.3.  The cubic yard volume of the unattached stump will be based on the diameter conversion using the published FEMA Stump Conversion Table (see Attachment 1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.12.3   The County or its representative will measure and certify all stumps before removal.

2.12.4   Stumps shall only be collected after the County and the Contractor document and perform the following:
a.  Location – Determine that the uprooted stump is located on improved public property or a public ROW.  Record and document the location using photography, map depiction and specific descriptive notations.
b.   Size – Measure and record the diameter of the stump to be removed at the appropriate location.
c.   Marking – Eligible stumps will be marked and uniquely numbered with green paint.  Ineligible stumps will be marked with red paint.
d.   Stump Worksheet – Hazardous Stump Worksheet provided by the monitoring firm(s) will be completed in full for each stump to capture and following information: 1) names and signatures of parties present; 2) physical location (street address, road cross streets, etc.); 3) stump number; 4) size of the stump; and 5) date of stump removal.

2.12.5   The unit stump price shall include but not be limited to stump extraction, stump cavity filling with compacted soils and installation of seed and/or sod, stump hauling and stump reduction.

**2.13    ROW White Goods Debris Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the collection of white goods from the ROW, removal of refrigerants, transportation to a County approved DMS, decontamination and transportation to the County's approved final disposal site.

2.13.1   White goods containing refrigerants must first have such refrigerants removed by the Contractor's qualified technicians prior to mechanical loading.  White goods can be collected without first having refrigerants removed if the white goods are manually placed into a hauling vehicle with lifting equipment so that the elements containing refrigerants are not damaged.

2.13.2   The removal, transportation and disposal of white goods includes obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with the Local, State and Federal regulatory agencies.

2.13.3   There are no disposal fees for residential white goods.

**2.14    Used Electronics**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and proper disposal of eligible used electronics from the ROW to the County approved final disposal site.  Eligible used electronics includes but is not limited to disaster damaged televisions, computers, computer monitors and microwaves in areas identified and approved by the County.  The County will refer to the State Department of Environmental Protection for disaster specific guidance on electronic waste criteria and eligibility. The Contractor shall recycle or dispose of all eligible used electronics in accordance with all Local, State and Federal regulations.

**2.15    Household Hazardous Waste Removal, Transport and Disposal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and disposal of HHW.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.15.1   The removal, transportation and disposal of HHW included obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

2.15.2   The collection methods shall include collection vehicles supplied by the Contractor, which shall be capable of transporting HHW materials from the curb to the approved final disposal sites.  All hazardous waste collection personnel shall wear level D personal protective equipment (PPE) and carry a means of communication (for example, cell phone or radio) for safety and operational purpose.  Contractor personnel shall observe all applicable safety requirements for the handling of HHW in accordance with applicable regulations.  All HHW shall be examined prior to collection to ensure it is free of other more serious contaminants, including PCBs.  Such serious and non-qualifying non-HHW waste shall be noted and scheduled for separate recovery by the County or Contractor as directed by the County.  Debris identified as HHW shall be collected and placed in poly bags for temporary storage during transport to the approved final disposal site.

2.15.3   There may be a need for HHW to be segregated for other debris at the DMS.  Contractor personnel at the DMS shall observe all applicable safety requirements for the handling of HHW in accordance with applicable regulations.  Debris identified as HHW shall be collected and place in poly bags for temporary storage at the DMS and during transport to the approved final disposal site.

**2.16     Abandoned Vessel and Vehicle Removal**
Work shall consist of all the labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal and haul out of eligible vessels and vehicles in areas identified and approved by the County.  The removed eligible vehicles will be hauled to a County approve staging area and subsequently disposed of by the appropriate regulatory agency.

2.16.1   The removal, transportation and disposal required for abandoned vessel and vehicle removal includes obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

**2.17     Animal Carcass Removal and Disposal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated costs necessary for the removal, transportation and lawful disposal of dead animal carcasses in areas identified and approved by the County to an approved final disposal site.  The carcasses will be hauled to a County approved staging area and subsequently disposed of ty the appropriate regulatory agency.

2.17.1   The Contractor will coordinate activities with the appropriate Local animal control agency.

2.17.2   The removal, transportation and disposal of Animal Carcasses included obtaining all necessary Local, State and Federal Handling Permits and operating in accordance with all Local, State and Federal regulations.

**2.18     Snow Removal**
Work shall consist of all labor, equipment, fuel, traffic control costs and other associated cost necessary associated with the plowing, salting, sanding and related emergency snow removal work on County maintained roads and other roads within the disaster area as directed by the County.  All roadways designated by the County for snow removal shall be clear and passable within forty-eight (48) working hours of the issuance of a Notice to Proceed form the County to conduct emergency snow removal

work.  The County may choose to extend the Contractor's forty-eight (48) hour limit through a written request.  This may include roadways in municipalities within the County.  Roadways will be cleared as directed by the County.  The Contractor shall assist the County and its representative in ensuring proper documentation of emergency snow removal activities by documenting the type of equipment and/or labor utilized (that is, certification), starting and ending times, and zones/areas cleared.  Services performed will be compensated using a mutually agreed upon hourly labor and equipment price schedule.

### 2.19    Other Debris Removal Work

Neither the Contractor nor any Sub-Contractor shall solicit work from private citizens or others to be performed in the designated work areas during the term of this Contract.  The County reserves the right to require the Contractor to dismiss or remove from the project any workers as the County sees necessary.  Any debris removal vehicles dismissed from the project must have their issued placard removed and destroyed.

### 2.20    Use of Local Resources

The Contractor will be able to use their own Sub-contractor resources to meet the obligations of the contract.  FEMA encourages using local resources.  The County will establish the extent to which Contractor must use local resources.  It is expected that the awarded Contractor will encourage at least thirty (30) percent of Sub-contractors are resources located within the disaster area, including but not limited to procuring supplies and equipment, awarding subcontracts and employing workmen at the County's discretion.

### 2.21    Working Hours

Working hours of the contract shall only be during daylight hours, Monday through Sunday or as otherwise directed by the County.  No work outside these hours shall be allowed unless approved in advance by the County.

2.21.1   The Contractor shall conduct debris removal operations that generate noise levels above that normally associated with routine traffic flow during daylight hours only.  Work may be performed seven (7) days per week.  Adjustments to work hours as local conditions may dictate shall be coordinated between the County and the Contractor.  Unless otherwise directed, the Contractor must be capable of conducting volumetric reduction operations at DMS locations on a twenty-four (24) hour, seven (7) day a week basis.

### 2.22    Debris Site Tower Specifications

The Contractor shall provide as many towers as designated by the County at each disposal site for the use of County representative during their inspection of dumping operations.

2.22.1   If ingress and egress of the DMS(s) is of significant distance that the County or its authorized representative are unable to verify the entering and exiting trucks, then the Contractor may be required to provide a second tower.

2.22.2   The inspection platform of the tower shall be constructed at a minimum height of ten (10) feet from surrounding grade to finish floor level, have a minimum eight (8) feet by eight (8) feet of usable floor area, be covered by a roof with tow (2) feet overhangs on all sides and be provided with appropriate railings and a stairway.  The platform shall be enclosed, starting from the platform floor

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

level and extending up four (4) feet on all four (4) sides. The expense incurred by the Contractor for the construction of towers is an overhead expense considered part of the Contractor's compensation under the terms and conditions of Section 2.0.

2.22.3   The Contractor shall provide a minimum of one (1) portable toilet at each dumpsite for the use of County authorized representatives during their inspection of dumping operations. The toilet shall be provided prior to start of any dumping operations and will be kept in a sanitary condition by the Contractor throughout dumping operations. The expense incurred by the Contractor for the operation of portable toilets is an overhead expense considered part of the Contractor's compensation under the terms and conditions of Section 2.0.

2.22.4   Care shall be taken to place tower at a sufficient distance away from any reduction/dumping operations. If necessary, dumping operations may be temporarily suspended by the County due to unsuitable conditions at the tower.

**2.23     Equipment**
2.23.1   All trucks and other equipment must comply with all applicable Local, State and Federal regulations. Any truck used to haul debris must be capable of rapidly dumping its load without the assistance of other equipment and must be equipped with a tailgate that will effectively contain the debris during transport and permit the truck to be filled to capacity.

2.23.2   Sideboards or other extensions to the bed are allowable provided they meet all applicable regulations, cover the front and both sides, and are constructed to withstand severe operating conditions. The sideboards are to be constructed of two (2) inch by six (6) inch boards or greater and not to extend more than two (2) feet above the metal bedsides. Trucks or equipment certified with sideboards must maintain such sideboards and keep them in good repair. To ensure compliance, equipment will be inspected by the County or authorized representative prior to its use by the Contractor.

2.23.3   Trucks or equipment designated for use under this contract shall not be used for any other work during the working hours of this contract. The Contractor shall not solicit work from private citizens or others to be performed in the designated area during the period of this contract. Under no circumstances will the Contractor mix debris hauled for others with debris hauled under this contract.

2.23.4   Debris shall be reasonably compacted into the hauling vehicle. Any debris extending above the top of the bed shall be secured in place to prevent it from falling off. Measures must be taken to prevent debris from blowing out of the hauling vehicle during transport to an approved DMS or an approved final disposal site.

2.23.5   Equipment used under this contract shall be rubber tired and sized properly to fit loading conditions. Excessively large equipment (100 cubic yards and up) and non-rubber tired equipment must be approved for use on the road by the County.

2.23.6   Hand-loaded vehicles are prohibited unless pre-authorized in writing by the County following the event. All hand-loaded vehicles will receive an automatic fifty (50) percent deduction for lack of compaction.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**2.24    Traffic Control**

2.24.1   The Contractor shall mitigate the effects of their operations on local traffic to the fullest extent practical. The Contractor is responsible for establishing and maintaining appropriate traffic controls in all work areas, including DMS(s) and debris collection sites.

2.24.2   The Contractor shall provide, erect, and maintain all necessary barricades, suitable and sufficient lights, danger signals, signs, and other traffic control devices at all Contractor work areas to ensure the safety of vehicular and pedestrian traffic.

2.24.3   The Contractor shall provide qualified flag personnel where necessary to direct the traffic and shall take all necessary precautions to protect the designated area and the safety of the public.

2.24.4   All work shall comply with all applicable Local, State, and Federal regulations governing personnel, equipment, and workplace safety. Any notification of a deficiency in traffic control or other safety items shall be immediately corrected by the Contractor. No further work shall take place until the deficiency is corrected. Neither the County nor the County's
authorized representative shall sign any additional load or unit rate tickets until the safety item is corrected.

2.24.5   Highways, streets, or parts of the designated area closed to through traffic shall be protected by effective barricades, and obstructions shall be illuminated during the hours from sunset to sunrise. Suitable warning signs shall be provided to properly control and direct traffic.

2.24.6   All barricades, warning signs, lights, temporary signals, other protective devices, flag persons, and signaling devices shall meet the minimum requirements established in the Manual on Uniform Traffic Control Devices for Streets and Highways, Part VI, prepared by the National Joint Committee on Uniform Traffic Control Devices and current at the time bids are received. Traffic control will conform to the State's most current roadway and traffic design standards and the Federal Highway Administration's (FHWA) Manual on Uniform Traffic Control Devices (MUTCD) for Streets and Highways. The foregoing requirements are to be considered as minimum and the Contractor's compliance shall in no way relieve the Contractor of final responsibility for providing adequate traffic control devices for the protection of the public and Contractor's employees throughout the designated area.

2.24.7   The expenses incurred by the Contractor for traffic control shall be compensated under the terms and conditions of Section 5.

**2.25    Damage to Public or Private Property**

2.25.1   All items damaged as a result of Contractor or Sub-Contractor operations (for example, sidewalks, seating, curbs, pipes, drains, water mains, pavement, mail boxes, and turf) shall be repaired or replaced by the Contractor, at their expense, in a manner prescribed by and at the sole satisfaction of the County. The Contractor will be responsible for any invoices submitted to the County (such as by utility companies or landowners) that are determined to be the result of damage done by the Contractor. The County reserves the right to pay any such invoices and deduct the cost from the Contractor's invoice. Repairs or receipt of repairs shall be completed and submitted to the County prior to submission of the Contractor's invoice for work accomplished. If the Contractor fails to repair any damaged property, the County may have the work performed and charge the Contractor.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

2.25.2   The Contractor shall restore all disturbed areas to their original condition, including re-grading, use of rye grass and permanent grass, and any other means necessary.

2.25.3   The Contractor's failure to restore damage to public or private property to the satisfaction of the County will result in the County withholding retainage money in an amount sufficient to make necessary repairs.

**2.26     Existing Utilities**
2.26.1   Some trees and debris that are to be removed under this contract may be blocked or entangled with overhead power, telephone, and television cables. In this case, it shall be Contractor's responsibility to coordinate directly with the utility owners to arrange for the removal of the debris without damage to the overhead and underground utility lines. The Contractor shall pay all such costs to the utility company for any adjustments.
.
2.26.2   The Contractor shall make the necessary repairs or pay all costs incurred to repair damaged utilities, as determined by the affected utility company. Repairs to all municipal and privately owned water and sewer facilities shall be made by the Contractor.

**2.27     Environmental Protection**
2.27.1   All chemicals of whatever nature used during project construction or furnished for project operations must be state and federally certified. Their use and disposal of all residues shall strictly comply with instructions.

2.27.2   The Contractor shall, at their own expense, ensure that noise and dust pollution is minimized to comply with all Local and State regulations and the approval of the County. The Contractor shall comply in a timely manner with all directions of the County regarding the use of a water truck or other approved dust abatement measures.

2.27.3   The Contractor shall comply with all laws, rules, regulations, and ordinances regarding environmental protection.

**2.28     Documentation and Measurement**
2.28.1   Prior to beginning any work, the County or its authorized representative shall clearly number each truck hauling debris or piece of equipment loading debris. All vehicles must be certified by the County or its authorized representative prior to debris collection. If a vehicle is working under multiple contracts or for multiple communities, it must be re-certified by a County authorized representative each time it returns to work from other contracts or communities.

2.28.2   The Contractor is responsible for ensuring that all Sub-Contractor's maintain valid driver's licenses and equipment legally fit for travel on the road.

2.28.3   The Contractor shall designate one Project Manager. The Project Manager shall provide the County with a telephone number at which the Project Manager can be reached throughout the project.

2.28.4   Load tickets will be provided by the County or its authorized representative for recording volumes of debris removal.
Each load ticket shall consist of one original and four carbon-copy duplicates.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

Load tickets will be issued by a County authorized representative at the loading site. The County will keep one copy of the ticket, and give four copies to the vehicle operator. Upon arrival at the dumpsite, the vehicle operator will give the four copies to the County authorized representative at the dumpsite. Trucks with less than full capacities will be adjusted down by visual inspection. This determination will be made by the County authorized representative present at the dumpsite. The County authorized representative will validate, enter the estimated debris quantity, and sign the load tickets. The County will keep the original copy and the three remaining duplicate copies will be returned to the vehicle operator for the Contractor's records.

The Contractor shall give written notice of the location for work scheduled twenty-four (24) hours in advance to the County.

**2.29    Ownership of Debris**

All debris residing in the Public ROW and County provided DMS(s) shall be the property of the County until final disposal at a properly permitted disposal site. The Contractor shall be responsible removing debris up to the point where debris can only be described as light litter and additional collection can be facilitated only by sweeping and raking. In addition to debris stored on the ROW as the result of road clearing, the County will direct residents to place debris in segregated piles along the ROW, separated as to the waste category. There may be a need to perform some curbside separation of the different waste materials. Different waste materials will be collected in separate vehicles and may require disposal at different locations, which will be approved by the County. Any items requiring disposal at special sites shall be required to be monitored for the collection, complete haul, and delivery at the approved special site with the monitor obtaining an original copy of the disposal ticket showing inbound and outbound collection vehicle weights.

2.29.1   All bagged and bundled waste and debris smaller than two (2) inches in diameter and shorter than two (2) feet in length are outside the scope of this contract unless specifically directed by the County. Collection of municipal solid waste (MSW) is outside the scope of this contract. All debris handled by the Contractor shall become the property of the Contractor upon collection.

2.29.2   It is recognized that C&D debris might contain small amounts of asbestos, lead-based paints, treated wood or similar materials. Pennsylvania DEP may issue orders for the classification and disposition of all disaster debris. Based on the mandates of DEP and other applicable State and Federal reimbursement agencies, the character and disposal of waste streams will be determined. The Contractor and County will establish a final disposal plan based on these mandates.

**3.0   CONTRACTOR REQUIREMENTS**

3.1   Contractor must have the necessary expertise in providing services required in this RFP.

3.2   Contractor will direct any questions regarding County standards policies or procedures while performing assigned tasks, the assignee should discuss with designated County personnel.

3.3   Contractor shall be solely responsible for maintaining safety at all work sites. Contractor shall take all reasonable steps to insure safety for both workers and visitors to the site(s) to include traffic control. Contractor will also be solely responsible to ensure that all OSHA requirements are met and a safety officer assigned to the projection for the duration of the contract.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**4.0    QUALIFICATION OF PROPOSER**

4.1    Each Proposer shall demonstrate its qualification by providing the County with a proposal that includes at a minimum, the following information,

4.1.1    Background with specific detail to similar projects performed in excess of 500,000 cubic yards.

4.1.2 Technical experience regarding large scale debris removal operation associated with ice storms, snow removal, tornadoes, flooding, tropical events or other natural or manmade disasters.

4.1.3    Staffing – must provide listing of key personnel who would be assigned to the project, including their training, certification and years of experience.  Also indicated which personnel will be primary contacts, which will be dedicated staff and what role each staff member will play in execution of the contracted services.  Organizational chart including proposed points of contact and full-time project manager required to report to the County.

4.1.4    Contractor must furnish a "Certificate of Registration" that identifies the Contractor is authorized to conduct business in the State of Pennsylvania.

4.1.5    Listing of existing or past clients from the successful completion of five (5) debris removal projects, in which three (3) completed projects were in excess of 500,000 cubic yards. Include names and contact information from the referral customers that the County may contact.  Also, list of existing contracts within 250 miles of the County.

4.1.6    Discuss the brief history of the firm, including any predecessor firms and the current parent/subsidiary relationship with any other firm(s). Indicate how long the current firm has been in continuous operation and how long it has been providing services. Provide any significant information about the firm relevant to demonstrating its experience and how it is uniquely qualified to provide services. Indicate whether your firm has been the subject of any disciplinary action by federal, state government or by a professional association. If yes, explain the disciplinary action.

4.1.7    A list of Sub-contractors showing/including primary operating location.

4.1.8    Detailed listing of equipment and resources – list of on-site and off-site equipment that will be available at the collection site or facility.  List should include all fire prevention, safety, personal protective equipment n and other equipment that would be suitable or necessary for the project..

4.1.9    Mobilization and operations plan.

4.1.10   Construction drawings for OSHA compliant temporary inspection towers.

4.1.11   Spill and Fire Prevention Plan – submit spill prevention and fire prevention plans tailored to on-site activities at the debris management site (DMS) or facility.

4.1.12   Contingency Plan – submit a format for a contingency plan and provide a description of notification procedures to the participants of on-site emergencies and evacuation of the participants in case of an emergency on-site.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

4.1.13   Contractor shall submit information regarding their standard health and Safety Plan.

4.1.14   Description of Safety Record – submit listing of all warning notifications, violations and/or citations received from pertinent federal and/or state agencies in the past three (3) years.

4.1.15   Submit a listing of all Third party certifications such as ISO 9000 Series, ISO 14000 Series.

4.1.16   Contractor must submit the most current, unqualified, audited financial statement or SEC Form 10K for the proposing organization.

4.1.17   Public Information Plan – Public Information Representative provided by the Contractor in interface with the County's Public Information Officer (PIO).

## 5.0   COUNTY RESPONSIBILITIES

County responsibilities will vary depending on County needs and resources. The County at a minimum will be responsible for the following:

5.1   Coordinating collection activities with the Contractor.

5.2   Completing County service request forms.

5.3   Identifying suitable DMS activities.

5.4   Promote debris management activities.

5.5   Provide educational materials.

5.6   Submit post-collection DMS(s) data reports to DEP.

5.7   Recruiting and coordinating volunteers.

5.8   Coordinate with local police, fire, emergency medical services (EMS) and other appropriate agencies.

5.9   Provide emergency contact information

5.10   Issuance of a written Notice to Proceed, with a not to exceed amount at the appropriate time.

**Special Conditions**
**Vendor Interview/Presentation**
Upon review of the Proposals, the County reserves the right to request and schedule meeting(s) at a designated time, date and location for an interview and/or presentation.

**Subcontracts**
Intended use of subcontracted services for any part of this RFP must be identified in your proposal.  The Contractor shall retain total responsibility for the performance of the contract.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**Child Abuse Clearances Required**
Proposers are required to complete and return the PA Protective Services Compliance Verification Form with their Proposal.  Copies of Pennsylvania Child Abuse Clearances (Childline) are required for all employees and subcontractors.

**Identification**
Contractor employees must wear company uniform with company name and visibly wear/display a company identification badge.  Contractor's employees deemed to be disruptive, unqualified or under the influence will have their security withdrawn and be permanently removed from the Facility.

**Invoicing/Payments**
The County will pay the amount due to the Contractor within thirty days after receipt of a correct invoice. Any invoices older than six (6) months, the County reserves the option to deduct ten percent (10%) per month from the payment due for processing fees subject to a twenty-five dollar minimum on any outstanding request(s) for payment.  The County assumes no liability for any payment request older than six (6) months from the delivery or completion of work.

In the event any portion of this scope of work is to be funded by state or federal funds, the Contractor will comply with all requirements of the state or federal government applicable to the use of the funds. The County will only pay for those items deemed eligible by the federal funding agency, unless the County otherwise agrees in writing.

Invoices shall be submitted to the County or authorized representative on a bi-weekly basis. All invoices must be submitted with a hard copy and electronic copy (Microsoft Excel format) of the invoice detail. The invoice detail must consist of a tabular report listing all ticket information required by the County. Invoice detail submittals will be checked against County records. County records are the basis of all payment approvals. Only one hundred percent (100%) accurate and complete invoices shall be approved for payment.

Contractor must submit a final invoice within thirty (30) days of completion of scope of work. Completion of scope of work will be acknowledged, in writing, by the County. The final invoice must be marked "FINAL INVOICE" and no additional payments will be made after the Contractor's final invoice. The County, or an authorized representative, will monitor, verify, and document with load tickets or unit rate tickets the completion of all work, as defined in the scope of work. The Contractor will be provided copies of this documentation. These documents will be used by the Contractor as backup data for invoice submittals. Work not ticketed or not authorized by the County will not be approved for payment. Additionally, any ticket submitted for payment must be properly completed. Tickets missing loading address, truck number, certified capacity, collection monitor signature, disposal site, load call or disposal monitor signature will not be paid, nor will the County be responsible for unpaid incomplete tickets.

The County reserves the right to request that private property debris removal operations will be invoiced separately from right-of-way collection removal operations. The County reserves the right to request additional invoice separation by debris type (construction and demolition, vegetative debris, household hazardous waste, etc.), program (right-of-way collection, private property debris removal, etc.) and/or applicant(s) (entities located within the jurisdiction).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

A ten percent (10%) retainage will be withheld from each reconciled invoice until the end of the project. In order to recover the retainage, the Contractor must successfully complete and receive a letter of completion from the County for all work zones. Retainage will be held until final reconciliation is complete. Portions of the retainage may be held by the County to repair damage caused by the Contractor to public or private property.

The Contractor is responsible for payment to all subcontractors utilized for the services rendered within this scope of work. The Contractor shall execute release waivers with all subcontractors to release the County from payment to subcontractors directly. The release waivers for all subcontractors shall be provided to the County prior to final retainage release.

No separate payment will be made for mobilization and demobilization operations. These costs are to be included in the respective unit prices bid for debris removal and will not be adjusted based on the total amount of debris actually removed in the contract.

## DEFINITIONS OF KEY TERMS

**1.0   Site Approved Final Disposal**
A final disposal site approved in writing by the COUNTY.

**2.0   Authorized Representative**
County employees and/or contracted individuals designated by the County or County Debris Manager.

**3.0   Cleanup Crew**
A group of individuals or an individual employed by the Contractor to collect disaster debris.

**4.0   Construction and Demolition (C&D) Debris**
FEMA Publication 325 defines eligible C&D debris as damaged components of buildings and structures such as lumber/wood, gypsum wallboard, glass, metal, roofing material, tile, carpeting and floor coverings, window coverings, plastic pipe, concrete, fully cured asphalt, heating, ventilation and air conditioning systems and their components, light fixtures, small consumer appliances, equipment, furnishings and other residential contents that are a result of a disaster. (Note: This definition of C&D debris is for disaster recovery purposes and is not the same definition commonly used in other solid waste documents.) Current eligibility criteria include the following:

4.1 Debris must be located within a designated area and be removed from an eligible applicant's improved property or right-of-way (ROW).

4.2  Debris removal must be the legal responsibility of the applicant.

4.3  Debris must be a result of a major disaster.

**5.0   Debris**
Items and materials broken, destroyed, or displaced by a natural or human-caused federally declared disaster. Examples of debris include but are not limited to trees, C&D debris, and personal property.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

### 6.0  Debris Management Site (DMS)

A location to temporarily store, reduce, segregate, and/or process debris before it is hauled to a final disposal site. May also be referred to as a temporary debris storage and reduction site (TDSRS) or temporary debris staging and processing facility (TDSPF).

### 7.0  Debris Manager

The County will designate a Debris Manager, who will provide oversight for all phases of debris removal operations.

### 8.0  Debris Removal

Picking up debris and taking it to a DMS, composting facility, recycling facility, permitted landfill, or other reuse or end-use facility.

### 9.0  Demolition

Demolition is the act or process of reducing a structure, as defined by the State of Texas or local code, to a collapsed state. It contrasts with deconstruction, which is the taking down of a building while carefully preserving valuable elements for reuse.

### 10.0  Description of Designated Area

10.1  The designated area for debris removal is bounded by County limits and includes all public ROWs, easements, parks, and debris staging areas within the areas of the County. Debris clearance and removal on roadways in  municipalities within the County's limits may assign debris removal  responsibilities to the Contractor. The Contractor will remove debris from municipal roadways at the direction of the County. The County may also authorize the Contractor to remove debris from Non-County roadways or other  areas as directed in writing by the County.

10.2  All debris identified by the County shall be removed. The Contractor shall make up to two complete passes through the County's limits, removing all debris  along each ROW. The County may or may not require the Contractor to perform a third pass. Partial removal of debris piles is strictly prohibited. The Contractor shall not move from one designated area to another designated area without prior approval from the County or its representative. Any eligible debris  (such as fallen trees) that extends onto the ROW from private property shall be cut at the point where it enters the ROW, and the part of the debris that lies within the ROW shall be removed. The Contractor shall not enter onto private property during the performance of this contract unless specifically authorized in writing by the County.

10.3  The Contractor shall deliver debris to disposal sites that have been permitted to receive disaster debris and will adhere to all State, Local, and Federal regulations.

10.4  Debris shall be reasonably compacted into the hauling vehicle. No limbs shall be allowed to protrude more than six (6) inches beyond the sides of the truck bed. Any debris extending above the top of the truck bed shall be secured in place to prevent it from falling off. Measures must be taken to prevent debris from blowing out of the hauling vehicle during transport to the disposal site.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

10.5  All debris will be mechanically loaded. Hauling vehicles that are hand-loaded or that require mechanical assistance for dumping will not be permitted to dump at DMS(s), unless approved in advance by the County.

10.6  Loose leaves and small debris in excess of one bushel basket shall be removed within the designated area. No debris shall be left on the road surface. No single piece of debris larger than six (6) inches in any dimension shall be left on-site. Hand crews and rakes will be required.\

10.7  The Contractor will provide an on-site Project Manager to the County. The Project Manager shall provide the County with a telephone number at which the Project Manager can be reached throughout the project. The Project Manager will be expected to have daily meetings with County representatives. Daily meeting topics will include but will not be limited to volume of debris collected, completion progress, local coordination, and damage repairs. The County may adjust the frequency of meetings. The Contractor Project Manager must be available 24 hours-a-day, or as required by the County.

10.8  The County may provide the Contractor with potential DMS(s). The Contractor will be responsible for returning the DMS(s) to its original condition, abiding by all State and Federal environmental regulatory requirements.

10.8.1   DMS locations to be determined within the County service request form.

10.8.2   Once DMS locations are identified, the Contractor will be provided with the address, GPS coordinates, and estimated acreage of each DMS.

10.8.3   Based on the severity of the disaster, the County may task the Contractor with locating additional sites available to be used as DMS(s).

10.8.4   The County does not warrant or guarantee the availability or use of any dump sites. The Contractor must coordinate directly with owners of all final disposal sites. All final disposal sites must be approved in writing by the County. The Contractor will remain legally responsible for the handling, reduction, and final haul-out and disposal of all reduced and unreduced debris. DMS(s) operations and remediation must comply with all Local, State, and Federal safety and environmental standards. Contractor reduction, handling, disposal, and remediation operations must be approved in writing by the County.

10.8.5   Payment for disposal costs (such as tipping fees) incurred by the Contractor at permitted disposal facilities, or other County approved sites that meet Local, State, and Federal regulations for disposal, will be made at the cost incurred by the Contractor. The Contractor must furnish a copy of the invoice received by the disposal facility, all scale or load tickets issued by the disposal facility, and proof of CONTRACTOR payment to the disposal facility.

10.09  The Contractor shall conduct the work so as not to interfere with the disaster  response and recovery activities of Federal, State, and Local governments or agencies, or of any public utilities.

10.10  The County reserves the right to inspect the DMS(s), verify quantities, and review operations at any time.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

10.11  The Contractor shall be capable of assembling, directing, and managing a workforce that can be fully operational in debris management operations in a maximum of seventy-two (72) hours, or sooner depending on the extent of the disaster. Operations must begin within twenty-four (24) hours of notification by the County. Depending on the category of the event, the County may request immediate mobilization.

10.12  Debris management activities reimbursed through federal disaster programs may occur in areas protected by the Endangered Species Act. For any project that requires a federal permit or receives federal funding is subject to Section 7. The Contractor and County will comply with the findings of the Section 7 consultation, if applicable.

## 11.0   Disaster-Specific Guidance (DSG)
DSG is a policy statement issued in response to a specific post-event situation or need in a state or region. Each DSG is issued a number and is generally referred to by its numerical identification.

## 12.0   Eligible
Eligible means qualifying for and meeting the most current stipulated requirements (at the time the written Notice to Proceed is issued and executed by the County to the Contractor) of the FEMA Public Assistance Grant Program, FEMA Publication 321, FEMA Publication 322, FEMA Publication 323, FEMA Publication 325, and all current FEMA fact sheets, guidance documents, and DSGs. Eligible also includes meeting any changes in definition, rules, or requirements regarding debris removal reimbursement as stipulated by FEMA during the course of a debris removal project.

## 13.0   Endangered Species Act
13.1  Section 7 of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), requires all Federal agencies to consult with the National Marine Fisheries Service (NMFS) for marine and anadromous species, or the United States Fish and Wildlife Service (FWS) for fresh-water and wildlife, if they are proposing an action that may affect listed species or their designated habitat. "Action" is defined broadly to include funding, permitting, and other regulatory actions. (See 50 C.F.R. §402.02.)

13.2  Each Federal agency is to ensure that any action they authorize, fund, or carry out is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of a designated critical habitat. This is done through consultation. If such species may be present, the Local government must conduct a biological assessment (BA) to analyze the potential effects of the project on listed species and critical habitat in order to establish  and justify an effect determination (assistance and coordination may be  available from the State of Texas, especially with transportation projects). The Federal agency reviews the BA and, if it concludes that the project may adversely affect a listed species or its habitat, it prepares a biological opinion. The biological opinion may recommend reasonable and prudent alternatives to  the proposed action to avoid jeopardizing or adversely modifying the habitat.

## 14.0   FEMA Publication 325 Debris Management Guide
This publication is specifically dedicated to the rules, regulations, and policies associated with the debris removal process. Familiarity with this publication and any revisions can help a Local government limit the amount of non-reimbursable expenses. The Debris Management Guide provides the framework for the debris removal process authorized by the Stafford Act, including the following:

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

14.1  Eliminating immediate threats to lives, public health, and safety

14.2  Eliminating immediate threats of significant damage to improved public or private property

14.3  Ensuring the economic recovery of the affected community to the benefit of the community at large

**15.0   Grinding**
Reduction of disaster-related vegetative debris through mechanical means into small pieces to be used as mulch or fuel. Grinding may also be referred to as chipping or mulching.

**16.0   Hazardous Hanging Limbs**
A limb that poses significant threat to the public. The current eligibility requirements for hazardous hangers according to FEMA Publication 325 are:

16.1  Located on improved public property;

16.2  Greater than two inches in diameter at the point of breakage; and

16.3  Still hanging in a tree and threatening a public use area, e.g. trails, sidewalks, golf cart path.

**17.0   Hazardous Leaning Tree**
A tree is considered hazardous if its condition was caused by the disaster; it is an immediate threat to lives, public health and safety, or improved property; it has a diameter breast height of six inches or greater; and one or more of the following criteria are met: according to FEMA Publication 325 include:

17.1  The tree has more than 50 percent of the crown damaged or destroyed.

17.2  The tree has a split trunk or broken branches that expose the heartwood.

17.3  The tree has fallen or been uprooted within a public use area.

17.4  The tree is leaning at an angle greater than thirty (30) degrees.

**18.0   Hazardous Stump**
A stump is defined as hazardous and eligible for reimbursement if all of the following criteria are met. The current eligibility requirements for hazardous hangers according to FEMA Publication 325 are:

18.1  The stump has fifty (50) percent or more of the root ball exposed.

18.2  The stump is greater than twenty-four (24) inches in diameter when measured twenty-four (24) inches from the ground.

18.3  The stump is located on a public ROW.

18.4  The stump poses an immediate threat to public health and safety.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**19.0    Historic Preservation**
In certain instances, debris operations may occur in designated areas (for example, DMS locations or private property) that are subject to historical preservation rules and regulations.

**20.0    Household Hazardous Waste (HHW)**
 20.1 The Resource Conservation and Recovery Act (RCRA) defines hazardous waste as materials that are ignitable, reactive, toxic, corrosive, or meet other listed criteria. Examples of eligible HHW include items such as paints, cleaners, pesticides, etc. The eligibility criteria for HHW are as follows:

20.1.1  HHW must be located within a designated area and be removed from an eligible applicant's improved property or ROW.

20.1.2  HHW removal must be the legal responsibility of the applicant.

20.1.3  HHW must be a result of a major disaster.

20.2  The collection of commercial disaster-related hazardous waste is generally not eligible for reimbursement. Commercial hazardous waste will only be collected by the Contractor with written authorization by the County. Hazardous waste must be disposed of in accordance with all rules and regulations of Local, State, and Federal regulatory agencies.

**21.0    Monitor**
Person that observes day-to-day operations of debris removal crews to ensure they are performing eligible work, meeting the COUNTY'S expectations and contractual requirements, and complying with all applicable Federal, State, and Local regulations. May also be referred to as a field inspector.

**22.0    Personal Protective Equipment (PPE)**
Equipment worn to minimize exposure to a variety of hazards.

**23.0    RACM**
Regulated Asbestos-Containing Material" (RACM) is:

23.1  Friable asbestos material

23.2  Category I non-friable ACM that has become friable

23.3  Category I non-friable ACM that will be or has been subjected to sanding, grinding, cutting or abrading

23.4  Category II non-friable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Montgomery County RFP 19-23**
**Department of Public Safety**
**Disaster Debris Management, Clearance and Removal Services**

**24.0   Recycling**
The recovery or use of wastes as a raw material for making products of the same or different nature as the original product.

**25.0   Refrigerant**
Ozone-depleting compound that must be removed from white goods or other refrigerant-containing items prior to recycling or disposal.

**26.0   Right-of-Entry (ROE)**
As used by FEMA, the document by which a property owner confers to the County or its Contractor or the United States Army Corps of Engineers the right to enter onto private property for a specific purpose without committing trespass.

**27.0   Right-of-Way (ROW)**
The portions of land over which facilities such as highways, railroads, or power lines are built. It includes land on both sides of the facility up to the private property line.

**28.0   Scale/Weigh Station**
A scale used to weigh trucks as they enter and leave a landfill. The difference in weight determines the tonnage dumped and a tipping fee is charged accordingly. It also may be used to determine the quantity of debris picked up and hauled.

**29.0   Tipping Fee**
A fee charged by landfills or other waste management facilities based on the weight or volume of debris dumped. May also be referred to as a disposal fee.

**30.0   Used Electronics**
End-of-life electronics (typically televisions, computers, and related components) that have been damaged by the disaster. May also be referred to as e-waste.

**31.0   Vegetative Debris**
31.1  Damaged and disturbed trees, tree limbs, bushes, shrubs, brush, untreated lumber, and wood products.
31.2  Remains of standing trees that are clearly damaged beyond salvage.

**32.0   White Goods**
As outlined in FEMA Publication 325, eligible white goods are defined as discarded disaster-related household appliances such as refrigerators, freezers, air conditioners, heat pumps, ovens, ranges, washing machines, clothes dryers, and water heaters. White goods can contain ozone-depleting refrigerants, mercury, or compressor oils that the federal Clean Air Act prohibits from being released into the atmosphere. The Clean Air Act specifies that only qualified technicians can extract refrigerants from white goods before they can be recycled. The eligibility criteria for white goods are as follows:

32.1  White goods must be located within a designated area and be removed from an eligible applicant's improved property or ROW.

32.2  White goods removal must be the legal responsibility of the applicant.

32.3  White goods must be a result of a major disaster

Case 2:26-cv-03945    Document 1-1    Filed 06/09/26    Page 192 of 811

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

PROCUREMENT ADVERTISEMENT

Insert in issue of June 10, 2019:

The County of Montgomery, Pennsylvania seeks competitive proposals to be delivered electronically to the County Purchasing Department for the following projects:

RFP 19-23 – Disaster Debris Clearance and Removal Services, due July 9, 2019, by 10:00 A.M.

RFP 19-24 – Youth Marijuana Prevention Project, due June 27, 2019, by 10:30 A.M.

Please visit http://www.montcopa.org/purchasing for further information.

NOTICE:
NO INVOICE WILL BE PROCESSED UNLESS THE TEAR SHEETS FROM THE DAY OF THE ADVERTISEMENT IS ATTACHED

/KW

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



| PURCHASE ORDER NUMBER |
|:---:|
| **127687-0-MC** |
| This number must appear on all invoices, packages, cartons, bills of lading, and packing slips. |

ORIGINAL

## Date: 06/06/2019

**COUNTY OF MONTGOMERY**
PURCHASING DEPARTMENT
PO BOX 311
NORRISTOWN, PA 19404-0311
Phone - (610) 278-3037

**Vendor:**
106190-2
21ST CENTURY MEDIA
PHILLY CLUSTER
PO BOX 1877
ALBANY NY 12201-1877

**Ship To:**
PURCHASING
ONE MONTGOMERY PLAZA
SUITE 702
425 SWEDE STREET
NORRISTOWN PA 19401

**Invoices will NOT be paid unless PO # is listed on the invoice**

Invoice to: invoices@montcopa.org

| QTY | UOM | DESCRIPTION | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|
| | | Deliver on June 6, 2019 unless specified by line<br>Purchase Order Currency: Dollars<br>Invoice by mail<br>Process Level: CNTY | | |
| 150.00 | EA | ADVERTISEMENT FOR RFP<br>RFP 19-23 & 19-24<br>Vendor Item Number: ISSUE OF 6-10-19<br>Vendor Item Desc: | 1.00 | 150.00 |
| | | Purchase Order Summary<br>Goods Total:<br>Order Total: | | $150.00<br>$150.00 |
| | | Insert in issue of June 10, 2019: | | |
| | | The County of Montgomery, Pennsylvania seeks competitive proposals to be delivered electronically to the County Purchasing Department for the following projects: | | |
| | | RFP 19-23  Disaster Debris Clearance and Removal Services, due July 9, 2019, by 10:00 A.M. | | |
| | | RFP 19-24  Youth Marijuana Prevention Project, due June 27, 2019, by 10:30 A.M. | | |
| | | Please visit http://www.montcopa.org/purchasing for further information. | | |
| | | NOTICE:<br>NO INVOICE WILL BE PROCESSED UNLESS THE TEAR SHEETS FROM THE DAY OF THE ADVERTISEMENT IS ATTACHED | | |
| | | /KW | | |

MONTGOMERY COUNTY COMMISSIONERS
Per Joseph Coco - Director of Purchasing

**Total Amount:** **$150.00**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Public | Purchase™

Chat  Help  Logout                                                          Home    New Bid    Closed Bids    My Stuff    Tools

## Questions for Bid RFP #19-23 - Disaster Debris Clearance and Removal Services

### Question #1

Where/how can interested firms locate Exhibits B and C (pricing)?

Jun 25, 2019 10:57:54 AM EDT
By: Phillips & Jordan, Inc. - pnjresponse

**Answers**

Please list the section where exhibits B and C are mentioned.

Jun 25, 2019 1:06:12 PM EDT
By: cspearman

[Archive]

### Question #2

Upon review of the County's RFP, I did not see a Pricing schedule. Section 2.7.3 points to the price schedule of this RFP. Does the County have a Pricing Schedule Form for proposers to use? Are we to create and submit our own Pricing Schedule?

Jun 25, 2019 11:57:53 AM EDT
By: DRC Emergency Services - drcusa

**Answers**

We would like the vendors to submit their own pricing schedule for debris removal services.

Jun 25, 2019 1:05:42 PM EDT
By: cspearman

[Archive]

### Question #3

As clarification to question #1: both Exhibits B and C are mentioned in the Sample Agreement documents, items 2 & 3.

Jun 25, 2019 1:31:24 PM EDT
By: Phillips & Jordan, Inc. - pnjresponse

**Answers**

Exhibit is our Standard Terms and Conditions which you'll need to agree. This document is already attached in Public Purchase. Exhibit C is your / bidders Cost Proposal which you'll need to provide.

Jun 26, 2019 7:36:27 AM EDT
By: cspearman

[Archive]

### Question #4

Are bid bonds to be submitted physically or uploaded onto Public Purchase?

Jun 25, 2019 6:00:04 PM EDT
By: DRC Emergency Services - drcusa

**Answers**

A Bid bond is required and should be uploaded into Public Purchase.

Jul 3, 2019 10:51:00 AM EDT
By: cspearman

[Archive]

### Question #5

PDF page 19 of the RFP, Special Conditions states: "Child Abuse Clearances Required Proposers are required to complete and return the PA Protective Services

**Answers**

Please use the attached link;

http://www.keepkidssafe.pa.gov/resources/clearances/index.htm

https://nam03.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.keepkidssafe.pa.gov%2Fresources%2Fclearances%2Findex.htm&amp;data=02%7C01%7Ccspearma%40montcopa.org%7C8615bd

### Question #6

Please clarify if a bid bond is required for this proposal?

If yes, should the bond be for 5% of the total bid value, as discussed in Item 18 of the Standard Instructions?

If the bond should be for 5%, how should the total bid value be calculated?

Jun 26, 2019 10:52:39 AM EDT
By: Phillips & Jordan, Inc. - pnjresponse

**Answers**

Yes a bid bond is required and should be uploaded into Public Purchase. Please refer to paragraph 18 Bid Bonds, of the Instruction to Bidders

Jul 3, 2019 10:53:55 AM EDT
By: cspearman

[Archive]

### Question #7

Item 21 of the Standard Instructions states: "In evaluating bids, in addition to price, the County may consider delivery time, bidders' experience, past record of bidder in meeting commitments and any other general factors that may be deemed pertinent to the best interests of the County." Please clarify what the specific evaluation criteria will be for this solicitation and how much weight each criterion will carry.

Jun 26, 2019 10:53:45 AM EDT
By: Phillips & Jordan, Inc. - pnjresponse

**Answers**

Bids / vendors will be evaluated based information received in the bid packet. We will compare bid packets based off of pricing and where possible will check references. No specific criteria has been developed for evaluation.

Jul 1, 2019 1:46:21 PM EDT
By: cspearman

[Archive]

### Question #8

Can I get the past bid tabulation / current contract pricing?

Also, I am not seeing in document any mention of a bid bond required, please advise?

Jun 26, 2019 1:07:43 PM EDT
By: Custom Tree Care, Inc. - customtreecare

**Answers**

There is not past bid tabulation. This is a firs time for this project.

Jul 3, 2019 10:55:48 AM EDT

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Yes a bid bond is requires. Please see paragraph 18 of the Instructions to Bidders for Bid Bonds  By: cspearman

[Archive]

---

**Question #9**

As this is not a construction bid, please confirm a bid bond is not required with the submittal.  Jun 27, 2019 12:30:44 PM EDT
By: DRC Emergency Services - drcusa

**Answers**
Yes a Bid Bond is required.  Jul 3, 2019 11:03:37 AM EDT
By: cspearman

[Archive]

---

**Question #10 (Not Approved)**

The Grant Addendum T&Cs, Item 10 states: "WHEN required by Federal program legislation, all construction contracts awarded by the County, Contractor or subcontractors of more than $2000 shall include a provision for compliance with the Davis-Bacon Act (40 U.S.C. § 276a to a-7) and as supplemented by Department of Labor regulations (29 CFR part 5, "Labor Standards Provisions Applicable to Contracts Governing Federally Financed and Assisted Construction")..."  Jun 27, 2019 3:50:51 PM EDT
By: Phillips & Jordan, Inc. - pnjresponse

Please clarify if prevailing wages will apply to this contract.

[Approve]

---

**Question #11**

Not clear on the below site, which form to complete?
http://www.keepkidssafe.pa.gov/resources/clearances/index.htm
**Answers**
https://nam03.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.keepkidssafe.pa.gov%2Fresources%2Fclearances%2Findex.htm&amp;data=02%7C01%7Ccspearma%40montcopa.org%7C8615bd

---

**Question #12**

Please confirm that the Pennsylvania Child Abuse History Certification is not applicable.  Jun 28, 2019 10:37:36 AM EDT
By: DRC Emergency Services - drcusa

If applicable, which individual in the company is required to fill it out?
**Answers**
Supervision and site managers should complete the certification.  Jul 3, 2019 11:00:12 AM EDT
By: cspearman

[Archive]

---

**Question #13**

The bids states that the subcontractor needs to fill out the Pennsylvania Child Abuse History Certification. Is this post award? If not, which individuals in the company need to fill it out?  Jun 28, 2019 10:40:16 AM EDT
By: DRC Emergency Services - drcusa
**Answers**
The PA Child Abuse History Certification should be complete post award. Supervision and site managers should complete the certification  Jul 3, 2019 10:59:21 AM EDT
By: cspearman

[Archive]

---

**Question #14**

Regarding Question 5: There is not a form entitled "PA Protective Services Compliance Certification Form" located on the page connected to the link provided in

**Answers**
https://nam03.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.keepkidssafe.pa.gov%2Fresources%2Fclearances%2Findex.htm&amp;data=02%7C01%7Ccspearma%40montcopa.org%7C8615bd

---

**Question #15**

RFP item 2.29 states: "All debris residing in the Public ROW and County provided DMS(s) shall be the property of the County until final disposal at a properly permitted disposal site."  Jul 1, 2019 12:23:14 PM EDT
By: Phillips & Jordan, Inc. - pnjresponse

RFP item 2.29.1 states: "All debris handled by the Contractor shall become the property of the Contractor upon collection."

Please clarify if the contractor or the County will maintain ownership of debris.
**Answers**
The debris will remain the property of the County until final disposal at a properly permitted disposal site  Jul 1, 2019 1:29:01 PM EDT
By: cspearman

[Archive]

---

**Question #16**

Can you please clarify which "Clearance" form we need to submit?

**Answers**
https://nam03.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.keepkidssafe.pa.gov%2Fresources%2Fclearances%2Findex.htm&amp;data=02%7C01%7Ccspearma%40montcopa.org%7C8615bd

---

[View Bid]

Case 2:26-cv-03945    Document 1-1    Filed 06/09/26    Page 196 of 811

Public Purchase: Bid Questions

The Public | Group

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY PURCHASING DEPARTMENT**

19-C.

On the motion of _____, seconded by _____, it was unanimously adopted that:

<u>BACKGROUND</u>

1. The Public Safety Department has solicited Request for Proposal 19-23 for Disaster Debris Clearance and Removal Services for Montgomery County.

2. RFP 19-23 was advertised on <u>www.publicpurchase.com.</u> The RFP was accessed by eighteen (18) providers. Three (3) responses were received.

3. The Public Safety Department recommends entering into a contract with DRC Emergency Services LLC of Galveston, TX with event pricing as per the Logistical Services fee schedule submitted with providers response

**NOW THEREFORE IT IS HEREBY RESOLVED** that the proper County Officials, in accordance with the authority conferred by law, subject to the approval of the County Solicitor, are hereby authorized to enter into a contract with DRC Emergency Services LLC of Galveston, TX, on an as-needed basis.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY**
**BOARD OF COMMISSIONERS**

VALERIE A. ARKOOSH, MD, MPH, CHAIR

KENNETH E. LAWRENCE, VICE CHAIR

JOSEPH C. GALE, COMMISSIONER



**DEPARTMENT OF PUBLIC SAFETY**

MONTGOMERY COUNTY E.O.C. • 50 EAGLEVILLE ROAD
NORRISTOWN, PA 19403
610-631-6500
FAX: 610-631-6536
WWW.DPS.MONTCOPA.ORG

THOMAS M. SULLIVAN
DIRECTOR

### MEMORANDUM

TO:      Christopher Spearman
          Purchasing

THRU:    Thomas M. Sullivan

FROM:    Michelle Jackson

DATE:    September 26, 2019

SUBJECT: RFP 19-23 Disaster Debris Clearance and Removal Services

---

It is the recommendation of the Department of Public Safety that the County engage DRC for debris management services on a stand-by contract basis.

Attached please find a memo from Jason Wilson, Deputy Director for Emergency Management that details method used to choose this vendor.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY
BOARD OF COMMISSIONERS**
VALERIE A. ARKOOSH, MD, MPH, CHAIR
KENNETH E. LAWRENCE, JR. VICE CHAIR
JOSEPH C. GALE, COMMISSIONER



**DEPARTMENT OF PUBLIC SAFETY**
MONTGOMERY COUNTY E.O.C. • 50 EAGLEVILLE ROAD
NORRISTOWN, PA 19403
610-631-6500
FAX: 610-631-6536
WWW.DPS.MONTCOPA.ORG

THOMAS M. SULLIVAN
DIRECTOR

Date:  9/26/2019

To:  Thomas M. Sullivan

Subject:  Debris Management Contract Recommendation

Tom,

After a review of the Debris Management Plan, it has become apparent that Montgomery County does not possess the personnel or equipment necessary to facilitate a large-scale debris management operation resulting from a destructive incident. As such, a contractor will be required to provide the necessary services to ensure proper FEMA reimbursement. The following is a review of the RFP's and recommendation to select a vendor for debris management services on a no cost stand-by basis.

The reviewed RFP's included the following services in debris management:

- Eligible disaster debris removal from roadways and public right of ways (ROW)
- Transportation of eligible disaster debris
- Debris Management Site (DMS) coordination and operation
- Debris reduction and grinding – including haul out to final disposal sites
- Completion of FEMA paperwork required for reimbursement

The RFP's were compared by debris management services listed by cost per yard, cost per hour and added services such as training and exercise involvement and incident pre-planning. The contract allows for pre-deployment of contractor / vendor resources based upon severe weather forecasts and need determined by the County. Depending upon the scope of an incident, the Debris Management Plan activation would require several DMS locations to be opened within the County. MCDPS along with other County departments would be responsible for providing a designated representative at each DMS and debris loading site to ensure that unauthorized debris is not entering the system and load numbers are accurate. In addition, MCDPS would be responsible for coordinating DMS activities with municipalities and promoting debris management activities.

Costs incurred by the County by activating this contract would include debris removal, debris hauling, debris site management, debris management site equipment rental, debris reduction activities and FEMA reimbursement activities. Ultimately up to 75% of the cost of debris removal costs incurred by the County will be reimbursed after a Presidential Disaster Declaration. The cost includes a 25% match by the County which is often waived during disasters for complete reimbursement.

To give the vendor cost comparison contrast, the Debris Management Plan scenarios were used to determine debris amounts generated by different types of storms. The ice storm and hurricane

scenarios selected represent a medium probability of occurrence with a high volume of debris that would overwhelm the capabilities of the municipalities and County.

For example, an ice storm with an SPIA Index (Sperry-Plitz Ice Accumulation Index) of 3 would generate 556,000 yards of debris throughout the County with extensive tree / limb damage and power disruption of up to 5 days. This represents an ice storm comparable to that of 2014. A Category 1 hurricane impact would generate 684,000 yards of debris throughout the County with extensive tree, structure and infrastructure damage.

**Vendor / Contractor Cost Comparison Estimate**

| Ice Storm Scenario | | | |
|---|---|---|---|
| **Vendor** | **Debris Removal Cost per Yard – Vegetative** | **Debris Estimate** | **Estimated Cost** |
| DRC | $9.95 | 556,000 Yards | $5,532,200 |
| CERES | $11.98 | 556,000 Yards | $6,660,880 |

| Category 1 Hurricane Scenario | | | |
|---|---|---|---|
| **Vendor** | **Debris Removal Cost per Yard** | **Debris Estimate** | **Estimated Cost** |
| DRC | $9.95 - Vegetative | 513,000 yards Veg | $5,104,350 |
| | $10.25 – C&D | 171,000 yards C&D | $1,752,750 |
| **Total** | | | $6,857,100 |

| | | | |
|---|---|---|---|
| CERES | $11.98 | 513,000 yards Veg | $6,145,740 |
| | $11.99 | 171,000 yards C&D | $2,050,290 |
| **Total** | | | $8,196,030 |

CERES and DRC act as general contractors that subcontract work for hauling and sorting debris. Each have agreements with local subcontractors who will begin the debris management process as soon as requested. As the debris management operation grows, the general contractor will provide professional staffing to assist with debris site coordination, paperwork completion and will provide an EOC liaison. Additionally, company owned equipment will be available to supplement local resources for hauling and debris site operations.

When comparing the proposals, it became apparent that DRC offers more in terms of resources and personnel. In addition to debris management resources, DRC also has temporary shelters, satellite communications trailers, refrigerated containers and large portable generators available through the proposed agreement at an additional cost per hour or day. As a part of the proposal, DRC will also provide orientation training and participate in debris management related exercises at no additional cost.

Based upon the comparison of the RFP's provided by DRC and CERES, it is my recommendation to engage DRC for debris management services on a stand-by contract basis.

Let me know if you have any questions.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully,


Jason R. Wilson
Deputy Director for Emergency Management
Montgomery County Department of Public Safety

Case 2:26-cv-03945   Document 1-1   Filed 06/08/26   Page 202 of 811

# Public | Purchase™ ▷

Chat 💬   Help   Logout                    Home   New Bid   Closed Bids   My Stuff   Tools



## Bid RFP #19-23 - Disaster Debris Clearance and Removal Services

[Switch to Vendor View]

|  |  |
|---|---|
| Bid Type | **RFP** |
| Bid Number | **19-23** |
| Title | **Disaster Debris Clearance and Removal Services** |
| Start Date | **Jun 11, 2019 1:45:21 PM EDT** |
| End Date | **Jul 9, 2019 10:00:00 AM EDT** |
| Agency | **County of Montgomery** |
| Department | **Public Safety** |
| Bid Contact | **Christopher Spearman**<br>(610) 278-3037<br>cspearma@montcopa.org<br>PO Box 311<br>Norristown, PA  19401 |

### Access Reports
View reports on who has been notified of the bid or accessed it.
[Notification report]
[Access report]

### Questions
16 Questions
1 Unanswered
16 New Questions, and 16 New Answers
[View Questions]

### Awarding Details
[Final Award Tabulation]

---

### 🏆 Notice of Award Information

**Vendors**

DRC Emergency Services

[View Award Tabulation]

*Information Published on: Oct 18, 2019 9:16:57 AM EDT*

---

### Description

The Contractor shall have the capacity to manage a major workforce with multiple Sub-contractors and to cover the expenses of a major recovery prior to being paid by the County.  Established management teams must be in place. The Contractor shall have the resources to provide the equipment and personnel necessary to cover a disaster.

 It shall be the Contractors responsibility to load, transport, reduce and properly dispose of all disaster generated debris once the County issues a Notice to Proceed to the Contractor, unless otherwise directed in writing by the County.

 It shall be the Contractors responsibility to provide assistance to the County for completion of all documentation required for reimbursement from FEMA for all associated debris management related costs.

**Last day to submit inquiries/questions for this RFP will be June 27, 2019**

**When uploading your response, please submit the following
as <u>separate documents</u>: RFP Response, Cost Proposal, Appendix A and a current W-9.**

---

### Documents

| Name | Acceptance Required | |
|---|---|---|
| 📄 RFP 19-23 Disaster Debris Management, Clea | No | [Download] |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case 2:26-cv-03945  Document 1-4  Filed 06/09/26  Page 203 of 811

| | | |
|---|---|---|
| Appendix A.docx | No | [Download] |
| Contract Cover and Signature Page (SAMPLE | No | [Download] |
| Exhibit A - Standard Terms and Condition for | Yes | [Download] |
| Grant Addendum T&Cs.pdf | Yes | [Download] |
| Instructions to Bidders Template.docx | No | [Download] |
| Sole Source Contract Cover and Signature Pa | No | [Download] |
| Trade Secret Form.pdf | No | [Download] |

Customer Support: agencysupport@publicpurchase.com | Copyright 1999-2021 © | The Public Group, LLC. All rights reserved.

The Public | Group.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT
# 4

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents



# DRC
## EMERGENCY SERVICES
### *Striking Back.*

718 Union Avenue • Suite 3• Brielle, NJ 08730
(888) 721-4372 • Fax: (504) 482-2852
www.drcusa.com

## REQUEST FOR PROPOSAL
### Disaster Debris Clearance and Removal Services

### RFP NO. 19-23

### JULY 9, 2019 • 10:00AM
### ORIGINAL

### MONTGOMERY COUNTY
**Department of Public Safety**
**PO Box 311**
**Norristown, PA 19401**

## PREPARE•RESPOND•RECOVER

POINTS OF CONTACT:
Kristy Fuentes, Kfuentes@drcusa.com
Mark Stafford, Mstafford@drcusa.com

# Table of Contents

**DISASTER DEBRIS CLEARANCE AND REMOVAL SERVICES**

**RFP NO. 19-23**

**PROPOSAL LETTER**

| |
|---|
| **TAB 1**<br><br>Background With Projects in Excess of 500,000 Cubic Yards |
| **TAB 2**<br><br>Technical Experience in Managing Large Scale Events |
| **TAB 3**<br><br>Staffing |
| **TAB 4**<br><br>Certificate of Registration |
| **TAB 5**<br><br>Past and Current Contracts |
| **TAB 6**<br><br>Brief History of the Firm |
| **TAB 7**<br><br>Subcontracting Plan |
| **TAB 8**<br><br>Listing of equipment and Resources |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## TAB 9

Mobilization and Operations Plan

## TAB 10

OSHA Compliant Inspection Tower

## TAB 11

Spill and Fire Prevention Plan

## TAB 12

Contingency Plan

## TAB 13

Standard Health and Safety Plan

## TAB 14

Safety Record

## TAB 15

Third Party Certifications

## TAB 16

Financial Documents

## TAB 17

Public Information Plan

Per the Questions and Answers, the Child Abuse History Certification will be completed post award by supervision and site managers



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DRC
### EMERGENCY SERVICES
*Striking Back.*

718 Union Avenue • Suite 3• Brielle, NJ 08730 • (888) 721-4372 • Fax: (504) 482-2852
www.drcusa.com

July 9, 2019

Montgomery County
Department of Public Safety
PO Box 311
Norristown, PA 19401

Re:     Disaster Debris Clearance and Removal Services
        RFP No. 19-23

Dear Sir or Madam,

DRC Emergency Services, LLC, appreciates the opportunity to present to you and Montgomery County our proposal to provide Disaster Debris Clearance and Removal Services as required in the above referenced RFP. DRC is among the leading disaster management companies in the United States. Our services include emergency debris removal; disaster management—including temporary housing, workforce housing and life support—as well as required FEMA documentation; debris management; right-of-way maintenance; marine debris, salvage and recovery; vehicle and vessel removal and processing; technical assistance and project management; construction and construction management; demolition; and landfill management.

DRC has an office in New Jersey, which is located three and a half hours away from Montgomery County, our additional office locations in Galveston, Texas, New Orleans, Louisiana, Semmes, Alabama, Surf City, North Carolina, and West Palm Beach, Florida provide us with geographical maneuverability along the Gulf Coast, and allow us to continue to provide services to Montgomery County should any location be compromised during a disaster. DRC currently has dozens of reservists and hundreds of subcontractors ready to participate in any response effort. Depending on the size of an event which may strike Montgomery County, DRC will dedicate all necessary manpower and equipment and in no case, will the project be understaffed.

Corporate officers with legal signing authority to bind DRC to the terms and conditions of this proposal include: John Sullivan, President; Kristy Fuentes, Vice President/Secretary-Treasurer. Evidence of their authority is attached.

The Program Manager for Montgomery County is Mark Stafford who can be reached at (888) 721-4372, by cell: (504) 415-7945 or by email: Mstafford@drcusa.com. Mark is vastly familiar with the area and lived in the County for 8 years. He is available to the City 24/7.

This proposal is in all respects fair and in good faith, without collusion or fraud and conforms to the specifications of your RFP. If we may offer any additional information or clarifications, please let us know. Thank you for the opportunity to offer our services and we look forward to working with Montgomery County in the future.

Sincerely,

Kristy Fuentes
Vice President, Secretary, Treasurer

3



**ACTION IN LIEU OF
A MEETING OF THE
MANAGER OF
DRC EMERGENCY SERVICES, LLC**

This action is taken in accordance with Section 10-12-22 of the Alabama Limited Liability Company Act, as amended (the "Act"), in lieu of a meeting of the sole Manager of DRC EMERGENCY SERVICES, LLC, an Alabama limited liability company (the "Company"), and is made effective as of January 19, 2016.

WHEREAS, Section 4.2 of the Company's Second Amended and Restated Operating Agreement dated January 20, 2016 (as amended, the "LLC Agreement") and the Act permit the Manager of the Company to take the following actions; and

WHEREAS, the undersigned, DRC Equity LLC, constitutes the sole Manager of the Company (the "Manager").

NOW, THEREFORE, the undersigned hereby makes the following resolutions and consents to the following actions in lieu of a meeting of the Manager of the Company:

1.      The following persons, in their respective corporate capacities indicated below, are hereby authorized and empowered for the express limited purpose of signing documents for the submission of bids, proposals, offers, responses and other related documents to, any federal, state or local government, including any governmental entity, organization, body, agency, department or political subdivision, for the transaction of business by or on behalf of the Company:

| Name | Office/Capacity |
|------|-----------------|
| John R. Sullivan | President |
| Kristy Fuentes | Vice President of Business Development, Secretary and Treasurer |

2.   The officers listed above after giving effect to this written consent are hereby authorized and directed on behalf of the Company to execute and deliver such agreements and instruments, make such filings and give such notices, and take any and all such other actions, and to do or cause to be done, such acts as such officers may deem necessary or advisable to accomplish or otherwise implement the purposes of the foregoing resolutions or to cause the Company to perform its obligations under any of the foregoing.

3.   All actions taken by any officer of the Company in connection with any of the transactions contemplated by these resolutions are hereby authorized, approved, ratified and confirmed in all respects.

4.   This written consent may be executed in counterparts, and all so executed shall constitute one action notwithstanding that all of the undersigned are not signatories to the original or to the same counterpart. This written consent shall be filed with the minutes of the proceedings of the Manager of the Company.

**[SIGNATURE PAGE FOLLOWS]**

4

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM Fee = $0.00 The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Dated effective as of the date first written above.



Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM Fee = $0.00 The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC EMERGENCY SERVICES LLC**

By:   **DRC EQUITY, LLC**
       a Texas limited liability company
Its:   Manager

By:  John R. Sullivan
Its:  President

[Consent to Appoint Manager – DRC Emergency Services, LLC (January 2016)]

5

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 1: Background with Projects in Excess of 500,000 Cubic Yards
## Disaster Debris Clearance and Removal Services

# SIMILAR PROJECTS PERFORMED IN EXCESS OF 500,000 CUBIC YARDS

| 2018 | CONTRACTING AGENCY | DESCRIPTION OF WORK | CUBIC YARDS |
|---|---|---|---|
| October | FDOT Region 3 Bay and Calhoun Counties | Hurricane Michael (DR-4399) | 1,790,564.4 |
| October | FDOT Region 2 Gulf, Liberty, Franklin, Gadsden, Wakulla, Leon, and Jefferson Counties | Hurricane Michael (DR-4399) | 1,218,708.05 |
| October | Jackson County, FL | Hurricane Michael (DR-4399) | 2,346,830.4 |
| October | Wilmington, NC | Hurricane Florence (DR-4393) | Est. 1.4 million |
| September | Pender County, NC | Hurricane Florence (DR-4393) | Est. $10,200,000 |
| **2017** | **CONTRACTING AGENCY** | **DESCRIPTION OF WORK** | **CUBIC YARDS** |
| November | DTOP-Puerto Rico | Hurricane Maria Debris Removal (DR-4339) | 1,077,965 |
| October | Miami-Dade County, FL | Site Management and Reduction of Temporary Debris Storage and Reduction Site - **Hurricane Irma (DR-4337)** | $5,060,786.86 |
| October | Monroe County, FL | Debris Removal - Hurricane Irma (DR-4337) | $11,648,125.84 |
| August | Harris County, TX | Debris Removal - **Hurricane Harvey (DR-4332)** | Est. 1,200,000 |
| August | Houston, TX | Debris Removal - **Hurricane Harvey (DR-4332)** | Est. 1,100,000 |
| August | City of Port Aransas, TX | Debris Removal - **Hurricane Harvey (DR-4332)** | Est. $15,000,000 |
| **2016** | **CONTRACTING AGENCY** | **DESCRIPTION OF WORK** | **CUBIC YARDS** |
| August | East Baton Rouge Parish/City of Baton Rouge | Disaster Debris Removal and Disposal - **Louisiana Severe Storms and Flooding (DR-4277)** | 1,947,581 |
| **2014** | **CONTRACTING AGENCY** | **DESCRIPTION OF WORK** | **CUBIC YARDS** |
| February | South Carolina Department of Transportation | Clearing Roads, ROW, Debris Hauling due to a hurricane/storm event | 1,464,598.00 |
| **2009** | **CONTRACTING AGENCY** | **DESCRIPTION OF WORK** | **CUBIC YARDS** |
| March | Baxter County, AR | Ice Storm Debris Removal | 681,201.90 |
| February | Kentucky Department of Transportation – District 1 | Ice Storm Debris Removal | 1,242,759.69 |
| February | Fayetteville, AR | Ice Storm Debris Removal 2009 | 519,832.55 |
| January | Texas General Land Office | Marine Debris Removal - **Hurricane Ike** | 2,100,000.00 |
| **2008** | **CONTRACTING AGENCY** | **DESCRIPTION OF WORK** | **CUBIC YARDS** |
| September | LADOTD District 2, 3, 61, 62 | Debris Removal - **Hurricane Gustav** | 3,000,746 |

# Tab 1: Background with Projects in Excess of 500,000 Cubic Yards
## Disaster Debris Clearance and Removal Services



| September | Galveston, TX | Debris Removal - **Hurricane Ike** | 1,301,655.86 |
|---|---|---|---|
| September | Harris County, TX | Debris Removal - **Hurricane Ike** | 1,491,647.22 |
| September | Houston, TX | Debris Removal - **Hurricane Ike** | 5,035,439.18 |
| June | Macon, GA | Debris Management and Removal Services | 510,490.20 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

7



# HALLMARK EVENTS

## *Jackson County, FL, Hurricane Michael*

### Contract Summary
On October 10, 2018, Hurricane Michael impacted the FL Panhandle with 160 mph winds. As DRC Emergency Services, LLC (DRC) continued to perform its debris/beach restoration missions in 13 locations in NC, in response to Hurricane Florence on September 14, 2018, mobilization of Jackson County, Holmes County, and Tyndall Air Force Base, FL, and FL DOT began to complete disaster recovery and debris removal services as de- scribed in the following paragraphs.

### Pre-Execution
Despite the existence of a "standby" contract, very little pre-event planning was in place prior to Hurricane Michael, mostly because the County's primary contractor failed to perform advanced planning and training with/for the Jurisdiction. Consequently, the County Ad- ministration and Board of Commissioners elected to activate three Contractors. DRC solidified its chances of being activated by sup- plying 338 push crews, more than four times more than either of the two other Contractors.

The fact that Jackson County is rural (approx. 48,000 residents) made locating TDSR locations rather easy. DRC prepared six TDSR locations to accept both vegetative and C&D debris. Permits were secured for both burning and grinding of debris. The emergency push was such a large task that it continued for ten days allowing ample time to locate, permit and construct TDSR locations.

Initial debris estimates indicated that DRC would need to ramp up to about 130-160 large capacity load and haul crews averaging six loads per day. Based upon initial debris estimates, DRC expected to collect, process and dispose of 2-3 million CY in one third of the County's land mass. Therefore, TDSR locations were selected with volume and geographical spread as primary determinates.

### Deployment/Mobilization
Immediately following the storm, assisted local law enforcement with search and rescue efforts by using heavy equipment and chainsaw crews to clear entrance to affected residences.

The ten- day emergency push allowed time to assess local load and haul resources and consequently DRC began the process by mobilizing fifteen local crews as our primary subcontractors moved equipment in for measurement and certification. The certification process was extremely slow due to, the FL DOT's oversight/ monitoring contractor being understaffed, however eventually DRC was operating ~150 load and haul crews into six separate TDSR locations. Geographically, DRC operated the western portion of the County while a competitor split the eastern portion.

### Execution
The most effective operating technique is to cut leaners and hangers ahead of load and haul crews so that the cut volume is collected simultaneously with the ROW volume. Unfortunately, the contracts with DRC and our competitors were interpreted as calling for a separate "cradle to grave" approach to the cutting, collection and disposal of leaners

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DRC
EMERGENCY SERVICES
*Striking Back.*

and hangers. All three companies took exception to the County's interpretation of that contractual clause and successfully petitioned the County Commission for the change. Eventually the petition was granted and the methodology was changed at a net economic savings to the County, primarily in the form of reduced monitoring cost relating to the elimination of separate collection crews.

Since there was a fairly even distribution of available debris, routing was accomplished by the distribution of grid maps to individual sub- contractors.

Processing of vegetative debris by DRC was performed by open burning in the most remote locations and Air Curtain Incineration or Grinding in more populated locations. The most cost-effective method was burning due to a 5% residual which FDEP allowed to be tilled into the soil. All of the ground vegetative volume produced by DRC was recycled/wind-rowed by local Farmers.

Construction and demolition debris, about 500,000 yards out of 2,500,000 CY collected, processed and disposed/recycled by DRC in Jackson County, was processed by compaction and hauled to final disposal the County Land- fill (Springhill LF) and Blountstown LF in Campbellton, FL. The HHW and white goods contract was awarded to DRC, however a NTP was never issued. White goods were scavenged from curbside and not enough HHW materialized to activate the contract. Job safety analysis were performed for both load and haul conditions and TDSR dynamics with daily safety tail-gate meetings serving to create awareness of safety concerns.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## Baton Rouge, LA, 2016 August Flood

### Contract Summary
Severe rains fell for several days in 2016 causing severe flooding to 60,000 homes in Baton Rouge, LA and additional homes in surrounding Parishes. DRC Emergency Services (DRC) had recently competed for and was awarded a "standby" contract for the City/ Parish which encompassed response features and line items similar to the ACI-RCDMS contract. Consequently, DRC was activated to perform disaster services and management on August 16, 2016.

DRC conducted right of way (ROW) debris collection, processing and disposal/recycling. We provided separate collection crews for the collection of thousands of white goods, tires, household hazardous waste units and electronic wastes (e-wastes).

Environmental considerations were of fore- most importance for all project stakeholders, particularly LDEQ. DRC worked closely with LDEQ's Department Director to establish Statewide protocol relative to debris acceptance, load monitoring and debris constituent identification. LDEQ praised the project and operation of the TDSR sites as a model for future events.

USACE provided project oversight and guidance to the State of Louisiana. The USACE representative considered the project, and particularly the operation of the TDSR sites, a benchmark event worthy of filming for the future training of personnel.

### Pre-Execution
The contract with the consolidated Government of the City of Baton Rouge/East Baton Rouge Parish is a "standby" contract which is the same as the USACE Advanced Contract Initiative. The "standby" contract allowed DRC Emergency Services to prepare in advance for such an event. For example, the advantages of holding the advanced contract allowed for:

- Familiarization of DRC's Management, Safety and Quality Control Personnel with Government personnel (Project Owner) before the disaster
- The selection of multiple potential TDSR locations in advance of mobilization. Specifically, one of the two sites selected and used by DRC was permitted in advance of the event
- Final Disposal contracts were secured prior to the event
- Local debris subcontractors, including minority participants, were pre-identified and Master Service Agreements were secured
- Priority clearance roads/routes were identified to allow for expedited clearing

Additional Pre-Execution Considerations and Tasks
- Initial Damage Survey: DRC and the Government's oversight monitoring contractor, Thompson Consulting, worked together to perform Initial Damage Assessments. The importance of this exercise is that the results form the basis of Project Worksheets or request(s) for FEMA funding
- Estimating flood debris volume presented a significant challenge because of the incremental measured appearance of debris at curbside due to private insurance interest and the time required for local residents to begin tear-out and cleanup efforts
- Assignment of collection grids to both balance volume concerns with Political concerns
- Properly "right sizing" collection crews in order to expedite collection, enhance productivity and consider safety factors was paramount to the successful operation

10

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services



- Proper volume estimates was the basis for determining the proper size and amount of TDSR operating equipment. For instance, a landfill compactor was a acquired to in- crease construction and demolition compaction at the TDSR site
- The size and scope of the overall project  was considered when determining the optimum number of safety and supervisory personnel
- Real time truck location monitoring and volume productivity provided by Thompson Consulting was a key to maximizing productivity and accountability even though DRC began load and haul operations to a final disposal site
- Household Hazardous Waste (HHW) col- lection routes began on day seven followed by e-waste and white good routes
- DRC's operations team "right sized" equipment and manpower through daily assessments of eligible flood debris

## Deployment/Mobilization

- DRC's management personnel were in contact with city government officials immediately upon recognizing that the flooding may be problematic. On day two of the event, after rain continued non-stop, DRC began to mobilize boats and emergency response and recovery personnel to the East Baton Rouge Sheriff's Department to work  search and rescue missions in conjunction with the Department
- Within the next 24 hours, DRC was operating twenty- five search and rescue crews that rescued over three-hundred stranded residents from locations within the Parish
- Anticipating a notice to proceed for debris collection, processing and disposal, DRC  began moving equipment in the direction of  Baton Rouge. Our local minority subcontractor was placed on ready mode and TDSR equipment was identified
- DRC's Program Manager initiated our tier-down or ring-down call procedure to alert our Personnel and Subcontractor structure
- Upon receiving a "Notice to Proceed" from  the Government, twenty- five crews were  being certified and measured in by the  City/Parish's Monitoring Firm within the first twenty- four hours
- The initial TDSR site, which was pre- permit-ted and approved was equipped with entrance and exit monitoring towers, water trucks, yellow iron, traffic signage and traffic control personnel, spotters and office trailers within forty-eight hours of the NTP

## Execution

**Routing—**Because the flooding took place in distinct pockets across the City/Parish and did  not affect every area of the Jurisdiction, routing and collection crew distribution became a challenge. Too many crews in a single area created safety concerns and hampered productivity.  Typical route grids were not initially  effective because of the uneven availability of debris.  Debris was brought to the curb in uneven and unpredictable amounts due to delays  brought on by private insurance companies  and a shortage of contractors to perform demolition and repair.  Consequently, routing was prepared each afternoon for assignment the  next morning. The load and haul operation  peaked at 240 crews. Additional crews collected white goods, HHW and e-waste.


**TDSR Operation—**The productivity goal for this project was to ensure that every crew could achieve a minimum of six loads per day. In order to achieve this goal, two TDSR sites were ultimately necessary.  The sites were geographically positioned to maximize productivity and allow for minimum ingress and  egress time.  The agreement between DRC and the State Department of Environmental Quality (LDEQ), provided for safeguards to ensure that no unauthorized waste entered a TDSR or final disposal site.  Spotters were available to examine each load as trucks were being unloaded.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services

It is important to note that DRC initially attempted to direct haul all C&D to the final disposal landfill, Ronaldson Field in north Baton Rouge Parish. Travel time was extreme, and it quickly became apparent that well placed TDSR would be the key to a successful operation. The initial TDSR of twenty- five acres was already prepared and operational.

Following the first month of operation, the throughput in TDSR 1 became problematic, therefore TDSR 2 was opened to relieve the overflow.

DRC achieved a C&D compaction rate of approximately 2.5 on over 2M CYs of C&D.

**Recycling**—In addition to metals, soil and small quantities of re-useable wood, white goods, electronic waste and household hazardous wastes were recycled.

# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services



## City of Houston, TX, Hurricane Harvey

### Contract Summary

DRC Emergency Services, LLC (DRC) collected, processed and disposed of more than 5M CYs of C&D in the City of Houston and Harris County, TX in response to Hurricane Harvey which impacted the coast of South Texas, on August 25, 2017 and caused severe flooding in low lying areas. When Maria hit, DRC was responding to 17 other TX juris- dictions following Harvey's landfall in TX on August 25, 2017; 26 Florida jurisdictions following Hurricane Irma's landfall on September 10, 2017; and, on the Island of Puerto Rico following the landfall of Hurricane Maria on September 20, 2017.

### Pre-Execution

- DRC has long held a "Stand-by" contract with the City of Houston, Texas. Through this contract, we have of pre-identified TDSR locations, final disposal sites, minority and local subcontractors and developed relation- ships with key government personnel
- Debris estimates were established through joint estimates between DRC, the City's independent monitoring firm and city staff
- TDSR sites were pre-identified before the event and permitting was seamlessly accomplished through TCEQ by DRC's VP of Environmental Compliance. Final disposal sites were also pre-identified and contracts put in place with the owners of those sites
- Job Safety Analyses (JSA) were performed on all TDSR locations. Supervisors were held accountable for holding daily safety meetings with all employees and subcontractors
- A DBE, MBE outreach office was established to identify subcontractors and ensure goals were met
- ADMS systems provided by Tetra Tech met the City's guidelines for reporting and billing purposes and interfaced with DRC's reconciliation software

### Deployment/Mobilization

Hurricane Harvey created massive flooding in pockets of the City of Houston. Flooding (C&D) events create difficulty relative to estimating volume for the following reasons:

- Owners of flooded homes many times wait for their private insurance company to adjust the damages before beginning the removal of damaged construction material and furniture. This practice creates uneven volume availability
- Homeowner will typically perform work on their damaged structure as their free time al- lows
- Damage severity can differ from structure to structure

The above scenarios make volume estimates difficult and many times prolong the life of the project. Experience performing similar work allowed DRC to "Right Size" the job as approximately seventy-five crews were mobilized in the first 72 hours and the number of crews escalated to more than four-hundred by the end of the third week. A de-escalation of that number began after 45 days of operation.

In order to accommodate that amount of "rolling stock", eleven TDSR locations were set up, permitted, manned and operated by DRC. Direct hauling to landfills was not practical due to volume demands and traffic restrictions.

### Execution

- DRC aided the City's Public Information Officer with debris separation literature which was used over radio and

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case 2:26-cv-03945    Document 1-1    Filed 06/03/26    Page 219 of 811



television and called for separation of C&D, white goods, tires, HHW, vegetative debris, e-waste and garbage

- Productivity standards were set to 6 loads per crew/day
- Ground crew personnel assigned to each crew ensured that only C&D debris was collected by right of way crews and would help separate non-compliant materials
- Separate routes and equipment were operated by DRC for white goods and an independent Contractor ran the HHW collection routes
- Routing methodology relied upon established solid waste collection grids adjusted daily for volume fluctuations
- Due to the condition of the flood debris, little recycling was possible outside of metal, white goods and e-waste
- Compaction was the method of reduction with an overall achieved rate of 2.3 to 1
- It is important to note that DRC also mobilized and completed a major Marine Debris mission for the City in Lake Houston, Spring Creek and the San Jacinto River. More than one-hundred thousand cubic yards of marine debris was collected, processed and disposed

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services



## *City of Wilmington, NC, Hurricane Florence*

### Contract Summary

On September 14, 2018, Hurricane Florence ravaged the Carolina coast dumping rain and causing severe tree damage. DRC held a "standby" contract in Wilmington, NC and was communicating consistently with the City's Director of Public Services regarding the impending "emergency push" response and debris mission. We were also making response plans with 13 other NC jurisdictions for which standby contracts were in place.

During this time, DRC was just finishing work in two Alabama Counties in response to an outbreak of tornados, however, there was no way to predict that Hurricane Michael would impact the Panhandle of Florida and Southern Georgia less than a month later.

### Pre-Execution

The benefits of holding a "standby" contract in Wilmington allowed DRC to pre-plan a multitude of functions:

- Emergency Push routes and route priorities were pre-established during previous meetings with the City
- Local Push and Load and Haul subcontractors were already identified with Master Service Agreements in place
- TDSR and Final Disposal/Recycling locations were already established from DRC's previous work in Wilmington
- JSAs specific to TDSR and final disposal lo-cations were performed
- Meetings were previously held with the City's third-party monitoring firm and systems were discussed and understood by both parties
- Local fuel supply contracts were in place
- Staging areas and trailer parking locations were pre-secured
- Debris towers were secured
- Non-local subcontractors were pre-staged approximately 150 miles outside the cone of danger

### Deployment/Mobilization

- Local push crews were activated and pushing debris from the priority routes immediately following a reduction of wind speed to safe levels
- Pinch points were activated to register and record push equipment and crews. Times in and out were recorded at these points and street assignments were distributed
- Local crews were activated and instructed to stage for measurement at a specific TDSR
- Non-local crews were activated and instructed to stage for measurement by the City's Monitoring firm
- The process of preparing four TDSR began immediately after winds reached safe levels
- Initial Debris Assessment was performed immediately after winds subsided in order to determine crew needs, TDSR requirements and to prepare debris density maps
- A pre-work meeting was held between DRC, the City's Public Services Director and the City's Monitoring firm to prepare a pre-work plan

### Execution

- Management personnel, yellow iron and all necessary support equipment was in place on the Four TDSR by the end of first 48 hours post storm
- DRC's Operations staff prepared route maps for an estimated peak number of 50- 70 Load and Haul crews
- Grid maps were adjusted daily to account for traffic conditions, volume and total loads per crew/day

15

Case 2:26-cv-03945    Document 1-1    Filed 06/03/26    Page 221 of 811


- Estimates called for approximately one mil- lion cubic yards; however, actual results for Wilmington produced 1.4 M of which only 40,000 yards was C&D
- DRC averaged approximately 60 daily crews plus 30 bucket trucks for leaners and hangers
- DRC worked closely with the City's Monitoring Firm to provide the Director with up- dated statistical information that he used to inform elected Officials and the Public
- TDSR processing was primarily performed with tub grinders and direct haul to final disposal for C&D
- The project lasted approximately 3 months with final haul out and TDSR closure ending by month four

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services



## *State of South Carolina, Ice Storm PAX*

### Contract Summary

The winter storms of 2014 wreaked havoc on the eastern seaboard. DRC's initial work began in Richmond, Virginia supporting the city with ice and snow removal on several occasions during the months of December and January. On February 10, 2014, Ice storm Pax impacted the States of North Carolina, South Carolina and Georgia. DRC Emergency Services' contract with the South Carolina Department of Transportation was activated in response to the event. This event damaged and destroyed millions of trees throughout the State of South Carolina. The South Carolina Department of Transportation contracted DRC to cut, remove and transport vegetative debris within 8 counties. The scope of work encompassed over 12,000 miles of roadway and involved the clearing and the trimming of over 225,000 trees. DRC managed and operated over 15 Debris Management Sites, reducing and recycling over 1.5 million cubic yards of debris. Simultaneously, DRC's contracts in North Carolina, were activated in New Hanover County, Pender County, the City of Wilmington for debris removal and reduction of approximately 400,000 cubic yards of debris. The winter of 2014 ended with a late ice storm in the first week of March in the State of North Carolina. In response to the damage caused by this storm, DRC was contracted by the City of Thomasville and the City of Archdale.

### Pre-Execution

- Volume estimates were difficult to obtain due to the significant number of DOT road miles and because much of the volume remained in the trees in the form of hangers. DRC used one- mile segments in ten distinct stretches of roadway to estimate volume. The average composite volume was extended by the total road miles for which work was to be performed to determine total estimated volume
- The total estimated cuts were divided by the prescribed number of work-days (60) and then by the estimated number of cuts per crew/day (75) to determine the number of cut crews required
- A special mobile all- wheel drive, telescoping (360 degree) circular saw was used to produce the dramatic pace and volume
- A load and haul crew was assigned to every two cut crews geographically. This ratio was later changed to 1 to 1
- TDSR sites were spread geographically in order for load and haul crews to keep up with cut crews
- TDSR were permitted for grinding and burning where allowed

### Deployment/Mobilization

- DRC's Management and mobilization team assembled in Columbus, SC within 24 hours to meet with SCDOT personnel
- Several line items that were missing from the contract were negotiated with the Department during the meeting
- Geographical assignments were given by the Department and mobilization began that afternoon
- Full mobilization was achieved within the first week of operation

### Execution

- Job Safety Analyses were produced for all TDSR and for the specialized work per- formed on SCDOT roadways. The analyses were discussed repeatedly in morning toolbox meetings with each crew
- Approximately 17 subcontractors were used to execute this contract with two local small business contractors playing a major role
- Initially, DRC activated 50 push or clearance crews to cut overhanging limbs and trees and open transportation routes
- Volume per cut crew exceeded load and haul capacity within the first two weeks which predicated the addition of load and haul crews

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 2: Technical Experience in Managing Large Scale Events
## Disaster Debris Clearance and Removal Services

## *Puerto Rico, Hurricane Maria*

### Contract Summary

On September 20, 2017, when Hurricane Maria made landfall in Puerto Rico (PR) as a Category 4, DRC Emergency Services, LLC (DRC) was already fully engaged in 43 debris management contracts in TX, FL and GA. De- spite this, DRC's management team was on the ground in PR within 24 hours assessing damage. It would not be long until DRC was mobilizing a huge number of local resources and shipping supplemental resources from the U.S. mainland. DRC collected, processed and disposed of >1M CYs on an island with rugged terrain and a crippled infrastructure while simultaneously completing the same for an additional 8M CYs back home on other projects.

### Pre-Execution

DRC sent a management/execution team to identify local partners to facilitate debris and housing operations; identify local subcontractors with load and haul capabilities; execute Master Service Agreements with qualified subcontractors; and, assess port capabilities for receiving supplemental assets from the U.S. We performed preliminary debris estimates, identified housing and food supplies, deter- mined the required number of bucket trucks, load and haul crews and specialty crews, and identified potential TDSR sites.

### Deployment/Mobilization

DRC initially activated 4 TDSR sites, mobilized 150 local load and haul crews and leaner and hanger crews, and approximately 300 load and haul crews and tree crews from our sub- contractor base in the U.S.

### Execution

DRC opened 9 TDSR locations and established collection zones to account for volume, terrain and location of the TDSR sites. At peak, we had 340 load and haul crews operating, 200 of which were local PR crews. The local crews operated smaller capacity trucks with front-end loaders or skid steers. We executed con-tracts w/8 final disposal sites.

18



# KEY PERSONNEL

DRC, its subcontractors, and/or personnel lists their accomplishments among memberships in several professional organizations including NEMA, APWA, SWANA and the Society of American Military Engineers. DRC and/or its' affiliates, associates and/or subcontractors are licensed General Contractors in the states in which DRC performs disaster response services. DRC is familiar with USACE, FEMA, and FHWA rules and regulations, the Stafford Act, and 44CFR as they pertain to emergency response, recovery and reimbursement.

## John Sullivan, President

Mr. Sullivan has vast experience in all aspects of the construction industry, ranging from marine construction and dredging, land development and infrastructure construction as well as the intricate completion of individual custom homes.  Mr. Sullivan, along with his brothers, started Sullivan Land Services, Ltd. which provides comprehensive site services for disaster response and recovery, infrastructure, and commercial landscaping, while earning a degree at Texas A&M University in Construction Management.  His ingenuity eventually led to the creation of Sullivan Interests, Ltd., a portfolio of companies that provides services and products to various industries.

With over 20 years of experience in the construction industry, Mr. Sullivan has gained both extensive knowledge and hands on experience with the recovery process.

3 years of experience with DRC, 20 years of industry experience.

FEMA Certifications: IS-20.18, IS-100.b, IS-100.pwb, IS-200.b

## Mark Stafford, Vice President of Response and Recovery

Mr. Stafford brings many years of experience in disaster and commercial/industrial waste management to DRC Emergency Services. He has participated in recovery following ice storms and hurricanes throughout the Southeast. Mark has overseen and operated landfills, recycling operations and transportation companies exceeding $200 million in annual revenues. He has managed teams of over 1,100 staff serving business, industry and municipalities.

Prior to joining DRC, Mark was the president and regional director of Allied Waste for the State of Louisiana. He also worked in an executive capacity for Waste Management. He earned a B. S. in business from the University of Louisiana.

15 years of experience with DRC, 38 years of relevant experience.

FEMA Certifications: IS-5.a, IS-11.a, IS-33.17, IS-35.17, IS-100.pwb, IS-106.17, IS-200.b, IS-315, IS-317, IS-546.a, IS-547.a, IS-660, IS-700.a, IS-702.a, IS-706, IS-775, IS-800.b, IS-801, IS-802, IS-803, IS-806, IS-906, IS-907, IS-2900
Other Certifications: Hazwoper

The Point of Contact for Montgomery County is Mark Stafford who can be reached at (888) 721-4372, by cell: (504) 415-7945 or by email: Mstafford@drcusa.com.

*"The team at DRC has been most professional, engaging, and amenable to the City's needs during the initial five-year period."*

— Harry Hayes Director of Solid Waste Management City of Houston

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 3: Staffing
## Disaster Debris Clearance and Removal Services



## Kristy Fuentes, Vice President of Compliance and Administration

Kristy Fuentes is the Vice President of Compliance and Administration for DRC Emergency Services, LLC (DRC ES) and Chief Ethics & Compliance Officer. Previously, Ms. Fuentes was Director of Business Development, leading the marketing, sales and communications functions. Since joining DRC in 2005, Ms. Fuentes has provided assistance to clients in planning, program management, disaster response, demolition contracting and regulatory compliance.

Following Hurricane Katrina, Ms. Fuentes managed expansive projects for the Orleans Levee Board, St. Bernard Parish and the United States Corps of Engineers. Ms. Fuentes has served as program manager for four contracts with the Louisiana Department of Environmental Quality, including the "Katrina Car and Vessel" contract and three massive demolition projects in the City of New Orleans. Following Hurricane Gustav, Ms. Fuentes managed nine major disaster-response contracts across southern Louisiana with a cumulative contract value of over thirty million dollars. In response to the BP MC 232 oil spill, Ms. Fuentes played a key role in the clean-up of lower Jefferson, Terrebonne and Plaquemines Parishes through the employment and management of hundreds of local residents and vessels.

Since November 2013, Ms. Fuentes has implemented changes and improvements to the methods and procedures for contract, licensing and pre-qualification processes, ensuring contractor compliance with Federal and State regulations.

Ms. Fuentes plays a key administrative role in every project DRC performs. In the wake of Hurricanes Michael and Florence in 2018 she directed 45 simultaneous contract activations while providing oversight of accounting, invoicing, ticket reconciliation and overall administrative management. Ms. Fuentes has provided this kind of oversight on all of DRC's projects since 2013.

13 years of experience with DRC, 20 years of relevant experience.

FEMA Certifications: IS-5.a, IS-10.a, IS-11.a, IS-29, IS-37.17, IS-42, IS-100, IS-100.b, IS-100.pwb, IS-106.17, IS-200.b, IS-241.b, IS-244.b, IS-315, IS-317, IS-453, IS-546.a, IS-547.a, IS-632.a, IS-633, IS-634, IS-700, IS-702.a, IS-706, IS-775, IS-800.b, IS-801, IS-802, IS-803, IS-804, IS-906, IS-907, IS-909, IS-2900
Other Certifications: Hazwoper

## Cliff Lowe, Vice President of Business Development

Cliff Lowe has over ten years of experience in the disaster management industry and has managed federal projects around the globe, giving him a unique knowledge of state and federal contracts. Since he has been with DRC, Mr. Lowe aided in the Hurricane Michael recovery at the Tyndall Air force Base in Florida. As DRC's Vice President of Business Development, Mr. Lowe is responsible for the day to day management of DRC's Regional Manager Team, sales and marketing, and coordinating with DRC's sister company, SLS.

Mr. Lowe was previously employed at HDR Engineering and Construction, where he worked as a Project Manager for HDR's OCUNUS Program. The program collectively performed 300 million cubic yards of work in Iraq, Afghanistan, and Kuwait. In 2016, he was awarded the Pathfinder of Distinction for Leadership for his role in Hurricane Matthew recovery efforts.

1 years of experience with DRC, 10 years of relevant experience.

Mr. Lowe has a Bachelor's Degree of Science and a Master's Degree of Science, both obtained at Texas A&M University.

Certifications: 40 Hour HAZWOPER, License Asbestos Inspector

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## Joe Newman, Vice President of Operations

With more than 13 years of experience in overseeing large-scale construction and disaster-related debris management projects, Mr. Newman has managed teams over multiple disasters including Hurricanes Isabel, Dennis, Katrina and Ike. Through the years, he has had many roles including heavy equipment operation, planning and coordination of construction process, securing permits and licenses, delivery of materials and equipment, FEMA compliance, coordinating and operating with municipality officials, and estimating for contracts.

As Vice President of Operations, Mr. Newman provides operational oversite in order to measures progress and adjust processes to ensure the success of the project. Mr. Newman oversees all project managers and works closely with management personnel to maintain efficient team structure during an activation.

Previously, while activated for Hurricane Ike, Mr. Newman oversaw the collection, processing, and recycling/disposal of over 1,000,000 cubic yards of debris.  His recent project activations include Hurricanes Michael, Florence, Harvey, Maria, and Irma. Mr. Newman plays a role in every major activation providing overall project management and operational oversight.

14 years of experience with DRC, 16 years of relevant experience.

FEMA Certifications: IS-33.17, IS-35.17, IS-100.b, IS-100.pwb, IS-632.a, IS-702.a, IS-2900
Other Certifications: Hazwoper

## Sam Dancer, Field Supervisor and Project Manager

After more than a decade in the military and law enforcement, Mr. Dancer became a Field Supervisor and Project Manager, handling contracts involving clean-up following Hurricanes Gustav and Ike; City of Fayetteville, AR ice storm; City of Nashville, Tennessee flooding; BP Oil Spill; and the Port Au Prince, Haiti earthquake.

More recently, he was involved in: St. Charles County and the City of Bridgeton tornado debris removal (MO); Tuscaloosa (ALDOT) residential demolition of tornado-damaged residences (AL); Terrebonne Parish (LA) and St. Louis Bayou (MS) Cleanout project; City of New Orleans Strategic Demolition for Economic Recovery project (LA); East Baton Rouge Parish wind storm damage (LA); Ascension Parish, Tangipahoa Parish (LA), and Houston (TX) flood damage; project manager for Hurricane Irma Largo.

6 years of experience with DRC, 13 years of relevant experience.

FEMA Certifications: IS-3, IS-5.a, IS-10.a, IS-11.a, IS -20.19, IS -21.19, IS-29, IS-33.17, IS-36, IS-37.19, IS-42, IS-60.b, IS-75, IS-100.c, IS-100.fda, IS-100.fwa, IS-100.hcb, IS-100.he, IS-100.leb, IS-100.pwb,  IS-106.17, IS-200.b, IS-200.hca, IS-201, IS-230.d, IS-00240.b, IS-241.b, IS-244.b, IS-315, IS-317, IS-324.a, IS-325, IS-394.a, IS-405, IS-420, IS-421, IS-453, IS-454, IS-546.a, IS-547.a, IS-632.a, IS-633, IS-634, IS-660, IS-700.b, IS-702.a, IS-703.a, IS-706, IS-775, IS-800.b, IS-801, IS-802, IS-803, IS-804, IS-807, IS-807, IS-809, IS-810, IS-811, IS-812, IS-813, IS-906, IS-907, IS-909, IS-912, IS-914, IS-01010, IS-1150, IS-1172, IS -2000, IS -2500, IS -2600, IS-2900.a

OSHA Certifications: OSHA-105, OSHA-107, OSHA-108, OSHA-112, OSHA-113, OSHA-115, OSHA-116, OSHA-121, OSHA-122, OSHA-123, OSHA-144, OSHA-150, OSHA-151, OSHA-152, OSHA-161, OSHA-162, OSHA-602, OSHA-603, OSHA-605, OSHA-612, OSHA-614, OSHA-618, OSHA-700, OSHA-701, OSHA-702, OSHA-704, OSHA-707, OSHA-716, OSHA-718, OSHA-719, OSHA-722, OSHA-750, OSHA-806, OSHA-807, OSHA-808, OSHA-809, OSHA-815, OSHA-852

Other Certifications: Access to a TWIC card, Access to HSIN granted by the Department of Homeland Security for Louisiana, Mississippi, Texas, Alabama, and the EM Site

# Tab 3: Staffing
## Disaster Debris Clearance and Removal Services



## Daniel Strode, Project Manager

With over 14 years of on the ground experience in both disaster response/recovery and international development Mr. Strode is a proven professional and dedicated to responding to those in need.  Mr. Strode is well-versed in coordinating pre-event planning with extensive knowledge of federal disaster and emergency response related programs, policies and operations, having worked on 8 major disaster responses, including international work for an earthquake in Nepal and Hurricane in Belize. Additional project experience includes housing design and construction using AutoCAD, professional training, emergency distribution, debris management, and demolition. Other experience includes business development and stakeholder relations including USAID, OFDA, UNDP, DFID, ECHO, IFRC and many other INGOs. Mr. Strode also has experience in establishing communications and working with municipal, FEMA, international government clients, and other stakeholders within the response command structure.

2 years of experience with DRC, 14 years of relevant experience.

FEMA Certs: FEMA IS 100, 101, 102, 230, 235, 240, 700, 800

Other Certifications: USACE CQCM for Contractors, 40 Hour Hazwoper, Hazwoper Supervisor

## Lisa Garcia Walsh, Contracts Manager

Ms. Garcia Walsh has overseen DRC's contracts since 2010. Her role is to maintain all contractual records and documentation, such as receipt and control of all contract correspondence. She is responsible for applying, renewing, and activating general contractor licenses nationwide as well as other authorizations and pre-qualifications. Additionally, she is responsible for invoicing, ticket reconciliation and coordination with subcontractors, municipalities and monitoring firms regarding accounting procedures. Ms. Garcia Walsh helps ensure data is collected and processed efficiently.

Ms. Garcia Walsh brings experience in data management operations following some of the largest debris generating natural disaster in recent history. She oversaw data collection and processing for state and federally funded projects. She assists with data management, invoice reconciliation, and project closeout.

Ms. Garcia Walsh has provided administrative assistance to DRC's management personnel on all major disasters since 2013. Prior to joining DRC, Ms. Garcia Walsh provided administrative assistance for emergency response projects involving FEMA protocol.

8 years of experience with DRC, 13 years of relevant experience.

FEMA Certifications: IS-5.a, IS-10.a, IS-11.a, IS-37.17, IS-42, IS-100.a, IS-100.b, IS-100.pwb, IS-106.17, IS-200.b, IS-201, IS-244, IS-315, IS-317, IS-324.a, IS-453, IS-546.a, IS-547.a, IS-632.a, IS-633, IS-634, IS-660, IS-700.a, IS-702.a, IS-706, IS-775, IS-800.b, IS-801, IS-802, IS-803, IS-806, IS-906, IS-907 IS-909, IS-2900
Other Certifications: Hazwoper

Please see organizational chart attached.

Case#: 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC**
EMERGENCY SERVICES
*Striking Back.*

# Tab 4: Certificate of Registration
## Disaster Debris Clearance and Removal Services

Please see a Certificate of Registration from the State of Pennsylvania attached.

24

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF STATE

12/10/2018

TO ALL WHOM THESE PRESENTS SHALL COME, GREETING:

I DO HEREBY CERTIFY THAT,

DRC Emergency Services, LLC

is duly registered to do business under the laws of the Commonwealth of Pennsylvania and remains a registered Foreign Limited Liability Company so far as the records of this office show, as of the date herein.

I DO FURTHER CERTIFY THAT this Certificate of Registration shall not imply that all fees, taxes and penalties owed to the Commonwealth of Pennsylvania are paid.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the Secretary's Office to be affixed, the day and year above written.

*Robert Torres*

Acting Secretary of the Commonwealth

Certification Number: TSC181210181960-1

Verify this certificate online at http://www.corporations.pa.gov/orders/verify



# Tab 5: Past and Current Contracts
## Disaster Debris Clearance and Removal Services

# REFERENCES

| OWNER & TIMELINE | DESCRIPTION OF WORK | CONTRACT VALUE | CUBIC YARDS | POINT OF CONTACT |
|---|---|---|---|---|
| **City of Wilmington, NC** October 2018-February 2019 | Debris Removal Services **Hurricane Florence (DR-4393)** | $18.3  million | Estimated 1.4 million | Dave Mayes, Director of Public Services Phone: (910) 341-5880 Fax: (910) 431-0099 dave.mayes@wilmingtonnc.gov 102 North Third Street Wilmington, NC 28402 |
| **Holmes County, FL** October 2018- February 2018 | Debris Removal Services **Hurricane Michael (4399)** | Est. $1.2 million | 91,116.23 | Clint Erikson, *County Commissioner, District 5* Phone: (850) 547-1119 107 E. Virginia Avenue Bonifay, FL 32425 |
| **Jackson County, FL** October 2018-April 2019 | Debris Removal Services **Hurricane Michael (4399)** | Est. $40,000,000 | 2,346,830.4 | Clint Pate, *County Commissioner, District 2* Phone: (850) 527-3900 cpate@jacksoncountyfl.com 2864 Madison Street Marianna, FL 32448 |
| **East Baton Rouge Parish/City of Baton Rouge** August 2016 – June 2017 | Disaster Debris Removal and Disposal **Louisiana Severe Storms and Flooding (DR-4277)** | $37,820,003.62 | 1,947,581 | Adam Smith, *P.E. Interim Director* Phone: (225) 389-5623 Fax: (225) 389-5391 Amsmith@brgov.com 222 Saint Louis Street, Suite 816 Baton Rouge, LA 70802 |
| **South Carolina Department of Transportation** February 2014 – August 2014 | Emergency Debris Removal **2014 South Carolina Ice Storm** | $44,233,669.57 | 1,464,598 | Mark Hunter, *SCDOT Maintenance Engineer* Phone: (803) 429-3045 Fax: (803) 737-2850 Huntermw@dot.state.sc.us 955 Park Street Columbia, SC 29201 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 5: Past and Current Contracts
## Disaster Debris Clearance and Removal Services

**DRC**
EMERGENCY SERVICES
*Striking Back.*

# CURRENT CONTRACTS WITHIN 250 MILES OF MONTGOMERY COUNTY

| State of Maryland | | | |
|---|---|---|---|
| Frederick County (2) | State of Maryland – Region A | State of Maryland – Region B  State of Maryland – Region C | State of Maryland – Region E  State of Maryland – Region D |
| **State of New York** | | | |
| New York (City of) | State of New York | | |
| **State of Virginia** | | | |
| Prince William | | Prince William | |

Case #: 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

For 30 years, DRC has provided extensive disaster recovery services, environmental services and civil construction to federal, state, and local governments. As a leader in the recovery industry, our passion is helping communities prepare for the worst while being prepared to deliver a rapid response when necessary, all to facilitate the most efficient recovery possible. Setting new industry standards is what our customers have come to expect; DRC takes pride in our versatility and in our innovative approach to every job. Having successfully completed over $2.5 billion in contracts over the last 30 years alone, DRC employs scores of talented professionals ready to satisfy our client's needs. We are proven, and we are ready.



The primary mission of our company is to provide a **professional, honest, and immediate response** to natural and man-made disasters throughout the world. DRC is highly capable in managing all facets of a disaster, particularly because of our extensive experience in communicating with our clients. Through our experience, we have developed an inherent understanding of how to direct emergency response and recovery.

DRC has provided a plethora of services in response to disaster recovery including, but not limited to:

- Debris Management
- Demolition
- Marine Debris, Salvage, and Recovery
- Vehicle and Vessel Removal and Processing
- Technical Assistance and Project Management
- Temporary Housing, Workforce Housing and Life Support
- Construction and Construction Management
- Landfill Management
- Civil, Heavy, and Recovery Construction

- Oil Spill Response and Mining
- Right-of-way maintenance
- Beach Restoration
- Canal Bank Stabilization
- Drainage Improvement Projects
- Hazardous Waste Segregation
- Environmental Control
- Traffic Control
- Tree Trimming and Removal
- Emergency Supplies and Support

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

**DRC** EMERGENCY SERVICES — *Striking Back.*



# NOTABLE ACHIEVEMENTS AND EXPERIENCE

- Simultaneously mobilized, staffed and successfully operated **53 individual projects** throughout the Southeastern US during the 2017 Hurricane Season.

- Established a **single-day productivity record** for post-disaster debris removal as recognized by FEMA in 2008 for collecting 440,000 cubic yards.

- Designed, implemented, managed and financed a **150-mile Gulf of Mexico shoreline protection system** in response to the BP oil spill.

- Established industry standards for total volume recycled by **recycling 100% of the 5.6 million cubic yards collected** in Houston, TX following Hurricane Ike.

- **30-year record** of assisting local jurisdictions with FEMA reimbursement **without a single deobligation.**

"The City of Houston set an **all-time, one day record** for debris removal in anything that's been done in the United States of America. And we've **increased significantly the pace of our removal of debris every day.**"

Bill White, Former Mayor of Houston, Texas

29

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Tab 6: Brief History of the Firm
### Disaster Debris Clearance and Removal Services

# BACKGROUND AND CAPACITY

The company was formed in 1989 in response to Hurricane Hugo. In 2005 DRC began operating as DRC Emergency Services, LLC. Since its inception, DRC has responded and navigated through countless disaster events that included hundreds of contracts, each involving a unique community with distinct circumstances. In the past, DRC has picked up as little as 170 cubic yards for a single client and over 12 million cubic yards during 39 simultaneous activations. Having performed debris operations across the Continental United States and internationally for three decades, DRC has engaged a network of over 3,000 subcontracting partners. Our relationship with these contractors **guarantees that no matter the size or location of an event, DRC will respond timely.**

The parent company to DRC Emergency Services, LLC is DRC Equity, LLC.

---

When disasters hit communities,
DRC Emergency Services is there.
We stand by ready to help you
**prepare**, **respond**, and **recover**
in the face of disaster.

---



# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services



## KEY PROJECTS AND VALUES

**2018**
Hurricane Michael
- $64,900,000 est.
- 3,300,000 cubic yards

**2018**
Hurricane Florence
- $35,700,000 est.
- 2,700,000 cubic yards

**2017**
Hurricane Harvey
- $89,426,277
- 3,500,000 cubic yards

**2017**
Hurricane Irma
- $48,775,168.58
- 2,200,000 cubic yards

**2017**
Hurricane Maria
- $69,575,413.24
- 1,800,000 cubic yards

**2016**
LA Floods, Hurricanes Matthew & Hermine
- $64,700,000
- 4,000,000 cubic yards

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 6: Brief History of the Firm
### Disaster Debris Clearance and Removal Services

## RELEVANT WORK EXPERIENCE

| 2018 | Location | Temporary Site | Total Tonnage | Contract Value |
|---|---|---|---|---|
| **Hurricane Michael** | **Florida:** Holmes County, Jackson County, Florida Department of Transportation**,** Tyndall Air Force Base, NSA Panama City **Georgia:** Colquitt | 27 | 3,300,000 | Est. $64,900,000 |
| **Hurricane Florence** | **North Carolina:** Pender County, Wilmington, Havelock, Burgaw, Pine Knoll Shores, Surf City, Topsail Beach, Pamlico County, New Hanover County, Greene County, Southport, Jones County, and Sampson County, Camp Lejune | 18 | 2,700,000 | Est. $35,700,000 |
| **Alabama Tornado Outbreaks** | **Alabama:** Calhoun County, St. Clair County, and the City of Jacksonville | 2 | 302,004.00 | $ 4,833,620 |
| **2017** | Location | Temporary Site | Total Tonnage | Contract Value |
| **Hurricane Harvey** | **Texas:** Texas GLO, Waller County, Harris County, Jefferson County, Port of Corpus Christi, Cities of Aransas Pass, Groves, Cleveland, Bellaire, Humble, Nederland, Port Aransas, Houston, Jacinto, Port Arthur,  Piney Point Village, Port Neches, and Texas City | 16 | 3,579,940.50 | $ 89,426,277.00 |
| **Hurricane Irma** | **Florida:** Florida Department of Transportation, Florida Department of Environmental Protection, Monroe County, Citrus County, Miami-Dade County, Coconut Creek, Cutler Bay, Daytona Beach, Debary, Deland, Fernandina, Ft. Lauderdale, Indian Creek Village, Inverness, Largo, Miami, North Miami, North Miami Beach, Surfside, Orange City, Orlando, Palm Beach Gardens, Pembroke Pines, Redington Beach, and St. Augustine **Georgia:** Brunswick | 30 | 2,159,454.64 | $ 48,775,168 |
| **Hurricane Maria** | **Puerto Rico:** Department of Transportation and Public Works | 8 | 1,082,845.80 | $ 69,757,413 |
| **2016** | Location | Temporary Site | Total Tonnage | Contract Value |
| **Winter Storm Jonas** | **Maryland:** Maryland Department of General Services, State of Maryland, Prince Georges County and City of Baltimore **Virginia:** Loudoun County | N/A | N/A | $ 1,002,792 |
| **Multiple Severe weather events and flooding** | **Texas:** Harris County, Houston, Texas DOT **Louisiana:** East Baton Rouge parish, Ascension Parish, Tangipahoa Parish, Lafayette Parish, St. Martin Parish, City of Baker, Assumption Parish, Iberville Parish, City of St. Gabriel, | 5 | 2,800,000.00 | $ 50,000,000 |
| **Hurricane Hermine** | **Florida:** Citrus County, Leon County | N/A | 26,694.25 | $1,792,096.93 |
| **Hurricane Matthew** | **Florida:** Daytona Beach, Ormond Beach, Deland, Orange City, St. Augustine, Sebastian                                    **North Carolina:** New Hanover County, Pender County, Hyde County, Greene County, City of Wilmington, City of North Topsail Beach **Georgia:** Georgia Department of Transportation | 14 | 579,473.65 | $13,572,406.02 |

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

 DRC EMERGENCY SERVICES — Striking Back.

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| 2004 | Location(s) | Temporary Site | Cubic Yardage | Contract Value |
|---|---|---|---|---|
| Texas Flood Event | **Texas:** Texas Department of Transportation, City of Houston, and City of Bellaire | N/A | 238,463.00 | $ 2,039,329 |
| Louisiana Storm Event | **Louisiana:** East Baton Rouge Parish and Ascension Parish | N/A | 135,977.96 | $ 875,867 |

| 2002 | Location(s) | Temporary Site | Cubic Yardage | Contract Value |
|---|---|---|---|---|
| Winter Ice Storms | **South Carolina:** South Carolina Department of Transportation <br> **North Carolina:** New Hanover County, Pender County, City of Wilmington, City of Thomasville and City of Archdale | 15 | 1,839,119.82 | $ 54,449,473 |

| 2001 | Location(s) | Temporary Site | Cubic Yardage | Contract Value |
|---|---|---|---|---|
| Midwestern Tornado Outbreak | **Missouri:** St. Louis County, St. Charles County, and City of Bradenton <br> **Oklahoma:** City of Pottawatomie and City of Oklahoma City | 2 | 205,288.10 Cubic Yards 50,426.28 Tons | $ 3,253,487 |

| 2000 | Location(s) | Temporary Site | Cubic Yardage | Contract Value |
|---|---|---|---|---|
| Superstorm Sandy | **New Jersey:** Piscataway and City of Ocean City <br> **New York:** New York Department of Transportation <br> **Maryland:** Harford County | N/A | 988,081.93 | $ 19,063,581 |
| Hurricane Isaac | **Louisiana:** Louisiana Department of Transportation, Ascension Parish, St. John the Baptist Parish, Jefferson Parish, East Baton Rouge Parish, St. Charles Parish, City of New Orleans, New Orleans Downtown Development District, and City of Mandeville | 6 | 814,611.22 | $ 11,929,391 |

| 2000 | Location(s) | Temporary Site | Cubic Yardage | Contract Value |
|---|---|---|---|---|
| Hurricane Irene | **North Carolina:** New Hanover County, Pender County, Pamlico County, North Topsail Beach, Havelock, and Southern Shores <br> **Virginia:** Virginia Department of Transportation, Virginia Department of Emergency Management, City of Richmond, Suffolk <br> **Maryland:** St. Mary's County, Calvert County, and Harford County <br> **Rhode Island:** Rhode Island Department of Transportation, Burgaw, Barrington, Cranston, Narragansett, Cumberland, Providence, | 14 | 872,108.16 | $ 18,477,522 |
| 2011 Tornado Outbreak | **Alabama:** Alabama Department of Transportation Divisions 1, 3, and 5, Alabama Department of Natural Resources, Jefferson County, Franklin County Calhoun County, City of Birmingham, City of Trussville, Town of Phil Campbell, Birmingham Airport Authority, and University of South Alabama <br> **Mississippi:** Holmes County, Clay County, Durant, | 12 | 2,695,808.75 | $ 32,235,282 |
| FEMA Site Development | **North Dakota:** Minot | N/A | N/A | $ 9,367,899 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

| 2010 | Activation | Temporary Site | Cubic Yardage | Contract Value |
|------|------------|----------------|---------------|----------------|
| **Deepwater Horizon Oil Spill** | **Louisiana:** USES of Louisiana, Plaquemines Parish, Terrebonne Parish, St. Bernard Parish, Lafourche Parish, and Jefferson Parish **Florida**: Okaloosa County, Santa Rosa County, and Escambia County | N/A | N/A | $ 185,334,468 |

| 2008 | Activation | Temporary Site | Cubic Yardage | Contract Value |
|------|------------|----------------|---------------|----------------|
| **Hurricane Ike** | **Texas:** Texas GLO, Texas Department of Transportation, Trinity Bay Conservation, Harris County, Jefferson County, Jefferson County Drainage District, Nassau Bay, City of Nederland, City of Humble, Jamaica Beach, Port Arthur, Baytown, El Largo Port of Galveston, City of Groves, Piney Point Village, City of Galveston, Taylor Lake Village, City of Bellaire, City of Port Neches, and the City of Houston | 25 | 11,377,207.60 | $ 169,770,518 |
| **Hurricane Gustav** | **Louisiana:** Louisiana Department of Transportation, Assumption Parish, Iberville Parish, Bayou Lafourche Fresh Water District, St. John the Baptist Parish, St. Landry Parish, Iberville Parish, Lafayette Parish, Iberia Parish, Tangipahoa Parish, Terrebonne Parish, City of Kenner, and the City of New Orleans | 21 | 4,289,503.96 | $ 38,218,302 |

| 2005 | Activation | Temporary Site | Cubic Yardage | Contract Value |
|------|------------|----------------|---------------|----------------|
| **Hurricanes Katrina, Rita and Wilma** | **Louisiana:** Louisiana Department of Environmental Quality, Orleans Levee District, East Baton Rouge Parish, Washington Parish, Plaquemines Parish, St. Tammany Parish, City of Kenner, City of Westlake **Mississippi:** USCG, Mississippi Department of Transportation, and the City of Gulfport **Florida:** Florida Department of Transportation, Palm Beach Solid Waste Authority, Martin County, Miami-Dade County, Monroe County, Palm Beach County, Plantation, Deerfield Beach, North Miami, Miami, Hollywood, and the City of Gulf Breeze | 20 | Currently Unknown | $ 1,162,578,450 |

| 2004 | Activation | Temporary Site | Cubic Yardage | Contract Value |
|------|------------|----------------|---------------|----------------|
| **Hurricanes Charley, Frances, Ivan and Jeanne** | **Florida:** South Florida Management District, Okaloosa County, Escambia County, St. Lucie County, Hillsborough County, Indian River County, Martin County, Jacksonville Beach, Mary Esther, Broward County, City of Tampa, Crestiew, Deerfield Beach, Deltona, Hollywood, Orchid, Plantation, Tarpon Springs, Nicevilla, Sanford, Temple Terrace, West Palm Beach, Vero Beach | 10 | Approximately 10,000,000 | $ 130,293,371 |

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services



# EXPERIENCE WITH FEMA REIMBURSEMENT

Having participated in every major disaster for the past 30 years, DRC has an unparalleled record for providing jurisdictions the maximum reimbursement rate granted by FEMA. **Our record serves as a testament to DRC's ability to perform within the strict guidelines established by our Federal Government, as well as our ability to attract and maintain well trained and principled personnel.**

## *Adherence to Policy Changes*

DRC Emergency Services strives to continuously stay ahead of any changes in FEMA policy and guidance that may affect our Clients. DRC, immediately implemented internal measures to ensure that our clients, and prospective clients, were prepared to be fully compliant with this guidance. DRC carefully reviewed scopes of service, terms of inclusion, evaluation, pricing models, and other key components for any items which may have been deemed non-compliant relative to the new guidance. Additionally, **DRC Emergency Services, LLC is a founding member of DRCA** (the industry's trade organization). Through this membership, DRC helps shape policy and legislation for jurisdictions recovery process. Our additional memberships in other professional organizations (NEMA, APWA and SWANA), provides us with recent industry knowledge necessary to support our client base.

## *Major Disaster Recovery Projects*

DRC has extensive experience working with FEMA on major disaster recovery projects. With over 30 years of experience, DRC has developed an inherent understanding of how to direct emergency response and recovery.

| Date | Event | State | Declaration Number |
|---|---|---|---|
| 2018 | Hurricane Michael | FL, GA | DR-4399, DR-4400 |
| | Hurricane Florence | NC | DR-4393 |
| 2017 | Hurricane Maria | PR | DR-4339 |
| | Hurricane Irma | FL, GA | DR-4337, DR-4338 |
| | Hurricane Harvey | TX | DR-4332 |
| 2016 | Hurricane Matthew | NC, GA, FL | DR-4285, DR-4284, DR-4283 |
| | Hurricane Hermine | FL | DR-4393 |
| | LA Severe Storms & Flooding | LA | DR-4277 |
| 2015 | TX Severe Storms & Flooding | TX | DR-4269 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

| Year | Event | State | DR Number |
|---|---|---|---|
| 2014 | Ice Storm Pax | SC, NC | DR-4166, DR-4167 |
| 2012 | Hurricane Sandy | NY, MD, NJ, MO | DR-4085, DR-4091, DR-4086, DR-4098 |
| 2012 | Hurricane Isaac | LA | DR-4080 |
| 2011 | Hurricane Irene | VA MD, NC, RI | DR-4024, DR-4034, DR-4019, DR-4027, |
| 2010 | TN Severe Flooding | TN | DR-1909 |
| 2009 | Ice Storms | MD, VA | DR-1875, DR-1874 |
| 2008 | Hurricane Ike | TX | DR-1791 |
| 2008 | Hurricane Gustav | LA | DR-1786 |
| 2008 | Mother's Day Tornadoes | GA | DR-1750 |
| 2008 | F5 Tornado | IA | DR-1763 |
| 2007 | Ice Storms | MO | DR-1736 |
| 2006 | Ice Storms | NY | EM-3268 |
| 2005 | Hurricane Katrina | FL, LA, MS | DR-1602, DR-1603 DR-1604 |
| 2005 | Hurricane Wilma | FL | DR-1609 |
| 2005 | Hurricane Rita | TX, LA | DR-1606, DR-1607 |

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services



| | | | |
|---|---|---|---|
| 2005 | Hurricane Ophelia | NC | DR-1608 |
| 2005 | Hurricane Dennis | FL | DR-1595 |
| 2004 | Tropical Storm Gaston | SC | DR-1547 |
| 2004 | Hurricane Charley, Francis, Jeanne, and Ivan | FL | DR-1539, DR-1545 DR-1561, DR-1551 |
| 2003 | Hurricane Isabel | VA | DR-1491 |
| 2002 | Hurricane Lili | LA | DR-1437 |
| 2002 | Emergency Tire Fire | VA | FSA-2397 |
| 2002 | Hurricane Isadore | LA | DR-1435 |
| 2002 | Severe Floods | VA | DR-1406 |
| 2002 | Snow Storm | NY | DR-1404 |
| 2001 | Ice Storm | KS, MO | DR-1366, DR-1412 |
| 2001 | Tropical Storm Gabrielle | FL | DR-1393 |
| 2001 | Tropical Storm Allison | LA | DR-1380 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

| Year | Event | State | DR Number |
|---|---|---|---|
| 2001 | Severe Flooding | WV | DR-1378 |
| 2001 | Severe Flooding | TX | DR-1379 |
| 2001 | Ice Storms | OK, LA | DR-1355, DR-1357 |
|  |  | TX | DR-1356 |
| 2000 | Catastrophic Flood | NJ | DR-1337 |
| 2000 | F4 Tornado | TX | DR-1323 |
| 2000 | Ice Storm | NC | DR-1312 |
| 2000 | Ice Storm | GA | DR-1311 |
| 1999 | Hurricane Floyd | FL, SC | DR-1300, DR-1299 |
|  |  | NC | DR-1292 |
| 1999 | F5 Tornado | OK | DR-1272 |
| 1999 | Hurricane Irene | FL | DR-1306 |
| 1999 | Tropical Storm | TX | DR-1274 |

We are committed to the people and communities we serve. No matter the project, we approach our work with the goal of bettering our clients' lives.

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services



# FAMILY OF COMPANIES

Together with our commonly-owned affiliates, SLSCO, Callan Marine, and Texas International Terminals we are able to respond immediately to disaster events and provide almost every service required to move through the complete disaster recovery timeline. We are one of the only companies in the United States that can perform these services in a streamlined manner from both the contracting and management sides. This portfolio of companies is under the same ownership and share all resources and assets, including financial, personnel, equipment and facilities.

## DRC EMERGENCY SERVICES, LLC



DRC specializes in providing extensive disaster recovery, environmental and civil construction services throughout the country. We are recognized for providing government and private entities with rapid response solutions and facilitating the most effective immediate recovery efforts tailored to each specific disaster. Throughout our 30-year history, DRC has successfully completed over $2 billion in response contracts and has handled over 40 million yards of debris. We have the ability to mobilize over 4,000 pieces of equipment to any location in the United States and maintain a strong cadre of disaster and debris management and operational personnel, who are augmented by hundreds of regional and local construction partners and personnel.

## SLSCO, LP



SLS specializes in disaster response, short-term and long-term housing solutions and comprehensive community rehabilitation and reconstruction. We are capable of providing both program/construction management and general contracting services. For over the past decade, SLS has been involved in the reconstruction, rehabilitation elevation of over 22,000 homes in programs worth in excess of $800 million. We have performed work nationwide and internationally and have served Federal clients such as FEMA and HUD, as well as numerous state, regional, county, and city governmental authorities throughout Texas, California, New York, New Jersey, Pennsylvania, Louisiana, South Carolina, South Dakota, Florida, Puerto Rico, and the U.S. Virgin Islands.

## Callan Marine, LTD



Callan Marine is a highly-specialized marine construction firm capable of providing design, engineering, management, and construction services. We provide every type of marine construction activity including debris management and removal, dredging, shoreline protection, beach renourishment, port/dock facility construction, marine protection mitigation improvements and wetland construction. We are recognized as one of the leading marine construction service providers on the Gulf Coast with a long list of government and private clients who continually utilize Callan Marine for comprehensive marine construction services. Throughout our history, Callan Marine has performed hundreds of projects worth over $200 million.

## Texas International Terminals



Texas International Terminals is a world-class liquid and dry bulk multi-modal facility for deep draft vessel, unit train, manifest rail, barge and trucking along the Galveston Ship Channel. TIT has the capability for liquid transfer and storage, dry bulk handling and storage – as well as layberth facilities for all vessels, including Panamax Class. As a full-service terminal operator, stevedore and material handler, Texas International Terminals links our clients with the global and domestic marketplace within a single, centrally-located facility on the United States Gulf Coast. Just three miles from the Gulf of Mexico and located in Galveston, Texas – TIT is well positioned on the Galveston Ship Channel and the Gulf Intracoastal Waterway.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC** EMERGENCY SERVICES — *Striking Back.*

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services

# COMPREHENSIVE SERVICES

DRC, SLS, Callan Marine, and Texas International Terminal have the capability to execute each step in the recovery process, utilizing some of the best personnel, resources and financial capabilities in the disaster industry. Through the combined efforts of our distinct companies, we are ready, willing and able to take the lead in all three critical phases of disaster management and recovery and assist clients with accomplishing the full restoration of lives and communities.

Immediate response to a disaster is imperative to quickly restoring a community to functioning levels. No matter the task, we specialize in executing this phase and work around the clock to clear the way for the restoration of critical services to affected areas.
- Disaster management and relief services
- Emergency mitigation with debris removal
- Demolition and structural stabilization
- Emergency sheltering and mass care
- Restoration of critical services and emergency utilities
- Water damage mitigation and removal of materials

Once critical needs are met, the second phase commences to execute recovery efforts and enable communities to begin moving forward. We have the ability to streamline the process and make the phased transition immediate and seamless.

- Temporary and permanent housing solutions
- Road reconstruction and utility work
- Electrical, plumbing, sewage and HVAC services
- Marine debris salvage and recovery
- Debris removal and hazardous material abatement
- Beach sand screening and replenishment

With the completion of recovery efforts, permanent restoration begins, which enables a community to rebuild in a manner that brings a return to normalcy. Through "pocket" construction or comprehensive community development, we help bring stability and enable positive forward momentum.
- Permanent residential rehabilitation, reconstruction, and elevation
- Infrastructure development
- Marine and port facility reconstruction
- Land and marine disaster mitigation improvements
- Community master-plan design and construction
- Program and construction management

# Tab 6: Brief History of the Firm
## Disaster Debris Clearance and Removal Services



# REGULATORY

1. In September 2014, DRC Emergency Services was suspended for 22 business days relating to a project in Joplin, Missouri. Following a detailed response by DRC's new Ownership and Management, the suspension was lifted without any fine or penalty.  DRC maintains a robust Corporate compliance, safety and ethics program and operates in good standing with all branches of Government.

2. By Consent Order dated March 9, 2015, the South Carolina Department of Health and Environmental Control assessed a $10,000 civil penalty against DRC Emergency Services, LLC for burning vegetative debris within 1000 feet from a public roadway. The incident was self-reported by DRC Emergency Services, LLC.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 7: Subcontracting Plan
## Disaster Debris Clearance and Removal Services

# EMPLOYMENT OF LOCAL & MINORITY CONTRACTORS

DRC maintains one of the industry's largest network of pre-screened and fully qualified subcontractors, including local and preferred vendors. DRC's subcontractors are evaluated extensively, including past performance, equipment and +personnel availability, mobilization timeframes, insurance, and cost.



The use of local resources is vitally important to a successful disaster recovery operation. Because of its importance, we have developed a vast network of subcontractors that are uniquely qualified and meet all operational requirements envisioned under this RFP.

Throughout its history, DRC has maintained strong relationships with local vendors and subcontractors. We pride ourselves on facilitating local involvement during recovery efforts and encourage local knowledge and experience. DRC has assembled a cadre of thousands of subcontractors which includes SBE, MBE, WBE, HUB Zone, 8(a), and VOSB (including Service-Disabled VOSB) contractors. DRC has established procedures nationally recognized in the area of community outreach as discussed below.

## *Proposed Subcontractors*

The Davey Tree Expert Company
Michael Mittiga
1500 N. Mantua Street
Kent, Ohio 44240
(800) 445-8733
Scope: Post disaster debris removal services

Riccelli Enterprises, Inc.
Robert Madey
6131 East Taft Road
North Syracuse, NY 13212
315-433-5115
Scope: Post disaster debris removal services

Beeghly Tree, LLC
Ryan Beeghly
458 Hillvale Road
Somerset PA 15501
(814) 444-8733
Scope: Post disaster debris removal services

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 7: Subcontracting Plan
## Disaster Debris Clearance and Removal Services



## Local S/M/WBE Resource Program

While DRC maintains a current, active subcontractor list, Regional Managers reach out to local subcontractors and small, minority and women-owned business enterprises (S/M/WBE) by utilizing:

- Governmental databases
- Local, regional, and national SBE compliance departments
- Client and vendor references
- Direct mail community outreach
  - o Information can be found by contacting: 888-721-4DRC or going on drcusa.com

Upon receipt of Notice of Award, DRC will make contact with local governments and SBE Resource offices to schedule an informational and technical assistance workshop for potential vendors and businesses. The workshops provides:

- "hands on" technical assistance to a variety of companies
- matches S/M/WBE contractors with other companies in order to strengthen their competitive position

DRC is committed to ensuring that local companies are made aware of all potential contracting and partnership opportunities.

From our extensive experience with subcontractors, DRC knows the importance of establishing strict guidelines for performance and safety standards. All subcontractors will be screened for qualifications and safety compliance prior to being offered a contract with DRC. Additionally, at the discretion of the contracting agency, all subcontractors will be approved prior to beginning work. Our sample Subcontractor Agreement details the scope of work and responsibilities of each subcontractor. The Subcontractor Agreement also commits the subcontractor to all governmental regulations and requirements. All subcontractor equipment will be inspected and properly maintained and all personnel certifications and safety courses will be on file and renewed or updated as needed.

In addition to stringent qualifications standards, DRC requires the following summarized items from subcontractors:

- Compliance with all DRC safety plans.
- Ability to meet liability and automobile insurance requirements (these may vary from contract to contract).
- Compliance with governmental employment regulations, unemployment compensation and workman's compensation laws.
- Completion of a subcontracting agreement specifying the scope of work, terms and conditions, pricing, liability requirements and any hold harmless agreements.

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 7: Subcontracting Plan
## Disaster Debris Clearance and Removal Services



**DRC Emergency Services, LLC**
110 Veteran Memorial Blvd. Suite 515
Metairie, Louisiana 70005
Phone: 504-482-2848 Fax: 504-482-2852

Company Name: _____

Contact Person: _____

Contact Person#: _____

Email: _____

Address: _____

DBE/WBE: _____

Licensing/
Certifications: _____

Equipment: _____

Notes: _____

---

**DRC EMERGENCY SERVICES**
*Striking Back.*

110 Veterans Memorial Blvd. Suite 515
Metairie, Louisiana 70005
Phone: (504) 482-2848 Fax: (504) 482-2852
www.drcusa.com

In the event of a disaster in the City of Mobile and DRC Emergency Services is tasked with the Debris Removal and Disposal, the following equipment and licensing will be required:

**EQUIPMENT:**

a. Hauling Equipment with bed capacity of greater than 30 cy. and up to 100 cy is preferred. Self-loading equipment is also preferred, however, pieces of hauling equipment can be coupled with front end loaders with grapples and bobcats with grapples that are capable of loading hauling equipment. All equipment must meet DOT standards for on road travel. All loading equipment must operate with rubber tires.

b. Seventy Hour Emergency Push (short term use) – the above equipment applies, however, rubber tire front end loaders, motor graders, telehandlers, backhoes, bobcats with buckets can be used during the first 70 hours.

c. Operation of the DMS sites (Debris Management Sites) – Bulldozers, water disbursement trucks, grapple trucks, backhoes can be used for this operation.

**INSURANCE REQUIREMENTS:**

a. General Liability – $1,000,000.00 / $1,000,000.00 Aggregate

b. Workers Compensation - $1,000,000.00/$1,000,000.00/$1,000,000.00

**DBE CERTIFICATION**

DBE Certificate not required; however, if you are DBE registered with the City of Mobile, please send a copy of the certification by fax or mail to:

110 Veterans Memorial Blvd. Suite 515
Metairie, Louisiana 70005
FAX: 504-482-2852

---

*"Our Mayor's Office, Councilmembers, my office, and other coordinating agencies took great comfort in the "on the ground" presence and access they had to DRC's team throughout this effort, and their commitment to the job until we fully addressed all the recovery needs of our residents was greatly appreciated."*

– Adam M. Smith, P.E., Chief of Wastewater Operations & Maintenance,  City of Baton Rouge/Parish of East Baton Rouge's Department of Environmental Services

# Tab 7: Subcontracting Plan
## Disaster Debris Clearance and Removal Services



## Prompt Payment of S/M/WBEs

In addition to occasionally assisting S/M/WBEs with operating startup costs, DRC has a 20 plus year history of paying subcontractors on a weekly basis.

### Subcontractor Payable Chart



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC** EMERGENCY SERVICES — *Striking Back.*

# AFFIRMATIVE ACTION/ EQUAL OPPORTUNITY POLICY

DRC is an equal employment opportunity employer.  Employment decisions are based on merit and business need, and not on race, color, citizenship status, national origin, ancestry, gender, sexual orientation, age, religion, creed, physical or mental disability, marital status, veteran status, political affiliation, or any other factor protected by law.  DRC complies with the law regarding reasonable accommodation for handicapped and disabled employees.  DRC's President has issued the following policy:

DRC recognizes the value of hiring a diverse group. Due to the nature of our work and the fact that we provide services worldwide, we find it necessary and advantageous to employ a number of persons from various countries who are of different races, religions and ethnic groups. In addition, we believe work force diversity may provide a significant market advantage.

It is the policy of DRC to comply with all the relevant and applicable provisions of the Americans with Disabilities Act (ADA). DRC will not discriminate against any qualified employee or job applicant with respect to any terms, privileges, or conditions of employment because of a person's physical or mental disability.  DRC will also make reasonable accommodation wherever necessary for all employees or applicants with disabilities, provided that the individual is otherwise qualified to safely perform the essential duties and assignments connected with the job and provided that any accommodations made do not impose an undue hardship on DRC.

Equal employment opportunity notices are posted as required by law. Management is primarily responsible for seeing that DRC's equal employment opportunity policies are implemented, but all members of the staff share in the responsibility for assuring that by their personal actions the policies are effective and apply uniformly to everyone. Any employee, including managers, involved in discriminatory practices will be subject to termination.





**EMERGENCY SERVICES**
*Striking Back.*

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 8: Listing of Equipment and Resources
## Disaster Debris Clearance and Removal Services

# AVAILABILITY OF FIRM'S RESOURCES

## *Availability of Key Personnel*

For the past 29 years, the DRC team has responded to major natural or man-made disasters occurring within the continental United States and its territories, in theatres of U.S.-led troop operations, and in Central America. The DRC personnel are trained, motivated and available for immediate deployment in an emergency response. All assigned personnel will be available to the County as needed. Personnel are N.I.M.S-certified and/or have specialized training in safety and asbestos management and are equipped with utility vehicles, digital, handheld, multi-state, two-way radios, cellular communications, and handheld computers. DRC personnel will have the experience and/or training to respond **immediately** to disasters and are provided with a DRC ES supervisor handbook including required reports and forms for successful disaster response and management thereof.

> "DRC's knowledge base, experience, and ability to make experts available in the field were instrumental in the successful completion of this work."
>
> **– Donald G. Donaldson, P.E., Engineering Director/County Engineer, Martin County, FL**

Regional Managers are assigned to specific geographic locations throughout the United States to assist, monitor and lead the project teams in response to emergency situations. Regional Managers from one region may be assigned to support other Regional Managers as needed and all Regional Managers may be mobilized to one location to support emergency situations. Regional Manager for Montgomery County is Mark Stafford who is capable of responding to the needs of the County 24 hours a day, 7 days a week.

## *Available Equipment*

DRC has the most expansive collection of rolling stock and equipment in the disaster services industry. The company has 2,568 trucks and 1,657 pieces of support equipment, either owned or under agreement, available for immediate use. As part of the company's Corporate Mobilization Plan, a monthly inventory of available equipment is performed, recorded, and readily available. DRC has actively demonstrated the ability to quickly amass and mobilize significant quantities of equipment. Most recently, during the 2017 hurricane season, we operated in excess of 2,000 pieces of equipment while simultaneously responding to Hurricanes Irma, Harvey, and Maria.

In addition to the equipment owned by DRC, we have national accounts with multiple equipment rental companies that offer us the capability to meet the equipment needs of the County DRC also has accounts with national and international Industrial supply warehouses, such as Aramsco and Grainger, who offer environmental safety, disaster response, surface preparation and restoration goods and services which includes fire safety and PPE of all types.

### List of Equipment

| DRC Emergency Services Asset List | | |
|---|---|---|
| **Equipment Type** | **Description** | **Quantity** |
| Bucket Trucks | various models with booms | 110 |
| Chip Trailers | various models and horse-power | 14 |
| Chip Vans | receptacle vehicles | 2 |
| Dump Trucks | various models with dual and tri axles | 353 |
| End Dump Trailers | various models and capacity | 298 |
| Flat Bed Semis | various models for equipment movement | 6 |

# Tab 8: Listing of Equipment and Resources

## Disaster Debris Clearance and Removal Services



| Flat Beds | 53' equipment trailers | 20 |
|---|---|---|
| Fuel Trucks | multiple model and gallon capacity | 46 |
| Low Boys | equipment movement trailers | 53 |
| Pickups | half and three quarter ton of various make and model | 45 |
| Roll Off Trucks | primarily Galbreath 60,000 pound hoist on various makes | 82 |
| Rolls Off Containers | 20, 30 and 40 cubic yard containers | 337 |
| Self Loaders | various makes with buckets ranging from 2-10 cubic yards | 343 |
| Semi Dumps | various makes and models with various capacity | 240 |
| Semi Tractors | various makes | 232 |
| Service Trucks | fully stocked road ready service vehicles | 79 |
| Slingers | various models | 5 |
| Straight Trucks | various makes and models | 8 |
| Sweepers | various models used for DMS operation | 3 |
| Tankers | various models | 125 |
| Tractor /Trailers Combos | various models | 29 |
| Tractors | various makes and models | 43 |
| Trailers | 25 foot travel trailer | 1 |
| Utility Trailers | 15 and 20 foot utility trailers | 2 |
| Vacuum Trailer | various makes | 30 |
| Vacuum Trucks (Wet) | various makes for | 13 |
| Walking Floors | 48 ft automated trailers | 46 |
| Water Trucks | various capacity used for DMS operation | 3 |
| Attachments - various | buckets, hoists, slings etc. | 157 |
| Back Hoes | various models and capacity | 40 |
| Bobcats | skid-steer with multiple attachments | 53 |
| Bull Dozers | various makes and sizes | 45 |
| Conveyors | used for material movement | 2 |
| Crushers | metal compaction and volume reduction | 24 |
| Excavator | various makes and models | 164 |
| Feller Buncher | various makes and models used for clearing projects | 27 |
| Front End Loaders | various makes, models and bucket capacity | 127 |
| Generators | various | 41 |
| Grinders | horizontal and tub grinders | 36 |
| Jarraf Tree Trimmers | high capacity trimming equipment | 3 |
| Jersey Barriers | used for highway projects and within DMS | 200 |
| Light Plants | various used for nite operation | 100 |
| Material Handlers (Tele Boom) | loading equipment | 3 |
| Mobile Kitchens | various models | 13 |
| Off Road Dumps | Volvo high capacity | 2 |
| Pumps | various sizes | 5 |
| Safety Signs, Cones and PPE/arrow boards/message boards | used for highway operations | 503 |
| skid steers | various sizes with multiple attachments | 96 |
| Screens | shaker screens and sand screens | 4 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Water Trucks | various models and capacity | 12 |
|---|---|---|
| **Total:** | | **4225** |

## Marine Vessels/Equipment

| Equipment Type | Quantity |
|---|---|
| Inland Marine Harvestor | 1 |
| Air Boat | 3 |
| Amphibious Aquatic Excavator | 1 |
| Tug Boat | 14 |
| Underwater ROV | 1 |
| Utility Boat | 1 |
| Work Boat | 15 |
| JON Boats | 10 |
| 500 CRANE (120 X 54 X 10) | 1 |
| 510 CRANE (100 X 52 X 9) | 1 |
| 524 CRANE (250 x 64 x 12) | 1 |
| 526 CRANE (293 X 80 X 19) | 1 |
| 527 CRANE (176 X 75 X 13) | 1 |
| 529 CRANE (250 X 64 X 12) | 1 |
| 531 CRANE (420 X 98 X 25) | 1 |
| 532 CRANE (300 X 90 X 19) | 1 |
| 533 CRANE (310 X 100 X 20) | 1 |
| 534 CRANE (111 X 45 X 11) | 1 |
| 535 CRANE (250 x 64 x 12) | 1 |
| 536 CRANE (250 x 64 x 12) | 1 |
| 541 CRANE (200 X 60 X 12) | 1 |
| 566 CRANE (140 X 70 X 12) | 1 |
| Hopper Barge (EX NYC DOS) | 16 |
| Hopper Barge (260 X 52.5 X 12) | 7 |
| Hopper Barge (200 X 40 X 17.75) | 2 |
| Hydra Sport | 1 |
| Hydraulic Driven propelled pushers | 1 |
| Pontoon Boats | 9 |
| Poseidon Barges | 3 |
| Push Boats | 2 |
| Rescue Skiff | 2 |
| Sectional Barges | 28 |
| Side Scan Sonar | 2 |
| Deck Barge | 32 |
| Deck Barge with 9' bin walls | 2 |
| Deck Barge with spuds | 7 |
| Deck Barge with steel box rails | 19 |
| Go Devil Boat | 1 |
| **Total:** | **61** |

# Tab 8: Listing of Equipment and Resources
## Disaster Debris Clearance and Removal Services

**DRC**
EMERGENCY SERVICES
————— *Striking Back.*

## *Ability to Manage Multiple Contracts*

DRC has implemented a comprehensive Corporate Level Advance Mobilization Plan to ensure a coordinated, expeditious and effective response to disasters by its personnel and resources. This plan has been utilized by DRC to respond quickly in the following contracts:

### 2018 Hurricane Michael
- DRC was active in 9 jurisdictions, managed 27 debris management sites and removed approximately 5,702,004 cubic yards of debris. The work is still ongoing.

### 2018 Hurricane Florence
- DRC was concurrently activated in 14 jurisdictions, managed 18 debris management sites and picked up approximately 2,500,000 cubic yards of debris. The work is still ongoing.

### 2017 Hurricane Maria
- DRC was activated by the Department of Transportation and Public Works in Puerto Rico. During this contract, DRC managed 8 debris management sites and removed over 1,000,000 cubic yards of debris.

### 2017 Hurricane Irma
- DRC was activated in 26 jurisdictions simultaneously while managing 30 debris management sites. DRC anticipates removing over debris over 4,000,000 cubic yards of debris.

### 2017 Hurricane Harvey
- DRC was activated in 17 jurisdictions following Hurricane Harvey and simultaneously ran more than 16 debris management sites during this activation.
- DRC has recovered and reduced over 2,750,000 cubic yards of debris to date.

### 2016 Hurricane Hermine
- In Citrus County, Florida, DRC successfully removed and disposed of more than a thousand tons of residential flood debris and tens of thousands of cubic yards of vegetation in less than 30 days

### 2016 Louisiana Severe Flooding DR4277
- DRC picked up 1 million cubic yards of debris over the course of 30 days in East Baton Rouge Parish, Louisiana.
- DRC opened and operated two Temporary Debris Management Sites to compact and recycle C&D debris prior to haul out for final disposal. These sites operated with such efficiency that FEMA and the USACE filmed the operation to use in training sessions.

### Winter Storm Jonas 2016
- The snow from Winter Storm Jonas started the morning of January 22nd and by the evening DRC had started mobilizing in 5 different jurisdictions. Operations continued 24 hours a day and required two operators per piece of equipment, around the clock management and support personnel. The project was completed in 10 days.

### Ice Storm Pax 2014
- DRC was simultaneously activated in New Hanover County, NC, Pender County, NC, and the City of Wilmington, NC for debris removal and reduction of approximately 400,000 cubic yards of debris.
- The South Carolina Department of Transportation contracted DRC to cut, remove and transport vegetative debris in 8 counties, totaling over 12,000 miles of roadway clearing and the trimming of over 225,000 trees.
- DRC managed and operated over 15 Debris Management Sites reducing and recycling over 1.5 million cubic yards of debris.

### The Hurricane Season of 2012
- DRC simultaneously operated 14 contracts throughout the Southeast in response to Hurricane Isaac. DRC concurrently operated six TDSRS sites in Louisiana alone.

### The Hurricane Season Of 2009

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



- The Texas GLO requested assistance for the removal of marine debris that was generated as a result of Hurricane Ike in 2008. These services were performed in Trinity, Galveston, East and West Bay and have an approximate contractual value of $22,703,700.00.
- DRC also provided services for areas such as Kentucky and Arkansas that were ravaged by severe ice storms. These services are valued at approximately $11,157,132.02.

## The Hurricane Season Of 2008

- DRC responded in service to 36 separate contracts, including the cities of New Orleans, Houston, and Galveston in response to Hurricanes Gustav and Ike devastating the Louisiana and Texas coastlines. DRC's work in these regions was nearly completed in a little over two months.
- DRC established a single-day productivity record for post-disaster debris removal as recognized by FEMA by collecting 440,000 cubic yards of debris in a single day in the City of Houston.
- In just ninety days, DRC collected more than 5.6 million cubic yards of debris from the City of Houston alone.
- DRC's expedited operation using more than 2,000 pieces of collection equipment made it possible for the city of Houston to receive reimbursement in the greater than 80% range.
- Following Hurricane Ike, DRC simultaneously operated seven TDSRS sites handling 11,000,000 CY of debris, recycling materials out of the waste stream in two of those facilities.

## The Hurricane Season Of 2005

- DRC is proud to have assisted in the recovery following the devastation of Hurricanes Katrina, Rita, Wilma, and Cindy affecting the Florida Keys, throughout Mississippi and Louisiana, and into Houston, Texas. To date, DRC has successfully completed over $130,000,000 in disaster remediation in the hardest hit parishes of Louisiana and in Monroe, Escambia, and Miami-Dade counties in Florida, as well as the eastern coastal counties of Texas.
- Following Hurricane Wilma, DRC simultaneously operated five TDSRS sites in Louisiana, processing debris for the Louisiana DOTD. Also in 2005, DRC simultaneously operated six TDSRS sites for the Louisiana DOTD in two districts following Hurricane Katrina.

## The Hurricane Season Of 2004

- In the aftermath of Hurricanes Charley, Frances, Jeanne and Ivan, DRC and its teaming partners and/or subcontractors, performed 37 virtually simultaneous contracts and $150,000,000 in emergency work, including the removal of over 10,000,000 cubic yards of debris and the restoration of miles of beaches, throughout the state of Florida, from Monroe County to Escambia County, as well as projects in Virginia, South Carolina, and Texas.
- DRC simultaneously operated more than ten TDSRS sites in Florida.

## 2000 Winter Ice Storm

- In January 2000, in the aftermath of the Winter Ice Storm, DRC performed debris removal and landfill management services in North and South Carolina and Georgia. Approximately 800,000 cubic yards of debris was removed and processed within approximately 90 days.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
### Disaster Debris Clearance and Removal Services



**The primary mission of DRC Emergency Services, LLC is to provide a professional, honest and immediate response to natural and man-made disasters.**

One of the primary missions of any the County is to protect lives, minimize the loss or degradation of resources, and continue to sustain and restore operational capability following an event. DRC uses a basic three phase approach to help Montgomery County achieve these goals. DRC's approach to **prepare, respond,** and **recover** are fundamental to successful disaster management.



**When disasters hit communities, DRC Emergency Services is there. We stand by ready to help you prepare, respond, and recover in the face of disaster.**



52



# PREPARE



**PREPARE**

- *Contract Award*
- *Local Teaming Partners*
- *Available Equipment*
- *Joint Planning & Training*
- *Forecasting*

## Contract Award

Upon award, DRC's Regional Manager Mark Stafford will schedule a meeting with Montgomery County. The initial meeting is critical, allowing both the County and the Regional Manager to make introductions, as well as to prepare for any pending disasters. DRC's primary goal in this meeting would be to develop a step by step plan to expedite arrangements for training and response phases of the contract. These provisions include but are not limited to:

- Presenting key team members, including the Project Manager, and their responsibilities
- Scheduling table top scenario exercises to include planning and routing
- Facilitating the designation and readiness of DMS and final disposal sites
- Introducing Monitoring Firm Representative (if applicable)



## Local Team Partners, Vendors, and Subcontractors

DRC maintains a network of hundreds of subcontractors, approximately 30 of which are primary subcontractors that have been a part of DRC's responses in the last 30 years. These subcontractors along with DRC's own personnel and equipment are capable of mobilizing events of huge magnitude. The identification of local subcontractors prior to activation secures commitment of equipment and insurance requirements. In compliance with the Stafford Act, DRC encourages local participation. A few methods used to identify local subcontractors include:

- Outreach programs
- Government referrals
- Website applications
- Direct mail outreach

> "Through weekly project meetings, I became increasingly familiar with the organization's natural abilities and orderly work ethic. As the cleanup effort progressed, I realized that this company's staff was a perfect fit for working with subcontractors and property owners."
>
> — Leo T. Lucchesi Director of Public Works Washington Parish Government

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

![DRC Emergency Services — Striking Back.]

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

The use of local subcontractors helps revitalize Montgomery County's community and economic recovery after a disaster. DRC is always committed to utilizing local subcontractors because we are dedicated to the complete recovery of Montgomery County's community.

DRC continues to build its subcontractor base and boast potentially the largest group in the industry. All subcontractors are vetted and Montgomery County will always have a final authority on the use of subcontractors. DRC's current list of additional local subcontractors in the Montgomery County area is illustrated below:

> *"DRC, LLC, its staff, and sub-contractors were an essential and outstanding asset to the County's effort to recover from this destructive storm event. I cannot recommend them more highly. We certainly don't relish the possibility of another difficult storm season, but know that DRC will be there to meet all challenges imposed."*
>
> – George Garrett, Sr. Director of Marine Resources & GIS Services of Monroe County, Florida

## Joint Planning and Training

DRC provides Montgomery County with planning and training throughout the length of the County's contract at no extra cost. Benefits of these sessions include:
- Providing an opportunity to build relationships between both parties
- Delivering invaluable operational and administrative information to all stakeholders
- Discussing forecasting and reviewing the debris management plan



## Identifying Equipment Staging Areas

While discussing potential plots to stage equipment, the following should be considered:
- Staging away from residential areas
- Easy access from main right-of-ways
- Sufficient acreage to manage a large number of vehicles
- Fencing around the facility is preferable

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## DMS Site Selection
Criteria at a minimum will include:

- Public versus private land considerations
- Environmental agency approvals
- Dust and fire mitigation
- Ingress and egress considerations
- Security features
- Storm water controls considerations
- Elevation
- Sound buffers and fencing
- 24 hour DMS security



## County Approved Disposal Sites

| Facility Name | Facility Address | Company |
|---|---|---|
| Alliance Sanitary Landfill | 398 S Keyser Ave. Taylor, PA 18517 | Waste Management of PA |
| Bethlehem Landfill | 2335 Applebutter Rd. Bethlehem, PA 18018 | IESI |
| Blue Ridge Landfill | 1660 Orchard Rd. Chambersburg, PA 17254 | IESI |
| Brooke County Sanitary Landfill | 1140 Petrillo Road, Colliers, WV 26035 | J.P. Mascaro & Sons |
| Camden County R R Facility | 600 Morgan Blvd. Camden, NJ 08104 | Covanta |
| Chestnut Valley Landfill | 1184 McClellandtown Rd McClellandtown, PA 15458 | Advanced Disposal |
| Commonwealth Env. Systems, L.P. | 99 Commonwealth Rd. Hegins, PA 17938 | Keystone Sanitary L Inc. |
| Conestoga Landfill | 420 Quarry Rd. Morgantown, PA 19543 | Republic Services |
| Covanta Plymouth R R | 1155 Conshohocken Rd. Conshohocken, PA | Covanta |
| Cumberland Co Landfill | 135 Vaughn Road Shippensburg, PA 17257 | Advanced Disposal |
| Delaware Valley R R | 10 Highland Ave. Chester, PA 19013 | Covanta |
| Grand Central Sanitary Landfill | 910 W. Penna. Ave. Pen Argyl, PA 18072 | Waste Management of PA |
| Greentree Landfill | 635 Toby Road Kersey, PA 15846 | Advanced Disposal |
| Grows North Landfill | 1000 New Ford Mill Rd. Morrisville, PA 19067 | Waste Management of PA |
| Keystone Sanitary Landfill | 249 Dunham Dr. Dunmore, PA 18512 | Keystone Sanitary L Inc. |

| Facility Name | Facility Address | Company |
|---|---|---|
| Lancaster County R R | 1911 River Rd. Bainbridge, PA 17502 | Lancaster Co. Solid Waste Mgt. Auth. |
| Lanchester Landfill | 7224 28th Division Hwy. Narvon, PA | Chester Co. Solid Waste Auth. |
| Modern Landfill | 4400 Mt. Pisgah Rd. York, PA 17402 | Republic Services |
| Mostoller Landfill | 6825 Glades Pike Rd Somerset, PA 15501 | Advanced Disposal |
| Philadelphia Process Eng. Fuel Facility | 5245 Bleigh Ave. Philadelphia, PA 19136 | Waste Management of PA |
| Pioneer Crossing Landfill | 727 Red Lane Rd. Birdsboro, PA 19508 | J.P. Mascaro & Sons |
| Rolling Hills Landfill | 583 Longview Rd. Boyertown, PA 19512 | Delaware Co Solid Waste Auth |
| Sandy Run Landfill | 895 Landfill Rd Hopewell, PA 16650 | Advanced Disposal |
| Susquehanna Resource Mgt Complex | 1716 South 19th St. Harrisburg, PA 17104 | Lancaster Co. Solid Waste Mgt. Auth. |
| Tulleytown Landfill | 1300 Bordentown Rd. Tullytown, PA 19007 | Waste Management of PA |
| Tulleytown R R Facility | 200 Bordentown Rd. Tullytown, PA 19007 | Waste Management of PA |
| Western Berks Landfill | 455 Poplar Neck Rd. Birdsboro, PA 19508 | Advanced Disposal |
| Wetzel County Landfill | Cider Run Rd. New Martinsville, WV 26155 | J.P. Mascaro & Sons |
| Wheelabrator Falls | 1201 New Ford Mill Rd. Morrisville, PA 19067 | Waste Management of PA |
| York County R R Center | 2651 Blackbridge Rd. York, PA 17402 | York County Solid Waste Auth |

## Identifying Permanent Disposal Facilities, Transfer and Recycling Facilities
DRC has agreements in place with most major disposal and recycling facilities in the area. DRC's management will be responsible for working with the jurisdiction to identify these facilities and to secure favorable terms and conditions with each facility. Additionally, DRC's staff includes Steve Crawford, an expert in recycling, resource recovery, and disposal. With 25 years of experience, Crawford brings expertise and exceptional knowledge to every project.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

## Establishing Emergency Push Routes & Collection Grids

Collection grids and emergency push routes should include:

- Hospitals
- Police departments
- Emergency shelters
- Nursing homes
- Major traffic routes

## *Forecasting*

DRC will incorporate Montgomery County's debris management plan and use the USACE model to predict project debris volumes, storage acreage needed, equipment, and manpower needed for the project.

## Estimated Debris Volumes for Montgomery County

Model based on 100% of households' impacted Countywide.

| Storm Category | Est. Clean Woody Debris (CY) | Est. Mixed C&D Debris (CY) | Total Cubic Yards | Acres Required for Debris Management (w/ Roads & Buffers) |
|---|---|---|---|---|
| 1 | 864,000 | 96,000 | 960,000 | 49.39 |
| 2 | 3,447,000 | 383,000 | 3,830,000 | 197.04 |
| 3 | 11,205,000 | 1,245,000 | 12,450,000 | 640.51 |
| 4 | 21,546,000 | 2,394,000 | 23,940,000 | 1,231.62 |
| 5 | 34,479,000 | 3,831,000 | 38,310,000 | 1,970.91 |

## Model Assumptions:

- Population – 826,075 with estimated 283,333 Households
- Medium Vegetation Characteristic
- Light Commercial Density
- Heavy Precipitation

## Forecasting Scenarios

### Scenario 1

*CUBIC YARDS ASSUMED:* 1,000,000

*ESTIMATED TIME OF COMPLETION:* 90 total days with three complete passes

*AVERAGE CUBIC YARDS PER TRUCK PER DAY:* 500

*TRUCKS REQUIRED:* (120 cubic yard self- loaders) 30 crews for the first 30 days; 20-22 crews for days 30-90

*DMS REQUIRED FOR LESS THAN 10 MILE HAUL:* 4-6

*PERSONNEL REQUIRED:* Project Manager, three supervisors, DMS site manager, staff of 3-5 per DMS site and full back-office staff



Disclaimer: The following scenarios are for discussion and demonstration only. Type, category, and intensity determine the number of trucks and personnel required.

### Scenario 2

*CUBIC YARDS ASSUMED:* 500,000

*ESTIMATED TIME OF COMPLETION:* 90 total days with three complete passes

*AVERAGE CUBIC YARDS PER TRUCK PER DAY:* 500

*TRUCK TYPE/REQUIRED:* (120 cubic yard self- loaders or equivalent) 15-18 crews for the first 30 days; 10 crews for days 30-90

*DMS REQUIRED FOR LESS THAN 10 MILE HAUL:* 2-4

*PERSONNEL REQUIRED:* Project Manager, three supervisors, DMS site manager, staff of 3-5 per DMS site and full back-office staff

### Scenario 3

*CUBIC YARDS ASSUMED:* 250,000

*ESTIMATED TIME OF COMPLETION:* 60 total days with three complete passes

*AVERAGE CUBIC YARDS PER TRUCK PER DAY:* 500

*TRUCKS TYPE/REQUIRED:* (120 cubic yard self- loaders or equivalent) 10 crews for the first 30 days; 10 crews for days 30-90

*DMS REQUIRED FOR LESS THAN 10 MILE HAUL:* 2

*PERSONNEL REQUIRED:* Project Manager, two supervisors, DMS site manager, staff of 3-5 per DMS site and full back-office staff



Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

## RESPOND




- *Alert Phase*
- *Disaster Impact*
- *Response Timeline*
- *Initial Damage Assessments*
- *Emergency PUSH Operations*
- *Loading and Hauling Operations*
- *Debris Management Site Operations*
- *Safety*
- *Prompt Damage Complaint*
- *Accounting and Document Management*

## Alert Phase

If a potential disaster can be predicted, DRC will activate the following alert phases:

- 72 hours before impending impact, RM will contact Montgomery County to discuss activation and response
- At the discretion of the County, DRC will mobilize personnel within 24 hours prior to disaster impact to arrive at the Emergency Operations Center
- Identification and readiness assessment of subcontractor network for Emergency Push and Load and Haul Operations
- Pre-staging of equipment and personnel as needed to respond to the immediate aftermath of the event "push activities"
- Emergency Push Collection routes have been determined



# Disaster Impact

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



DRC has a unique ability to rapidly **respond** to a disastrous event while maintaining communication with communities to help them **prepare** for any trouble, making us a leader in the disaster **recovery** industry.

## *Response Timeline*

The type, intensity, and duration of each event dictates the response time. Upon receipt of Notice to Proceed or Task Order, DRC will commence mobilization of equipment, operators, and laborers.

**DRC proposes the following time frames in which services can be provided without unwarranted delay or interference:**

### Within 24 Hours Post Event

- Project Manager and support are in place and interacting with Montgomery County's Point of Contact
- Staging and measurement (certification) of equipment is underway
- Permitting and mobilization of DMS sites has begun
- Emergency Push activities are well underway with coordination with utility providers
- Initial Damage Assessment complete
- Public Service Announcements are initiated
- Logistical Support requirements have been assessed
- Initial Safety Meeting is held
- Time and location of daily production meetings is established



### Within 48 Hours Post Event

- Initial understanding of crew type and quantity has been established with the County's Point of Contact
- Roughly 50 percent of required equipment and manpower are in place
- At least one DMS is operational and load and haul activities can begin
- Discussions have begun with final disposal and recycling/composting providers (if applicable)
- Collection Zones have been mapped and discussed with the County's Point of Contact
- Truck certifying continues
- Daily Safety Meetings continue



### Within 72 Hours Post Event

- Full Mobilization is complete
- Emergency Push complete (if applicable)
- All contractual requirements (bonds, safety plans, dust control, community outreach, bonds etc.) are submitted
- Productivity assessments made based upon existing travel times and DMS requirements adjusted
- Equipment and personnel needs are reassessed
- Additional local and equal opportunity vendor outreach has begun and those applicants vetted
- Daily productivity meeting continues between DRC, the County point of contact and the Monitoring Firm assigned to the project
- Daily Safety Meetings continue

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

## Initial Damage Assessment

Initial damage assessments are usually completed within 36 hours of an incident by local, state, federal, and contractors and provide an indication of the loss and recovery needs. The debris assessment will accomplish all of the following:

- Estimate the quantity and mix of debris
- Estimate damage costs
- Determine impact on critical facilities
- Identify impact on residential and commercial areas

## Emergency PUSH Operations

- PUSH routes are predetermined with the help of County, who have a clear understanding of geography of the community
- Debris is "pushed" or cleared from the Public Roadway generally in an order of priority established by Montgomery County
- Crews generally consist of equipment capable of moving heavy material (skid steers, front end loaders etc.) and personnel and supervision with chainsaws
- Attempt to make roadways and intersections as safe as possible for sight and traffic obstructions
- This phase of work is accomplished within the first 70 cumulative hours (plus or minus) after the event



## Loading and Hauling Operations

### Certification of Equipment

This task can begin as soon as practical but generally 12-24 hours after a Notice to Proceed is issued. In general, trucks are staged at a location where the County's third-party monitoring firm can measure load capacity and assign unique identification to each piece of loading and hauling equipment.



# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Debris Removal from Public Rights of Way

Within 24-48 hours of a Notice to Proceed (or a reasonable amount of time agreed upon by the County) DRC will commence debris removal operations with multiple Debris Removal Crews. Debris Removal Crews will many times consist of three to five hauling vehicles of 100 to 150 cubic yard capacity with operators, one front end loader with operator, one foreman, and three laborers/flagmen (when required by traffic conditions). In other instances where conditions allow, self-loading equipment of similar capacity will be utilized to maximize efficiency.

- All field supervisors shall ensure that all debris disposal-hauling operators are licensed and certified to operate required equipment.
- All debris disposal operators will be given area maps designating assignment/authorized areas or zones of operations as well as transport routes designated and/or approved by the County.
- As subcontractors complete zones, the areas are jointly surveyed by Montgomery County or its designated representative and closed out.

Through the installment of PSAs, public participation can enhance the efficiency of the collection/material separation process. A typical flyer which defines material separation:

## PICKING UP THE PIECES

Following these specific guidlines when hauling hurricane-related debris and household garbage to the curb will make for a speedier removal process

**WRONG WAY**

**CROSSING THE LINE**
➤ Any debris placed from the sidewalk toward your property will not be picked up. Contractors cannot collect items on private property.

**PROPPING UP**
➤ Do not set debris against trees or poles. Doing so makes it harder for cleanup crews to scoop up the items.

Sources: Army Corps of Engineers, debris removal contractors

STAFF GRAPHIC BY DAN SWENSON

**HELPFUL HINTS**
- Ⓐ Limit curbside garbage to two 32-gallon containers or eight trash bags
- Ⓑ Share piles with neighbors
- Ⓒ Refrigerator and freezer doors must be secured with duct tape

**CORRECT WAY**

Homeowners and businesses are being asked to separate debris into the following categories:

| Ⓐ HOUSEHOLD GARBAGE | Ⓑ CONSTRUCTION DEBRIS | Ⓒ VEGETATION DEBRIS | Ⓓ HOUSEHOLD HAZARDOUS WASTE | Ⓔ 'WHITE' GOODS | Ⓕ ELECTRONICS |
|---|---|---|---|---|---|
| ➤ Bagged trash | ➤ Building materials | ➤ Tree branches | ➤ Oils | ➤ Refrigerators | ➤ Televisions |
| ➤ Discarded food | ➤ Drywall | ➤ Leaves | ➤ Batteries | ➤ Washers, dryers | ➤ Computers |
| ➤ Packaging, papers | ➤ Lumber | ➤ Logs | ➤ Pesticides | ➤ Freezers | ➤ Radios |
| ➤ All garbage should be placed curbside the night before the scheduled weekly pickup. | ➤ Carpet | | ➤ Paints | ➤ Air conditioners | ➤ Stereos |
| | ➤ Furniture | | ➤ Cleaning supplies | ➤ Stoves | ➤ DVD players |
| | ➤ Mattresses | | ➤ Compressed gas | ➤ Water heaters | ➤ Telephones |
| | ➤ Plumbing | | | ➤ Dishwashers | |

## Multiple Scheduled Passes

In order to allow citizens to return to their properties and bring debris to the right-of-way as recovery progresses, DRC ES adheres to FEMA's guideline of three scheduled collections or passes.

In rare cases, particularly following major flooding, additional collections may be warranted.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC**
EMERGENCY SERVICES
— Striking Back.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

## Field Operations

All eligible debris will be removed from public easements, property, and rights-of-way to designated Debris Management Site and/or directly to a final disposal site. Eligible debris is generated directly by the event or as a result of the event and is in the public Right of Way; for private property debris to be eligible, Private Property Debris Removal has to be authorized:

*The illustration to the right depicts a typical post- disaster scenario that involves construction and demolition debris (C&D). In this case, the public is advised through radio, television, social media, an a graphic such as above to place disaster generated debris to the right of way (ROW) in separate piles by debris type for separate collections.*





## Vegetative Debris

Vegetative debris is defined as: tree branches, leaves, logs, timber, and stumps.

- Eligibility—Public right of way or improved public property
- Collected from Private property only with FEMA private property debris removal right of entry authority
- Most productive operation combines the collection of leaners and hangers with normal ROW debris collection
- Allows for a wide spectrum of equipment use for productive collection
- Most commonly collected and transported to a Debris Management Site for processing and haul out
- Reduction by grinding provides opportunity for recycling, re-use and consumption as a fuel source
- Reduction by burning provides for the most cost- effective processing, if burning is an option



# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Construction and Demolition (C & D) Debris

Construction and Demolition (C&D) typically consist of: building materials, drywall, lumber, carpet, furniture, mattresses, and plumbing.

- Generally produced from floods, tidal surge and earthquakes
- Allows for a wide variety of equipment use including self-loading apparatus
- Landfill restrictions on material acceptance should be a consideration and can vary by state
- Utilization of DMS provides opportunity for reduction by material separation and compaction
- Load weight must be monitored particularly upon haul-out to final disposal
- Transportation to final disposal site does not allow for reduction, however is an alternative when travel time is not effected



## White Goods

White goods is defined as: refrigerators, washers, dryers, freezers, air conditioners, stoves, water heaters, and dishwashers.

- Separately collected and staged within a designated area at a DMS or hauled directly to a recycler
- Collection can be performed with light duty trucks and trailers typically possessing a lift-gate
- Freon shall be removed by a certified technician under EPA regulations
- Citizens are informed through PSAs , fliers and social media to remove all contents from refrigerators and freezers prior to collection or to duct tape doors shut to facilitate safety and ease of collection
- Refrigerators and freezers collected with contents shall be staged for content removal and disposal
- White goods shall be recycled, and any derived proceeds handled in accordance with the contractual terms and conditions

## Household Hazardous Waste

HHW typically consist of oils, batteries, pesticides, paint, cleaning supplies and compressed gas.

- Collected only by trained and certified personnel with proper PPE and typically occurs in advance of load and haul crews
- Collected separately and securely placed in spill-proof containers for transportation to staging at a DMS or direct transport to a qualified recycler/disposal facility
- When stored at a DMS, the area is generally lined or bermed or both depending upon the requirements of the state environmental agency proper packaging and transportation is often performed by the recycler

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC** EMERGENCY SERVICES — *Striking Back.*

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Electronic Waste Collection (E-Waste)

E-Waste debris includes: televisions, computers, radios, DVD players, telephones, and almost anything with an electric cord

- Collected separately with one or two collections (passes)
- Generally staged in a specific area of a DMS or transported directly to a recycler
- Collected in light duty trucks and trailers by general laborers and a supervisor
- Recycling of the items is always the goal



## Tires

Tires often appear on the public ROW for collection following flood events or tidal surge.

- Collection can be accomplished separately using light duty equipment
- Transportation directly to the recycler or shredder is preferred
- Tires create a special problem for landfill operators as they tend to rise or float and can ultimately damage the landfill cap
- Federal/state regulations often require a waste hauler permit during transportation

**Additional debris related collections, operations and projects that may occur during the response or recovery phase include but is not limited to the following:**

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Private Property Debris Removal

FEMA may extend public assistance to private property debris removal when it poses a threat to the public. Under the request and direction of Montgomery County or its representative, the contractor will initiate and manage a Right of Entry (ROE) program to remove debris on private property and/or demolish private structures that are a public safety hazard. The property owner must grant access prior to any work, unless there is an immediate threat to the lives, health, and safety to the County's citizens.



## Hazardous Tree and Limb Removal

A tree is considered "hazardous" if its condition was caused by the disaster and public health and safety are at risk. If possible, leaner and hanger removal will be performed in advance of load and haul activity and collected simultaneously with ROW debris. Eligibility is usually determined by Montgomery County's independent monitoring firm.

- Equipment may include bucket trucks, automated saw trucks, excavators and climbers with chainsaws
- Criteria to deduce if a leaner or hanger is hazardous is:
  - Must be six inches in diameter or greater when measured at chest height
  - More than 50% of the crown damaged or destroyed
  - Split trunk or broken branches that exposed the heartwood
  - Fallen or uprooted within a public use area
  - Leaning at an angle greater than 30 degrees
  - Hanging limbs must be 2 inches in diameter and must pose a threat of falling into an improved public area or public right-of-way



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC** EMERGENCY SERVICES
*Striking Back.*

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Removal of Hazardous Stumps

Stump removal usually takes place late in the debris removal process and is generally determined eligible by the County's monitor. A stump may be determined to be hazardous and eligible for Public Assistance grant funding as a per-unit cost for stump removal if it meets all of the following criteria:

- 50 percent or more of the root-ball exposed (less than 50 percent of the root-ball exposed may be flush cut)
- Greater than 24 inches in diameter, as measured 24 inches above the ground
- On improved public property or a public right-of-way
- Poses an immediate threat to life, and public health and safety
- Larger stumps are extracted by excavators and loaded upon flat-bed trailers for transport the DMS or final disposal facility
- Most often, large stumps must be split prior to processing by grinding

## Vehicle and Vessel Removal

DRC has extensive experience performing large scale vehicle and vessel removal and recovery projects. A single project for the State of Louisiana following Hurricanes Katrina and Rita involved the recovery and management of thousands of vehicles and vessels. The components of these projects vary from State to State due to legal requirements; but in the case of this operation, the scope of work will develop according to the direction of Montgomery County. Commonly used procedures are:

- Generally, aggregation sites are activated for storage, processing, recordation and access
- For land based recovery, vehicles and vessels are tagged and recorded prior to recovery
- For water based vessel recovery, eligible targets are located and recorded prior to recovery
- Initial notification to owner is sent from VIN information gathered in the field using State Police database (County specific)
- Vehicles and vessels are aggregated on one or more sites and gridded for easy access
- Fluids are removed from each unit within the aggregation site
- Additional notifications are sent to owners using certified mail (if required)
- Private insurance companies are allowed to view and access units
- Vessels and vehicles can be retrieved by owner/insurance or destroyed/recycled
- Vehicles that have not been retrieved are crushed and recycled
- Scrap value proceeds (if any) are disbursed according to the contract



# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Expertise in the Removal of Dead Animals and Putrescent Disposal

Improper disposal of animal carcasses can contaminate drinking water sources or spread disease. It is DRC's policy to handle and dispose of animal remains with care and in accordance with all state and local regulations.

If possible, all identified carcasses should be disposed of within 48 hours of death. There are several approved methods for the disposal of animal carcasses:

- **Incineration** at a secure and pre-approved site.
- **Deposition** in a contained landfill approved for remains disposal.
- **Composting**, with approval, is a sanitary and practical method of carcass disposal.

## Demolition

DRC Emergency Services, LLC employs many experienced supervisors, project managers, operators, and other technicians, many of whom have many years of experience in the demolition field. Demolition projects will be staffed with a Superintendent to oversee daily operations and a Project Manager responsible for subcontractor relations, schedule maintenance, and coordination with Montgomery County.

All demolition operations will be conducted in a safe, environmentally responsible manner, in accordance with the requirements of the local government. Operations will proceed with the disconnection of utilities to all structures. The structures will then be demolished to the slab on grade level. Structures will be removed completely prior to the removal of any street or curb improvements, so that a clean and durable means of ingress and egress can be maintained during demolition operations. Slabs on grade will be excavated and removed. Once a structure has been completely removed, the area will be stabilized using the best management practices (DMP).

Existing structures will be demolished using conventional construction equipment such as excavators, track loaders and bull dozers. Concrete slabs will be excavated using track type excavators and hammers (if necessary) and will then be crushed on site using portable concrete crushing technology. Debris and recycled materials will be removed from the site using dump trucks.

## Snow Removal

Snow removal operations closely resemble the debris mission. Initially, skid steers and front end loaders are used to clear the roads. Large capacity rubber tire front end loaders are then used to load and haul the snow to a County designated location where it can be melted mechanically or naturally over time. DRC has performed this scope of work numerous times and utilizes the resources from these previous projects where we have successfully performed.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC**
EMERGENCY SERVICES
*Striking Back.*

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

## *Debris Management Site Operations*

### Permitting and Site Mobilization

Within 24 hours of a notice to proceed, mobilization to pre-established DMS locations will begin:

- Phase One—environmental audit is performed
- The number of DMS sites to be used is determined by estimated volumes, travel times, traffic patterns and material to be processed
- Ideally, site placement and number should facilitate a minimum of five loads per truck per day
- Land Use Agreements are immediately executed with any private land owners
- For those sites not already permitted, an immediate permitting request will be submitted by DRC's Vice President of Administration and Compliance (Kristy Fuentes)
- DMS Site Plan is established and submitted



### Environmental Considerations

- Where practical, a phase one environmental assessment should be performed prior to use as a DMS
- Soil samples are taken prior to use
- Pictures and video of the site prior to use is considered a best management practice
- DRC may use drone photography before and after use as a best management practice
- An independent engineer is often used to satisfy additional requirements of State regulators such as the need for SWPPP, perimeter silt fencing, air monitoring etc.

### Site Access

For the success of site access, separate points of ingress and egress should be established if possible and avoidance of truck traffic through residential areas is ultimately important.

- **Traffic Controls** - Traffic control personnel, with appropriate traffic control safety equipment, will be stationed at the ingress observation tower to maintain vehicular traffic control. Additional traffic control personnel can be stationed throughout the site, as needed, to enforce proper traffic flow.
- **Inspection Towers** - Inspection towers shall be constructed to facilitate observation and quantification of debris hauled for storage at debris staging sites. Ideally two inspections towers should be utilized at each DMS if volume warrants. One tower at point of ingress for use by the monitoring firm's employee, one tower at the point of egress to ensure all debris hauling trucks are in fact empty upon leaving the site. One tower may be utilized if ingress and egress point is the same. Additionally, the use of all terrain man lifts are sometimes substituted for the tower shown.
- **Maintenance and Grading** - Maintenance and grading of the debris management site will occur throughout the operating day. Access roads will be constantly maintained, and dust control managed by use of a water truck. Access roads will be swept as often as necessary.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services

**DRC**
EMERGENCY SERVICES
——— *Striking Back.*




## Debris Storage Area

Debris may be segregated into five main areas as determined by the type of event.

**Vegetative debris**—Vegetative debris will be cleaned of C&D debris to the extent possible to facilitate compliance with requirements for reduction of vegetative debris and processing of C&D.

**Construction and Demolition (C&D) Debris**—Stored separately within an area that will facilitate separation, compaction or grinding.

**Recyclables/Salvage**—Recyclable/salvageable materials will be stock piled in accordance with the site plan.

**White goods**—White goods will be stock piled in a contained area in accordance with the site plan if not transported directly to the recycler.

**Household Hazardous Waste (HHW)**—HHW will be segregated and stored in an approved containment area that may be lined and bermed.




## Debris Reduction Methods

**Grinding and/or Chipping Operations**—Primarily used for reducing vegetative debris to achieve a 4 to 1 reduction or better. Resulting product is beneficial for use as fuel or reused as compost. The method is less often used as a reduction method for Construction and Demolition material due to its impact on equipment.

- Reduction by grinding provides opportunity for recycling, re-use and consumption as a fuel source

**Burning**—Environmental impact and safety are primary considerations. Most often allowed in rural settings, it's the most efficient reduction method for vegetative debris as a 95% reduction can be achieved. Air curtain incineration and trench burning can serve to mitigate the release of smoke etc.

- Reduction by burning provides for the most cost-effective processing, if burning is an option



**Compaction**—The most acceptable reduction method for construction and demolition debris when combined with recycling; a 2 to 1 reduction ratio is most often achieved.



**Final Debris Disposal**

Selection of final disposal location(s) for processed debris is normally determined during the planning phase. Per Subtitle D, lined sites are generally selected. However, in some cases, permitted construction and demolition sites are used when regulations allow.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



## Recycling Strategies

**Vegetative Debris**—Available to serve as a viable fuel source for manufacturing, etc. and used frequently as mulch for agricultural purposes. The resulting product is donated to citizens for use in flower beds and gardens and can be used as alternative daily cover in landfills when allowed. Additional uses are to use as roadbed for temporary roads and can be thinly spread across acreage to produce dirt.

**Aggregates**—Concrete, brick, and similar materials can be crushed and used as fill material, road base, etc.

**Construction and Demolition Debris**—Wood, metals, plastics and sometimes gypsum can be pulled from the waste stream and recycled if sufficient quantities exist and recycling facilities are available and accessible.

**White Goods**— Easy to recycle due to abundant processors.

**Electronic Waste (E-Waste)**—While these components are quite abundant, particularly following a flood or tidal surge, recyclers of these items have become more difficult to find. Some of the components found in televisions, computer monitors, copy machines etc. contain heavy metals making disposal a poor option, resulting in markets being the best option. Shipping to foreign markets is sometimes the best option.



## Debris Management Site Closeout

Restoration is conducted during the close out phase of each DMS. The scope of restoration is determined by post use site conditions, terms of the land lease, or the County directive and mutual understanding when public property is used. Restoration can consist of final removal of all debris and other managed components as well as all structures and temporary features. Additionally, grading and leveling, removal of temporary roads and fencing, and grassing or seeding of the site to documented pre-use condition may be necessary.



Post use drone footage and still photography shall be taken to illustrate the current condition of the site as it compares to the baseline or pre-use documentation. Environmental sampling that mirrors pre-use sampling is a best management practice.

- Random soil samples, surface and if necessary water samples, may be taken and sealed in containers for comparison

> **"This debris removal project has been a resounding success, and the GLO appreciates the many hours of hard work put in by the DRC team."**
>
> — Benjamin K. Au Architect, Director of Construction Services GLO, Texas

with pre-use samples taken
- Independent third- party engineers and testing labs may be used
- Post use samples and pre-use samples may be tested in an independent lab to determine the presence of contaminants

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Final Inspection, Released and Acceptance of Montgomery County and/or Landowner

In most cases, final closure approval is needed by both the State Environmental Agency and the property owner.



## *Safety*

DRC maintains an unwavering commitment to the health and safety of our employees, subcontractors, customers, and the communities that we service.

### **Safety** comes before **profit and productivity**.

Our goal is to ensure that all projects operate under the safest possible conditions and as such, DRC maintains a robust in-house safety program. Headed by a dedicated team of Project Managers and Regional Managers, DRC's programs and practices include:

- Morning project safety toolbox meetings
- Weekly "better ideas for improvement" meetings
- Weekly formal safety meetings
- Constant safety training certifications
- Safety recognition through our "challenge coin" award program

DRC follows all OSHA regulations and other federal and state agency guidelines when conducting an operation. DRC's Corporate Safety Plan includes Safety Plans and Policies, an Accident Prevention Plan and a Substance Abuse Policy. It is the policy of this organization to provide and maintain work environments and procedures which will:

1. Safeguard public and Government personnel, property, materials, supplies, and equipment exposed to contractor operations and activities;



2.  Avoid interruptions of Government operations and delays in project completion dates; and

3.  Control costs in the performance of this contract.

Operational safety, health, and accident prevention measures will be in effect and reinforced daily by all active personnel. These measures and procedures will be reiterated weekly during planning meetings, or as needed.

Immediate action will be taken to correct any safety deficiency while maintaining the utmost respect for all members of our workforce. All actions will be documented and the safety of citizens will be considered vital.

Training programs include:
Smith System Driver Training
Hazardous Materials Training
Demolition Safety
Asbestos Abatement Training
Power Line Awareness
Hazardous Communication
Lockout/Tagout
Fire Prevention Training
Environmental Management Planning



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*DRC EMERGENCY SERVICES — Striking Back.*

## Prompt Damage Complaint

- DRC maintains a damage hotline (888-721-4DRC) for all projects. A complaint manager is assigned to the project and is responsible for tracking all damage and repair.
- DRC will investigate all damages and complaints within 24 hours and will propose a resolution to the damaged party within 48 hours.

## Accounting and Document Management

DRC's invoicing procedure is as follows:

- Load tickets are received, logged, and then scanned into DRC's database system. Tickets are then entered and audited for accuracy.
- Invoice is worked up along with the ticket data backup.
- The reconciliation process then takes place with either the Monitoring Firm or the reconciliation contact with the County (if there isn't a Monitoring Firm).
- Once the invoice and ticket data has been 100% reconciled, the Monitoring Firm, or the reconciliation contact with the jurisdiction, then recommends the invoice to FEMA for payment.
- Frequency:  The invoicing is usually done on a weekly basis

DRC maintains a fully-staffed, fully operational Data Center at its headquarters all year. The Data Center is staffed by experienced and professional personnel with extensive knowledge of recording, reporting, contract, and reimbursement requirements. The Data Center is equipped with state-of-the-art information technology and is prepared to meet and exceed the reporting requirements of each client. All servers and networked computers are backed up both on and off-site every day. The emergency nature of DRC's work requires that the Company remain on-line and in contact across its network at all time.



# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services



# RECOVER





- *Demolition*
- *Man Camp Services*
- *Post Disaster Temporary Housing*
- *Marine Services*

Many of the elements of work shown above can be categorized as a recovery functions, although some, if not all, could be performed simultaneously with the debris mission. Of those listed above, marine debris removal, marine salvage, and beach restoration have been previously addressed under the Response phase of operations.

Effective recovery requires a comprehensive effort of all phases that enable logical and efficient execution. The subsequent functions outlined below are all steps in a model that must be executed intelligently and with real-world experience. DRC Emergency Services, LLC, SLS and Callan Marine comprise a core of companies under single ownership that excel at providing a turn-key approach to total disaster management. We stand alone in the industry as the only provider of these services.





Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# SLS

DRC's sister Company, SLS, is a prominent post disaster Temporary Housing provider. From turnkey temporary trailer facilities to massive man camps designed to house and feed thousands, SLS has designed and performed most all post disaster applications.



SLS pioneered the current FEMA S.T.E.P. program during the aftermath of Hurricane Sandy in New York. The Program in New York was called "Rapid Repair" and a similar program in Baton Rouge was called "Shelter at Home". These programs are designed to perform essential elements of restoring damaged single- family residences and return homeowners back into their homes quickly. As an additional positive result, the cost of the typical S.T.E.P. program is approximately 20% the cost of placing a displaced Family into a trailer or similar structure. Rapidly returning displaced families to their homes provides a sense of community and normalcy to the affected citizens.

In anticipation of Hurricane Florence's impact on the East Coast, SLS was activated by the Virginia Department of Emergency Management to provide emergency shelter services for the state of Virginia and surrounding state evacuees.

**Project specs:**
**Location:** Richmond, Williamsburg, and Newport News, Virginia
**Client:** State of Virginia
**Type:** State of Virginia
**Units:** 5,775 beds in three locations



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 9: Mobilization and Operations Plan
## Disaster Debris Clearance and Removal Services





DRC's sister Company, Callan Marine is a highly-specialized construction firm capable of providing, design, engineering, management and construction services such as:

- Marine debris management and removal
- Offshore and inland dredging
- Shoreline protection
- Beach re-nourishment
- Port/Dock facility construction
- Wetlands construction
- Marine protection mitigation and improvements



**Callan Marine has dredged thousands of miles of waterway in the Gulf Coast region to keep our customers productive.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

77



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# OSHA-COMPLIANT TEMPORARY INSPECTION TOWERS

Inspection towers shall be constructed to facilitate observation and quantification of debris hauled for storage at debris staging sites. No less than two inspections towers should be utilized at each debris-staging site. One tower at point of ingress for use by company inspector and Government inspector, one tower at the point of egress to ensure all debris hauling trucks are in fact empty upon leaving the site, one tower may be utilized if ingress and egress point is the same. The egress tower shall be manned by at least a representative of DRC.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC** EMERGENCY SERVICES *Striking Back.*  **Tab 11: Spill and Fire Prevention Plan**

Disaster Debris Clearance and Removal Services

# SPILL AND FIRE PREVENTION

## Emergency Procedures

To ensure the safety of all personnel, contractors, and/or incoming constituents, the emergency procedures that follow provide the minimum operations that should occur.

## Notification

Site personnel will notify proper personnel in the event of an emergency situation.  If necessary, the Site Foreman will notify the Field Supervisor, after he/she thoroughly evaluates the situation, as well as personnel designated for mitigation.

The Field Supervisor will contact Senior Management and outside agencies, as the event dictates.  All notifications will be made in accordance with the EPCP.

## Isolation

The area that the emergency event has occurred will be isolated by removing personnel, identifying perimeters, and by denying access to non-essential personnel.  Depending on environmental conditions and type of release, every effort to approach the area of the release upwind and away from, should be made to reduce potential contamination.

## Protection

Day to day operations at the work site constitute what will be considered Level D clothing.  Level D clothing should be worn when the atmosphere contains no known hazard and the potential for contamination does not exist.  Level D clothing shall consist of a minimum of:

- Work clothing
- Coveralls
- Boots/shoes with steel toe and shank
- Hard hat
- Safety glasses/goggles
- Gloves may be optional depending on situation

Personnel must be trained to recognize when the emergency situation would necessitate Level D clothing. Also, personnel must be trained in donning and doffing procedures.  When release of a hazardous waste or material is known and an air-purifying respirator may be needed, Level C clothing will be required.  Level C clothing should be utilized when product will not be readily absorbed through any exposed skin and if an air-purifying respirator will be sufficient for protection against potential air contaminants.  Level C clothing should include a minimum of

- Air purifying respirator proper for product being released
- Hooded chemical clothing, compatible with product being released
- Outer, chemical-resistant, gloves
- Inner, chemical-resistant, gloves
- Outer, chemical-resistant, boots
- Hard hat

*Note: Material compatibility must always be considered when selecting proper chemical protective clothing.*

# Tab 11: Spill and Fire Prevention Plan
## Disaster Debris Clearance and Removal Services

**DRC**
EMERGENCY SERVICES
*Striking Back.*

Personnel must be trained to recognize when the emergency event would necessitate Level C clothing. Also, personnel must be trained in donning and doffing procedures.  Use of an air-purifying respirator must be in accordance with the individual manufacturer's specifications, and must be appropriate for the product being released.

## Identification
Products on-site will be identified in accordance with 29 CFR 1910.1200, the Federal Hazard Communication Regulation. Personnel will be familiar with Material Safety Data Sheets (MSDS) and their location.  The North American Emergency Response Guidebook should assist, when applicable, with initial identification and control measures, of an unknown product.  Container shapes and sizes should be identified and the hazards associated with should be recognized.  The type of release should be identified (i.e. solid, liquid, or gas) and its concentration and / or presence verified by the use colormetric tubes and pH paper.

## Spill / Leak Control
Spill / Leak Control for product release shall not exceed beyond primary containment and confinement measures, or beyond the capabilities of the on-site personnel that may be involved with mitigation.  The use of remote shut-off valves may be utilized to control the release of a hazardous waste or material, if said can be done with total regard for safety and minimal contact with product.  Decontamination of personnel, equipment, and chemical protective clothing must be completed after spill / leak control measures have been completed in accordance with 29 CFR 1910.120.

## Fire Control
On-site Fire Control shall be accomplished with specific emphasis on safety of personnel in the area where the emergency event has occurred.  Fire Control shall not exceed the capabilities of the personnel that may be involved with mitigation of the emergency situation. Initial use of fire extinguishers, remote shut-off valves and utilization of monitor nozzles from a safe distance and position when absolutely necessary shall be the basis for this type of operation.  Outside agencies should be notified in the event that the situation exceeds the capabilities of on-site personnel.

## Fire Prevention
All provisions of the National Fire Prevention Code, the United States Coast Guard Regulations, and any applicable local requirements will be adhered to.
The contractor shall survey all activities and determine which require a hot work permit.  Fires and open flames shall not be left unattended.  All sources of ignition shall be prohibited within fifty feet of operations with a potential fire hazard: the area will be conspicuously and legibly posted No Smoking or Open Flame.  Smoking shall be prohibited in all areas where flammable, combustible materials are stored: No Smoking or Open Flame signs will be posted in all prohibited areas.

Approved fire extinguishers will be placed in each piece of operating equipment following the guidelines set forth in EM 385-1-1. Fire extinguishers shall be approved by a nationally recognized testing laboratory and labeled to identify the listing and labeling organization and the fire test and performance standard that the fire extinguisher meets or exceeds.  Machinery will be equipped with a $CO_2$ or dry chemical fire extinguisher with a minimum UL rating of 5-B:C.  General training will be provided by the project supervisor on the use and locations of fire extinguishers. Facility fire extinguishers will be suitably placed, distinctly marked, readily accessible, and maintained in a fully charged and operable condition.  A fire extinguisher, rated not less than 20B shall be located not less than twenty-five feet or more than seventy-five feet from any outside flammable liquid storage area.

Flammable liquids shall be kept in closed containers when not in use. Safety cans and other portable containers for flammable liquids have a flash point at or below seventy-three degrees Fahrenheit shall be painted red with a yellow band around the can and the name of the contents legible indicated on the container. Flammable and combustible liquids shall not be stored in areas used for exits, stairways, or safe passage of people. Workers shall carefully guard against any part of their clothing becoming

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

contaminated with flammable or combustible fluids. They will not be allowed to continue to work if their clothing becomes contaminated and must remove or wet down the clothing as soon as possible.  No flammable liquid with a flash point below one hundred degrees Fahrenheit shall be used for cleaning purposes or to start or rekindle fires.  Areas in which flammable or combustible liquids are transferred in quantities greater than five gallons shall be separated from other operations by at least twenty-five feet or a barrier having a fire resistance of at least one hour. Drainage or other means shall be provided to control spills. During refueling natural ventilation shall be provided to maintain the concentration of flammable vapor at or below 10% of the lower flammable limit.

All storage, handling, and use of flammable and combustible liquids shall be under the supervision of a qualified person.  Only approved containers and portable tanks may be used for storage and handling of flammable and combustible liquids.  Approved metal safety cans shall be used for handling and use of flammable liquids in quantities greater than one gallon with certain specific exceptions.  Flammable or combustible liquids will not be stored in areas used for exits, stairways, or normally used for the safe passage of people.  The indoor storage of flammable and combustible liquids will be limited to no more than fifteen gallons. Disposal of combustible waster materials shall be in compliance with environmental laws and regulations.
Vehicles, equipment, materials, and supplies shall not be places so that access to fire hydrants and other fire fighting equipment is obstructed.

During demolition, existing automatic sprinkler systems (if applicable) shall be retained in service as long as reasonable. Modification of sprinkler systems to permit alterations to additional demolition should be expedited so that they system may be returned to service as quickly as possible.  Sprinkler control valves shall be checked daily at close of work to ascertain that the protection is in service. The operation of sprinkler control valves is permitted only when approved by the designated authority.

## Evacuation / Employee Assembly Areas

In addition to the personnel accountability procedures outlined in section "Organization / Responsibilities" above, a plan for personnel not directly involved with emergency situation mitigation, shall be developed and disseminated.  In the event of an emergency, a pre-designated assembly point shall be established, and personnel should report to this point and proper documentation made to support accountability.  Routes of egress to the assembly point shall be clearly marked to minimize confusion during an emergency situation.  Alternate routes of egress will be designated and clearly marked on the Site Specific Safety and Health Plan, Form DRC-H&S-28.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CONTINGENCY PLAN

## Contingency Plans and Emergency Response Capability

Emergency response will be covered at the safety and health indoctrination and continuing training meeting. The plans shall be randomly tested to ensure their effectiveness. Inclusive of these plans and procedures shall be:

- Escape procedures and routes
- Critical plant operations
- Employee accounting following an emergency evacuation
- Rescue and medical duties
- Means of reporting emergencies
- Persons to be contacted for information or clarification

Planning for this operation shall include the total system response capabilities to minimize the consequences of accidents or natural disaster.

On-site emergency planning shall be integrated with off-site emergency support.

Emergency alert systems shall be developed and tested to alert all persons likely to be affected by existing or imminent disaster conditions and to alert and summon the people and equipment compromising the emergency response capability.

Emergency telephone numbers and reporting instructions for ambulance, physician, hospital, fire, and police shall be conspicuously posted at the work site. In the unlikely event of an emergency response situation, the following procedures will be implemented:

- Project Manager will be immediately notified
- Project Manager will evaluate the emergency and notify the following agencies, if necessary.
- Client Representatives
- Local fire and Police Departments
- Local environmental officials
- Local emergency management personnel
- Residents adjacent to site

When necessary, all personnel will be evacuated from the site and issued additional safety equipment as required. A signal for site evacuation will be established at the onset of site activity.

## Fire, First Aid Emergency and Ambulance Service

**911 (**APPROPRIATE LOCATION**) Fire and Rescue Department**

## Prevention of Alcohol and Drug Abuse on the Job

At no time while on duty may employees use or be under the influence of alcohol, narcotics, intoxicants, or similar mind-altering substances. Employees found to be under the influence of or consuming such substances will be immediately removed from the job site. The importance of a drug-free environment will be emphasized. Every safety meeting will include EM-385-1 Section 01.A.02 as part of the instruction.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 12: Contingency Plan
## Disaster Debris Clearance and Removal Services



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Activity Hazard Analysis

Prior to commencement of any single phase of debris collection, site management, or debris reduction activities, the project manager and/or health and safety officer will address the particular concerns associated with the work area.  These concerns include:

- Physical hazards- uneven or soft earth roads, stones, exposed power lines, or sources, and any other obvious hazards
- Chemical hazards- emissions/odors, eye or respiratory irritations, and airborne particulate problems
- Traffic and personnel access and egress routes
- Heat Stress
- Cold Stress
- Noise Hazards
- Equipment Hazards
- Other concerns such as weather conditions (lightning, severe wind, etc.)
- A site-specific health and safety plan will be completed for each major area of operation.



# EMPLOYEE TRAINING AND HEALTH AND SAFETY PLAN

## Administrative Responsibilities

The DRC Safety Officer for the affected area is the official responsible for health and safety issues. His authority and responsibility include the development, enactment, and enforcement of organization's overall Health and Safety Program. An outline of his responsibilities includes:

## Professional Development
- Establish and maintain a health and safety library
- Keep appraised of changes in health and safety regulations
- Participate in professional organizations related

## Program Development
- Develop and maintain the injury and illness prevention program
- Develop and maintain the injury and illness prevention policies and procedures
- Safety rules
- Incentive and motivation programs
- Accident investigations
- Safety inspections
- Plan and prepare for natural and manmade disasters
- Establish a medical program, which includes on-site First Aid capabilities
- And off-site emergency car

## Training and Communication
- Provide a general safety orientation for employees
- Train supervisors and managers in their responsibilities
- Inspection of facilities, work sites, material, equipment

## Enforcement
- Assure safe job placement and assignment
- Conduct hazard analysis of existing facilities and operations
- Study hazards of planned and proposed operations
- Accident investigation
- Audit safety performance
- Conduct research on technical safety problems

## Accounting
- Maintain the accident record keeping system
- Maintain documentation on all aspects of the injury and illness prevention program

## Responsibilities and Authorities of Safety Manager

With this position, the Safety Manager has the unconditional support and authority to stop any work which is not in compliance with safety regulations.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 13: Standard Health and Safety Plan
## Disaster Debris Clearance and Removal Services



Specific duties as safety manager include, but are not limited to:

1. Manage all safety for debris removal missions
2. Outline the duties of safety organization for DRC on each task order
3. Disseminate information to all employees regarding safety
4. Manage overall safety in conjunction with quality control manager for debris operations
5. Manage overall eligibility for debris operations
6. Stop any non-compliant work
7. Oversee and manage all safety reports that are reported on a daily basis
8. Maintain a safe, professional and compliant work atmosphere
9. Daily safety & quality control meetings with Town of Atlantic Beach inspectors as directed by the KO.

## Safety Training and Continuing Safety Education

It is the policy of this organization to provide and maintain work environments and procedures which will (1) safeguard public and Government personnel, property, materials, supplies, and equipment exposed to contractor operations and activities; (2) avoid interruptions of Government operations and delays in project completion dates; and (3) control costs in the performance of this contract. The key contractor responsibilities concerning safety include (1) providing all personnel a general safety and health indoctrination and a safety and health orientation/screening prior to the commencement of work (or any single phase of work); (2) the continuing instruction/monitoring of each contractor, subcontractor, supplier and employee in the safe operation of their specific area of responsibility using the proper tools and in accordance with the safety procedures and guidelines outlines in United States Army Corps of Engineers Manual EM 385-1-1 revised October 1998 to insure that all work is performed in a safe manner. Through careful planning, hazard recognition and control, safety indoctrination and training, and rigorous attention to safety procedures, we shall ensure the health and safety or personnel at our work sites and the public adjacent to our work sites.

No person shall be required or instructed to work in surroundings or under conditions that are unsafe or dangerous to his/her health. Any person aware of an unsafe or dangerous condition shall report the condition to his/her supervisor immediately. The particular operation will be stopped; the project manager will appoint a competent individual to investigate the condition and make corrections prior to restart of the operation. All information shall be recorded, maintained in the project file. A copy of the manual is available upon request.

Safety and health meetings shall be conducted once a month for all supervisors on the project location and once a week by supervisors (foreman) for all workers. The meetings shall be documented by the Safety Officer. The minimum information included in the report shall be (1) the date of the meetings; (2) name, social security number, and signature of attending individual(s); (3) the name of the individual(s) conducting the meeting. Copies of the safety manifest will be kept on file for a period of one year and shall be furnished to the designated authority upon written request.

The safety and health indoctrination and training meetings shall be based upon the contractor Safety Program and the United States Army Corps of Engineers Safety and Health Requirements Manual EM 385-1-1, October 1998. Safety and health subjects, at a minimum, shall include:

- Requirements and responsibilities for accident prevention and maintaining safe and healthful work environments
- General safety and health policy and procedures and pertinent provisions of EM 385-1-1
- Employee and supervisor responsibilities for reporting all accidents
- Provisions for medical facilities and emergency response and procedures for obtaining medical treatment or emergency assistance
- Procedures for reporting a correcting unsafe conditions or practices
- Job hazards and the means to control/eliminate those hazards, including applicable job and/or activity hazard analyses
- Job hazards communication

Case #2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Health and Safety Provision

## Accident Reporting

All supervisory personnel, foreman and employees will be instructed to report accidents to the Project Manager. Employees are responsible for reporting all injuries or occupational-related illnesses as soon as possible to his/her immediate supervisor. The contractor's office will record all incidents, along with the treatment provided. Reports will contain the following information:

- Name
- Date of Injury
- Time of Injury
- Nature of Injury or Illness
- Description of Accident
- Treatment Provided
- Date of Admittance (If Applicable)
- Occupation
- Name of Witness (If Applicable)
- Name of Employer
- Name of Immediate Supervisor

An accident that results in a fatal injury, five or more persons admitted to a hospital or property damage in an amount that exceeds $2,000.00 shall be reported to the designated authority and to the contracting office within twenty-four hours. Except for rescue and emergency measures, the accident scene shall not be disturbed until it has been released by the investigating official. A contractor representative will be assigned to investigate accidents of this nature in depth to identify all causes and to recommend hazard control measures.

## Safety Summary – Accident Reporting

Each employee shall be provided initial indoctrination and such continued safety training to enable him or her to perform their responsibilities safely.

Injured persons fare responsible for reporting as soon as possible to their immediate supervisor or foreman.

A first report of injury will be recorded on all injuries with a copy maintained by the contractor.

All persons treated and released must have a doctor's statement as to the employee's condition concerning their work status. A copy will be maintained by the contractor on the project while the original will be forwarded to main office.

A daily record of all first aid treatments not otherwise reportable shall be maintained on prescribed forms and furnished to the designated authority upon request.

All accidents will be documented, investigated, and recommendations will be implemented to prevent a further occurrence.

## Sanitation

An adequate temporary supply of Federal, State, or local health authority approved drinking water will be supplied in all places of employment. Only approved potable water systems shall be used for the distribution of drinking water. Portable drinking water systems will be used and shall be designed, constructed and serviced to ensure sanitary conditions, shall be capable of being closed, and shall have a tap. Containers shall be clearly marked as to their contents and shall not be used for other purposes. Water shall

# Tab 13: Standard Health and Safety Plan
## Disaster Debris Clearance and Removal Services



not be dipped from containers. Use of a common cup is prohibited. Unused disposable cups shall be kept in sanitary containers and waste receptacle shall be provided for used cups. Drinking water shall be dispensed by means that prevent contamination between the consumer and source. Outlets dispensing non-potable water will be conspicuously posted Caution –water Unfit for Drinking, Washing, or Cooking. There shall not be any cross connection between a system furnishing potable water and a system furnishing non-potable water.

## Toilets

Where sanitary sewers are not available, chemical toilets will be provided in compliance with local codes. Two chemical toilets will be provided, one for each sex. Each toilet shall be equipped with a toilet seat and toilet seat cover. The facility designated for male use will be equipped with a metal or plastic urinal trough. The facilities shall be constructed so that the occupants shall be protected against weather and falling objects; all cracks shall be sealed and the door shall be tight-fitting, self-closing and latchable. Adequate ventilation shall be provided and all window and vents screened; seat boxes will be vented to the outside (minimum vent size 4" diameter) with vent intake located one inch below the seat. The interior of the facility shall be lighted. Provisions for routinely servicing and cleaning all toilets and disposing of the sewage shall be established before placing toilet facilities into operation. The method of sewage disposal and location selected shall be in accordance with Federal, State, and local health regulations

## Waste Disposal

Receptacles used for putrescible or dangerous waste material shall be so constructed to prevent leakage and to allow thorough cleaning and sanitary maintenance. The receptacles will be maintained in a sanitary condition without the aid of a cover. The solid and liquid waste will be removed of in a manner as to avoid creating a menace to health and often as necessary to maintain a sanitary environment.

## Housekeeping

Working areas will be cleaned up daily. The contractor will provide all personnel and equipment to ensure compliance with all housekeeping requirements. The contractor will inspect the work area daily and record all findings on a daily inspection report to ensure the facility is in compliance. In the location of temporary buildings and yard storage, appropriate care shall be taken for proper separation to preclude an accumulation of fire potential. The contractor is responsible for maintaining the entire area, but particularly storage areas, free from accumulation of unnecessary combustible materials

## Medical and First Aid Requirements

Prior to start of work, arrangements shall be made for medical facilities and personnel to provide prompt attention to the injured and for consultation on occupational safety and health matters. Communication and transportation to effectively care for injured workers shall be provided.

Employees on each shift shall be instructed to administer First Aid and CPR. No employees shall be required to work alone in remote areas.

First Aid kits shall contain at minimum sixteen unit-type first aid packages. First Aid kits comply with Z308.1 constructed or weather proof containers, easily accessible to all workers, and each item therein maintained sterile.

The contents of First Aid kits shall be checked prior to utilization and weekly when work is progress to insure that expended items are replaced.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Tab 13: Standard Health and Safety Plan
## Disaster Debris Clearance and Removal Services

## Temporary Facilities

Plans for the layout of a temporary construction building (field office trailer or mobile command center), fencing, access routes and anchoring systems for the temporary construction building shall be submitted to and approved by the designated government authority. The temporary field office design and construction shall have the following taken in to consideration:

- Dead and live loads
- Soil and hydrostatic pressures
- Wind loads
- Rain and snow loads

The field office shall be anchored with rods and cables or by steel straps to ground anchors. The anchor system shall be designed to withstand winds and must meet applicable state or local standards for anchoring mobile trailer homes.

Temporary project fencing (or a substitute acceptable to the government's designated authority and delineated in the accident prevention plan) shall be provided in areas of active utilization by members of the public. Signs warning of the presence of construction areas shall be posted on the fencing. At a minimum, posting shall be on all fenced sides of the project and spaced on sign every three hundred feet. The contractor shall control access to the construction area. The construction are shall be designated a hard hat area and signage designating it as such shall be posted at any and all points of entry. Official visitors shall wear the required Personal Protective Apparel.

## Personal Protective and Safety Equipment

Employees shall use any personal protective and safety equipment (PPSE) which may be required to maintain their exposure within acceptable limits. The contractor shall ensure that employees receive training in and use and maintain their exposure within acceptable limits. At a minimum demolition phase personnel shall be required to wear clothing suitable for the weather and conditions including long sleeve shirts, long trousers, protective work boots, and head protection. As/if hazards warrant, hearing protection, eye protection, hand protection, and respiratory protection shall be required. Persons handling rough, sharp edged, abrasive materials or here the work subjects the hands to lacerations, punctures, burns, or bruises shall use hand protection. All PPSE shall properly fit the employee. Eye protection equipment shall meet the requirements of ANSI standard Z87-1. Head protection shall meet the requirements of ANSI Z89.1. Employees shall be physically able and medically determined qualified to use the personal protective and safety equipment, which may be required in their job duties. Users of PPSE shall be trained in and knowledgeable of the use, limitations, inspection, and maintained in serviceable and sanitary condition as recommended by the manufacturer. All PPSE shall be inspected regularly and maintained in serviceable and sanitary condition. Defective equipment shall not be used. Before being stored or reissued to another person equipment shall be cleaned, disinfected and repaired.

Chainsaw operators shall be required to wear approved leg (chaps) and foot protection in addition to the mandatory PPSE.

## Fire Prevention

All provisions of the National Fire Prevention Code, the United States Coast Guard Regulations, and any applicable local requirements will be adhered to.

The contractor shall survey all activities and determine which require a hot work permit. Fires and open flames shall not be left unattended. All sources of ignition shall be prohibited within fifty feet of operations with a potential fire hazard: the area will be conspicuously and legibly posted No Smoking or Open Flame. Smoking shall be prohibited in all areas where flammable, combustible materials are stored: No Smoking or Open Flame signs will be posted in all prohibited areas.

Approved fire extinguishers will be placed in each piece of operating equipment following the guidelines set forth in EM 385-1-1. Fire extinguishers shall be approved by a nationally recognized testing laboratory and labeled to identify the listing and labeling

Case 2:26-cv-03945 Document 1-1 Filed 06/09/26 Page 294 of 811



organization and the fire test and performance standard that the fire extinguisher meets or exceeds. Machinery will be equipped with a CO2 or dry chemical fire extinguisher with a minimum UL rating of 5-B:C. General training will be provided by the project supervisor on the use and locations of fire extinguishers. Facility fire extinguishers will be suitably placed, distinctly marked, readily accessible, and maintained in a fully charged and operable condition. A fire extinguisher, rated not less than 20B shall be located not less than twenty-five feet or more than seventy-five feet from any outside flammable liquid storage area.

Flammable liquids shall be kept in closed containers when not in use. Safety cans and other portable containers for flammable liquids have a flash point at or below seventy-three degrees Fahrenheit shall be painted red with a yellow band around the can and the name of the contents legible indicated on the container. Flammable and combustible liquids shall not be stored in areas used for exits, stairways, or safe passage of people. Workers shall carefully guard against any part of their clothing becoming contaminated with flammable or combustible fluids. They will not be allowed to continue to work if their clothing becomes contaminated and must remove or wet down the clothing as soon as possible. No flammable liquid with a flash point below one hundred degrees Fahrenheit shall be used for cleaning purposes or to start or rekindle fires. Areas in which flammable or combustible liquids are transferred in quantities greater than five gallons shall be separated from other operations by at least twenty-five feet or a barrier having a fire resistance of at least one hour. Drainage or other means shall be provided to control spills. During refueling natural ventilation shall be provided to maintain the concentration of flammable vapor at or below 10% of the lower flammable limit.

All storage, handling, and use of flammable and combustible liquids shall be under the supervision of a qualified person. Only approved containers and portable tanks may be used for storage and handling of flammable and combustible liquids. Approved metal safety cans shall be used for handling and use of flammable liquids in quantities greater than one gallon with certain specific exceptions. Flammable or combustible liquids will not be stored in areas used for exits, stairways, or normally used for the safe passage of people. The indoor storage of flammable and combustible liquids will be limited to no more than fifteen gallons. Disposal of combustible waster materials shall be in compliance with environmental laws and regulations.

Vehicles, equipment, materials, and supplies shall not be places so that access to fire hydrants and other fire fighting equipment is obstructed.

During demolition, existing automatic sprinkler systems (if applicable) shall be retained in service as long as reasonable. Modification of sprinkler systems to permit alterations to additional demolition should be expedited so that they system may be returned to service as quickly as possible. Sprinkler control valves shall be checked daily at close of work to ascertain that the protection is in service. The operation of sprinkler control valves is permitted only when approved by the designated authority.

## Machinery and Mechanized Equipment
Before any machinery or mechanized equipment is placed in use, it shall be inspected and tested by a competent person and certified to be in safe operating condition.

Inspections and tests shall be in accordance with manufacturers' recommendations and shall be documented. Records of tests and inspections shall be maintained at the site by the contractor, and shall be made available upon request of the designated authority, and shall become part of the project file. All machinery and equipment shall be inspected daily to ensure safe operating conditions: certified persons will conduct the daily inspections and tests. Tests shall be made at the beginning of each shift during which the equipment is found to be unsafe, or whenever a deficiency which affects the safe operation of equipment is observed, the equipment shall be immediately taken out of service and its use prohibited until unsafe conditions have been corrected. A tag indicating that the equipment shall not be operated and that the tab shall not be removed, shall be placed on the steering wheel.

Case # 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Where required, lockout procedures will be used. The tag will remain in its attached location until it is demonstrated to the individual dead lining the equipment that it is safe to operate. When corrections are complete, the machinery or equipment shall be re-tested and re-inspected prior to being returned to service.

Machinery and mechanized equipment shall be operated only by designated, qualified personnel. Machinery or equipment shall not be operated in a manner that will endanger persons or property, nor shall the safe operating speeds or loads be exceeded. Getting off of any equipment while it is in motion is prohibited. Machinery and equipment shall be operated in accordance with the manufacturers' instructions and recommendations. When the manufacturers' instructions or recommendations are more stringent than the requirements of this manual, the manufacturers' instructions or recommendations shall apply.

Seat belts or equal protection will be provided on each piece of machinery and equipment. Seat belts and anchors meeting the requirements of 49 CFR 571 shall be installed and worn in all motor vehicles. Glass used in windshields or cable shall be safety glass. Equipment operated on the highway shall be equipped with headlights, taillights, brake lights, and back-up lights and turns signals from the front and rear. All equipment with windshields shall be equipped with power wipers. Vehicles that operate under conditions that cause fogging or frosting of the windshields shall be equipped with operable de-fogging or de-frosting devices. Mobile equipment, operating within an off-highway job site not open to public traffic, shall have a service brake system and parking brake system capable of stopping and holding the equipment while fully loaded on the grade of operation. Heavy-duty hauling equipment shall have an emergency brake system, which will automatically stop the equipment upon failure of the service brake system. The emergency brake system shall be manually operated from the cab of the equipment.

Preventative maintenance procedures recommend by the manufacturer shall be followed. All machinery or equipment shall be shut down and positive means taken to prevent its operation while repairs or manual lubrications are being done. For all repairs on machinery or equipment or parts thereof which are suspended or held apart, slings, hoists, or jacks shall also be substantially blocked or cribbed before personnel are permitted to work underneath or between them. End-loader buckets shall be fully lowered or blocked when not in use. All controls shall be in neutral positions with the engines stopped and brakes set, unless work being performed on the machinery requires otherwise. Stationary machinery and equipment shall be placed on a firm foundation and secured before being operated. All work areas in which heavy machinery is being operated shall be illuminated. All vehicles which will be parked or moving slower than normal traffic on haul roads shall have yellow flashing light or four-way flashers from all directions. Equipment shall be shut down prior to and during fueling operations.

Whenever equipment is parked, the parking brake shall be set. Equipment parked on an incline shall have the wheels chocked or track mechanism blocked and the parking set. All equipment left unattended at night, adjacent to a highway in normal use or adjacent to construction areas where work is in progress, shall have lights or reflectors, or barricades equipped with lights or reflectors, to identify the location of the equipment.

No modifications or additions which affect the capacity or safe operation of the machinery or equipment shall be made without the manufacturers' written approval. If such modifications are made, the capacity, operation, and maintenance instruction plates, tags, or decals shall be changed accordingly. In no case shall the original safety factor of the equipment be reduced. Steering or spinner knobs shall not be attached to the steering wheel. All industrial trucks shall meet the requirements of design, construction, stability, inspection, testing, maintenance, and operation, defined in ANSI/ASME B56.1 Safety Standards for Low Lift and High Lift Trucks.

The controls of loaders, excavators, or similar equipment with folding booms or lift arms shall not be operated from a ground position unless so designed. Personnel shall not work or pass under or ride in the buckets or booms or loaders in operation.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 13: Standard Health and Safety Plan
## Disaster Debris Clearance and Removal Services

**DRC**
EMERGENCY SERVICES
*Striking Back.*

All machinery and construction equipment will be equipped with a reverse signal alarm. Reverse signal alarms shall be audible and sufficiently distinct to be heard under prevailing conditions. Reverse signal alarms shall in addition to requirements for signal persons.

All belts, gears, shafts, pulleys, sprockets, spindles, drums, flywheels, chains, or other reciprocating, rotating, or moving parts of equipment shall be guarded when exposed to contact by persons or when they otherwise create a hazard. All hot surfaces of equipment, including exhausts pipes or other lines, shall be guarded or insulated to prevent injury and fire. Substantial overhead protection shall be provided for operators of construction equipment in the form of FOPs and /or ROPs.

## Motor Vehicles

Every person operating a motor vehicle shall possess, at all times while operating such a vehicle, a permit valid for the equipment being operated. No vehicle shall be placed in service until it has been inspected on a scheduled maintenance program. Weekly inspections include the following.

- Service brakes, including trailer brake connections
- Parking System
- Emergency Stopping System
- Tires
- Horns- Backup alarms
- Steering Mechanisms
- Coupling devices
- Seat Belts
- Operating controls
- Safety devices
- Accessories including lights, reflectors, windshield wipers, defrosters, and fire extinguishers.

Records of tests and safety inspections shall be maintained at the site and shall be available on request to the designated authority. Vehicles not meeting safe operating conditions shall be immediately removed from service, its use prohibited until unsafe conditions have been corrected, and re-inspected before being placed in service again. Equipment operated between sunset and sunrise shall have the following lights:

- Two headlights
- At least one red taillight and one red or amber stoplight on each side of the rear.
- Directional signal lights on both front and back.
- Three emergency flares, reflective markers, or equivalent portable warning device.

All vehicles shall be equipped with service brakes and manually operated parking brakes. Service and parking brakes shall be adequate to control the movement of, to stop, and to hold the vehicle under all conditions of service. Service brakes on trailers and semi-trailers shall be controlled from the driver's seat of the prime mover. Braking systems on every combination of vehicles shall be so designed as to be in approximate synchronization on all wheels and develop the required braking effort on the rear wheels first. The design shall also provide for application of the brakes by the driver of the prime mover from the cab. Exceptions to this are vehicles in tow by approved tow-bar hitch. Every motor vehicle shall have:

- Speedometer
- Fuel gauge
- Audible warning device in operation condition
- Windshield and windshield wiper

91

- Operable defrosting and defogging device
- Adequate rearview mirror
- Cabs, cab shields, and other protection
- Non-slip surfaces on steps
- Power operated starting device

Glass in windshields, windows, and doors shall be safety glass. Any cracked or broken glass shall be replaced. Industrial and commercial vehicles shall meet the guarding and safety requirements of EM 385-1-1 Section 16.B.

All dump trucks shall be equipped with a holding device to prevent accidental lowering of the body while maintenance work or inspection work is being done. All hoist levers shall be secured to prevent accidental starting or tripping off of the mechanism. All off-highway end-dump trucks shall be equipped with a means to determine whether or not the dump box is lowered. Minimum emergency equipment required is one red flag not less than 12 inches square with standard and three reflective marks, which shall be available for immediate use in case of emergency stops, two wheel clocks for each vehicle or each unit of a combination of vehicles, at least one 2A:10B:C fire extinguisher.

The principles of defensive driving shall be practices. Seat belts shall be installed and worn per 16.B.08. The operator must have the vehicle under such control as to be able to bring it to a complete stop within the assured clear distances ahead. Vehicles will not be driven at speeds greater than the posted speed limits, with regard for weather, traffic, intersections, width, and character of the roadway, type of motor vehicle, and other existing conditions. Headlights shall be lighted from sunset to sunrise, during fog, smoke, rain, or other unfavorable atmospheric conditions, and at any other time when there is not sufficient light for the vehicle to be seen or for the operator to see on the highway at a distance of five hundred feet. Vehicles shall not be driven on a downgrade with gears in neutral or clutch disengaged.

Drivers of trucks and similar vehicles shall leave the cab while the vehicle is being loaded, when they are exposed to danger from suspended loads or overhead loading equipment. Vehicles shall not be loaded in a manner which obscures the driver's view ahead or to either side or which interferes with the safe operation of the vehicle. The load on every vehicle shall be evenly distributed and tarped (the tarp equipment may be waived only by the Corporate Safety Officer with approval from the Contracting Officer's Representative).

All trucks shall be equipped with the manufacturers' approved tailgates. These gates shall be the "barn-style" gates in lieu of the swinging tailgate that is hinged at the top of the dump body. If vehicles have the swinging tailgate, they may substitute tailgate fencing for the manufacturers' gate. Contractor will not approve fencing that does not have solid metal bars around all four sides of the fence. The following criteria apply to tailgate fencing:

- Attach fencing permanently to one side of truck bed
- After loading, secure fencing to other side of bed in two places with heavy-gauge wire.
- Fencing must extend to the bottom of the bed.
- Solid metal bars shall be used on all four sides on the fence. This will allow the load to be secured without having to tie the bottom of the fence to the bed.

## Debris Reduction Sites

The contractor shall submit a debris reduction plan prepared by a component person based on the engineering for the safe reduction of all debris. Household hazardous materials, to the extent practical shall be removed and disposed of prior to arriving at the debris reduction site. Household hazardous material will be removed by the collection crews and left at a curbside prior to arrival at the dumpsite. Spotters will be employed at the dumpsite to further inspect loads for household hazardous materials. This material will be sorted out and stored in the Field Expedient HTW Containment Cell. Each dumpsite will have a HTW

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tab 13: Standard Health and Safety Plan
## Disaster Debris Clearance and Removal Services



Containment Cell. Dust control shall be performed as the work proceeds and whenever a dust nuisance or hazard is identified. Only those persons necessary for the operations shall be permitted in the debris reduction work area at any time. A 300-foot exclusion zone will be established around all tub grinding equipment. An example site plan is attached. Employees engaged in debris reduction activities shall be instructed in the plan so that they may conduct their activities in a safe manner.

## Debris Collection

Each location where debris collection is done shall be under the direction of a qualified supervisor. Electrical equipment or conductors in the vicinity shall be considered energized. Debris collection equipment shall be inspected, maintained, repaired, and used in accordance with the manufacturers' instructions. All vehicles shall have completed Safety Checklist for Vehicles, completed prior to commencing work. Employees shall be instructed in the safe and proper use of all equipment provided to them. Prior to felling operations, the employee shall consider:

- Trees and the surrounding area for anything that may cause trouble when the trees are loaded.
- Shape of the tree, the lean of the tree, and decayed or weak spots
- Wind force
- Location of people
- Electrical hazards
- Traffic control devices/ personnel

The work area shall be cleared to ensure safe working conditions. Brush and logs shall not be allowed to create a hazard at the work site. Logs and brush shall be securely loaded onto trucks in such a manner as not to obscure tail or brake lights and vision, or to overhang the side.

# Emergency Response Capability and Contingency Plans

Emergency response will be covered at the safety and health indoctrination and continuing training meeting. The plans shall be randomly tested to ensure their effectiveness. Inclusive of these plans and procedures shall be:

- Escape procedures and routes
- Critical plant operations
- Employee accounting following an emergency evacuation
- Rescue and medical duties
- Means of reporting emergencies
- Persons to be contacted for information or clarification

Planning for this operation shall include the total system response capabilities to minimize the consequences of accidents or natural disaster.

On-site emergency planning shall be integrated with off-site emergency support.
Emergency alert systems shall be developed and tested to alert all persons likely to be affected by existing or imminent disaster conditions and to alert and summon the people and equipment compromising the emergency response capability. Emergency telephone numbers and reporting instructions for ambulance, physician, hospital, fire, and police shall be conspicuously posted at the work site. In the unlikely even of an emergency response situation, the following procedures will be implemented:

- Project Manager will be immediately notified
- Project Manager will evaluate the emergency and notify the following agencies, if necessary.
- Client Representatives

93



- Local fire and Police Departments
- Local environmental officials
- Local emergency management personnel
- Residents adjacent to site

When necessary, all personnel will be evacuated from the site and issued additional safety equipment as required. A signal for site evacuation will be established at the onset of site activity.

## Fire, First Aid Emergency and Ambulance Service

911 (APPROPRIATE LOCATION) Fire and Rescue Department

## Prevention of Alcohol and Drug Abuse on the Job

At no time while on duty may employees use or be under the influence of alcohol, narcotics, intoxicants, or similar mind-altering substances. Employees found to be under the influence of or consuming such substances will be immediately removed from the job site. The importance of a drug-free environment will be emphasized. Every safety meeting will include EM-385-1 Section 01.A.02 as part of the instruction.

## Activity Hazard Analysis

Prior to commencement of any single phase of debris collection, site management, or debris reduction activities, the project manager and/or health and safety officer will address the particular concerns associated with the work area. These concerns include:

- Physical hazards- uneven or soft earth roads, stones, exposed power lines, or sources, and any other obvious hazards
- Chemical hazards- emissions/odors, eye or respiratory irritations, and airborne particulate problems
- Traffic and personnel access and egress routes
- Heat Stress
- Cold Stress
- Noise Hazards
- Equipment Hazards
- Other concerns such as weather conditions (lightning, severe wind, etc.)
- A site-specific health and safety plan will be completed for each major area of operation.

DRC has a plan with more policies and procedures that will be available upon request.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DRC**
EMERGENCY SERVICES
*Striking Back.*

## Tab 14: Safety Record
### Disaster Debris Clearance and Removal Services

# SAFETY RECORD

DRC has no warning notifications, violations, and/or citations received from pertinent federal and/or state agencies in the past three (3) years.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT
# 5

**MONTGOMERY COUNTY PURCHASING DEPARTMENT**

19-C.

On the motion of _____, seconded by _____, it was unanimously adopted that:

BACKGROUND

1. The Public Safety Department has solicited Request for Proposal 19-23 for Disaster Debris Clearance and Removal Services for Montgomery County.

2. RFP 19-23 was advertised on www.publicpurchase.com. The RFP was accessed by eighteen (18) providers. Three (3) responses were received.

3. The Public Safety Department recommends entering into a contract with DRC Emergency Services LLC of Galveston, TX with event pricing as per the Logistical Services fee schedule submitted with providers response

**NOW THEREFORE IT IS HEREBY RESOLVED** that the proper County Officials, in accordance with the authority conferred by law, subject to the approval of the County Solicitor, are hereby authorized to enter into a contract with DRC Emergency Services LLC of Galveston, TX, on an as-needed basis.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY**
**BOARD OF COMMISSIONERS**

VALERIE A. ARKOOSH, MD, MPH, Chair
KENNETH E. LAWRENCE, Vice Chair
JOSEPH C. GALE, Commissioner



**DEPARTMENT OF PUBLIC SAFETY**
Montgomery County E.O.C. • 50 Eagleville Road
Norristown, PA 19403
610-631-6500
FAX: 610-631-6536
WWW.DPS.MONTCOPA.ORG

Thomas M. Sullivan
Director

## MEMORANDUM

TO:      Christopher Spearman
         Purchasing

THRU:    Thomas M. Sullivan

FROM:    Michelle Jackson

DATE:    September 26, 2019

SUBJECT: RFP 19-23 Disaster Debris Clearance and Removal Services

---

It is the recommendation of the Department of Public Safety that the County engage DRC for debris management services on a stand-by contract basis.

Attached please find a memo from Jason Wilson, Deputy Director for Emergency Management that details method used to choose this vendor.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY**
**BOARD OF COMMISSIONERS**
**VALERIE A. ARKOOSH, MD, MPH, CHAIR**
**KENNETH E. LAWRENCE, JR. VICE CHAIR**
**JOSEPH C. GALE, COMMISSIONER**



**DEPARTMENT OF PUBLIC SAFETY**
MONTGOMERY COUNTY E.O.C. • 50 EAGLEVILLE ROAD
NORRISTOWN, PA 19403
610-631-6500
FAX: 610-631-6536
WWW.DPS.MONTCOPA.ORG

THOMAS M. SULLIVAN
DIRECTOR

Date:  9/26/2019

To:  Thomas M. Sullivan

Subject:  Debris Management Contract Recommendation

Tom,

After a review of the Debris Management Plan, it has become apparent that Montgomery County does not possess the personnel or equipment necessary to facilitate a large-scale debris management operation resulting from a destructive incident. As such, a contractor will be required to provide the necessary services to ensure proper FEMA reimbursement. The following is a review of the RFP's and recommendation to select a vendor for debris management services on a no cost stand-by basis.

The reviewed RFP's included the following services in debris management:

- Eligible disaster debris removal from roadways and public right of ways (ROW)
- Transportation of eligible disaster debris
- Debris Management Site (DMS) coordination and operation
- Debris reduction and grinding – including haul out to final disposal sites
- Completion of FEMA paperwork required for reimbursement

The RFP's were compared by debris management services listed by cost per yard, cost per hour and added services such as training and exercise involvement and incident pre-planning. The contract allows for pre-deployment of contractor / vendor resources based upon severe weather forecasts and need determined by the County. Depending upon the scope of an incident, the Debris Management Plan activation would require several DMS locations to be opened within the County. MCDPS along with other County departments would be responsible for providing a designated representative at each DMS and debris loading site to ensure that unauthorized debris is not entering the system and load numbers are accurate. In addition, MCDPS would be responsible for coordinating DMS activities with municipalities and promoting debris management activities.

Costs incurred by the County by activating this contract would include debris removal, debris hauling, debris site management, debris management site equipment rental, debris reduction activities and FEMA reimbursement activities. Ultimately up to 75% of the cost of debris removal costs incurred by the County will be reimbursed after a Presidential Disaster Declaration. The cost includes a 25% match by the County which is often waived during disasters for complete reimbursement.

To give the vendor cost comparison contrast, the Debris Management Plan scenarios were used to determine debris amounts generated by different types of storms. The ice storm and hurricane

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

scenarios selected represent a medium probability of occurrence with a high volume of debris that would overwhelm the capabilities of the municipalities and County.

For example, an ice storm with an SPIA Index (Sperry-Plitz Ice Accumulation Index) of 3 would generate 556,000 yards of debris throughout the County with extensive tree / limb damage and power disruption of up to 5 days. This represents an ice storm comparable to that of 2014. A Category 1 hurricane impact would generate 684,000 yards of debris throughout the County with extensive tree, structure and infrastructure damage.

### Vendor / Contractor Cost Comparison Estimate

| Ice Storm Scenario | | | |
|---|---|---|---|
| **Vendor** | **Debris Removal Cost per Yard – Vegetative** | **Debris Estimate** | **Estimated Cost** |
| DRC | $9.95 | 556,000 Yards | $5,532,200 |
| CERES | $11.98 | 556,000 Yards | $6,660,880 |

| Category 1 Hurricane Scenario | | | |
|---|---|---|---|
| **Vendor** | **Debris Removal Cost per Yard** | **Debris Estimate** | **Estimated Cost** |
| DRC | $9.95 - Vegetative | 513,000 yards Veg | $5,104,350 |
| | $10.25 – C&D | 171,000 yards C&D | $1,752,750 |
| **Total** | | | $6,857,100 |

| | | | |
|---|---|---|---|
| CERES | $11.98 | 513,000 yards Veg | $6,145,740 |
| | $11.99 | 171,000 yards C&D | $2,050,290 |
| **Total** | | | $8,196,030 |

CERES and DRC act as general contractors that subcontract work for hauling and sorting debris. Each have agreements with local subcontractors who will begin the debris management process as soon as requested. As the debris management operation grows, the general contractor will provide professional staffing to assist with debris site coordination, paperwork completion and will provide an EOC liaison. Additionally, company owned equipment will be available to supplement local resources for hauling and debris site operations.

When comparing the proposals, it became apparent that DRC offers more in terms of resources and personnel. In addition to debris management resources, DRC also has temporary shelters, satellite communications trailers, refrigerated containers and large portable generators available through the proposed agreement at an additional cost per hour or day. As a part of the proposal, DRC will also provide orientation training and participate in debris management related exercises at no additional cost.

Based upon the comparison of the RFP's provided by DRC and CERES, it is my recommendation to engage DRC for debris management services on a stand-by contract basis.

Let me know if you have any questions.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully,


Jason R. Wilson
Deputy Director for Emergency Management
Montgomery County Department of Public Safety

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT
# 6

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Montgomery County RFP 21-43
# Public Safety
# Debris Management Monitoring Firm

## PURPOSE:

The County of Montgomery is soliciting sealed proposals to provide a no-cost standby contract with a Disaster Debris Monitoring Services to complement activation of the current Debris Management Plan and to work alongside the County's Debris Removal Contractor. Upon activation, the potential monitoring firm will deploy staff to support truck certification, collection, and disposal monitoring functions. The potential monitoring firm will orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract requirements, and safety procedures. Collection monitors must carefully document debris collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement.

## SCOPE OF WORK:

This Scope of Work (SOW) provides for the delivery of comprehensive Debris Monitoring Services. Debris Monitoring Services must include, but should not be limited to, the following:

- Deploy staff to support truck certification, collection, and disposal monitoring functions.
- The potential monitoring firm will orient employees with operational procedures and familiarize staff with the field-training program on current debris removal eligibility, FEMA requirements, County debris removal contract requirements, and safety procedures.
- Collection monitors must carefully document debris collection information to demonstrate eligibility and ensure proper debris removal contractor payments and FEMA reimbursement. The documentation should include:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# PROJECT TIMELINE:

Given the cooperation of all related subject matter experts, a draft plan should be delivered to the Montgomery County Director of Public Safety within 60 days of the execution of the contract. The contracted vendor will coordinate and manage subsequent meetings related to updating and finalizing the plan. The final plan must be completed and delivered to the Montgomery County Director of Public Safety within six months of contract execution.

# PROPOSAL FORMAT:

Proposers must succinctly respond in the format delineated below. Elaborate, irrelevant, or otherwise unnecessary information will not be considered.

The following information should be tabbed to identify the required information. Failure to submit this information may render your proposal non-responsive.

# QUALIFICATIONS OF THE FIRM:

A. Provide a description and history of the firm focusing on previous governmental experience. Firm qualifications must include, at minimum, the following:
   i. Recent experience demonstrating current capacity and current expertise in debris removal, solid waste and hazardous waste management and disposal.
   ii. Documented knowledge and experience coordinating with Federal, State and Local emergency agencies.
   iii. Experience representing local governments with various state and federal funding sources and reimbursement processes
   iv. Experience with special disaster recovery program management services including private property/right-of-entry (ROE) work, roadway right of way and drainage channel clean-up and reimbursement, leaning tree and hanging limb removal, hazardous material removal, asbestos abatement, data management, and hauler invoice reconciliation and contracting, and FEMA appeals assistance.
B. Provide, at a minimum, three (3) references for which the firm has performed services within the past five (5) years that are similar to the requirements in the Scope of Services. Provide the reference contact name, address, e-mail address, telephone numbers and date of the contract.
C. The selected firm must be willing to contract for a payment schedule that could require a six-month payment processing time.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# QUALIFICATIONS OF STAFF:

Provide an organizational chart, resumes, and summary of staff qualifications. Key project staff (management staff including, but not limited to: project manager, monitoring operations managers, FEMA reimbursement specialist, data manager, etc.) should be full time employees of the proposing firm and have experience, working for the Proposer, in the following:

A. Experience demonstrating current capacity and current expertise in debris removal, solid waste and hazardous waste management and disposal.

B. Documented knowledge and experience of Federal, State and Local emergency agencies, state and federal programs, funding sources and reimbursement processes.

C. Experience with special disaster recovery program management services including Debris Site Management regulations and operations.

D. Debris monitors should have experience working on construction sites and be familiar with safety regulations. It is not necessary to have professional engineers or other certified professionals perform the monitoring duties.

## TECHNICAL APPROACH:

Provide a description of the Proposer's approach to the project, to include oversight of debris recovery operations, management of the debris recovery contractors, and billing/invoices reporting procedures to FEMA and the County. More specifically, Proposers should be sure to include information describing their Automated Data Management System, including GPS tracking system capability used to track collection progress.  These systems should provide County the ability to remotely monitor status and location "live".

A detailed description of the Proposer's Deployment Timeline is also requested. From the time of notification of activation to being fully operational, please describe your process steps and associated timeline.

## COST PROPOSAL:

Each Proposer must complete and submit the Cost Proposal Form/Fee Schedule included herein. The Cost Proposal will be evaluated on the hourly rates submitted on the cost proposal form for the labor positions listed. All non-labor projected costs will be billed to the County at cost without markup. All Per Diem Expenses shall be billed directly to the County at a rate not to exceed the GSA Per Diem Allowance for the project area.

## OTHER INFORMATION:

Proposer shall include a draft contract with the RFP submission. The contract must meet all contracting requirements of 2 CFR 200 and FEMA. Furthermore, all attachments should be completed and included in the RFP submission. Submittal requirements include:
- Proof of Insurance
- W-9
- DUNS Number
- Attachment A: Cost Proposal Form
- Attachment B: Hourly Rate Schedule
- Attachment C: Non-Collusion Affidavit
- Attachment D: Certification Regarding Lobbying
- Attachment E: Certification Regarding Debarment, Suspension, and Other Responsibility Matters
- Attachment F: MOB/WOB/Section 3 Business (if Applicable)
- Attachment G: Conflict of Interest Certification

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Attachment A: Cost Proposal Form

## DISASTER DEBRIS MONITORING SERVICES

### Montgomery County, Pennsylvania

**Name of Firm:** _____

**Address:** _____

**City, State, Zip:** _____

**Telephone:** _____

**Fax:** _____

**Contractor's License Number:** _____

**Authorized Signature:** _____ (provide evidence of signing authority)

**Name and Title:** _____

# Attachment B: Hourly Rate Schedule

Name of Business: _____

Contact Person: _____

Email Address: _____

Authorized Signature: _____

|     | Positions | Hourly Rates* | Hours** | Total |
| --- | --- | --- | --- | --- |
| 1.  | Project Manager | $ | | $ |
| 2.  | Data Manager | $ | | $ |
| 3.  | Cost Recovery Specialist | $ | | $ |
| 4.  | Field Supervisors | $ | | $ |
| 5.  | Fixed Site Monitors | $ | | $ |
| 6.  | Supervising Monitors | $ | | $ |
| 7.  | Field Monitors | $ | | $ |
| 8.  | Environmental Specialist | $ | | $ |
| 9.  | GIS Specialist | $ | | $ |
| 10. | Billing/Invoice Analysts | $ | | $ |
| 11. | Administrative Assistants | $ | | $ |

*Any over time will be billed at the hour rate time 1.5. Over time is not to be included in the rates above.

**These hours are not intended to represent the actual contract amount but are an estimate representation of a typical work week. The actual contract value will be negotiated with the successful proposing agency prior to issuance of the notice to proceed for each event.

**This document must be completed and returned with your Submittal**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Attachment C: Non-Collusion Affidavit

The following affidavit **MUST** accompany your response to this proposal.

COUNTY OF _____ )

STATE OF _____ )

AFFIDAVIT

I, _____, declare under oath, under penalty of perjury, That I am lawfully qualified and acting officer and/or agent of _____(Firm's Name)

*and that:*

1. That the affiant has not been party to any collusion among proponents in restraint of freedom of competition by agreement to propose at a fixed price or to refrain from making a proposal; or with any official of the state or political subdivision of the State, including Montgomery County, Pennsylvania, as to quantity, quality, or price in the matter of the attached proposal, or any other terms of said prospective contract; or in any discussions between proponents and any official of the state, including Montgomery County, Pennsylvania, concerning the exchange of money or other thing of value for special consideration in the letting of a contract and,

2. _____ (Firm's Name), has not pled guilty to or been convicted of a felony charge for fraud, bribery, or corruption involving sale of real or personal property to any state or any political subdivision of a state.

3. That no person, firm, corporation subsidiary, parent, predecessor, or other entity affiliated with or related to has been convicted of a _____ (Firm's Name) felony charge for fraud, bribery, or corruption relating to sale of real or personal property to any state or political subdivision of a state.

_____

(Officer or Agent)

Subscribed and sworn to before me this _____ day of _____, _____ .

(SEAL)

_____

*My Commission Expires*                    *Notary Public*

# Attachment D: Certification Regarding Lobbying

The undersigned certifies, to the best of his or her knowledge and belief, that:

1.  No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3.  The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

| Signature | |
| --- | --- |
| Printed Name | |
| Position | |
| Date | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Attachment E: Certification Regarding Debarment, Suspension, and Other Responsibility Matters

In accordance with 2 CFR Part 2424 and 24 CFR Parts 5, 6, et al (US Department of Housing and Urban Development: Implementation of OMB Guidance on Debarment and Suspension; Final Rule) the Respondent certifies, to the best of his or her knowledge and belief, that:

1. No employee of the Respondent who will materially participate in the Respondent's delivery of labor or work product under this RFP is currently suspended or debarred under the applicable laws or regulations in effect on the date of certification;

2. No sub-contractor, partner or other party who will materially participate in the Respondent's delivery of labor or work product under this RFP is currently suspended or debarred under the applicable laws or regulations in effect on the date of certification.

3. The undersigned Respondent shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

| | |
|---|---|
| Signature | |
| Printed Name | |
| Position | |
| Date | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Attachment F: MOB/WOB/Section 3 Business (if Applicable)

Instructions: If the Respondent is a Minority Owned Business (MOB) or Women Owned Business (WOB) or qualifies as a Section 3 business, the Respondent completes Form F.1. If the Respondent intends to utilize a MOB/WOB or Section 3 business in the performance of the proposed contract, the respondent completes Form F.2

## F.1: CERTIFICATION AS A MINORITY OWNED, WOMENOWNED OR SECTION 3 BUSINESS

I, _____ certify that _____ is a Minority Owned, Women Owned or Section 3 Business.

| Business Registered Name | |
|---|---|
| Business Registered Address 1 | |
| Business Registered Address 2 | |
| State of Registration | |
| Certificate or Registration Number | |
| Certifying Agency | |

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. The County reserves the right to withdraw or terminate the proposed contract should the representation of fact be false.

| Bidder Name | |
|---|---|
| Signature | |
| Printed Name | |
| Position | |
| Date | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# F.2: STATEMENT OF INTENT OF MOB/WOB/SECTION 3 UTILIZATION

I, _____ certify that _____ will utilize Minority Owned Business (MOB) or Women Owned Business (WOB) as subcontractor(s), vendor(s), supplier(s), or professional service(s). The **estimated dollar value** of the amount that we plan to pay the MOB or WOB subcontractor(s), vendor(s), supplier(s), or professional service(s) is $ _____

| Description of Work | MOB Amount | WOB Amount | Section 3 Amount | Name of MOB/WOB/Section 3 |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. The County reserves the right to withdraw or terminate the proposed contract should the representation of fact be false

| | |
|---|---|
| Signature | |
| Printed Name | |
| Position | |
| Date | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Attachment G: Conflict of Interest Certification

In accordance with 24 CFR 85.36(b)(3) the Bidder certifies that no member, officer, or employee of the County or its designees or agents, no member of the governing body of the County of Montgomery in which the program is situated, and no other public official of the County who exercises any functions or responsibilities with respect to the program during his tenure or for one year thereafter, has any interest, direct or indirect, in any contract or subcontract, or the proceeds thereof for work to be performed in connection with the program assisted under the Agreement. The Bidder shall incorporate, or cause to be incorporated, in all subcontracts, a provision prohibiting such interest pursuant to the purposes of Section 24 CFR part 85.36 (3). This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

| | |
|---|---|
| Signature | |
| Printed Name | |
| Position | |
| Date | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 7

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Public Assistance Program and Policy Guide

## Version 4, Effective June 1, 2020

(FP 104-009-2)



FEMA

# TABLE OF CONTENTS

Page Numbers

FOREWORD ................................................................................................................ 12

LIST OF CHANGES AND CLARIFICATIONS GROUPED BY GENERAL TOPIC .............. 12

INTRODUCTION ........................................................................................................ 17

   I.    Public Assistance Program Overview ................................................................. 17

   II.   Authorities ....................................................................................................... 17
       A.  Statutes .................................................................................................... 17
       B.  Regulations .............................................................................................. 18

   III.  Document Purpose and Use .............................................................................. 18

   IV.  Scope ............................................................................................................... 19

   V.   Applicability .................................................................................................... 19

   VI.  Document Management and Maintenance .......................................................... 19

CHAPTER 1:  PRE-AWARD ACTIVITIES ................................................................ 21

   I.    Preliminary Damage Assessment ...................................................................... 21

   II.   Declaration Request .......................................................................................... 21

   III.  Declaration Evaluation ..................................................................................... 22
       A.  State and Territorial Governments ............................................................ 22
       B.  Tribal Governments ................................................................................. 23

   IV.  Presidential Declaration ................................................................................... 23
       A.  Type of Incident ...................................................................................... 24
       B.  Incident Period ........................................................................................ 24
       C.  Designated Areas ..................................................................................... 24
       D.  Types of Assistance ................................................................................. 24
       E.  Federal Cost Share ................................................................................... 25

   V.   Recipient Administrative Requirements ............................................................. 26
       A.  Application for Federal Assistance ........................................................... 26
       B.  FEMA-State/Territory/Tribe Agreement ................................................... 26
       C.  Payment Management System .................................................................. 27
       D.  Administrative Plan ................................................................................. 27

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

E.   Hazard Mitigation Plan.................................................................27

CHAPTER 2:   OPERATIONAL COORDINATION .........................................29

I.   Operational Priorities .................................................................30
A.   Community Lifelines.............................................................30
B.   Incident Action Plan............................................................30

II.   Response and Recovery Coordination ...............................................31
A.   Response Coordination........................................................31
B.   Recovery Coordination........................................................32
1.   Field Operations.........................................................32
C.   Public Assistance Coordination and Planning...........................33

CHAPTER 3:   APPLICANT COORDINATION AND ELIGIBILITY .....................35

I.   Public Assistance Web-based Systems ...............................................35

II.   Applicant Briefing .....................................................................36

III.   Request for Public Assistance.........................................................36

IV.   Written Correspondence ..............................................................37

V.   Eligibility Determinations.............................................................38
A.   Requests for Information.....................................................38
B.   Notification of an Ineligibility Determination...........................38
C.   Appeal Rights and Requirements ...........................................39
1.   Appeal Deadlines.........................................................39
2.   Appeal Content ...........................................................40
3.   Appeal Review ............................................................40
4.   Appeals for Alternative Procedures Projects......................41
D.   Arbitration ......................................................................41

VI.   Applicant Eligibility...................................................................42
A.   State and Territorial Governments .........................................42
B.   Tribal Governments ...........................................................42
C.   Local Governments ...........................................................42
D.   Private Nonprofit Organizations...........................................43
1.   Private Nonprofit Critical Services ..................................45
2.   Private Nonprofit Essential Social Services........................46
3.   Private Nonprofit Ineligible Services ...............................47
4.   Private Nonprofit Application Documentation Requirements ...47

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

VII. Exploratory Call ................................................................................................ 48

VIII. Recovery Scoping Meeting ............................................................................... 49

CHAPTER 4:   GENERAL WORK AND FACILITY ELIGIBILITY ...................................... 51

I.   General Work Eligibility ................................................................................... 51
   A.   Categories of Work ..................................................................................... 51
   B.   Minimum Work Eligibility Criteria ........................................................... 51
      1.   Result of Declared Incident ................................................................ 51
      2.   Within Designated Area ...................................................................... 52
      3.   Legal Responsibility ........................................................................... 52
   C.   Environmental and Historic Preservation Requirements ............................ 54

II.   Facility Eligibility ............................................................................................ 55
   A.   Public Facility ............................................................................................ 56
   B.   Private Nonprofit Facility ........................................................................... 56
      1.   Mixed-Use Facility ............................................................................. 56
      2.   Small Business Administration Loan Requirement ............................. 57
   C.   Inactive or Partially Inactive Facility ......................................................... 58
   D.   Facility Scheduled for Repair or Replacement ........................................... 59

CHAPTER 5:   DAMAGE AND IMPACT INFORMATION ................................................. 60

I.   List of Impacts ................................................................................................. 60

II.   Grouping Impacts into Projects ........................................................................ 61
   A.   Initial Emergency Work Grouping .............................................................. 61
   B.   Initial Permanent Work Grouping ............................................................... 61
   C.   Final Grouping ........................................................................................... 63

III.   Site Inspections and Obtaining Damage Information ......................................... 63
   A.   Damage Information .................................................................................... 63
   B.   Site Inspections .......................................................................................... 64

CHAPTER 6:   COST ELIGIBILITY ............................................................................. 65

I.   Reasonable Costs ............................................................................................. 65
   A.   Analysis ..................................................................................................... 65

II.   Applicant (Force Account) Labor ...................................................................... 68
   A.   Labor Policies ............................................................................................ 69
   B.   Eligibility Criteria Based on Type of Employee and Work Performed ......... 69
      1.   Reassigned Employees ....................................................................... 70
      2.   Reassigned Employees Funded from an External Source ................... 70
      3.   Backfill Employees ............................................................................. 70
      4.   Essential Employees Called Back from Furlough ............................... 71

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5.  Supervisors ........................................................................................... 71
6.  Other ..................................................................................................... 71
7.  Standby Time ....................................................................................... 71

III.  Applicant-Owned and Purchased Equipment ....................................... 72
A.  FEMA Rates .......................................................................................... 73
B.  State, Territorial, or Tribal Rates ......................................................... 73
C.  Local Rates ........................................................................................... 73
D.  Equipment with No Established Rate .................................................... 73

IV.  Leased Equipment ................................................................................... 74

V.  Supplies ................................................................................................... 74

VI.  Disposition of Purchased Equipment and Supplies ............................... 75
A.  Disposition of Purchased Equipment .................................................... 75
B.  Disposition of Purchased Supplies ........................................................ 76

VII.  Disposition of Real Property ................................................................... 76

VIII. Procurement and Contracting Requirements ........................................ 76
A.  Procurement and Contracting Requirements for State and Territorial Government Entities .................................................................................. 77
1.  Procurement ........................................................................................ 77
2.  Contracting .......................................................................................... 77
B.  Procurement and Contracting Requirements for Tribal and Local Government Agencies and Private Nonprofits ........................................ 78
1.  Pre-procurement Considerations ........................................................ 78
2.  General Federal Procurement Requirements ...................................... 78
3.  Procurement Methods ......................................................................... 80
4.  Contract Types .................................................................................... 82
5.  Additional Contracting Considerations .............................................. 83
C.  Required Contract Clauses ................................................................... 84
D.  Documentation Requirements .............................................................. 85

IX.  Mutual Aid ............................................................................................... 85
A.  Post-Incident Agreements .................................................................... 86
B.  Eligibility .............................................................................................. 86

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

X.    Prisoners ................................................................................................................ 87

XI.   National Guard ....................................................................................................... 87

XII.  Direct Federal Assistance ..................................................................................... 88

XIII. Increased Federal Cost Share for a Limited Timeframe ....................................... 88

XIV.  Donated Resources ............................................................................................... 88
      A.   Offset Amounts ............................................................................................. 90
      B.   Documentation Requirements ....................................................................... 91

XV.   Project Management and Design Services ............................................................. 92

XVI.  Grant Management and Administration ................................................................ 92

XVII.       Surveys to Assess or Locate Damage or Debris Impacts ................................ 92

XVIII.      Duplication of Benefits .................................................................................... 93
      A.   Insurance Proceeds ....................................................................................... 93
      B.   Non-Federal Grants and Cash Donations ...................................................... 94
      C.   Third-Party Liability ..................................................................................... 95
      D.   Other Federal Awards ................................................................................... 95

XIX.  Duplication of Funding Between FEMA Programs ............................................... 95

XX.   Interest on Loans ................................................................................................... 96

XXI.  Ineligible Costs ..................................................................................................... 96
      A.   Loss of Revenue ............................................................................................ 96
      B.   Loss of Useful Service Life ........................................................................... 96
      C.   Tax Assessments ........................................................................................... 96
      D.   Increased Operating Costs ............................................................................ 96

CHAPTER 7:  EMERGENCY WORK ELIGIBILITY ................................................... 97

I.    Debris Removal (Category A) ................................................................................ 99
      A.   Alternative Procedures for Debris Removal ................................................. 101
      B.   Hazardous Limbs, Trees, and Stumps .......................................................... 101
           1.   Broken Limb or Branch Removal .......................................................... 102
           2.   Tree Removal ......................................................................................... 102
           3.   Stump Removal ...................................................................................... 102
           4.   Documentation Requirements for Hazardous Limbs, Trees, and Stumps ......... 103
      C.   Waterways ..................................................................................................... 103
           1.   Navigable Waterways ............................................................................ 104
           2.   Non-navigable Waterways, Including Flood Control Works and Natural
                Waterways ............................................................................................. 104

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3.  Identifying Debris Impact Locations ........................................................... 105
D.  Privately Owned Vehicles and Vessels on Public Property ................................. 105
E.  Disposal ....................................................................................................... 105
    1.  Recycling Revenue ................................................................................. 105
    2.  Temporary Staging Sites ......................................................................... 106
    3.  Hand-Loaded Trucks and Trailers ............................................................ 106
    4.  Landfills and Tipping Fees ...................................................................... 106
F.  Monitoring Contracted Debris Removal Operations ......................................... 107
G.  Debris Removal from Private Property ............................................................ 107
    1.  Approval Process ................................................................................... 108
    2.  Removal from Private Roads ................................................................... 108
    3.  Removal from Private Residential Property .............................................. 109
    4.  Removal from Commercial Property (Requires FEMA's Pre-approval) ......... 109
    5.  Duplication of Benefits ........................................................................... 109

II.  Emergency Protective Measures (Category B) ..................................................... 110
A.  Saving Lives and Protecting Public Health and Safety ...................................... 110
B.  Protecting Improved Property ....................................................................... 111
C.  Emergency Protective Measures on Private Property ........................................ 112
D.  Emergency Protective Measures Conducted by Private Nonprofit Organizations . 112
E.  Pre-positioning Resources ............................................................................. 113
F.  Expenses Related to Operating a Facility or Providing a Service ........................ 113
G.  Emergency Public Transportation and Communication (DFA only) .................... 114
H.  Flood Fighting ............................................................................................. 114
I.  Emergency Operations Centers ..................................................................... 115
J.  Emergency Access ........................................................................................ 115
K.  Hazardous Materials ..................................................................................... 116
L.  Supplies and Commodities ............................................................................ 116
M.  Meals .......................................................................................................... 117
N.  Medical Care ............................................................................................... 117
O.  Evacuation and Sheltering ............................................................................. 119
    1.  Evacuation ............................................................................................ 119
    2.  Sheltering .............................................................................................. 120
    3.  Childcare Services .................................................................................. 124
    4.  Host-State or Host-Tribe Evacuation and Sheltering .................................. 124
P.  Infectious Disease Incident ........................................................................... 126
Q.  Mosquito Abatement .................................................................................... 126
R.  Residential Electrical Meter Repair ................................................................ 126
S.  Safety Inspections ........................................................................................ 127
T.  Animal Carcasses ......................................................................................... 128
U.  Demolition of Private Structures ................................................................... 128
    1.  Conditions for Eligibility ........................................................................ 128
    2.  Commercially Owned Structures .............................................................. 129
    3.  Eligible Work ........................................................................................ 129
    4.  Ineligible Work ...................................................................................... 130
V.  Temporary Relocation of Essential Services .................................................... 130

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1. Eligible for Temporary Relocation:...................................................130
2. Ineligible for Temporary Relocation .............................................131
3. Determining Eligibility of Temporary Relocation ........................131
4. Lease, Purchase, or Construct ......................................................131
5. Safe Rooms for Temporary School Facilities ...............................132
6. Temporary Relocation Costs ........................................................132
7. Time Limitations ..........................................................................133
8. Disposition Requirements ............................................................134
W. Snow-Related Activities........................................................................134
1. Limited Time Period......................................................................134
2. Eligible Work ...............................................................................135
X. Emergency Repair or Stabilization.......................................................135
1. Operation Blue Roof (DFA Only)................................................135
2. Slope Stabilization .......................................................................136
3. Mold Remediation ........................................................................136
4. Emergency Berms on Beaches .....................................................137

III.  Damage Caused During Performance of Emergency Work .........................138

CHAPTER 8:  PERMANENT WORK ELIGIBILITY.............................................140

I.  Environmental and Historic Preservation Considerations ..........................141

II.  Requirement to Obtain and Maintain Insurance ........................................144
A.  Insurance Reductions and Impact on Facility Eligibility in Subsequent Disasters . 145

III.  Codes and Standards....................................................................................145
A.  Eligibility Criteria..............................................................................145
1.  Applies to the Type of Restoration Required ..............................145
2.  Appropriate to Pre-disaster Use..................................................146
3.  Reasonable....................................................................................146
4.  Written, Formally Adopted, and Implemented............................147
5.  Applies Uniformly........................................................................148
6.  Enforced .......................................................................................148
B.  FEMA Consensus-Based Codes, Specifications and Standards...........149
C.  Ineligible Upgrades ..........................................................................149
D.  Historic Preservation Compliance ...................................................149
1.  Federal Requirement ....................................................................149
2.  State, Territorial, or Tribal Government Requirement.................149
E.  Floodplain Management and Wetland Protection .............................149
F.  Requirement for Communities Participating in the National Flood Insurance Program ....................................................................................................151
G.  Accessibility for Individuals with Disabilities .................................151
H.  Permit Requirements .........................................................................153

IV.  Hazard Mitigation ......................................................................................153
A.  Public Assistance Hazard Mitigation ...............................................154

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

B. Public Assistance Mitigation Funds for Capped Projects ...................................... 156
  1. Improved Project ....................................................................... 156
  2. Alternate Project ....................................................................... 156
  3. Alternative Procedures Project ....................................................... 156

V. Repair vs. Replacement ............................................................................ 157
  A. Calculation.................................................................................. 157
  B. Written Request ........................................................................... 158
  C. Eligible Funding .......................................................................... 158
  D. Replacement of Components of a Facility or System ............................... 159

VI. Relocation ........................................................................................... 160
  A. Eligible Work and Funding ............................................................. 161
  B. Sale or Lease of Property at Original Site ........................................... 161

VII. Facility Located in or Impacting a Floodplain.............................................. 161
  A. 8-Step Decision-making Process...................................................... 162
  B. Facility Located in a Special Flood Hazard Area................................... 162
    1. National Flood Insurance Program............................................. 162

VIII. Capped Projects ................................................................................... 163
  A. Capped Project Funding ................................................................ 164
  B. Use of Capped Project Funds .......................................................... 164
    1. Use of Alternative Procedures Project Funds................................. 165
    2. Use of Improved Project Funds................................................. 166
    3. Use of Alternate Project Funds................................................. 167
  C. Disposition of Original Facility ....................................................... 168

IX. Eligibility Considerations by Facility ........................................................ 168
  A. Roads and Bridges (Category C)...................................................... 168
    1. Maintenance ....................................................................... 169
  B. Water Control Facilities (Category D) ............................................... 170
    1. Restoring the Capacity of Channels, Basins, and Reservoirs............... 171
    2. Flood Control Works............................................................. 171
  C. Buildings and Equipment (Category E) .............................................. 171
    1. Buildings........................................................................... 172
    2. Equipment and Supplies......................................................... 172
    3. Files ................................................................................ 173
    4. Research-Related Contents....................................................... 173
    5. Animals............................................................................. 173
    6. Irreplaceable Collections and Individual Objects........................... 175
    7. Library Books and Publications ................................................ 176
  D. Utilities (Category F).................................................................... 176
    1. Right-of-Way Clearance.......................................................... 176
    2. Power: Transmission and Distribution System Conductor Replacement ........ 177
  E. Parks, Recreational, Other (Category G)............................................. 179

1.  Beaches ................................................................................................ 180

F.  Landslides and Slope Stabilization ........................................................... 181

CHAPTER 9:  SCOPE OF WORK AND COST DEVELOPMENT ................................... 183

I.  Scope of Work Development ......................................................................... 183

II.  Cost Development ....................................................................................... 183

A.  Project Thresholds ................................................................................ 183
B.  Expedited Projects for Emergency Work .................................................. 184
C.  Costs for Projects with All Work Completed ............................................ 185
D.  Estimating Emergency Work Projects with Work to be Completed ............ 186
E.  Estimating Permanent Work Projects with Work to be Completed ............ 186
1.  Projects Requiring Engineering Analysis ............................................ 186
2.  Applicant Estimates ......................................................................... 187
3.  FEMA Estimates .............................................................................. 187
4.  Expert Panel Review ........................................................................ 187
5.  Insurance Reductions ....................................................................... 188
6.  Fixed-Cost Offer for Alternative Procedures Projects ......................... 188

III.  Compliance Reviews .................................................................................. 189

CHAPTER 10: OBLIGATION AND RECOVERY TRANSITION ..................................... 190

I.  Final Review and Obligation ........................................................................ 190

A.  Recipient Review .................................................................................. 190
B.  Final Review ........................................................................................ 190
C.  Obtaining Funds ................................................................................... 190

II.  Recovery Transition Meeting ....................................................................... 191

III.  Transition Field Operation to Regional or Recovery Office ............................. 191

CHAPTER 11: POST AWARD MONITORING ........................................................... 193

I.  Large Project Quarterly Progress Reports .................................................... 193

II.  Financial Status Reports ............................................................................. 193

III.  Federal Funding Accountability and Transparency Act ................................... 194

IV.  Post Award Change in Scope of Work ........................................................... 194

A.  Scope of Work Changes on Permanent Work Alternative Procedures Projects ..... 195

V.  Work Completion Deadlines ........................................................................ 196

VI.  Audits ....................................................................................................... 197

A.  Single Audits ....................................................................................... 198

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

B.  Government Accountability Office ...................................................................... 198
C.  Office of the Inspector General ......................................................................... 198
D.  Recovery of Improper Payments ....................................................................... 198

CHAPTER 12: FINAL RECONCILIATION AND CLOSEOUT ............................................199

I.  Project Reconciliation and Closeout.......................................................................... 199
A.  Small Projects.................................................................................................... 199
B.  Large Projects ................................................................................................... 200
C.  Alternative Procedures Permanent Work Projects ........................................... 202
D.  Subrecipients ..................................................................................................... 202

II.  Stafford Act Section 705.......................................................................................... 203

III.  Public Assistance Award Closeout ......................................................................... 203

IV.  Documentation Retention Requirements ................................................................ 203

ABBREVIATIONS AND ACRONYMS.................................................................................204

REFERENCES AND RESOURCES .....................................................................................207

TERMS AND DEFINITIONS ..............................................................................................213

APPENDIX A: ENVIRONMENTAL AND HISTORIC PRESERVATION COMPLIANCE..221

APPENDIX B: PRIVATE NONPROFIT FACILITY ELIGIBILITY EXAMPLES.................227

APPENDIX C: WELDED STEEL MOMENT FRAME .........................................................230

APPENDIX D: FREQUENT COMPLIANCE ISSUES WITH COOPERATIVE PURCHASING
            PROGRAMS.................................................................................................232

APPENDIX E: STUMP CONVERSION TABLE .................................................................233

APPENDIX F: HAZARDOUS STUMP WORKSHEET........................................................235

APPENDIX G: MOSQUITO ABATEMENT.........................................................................236

APPENDIX H: SNOW ASSISTANCE.................................................................................238

APPENDIX I: MOLD REMEDIATION................................................................................240

APPENDIX J: COST-EFFECTIVE PUBLIC ASSISTANCE HAZARD MITIGATION
            MEASURES.................................................................................................242

APPENDIX K: CONTRACT PROVISIONS ........................................................................247

APPENDIX L: VALIDATION OF APPLICANT-PROVIDED COST ESTIMATES .............260

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

APPENDIX M: ALTERNATIVE PROCEDURES FOR PERMANENT WORK ..................... 263

APPENDIX N: WORK ELIGIBILITY CONSIDERATIONS BY TYPE OF FACILITY ........ 265

**FIGURES**

Figure 1. PA Program Delivery Process ................................................................................. 19
Figure 2. Map of FEMA Regions ........................................................................................... 37
Figure 3. PA Eligibility Pyramid ............................................................................................ 38
Figure 4. Applicant Eligibility ................................................................................................ 42
Figure 5. PNP Eligibility ......................................................................................................... 43
Figure 6. Categories of Work .................................................................................................. 51
Figure 7. Facility Eligibility .................................................................................................... 55
Figure 8. SBA Loan Outcomes ............................................................................................... 58
Figure 9. Cost Eligibility ......................................................................................................... 65
Figure 10. Emergency Work Eligibility .................................................................................. 97
Figure 11. Debris on Private Property ................................................................................... 107
Figure 12. Determining Eligibility of Emergency Berms on Beaches ................................. 138
Figure 13. Permanent Work Eligibility ................................................................................. 140
Figure 14. Path of Travel ....................................................................................................... 152
Figure 15. FEMA Hazard Mitigation Programs ................................................................... 154
Figure 16. Typical Beach Profile ........................................................................................... 181
Figure 17. Work Completion Deadlines ................................................................................ 196

**TABLES**

Table 1. PNP Eligible Critical Services ................................................................................. 45
Table 2. PNP Eligible Noncritical, Essential Social Services .............................................. 46
Table 3. PNP Ineligible Services ........................................................................................... 47
Table 4. PNP RPA Documentation and Information Requirements ...................................... 47
Table 5. Emergency Work Labor Eligibility ......................................................................... 70
Table 6: Deadlines for Submitting Quarterly Progress Reports ......................................... 193
Table 7. Information to Support SOW Changes ................................................................... 195
Table 8. Information to Support a Time Extension .............................................................. 197

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# FOREWORD

On behalf of the Federal Emergency Management Agency (FEMA), I am pleased to issue this Fourth Edition (Version 4) of the *Public Assistance Program and Policy Guide* (PAPPG). FEMA has archived previous editions at www.fema.gov/assistance/public/policy-guidance-fact-sheets/policy-archives. FEMA applies this Version 4 to incidents declared on or after June 1, 2020. This version supersedes Version 3.1.

As part of this version of the PAPPG, FEMA has incorporated the *Public Assistance Alternative Procedures for Permanent Work Pilot Policy* (FP 104-009-7). This establishes Alternative Procedures as the first option considered for all large permanent work projects in order to ensure the ability of Applicants to drive their own recovery. It standardizes a single process for the development and consideration of fixed cost estimates for all permanent work projects. Applicants will be able to agree to a fixed cost estimate or choose to pursue funding under standard, actual cost procedures. This approach maximizes Applicant awareness of the opportunities and benefits provided by the Alternative Procedures, which include, but are not limited to:

- Flexibility in meeting post-disaster recovery needs, as opposed to being limited to rebuilding back to what existed prior to the disaster;
- Ability to share funds across all Alternative Procedures Permanent Work Projects;
- Ability to retain and use excess funds to reduce risk and improve future disaster operations (subject to timely closeout); and
- Eligibility for cost-effective hazard mitigation on replacement projects.

Appendix M: *Alternative Procedures for Permanent Work Pilot*, provides additional information along with a summary of benefits in comparison to the standard Public Assistance (PA) procedures.

Additionally, this PAPPG Version 4 incorporates the following:

## List of Changes and Clarifications Grouped by General Topic

| Administrative |
|---|
| **Reorganized and simplified** language throughout the PAPPG |
| Incorporated the **Program Delivery Process** throughout the PAPPG |
| Updated References and Resources list |
| Updated Appendix A: *Environmental and Historic Preservation Compliance* |
| Added language on **outcome-driven recovery** (Chapter 2. *Operational Coordination*) |
| Incorporated key **Grants Management** language and requirements such as **work completion definition** and deadline requirements throughout the PAPPG |
| Moved documentation checklists to relevant sections and **specified required documents** throughout the PAPPG |
| Defined **policy on logical grouping** of damage (Chapter 5:II. *Grouping Impacts into Projects*) |
| Incorporated **Documentation Retention** Requirement (Chapter 12:IV. *Documentation Retention Requirements*) |
| Incorporated **Appeal policy** (Chapter 3:V.C. *Appeal Rights and Requirements*) |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Administrative

| |
|---|
| Incorporated **Determination Memo** and **Administrative Record** guidance (Chapter 3:V.B. *Notification of Ineligibility Determination*) |
| Added **Closeout** policy and **documentation requirements** (Chapter 12. *Final Reconciliation and Closeout*) |
| Added standard **Request for Information deadlines** (Chapter 3:V. *Eligibility Determinations*) |
| Added definition for **site** (Chapter 5: *Damage and Impact Information*) |
| Added FEMA **validation of** Applicant-submitted **damage** information and documentation (Chapter 5:III.B. *Site Inspections*) |
| Added requirement for all **documentation** to be submitted **within 90 days** of work completion **regardless of obligation** status (Chapter 9:II.C. *Costs for Projects with All Work Completed*) |

## Applicant Eligibility

| |
|---|
| Added **animal control services, center-based childcare, and food banks** to eligible private nonprofit (PNP) list (Chapter 3:VI.D.2. *Private Nonprofit Essential Social Services*) |
| Proration of emergency work on PNP **mixed-use facilities** (Chapter 4:II.B.1. *Mixed-Use Facility*) |
| Clarified that **PNP** facilities that provide **flood control** are **ineligible** (Chapter 3:VI.D.3. *Private Nonprofit Ineligible Services*) |
| Clarified requirements for **PNPs exempt from 501c** requirement (Chapter 3:VI.D. *Private Nonprofit Organizations*) |
| Clarified **Community Development District requirement to serve the public** (Chapter 3:VI.D. *Private Nonprofit Organizations*) |
| Moved **public broadcasting** to PNP **critical service** table based on Stafford Act (Chapter 3:VI.D.1. *Private Nonprofit Critical Services*) |

## Emergency Work Eligibility

| |
|---|
| Clarified **demolition versus debris** (Chapter 7:I.G. Debris Removal from Private Property) |
| Added reference to Operation **Blue Roof** (Chapter 7:II.X.1. *Operation Blue Roof*) |
| Clarified that FEMA may provide exceptions to **demolish commercial structures** in limited, extraordinary circumstances (Chapter 7:II.U.2. *Commercially Owned Structures*) |
| Clarified and aligned **standby time** and **pre-positioning** of resources (Chapters 6:II.B.7. *Standby Time* and 7:II.E. *Pre-positioning Resources*) |
| Simplified the **opt-in** procedure for **debris removal Alternative Procedures** (Chapter 7:I.A. *Alternative Procedures for Debris Removal*) |
| **Removed "temporary"** from emergency repair language (Chapter 7:II.X. *Emergency Repair or Stabilization*) |
| Clarified **debris clearance vs. debris removal** (Chapter 7:II.J. *Emergency Access*) |
| Reduced list of **services eligible for temporary relocation** and added examples of eligible and ineligible support services (Chapter 7:II.V. *Temporary Relocation of Essential Services*) |
| Clarified that **Mosquito Abatement** may be eligible if any one of the bullet scenarios exists (Appendix G: *Mosquito Abatement*) |
| Eliminated requirement to make at least 10 percent of **sheltering capacity** available in Host-State sheltering (Chapter 7:II.O.4. *Host-State or Host-Tribe Evacuation and Sheltering*) |
| Refined **beach** eligibility language (Chapter 7:II.X.4. *Emergency Dunes or Berms on Beaches*) |
| Clarified language on **essential employees** being called-back from leave (Chapter 6:II.B.4. *Essential Employees Called Back from Furlough*) |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| **Emergency Work Eligibility** |
|---|
| Clarified that the **return of evacuees** is eligible (Chapter 7:II.O.1. *Evacuation*) |
| Clarified language regarding **damage caused during Emergency Work** (Chapter 7:III. *Damage Caused During Performance of Emergency Work*) |

| **Permanent Work Eligibility** |
|---|
| Eliminated **Alternate Project** reduction (Chapter 8:VIII.A. *Capped Project Funding*) |
| Clarified that replacement of **moldy** construction materials is only eligible as Permanent Work (Appendix I: *Mold Remediation*) |
| Clarified cost-effective **mitigation for low slope roofs** (Appendix J: *Cost-Effective Public Assistance Hazard Mitigation Measures*) |
| Refined **beach** eligibility language (Chapter 8:IX.E.1. *Beaches*) |
| Clarified eligibility of **Americans with Disability Act** requirements (Chapter 8:III.G. *Accessibility for Individuals with Disabilities*) |
| Refined hazard **mitigation policy** language (Chapter 8:IV.A. *Public Assistance Hazard Mitigation*) |
| Defined which **Flood Control Works** are under authority of the Natural Resources Conservation Service (Chapter 8:IX.B.2. *Flood Control Works*) |

| **Cost Eligibility** |
|---|
| Added language on **cost share matching** with Other Federal Agency funds (Chapter 1:IV.E. *Federal Cost Share*) |
| Clarified PNP cost ineligibility when a **PNP declines or misses the deadline** to apply for a disaster loan from the Small Business Administration (Chapter 4:II.B.2. *Small Business Administration Loan Requirement*) |
| Clarified Small Business Administration loan requirement for PNP **mixed-use facilities** (Chapter 4:II.B.2. *Small Business Administration Loan Requirement*) |
| Incorporated additional language on **procurement and contracting** (Chapter 6:VIII. *Procurement and Contracting Requirements*) |
| Added language on what costs are covered by **increased cost shares** (Chapter 6:XIII. *Increased Federal Cost Share for a Limited Timeframe*) |
| Explained difference between **project management** and **grant management** costs (Chapter 6:XV. *Project Management and Design Services* and XVI. *Grant Management and Administration*) |
| Clarified eligibility of costs related to **pursuing insurance** proceeds (Chapter 6:XVIII.A. *Insurance Proceeds*) |
| Added language on eligibility of **interest on loans** (Chapter 6.XX. *Interest on Loans*) |
| Incorporated **increased operating cost clarifications**, including ineligibility of costs related to transportation of students to alternate schools or temporary facilities, staff being held-over to cover shifts, and new landfills (Chapter 7:II.F. *Expenses Related to Operating a Facility or Providing a Service*) |
| Clarified that the **minimum threshold** does not apply to Donated Resources or Management Costs (Chapter 9:II.A. *Project Thresholds*) |
| Allowing **Small Project completed work** to be **estimated and certified** (Chapter 9:II.C. *Costs for Projects with All Work Completed*) |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| **Cost Eligibility** |
|---|
| Added language conveying that FEMA **does not re-evaluate reasonable costs on Alternative Procedure Permanent Work Pilot projects** (Chapter 9:II.E.6. *Fixed-Cost Offer for Alternative Procedures Projects*) |
| Eliminated allowance for **insurance** adjustments on **individual small projects** (Chapter 12:I.A. *Project Reconciliation and Closeout, Small Projects*) |

| **Policy and Guidance Documents Incorporated and Superseded** |
|---|
| FEMA Recovery Policy, *Public Assistance Donated Resources* |
| FEMA Recovery Policy FP 104-09-12, *Public Assistance Alternative Procedures Pilot Program for Debris Removal* |
| FEMA Recovery Policy FP 104-009-7, *Public Assistance Alternative Procedures Pilot Program - Permanent Work Standard Operating Procedures* |
| *Public Assistance Alternative Procedures for Permanent Work Pilot (Version 4)* |
| FEMA Fact Sheet, *Public Assistance: Procurement Conducted Under Exigent or Emergency Circumstances* |
| FEMA Fact Sheet, *Public Assistance: Purchasing Goods or Services through Cooperative Purchasing Programs* |
| FEMA Fact Sheet, *Public Assistance: Private Property Debris Removal* |
| FEMA Fact Sheet, *Public Assistance: Contracting Requirements Checklist* |
| FEMA Job Aid, *Public Assistance: Reasonable Cost Evaluation* |
| FEMA's *Public Assistance Program Interim Guidance on 2 C.F.R. Part 200* |
| March 15, 2019, memo: FEMA's *Approved Cost Estimating Methodology* |
| July 9, 2018, memo: *Policy Clarification for Public Assistance Hydrologic and Hydraulic Study Requirements for Drainage Structures and Culverts* |
| March 15, 2019, memo: *FEMA Public Assistance Repair Versus Replacement Policy Clarification* |
| April 11, 2018, memo: *FEMA Public Assistance Eligibility of Private Nonprofit Elementary and Secondary Schools* |
| *Public Assistance Program Field Operations Pocket Guide* |
| *Public Assistance Program Management and Grant Closeout Standard Operating Procedure* (SOP 9570.14), December 2013 |
| *FEMA Instructional Guidance, Public Assistance Expedited Projects* |

| **Guidance Documents Summarized and Referenced** |
|---|
| FEMA Fact Sheet *Public Assistance Appeals and Arbitration Under the Disaster Recovery Reform Act* |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Guidance Documents Summarized and Referenced |
| --- |
| *State Led Public Assistance Guide* |
| *Damage Assessment Operations Manual* |
| FEMA Recovery Policy FP 104-11-2, *Public Assistance Management Costs (Interim)* |
| FEMA Recovery Interim Policy FP 104-009-11, *Consensus-Based Codes, Specifications and Standards for Public Assistance* (Chapter 8:III.B, *FEMA Consensus-Based Codes, Specifications and Standards*) |

FEMA makes updates to the PAPPG at www.fema.gov/assistance/public/policy-guidance-fact-sheets on an annual basis when necessary and conducts a comprehensive review no less than every three years. We look forward to your feedback to help inform the next version. FEMA staff may send policy recommendations through the PA Change Control Tool at usfema.sharepoint.com/teams/ORRApps/NewPA/Pages/SubmitRequest-CCT-P3.aspx. Recipients and Applicants may request changes via email at FEMA-Recovery-PA-Policy@fema.dhs.gov.

Keith Turi
Assistant Administrator
Recovery Directorate

V4 2020                                                                     Page 16

# INTRODUCTION

## I.   Public Assistance Program Overview

The mission of the Federal Emergency Management Agency's (FEMA's) Public Assistance (PA) Program is to provide assistance to State, local, Territorial, or Tribal, and local (SLTT) governments, and certain types of private nonprofit (PNP) organizations so that communities can quickly respond to and recover from major disasters or emergencies declared by the President. Through the PA Program, FEMA provides supplemental Federal grant assistance for debris removal, emergency protective measures, and the restoration of disaster-damaged, publicly owned facilities and specific facilities of certain PNP organizations. The PA Program also encourages protection of these damaged facilities from future incidents by providing assistance for hazard mitigation measures. FEMA provides this assistance based on authority in statutes, executive orders (EOs), regulations, and policies.

## II.   Authorities

FEMA provides assistance based on authorities defined in statutes and regulations. These authorities also specify requirements that must be met. When the PAPPG uses the words "must" or "required," it is a legal requirement. The Applicant jeopardizes its PA funding if it does not comply with these requirements.

### A.     Statutes

Statutes are Federal laws passed by the U.S. Congress and signed by the President. All PA Program assistance must comply with all applicable statutes. The statute that authorizes FEMA to provide assistance via the PA Program is the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended (Stafford Act), Title 42 of the United States Code (U.S.C.) § 5121 et seq.[1] The following sections of the Stafford Act specifically authorize the assistance FEMA provides under the PA Program:

- Title I – Findings, Declarations and Definitions

- Title III – Major Disaster and Emergency Assistance Administration
  - Sec. 311. Insurance
  - Sec. 312. Duplication of Benefits
  - Sec. 324. Management Costs

- Title IV – Major Disaster Assistance Programs (applies to Major Disaster Declarations)
  - Sec. 403. Essential Assistance
  - Sec. 406. Repair, Restoration, and Replacement of Damaged Facilities
  - Sec. 407. Debris Removal
  - Sec. 428. Public Assistance Program Alternative Procedures
    - Section 428 of the Stafford Act authorizes FEMA to provide specific exceptions, or "Alternative Procedures," to PA Program regulations.[2] FEMA is currently

---

[1] www.fema.gov/disasters/stafford-act.

[2] The Robert T. Stafford Disaster Relief and Emergency Assistance Act, Public Law 93-288, as Amended (Stafford Act) § 428, Title 42 of the United States Code (U.S.C.) § 5189f.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

piloting these Alternative Procedures as optional procedures. These procedures are available to each Applicant on a voluntary basis. The specific alternatives are presented throughout this document, where applicable.

- Title V – Emergency Assistance Programs (applies to Emergency Declarations)
  o Sec. 502. Federal Emergency Assistance

- Title VII – Miscellaneous
  o Sec. 705. Disaster Grant Closeout Procedures

## B.　　Regulations

Regulations are Federal rules with the force and effect of law that implement a statute based on a Federal agency's interpretation of that statute.[3] FEMA and any entity receiving PA assistance must comply with all applicable Federal Regulations.[4]

FEMA publishes PA Program rules in the following parts of Title 44 of the Code of Federal Regulations (C.F.R.), Emergency Management and Assistance:[5]

- Part 206 Subpart G, Public Assistance Project Administration;
- Part 206 Subpart H, Public Assistance Eligibility; and
- Part 206 Subpart I, Public Assistance Insurance Requirements.

The Office of Management and Budget establishes regulations regarding administrative requirements, cost principles, and audit requirements in 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards.

# III. Document Purpose and Use

FEMA issues policy to articulate the Agency's intent and direction in applying statutory and regulatory authority to achieve desired outcomes. The purpose of the *Public Assistance Program and Policy Guide* (PAPPG) is to define FEMA's PA Program and its policy and procedural requirements. Only the Assistant Administrator of Recovery at FEMA Headquarters has the authority to modify or waive PA Policy.

The PAPPG provides high-level program delivery information and describes important PA functions that occur throughout the entire program delivery lifecycle.

FEMA staff use the PAPPG to guide decision-making and ensure consistent implementation of the PA Program across the Nation. Separate FEMA policies and guidance documents that apply

---

[3] Stafford Act § 321, 42 U.S.C. § 5164.
[4] Title 44 of the Code of Federal Regulations (C.F.R.) § 206.200(b). The electronic version of the C.F.R. is available at www.ecfr.gov.
[5] Stafford Act § 325, 42 U.S.C. § 5165c; 44 C.F.R. § 1.4.

to the PA Program are referenced where applicable and listed in the *References and Resources* section at the end of the PAPPG.

## IV.  Scope

The PAPPG provides comprehensive PA policy to use when evaluating eligibility. It includes FEMA's policy statements and provides a summary of each step of the PA Program lifecycle beginning with pre-declaration activities through closure of the PA Program award for a declared incident. Figure 1 below provides an overview of the PA Program delivery process. The PAPPG references and provides weblinks to other FEMA policies and documents such as standard operating procedures and job aids that provide detailed instructions for individuals involved with implementing each of the various steps.



**Figure 1. PA Program Delivery Process**

## V.   Applicability

FEMA applies Version 4 of the PAPPG to incidents declared on or after June 1, 2020. Individuals who have responsibilities managing, implementing, or pertaining to the PA Program should refer to the PAPPG for PA policy and procedural requirements.

## VI.  Document Management and Maintenance

FEMA generally publishes proposed PA policy language for public comment prior to publishing in this document.[6] When the policy is deemed significant, FEMA publishes it in the *Federal*

---

[6] Stafford Act § 325, 42 U.S.C. § 5165c.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*Register.*[7] FEMA conducts a comprehensive review of this publication no less than every three years. FEMA staff may send policy recommendations through the PA Change Control Tool at usfema.sharepoint.com/teams/ORRApps/NewPA/Pages/SubmitRequest-CCT-P3.aspx. Recipients and Applicants may request changes via email at FEMA-Recovery-PA-Policy@fema.dhs.gov.

---

[7] FEMA is required to publish policies for comment if they are deemed "significant" by the Office of Management and Budget, pursuant to Executive Order 12866.

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 1:  PRE-AWARD ACTIVITIES

The Stafford Act[8] authorizes the President to provide Federal assistance when the magnitude of an incident or threatened incident exceeds the affected State,[9] local[10] Territorial, and Indian Tribal[11] government capabilities to respond or recover. This chapter explains procedures and requirements for activities that occur during the pre-award phase, including the process for requesting a Presidential declaration, FEMA's evaluation criteria, the contents of the declaration, and the initial administrative requirements for a State, Territorial, or Tribal government to receive assistance.

## I.    Preliminary Damage Assessment

When a State, Territorial, or Tribal government determines that an incident may exceed SLTT capabilities to respond, it requests a joint Preliminary Damage Assessment (PDA) with FEMA.[12] Federal, SLTT government, and certain PNP organization officials work together to estimate and document the impact and magnitude of the incident.[13] Accurate and comprehensive PDAs are critical to enabling efficient response and recovery. FEMA's *Damage Assessment Operations Manual*[14] provides detailed information to assist staff involved with damage assessments and describes how FEMA utilizes the information when evaluating requests for Major Disaster Declarations.

## II.   Declaration Request

The Governor[15] or Tribal Chief Executive[16] may request a declaration from the President through FEMA. A Tribal government may elect to be a Recipient[17] or a Subrecipient[18] under a

---

[8] www.fema.gov/disasters/stafford-act.

[9] Stafford Act § 102(4), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(22), State governments include the District of Columbia, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands.

[10] Stafford Act § 102(8), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(16), local governments include counties, municipalities, cities, towns, townships, local public authorities, school districts, special districts established under State law, intrastate districts, councils of governments (regardless of whether the council of governments is incorporated as a nonprofit corporation under State law), regional or interstate government entities, agencies or instrumentalities of a local government; State-recognized Tribes; and rural communities, unincorporated towns or villages, or other public entities, for which an application for assistance is made by a State or political subdivision of a State.

[11] Stafford Act § 102(6), 42 U.S.C. § 5122; 44 C.F.R. § 206.201(i), an Indian Tribal Government is any Indian or Alaska Native tribe, band, nation, pueblo, village, or community listed as an Indian Tribe under the Federally Recognized Indian Tribe List Act of 1994. Hereinafter referred to as Tribal Government.

[12] 44 C.F.R. § 206.33(a).

[13] 44 C.F.R. § 206.33(b).

[14] www.fema.gov/disasters/preliminary-damage-assessment-reports/guide.

[15] Stafford Act § 102(5), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(12).

[16] Stafford Act § 102(12), 42 U.S.C. § 5122.

[17] 44 C.F.R. § 206.201(e). Per 2 C.F.R. § 200.86, A Recipient is an entity that receives a Federal award directly from a Federal awarding agency to carry out an activity.

[18] Per 2 C.F.R. § 200.93, a Subrecipient is an Applicant that receives a subaward from a pass-through entity to carry out part of a Federal program.

State or Territorial declaration or request its own declaration as a Recipient.[19] The Governor, and/or the Tribal Chief Executive if the Tribal Government wishes to be its own Recipient, must submit the request no later than 30 days after the incident occurs.[20] FEMA may extend the deadline if the Governor or Tribal Chief Executive submits a written time extension request within 30 days of the incident stipulating the reason for the delay.[21] When a severe or catastrophic incident occurs, the Governor or Tribal Chief Executive may submit a declaration request prior to completion of the PDA.[22] This is referred to as an expedited declaration request. In such circumstances, assistance is generally limited to that which would address immediate needs based on rapid assessments until the PDA is completed.



## III.  Declaration Evaluation

FEMA uses PDA information to evaluate the need for assistance under the PA Program.

### A.    State and Territorial Governments

For State and Territorial governments, FEMA's evaluation is based on six primary factors:

- Estimated cost of assistance;
- Insurance coverage;
- Other Federal agency programs;
- Localized impacts;
- Hazard mitigation; and
- Recent multiple disasters.[23]

FEMA reviews the facility and cost information to ensure that the estimated costs include all appropriate insurance reductions and do not include costs related to facilities under the authority of another Federal agency. FEMA then compares the estimated eligible amounts to the established annual per capita indicators. To account for localized impacts when the statewide per

---

[19] A Tribal Governmental may also receive one type of assistance under a State or Territorial declaration and another type of assistance under its own declaration, provided there is no duplication of benefits. Additional information for Tribal declarations is available at www.fema.gov/about/organization/tribes.

[20] Stafford Act §§ 401 and 501, 42 U.S.C. §§ 5170 and 5191; 44 C.F.R. §§ 206.35 and 206.36. For Emergency Declarations, the Governor or Tribal Chief Executive must submit the request within 5 days after the need for assistance becomes apparent. For Major Disaster Declarations, the Governor or Tribal Chief Executive should submit the request as soon as possible after completion of the Joint PDA. Information and forms for Presidential declaration requests are available at www.fema.gov/disasters/request-for-presidential-disaster-declaration, and for Tribal governments specifically, www.fema.gov/disasters/tribal-declarations.

[21] 44 C.F.R. §§ 206.35(a) and 206.36(a).

[22] 44 C.F.R. § 206.33(d).

[23] 44 C.F.R. § 206.48(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

capita impact is low, FEMA evaluates whether there are extraordinary concentrations of damage resulting in significantly high per capita impacts at the local government level.

To encourage hazard mitigation, FEMA considers whether SLTT government mitigation measures taken prior to the incident likely reduced the damage impacts, especially if such mitigation averted damage that would have increased the estimated eligible cost above the per capita indicator.

Understanding that the effects of multiple disasters in a confined period of time can affect response and recovery capabilities, FEMA also evaluates the overall impacts of Federal and State, Territorial, or Tribal declarations that have occurred within the past 12 months and the extent to which the State, Territorial, or Tribal government has spent its own funds. If there were disasters prior to the 12-month period that still have substantial impacts on SLTT governments, FEMA may also consider impacts from these disasters.

## B.    Tribal Governments

Tribal governments requesting a declaration have different declaration factors than State and Territorial governments. PA declaration factors for tribes include:

- Estimated cost of assistance (minimum damage amount of $250,000);
- Insurance coverage;
- Other Federal agency programs;
- Hazard mitigation;
- Recent multiple disasters (previous 24 months);
- Types and amounts of damage;
- Economic impact of the damage to the community and government;
- Tribal resources available for response and recovery;
- Demographics of the impacted community;
- Impact on community infrastructure;
- Unique conditions that affect Tribal governments (e.g., remoteness, economy, cultural considerations); and
- Other relevant information.

Additional detail is provided in the Tribal Declaration Pilot Guidance.[24]

# IV.  Presidential Declaration

For FEMA to provide assistance, the President must declare that an emergency or major disaster exists. The declaration[25] establishes the:

- Type of incident;
- Incident period;
- Designated areas;
- Types of assistance;
- Federal cost share; and

---

[24] www.fema.gov/disasters/tribal-declarations.
[25] Each Presidential declaration is available at www.fema.gov/disasters/disaster-declarations.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Federal Coordinating Officer (FCO).

## A.    Type of Incident

The declaration designates the type of incident (e.g., hurricane, tsunami, or earthquake). For Emergency Declarations, an incident is any instance that the President determines warrants supplemental emergency assistance to save lives and protect property and public health and safety, or to lessen or avert the threat of a catastrophe.[26] For Major Disaster Declarations, an incident is any natural catastrophe (including any hurricane, tornado, storm, high water, wind driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion.[27] Major Disaster Declarations may include a combination of incident types, such as storms and landslides.

## B.    Incident Period

The declaration designates the incident period. The incident period is the span of time during which the federally declared incident occurs.[28] This period varies in length, depending on the incident.

## C.    Designated Areas

The declaration designates which areas (e.g., county, parish, city, or Tribal government) are eligible to receive Federal assistance.[29] FEMA may add additional areas after the initial designation. However, for FEMA to consider adding an additional area, the Governor or Governor's Authorized Representative (GAR)[30] or, for Tribal declarations, the Tribal Chief Executive or Tribal Authorized Representative (TAR) must request the addition within 30 days of the declaration date or the end of the incident period, whichever is later.[31] FEMA may extend the deadline if the Governor, GAR, Tribal Chief Executive, or TAR submits a written time extension request within the 30-day deadline with justification of the inability to meet the deadline.[32]

## D.    Types of Assistance

The declaration designates the types of Federal assistance authorized.[33] The President may authorize assistance to individuals, households, and SLTT governments, and certain types of PNP organizations. FEMA provides assistance to individuals and households via its Individual Assistance (IA) programs. FEMA provides assistance to SLTT governments and certain types of PNP organizations via its PA Program. The type of assistance authorized may vary among designated areas. FEMA may add additional types of assistance after the declaration. However, for FEMA to consider adding additional types of assistance, the Governor or GAR or, for Tribal declarations, the Tribal Chief Executive or TAR must request the assistance within 30 days of

---

[26] Stafford Act § 102(1), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(9).
[27] Stafford Act § 102(2), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(17).
[28] 44 C.F.R. § 206.32(f).
[29] 44 C.F.R. §§ 206.2(a)(6) and 206.40(b).
[30] 44 C.F.R. §§ 206.2(a)(13) and 206.41(d).
[31] 44 C.F.R. § 206.40(c).
[32] 44 C.F.R. § 206.40(d).
[33] 44 C.F.R. § 206.40(a).

the declaration date or the end of the incident period, whichever is later.[34] FEMA may extend the deadline if the Governor, GAR, Tribal Chief Executive, or TAR submits a written time extension request within the 30-day deadline with justification of the inability to meet the deadline.[35] Tribal governments may receive one type of assistance under a State or Territorial declaration as a Subrecipient and another type of assistance under its own declaration as a Recipient, provided there is no duplication of benefits.



FEMA Regional Administrators (RAs)[36] have the authority to issue Fire Management Assistance Grant (FMAG) declarations for wildfires that threaten such destruction that would constitute a major disaster.[37] The FMAG Program is separate and distinct from the PA Program. FMAG declaration criteria, eligibility, and other program information are available at 44 C.F.R. Part 204, *Fire Management Assistance Grant Program*, and in FEMA's *Fire Management Assistance Grant Program Guide* (FEMA P-954).[38]

If significant damage occurs as a result of one or more FMAG fire incidents, the Governor or Tribal Chief Executive may subsequently request a Major Disaster Declaration for the fire incident(s). FEMA evaluates such requests based on damage and costs not covered under the FMAG Program, such as public infrastructure damage. If the President declares a Major Disaster and authorizes the PA Program, FEMA usually funds all costs related to those fire incidents under the PA Program for efficiency in administration of assistance and to avoid a duplication of benefits between programs.

## E.    Federal Cost Share

The assistance FEMA provides through its PA Program is subject to a cost share.[39] The cost share ensures local interest and involvement through financial participation. The Federal share is not less than 75 percent of the eligible costs.[40] FEMA may recommend an increase up to 90 percent if actual Federal obligations, excluding administrative costs, meet or exceed a qualifying threshold.[41]

For Emergency Work specifically, the Federal cost share may be increased in limited circumstances, and for limited periods of time, if warranted.[42] See Chapter 6:XIII, *Increased Federal Cost Share for a Limited Timeframe*, for details on how FEMA applies the increased Federal cost share.

---

[34] 44 C.F.R. § 206.40(c).
[35] 44 C.F.R. § 206.40(d).
[36] 44 C.F.R. § 206.2(a)(21).
[37] Stafford Act § 420, 42 U.S.C. § 5187; 44 C.F.R. Part 204.
[38] www.fema.gov/assistance/public/fire-management-assistance.
[39] 44 C.F.R. § 206.203(b).
[40] Stafford Act §§ 403(b), 406(b), 407(d), and 503(a), 42 U.S.C. §§ 5170b, 5172, 5173, 5193; 44 C.F.R. §§ 206.47(a) and 206.65.
[41] 44 C.F.R. § 206.47(b).
[42] 44 C.F.R. § 206.47(d).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The Applicant can only apply other Federal award funds toward the PA non-Federal cost share if the other Federal agency has specific statutory authority allowing its funds to be used to meet cost-share requirements.[43] For example, the U.S. Department of Housing and Urban Development's (HUD's) Community Development Block Grant (CDBG) program may be used for the non-Federal share on PA projects if certain requirements are met. FEMA applies the cost share at the project level. Therefore, any other agency's Federal funds must be applied at the project level and may not be used across multiple projects (with exception of Permanent Work Alternative Procedure projects as described in Chapter 8:VIII. *Capped Projects*). Further, if the Applicant uses funds from another Federal agency to meet the non-Federal share, it must meet all requirements of the other agency as well as all PA Program requirements. The Applicant cannot apply PA funds toward the non-Federal cost share of other Federal agency awards.

## V.    Recipient Administrative Requirements

When the Presidential declaration authorizes assistance to SLTT governments and certain types of PNP organizations, FEMA implements the PA Program. The Recipient is responsible for completing an application for assistance and submitting required documents before FEMA can provide PA funding. This section describes the required documents. The Recipient may upload these documents into PA Grants Portal at the Event Level (see Chapter 3:I, *Public Assistance Web-based Systems*). If the document is related to multiple disasters, such as a Hazard Mitigation Plan, the Recipient should upload it to its Organizational Profile.



www.fema.gov/sites/default/files/2020-07/fema_state-led-public-assistance_Guide_2-1-2019.pdf).

### A.    Application for Federal Assistance

The declared State, Territorial, or Tribal government must complete and submit Standard Form (SF) 424, Application for Federal Assistance, and SF-424D, Assurances for Construction Programs[44] before FEMA provides assistance. The SF-424 includes the period of performance (POP) for the PA award (referred to as the prime award). The prime award POP begins on the first day of the incident period and initially extends four years from the declaration date.

### B.    FEMA-State/Territory/Tribe Agreement

After every declaration, the applicable State, Territorial, or Tribal government enters into an agreement with FEMA regarding the understanding, commitments, and conditions under which FEMA provides assistance (FEMA-State/Territory/Tribe Agreement). FEMA and the Governor or Tribal Chief Executive must sign this agreement before FEMA provides assistance. If necessary, because of exigent circumstances, FEMA may authorize essential emergency services

---

[43] Stafford Act § 312, 42 U.S.C. § 5155.
[44] 44 C.F.R. § 206.202(e). The SF-424 forms are available at www.grants.gov/web/grants/forms/sf-424-family.html.

or housing assistance under the Individuals and Households Program (IHP) while the agreement is in process for signature.[45]

## C.    Payment Management System

FEMA provides PA funding to Recipients via the U.S. Department of Health and Human Services (HHS) Payment Management System. Therefore, if an entity is a Recipient for the first time, it must request access to the Payment Management System and complete the Direct Deposit Form (SF-1199A) to obtain a FEMA-specific account before FEMA can provide funding.[46]

## D.    Administrative Plan

Recipients must have a FEMA-approved Administrative Plan that describes how it intends to administer the PA Program before FEMA provides PA funding for any project. At a minimum, the Administrative Plan must include:

- The agencies responsible for program administration;
- Identification of staffing functions, the source of staff to fill the functions, the management and oversight responsibilities of each function; and
- Procedures for:
  - Notifying potential Applicants of the availability of the PA Program;
  - Conducting Applicant Briefings;
  - Assisting FEMA in determining Applicant eligibility;
  - Participating with FEMA in conducting PDAs;
  - Participating with FEMA in establishing PA mitigation and insurance requirements;
  - Processing appeals, time extension requests, and other project-related correspondence;
  - Complying with Environmental and Historic Preservation (EHP) requirements;
  - Complying with PA administrative requirements including, but not limited to, procurement, contracting, and closeout;
  - Complying with audit requirements;
  - Requesting reimbursement or advanced funds; and
  - Determining staffing and budgeting requirements for proper management of the PA Program.

A Recipient must submit its Administrative Plan to FEMA on an annual basis and an amendment for each incident that occurs within the year if needed to meet current policy guidance or to address the specifics of the new incident. The Recipient must incorporate the approved Administrative Plan into its State, Territorial, or Tribal emergency plan.[47]

## E.    Hazard Mitigation Plan

Hazard mitigation is most effective when implemented under a comprehensive, long-term mitigation plan. SLTT governments engage in hazard mitigation planning to identify risks and

---

[45] 44 C.F.R. § 206.44(a).

[46] The Payment Management System Access Form and the SF-1199A are available at pms.psc.gov/.

[47] 44 C.F.R. § 206.207(b). An administrative plan template is available here.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

vulnerabilities associated with natural disasters and develop long-term strategies for protecting people and property from future incidents. Recipients must have a FEMA-approved Hazard Mitigation Plan before FEMA can provide PA funding for any Permanent Work.[48] The Recipient must show in its plan how it intends to reduce risks from natural hazards and must update the plan every 5 years.

Tribal governments must meet the requirements of 44 C.F.R. § 201.7, *Tribal Mitigation Plans.* States and Territories must meet the requirements of 44 C.F.R. § 201.4, *Standard State Mitigation Plans* or have an Enhanced Mitigation Plan that meets the requirements of 44 C.F.R. § 201.5, *Enhanced State Mitigation Plans.*[49]

---

[48] 44 C.F.R. § 201.3(c)(1) and (e)(1).

[49] Additional information about the mitigation plan requirement is available here.

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 2:   OPERATIONAL COORDINATION

FEMA leads implementation of Stafford Act authorities and coordination of Federal assistance to impacted communities. FEMA's goal is to help communities recover by focusing on their desired goals and outcomes. FEMA refers to this as outcome-driven recovery. This is a problem-solving approach that promotes unity of effort among stakeholders to identify recovery needs, vision, and goals, and to resource holistic recovery solutions. It emphasizes the need for integration of all partners in recovery, appropriate and consistent coordination, and transparency to ensure that a community can set its own goals and priorities, identify strategies to access funding and other resources to meet its goals, and effectively implement projects. This chapter describes how Federal, State, Territorial, and Tribal leadership coordinate during response and recovery operations to ensure successful outcomes.



FEMA conducts incident operations based on the national comprehensive, systematic approach set forth by the *National Incident Management System* (NIMS).[50] NIMS is designed to ensure that local jurisdictions retain command, control, and authority over response and recovery activities for their jurisdictional areas. It establishes consistent structure, concepts, principles, processes, and language at a national level enabling efficient coordination of emergency management operations across all levels of government.

The *National Response Framework* (NRF) and *National Disaster Recovery Framework* (NDRF)[51] build upon NIMS by defining the core capabilities necessary for response and recovery and fostering a holistic, collaborative approach, emphasizing the need for the involvement of the whole community (individuals, families, households, communities, private and nonprofit sectors, faith-based organizations, and all levels of government). The NRF and NDRF detail Federal and SLTT government roles and responsibilities during response and recovery operations.

---

[50] www.fema.gov/emergency-managers/nims.
[51] www.fema.gov/emergency-managers/national-preparedness/frameworks/recovery.

# I.    Operational Priorities

## A.    Community Lifelines

Lifelines are the most fundamental services in the community, that, when stabilized, enable all other aspects of society. FEMA and other Emergency Management organizations use community lifelines to establish and track operational priorities during incident stabilization. The seven lifelines are:



- Safety and security;
- Food, water, and sheltering;
- Health and medical;
- Energy (power and fuel);
- Communications;
- Transportation; and
- Hazardous materials.

Lifelines provide indispensable service to enable the continuous operation of critical business and government services. Analyzing impacts to each of the lifelines allows decision-makers to:

- Rapidly determine whether an incident is large or complex;
- Prioritize and focus response efforts to maintain or restore the most critical services and infrastructure;
- Ensure limited resources can go toward a common goal that requires involvement across the whole community; and
- Promote a response that fosters better integration and communication across the whole community since lifeline management transcends public and private sector boundaries.

FEMA's *Community Lifelines Implementation Toolkit*[52] provides comprehensive information and resources for implementing lifelines during incident response.

## B.    Incident Action Plan

The Incident Action Plan (IAP) is a written plan defining the objectives for managing the overall incident and addressing the operational priorities. FEMA and the State, Territory, or Tribe develop the IAP through a series of meetings which occur once during each Operational Period (O-Period). The O-Period is the timeframe designated to execute a specific set of actions. During the response phase, this is typically 12-24 hours and FEMA usually expands it to 48-96 hours or longer as the operation shifts into the recovery phase. The IAP is initially organized by lifeline stabilization priorities and shifts to recovery outcome priorities as the lifelines stabilize.



---

[52] www.fema.gov/emergency-managers/practitioners/lifelines-toolkit.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The IAP provides the following information:

- Work assignments delineated by division and group;
- Resources required to complete work assignments;
- Operational facilities and reporting locations for plan execution; and
- Organization charts, contact information, and medical, safety, and communications plans.

The PA Group Supervisor (PAGS) ensures that PA Program work assignments, information, and contributions toward larger recovery outcomes are accurately reflected in the IAP. For additional information on the IAP process, see the *Incident Action Planning Guide*.[53]

## II.   Response and Recovery Coordination

Federal, State, Territorial, and Tribal government coordination begins with response during the pre-award phase and continues through the completion of recovery operations and closeout of the award. Response operations begin to transition to recovery when immediate threats to health and safety begin to stabilize. This timeframe varies by entity depending on the level of impact and response capabilities.

### A.      Response Coordination

FEMA operates 24-hour National and Regional Watch Centers that provide national and regional awareness on potential, developing, or ongoing situations that may require a coordinated Federal response. When warranted, based on situational awareness provided by the Watch Centers, FEMA activates its National and Regional Response Coordination Centers (NRCC/RRCC). These coordination centers function as multi-agency coordination facilities to prepare for and respond to the immediate needs of an incident, as identified by the State, Territorial, or Tribal government. The RA determines when to activate the RRCC. The FEMA Administrator may activate the NRCC when incidents cross regional borders, have broad geographic implications, or are nationally significant. The NRCC allocates and prioritizes national resource deployments and coordinates with the RRCC to provide additional support for immediate needs.

As described in the NRF various agencies that provide response capabilities are grouped into Emergency Support Functions (ESFs). During response, ESFs are a critical mechanism to coordinate functional capabilities and resources provided by Federal departments and agencies, along with certain private-sector and nongovernmental organizations. ESFs are activated selectively and may not be activated for all incidents. The NRF describes the composition and mission functions of each of the ESFs.[54]

When FEMA activates the RRCC or NRCC, it also activates representatives from the appropriate ESFs to deploy to the RRCC or NRCC to support incident objectives consistent with the purpose and scope defined in the NRF annex for each of the ESFs. PA typically staffs a position in the RRCC or NRCC to support incident objectives related to debris removal and critical infrastructure (facilities that provide transportation, energy, communications, water, or emergency services). This position coordinates activities of ESFs 1 (Transportation), 3 (U.S. Army Corps of Engineers), 10 (U.S. Environmental Protection Agency), and 12 (Energy).

---

[53] *The Incident Action Planning Guide* is available at www.fema.gov/sites/default/files/2020-07/ Incident_Action_Planning_Guide_Revision1_august2015.pdf.
[54] The NRF is available at www.fema.gov/emergency-managers/national-preparedness/frameworks/response.

FEMA's National Incident Support Manual (NISM) provides additional information on NRCC operations.[55]

## B.    Recovery Coordination

FEMA's goal throughout the recovery phase is to assist communities and Applicants with achieving desired outcomes and building resilience. The National Preparedness Goal[56] identifies eight core capabilities that are critical for recovery. Various agencies that provide these recovery capabilities are grouped into the following six Recovery Support Functions (RSFs)[57]: Community Planning and Capacity Building; Economic Recovery; Health and Social Services; Housing; Infrastructure Systems; and Natural and Cultural Resources. As ESF activities subside, RSF activities ramp up and require continued information sharing and coordination.

RSFs support SLTT recovery efforts by coordinating among Federal and SLTT agencies and nongovernmental and private organizations to problem-solve and improve access to needed resources. The NDRF further describes the composition and mission of each RSF.[58] Activation of each RSF depends on incident-specific recovery issues.

The Federal Interagency Operational Plan (FIOP)[59] describes how Federal recovery field leadership, RSFs, and related entities work in coordination with nongovernmental and private organizations to support SLTT recovery efforts. It provides a flexible structure for disaster recovery leaders to address the specific needs of the incident and enhance sustainability and resilience of communities in a unified and collaborative manner.

## 1.    Field Operations

Prior to a declaration, FEMA may deploy a Regional or National Incident Management Assistance Team (IMAT) to provide additional situation awareness and manage Federal response operations from the field in the initial days or weeks after an incident.



Once the President issues an Emergency or Major Disaster Declaration, the Regional Watch Center or RRCC deploys key personnel to set up the initial field operations structure and assume primary responsibility for response coordination. At this point, primary responsibility for infrastructure-related tasks conducted at the RRCC are transitioned to the Infrastructure Branch Director (IBD) or PAGS.

---

[55] The NISM is available here.

[56] www.fema.gov/emergency-managers/national-preparedness/goal.

[57] Recovery Support Functions are teams of Federal and national partners with a Coordinating Agency, primary and supporting agencies, State and Territorial agencies, and other organizations. The Coordinating Agency is usually the entity that can bring in resources to address needs, whereas the support agencies provide technical and subject matter expertise along with additional information. Additional information is available here.

[58] See Table 3 of The National Disaster Recovery Framework, which is available here.

[59] www.fema.gov/emergency-managers/national-preparedness/frameworks/federal-interagency-operational-plans.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The declaration identifies the FCO.[60] The FCO works in partnership with the State or Territorial Coordinating Officer (SCO)[61] and Governor's Authorized Representative (or for Tribal declarations, the Tribal Coordinating Officer (TCO) and TAR) to coordinate Federal resources and disaster assistance programs.[62] FEMA and the State, Territorial, or Tribal government may initially operate at an Initial Operating Facility (IOF) until a facility is identified and established as a Joint Field Office (JFO). The IOF is usually at the State, Territorial, or Tribal Emergency Operations Center (EOC). The JFO is a temporary facility in proximity to the area affected by the incident that becomes the central location for coordination of response and recovery activities. Staff at the IOF transition to the JFO once it is established, typically several days to two weeks. FEMA's *Incident Management Handbook*[63] provides additional information on field operating structures and functional responsibilities.



## C.    Public Assistance Coordination and Planning

Primary responsibility for management and delivery of the PA Program rests with the PAGS. The PAGS coordinates with the Recipient to efficiently implement the PA Program. Additionally, the PAGS fosters collaboration and information sharing with other federal agencies (OFAs) and nongovernmental partners through participation in the RSFs and other operational task forces.

PA staff usually deliver the program from the JFO and receive project development and processing support from the designated Consolidated Resource Center (CRC). CRCs are permanent FEMA offices where subject matter experts and specialized resources provide support to all PA operations. The PAGS coordinates with the CRC Director to provide situational awareness and ensure efficient, synchronized operations. CRC responsibilities include project scoping, costing, validation, and compliance reviews.

PA staff at the JFO are responsible for providing customer service to each Applicant, conducting site inspections, obtaining project information and documentation, determining eligibility, and awarding projects. PA staff at the JFO receive policy support from the respective FEMA regional office. When necessary, the FEMA regional office engages FEMA Headquarters on complex policy matters.

FEMA and the Recipient coordinate closely on various operational planning elements. FEMA uses both PDA and Recipient-provided information to determine the initial needs of the operation. This information enables the PAGS and Recipient to determine initial staffing and training requirements, organizational structure, and logistical needs. Additionally, it provides awareness on various operational aspects such as potential policy issues or the need for task forces or specialized personnel for specific types of infrastructure.

---

[60] Stafford Act §§ 302(a) and (d), 42 U.S.C. § 5143; 44 C.F.R. §§ 206.2(a)(11) and 206.41(a).
[61] Stafford Act § 302(c), 42 U.S.C. § 5143; 44 C.F.R. §§ 206.2(a)(23) and 206.41(c).
[62] Stafford Act § 302(b), 42 U.S.C. § 5143; 44 C.F.R. § 206.42.
[63] www.fema.gov/emergency-managers/nims.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The PA Program is only one of many programs across numerous agencies that contribute to recovery projects in communities. Various agencies require incident impact information to focus their support appropriately and PA staff require assistance from other agencies to provide the best customer service possible to Applicants. Therefore, it is crucial for PA staff to foster partnerships and keep open lines of communication.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 3:    APPLICANT COORDINATION AND ELIGIBILITY

FEMA and the Recipient work in partnership to administer the PA Program and provide customer service to each Applicant. The Recipient sets operational priorities for the incident and each Applicant identifies its priorities. This chapter describes the PA activities that occur throughout Phase I of the PA Program delivery process, *Operational Planning and Applicant Coordination*, which includes the initial stages of Applicant coordination and Applicant eligibility determinations. Key milestones include conducting all Applicant Briefings, receiving and processing all Requests for Public Assistance (RPAs), and completing all Recovery Scoping Meetings. This chapter defines RPA requirements and PA policy on Applicant eligibility. It describes the web-based systems that FEMA, Recipients, and Applicants need to use for PA award processing, including submittal of information. This chapter also defines correspondence requirements and how FEMA documents its eligibility determinations.

## I.    Public Assistance Web-based Systems

FEMA uses web-based systems to provide transparency to all stakeholders throughout the PA Program delivery process. FEMA uses PA Grants Manager to review RPAs, develop and review all aspects of a project application, track the status of project application development, and receive information from Recipients and Applicants. Recipients and Applicants use PA Grants Portal to submit all documentation and information to FEMA, review all aspects of PA project applications, and track the status of PA project applications. PA Grants Manager and Grants Portal interface and are updated on an ongoing basis for continuous improvement.[64]



FEMA-Recovery-PA-Grants@fema.dhs.gov

Applicants upload documentation and information to different areas within Grants Portal.[65] Once an entity has an Organizational Profile in PA Grants Portal, it can upload documents to its Organizational Profile anytime regardless of whether it has a current disaster. This section of the portal is not incident-specific. Therefore, Applicants should upload documents that may apply across multiple incidents, such as labor or insurance policies, to this location. Applicants upload any documents that pertain to a specific disaster, but not a specific project to the Applicant Profile. If the documentation is specific to one project, Applicants upload it to the project section. If it pertains to a specific damage line item, Applicants upload it to the damage section.

---

[64] FEMA staff may submit change requests through the PA Change Control Tool at usfema.sharepoint.com/teams/ORRApps/NewPA/Pages/SubmitRequest-CCT-P3.aspx. Recipients and Applicants may request changes via email at FEMA-Recovery-PA-Grants@fema.dhs.gov.

[65] PA Grants Portal user manuals are available in the resource tab in the portal.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## II.  Applicant Briefing

As soon as possible following the President's declaration, the Recipient conducts briefings for all potential Applicants (i.e., SLTT government entities and PNPs).[66] The Recipient is responsible for notifying potential Applicants of the date, time, and location of the Applicant Briefing. FEMA attends the Applicant Briefing to support the Recipient. During these briefings, the Recipient provides high-level information regarding the PA Program, such as:

- Overview of the PA Program delivery process (e.g., PA Grants Portal, application procedures);
- Program deadlines;
- General eligibility criteria;
- Project funding;
- Hazard mitigation;
- Alternative Procedures;
- Compliance requirements (procurement, EHP, and insurance); and
- Administrative requirements, including documentation and recordkeeping.

To obtain maximum benefit from the information presented at the briefing, a potential Applicant should send representatives from its management, emergency response, public works, and finance department and designate a primary point of contact to interact with the Recipient and FEMA.

## III.  Request for Public Assistance

The RPA[67] is an application for the PA Program. If a SLTT government entity or PNP wishes to seek PA funding, it must first submit an RPA to FEMA, through the Recipient. FEMA accepts RPAs through PA Grants Portal. If a Tribal government is its own Recipient, it submits its RPA directly to FEMA via PA Grants Portal. Prior to submitting RPAs to FEMA, the Recipient must review and approve each RPA and provide its assessment of the Applicant's risk of noncompliance as required by 2 C.F.R. § 200.331(b).

Using the RPA, the Applicant provides general information about its organization, including physical location and point of contact. Given the necessity to collaborate with each Applicant early in the PA Program implementation process, FEMA's expectation is that the Recipient collect RPAs as soon as possible after the respective area is designated in the declaration. However, FEMA accepts RPAs up to 30 days from the date the respective area was designated.[68] FEMA may extend the deadline for submitting an RPA if the Recipient submits a request in writing with justification based on extenuating circumstances beyond the Applicant's or Recipient's control.[69]

Only certain PNPs are eligible Applicants. Therefore, FEMA requires additional documentation and information with PNP RPAs to evaluate eligibility. PNP Applicants must also submit its

---

[66] 44 C.F.R. § 206.207(b)(1)(iii)(B).
[67] www.fema.gov/assistance/public/apply.
[68] 44 C.F.R. § 206.202(c).
[69] 44 C.F.R. § 206.202(f)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

facility-specific information in Grants Portal with all applicable documentation listed in <u>Chapter 3:VI.D.4, *Private Nonprofit Application Documentation Requirements*</u>.

## IV. Written Correspondence

Throughout this document, FEMA notes specific instances in which the Applicant must obtain FEMA approval. All requests for FEMA approval must be submitted in writing through the Recipient. The Recipient must forward the correspondence to FEMA with its recommendation. One exception is Request for Information (RFI) responses. When the Applicant submits a response to an RFI, it may submit the response simultaneously to the Recipient and FEMA for expediency. Unless otherwise noted, FEMA calculates all deadlines based on calendar days. The RA has the authority to respond to all written correspondence unless otherwise noted. The RA usually delegates this authority to the FCO upon a Presidential declaration.[70] The RA or FCO may further delegate authorities as appropriate. FEMA usually provides its response to the Recipient, which subsequently forwards FEMA's determination to the Applicant (in some instances FEMA may send correspondence simultaneously to the Recipient and the Applicant, such as with notifications of ineligibility determinations, appeal responses, and RFIs). See Figure 2. *Map of FEMA Regions* for the geographical responsibilities of each FEMA Region.



**Figure 2. Map of FEMA Regions**

---

[70] 44 C.F.R. § 206.41(b).

## V.    Eligibility Determinations

The four basic components of PA eligibility are:

- Applicant;
- Facility;
- Work; and
- Cost.



FEMA refers to these components as the building blocks of an eligibility pyramid. FEMA evaluates each building block to determine eligibility, starting at the foundation (Applicant) and working up to cost at the top of the pyramid (see Figure 3. *PA Eligibility Pyramid*). There are two exceptions to the standard eligibility pyramid.

**Figure 3. PA Eligibility Pyramid**

For PNPs, FEMA must determine whether the PNP owns or operates a facility that provides an eligible service in order to determine whether the Applicant is eligible (see Chapter 3:VI.D. *Private Nonprofit Organizations*, for additional information and a pyramid specific to PNP eligibility). Secondly, for SLTT government Applicants, evaluating facility eligibility is not a necessary step for most Emergency Work, as described in Chapter 7. *Emergency Work Eligibility*.

### A.    Requests for Information

FEMA may require additional information or documentation to evaluate eligibility. In these cases, FEMA requests the information or documentation by submitting an RFI. Responses to RFIs are due by the deadline specified in the RFI. FEMA usually requires responses within 15 days of the Applicant's receipt of the RFI. FEMA establishes the deadline based on the nature of the request and consideration of the type and volume of information or documentation requested. Therefore, the amount of time allowed may vary.

### B.    Notification of an Ineligibility Determination

The Program Delivery Task Force Leader (PDTFL) coordinates with the PAGS to address eligibility issues as projects are developed.

When determining that the Applicant, facility, work, or cost is ineligible, FEMA provides written notice via a Determination Memorandum (DM) or a letter that includes:



- Explanation of what assistance FEMA denied and, as applicable, the amount of assistance denied for each item;
- The basis for FEMA's denial, including the provisions of law, regulation, or policy that support the determination;
- A complete list of all documents reviewed (clearly titled for future reference); and
- Information regarding the Applicant's rights and procedures to appeal.

FEMA transmits the letter or DM simultaneously to the Recipient and Applicant via a method that confirms receipt.[71] This serves as the formal notification of FEMA's determination setting forth the Applicant's appeal rights.

The PDTFL is responsible for ensuring all information and documentation directly or indirectly considered in FEMA's eligibility determination is in PA Grants Manager. This may include, but is not limited to:

- Projects and project amendments;
- Notifications of eligibility determinations;
- Supporting backup documentation;
- Correspondence;
- Photographs;
- Technical reports; and
- Other relevant information.

FEMA considers this the Administrative Record.

## C.      Appeal Rights and Requirements

The Applicant may appeal any FEMA determination related to an application for, or the provision of, assistance under the PA Program.[72] This includes, but is not limited to, Applicant eligibility denials, nonconcurrence on eligible damage or scopes of work (SOWs), denial of time extensions, closeout determinations, and deobligations resulting from an audit.

FEMA provides the Applicant with two opportunities to appeal a determination:

- The first appeal is to the RA.[73]
- If the Applicant disagrees with the first appeal determination, it may submit a second appeal to the Assistant Administrator of the Recovery Directorate at FEMA Headquarters[74]

At any point in the appeal process, the Applicant may withdraw its appeal by submitting a written request simultaneously to the Recipient and FEMA. FEMA sends a written acknowledgment simultaneously to the Recipient and Applicant.

All second appeal decisions represent the agency's final administrative decision on the matter.

## 1.      Appeal Deadlines

The Applicant must submit a written appeal to the Recipient within 60 days of receiving FEMA's written notification of its determination (FEMA's eligibility determination or first appeal decision).[75] The Recipient must forward the appeal with its written recommendation to

---

[71] FEMA may transmit the document via any method that confirms receipt such as PA Grants Manager, certified or return receipt mail, or an email with read-receipt acknowledgement.

[72] Stafford Act § 423, 42 U.S.C. § 5189a; 44 C.F.R. § 206.206. FEMA requires Applicants to waive appeal rights on Permanent Work Alternative Procedures Projects unless it is related to a cost adjustment made by FEMA after the Fixed-Cost Offer is accepted.

[73] 44 C.F.R. § 206.206(b)(1).

[74] 44 C.F.R. § 206.206(b)(2).

[75] 44 C.F.R. § 206.206(c)(1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FEMA within 60 days of its receipt of the appeal.[76] If either the Applicant or Recipient does not meet the respective 60-day deadlines, FEMA will deny the appeal as untimely.

### 2.　Appeal Content

The Applicant must include:

- ☐ All relevant documentation supporting its position;
- ☐ The specific funding amount (or amounts if there are multiple issues on appeal) in dispute, as applicable; and
- ☐ Citations to the provisions of law, regulation, or policy (applicable to the respective disaster) with which the Applicant believes FEMA's determination was inconsistent.[77]

### 3.　Appeal Review

Upon receipt of the appeal, FEMA reviews the appeal content and uses the Administrative Record and the laws, regulations, and policies applicable to the respective incident to analyze the appeal. FEMA may request additional information via an RFI to adequately adjudicate the appeal or it may make its decision based on the documentation and information provided at the time of appeal submission. Within 90 days of receiving the appeal, FEMA takes one of the following three actions:

- Requests additional information specifying the date FEMA must receive the information (usually 30 days). Within 90 days of receiving the information (or within 90 days of the expiration of the deadline to respond), FEMA provides its appeal decision simultaneously to the Recipient and Applicant;[78]
- Submits the appeal to an independent expert, or experts, for technical review and recommendations. Within 90 days of receiving the technical review recommendations, FEMA provides its appeal decision simultaneously to the Recipient and Applicant;[79] or
- Provides its written decision simultaneously to the Recipient and Applicant using a method that confirms receipt.[80]

### (a)　Requests for Information on Appeals

When FEMA issues an RFI, it includes a deadline for the Applicant to submit the information, usually 30 days.[81] FEMA issues the RFI simultaneously to the Recipient and Applicant via a method that confirms receipt.

FEMA generally issues an RFI when:

- It identifies specific documentation or information that, if provided, might impact the outcome of the appeal or assist FEMA in adequately responding to the appeal; or

---

[76] 44 C.F.R. § 206.206(c)(2).
[77] 44 C.F.R. § 206.206(a).
[78] 44 C.F.R. § 206.206(c)(3).
[79] 44 C.F.R. § 206.206(d).
[80] FEMA may transmit notification via PA Grants Manager, certified or return receipt mail, email with read-receipt acknowledgement, or other methods that confirm receipt.
[81] FEMA establishes the deadline based on the nature of the request and consideration of the type and volume of information or documentation requested.

- The original eligibility determination is incorrect based on applicable law, regulation, or policy, but FEMA has identified a new basis for denying all, or a portion of, the appeal.

On first appeal, if FEMA identifies potentially ineligible SOW or costs that were not previously denied it issues an RFI that includes an explanation of the:

- New eligibility issue(s);
- Basis for the determination including an explanation of the applicable provisions of law, regulation, or policy justifying the decision;
- Amount of funding subject to denial and deobligation; and
- Specific information or documentation required to justify or further evaluate the eligibility issue(s).

FEMA proceeds with its review upon receipt of the Applicant's response to the RFI or expiration of the deadline to respond.

*(b)       Remanding a Second Appeal*

When reviewing a second appeal, the Assistant Administrator of the Recovery Directorate at FEMA headquarters, or designee, may identify an issue that necessitates sending the appeal back to the RA. This should be reserved for cases when there is no other acceptable way to resolve the issue.

### 4.       Appeals for Alternative Procedures Projects

FEMA is piloting Alternative Procedures on Permanent Work Projects. Due to the goals, intent, and benefits of the Alternative Procedures, FEMA does not consider appeals on Alternative Procedures Permanent Work Projects (see Chapter 8:VIII. Capped Projects) unless it is related to a cost adjustment made by FEMA after the Fixed-Cost Offer is accepted (i.e., related to insurance, noncompliance, or an audit). Any disagreement on damage, SOW, or cost must be resolved prior to accepting the fixed-cost offer. Additionally, FEMA does not consider appeals on time extension denials for Alternative Procedures Projects.

### D.    Arbitration

Under certain circumstances, an Applicant that disputes a FEMA determination related to its PA application, including eligibility for assistance or repayment of assistance, have a right of arbitration.[82] Additional information is provided in FEMA's Fact Sheet *Public Assistance Appeals and Arbitration under the Disaster Recovery Reform Act* at www.fema.gov/sites/ default/files/2020-07/fema_DRRA-1219-public-assistance-arbitration-right_fact-sheet.pdf.

---

[82] Stafford Act § 423(d), 42 U.S.C. § 5189a, as amended by the Disaster Recovery Reform Act § 1219.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## VI.  Applicant Eligibility

FEMA provides assistance to eligible Applicants, which are defined below.[83] As shown in Figure 4. *Applicant Eligibility*, FEMA must first determine whether the Applicant is eligible before evaluating the Applicant's claim. FEMA and the Recipient review the RPA to determine whether the Applicant is eligible for assistance.[84] This section provides FEMA's policy on Applicant eligibility.



The first step in reviewing eligibility is to determine whether the Applicant is eligible.

**Figure 4. Applicant Eligibility**

### A.    State and Territorial Governments

State and Territorial governments, including the District of Columbia, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands, are eligible Applicants. This includes any agency or instrumentality thereof, exclusive of local governments.[85] The State or Territorial government designates one of the agencies (usually the emergency management agency) as the Recipient. The Recipient serves as the pass-through entity to the other agencies, which are Subrecipients.

### B.    Tribal Governments

Federally recognized Indian Tribal governments, including Alaska Native villages and organizations, are eligible Applicants. Alaska Native Corporations are ineligible as they are privately owned.[86]

### C.    Local Governments

The following types of local governments are eligible Applicants:[87]

- Counties and parishes;
- Municipalities, cities, towns, boroughs, and townships;
- Local public authorities;
- School districts;
- Intrastate districts;
- Councils of governments (regardless of whether incorporated as nonprofit corporations under State law);
- Regional and interstate government entities;
- Agencies or instrumentalities of local governments;
- State recognized Tribes; and
- Special districts established under State law.

---

[83] 44 C.F.R. § 206.222.
[84] 44 C.F.R. § 206.207(b)(1)(iii)(C).
[85] Stafford Act § 102(4), 42 U.S.C. § 5122; 44 C.F.R. §§ 206.2(a)(22) and 206.222(a); and 2 C.F.R. § 200.90.
[86] Stafford Act § 102(6), 42 U.S.C. § 5122; 44 C.F.R. §§ 206.201(i) and 206.222(c); and 2 C.F.R. § 200.54.
[87] Stafford Act § 102(8), 42 U.S.C. § 5122; 44 C.F.R. §§ 206.2(a)(16) and 206.222(a); and 2 C.F.R. § 200.64.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

o  Community Development Districts are special districts that finance, plan, establish, acquire, construct or reconstruct, operate, and maintain systems, facilities, and basic infrastructure within their respective jurisdictions. To be eligible, a Community Development District must own and be legally responsible for maintenance, and operation of an eligible facility that is open to and serves the general public.[88]

The State or a political subdivision of the State may submit applications on behalf of rural communities, unincorporated towns or villages, and other public entities not listed above.[89]

## D.  Private Nonprofit Organizations

Only certain PNPs are eligible Applicants. To be an eligible PNP Applicant, the PNP must show that it has:



**Figure 5. PNP Eligibility**

To be eligible, a PNP must own or operate a facility that provides an eligible service.

- A ruling letter from the U.S. Internal Revenue Service that was in effect as of the declaration date and granted tax exemption under sections 501(c), (d), or (e) of the Internal Revenue Code; or
- Documentation from the State substantiating it is a non-revenue producing, nonprofit entity organized or doing business under State law.[90]

If the organization is not required to obtain 501(c)(3) status or tax-exempt status under applicable State law, the organization must provide articles of association, bylaws, or other documents indicating that it is an organized entity, and a certification that it is compliant with Internal Revenue Code section 501(c)(3) and State law requirements.

Additionally, as shown in Figure 5. *PNP Eligibility*, prior to determining whether the PNP is eligible, FEMA must first determine whether the PNP owns or operates an eligible facility.[91] For PNPs, an eligible facility is one that provides one of the services listed below (the declared incident must have damaged the facility):

- A facility that provides a critical service, which is defined as education, utility, emergency, or medical (see Table 1. *PNP Eligible Critical Services*);[92] or
- A facility that provides a noncritical, but essential social service AND provides those services to the general public (see Table 2. *PNP Eligible Noncritical, Essential Social Services*).[93] PNP facilities generally meet the requirement of serving the general public if ALL of the following conditions are met.[94]

---

[88] Community Development Districts generally meet the requirement of serving the public based on the same criteria used for PNPs in Chapter 3:VI.D. *Private Nonprofit Organizations*.

[89] Stafford Act § 102(8)(c), 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(16)(iii).

[90] 44 C.F.R. § 206.221(f).

[91] 44 C.F.R. § 206.222(b).

[92] Stafford Act § 406(a)(3)(B), 42 U.S.C. § 5172; 44 C.F.R. § 206.221(e).

[93] 44 C.F.R. § 206.221(e)(7).

[94] FEMA also uses this criteria to determine whether a Community Development District serves the public.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- o Facility use is not limited to any of the following:
  - A certain number of individuals;
  - A defined group of individuals who have a financial interest in the facility, such as a condominium association;
  - Certain classes of individuals; or
  - An unreasonably restrictive geographical area, such as a neighborhood within a community;
- o Facility access is not limited to a specific population (such as those with gates or other security systems intended to restrict public access); and
- o Any membership fees meet all of the following criteria:
  - Are nominal;[95]
  - Are waived when an individual can show inability to pay the fee;
  - Are not of such magnitude to preclude use by a significant portion of the community; and
  - Do not exceed what is appropriate based on other facilities used for similar services.
- Certain types of facilities, such as senior centers, that restrict access in a manner clearly related to the nature of the facility, are still considered to provide essential social services to the general public.[96]

In cases where the facility provides multiple services, such as a community center, FEMA reviews additional items to determine the primary service that facility provides. Facilities established or primarily used for political, athletic, recreational, vocational, or academic training, conferences, or similar activities are ineligible (see Table 3. *PNP Ineligible Services*).

---

[95] FEMA considers the provision of services with a high membership initiation fee or high annual dues to be restrictive to certain populations. FEMA may consider the provision of services with a low fee that only covers administrative processing costs or a fee that can be waived upon demonstration of need to be accessible to the general public.

[96] Per Stafford Act §§ 102(11)(B) and 406(a)(3)(C), 42 U.S.C. §§ 5122 and 5172, organizations operating houses of worship that limit leadership or membership to persons who share a religious faith or practice still provide essential social services to the general public.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

1.        **Private Nonprofit Critical Services**

**Table 1. PNP Eligible Critical Services**

| PNP ELIGIBLE CRITICAL SERVICES | |
|---|---|
| **EDUCATION**<br>• Primary or secondary education as determined under State law and provided in a day or residential school, including parochial schools; OR<br>• Higher-education institutions that meet all of the following criteria:<br>  o Admit students or persons having a high school diploma or equivalent;<br>  o Are legally authorized to provide education beyond a secondary level;<br>  o Award a bachelor's degree or 2-year degree that is acceptable as full credit toward a bachelor's degree or provides at least a 1-year training program to prepare students for gainful employment in a recognized occupation; and<br>  o Are accredited by a nationally recognized agency or association (as determined by the Secretary of Education).<br>• Educational facilities that meet the above criteria are eligible without regard to religious character or use for religious instruction. | **EMERGENCY MEDICAL**<br>• Emergency medical care (diagnosis or treatment of mental or physical injury or disease) provided in:<br>  o Clinics<br>  o Dialysis facilities<br>  o Facilities that provide in-patient care for convalescent or chronic disease patients<br>  o Hospices and nursing homes<br>  o Hospitals and related facilities, including:<br>    ➢ Central service facilities operated in connection with hospitals<br>    ➢ Extended-care facilities<br>    ➢ Facilities related to programs for home-health services<br>    ➢ Laboratories<br>    ➢ Self-care units<br>    ➢ Storage, administration, and record areas<br>  o Long-term care facilities<br>  o Outpatient facilities<br>  o Rehabilitation centers |
| **UTILITY**<br>• Communications transmission and switching, and distribution of telecommunications traffic<br>• Electric power generation, transmission, and distribution.<br>• Irrigation to provide water for drinking water supply, fire suppression, or electricity generation<br>• Sewer and wastewater collection, transmission, and treatment<br>• Water treatment, transmission, and distribution by a water company supplying municipal water | **EMERGENCY SERVICES**<br>• Ambulance<br>• Fire protection<br>• Rescue<br>• Public broadcasting that monitor, receive, and distribute communication from the Emergency Alert System to the public |
| Administrative and support facilities essential to the provision of the PNP critical service are eligible facilities. | |

2. **Private Nonprofit Essential Social Services**

**Table 2. PNP Eligible Noncritical, Essential Social Services**

| PNP ELIGIBLE NONCRITICAL, ESSENTIAL SOCIAL SERVICES |
|---|

| | |
|---|---|
| Community centers established and primarily used for the following services (or similar) to the general public:<br>• Art services authorized by a SLTT government, including, but not limited to:<br>  • Arts administration<br>  • Art classes<br>  • Management of public arts festivals<br>  • Performing arts classes<br>• Community center activities that serve the public<br>• Educational enrichment activities that are not vocational, academic, or professional training. Examples include hobby or at-home pursuits, such as:<br>  o Car care<br>  o Ceramics<br>  o Gardening<br>  o Personal financial and tax planning<br>  o Sewing<br>  o Stamp and coin collecting<br>• Multi-purpose arts programming<br>• Senior citizen projects, rehabilitation programs, community clean-up projects, blood drives, local government meetings, and similar activities<br>• Services and activities intended to serve a specific group of individuals (e.g., women, African Americans, or teenagers) provided the facility is otherwise available to the public on a non-discriminatory basis<br>• Social activities to pursue items of mutual interest or concern, such as:<br>  o Community board meetings<br>  o Neighborhood barbecues<br>  o Various social functions of community groups<br>  o Youth and senior citizen group meetings<br>• Performing arts centers with a primary purpose of producing, facilitating, or presenting live performances, including:<br>  o Construction of production materials<br>  o Creation of artistic works or productions<br>  o Design<br>  o Professional training<br>  o Public education<br>  o Rehearsals | Facilities that do not provide medical care, but provide:<br>• Alcohol and drug treatment and other rehabilitation services<br>• Assisted living<br>• Custodial care, even if the service is not provided to the general public (including essential administration and support facilities)<br>• Childcare<br>• Center-based childcare, even if not provided to the public<br>• Day care for individuals with disabilities or access and functional needs (for example, those with Alzheimer's disease, autism, muscular dystrophy)<br>• Food assistance programs, including Food Banks and storage of food for Food Banks<br>• Health and safety services, including animal control services<br>• Homeless shelters<br>• Houses of worship<br>• Libraries<br>• Low-income housing (as defined by Federal or SLTT law or regulation)<br>• Museums:<br>  o Constructed, manufactured, or converted with a primary purpose of preserving and exhibiting a documented collection of artistic, historic, scientific, or other objects<br>  o Buildings, associated facilities, fixed facilities, and equipment primarily used for the preservation or exhibition of the collection, including:<br>    ➢ Permanent infrastructure, such as walkways and driveways of outdoor museum-type exhibition areas<br>    ➢ Historic buildings, such as barns and other outbuildings, intended for the preservation and exhibition of historical artifacts within a defined area<br>    ➢ Permanent facilities and equipment that are part of arboretums and botanical gardens<br>    ➢ Infrastructure, such as utilities, and administrative facilities necessary for support<br>  o The grounds at museums and historic sites are ineligible.<br>  o Open natural areas/features or entities that promote the preservation/conservation of such areas are ineligible.<br>• Residential and other services for families of domestic abuse<br>• Residential services for individuals with disabilities<br>• Senior citizen centers<br>• Shelter workshops that create products using the skills of individuals with disabilities<br>• Zoos |

| |
|---|
| With exception of custodial care facilities and museums, administrative and support facilities essential to the provision of PNP noncritical service are ineligible facilities. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**3.      Private Nonprofit Ineligible Services**

**Table 3. PNP Ineligible Services**

| PNP INELIGIBLE SERVICES | |
| --- | --- |
| **COMMUNITY CENTER SERVICES** | **OTHER COMMUNITY SERVICES** |
| • Training individuals to pursue the same activities as full-time paying careers (for example, vocational, academic, or professional training)<br>• Meetings or activities for only a brief period, or at irregular intervals<br>• Other education or training including:<br>  ○ Athletic, vocational, academic training, or similar activities<br>  ○ Political education | • Advocacy or lobbying groups not directly providing health services<br>• Cemeteries<br>• Conferences<br>• Day care services not included in previous table of eligible services<br>• Flood control (e.g., levees, berms, dunes)<br>• Land reclamation facilities<br>• Irrigation solely for agricultural purposes[97]<br>• Job counseling<br>• Property owner associations with facilities such as roads, bridges, and recreational facilities (except utilities or emergency facilities)<br>• Public housing, other than low-income housing<br>• Recreation<br>• Parking not in direct support of eligible facility |

**4.      Private Nonprofit Application Documentation Requirements**

**Table 4. PNP RPA Documentation and Information Requirements**

| All PNP Applicants |
| --- |
| ☐ A ruling letter from the Internal Revenue Service that was in effect on the declaration date and granted tax exemption under sections 501(c), (d), or (e) of the Internal Revenue Code; OR documentation from the State substantiating it is a non-revenue producing, nonprofit entity organized or doing business under State law. If exempt from both the requirement to apply for 501(c)(3) status and tax-exempt status under State law, the organization must provide articles of association, bylaws, or other documents indicating that it is an organized entity and a certification that it is compliant with Internal Revenue Code section 501(c)(3) and State law requirements. (required) |
| ☐ If the Applicant owns the damaged facility, proof of ownership (required) |
| ☐ If the Applicant leases the damaged facility, provide lease or other proof of legal responsibility to repair the incident-related damage (required) |
| ☐ List of services provided in the damaged facility, when, and to whom (required) |
| **Membership Organization** |
| ☐ Who is allowed membership (required) |
| ☐ What fees are charged (required) |
| ☐ Policy regarding waiving memberships (required) |

---

[97] 44 C.F.R. § 206.221(e)(3).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Child Care Facility |
| --- |
| ☐ Proof that the State Department of Children and Family Services, Department of Human Services, or similar agency, recognizes it as a licensed childcare facility (required) |

| Education |
| --- |
| ☐ Proof that the school is accredited or recognized by the State Department of Education (required). State regulations for private schools vary and some states do not require accreditation. A PNP school must demonstrate that it is recognized by the state as providing elementary or secondary education. Depending on state requirements, documentation may include, but is not limited to, the following (must have been in existence at the time of the incident): <br> ☐ Accreditation documents <br> ☐ Certification from the State Department of Education that the Applicant operated the facility as a PNP school at the time of the incident <br> ☐ Documentation demonstrating compliance with the State's compulsory attendance laws <br> ☐ School-year calendar <br> ☐ School budget <br> ☐ Complete list of students and teachers <br> ☐ Educational instruction property and equipment owned by the PNP <br> ☐ Tax records for the school <br> ☐ Documents reflecting school curriculum, transcripts, health and safety, disciplinary, or other records kept for students <br> ☐ Tuition receipts <br> ☐ Financial statements <br> ☐ Commencement documents <br> ☐ Inclusion in the U.S. Department of Education's National Center for Education Statistics Private School Universe Survey data[98] <br> ☐ State Department of Education electronic and paper homeschool declaration or registration forms |

| Mixed-Use Facility (See Chapter 4:II.B.1, *Mixed-Use Facility*) |
| --- |
| ☐ Proof of the established purpose of the facility with documentation (required), such as: <br> ☐ U.S. Internal Revenue Service documentation; <br> ☐ Pre-incident charter, bylaws, and amendments; or <br> ☐ Evidence of longstanding, routine (day-to-day) use (e.g., a calendar of activities). |

Once FEMA approves the RPA, the PAGS in coordination with the PDTFL assigns a Program Delivery Manager (PDMG) to the Applicant (usually within 5 working days of RPA approval). The PDMG serves as the primary point of contact for the Applicant, providing customer service and programmatic guidance throughout phases I through V of the PA Program delivery process.

# VII. Exploratory Call

The PDMG conducts the Exploratory Call with the Applicant (usually within 7 working days of Applicant assignment). The Exploratory Call is an introductory discussion conducted by the PDMG via a conference call. The PDMG reviews the Applicant Profile prior to the Exploratory

---

[98] The Private School Universe Survey electronic search tool is available at nces.ed.gov/surveys/pss/privateschoolsearch/.

Call. The objective for the call is to begin developing a relationship with the Applicant and prepare for the Recovery Scoping Meeting as follows:

- Understand the Applicant's incident impacts by gathering information about the type and level of damage and priority needs for assistance;
- Ensure the Applicant understands the general requirements for a list of impacts;
- Provide key information on documentation, procurement, and EHP requirements; and
- Schedule the Recovery Scoping Meeting and define appropriate attendees.

After the Exploratory Call and prior to the Recovery Scoping Meeting, the Applicant needs to begin compiling its list of impacts to formally document its claim. Chapter 5:I. *List of Impacts*, provides details on how to list the impacts. It is critical that the Applicant work with its PDMG to submit all impact information early in the process to enable efficient and accurate project development. FEMA and the Recipient use this information to deploy the appropriate number and type of resources and need the information as soon as possible to assist Applicants expeditiously.

## VIII. Recovery Scoping Meeting

FEMA and the Recipient should conduct the Recovery Scoping Meeting within 21 working days of assigning a PDMG to the Applicant.

While the Applicant Briefing provides high-level information for all potential Applicants, the Recovery Scoping Meeting addresses the specific needs of each eligible Applicant. At the Recovery Scoping Meeting, FEMA, the Recipient, and the Applicant review and refine the list of impacts and discuss:

- PA delivery process;
- Details of the Applicant's impacts from the incident;
- Hazard mitigation opportunities;
- Eligibility criteria for facilities, work and costs;
- Logical grouping of damage;
- Procurement requirements;
- Insurance reductions and requirements;
- EHP compliance requirements;
- Documentation requirements;
- Interagency Recovery Coordination;
- Deadlines; and
- Appeal process.

The Applicant should ensure staff with knowledge of the incident-related damage, emergency activities performed, and related costs attend the meeting (e.g., public works official, finance staff, risk manager).

Additionally, the Applicant and PDMG develop the Project Development Plan, which is a 45 to 60-day plan that includes a schedule of key steps to complete the project application development process. FEMA uses the Project Development Plan to track project application progress. In creating the plan, the PDMG and Applicant discuss:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Weekly Applicant Status Meeting schedule;
- Site inspection schedule;
- Applicant's role in approving the Damage Descriptions and Dimensions;
- Timeline to gather and submit documentation; and
- Timeline to develop SOWs and cost estimates.

V4 2020

# CHAPTER 4: GENERAL WORK AND FACILITY ELIGIBILITY

This chapter provides the general requirements for work to be eligible and provides PA policy on facility eligibility. Although eligibility determinations may occur later in the process, FEMA conducts much of its eligibility evaluation of facilities and work throughout Phase II: *Impacts and Eligibility*.

## I. General Work Eligibility

Through the PA Program, FEMA provides grant funding for:

- Emergency protective measures and debris removal (Emergency Work); and
- Permanent restoration of damaged facilities, including cost-effective hazard mitigation to protect the facilities from future damage (Permanent Work).

If an entity does not comply with all applicable statutes, EOs, regulations, and policies, FEMA may take one of several actions including disallowing all or part of the cost of the project not in compliance.[99]

### A. Categories of Work

To facilitate the processing of PA funding, FEMA separates Emergency Work into two categories and Permanent Work into five categories based on general types of facilities. These categories are shown in Figure 6. *Categories of Work*.

### B. Minimum Work Eligibility Criteria

At a minimum, work must meet each of the following three general criteria to be eligible:

- Be required as a result of the declared incident;
- Be located within the designated area; and
- Be the legal responsibility of an eligible Applicant.[100]

Work eligibility is discussed in detail in Chapters 7. *Emergency Work Eligibility* and 8. *Permanent Work Eligibility*.

**Emergency Work**

Address an immediate threat:

A  Debris removal
B  Emergency protective measures

**Permanent Work**

Restoration of:

C  Roads/bridges
D  Water control facilities
E  Buildings/equipment
F  Utilities
G  Parks, recreational, and other facilities

**Figure 6. Categories of Work**

### 1. Result of Declared Incident

The Applicant is responsible for showing that work is required:

- Due to an immediate threat resulting from the declared incident (Emergency Work); or

---

[99] 2 C.F.R. § 200.338.
[100] 44 C.F.R. § 206.223(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- To address damage caused by the declared incident (Permanent Work, temporary repairs, and mold remediation).

The Applicant must demonstrate that the debris causing an immediate threat was generated by the declared incident during the declared incident period.

The Applicant must demonstrate that damage was caused directly by the declared incident. FEMA does not provide PA funding for repair of damage caused by:

- Deterioration;
- Deferred maintenance;
- The Applicant's failure to take measures to protect a facility from further damage; or
- Negligence.[101]

When necessary to validate damage, the Applicant may be required to provide:

- ☐ Pre-incident photographs of the impacted site or facility; and/or
- ☐ Documentation supporting pre-disaster condition of the facility (e.g., facility maintenance records, inspection/safety reports).

If a facility was functioning prior to the disaster and the disaster caused damage that rendered the facility non-functional, the facility may be eligible provided the pre-disaster condition was not a significant contributing factor in the cause of failure.

## 2.    Within Designated Area

To be eligible, the facility must be located, and work must be performed, in the designated area defined in the declaration [except for sheltering, evacuation, and EOC activities]. The sheltering, evacuation and EOC activities must be used for a declared area.[102] Emergency Work or Permanent Work performed on a facility located outside of the designated area is ineligible. This is true even if an eligible Applicant is legally responsible for the work, including work performed outside the designated area to protect a facility within the designated area.

Tribal governments do not always have geographical boundaries, and some have boundaries that cross State lines. Therefore, declarations do not usually define specific designated geographical areas for Tribal governments. For Tribal governments, FEMA determines eligibility based on legal responsibility and whether the work is directly related to the declared incident.

## 3.    Legal Responsibility

To be eligible, work must be the legal responsibility of the Applicant requesting assistance.[103]

To determine legal responsibility for Emergency Work, FEMA evaluates whether the Applicant requesting the assistance either had jurisdiction over the area or the legal authority to conduct the work related to the request at the time of the incident.

To determine legal responsibility for Permanent Work, FEMA evaluates whether the Applicant claiming the costs had legal responsibility for disaster-related restoration of the facility at the time of the incident based on ownership and the terms of any written agreements (such as for facilities under construction, leased facilities, and facilities owned by a Federal agency).

---

[101] 44 C.F.R. § 206.223(e).
[102] 44 C.F.R. § 206.223(a)(2).
[103] 44 C.F.R. § 206.223(a)(3).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*(a)        Documentation to Support Legal Responsibility*

Documents that support legal responsibility include:

- ☐ Deeds;
- ☐ Titles;
- ☐ Lease agreements (required for leased facilities); and
- ☐ Contract (required for facilities under construction at the time of the incident).

*(b)        Facility Ownership*

When the Applicant requests PA funding to restore a facility, it is the Applicant's responsibility to provide proof that it owns the facility. To determine ownership, FEMA may review deeds, title documents, and local government tax records.

Ownership of a facility is usually sufficient to establish the Applicant's legal responsibility to restore the facility, provided it is not under construction by a contractor or leased to another entity at the time of the incident.

*(c)        Facilities under Construction*

If the facility is under construction by a contractor at the time of the incident, FEMA reviews the contract to determine whether the Applicant is legally responsible for the repair of damage caused by the incident.[104] At a minimum, FEMA evaluates the contract to determine if it:

- Identifies the contractor or owner as being responsible for disaster-related repairs;
- Requires a builder's risk policy for losses that occur while the contractor has control of the facility;
- Has a Force Majeure provision, which is a clause that relieves the contractor from responsibility for damage beyond its reasonable control, such as natural disasters (often referred to "acts of God") or acts of war; or
- Has a provision that identifies the point at which the contractor transfers legal responsibility for the facility, or portions of the facility, back to the owner.

*(d)        Leased Facilities*

The Applicant may own a facility and lease it to a tenant, or the Applicant may lease a facility owned by another party. In either case, FEMA reviews the lease agreement to determine legal responsibility for repair of damage caused by the incident. If the lease does not specify either party as responsible, FEMA considers the owner of the facility legally responsible for the costs to restore the facility.

If the lease is between two eligible Applicants, FEMA provides PA funding to the Applicant legally responsible for the restoration.

*(e)        Federal Facilities*

Facilities owned and maintained by Federal agencies are ineligible. If a Federal agency constructed a facility and formally designated the Applicant as the legally responsible entity for

---

[104] Stafford Act § 406(e)(2), 42 U.S.C. § 5172.

facility operation, maintenance, and repairs, then the facility may be eligible. FEMA reviews the other Federal agency's authority and agreement between the Federal agency and the Applicant to confirm the legally responsible entity.

*(f)        Jurisdiction over an Area*

In general, the Applicant only has legal responsibility to conduct Emergency Work activities within its jurisdiction. If the Applicant conducts Emergency Work activities outside its jurisdiction, it must demonstrate its legal basis and responsibility to conduct those activities.

*(g)        Conducting Activities on Private Property*

Work on private property is the legal responsibility of the property owner and generally ineligible for PA funding. In rare cases, FEMA may provide PA funding for specific, limited activities. In such cases, at a minimum, the Applicant must have legal authority to conduct the activity. To determine whether a SLTT government has legal authority to conduct activities on private property, FEMA reviews the Applicant's legal basis and specific authority to conduct the activities. See Chapter 7:I.E. Debris Removal from Private Property and 7:II.C. Emergency Protective Measures on Private Property for additional eligibility requirements.

*(h)        Work Under the Authority of Other Federal Agencies*

OFAs have authority to conduct work that may overlap with FEMA's authority. FEMA's authority is broad and most OFA authorities are more specific than FEMA's authorities.

FEMA evaluates its authorities against OFA authorities. Some of the Factors that FEMA considers when evaluating whether an OFA has more specific authority are whether the OFA's authority is specifically and exclusively:

- Available for a particular type of facility, work, or activity;
- Applicable to a Presidential Declaration under the Stafford Act;
- Specific to an incident or type of incident; or
- Delineated under direction by Congress.

In such cases, FEMA does not provide assistance for the facilities or work even if that OFA does not provide funding for the facility or work.[105] This restriction includes any activities or costs related to the work that falls under OFA authorities as the costs are not related to eligible work. The Applicant should apply to the respective agency for assistance with a facility or work under that agency's authority.

## C.        Environmental and Historic Preservation Requirements

Several statutes, EOs, and regulations establish requirements to protect the environment and preserve the Nation's historic and archaeological resources. FEMA reviews each PA project to ensure the work complies with applicable Federal EHP laws and implementing regulations, and applicable EOs. [106] The Applicant is responsible for complying with applicable Federal, State, Territorial, or Tribal EHP laws even if FEMA is not providing PA funding for all of the work.

---

[105] 44 C.F.R. § 206.226(a).
[106] 2 C.F.R. § 200.300.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

See Appendix A: *Environmental and Historic Preservation Compliance* for a description of frequently encountered EHP statutes, EOs, and regulations.

FEMA provides technical support to Applicants throughout the recovery process to help ensure compliance with all EHP laws, regulations, and EOs, as well as to identify opportunities to incorporate conservation measures in the project area for the protection and preservation of environmental or historic resources.

## II.    Facility Eligibility

In general, a facility must be determined eligible for work to be eligible. There are exceptions for some emergency work activities as shown in Figure 7. *Facility Eligibility* and discussed in Chapter 7. *Emergency Work Eligibility*.

A facility is a building, system, or equipment, built or manufactured, or an improved and maintained natural feature.[107]

An example of a system that qualifies as a facility is a water distribution system. Mechanical, electrical, plumbing, and other systems that are components of a facility in which they operate are considered part of that facility.



**Figure 7. Facility Eligibility**

For PNPs, the facility must be eligible in order for the work to be eligible.

For State, Territorial, Tribal, and local governments, the facility must be eligible in order for Permanent Work, temporary repairs, or mold remediation to be eligible. Facility eligibility is not applicable to other Emergency Work.

A natural feature is improved and maintained if it meets all of the following conditions:

- The natural feature has a designed and constructed improvement to its natural characteristics, such as a terraced slope or realigned channel;
- The constructed improvement enhances the function of the unimproved natural feature; and
- The Applicant maintains the improvement on a regular schedule to ensure that the improvement performs as designed.

Only the section of a natural feature that meets the criteria above is eligible. For example, if only 150 linear feet of a natural channel bank is armored with rip rap and maintained, the eligible facility would be limited to that 150-linear-foot section.

The following are ineligible facilities:

- Unimproved property (e.g., a hillside or slope, forest, natural channel bank); and
- Land used for agricultural purposes.[108]

---

[107] 44 C.F.R. § 206.201(c).
[108] Ibid.

## A.    Public Facility

An eligible public facility is one that a SLTT government owns or has legal responsibility for maintaining, including any:

- Flood control, navigation, irrigation, reclamation, public power, sewage treatment and collection, water supply and distribution, watershed development, or airport facility;
- Non-Federal-aid street, road, or highway;
- Other public building, structure, or system, including those used for educational, recreational, or cultural purposes; or
- Park.[109]

When a facility maintained by a Community Development District is not open to the general public or does not provide a service to the general public, the facility is ineligible.

## B.    Private Nonprofit Facility

An eligible PNP facility is one that provides educational, utility, emergency, medical, or custodial care, including for senior citizens or individuals with disabilities, and other essential social-type services to the general public (see Table 1. *PNP Eligible Critical Services* and Table 2. *PNP Eligible Noncritical, Essential Social Services*).[110]

If a PNP operates multiple facilities, or a single facility composed of more than one building, FEMA must evaluate each building independently, even if all are located on the same grounds. Buildings that are part of a complex that includes outdoor facilities (e.g., swimming pools, athletic fields, or tennis courts) are not evaluated separately from the rest of the complex when determining eligibility of the building. For example, an outdoor pool usually has a building for bathrooms and controlling entry. In such cases, FEMA does not evaluate the building for eligibility separately because it is an intrinsic part of the pool complex.

See Appendix B: *Private Nonprofit Facility Eligibility Examples*, for examples of PNP facilities and corresponding eligibility determinations.

### 1.    Mixed-Use Facility

PNP facilities that provide both eligible and ineligible services are considered mixed-use facilities. Eligibility of mixed-use PNP facilities is dependent on the *primary* use of the facility, which is determined by the amount of physical space dedicated to eligible and ineligible services. "Primary use" is the use for which *more* than 50 percent of the physical space in the facility is dedicated. FEMA evaluates the entire structure when determining primary use; it does not separately address individual areas, such as floors, basements, or wings. Common space, such as bathrooms, hallways, lobbies, closets, stairways, and elevators, is not included when calculating mixed-use space.

If FEMA determines that 50 percent or more of physical space is dedicated to ineligible services, the entire facility is ineligible. If the facility is eligible, FEMA prorates Permanent Work funding based on the percentage of physical space dedicated to eligible services. Depending on the specifics of the scenario, FEMA either prorates Emergency Work funding or limits Emergency

---

[109] Stafford Act § 102(10), 42 U.S.C. § 5122; 44 C.F.R. § 206.221(h).
[110] Stafford Act § 102(11), 42 U.S.C. § 5122; 44 C.F.R. § 206.221(e).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Work funding to what is eligible, necessary, and reasonable. The Applicant is responsible for the balance of costs to restore the facility and must restore the entire facility to receive funding for repairs to the eligible-use portions of the facility.

Eligible PNP irrigation and eligible PNP public broadcasting facilities are exempt from primary use requirements. However, in consideration of irrigation, FEMA will evaluate whether the facility was designed to provide eligible irrigation and whether it has ever been used for that purpose. If the facility was not designed for an eligible irrigation purpose, and has never been utilized for that purpose, it is not eligible.

### (a)        Mixed-Use Space

In cases where the same physical space is used for both eligible and ineligible services, the primary use is the use for which more than 50 percent of the operating time is dedicated in that shared physical space. If space is available for use, but the Applicant cannot support that it is used for eligible services for more than 50 of the percent of operating time, this criterion is not met.

If FEMA determines that 50 percent or more of the operating time in the shared physical space is dedicated to ineligible services, then FEMA does not include that physical space when evaluating primary use.

### (b)        Use by Multiple Entities

In cases where a PNP Applicant shares use of a facility, it is only eligible if the facility is primarily owned by the PNP Applicant and meets the primary use requirement. FEMA prorates funding for these facilities based on the percentage of physical space that the Applicant owns and dedicates to eligible services. The following guidelines are used to determine the eligibility of such facilities:

- If the eligible PNP owns the entire facility and leases a portion of it to another entity, the facility is eligible provided that the PNP dedicates more than 50 percent of the facility for eligible services. If the PNP leases 50 percent or more of the facility to an ineligible Applicant, or for ineligible services, then the facility is ineligible.
- If the eligible PNP only owns a portion of the facility, it is eligible provided that the PNP owns more than 50 percent of the facility and dedicates more than 50 percent of physical space for eligible services.

### 2.        Small Business Administration Loan Requirement

Following a Major Disaster Declaration, the U.S. Small Business Administration (SBA) can provide loans to individuals and businesses for facility restoration. For PNPs with facilities that provide noncritical, essential social services, FEMA only provides PA funding for eligible Permanent Work costs that an SBA loan will not cover for those facilities. Therefore, noncritical PNPs must also apply for a disaster loan from the SBA and receive a determination for Permanent Work on facilities that:[111]

- Provide noncritical services; or

---

[111] Stafford Act § 406(a)(3)(A)(ii), 42 U.S.C. § 5172; 44 C.F.R. § 206.226(c). For online applications to SBA, The Applicant should visit the SBA website at disasterloan.sba.gov/ela/. For additional assistance with the application process, the Applicant should contact the SBA Disaster Customer Service Center at 1-800-659-2955.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Are mixed-use facilities and the eligible portion of the facility is used to provide services that are entirely noncritical.

If the PNP misses the SBA application deadline, including any SBA approved extension, the Permanent Work is ineligible for FEMA PA funding. If the PNP declines an SBA loan, PA funding is limited to the costs that the loan would not have otherwise covered. This applies even when the PNP cannot accept the terms of the loan, and SBA therefore denies the loan, which may occur when the entity does not meet a collateral requirement. Possible outcomes are shown in Figure 8. *SBA Loan Outcomes*.



**Figure 8. SBA Loan Outcomes**

PNPs do not need to apply for a disaster loan from the SBA for facilities that:

- Provide critical services; or
- Are mixed-use and the eligible portion is either entirely or partially used to provide critical services.

## C.    Inactive or Partially Inactive Facility

To be eligible, a facility must have been in active use at the start of the incident period. Inactive facilities are ineligible, unless one of the following conditions is met:

- The facility was only temporarily inactive for repairs or remodeling (provided a contractor is not responsible for repair of disaster-related damage);
- The Applicant firmly established future active use in an approved budget; or

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- The Applicant can clearly demonstrate its intent to begin use within a reasonable amount of time.[112]

The above criteria also apply to facilities that are partially inactive at the start of the incident period. Inactive portions are ineligible unless one of the exceptions noted above applies.

When eligible repairs benefit an area that was not in active use, FEMA prorates funding based on the percentage of the facility that was in active use. For example, if the roof of a partially used building is destroyed, FEMA limits the eligible cost to a prorated amount of the total cost to replace the roof based on the percentage of the building that was in active use.

For PNP mixed-use facilities to be eligible, more than 50 percent of the facility had to be in active use for an eligible purpose at the time of the incident.

## D.    Facility Scheduled for Repair or Replacement

Facilities that are not yet under contract but are scheduled for repair or replacement using non-Federal funds are eligible provided that the claimed damage did not exist prior to the incident (FEMA may review procurement and contract documents to validate). If damage existed prior to the incident, only the repair of damage caused by the incident is eligible.

A facility scheduled for replacement within 12 months of the start of the incident period using Federal funds is ineligible. In such a case, the Applicant should coordinate with the agency funding the project to expedite replacement, if possible.

---

[112] 44 C.F.R. § 206.226(k)(2).

# CHAPTER 5:   DAMAGE AND IMPACT INFORMATION

This chapter provides information on procedures conducted during Phase II, *Impacts and Eligibility*, which include finalizing the list of impacts, logically grouping the impacts and associated damage and work into project applications;[113] conducting site inspections to develop a detailed description of the incident-related damage and dimensions; and collecting project information and documentation.

## I.    List of Impacts

The Applicant is required to identify and report all of its incident-related impacts to FEMA within 60 days of the Recovery Scoping Meeting.[114] FEMA may extend the deadline to identify and report the impacts if the Applicant submits a request with justification based on extenuating circumstances beyond the Recipient's or Applicant's control.[115] For example, if a site is inaccessible, FEMA may extend the deadline for that site.

The Applicant needs to submit this identification in the form of a list of impacts that includes all facility damage, debris quantities, and emergency protective measures to address immediate threats that the Applicant is claiming for PA funding. The Applicant lists the information by location with a rough estimate of the associated cost. The list does not include detailed descriptions of impacts, damaged components within a facility, or a final estimate of costs.



Each line item in the list needs to include the following:

- ☐ Unique Identifier (e.g., facility name and site) (required);
- ☐ Specific location of debris impacts or facility damage (required);
- ☐ General description of damage, emergency protective measures, or approximate quantities of debris;
- ☐ Approximate cost (required)
- ☐ Status of work; and
- ☐ Project priority level.

---

[113] 44 C.F.R. § 206.201(l).
[114] 44 C.F.R. § 206.202 (d)(1)(ii).
[115] 44 C.F.R. § 206.202 (f)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## II.    Grouping Impacts into Projects

This section defines logical grouping of work and damage.[116]

The PDMG works with the Applicant and PDTFL to identify sites and facilities that can be combined into one project. This is a two-step process: 1) Create groups based on categories of work and facility types. 2) Identify sites or facilities that should be formulated into separate projects.

Before grouping work or damage, the PDMG must identify and remove any damaged sites or facilities that are under the authority of another Federal agency. The PDMG must also identify and remove any facilities that were not in use at the time of incident in accordance with Chapter 4:II.C. *Inactive or Partially Inactive Facility*. The Applicant must either withdraw these sites and facilities from its list of impacts or FEMA will issue a Determination Memorandum.

### A.    Initial Emergency Work Grouping

The bullets below identify emergency work that FEMA usually groups together (each bullet stands for one initial grouping):

- All debris removal from public property (Category A);
- All debris removal from waterways (Category A);
- All debris removal from private residential property (Category A);
- All debris removal from commercial property (Category A);
- All private property demolition (Category B);
- All emergency response activities (except those conducted on private property) (Category B);
- Any emergency protective measures performed on private property (Category B);
- All emergency protective measures that involve facility construction or repairs (Category B);
- Each individual temporary facility (Category B); and
- All donated resources for Emergency Work (Category B).

### B.    Initial Permanent Work Grouping

The bullets below identify damaged facilities that FEMA considers initially grouping together (each bullet stands for one initial grouping). The list is based on infrastructure categories.

Transportation:

- All roads, bridges, low water crossings, and culverts (Category C);
- All mass transit facilities such as subways and railways (Category G);
- All airports (Category G); and
- All ports and harbors (Category G).

Flood Control:

- All dams and reservoirs (Category D);

---

[116] 44 C.F.R. § 206.201(k).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- All canals, drainage channels, and aqueducts (Category D);
- All stormwater retention and detention basins (Category D); and
- All coastal shoreline protection facilities (levees, berms, seawalls, sand revetments, etc.) (Category D).

Education:

- All school campuses (Category E).

Housing:

- All public housing campuses (Category E).

Health:

- All hospital campuses (Category E).

Emergency Service Facilities:

- All police, fire, emergency operation centers, prisons, etc. (Category E).

Other Government Facilities:

- All courthouses, administrative buildings, and other non-emergency buildings (Category E).

Energy:

- All power generation facilities and plants - Include all wind turbines, generators, substations, and other facilities within the confines of the plant. (Category F);
- Entire power transmission and distribution system (Category F); and
- Entire natural gas transmission and distribution system (Category F).

Water/Waste-water:

- All water and wastewater treatment plants (Category F);
- Entire water distribution system (Category F);
- Entire wastewater collection system (Category F); and
- Entire irrigation system (Category F).

Communications/Information Technology:

- All communication systems (Category F).

Natural and Cultural Resources:

- All parks, golf courses, and fish hatcheries (Category G);
- All beaches (Category G); and
- All cemeteries (Category G).

FEMA includes ancillary (support) facilities at a site in the same project as the primary facility at that site. Ancillary facilities may include but are not limited to: buildings, outside structures (e.g. maintenance and storage sheds, restroom facilities, bath houses, pumping stations, etc.), communication towers and antennas, contents, supplies, equipment, vehicles, fences, parking

V4 2020

lots, stairs, ramps, access roads, runways, signage, lighting, sidewalks, gutters, ditches, guard rails, integral ground, catch basins, outfall structures, piers, docks, trails, benches, picnic tables, swimming pools, golf courses, ball fields, etc. Any donated resources for Permanent Work must also be included in the Permanent Work Project.

## C.      Final Grouping

After initially grouping sites and facilities into one project, identify sites or facilities that need to be separated from the initial grouping and formulated into separate projects. Sites or facilities that need to be separated include those that:

- Are anticipated to require extensive EHP reviews. The PDMG works with EHP staff to identify these sites and facilities;
- Are in a Special Flood Hazard Area;
- Need Architectural/Engineering design funding prior to determining SOW and cost;
- Have 100% of the work completed;
- Are complex and require specialized technical support for project formulation, such as significantly damaged waste water treatment plants, dams, hospitals, or schools;
- Have ineligible work;
- Would make a project too unwieldy to review due to the number of sites and facilities combined (consider separating into two projects or creating separate projects based on geographical locations); and/or
- The Applicant and PDTFL agree have specific circumstances that make it illogical to combine.

PNP Applicants should also separate critical service facilities into separate projects from noncritical service facilities so that projects with critical service facilities are not delayed pending the Small Business Administration determination described in Chapter 4:II.B.2. *Small Business Administration Loan Requirement*.

# III.  Site Inspections and Obtaining Damage Information

FEMA gathers project-specific information by conducting site inspections and obtaining documentation. These activities occur concurrently.

## A.      Damage Information

FEMA requests information and documentation required to substantiate the eligibility of a project. The Applicant is responsible for providing this information and documentation to support that its facilities, work, and costs are eligible based on the applicable laws, regulations, EOs, and policies. At a minimum, FEMA usually requires the "who, what, when, where, why, and how much" for each item claimed.

The Applicant answers questions for each project, which trigger information and documentation that the Applicant needs to provide. Various documents may provide the information required; therefore, FEMA usually accepts a variety of documentation to substantiate eligibility. If FEMA requires specific information or documentation to support eligibility, FEMA specifies the requirement in checklists throughout the PAPPG; however, these checklists are not all-inclusive lists. FEMA and the Recipient work with the Applicant to evaluate submitted documentation and

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

determine whether it supports eligibility. If the Applicant does not provide sufficient documentation to support its claim as eligible, FEMA cannot provide PA funding for the work.

## B.    Site Inspections

Damage information is the foundation of the overall project award (i.e., SOW and cost eligibility are tied to the eligible damage). Therefore, FEMA and the Applicant need to reach agreement on the disaster-related damage description and dimensions, emergency protective measures, and debris impacts before proceeding with SOW development. If there are unresolved issues, FEMA documents the decision in a DM. Applicants should still concur on the portion of the damage that is agreed-upon so that the process can move forward.

FEMA conducts inspections at sites with work to be completed. The purpose of the inspection is to validate, quantify, and document the cause, location, and details of the reported damage and debris impacts. FEMA may also identify EHP issues, project-related conservation opportunities, and PA mitigation opportunities during the site inspection.

To expedite the process, in lieu of FEMA inspections at all sites, the Applicant may submit damage information and documentation for FEMA to review and validate using a sampling methodology. FEMA works with the Recipient and Applicant to determine when sampling and validation is appropriate. Sampling may not be appropriate for some damage sites.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 6:   COST ELIGIBILITY

This chapter provides PA policy on cost eligibility. Although costs are the final component evaluated for eligibility, as shown in Figure 9. *Cost Eligibility*, this criterion applies to all costs claimed. Not all costs incurred as a result of the incident are eligible. To be eligible, costs must be:



Figure 9. Cost Eligibility

- Directly tied to the performance of eligible work;
- Adequately documented;[117]
- Reduced by all applicable credits, such as insurance proceeds and salvage values;[118]
- Authorized and not prohibited under Federal or SLTT government laws or regulations;
- Consistent with the Applicant's internal policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the Applicant; and
- Necessary and reasonable to accomplish the work properly and efficiently.[119]

## I.    Reasonable Costs

A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the Applicant makes the decision to incur the cost.[120]

### A.    Analysis

In conducting a reasonable cost analysis, FEMA performs a preliminary review of the documentation to assess the complexity of the project and expertise required to complete the analysis. If specialized expertise is required, a subject matter expert with the appropriate specialized skills, knowledge, experience, or capability in the appropriate field such as engineering, architecture, or cost estimating conducts the analysis.

FEMA determines reasonableness by evaluating whether the:

- Cost is of a type generally recognized as ordinary and necessary for the type of facility or work.[121] FEMA evaluates the skill level and level of effort necessary to complete the required activity. If the type of employee or skill level is not appropriate for the specific task, FEMA limits PA funding to a rate based on the appropriate employee type or skill level. For complex projects, staff with a higher level of technical proficiency and experience may be appropriate.

---

[117] 2 C.F.R. § 200.403(g).
[118] Stafford Act § 312, 42 U.S.C. § 5155, and 2 C.F.R. § 200.406.
[119] 2 C.F.R. § 200.403.
[120] 2 C.F.R. § 200.404.
[121] 2 C.F.R. § 200.404(a).

- Applicant participated in ethical business practices, ensuring parties to a transaction are independent of each other, without familial ties or shared interests and on equal footing without one party having control of the other.[122]

- Individuals concerned acted with prudence under the circumstances considering their responsibility to the Applicant, its employees, its students or membership, the public, and the Federal government.[123] If exigent or emergency circumstances existed, FEMA evaluates the length of time the circumstances existed compared to the length of time costs were incurred.

- Applicant deviated from its established practices and policies.[124] FEMA generally considers the Applicant's own labor, equipment, and supply costs reasonable provided the costs are consistent with the entity's policies including, but not limited to, pay rates, labor policies, and cost schedules utilized during its normal operations.

- Applicant complied with procurement requirements (see Chapter 6:VIII. *Procurement and Contracting Requirements*). FEMA generally considers contract costs reasonable when the Applicant adheres to full and open competition under applicable Federal procurement requirements, and the scope of services or work in the contract and level of effort is consistent with respect to the eligible SOW. FEMA evaluates reasonableness when price competition is lacking or when the selection was noncompliant with the applicable procurement under grant requirements even though there may have been price competition.

  o Cost or Price Analysis: The cost or price analysis is one component of documentation that FEMA may review as part of its evaluation of reasonable costs. If the Applicant does not submit a cost or price analysis, FEMA may evaluate the elements that would have been part of such analysis.[125]The Applicant may need to provide this information if it is not included in the documentation submitted.

  o Selection Criteria: FEMA evaluates whether the Applicant selected the lowest responsible bidder based on the selection criteria. If the Applicant selected a contractor with a higher bid than others, it must substantiate its selection based on the selection criteria set forth in its Request for Proposal.

- Cost is comparable to the current market price[126] for similar goods or services in the same geographical area. FEMA makes its determination based on one or more of the following:

  o Historical documentation (previous contracts, invoices, or other documentation).

    o FEMA may compare costs to the Applicant's historical costs for similar SOW or items. FEMA considers inflation and other factors such as code or standard changes, availability of in-kind construction material, quantity, delivery schedules, and the economy. FEMA's Cost Estimating Format (CEF) employs a nationally recognized economic inflation factor. Some types of work may have a different inflation rate than others.

---

[122] 2 C.F.R. § 200.404(b).

[123] 2 C.F.R. § 200.404(d).

[124] 2 C.F.R. § 200.404(e).

[125] FEMA's *Procurement Guidance for Recipients and Subrecipients Under 2 C.F.R. Part 200* provides information on how to conduct a cost or price analysis (www.fema.gov/sites/default/files/2020-07/fema_procurement-disaster-assistance-PDAT_field-manual.pdf).

[126] 2 C.F.R. § 200.404(c).

- o Average costs in the area.
  - o Weighted average unit pricing: FEMA may determine the average costs in the area using weighted average unit prices. These are comprised of the average costs of historical bid tabulations and related specifications from competitive bid pricing solicitations respective to the area and usually includes all factors required to bid public works projects, such as performance bonds, bid bonds, overhead and profit, and general conditions. The Applicant or respective State, Territorial, or regional agency, such as the State's Department of Transportation may provide weighted average unit pricing and related specifications for FEMA's review.
  - o Other Applicant's project costs: FEMA may compare the costs with other Applicant's projects of similar SOW and similar circumstances such as event impacts, magnitude, comparable shortages, market factors, and any other unique circumstances that may impact either of the costs.
- o Published unit costs from national cost estimating databases. When using this method, FEMA confirms that the cost publication is current and prepares the estimate using its CEF and the appropriate locality adjustment factor.
  - o Industry cost estimating resources: When appropriate local data cannot be developed or obtained, FEMA uses industry standard construction cost estimating resources to prepare an estimate against which to evaluate reasonableness of the Applicant's actual costs. These costing methods include, but may not be limited to, RSMeans, BNi Costbooks, Marshall and Swift, and Sweet's Unit Cost Guide, which are widely accepted in the industry and available for nationwide use.
  - o Federal, State, or Territorial unit costs: When industry standard construction cost estimating resources do not provide work items that are appropriate or applicable to the construction activities required to complete the project, FEMA considers local cost data from OFAs or State or Territorial agencies responsible for construction of similar facilities in or near the locality.
  - o FEMA Cost Codes: FEMA maintains regional and national unit prices (cost codes). FEMA cost codes may be used when a cost is not found in other published unit costs or if the cost codes are otherwise more applicable than other published costs, such as for force account equipment.
- • Following factors or other extenuating circumstances existed and caused escalation in costs:
  - o Shortages in equipment, materials, supplies, labor, or contractors. When escalating costs are due to shortages, FEMA considers whether the Applicant's work continued beyond the period of shortages and whether there was an opportunity for the Applicant to obtain more reasonable pricing.
  - o Project-specific complexities: Complexities may include environmental or historic issues, remote access or location, provision of a unique service with few providers, or elements requiring an extraordinary level of effort.
  - o Economy of Scale: FEMA considers the amount of work that may impact the unit price (for example, smaller projects may have higher rates and larger projects may have lower rates due to various efficiencies that are realized with larger projects. Additionally, when hauling is involved, such as with debris projects, some projects may have longer haul routes due to landfill locations or road blockages).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

o   Applicant's Justification: When a reasonable cost analysis has been conducted and costs appear high for a project, FEMA reviews the Applicant's justification to determine whether there are any additional factors that justify the higher cost as a reasonable amount.

The Applicant is responsible for providing documentation to demonstrate its claimed costs are reasonable. Documentation may include, but is not limited to:

☐   Documentation showing current market price for similar goods or services, such as:

o   Historical documentation;

o   Average costs in the area; or

o   Published unit costs from national cost estimating databases.

☐   Documentation supporting necessity of unique services or extraordinary level of effort

☐   Documentation supporting shortages, challenging procurement circumstances, and length of time shortages or procurement challenges existed, such as news stories or supply chain vendor reports

Appendix L: *Validation of Applicant-Provided Cost Estimates* includes a checklist that FEMA staff use when evaluating the reasonableness of costs claimed. After completing the evaluation and ensuring that all appropriate costs and factors are included as described above, if FEMA determines any of the costs to be unreasonable based on its evaluation, FEMA may disallow all or part of the costs by adjusting eligible funding to an amount it determines to be reasonable. When determining the reasonable amount, FEMA may use the least-cost alternative, the lowest bid received by the Applicant, or the pricing of another Applicant's properly procured and selected contractor.

## II.   Applicant (Force Account) Labor

FEMA refers to the Applicant's personnel as "force account." FEMA reimburses force account labor based on actual hourly rates plus the cost of the employee's actual fringe benefits. FEMA calculates the fringe benefit cost based on a percentage of the hourly pay rate. Because certain items in a benefit package are not dependent on hours worked (e.g., health insurance), the percentage for overtime is usually different than the percentage for straight-time. Fringe benefits may include:

- Holiday leave;
- Accrued vacation leave;
- Sick leave;
- Social security matching;
- Medicare matching;
- Unemployment insurance;
- Workers compensation;
- Retirement;
- Health insurance;
- Life and disability insurance; and/or
- Administrative leave.

The Applicant needs to submit the following to support labor costs claimed (not an all-inclusive list):

- ☐ Summary of actual costs for completed work (required)
- ☐ For each individual:
  - o Name (required);
  - o Job title and function (required);
  - o Type of employee (i.e., full-time exempt, full-time non-exempt, part-time, temporary, etc.) (required);
  - o Days and hours worked (required);
  - o Pay rates and fringe benefit rate (required); and
  - o Description of work performed (required) with representative sample of daily logs/activity reports, if available
- ☐ Timesheets (representative sample required when requested)
- ☐ Fringe benefit calculations (required)
- ☐ Pay policy (required)

## A.    Labor Policies

FEMA determines the eligibility of overtime, premium pay, and compensatory time costs based on the Applicant's pre-disaster written labor policy, provided the policy:

- Does not include a contingency clause that payment is subject to Federal funding;
- Is applied uniformly regardless of a Presidential declaration; and
- Has set non-discretionary criteria for when the Applicant activates various pay types.

If these requirements are not met, FEMA limits PA funding to the Applicant's non-discretionary, uniformly applied pay rates.

All costs must be reasonable and equitable for the type of work being performed.

FEMA determines whether the number of hours claimed are reasonable and necessary by evaluating:

- The severity of the incident;
- Whether the work was performed at a time when it was necessary to work extraordinary hours based on the circumstances of the incident;
- The function of the employee for which the hours are claimed; and
- The number of consecutive hours the employee worked.

## B.    Eligibility Criteria Based on Type of Employee and Work Performed

FEMA's criteria for reimbursing straight-time labor costs differ depending on the type of employee and whether that employee is performing Emergency Work or Permanent Work.

For Permanent Work, both straight-time and overtime labor costs are eligible for both budgeted and unbudgeted employee hours.[127] For Emergency Work, only overtime labor is eligible for budgeted employee hours.[128] For unbudgeted employees performing Emergency Work, both

---

[127] Stafford Act § 406(a)(2)(C), 42 U.S.C. § 5172; 44 C.F.R. § 206.228(a)(2)(i).
[128] 44 C.F.R. § 206.228(a)(2)(iii).

straight-time and overtime labor are eligible. Table 5. *Emergency Work Labor Eligibility*, indicates different types of budgeted and unbudgeted employees. Overtime is time worked beyond an employee's scheduled working hours as defined by the Applicant's pre-disaster pay policy.

Under the Alternative Procedures authorized by Section 428 of the Stafford Act, straight-time labor costs are eligible for budgeted employees conducting eligible debris removal (Category A) activities.

**Table 5. Emergency Work Labor Eligibility**

| Emergency Work Labor Eligibility | | |
|---|---|---|
| **Budgeted Employee Hours** | **Overtime** | **Straight-Time** |
| Permanent employee | ☑ | |
| Part-time or seasonal employee working during normal hours or season of employment | ☑ | |
| **Unbudgeted Employee Hours** | **Overtime** | **Straight-Time** |
| Reassigned employee funded from external source | ☑ | ☑ |
| Essential employee called back from furlough | ☑ | ☑ |
| Temporary employee hired to perform eligible work | ☑ | ☑ |
| Part-time or seasonal employee working outside normal hours or season of employment | ☑ | ☑ |

### 1.       Reassigned Employees

The Applicant may assign an employee to perform work that is not part of the employee's normal job. For example, a police officer may clear debris. FEMA provides PA funding based on the reassigned employee's normal pay rate, not the pay level appropriate to the work, because the Applicant's incurred cost is the employee's normal pay rate.

### 2.       Reassigned Employees Funded from an External Source

Straight-time of a permanent employee funded from an external source (such as a grant from a Federal agency or statutorily dedicated funds) is eligible if the employee is reassigned to perform eligible Emergency Work that the external source does not fund. FEMA must confirm that no duplication of funding exists prior to approval.

### 3.       Backfill Employees

The Applicant may need to temporarily replace an employee who is responding to the incident. Overtime costs for the backfill employee are eligible even if the backfill employee is not performing eligible work as long as the employee that he/she is replacing is performing eligible Emergency Work.

FEMA also provides PA funding for straight-time if the backfill employee is a:

- Contracted or temporary employee; or
- Permanent employee called in on a normally scheduled day off (weekend or other off day).

If the backfill employee is called in from scheduled leave, only overtime is eligible.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

4.    **Essential Employees Called Back from Furlough**

Straight-time of essential employees called back to work from a budget-related furlough due to the declared incident is eligible if the costs are not budgeted.

5.    **Supervisors**

Second-level supervisors and above (e.g., commissioners, mayors, department directors, police and fire chiefs) are usually exempt employees.[129] Therefore, overtime costs related to these types of employees are ineligible, unless the Applicant:

- Demonstrates that the employee was directly involved with a specific project;
- Normally charges that individual's time to specific projects regardless of Federal funding; and
- Incurs overtime costs for the employee in accordance with a labor policy that meets the criteria in Chapter 6:II.A. *Labor Policies*.

6.    **Other**

Extraordinary costs (such as call-back pay, night-time and weekend differential pay, and hazardous duty pay) for essential employees who are called back to duty during administrative leave to perform eligible Emergency Work are eligible if costs are paid in accordance with a labor policy that meets the criteria above.

Administrative leave or similar labor costs incurred for employees sent home or told not to report due to emergency conditions are ineligible.

7.    **Standby Time**

FEMA may provide PA funding for labor costs related to intermittent standby time for staff conducting eligible evacuation or sheltering, search and rescue, or emergency medical care. All of the following criteria must be met:

- Standby use and pay are consistent with the Applicant's labor policy (or contractual obligation based on a labor agreement) and consistent with its practice in non-federally declared incidents;
- The standby time occurred when it was necessary to have resources available to conduct the respective life-saving action;
- The number of hours and individuals were reasonable and necessary based on the number of resources required;
- The employee was conducting the respective life-saving action; and
- All other labor cost eligibility criteria were met.

Examples of when FEMA may reimburse labor costs for standby time include, but are not limited to:

- When bus drivers are deployed to transport evacuees;
- When first responders are deployed for the purpose of evacuating or providing emergency medical care to survivors in order to save lives; and
- When a contract or union agreement requires payment for standby time.

---

[129] These employees are exempt from the overtime pay requirements set forth in the Fair Labor Standards Act.

Additionally, the Applicant may be required to pay firefighter costs from portal-to-portal, which may result in paying for 24-hour shifts with periods of rest. FEMA will reimburse costs based on such requirements. In these instances, FEMA limits its reimbursement to costs and timeframes that are reasonable and necessary, not to exceed 14 calendar days from the start of the incident period. The Applicant must provide the data that led to its decisions and actions.

Standby time is separate and distinct from pre-positioning resources, which is addressed in Chapter 7:II.E. *Pre-positioning Resources*.

## III.  Applicant-Owned and Purchased Equipment

FEMA provides PA funding for the use of Applicant-owned (force account) equipment, including permanently mounted generators, based on hourly rates.[130] FEMA may provide PA funding based on mileage for vehicles, if the mileage is documented and is less costly than hourly rates.

There are instances when the Applicant does not have sufficient equipment to effectively respond to an incident. If the Applicant purchases equipment that it justifiably needs to respond effectively to the incident, FEMA provides PA funding for both the purchase price and either:

- The use of the equipment based on equipment rates (without the ownership and depreciation components); or
- The actual fuel and maintenance costs.

FEMA only applies equipment rates to the time the Applicant is actually operating equipment. Although costs associated with transporting equipment (e.g., labor and equipment costs used to transport equipment) to an eligible site are eligible, costs for standby time (time spent on hold or in reserve) are ineligible unless the equipment operator uses the equipment intermittently for more than half of the working hours for a given day. In this case the intermittent standby time is eligible.

The Applicant should submit the following to support Applicant-owned or purchased equipment costs claimed (not an all-inclusive list):

For each piece of equipment:

- ☐ Type of equipment and attachments used, including year, make, and model (required);
- ☐ Size/capacity (e.g., horsepower, wattage) (required);
- ☐ Locations and days and hours used (required) should include usage logs
- ☐ Operator name (required when requested); and
- ☐ Schedule of rates, including rate components (required if not using FEMA rates)

Purchased Equipment:

- ☐ Invoices or receipts (required); and
- ☐ Locations and days and hours used (required)

---

[130] 44 C.F.R. § 206.228(a)(1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FEMA provides PA funding for force account equipment usage based on FEMA or SLTT equipment rates in accordance with the specific criteria noted below.

## A.    FEMA Rates

FEMA publishes equipment rates applicable on a national basis.[131] FEMA's rate schedule includes any item powered by fuel or attached to any item powered by fuel. FEMA develops equipment rates based on all costs associated with ownership and operation of equipment (except for operator labor). FEMA equipment rate components include depreciation, overhead, equipment overhaul (labor, parts, and supplies), maintenance (labor, parts, and supplies), lubrication, tires, ground engaging component (if applicable), and fuel. Because the rates include maintenance costs, a mechanic's labor costs to maintain Applicant-owned equipment are ineligible.

## B.    State, Territorial, or Tribal Rates

State, Territorial, or Tribal rates are those established under State, Territorial, or Tribal guidelines for use in normal day-to-day operations. FEMA provides PA funding based on State, Territorial, or Tribal rates up to $75 per hour.[132] FEMA only provides PA funding for a rate above $75 per hour if the Applicant demonstrates that each of the components of the rate is comparable to current market prices.[133]

## C.    Local Rates

Local rates are those developed under local government guidelines for use in normal day-to-day operations. FEMA generally provides PA funding for equipment usage based on the lower of either the local rate or the FEMA rate. However, if the local rate is lower, but it does not reflect all of the costs associated with operating the equipment, FEMA may provide PA funding based on the higher FEMA rate. Additionally, if the local rate is higher, the Applicant must document the basis for that rate and obtain approval from FEMA for the higher rate.[134]

If determining the lowest rate for each piece of equipment is overly burdensome because of the number of different types of equipment used, or if the Applicant prefers, FEMA will reimburse all equipment use based on the lower of the two rate schedules, rather than based on a comparison of each individual rate. In these cases, the PA Division at FEMA Headquarters determines which schedule of rates is lower.

## D.    Equipment with No Established Rate

If the Applicant uses equipment that has no established SLTT rate, FEMA reimburses that equipment based on the FEMA rate.[135] If FEMA does not have a rate established for the equipment, the Applicant may either submit a rate for approval or request that FEMA provide a rate. If the Applicant submits a rate, it must include documentation demonstrating that each component of the rate is comparable to current market prices. The rate cannot be based on rental

---

[131] www.fema.gov/schedule-equipment-rates.
[132] 44 C.F.R. § 206.228(a)(1)(i).
[133] Per 44 C.F.R. § 206.228(a)(1)(i), reimbursement of rates in excess of $75 is determined on a case-by-case basis by FEMA. FEMA evaluates the rate for approval based on current market prices.
[134] Ibid.
[135] 44 C.F.R. § 206.228(a)(1)(iii).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

rates as such rates include cost components, such as profit, that are above and beyond what is necessary to operate and maintain force account equipment.

## IV.  Leased Equipment

When the Applicant leases equipment, FEMA provides PA funding based on the terms of the lease. Leasing costs are eligible if:

- The Applicant performed an analysis of the cost of leasing versus purchasing the equipment;[136] and
- The total leasing costs do not exceed the cost of purchasing and maintaining equipment during the life of the eligible project.

If the leasing costs exceed the cost of purchasing and maintaining the equipment, FEMA determines the amount of eligible costs based on an evaluation of the reasonableness of the costs claimed, including whether the Applicant acted with prudence under the circumstances at the time it leased the equipment.

If the Applicant has a lease-purchase agreement and obtains ownership during completion of eligible work, FEMA provides PA funding for the equipment use based on the hourly equipment rate, as described in <u>Chapter 6:III. *Applicant-Owned Equipment and Purchased Equipment*</u>.

If the Applicant has a lease-purchase agreement and completes the eligible work prior to obtaining ownership, FEMA provides PA funding based on the cost to lease the equipment.

The Applicant needs to submit the following to support leased equipment costs claimed (not an all-inclusive list):

- ☐ Lease agreements (required);
- ☐ Invoices or receipts (required);
- ☐ Locations and days used (required);
- ☐ Hours used (required if lease agreement charges hourly rates); and
- ☐ Amount of fuel used, if not included in rental cost (required)

## V.  Supplies

The cost of supplies, including materials, is eligible if:

- Purchased and justifiably needed to effectively respond to and/or recover from the incident; or
- Taken from the Applicant's stock and used for the incident.

The Applicant must track items taken from stock with inventory withdrawal and usage records.

FEMA provides PA funding for these items based on invoices, if available. If invoices are not available for items used from stock, FEMA provides PA funding based on the Applicant's established method of pricing inventory.[137] If the Applicant does not have an established method, FEMA provides PA funding based on historical data or prices from area vendors.

---

[136] 2 C.F.R. § 200.318(d).
[137] 2 C.F.R. § 200.453(b).

FEMA consults with the U.S. Department of Homeland Security Office of Inspector General Emergency Management Oversight Team in cases where it has difficulty determining a reasonable value.

The Applicant must submit the following to support costs claimed for supplies (not an all-inclusive list):

Supplies from Stock:

- ☐ Cost documentation such as original invoices or other historical cost records (required);
- ☐ Inventory records (required);
- ☐ Type of supplies and quantities used (required – should include support documentation such as daily logs); and
- ☐ Location used (required)

Purchased Supplies:

- ☐ Receipts or invoices (required);
- ☐ Quantities used (required); and
- ☐ Justification (required if supplies were not used)

# VI.  Disposition of Purchased Equipment and Supplies

The discussion below describes disposition requirements when purchased equipment or supplies (including materials) are no longer needed for federally funded projects.

In the context of disposition, equipment is any tangible personal property (including information technology systems) having a useful life of more than 1 year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by the Applicant for financial statement purposes, or $5,000.[138] Tangible personal property that does not fall under this definition of equipment is a supply.[139]



## A.     Disposition of Purchased Equipment

In accordance with Federal regulations, State and Territorial government Applicants dispose of equipment in accordance with State and Territorial laws and procedures.[140]

When equipment purchased with PA funding are no longer needed for response to or recovery from the incident, Tribal and local governments and PNP Applicants may use the items for other federally funded programs or projects.[141]

---

[138] 2 C.F.R. § 200.33.
[139] 2 C.F.R. § 200.94.
[140] 2 C.F.R. § 200.313(b).
[141] 2 C.F.R. § 200.313(c).

When an individual item of equipment is no long needed for federally funded programs or projects, Tribal and local governments and PNP Applicants must calculate the current fair market value of the individual item of equipment. The Applicant must provide the current fair market for items that have a current fair market value of $5,000 or more. FEMA reduces eligible funding by this amount.[142] If the individual item of equipment has a current fair market value less than $5,000, FEMA does not reduce the eligible funding.[143]



Tribal and local governments and PNP Applicants must comply with all disposition requirements described in 2 C.F.R. 200.313(e), *Disposition*.

### B.    Disposition of Purchased Supplies

When supplies are no long needed for federally funded programs or projects, all Applicants, including State and Territorial government Applicants, must calculate the current fair market value of any unused residual supplies (including materials) that FEMA funded for any of its projects and determine the aggregate total.

The Applicant must provide the current fair market value if the aggregate total of unused residual supplies is greater than $5,000. FEMA reduces eligible funding by this amount.[144] If the aggregate total of unused residual supplies is less than $5,000, FEMA does not reduce the eligible funding.

## VII. Disposition of Real Property

If the Applicant acquires or improves real property with PA funds, disposition and reporting requirements apply when acquired or improved real property is no longer needed for the originally authorized purpose.[145] The PA Division at FEMA Headquarters provides disposition instructions.[146]

## VIII. Procurement and Contracting Requirements

FEMA provides PA funding for contract costs based on the terms of the contract if the Applicant meets Federal procurement and contracting requirements. Federal procurement and contracting requirements for State and Territorial government agencies are different than those for Tribal and local government agencies and PNPs. This section provides information on Federal procurement and contracting requirements.

FEMA PA staff coordinate with FEMA's Office of Chief Counsel when evaluating whether the Applicant complied with Federal procurement requirements. In the case of noncompliance, FEMA applies an appropriate remedy in accordance with its authorities.[147] FEMA has determined an appropriate remedy under these circumstances is to either deny all costs

---

[142] 2 C.F.R. § 200.313(e)(2).
[143] 2 C.F.R. § 200.313(e)(1).
[144] 2 C.F.R. § 200.314(a).
[145] 2 C.F.R. §§ 200.311 and 200.329.
[146] 2 C.F.R. § 200.311(c). Recipients and Applicants must obtain specific disposition instructions from FEMA.
[147] 2 C.F.R. § 200.338.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

associated with the contract or, if sufficient information is provided to substantiate a reasonable amount for the eligible work completed, FEMA may reimburse the portion of the costs it determines are reasonable and allowable based on all available information and documentation provided. In addition to monetary remedies, FEMA may also take non-monetary actions against the Applicant as authorized by 2 C.F.R. §§ 200.207 and 200.338.

FEMA's *Procurement Guidance for Recipients and Subrecipients Under 2 C.F.R. Part 200 (Uniform Rules)* provides additional details regarding Federal procurement and contracting requirements.[148]

## A.    Procurement and Contracting Requirements for State and Territorial Government Entities

Applicants must comply with Federal procurement requirements as a condition of receiving PA funding for contract costs for eligible work.

### 1.    Procurement

State and Territorial government Applicants[149] must comply with Federal procurement procedures at 2 C.F.R. § 200.317, which include:

- Following the same policies and procedures they would use for procurements with non-Federal funds; and
- Complying with the Environmental Protection Agency (EPA) guidelines in 2 C.F.R. § 200.322, Procurement of recovered materials.

FEMA does not typically review State or Territorial procurement policies or procedures. In certain circumstances, FEMA may review State or Territorial procurement policies or procedures or request that a State or Territorial attorney certify in writing whether the Applicant complied with the State's or Territorial's procurement policies and procedures.

### 2.    Contracting

State and Territorial government Applicants must include required provisions detailed in 2 C.F.R. § 200.326 in all contracts awarded.[150] Some provisions are based on sound contracting practices while others are required by Federal law, EO, and regulations. Some provisions do not apply under the PA Program (e.g. Davis Bacon Act[151] and Rights to Inventions Clause) while others require verbatim language.

Although time and material (T&M) contracts without a ceiling price and cost-plus-percentage-of-cost or percentage-of-construction contracts may be allowed under State or Territorial government standards, the use of these contracts has a high risk of noncompliance with the requirement that all costs be reasonable.[152]

---

[148] www.fema.gov/sites/default/files/2020-07/fema_procurement-under-grants-field-manual-supplement_1.pdf.

[149] See Chapter 3:VI.A. *State and Territorial Governments* for a description of which Applicants are State or Territorial government entities.

[150] 2 C.F.R. § 200.326.

[151] The Davis Bacon Act requires "prevailing wage" payment to contracted workers based on the local union wage scale defined by the U.S. Department of Labors. If the Applicant incorporates prevailing wage rates as part of its normal practice for all contracts regardless of the funding source, then those rates are eligible.

[152] 2 C.F.R. § 200.403(a).

**B.**     **Procurement and Contracting Requirements for Tribal and Local Government Agencies and Private Nonprofits**

Tribal and local governments, including Tribal Recipients, and PNPs[153] must comply with:

- Their own documented procurement procedures;
- Applicable SLTT government laws and regulations; and
- Applicable Federal laws and regulations.[154]

If a Federal requirement is different than the SLTT requirement, or the Applicant's own requirements, it must use the more restrictive requirement. Additionally, Territorial governments should consult their legal counsel when a project involves a public building or public works facility as the Buy American Act may apply to the procurement process.

**1.**     **Pre-procurement Considerations**

Tribal and local governments and PNPs must:

- Establish or update written procurement procedures that reflect applicable SLTT laws and regulations;[155] and
- Maintain required written standards of conduct covering conflicts of interest and governing the performance of employees who engage in the selection, award, and administration of contracts.[156]

Tribal and local governments and PNPs should also create a prequalified list of responsible contractors identified to possess the qualifications and technical abilities to satisfy the Applicant's potential requirement.[157] Although not a contract, many entities have prequalified lists that serve as contract research.

A prequalified contractor is one that the Applicant evaluated and determined to be qualified to perform the work based on capabilities, such as technical and management skills, prior experience, past performance, and availability. A prequalified contractor is not entitled to a "standby" contract. The Applicant must still conduct full and open competition. The Applicant cannot exclude potential bidders or offerors from qualifying during the solicitation period, even if they were not on the prequalified list.

**2.**     **General Federal Procurement Requirements**

Federal procurement requirements for Tribal and local governments and PNPs are found at 2 C.F.R. § 200.318 through 200.326. The requirements include, but are not limited to:

- Providing full and open competition[158] (Tribal government Applicants may provide preference to Indian organizations or Indian-owned economic enterprises[159] if the

---

[153] See Chapter 3:VI. *Applicant Eligibility* for a description of which Applicants are Tribal or local governments or PNPs.
[154] 2 C.F.R. § 200.318(a).
[155] Ibid.
[156] 2 C.F.R. § 200.318(c)(1).
[157] 2 C.F.R. § 200.319(d).
[158] 2 C.F.R. § 200.319(a).
[159] Per the Indian Financing Act of 1974, Pub. L. No. 93-262, § 2(e), 88 Stat 77 (codified as amended at 25 U.S.C. § 1452(f)), an Indian organization is the governing body of any federally recognized Tribe or an entity established or

Applicant substantiates that it met the Indian Self-Determination and Education Act requirements).

- Conducting the following steps to ensure the use of small and minority businesses, women's business enterprises, and labor surplus area firms when possible:[160]
  - o Place such organizations that are qualified on solicitation lists;
  - o Ensure such organizations are solicited whenever they are potential sources;
  - o Divide total requirements, when economically feasible, into smaller tasks or quantities;
  - o Establish delivery schedules, where the requirement permits, which encourage their participation;
  - o Use the services and assistance, as appropriate, of the Small Business Administration and the Minority Business Development Agency of the Department of Commerce; and
  - o Require prime contractor to conduct the above steps if subcontracting.

Note that Tribal government Applicants using the Indian Self-Determination and Education Assistance Act preference do not need to separately follow the six socioeconomic steps outlined above.

- Performing a cost or price analysis in connection with every procurement action above the simplified acquisition threshold,[161] including contract modifications. The Applicant must make independent estimates before receiving bids or proposals.[162] Additionally, the Applicant must negotiate profit as a separate element of the price when it performs a cost analysis and for each contract in which there is no price competition.[163]
- Evaluating and documenting the contractor's integrity, compliance with public policy, record of past performance, and financial and technical resources.[164]
- Ensuring that the contractor was not suspended or debarred.[165]
- Prohibiting the use of statutorily or administratively imposed SLTT geographic preferences in evaluating bids or proposals except where expressly encouraged by applicable Federal law.[166]
- Excluding contractors that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals from competing for such procurements to ensure objective contractor performance and eliminate unfair competitive advantage.[167]

---

recognized by the governing body. An Indian-owned economic enterprise is any commercial, industrial, or business activity established or organized by a member of a Federal recognized Tribe for the purpose of profit, provided that such Indian ownership constitutes 51 percent or more of the enterprise.

[160] 2 C.F.R. § 200.321.

[161] The simplified acquisition threshold is set by the Federal Acquisition Regulation at 48 C.F.R. § 2.101. The threshold is adjusted periodically for inflation.

[162] 2 C.F.R. § 200.323(a).

[163] 2 C.F.R. § 200.323(b).

[164] 2 C.F.R. § 200.318(h).

[165] 2 C.F.R. § 200.213.

[166] 2 C.F.R. § 200.319(b).

[167] 2 C.F.R. § 200.319(a).

- Maintaining records to detail the history of the procurement including, but are not limited to:
  - Rationale for the method of procurement;
  - Selection of contract type;
  - Contractor selection or rejection; and
  - The basis for the contract price.[168]

### 3.    Procurement Methods

Tribal and local governments and PNPs must use one of the following procurement methods:[169]



- Micro-purchase;
- Small purchase procedure;
- Sealed bid (formal advertising);
- Competitive proposal; or
- Noncompetitive proposal (sole-sourcing).

### (a)    *Noncompetitive Procurement*

FEMA may reimburse costs incurred under a contract procured through a noncompetitive proposal, also referred to as sole-source, only when one or more of the following circumstances apply:



- The item is only available from one source;
- The public exigency or emergency for the requirement will not permit a delay resulting from competitive solicitation (this exception to competitive procurement is only for work specifically related to the circumstance and only while the circumstances exists. Therefore, Applicants need to immediately begin the process of competitively procuring similar goods and services and transition to a competitively procured contract as soon as the circumstances cease to exist);
- FEMA or the Recipient expressly authorizes a noncompetitive proposal in response to a written request from the Applicant; or
- After solicitation of several sources, competition is determined inadequate.[170]

---

[168] 2 C.F.R. § 200.318(i).
[169] 2 C.F.R. § 200.320.
[170] 2 C.F.R. § 200.320(f).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

For each noncompetitive procurement, the Applicant must identify which of the four circumstances listed above apply and provide all of the following information, documentation, and justification:

☐ A brief description of the product or service being procured, including the expected amount of the procurement;

☐ Explanation of why a noncompetitive procurement is necessary. If there was a public exigency or emergency, the justification should explain the specific conditions and circumstances that clearly illustrate why competitive procurement would cause unacceptable delay in addressing the public exigency or emergency. (Failure to plan for transition to competitive procurement cannot be the basis for continued use of noncompetitive procurement based on public exigency or emergency);

☐ Length of time the noncompetitive contract will be used for the defined SOW, and the impact on that SOW should the noncompetitively procured contract not be available for that amount of time (e.g., how long does the Applicant anticipate the exigency or emergency circumstances to continue; how long it will take to identify requirements and award a contract that complies with all procurement requirements; or how long it would take another contractor to reach the same level of competence);

☐ The specific steps taken to determine that the Applicant could not have used, or did not use, full and open competition for the SOW (e.g., research conducted to determine that there were limited qualified resources available that could meet the contract provisions);

☐ Any known conflicts of interest and any efforts that the Applicant made to identify potential conflicts of interest before the noncompetitive procurement occurred. If the Applicant made no efforts, explain why; and

☐ Any other justification.

V4 2020



If FEMA determines that none of the allowable circumstances existed or did not preclude the Applicant from adhering to competitive procurement requirements, FEMA may disallow all or part of the associated costs.[171]

### 4.    Contract Types

FEMA reimburses costs incurred by Tribal and local governments and PNPs using three types of contract payment obligations: fixed price, cost-reimbursement, and, to a limited extent, T&M. The specific contract types related to each of these are described in FEMA's *Procurement Guidance for Recipients and Subrecipients Under 2 C.F.R. Part 200 (Uniform Rules)*.[172]

Tribal and local governments and PNPs must maintain oversight on all contracts to ensure contractors perform according to the conditions and specifications of the contract and any purchase orders.[173]

### (a)    Time and Material Contracts

T&M contracts do not provide incentives to the contractor for cost control or labor efficiency. Therefore, use of T&M contracts are only allowed if all of the following apply:

- No other contract type was suitable;
- The contract has a ceiling price that the contractor exceeds at its own risk; and
- The Applicant maintains a high degree of oversight to obtain reasonable assurance that the contractor is using efficient methods and effective cost controls.[174]

---

[171] 2 C.F.R. § 200.338.
[172] www.fema.gov/sites/default/files/2020-07/fema_procurement-under-grants-field-manual-supplement_1.pdf.
[173] 2 C.F.R. § 200.318(b).
[174] 2 C.F.R. § 200.318(j).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FEMA generally limits the use of T&M contracts to a reasonable timeframe based on the circumstances during which the Applicant could not define a clear SOW. Therefore, the Applicant should define the SOW as soon as possible to enable procurement of a more acceptable type of contract.

Some entities, such as Rural Electrical Cooperatives, provide the materials necessary to restore the facilities and refer to such contracts as Time and Equipment (T&E) contracts. The limitations and requirements that apply to T&M contracts also apply to T&E contracts.

### (b)    Cost-Plus-Percentage-of-Cost or Percentage-of-Construction

In addition to limiting reimbursement to costs that can be determined to be reasonable, FEMA does not reimburse the increased cost associated with the percentage on a cost-plus-percentage-of-cost calculation or percentage-of-construction cost method.[175] This type of contract billing is prohibited as it does not provide incentive to contractors to control costs because the contractor's profit increases as the costs of performance increase. Instead, it provides a financial interest to the contractor to increase costs so that its profit increases. FEMA identifies these cost methods by determining whether:

- Payment is on a predetermined percentage rate;
- The predetermined percentage rate is applied to actual performance costs;
- The contractor's total payment amount is uncertain at the time of contracting; and
- The contractor's payment increases commensurately with increased performance costs.[176]

## 5.    Additional Contracting Considerations

### (a)    Pre-Positioned Contracts

Some Applicants have pre-positioned contracts, which are contracts awarded before an incident occurs for the potential performance of work. These contracts are also referred to as advance or standby contracts. FEMA may reimburse reasonable costs under a pre-positioned contract if:

- It was originally procured in compliance with Federal procurement requirements;
- The scope of work was adequate to cover the work performed;
- The work performed was eligible; and
- The contract term covers time when work was performed.

### (b)    Cooperative Purchasing

A cooperative purchasing program is a cooperative arrangement for acquiring goods or services that involves aggregating the demand of two or more entities to obtain a more economical purchase.[177] Program membership may provide entities with access to lists of agreements or contracts for goods and services at pre-negotiated rates or prices. Typically, the member then purchases the goods or

---

[175] 2 C.F.R. § 200.323(d).

[176] See Federation Aviation Administration -Request for Advance Decision, 58 Comp.Gen. 654, 655 (1979), 79-2 CPD 34; Marketing Consultants International Limited, 55 Comp.Gen. 554, 562 (1975), 75-2 CPD 384.

[177] Cooperative purchasing programs are distinguishable from joint procurements. A joint procurement is a method of contracting in which two or more purchasers agree from the outset to use a single solicitation and enter into a single contract with a vendor for the delivery of goods or services. Joint procurements must still comply with Federal procurement requirements. However, FEMA sees fewer compliance issues with joint procurements.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

services by negotiating with participating vendors and placing purchase orders or entering into contracts based on the pre-negotiated rates or prices. FEMA advises against the use of cooperative purchasing programs due to frequent compliance issues with Federal procurement requirements. Appendix D: *Frequent Compliance Issues with Cooperative Purchasing Programs* provides a list of frequent compliance issues with cooperative purchasing programs for procurements above the simplified acquisition threshold. Applicants must document and explain how its use of the program complied with all procurement requirements.

Piggyback contracting is a type of cooperative purchasing and occurs when one entity assigns the contractual rights it has in a contract to another entity. FEMA advises against the use of piggyback contracts. Piggyback contracts are usually not compliant with Federal requirements as the scope of work pertains to the needs of a different entity.

## C.    Required Contract Clauses

Applicants must include required provisions detailed in 2 C.F.R. § 200.326 in all contracts awarded.[178] Some provisions are based on sound contracting practices while others are required by Federal law, EO, and regulations.

Required contract provisions include:

- ☐ Remedies Clause;
- ☐ Termination for Cause;
- ☐ Termination for Convenience;
- ☐ Equal Employment Opportunity;
- ☐ Contract Work Hours and Safety Standards Act;
- ☐ Homeland Security Acquisition Regulation Class Deviation 15-01 clauses; "Safeguarding of Sensitive Information" and "Information Technology Security and Privacy Training" for existing and new contracts and solicitations that have a high risk of unauthorized access to or disclosure of sensitive information;[179]
- ☐ Clean Air Act;
- ☐ Federal Water Pollution Control Act;
- ☐ Debarment and Suspension;
- ☐ Byrd Anti-Lobbying Amendment Clause;
- ☐ Byrd Anti-Lobbying Amendment Certification; and
- ☐ Procurement of Recovered Materials.

In addition to the required provisions, FEMA also recommends the following contract provisions be included in all contract awards:

- ☐ Changes Clause;

---

[178] 2 C.F.R. § 200.326.

[179] "Sensitive Information" is defined in Homeland Security Acquisition Regulation clause 3052 204-71, *Contractor Employee Access*, as any information, which if lost, misused, disclosed, or without authorization is accessed, or modified, could adversely affect the national or homeland security interest, the conduct of Federal programs, or the privacy to which individuals are entitled under 5 U.S.C. § 552a (the Privacy Act), but which has not been specifically authorized under criteria established by an Executive Order or an Act of Congress to be kept secret in the interest of national defense, homeland security or foreign policy.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

☐ Access to Records;

☐ Department of Homeland Security Seal, Logo, and Flags;

☐ Compliance with Federal Law, Regulations, and EOs Clause;

☐ No Obligation by Federal Government; and

☐ Program Fraud and False or Fraudulent Statements or Related Acts.

Some provisions do not apply under the PA Program (e.g. Davis Bacon Act[180] and Rights to Inventions Clause) while others require verbatim language. Appendix K: Contract Provisions provides the exact language for the provisions that require verbatim language and provides sample language for some of the other provisions.

### D.    Documentation Requirements

The Applicant should submit the following to support contract costs claimed (not an all-inclusive list):

☐ Procurement policy (required when requested);

☐ Procurement documents (i.e., requests for proposals, bids, selection process, etc.) (required when requested);

☐ A cost or price analysis (required for contracts above the simplified acquisition threshold)

☐ Contracts, change orders, and summary of invoices (required);

☐ Dates worked (required when requested);[181] and

☐ Documentation that substantiates a high degree of contractor oversight, such as daily or weekly logs, records of performance meetings (required for T&M contracts when requested).

## IX.  Mutual Aid

When the Applicant does not have enough resources to respond to an incident, it may request resources from another jurisdiction through a "mutual aid" agreement. FEMA refers to the entity requesting resources as the Requesting Entity. FEMA refers to the entity providing the requested resource as the Providing Entity.

FEMA provides PA funding to the Requesting Entity as it is legally responsible for the work. FEMA does not provide PA funding directly to the Providing Entity. For the work to be eligible, the Requesting Entity must have requested the resources provided.

Some States have a statewide mutual aid agreement that designates the State as being responsible for reimbursing mutual aid costs. In these States, the Providing Entity may request funding directly from the State, with prior consent of the Requesting Entity, in accordance with applicable State laws and procedures. If the Requesting entity and the State approve the request and the State pays the Providing Entity, FEMA provides PA funding to the State. The

---

[180] The Davis Bacon Act requires "prevailing wage" payment to contracted workers based on the local union wage scale defined by the U.S. Department of Labors. If the Applicant incorporates prevailing wage rates as part of its normal practice for all contracts regardless of the funding source, then those rates are eligible.

[181] FEMA may request this information to validate work was completed within the project's approved period of performance and when applicable for Emergency Work, to determine cost share application per Chapter 6:XIII. Increased Federal Cost Share for a Limited Timeframe)

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Requesting Entity may be responsible for reimbursing the State for any non-Federal local cost share, depending on specific State requirements.

The Requesting Entity or State, if applicable, must provide a description of the services requested and received, along with documentation of associated costs (e.g., labor, equipment, supplies, or materials) to FEMA in support of a request for PA funding.

## A.    Post-Incident Agreements

When the Requesting and Providing Entities do not have a written agreement, OR where such an agreement exists but is silent on reimbursement, the entities may verbally agree on the resources to be provided and on the terms, conditions, and costs of such assistance.

The agreement should be consistent with past practices for mutual aid between the entities. For example, if the Requesting Entity does not normally reimburse a Providing Entity for its costs, it should not agree to do so specifically for the declared incident.

Prior to funding, the Requesting Entity must document the verbal agreement in writing, have it executed by an official of each entity with the authority to request and provide assistance, and submit it to FEMA (preferably within 30 days of the Applicant's Briefing).[182]

## B.    Eligibility

Mutual aid resources are eligible when used for Emergency Work, emergency utility restoration (regardless of whether it is deemed Category B or F) or grant management activities [subject to the criteria in FEMA Recovery Policy FP 104-11-2, *Public Assistance Management Costs (Interim)*]. Mutual aid work is subject to the same eligibility criteria as contract work. Costs to transport the Providing Entity's equipment and personnel to the declared area are eligible.

Ineligible work performed by a Providing Entity includes, but is not limited to:

- Preparing to deploy;
- Dispatch operations outside the receiving State, Territory, or Tribe;
- Training and exercises; and
- Support for long-term recovery and mitigation operations.

The Emergency Management Assistance Compact (EMAC) is a national interstate mutual aid agreement that enables States and Territories to share resources in response to an incident. Work performed outside the receiving State or Territory that is associated with the operation of EMAC, including tracking of resources, is ineligible unless the work is associated with the receiving State's or Territory's emergency operations for the incident.

The Providing Entity's straight-time and overtime labor are eligible, including fringe benefits. When the Requesting Entity is a SLTT government and the Providing Entity is another division within the same SLTT government, straight-time for budgeted employees of the Providing Entity is ineligible.

---

[182] The Recipient conducts Applicant Briefings to provide PA Program information to potential Applicants. This briefing is described in Chapter 3:II. *Applicant Briefing*.

If the Providing Entity backfills deployed personnel, overtime for backfill personnel is eligible even if they are not performing eligible work. However, straight-time for backfill personnel is ineligible.

FEMA reimburses the use of equipment provided to a Requesting Entity based on either the terms of the agreement or equipment rates (detailed in Chapter 6:III. Applicant-Owned Equipment and Purchased Equipment). FEMA provides PA funding to repair damage to this equipment the same way as it provides PA funding to repair damage to Applicant-owned equipment (detailed in Chapter 7:IV. Damage Caused During Performance of Emergency Work).

The Applicant needs to submit the following to support mutual aid costs claimed (not an all-inclusive list):

- ☐ Written agreement (required);
- ☐ Services requested and received (required);
- ☐ Same information listed for labor, equipment, and supplies (required as applicable); and
- ☐ Invoices (representative sample required when requested).

## X.    Prisoners

FEMA provides PA funding for prisoner labor costs based on the rate that the Applicant normally pays prisoners. FEMA also provides PA funding for prisoner transportation to the worksite and extraordinary costs of security guards, food, and lodging.[183]

The Applicant should submit the following to support prison labor costs claimed (not an all-inclusive list):

- ☐ Estimated hours and rates for work to be completed;
- ☐ Prison labor pay policy and pay rate (required); and
- ☐ For each individual:
  - o Name (required);
  - o Days and hours worked (required);
  - o Description of work performed (required) should include a representative sample of daily logs or activity reports; and
  - o Locations worked (required).

## XI.  National Guard

The Governor may activate National Guard personnel to State Active Duty in response to an incident. Labor costs and per diem, if applicable, are eligible for State Active Duty personnel performing eligible work. Both straight-time and overtime are eligible, including fringe benefits.

The U.S. Department of Defense funds National Guard personnel activated under Full-Time National Guard Duty (Title 32) or Active Duty (Title 10). Therefore, Title 32 and Title 10 personnel costs, and any other costs funded by the U.S. Department of Defense, such as training, are ineligible.

---

[183] Stafford Act § 406(a)(2)(B), 42 U.S.C. § 5172.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## XII. Direct Federal Assistance

When the impact of an incident is so severe that the SLTT governments lack the capability to perform or contract eligible Emergency Work, the Recipient may request that the Federal government provide this assistance directly. FEMA may task another Federal agency to perform or contract the work provided it is an eligible activity under Chapter 7. *Emergency Work Eligibility*[184] unless the work falls under the authority of another Federal agency.[185] FEMA issues a "Mission Assignment" to task the work and refers to it as Direct Federal Assistance (DFA).[186] DFA has the same cost-share provisions applicable to the declaration (as described in Chapter 1:IV.E. *Federal Cost Share*).

## XIII. Increased Federal Cost Share for a Limited Timeframe

When the president authorizes an increased Federal cost share for a limited timeframe, FEMA applies it to all eligible costs related to work performed through 11:59 p.m. on the date of expiration. Therefore, the Applicant needs to delineate costs for work performed prior to the deadline versus costs for work performed after the deadline. The following bullets further define how FEMA applies the increased Federal cost share:

- Employees: Costs for hours worked up to the date and time of expiration.
- Purchased Material and Equipment: Cost to purchase each item that the Applicant needed and used to perform eligible work during the increased funding period. In this case, FEMA also applies the increased Federal cost share to the usage cost up to the date and time of expiration.
- Leased Equipment and Facilities: Lease costs up to date and time of expiration. FEMA may calculate the cost based on a proration of time (i.e., if a facility is leased for six months based on a monthly rate and the period for the increased Federal cost share expired 45 days from the start of the lease, FEMA applies the increased Federal cost share to the cost to lease the facility for 45 days based on a proration of the monthly rate).
- Contract Costs: Costs for work performed up to the date and time of expiration. If costs cannot be distinguished by date performed, FEMA may prorate costs based on the percentage of work completed prior to the deadline versus the percentage of work remaining. However, Applicants should work with contractors to delineate dates associated with work.

## XIV. Donated Resources

Individuals and organizations often donate resources to assist with response activities. FEMA does not provide PA funding for donated resources. However, FEMA allows the Applicant to use the value of donated resources (non-cash contributions of property or services)[187] related to eligible Emergency Work to offset the non-Federal cost share of its eligible Emergency Work projects and DFA; and to use the value of donated resources related to eligible work on a Permanent Work Project to offset the non-Federal cost share of that specific Permanent Work

---

[184] 44 C.F.R. § 206.208(a).
[185] 44 C.F.R. § 206.208(c)(2).
[186] 44 C.F.R. § 206.208(c)(1).
[187] 2 C.F.R.) § 200.96.

Project. FEMA applies the offsets regardless of the cost share arrangements between the Recipient and its Subrecipients.

For Emergency Work specifically, if there is a time-limited 100 percent Federal cost share period (see Chapter 6:XIII. *Increased Federal Cost Share for a Limited Timeframe*) and the Applicant uses resources donated during this time period, it may use the value of those donated resources to offset the non-Federal cost share incurred after the 100 percent Federal cost share period expires. If the Applicant uses resources from its stock that were donated during a previous incident or timeframe, it may use the value of those donated resources to offset its non-Federal cost share if the Applicant has not claimed the resources as an offset in a previous incident.

The Applicant may apply the offset if all of the following conditions are met:

- The donated resource is from a third party. A third party includes private entities or individuals, including individuals that are normally paid employees of the Applicant or Federal, State, Territorial, or Tribal government, but are volunteering as unpaid individuals and not on behalf of the employer);
- The donated resource is necessary and reasonable;[188]
- The Applicant uses the resource in the performance of eligible work[189] and within the respective Project's period of performance;[190] and
- The Applicant or volunteer organization tracks the resources and work performed, including description, specific locations, and hours.[191] The Applicant must track the donated resources for Permanent Work to the specific Project for which it is associated.

FEMA considers unpaid individuals who volunteer their labor to the Applicant to be third-party even if they are officially members or employees of the Applicant organization (e.g. volunteer fire fighters at a PNP volunteer fire department performing eligible Emergency Work).

Resources donated to the Applicant by an organization that would normally provide the same resources under its mission, such as the American Red Cross, are eligible as an offset provided the organization is not federally funded. Additionally, if a mutual aid agreement provides for assistance at no cost to the Applicant, the Applicant may use the value of that assistance to offset its non-Federal cost share.

The value of a donated resource is ineligible as an offset toward the non-Federal cost share if the resource is:

- Donated by a Federal agency;
- Donated by another federally funded source;
- Funded through a Federal award;[192]
- Used as an offset to any other Federal award;[193] or
- Used for ineligible work.

---

[188] 2 C.F.R. § 200.306(b)(3).

[189] Applicants may not use the value of standby time as a donated resource as no work is being performed.

[190] 2 C.F.R. § 200.309. For Emergency Work, the end of the period of performance is equal to the latest Emergency Work Project's period of performance.

[191] 2 C.F.R. §§ 200.434(d) and 306(b)(1).

[192] 2 C.F.R. § 200.306(b)(5).

[193] 2 C.F.R. § 200.306(b)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Requesting donated resources from contractors during the solicitation phase of a procurement may violate Federal procurement rules as it may be considered overly burdensome or restrictive of competition.[194] To remain compliant, the Applicant can do the following:

- Accept unsolicited donated resources from contractors;
- Maintain a list of donors; and
- Ask contractors that are donating resources to work with other organizations.

If the Applicant accepts donated resources from contractors, it must not do any of the following:

- Solicit donations in its requests for proposals or solicitations for bids;
- Directly solicit donations or requests for proposals from contractors who are actively bidding on its contracts;
- Grant an award to a contractor which has donated resources for the specific work covered by the contract;
- Show favoritism or give the appearance of showing favoritism to a contractor who has donated resources; and
- Limit competition among contractors based on donated resources, especially for smaller contractors (including women or minority owned businesses) that might not be able to afford to donate resources.

## A.    Offset Amounts

FEMA applies values to donated resources as follows:

- Volunteer Labor: The offset is based on the same straight-time hourly labor rate, and fringe benefits, as a similarly qualified person in the Applicant's organization who normally performs similar work. FEMA does not offset volunteer labor based on overtime or premium rates. If the Applicant does not have employees performing similar work, FEMA credits the non-Federal share based on a rate consistent with those ordinarily performing the work in the same labor market that the Applicant would otherwise compete for that type of work.[195]
- Equipment: The offset is based on equipment rates and must not exceed the fair rental value (if loaned) or the fair market value of equipment that is in similar age and condition at the time of donation (if donated with a transfer of title). See Chapter 6:III. *Applicant-Owned Equipment and Purchased Equipment* for information on equipment rates.[196]
- Supplies or Materials: The offset is based on current commercial rates; which FEMA validates based on invoices from previous purchases or information available from vendors in the area. The amount must not exceed the fair market value at the time of donation.[197]
- Buildings or Land: For buildings or land donated permanently (i.e., with a transfer of ownership), the offset is based on the fair market value at the time of donation as established by an independent appraisal and certified by the Applicant.

---

[194] 2 C.F.R. § 200.319.
[195] 2 C.F.R. § 200.306(e) and (f).
[196] 2 C.F.R. § 200.306(g), (h), and (i).
[197] 2 C.F.R. § 200.306(g).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Space: For building or land space donated for temporary use, the offset is based on the fair rental value of comparable privately-owned space in the same locality as established by an independent appraisal.[198]
- Logistical Support: Reasonable logistical support for volunteers doing eligible work, such as donations warehousing and management related to eligible work, may be eligible either for funding (if the Applicant provides the logistical support) or as a donated resource offset (if a third party provides the logistical support), subject to approval by FEMA.

For Emergency Work, FEMA applies the donated resource offset against the combined non-Federal cost share for all the Applicant's Emergency Work Projects (Category A and B) under the declared incident. The offset may not exceed the total out-of-pocket costs and is capped at the total non-Federal cost share of these projects. FEMA prepares the Emergency Work donated resource project as a Category B Project separate from Emergency Work Projects for the Applicant's incurred costs. FEMA does not obligate the donated resource Project until after it obligates all Emergency Work Projects for the Applicant.

For Permanent Work, FEMA applies the donated resource offset against the non-Federal cost share of the specific Permanent Work Project for which the resources were donated. The offset may not exceed the total out-of-pocket costs. FEMA caps the offset at the non-Federal cost share of that specific Permanent Work Project. The type and amount of resources donated must directly correlate to, and may not exceed, the type and amount approved in the scope of work of the Permanent Work Project (e.g., if the approved scope of work includes replacement of 10 chairs and 15 chairs are donated, the donated resource offset is limited to 10 chairs). FEMA adjusts the Permanent Work Project to capture any donated resource offsets related to the Project upon receipt of the donated resource information and no later than closeout.

## B.    Documentation Requirements

The Applicant needs to submit the following to support donated resources (not an all-inclusive list):

For each individual:

- ☐ Sign-in sheet (required);
- ☐ Name (required);
- ☐ Title and function (required for professional services);
- ☐ Days and hours worked (required); and
- ☐ Location of work and work performed (required).

Equipment:

- ☐ Same information listed under Chapter 6:III. *Applicant-Owned Equipment and Purchased Equipment* (required); and
- ☐ Who donated each piece of equipment (required).

Supplies or materials:

---

[198] 2 C.F.R. § 200.306(i)(3).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- ☐ Quantity used (required);
- ☐ Who donated (required);
- ☐ Location(s) used (required); and
- ☐ Invoices or other documentation to validate claimed value (required).

# XV. Project Management and Design Services

FEMA provides PA funding for costs related to project management and design activities as part of the project. Project management includes activities performed to manage the actual project. These are activities that would be required regardless of whether the entity is receiving PA funding and differ from management costs, which are costs for activities related to the receipt and administration of PA funding.

Project management activities may include procurement actions, legal review of contracts, monitoring contractor work, construction oversight and inspections, environmental and historic preservation permitting actions, completing load tickets for debris operations. These activities are eligible provided they are tracked and directly related to a specific, eligible project.

Architectural, engineering, and design services for the approved scope of work, including hazard mitigation, are also eligible provided the services are reasonable. Some projects do not need these services or require only basic services, while others require specialized engineering and design.

When evaluating the eligibility of project management and design services, FEMA considers whether the project includes improvements that are ineligible for funding (costs for management and design services associated with improvements or other ineligible work are not eligible).

# XVI. Grant Management and Administration

FEMA provides contributions for management costs that a Recipient or Subrecipient incurs in administering and managing PA awards. For Recipients, FEMA provides PA funding for management costs based on actual costs incurred up to 7 percent of the total award amount. For Subrecipients, FEMA provides PA funding for management costs based on actual costs incurred up to 5 percent of the Subrecipient's total award amount.[199] Additional information is available in FEMA's interim policy, FEMA Recovery Policy FP 104-11-2, *Public Assistance Management Costs (Interim)* and FEMA's *Public Assistance Management Costs Standard Operating Procedures.*[200]

# XVII.     Surveys to Assess or Locate Damage or Debris Impacts

The Applicant is responsible for identifying locations of incident-related damage or debris impacts. Costs related to assessing overall impacts of an incident, locating damage or debris impacts, and conducting PDAs are not eligible project costs, but may be eligible as management costs (see Chapter 6:XVI. *Public Assistance Grant Management and Administration*).

---

[199] Stafford Act § 324(a), 42 U.S.C. § 5165b as amended by the Disaster Recovery Reform Act; and 2 C.F.R. §§ 200.56 and 200.412.

[200] www.fema.gov/sites/default/files/2020-07/pa_mgmt_costs_sop_final.pdf.

If, during a survey after the declaration, the Applicant identifies incident-related damage to a facility, the costs related to the inspection of that facility are eligible as management costs provided the facility is eligible.

Further detailed inspections of that damage to determine the extent of damage or quantity of debris and method of repair or removal, including professional evaluations, are eligible as part of the work to restore the facility or work to remove the debris. If the Applicant performs a detailed inspection of a partially damaged system, eligible costs are based on the percentage of the system that was damaged. For example, if after inspecting 500 linear feet of sewer line, the Applicant identified 100 linear feet of line damaged by the incident, only one-fifth of the inspection costs are eligible.

FEMA has specific eligibility criteria for inspecting earthquake damage to buildings constructed with welded steel-moment frames. FEMA bases the eligibility criteria on *Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment Frame Buildings* (FEMA 352).[201] The criteria are summarized in Appendix C: *Welded Steel Moment Frame*. Safety inspections are discussed in Chapter 7:II.S. *Safety Inspections*.

# XVIII.     Duplication of Benefits

FEMA is legally prohibited from duplicating benefits from other sources. If the Applicant receives funding from another source for the same work that FEMA funded, FEMA reduces the eligible cost or de-obligates funding to prevent a duplication of benefits.[202]

## A.     Insurance Proceeds

FEMA cannot provide PA funding that duplicates insurance proceeds.[203] Consequently, FEMA reduces eligible costs by the amount of:

- Actual insurance proceeds, if known;[204] or
- Anticipated insurance proceeds based on the Applicant's insurance policy, if the amount of actual insurance proceeds is unknown. FEMA subsequently adjusts the eligible costs based on the actual amount of insurance proceeds the Applicant receives.

FEMA requires the Applicant to take reasonable efforts to pursue claims to recover insurance proceeds that it is entitled to receive from its insurer(s). FEMA may limit funding if the insurance policy provides coverage that should be pursued. If the Applicant expends costs to pursue its insurance claim, FEMA offsets the insurance reduction with the Applicant's reasonable costs to pursue the claim if:

- The incurred cost resulted from pursuing insurance proceeds for FEMA-eligible work; and
- The Applicant can provide documentation to show that the incurred cost was attributed to pursuing more insurance proceeds than the initial settlement amount.

---

[201] www.nehrp.gov/pdf/fema352.pdf.
[202] Stafford Act § 312, 42 U.S.C. § 5155, and 2 C.F.R. § 200.406.
[203] Ibid.
[204] 44 C.F.R. §§ 206.252(c) and 253(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

If the Applicant receives insurance proceeds for ineligible losses (e.g., business interruption), FEMA calculates a relative apportionment of insurance proceeds to determine the insurance reduction based on:

- The proceeds received per type of loss as specified by the insurance policy or settlement documentation;
- Policy limits for categories of loss as specified in the insurance policy; or
- The ratio of total eligible losses to total ineligible losses.

FEMA Recovery Policy (FP) 206-086-1, *Public Assistance Policy on Insurance*, describes insurance reductions in detail.[205]

The Applicant should upload the following documentation in PA Grants Portal at the Applicant Level (not an all-inclusive list):

- ☐ Summary of insurance coverage
- ☐ Actual insurance proceeds, if available (required before project is closed)
- ☐ General Property Insurance Policy (required if applicable):
  - o Property policy declaration pages;
  - o Schedule of covered locations;
  - o Property policy forms and endorsements;
  - o Inland marine coverage section; and
  - o Equipment breakdown section
- ☐ Flood insurance policy (required for flood loss)
- ☐ Wind policy, which may include a separate wind only insurance policy issued by a state Wind Pool or Association [required for wind-related loss (hurricane, tornado, severe weather incident)]
- ☐ Auto insurance policy (required for vehicle damage)
- ☐ Insurance settlement information (required if available):
  - o Final Statement of loss;
  - o Adjuster's estimates;
  - o Settlement checks;
  - o Correspondence explaining the settlement amount and allocation; and
  - o Letter of denial

## B.    Non-Federal Grants and Cash Donations

Grants and cash donations from non-Federal sources are subject to the following criteria based on whether the funds are provided toward a specific purpose and whether that specific purpose is otherwise eligible for PA funding.

- If the funds are designated for the same purpose as eligible work, the following apply:
  - o The Applicant may use the funds toward its non-Federal cost share.

---

[205] www.fema.gov/sites/default/files/2020-05/FP206-086-1_PublicAssistancePolicyInsurance_062915.pdf.

- o If the funds are not used toward the non-Federal cost share, FEMA considers the donation or non-Federal grant a duplication of benefits and reduces eligible costs by the duplicated amount.
- o If the funds exceed the amount of the non-Federal cost share, FEMA reduces eligible costs by the excess amount.

- If the funds are designated for non-specific purposes, FEMA does not consider the funds a duplication of benefits. The Applicant may use the funds toward its non-Federal cost share. If the funds exceed the amount of the non-Federal share, the Applicant can apply the excess amount toward ineligible work.
- If the funds are designated for a specific purpose that is ineligible, FEMA does not allow the Applicant to apply the funds toward its non-Federal cost share.

## C.    Third-Party Liability

When a third party[206] causes damage (e.g., an oil spill) or increases the cost of repair or cleanup and the Applicant requests FEMA funding for the costs, FEMA requires the Applicant to make reasonable efforts to pursue claims to recover costs it is entitled to receive from the third party.

If the costs recovered are not adequate despite the Applicant's good faith effort, FEMA reduces eligible costs based on the recovered amount. If the Applicant receives funds from the third party for eligible and ineligible work or losses, FEMA determines the offset amount based on:

- The proceeds received for eligible losses as specified by the settlement documentation; or
- The ratio of total eligible losses to total ineligible losses.

## D.    Other Federal Awards

If the Applicant receives funds from another Federal agency for the same purpose as PA funding, it is a duplication of benefits. FEMA cannot duplicate funds provided by another Federal agency.

# XIX. Duplication of Funding Between FEMA Programs

FEMA provides assistance under other Programs, such as its IA programs and Hazard Mitigation Grant Program (HMGP), that could duplicate assistance that is available under the PA Program. FEMA must ensure it does not duplicate funds in areas where its programs overlap.

For IA, individuals may receive assistance for work that, under certain circumstances, is also eligible under PA when a SLTT government has legal authority to perform the work. For example, a homeowner may receive IHP assistance for debris clearance from a privately-owned road and the local government may request PA funding for debris clearance from the same road for emergency vehicle access. FEMA must ensure it does not provide PA funding for the same work to two different entities.

For HMGP, FEMA can provide funding for a wide range of mitigation measures, including measures that may also be eligible under the PA Program. FEMA must ensure that PA funds do not duplicate HMGP funds.

---

[206] A third party is a private entity or individual that is not involved in the Federal award, i.e., not the Applicant or Federal, State, Territorial, or Tribal Government.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## XX. Interest on Loans

Applicants may need to obtain a loan to complete work. Financing costs for a loan is only eligible when it meets the conditions established in 2 C.F.R. § 200.449.

## XXI. Ineligible Costs

The Stafford Act authorizes FEMA to provide PA funding for specific work performed as a result of the incident. It does not authorize FEMA to provide PA funding for all losses or costs resulting from the incident. The following costs are ineligible because the Stafford Act does not authorize FEMA to provide PA funding for these items.

### A.    Loss of Revenue

FEMA cannot provide PA funding for revenue lost due to the incident. The following are examples of when loss of revenue may occur because of an incident:

- Hospitals release noncritical patients to make room for survivors;
- Hospitals sustain damage that reduces pre-existing capacity;
- Waiving toll fees on a toll road, even if for evacuation purposes;
- Waiving the normal fee for ferry service to encourage alternate transportation;
- Waiving tipping fees;
- A utility system is shut down; and
- Events are cancelled due to an entity using a venue for incident-related activities, such as sheltering.

### B.    Loss of Useful Service Life

FEMA cannot provide PA funding for the projected loss of useful service life of a facility. For example, if a road has been inundated by flood waters for an extended timeframe, FEMA cannot provide PA funding for the value of the projected loss of useful life of the road due to the long-term effects the inundation might have on the road. Similarly, FEMA cannot fund the value of the loss of landfill capacity due to incident-related debris.

### C.    Tax Assessments

SLTT governments may conduct tax assessments to re-assess real property values after an incident. Costs related to conducting these assessments are ineligible because the assessments are neither essential to addressing an immediate threat to life or improved property, nor connected with the permanent restoration of eligible facilities.

### D.    Increased Operating Costs

Increased costs of operating a facility or providing a service are generally ineligible, even when directly related to the incident. However, short-term increased costs that are directly related to accomplishing specific emergency health and safety tasks as part of emergency protective measures may be eligible, as discussed in Chapter 7:II.F. *Expenses Related to Operating a Facility or Providing a Service*.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 7:  EMERGENCY WORK ELIGIBILITY

FEMA is authorized to provide PA funding for Emergency Work,[207] including emergency protective measures and debris removal. This chapter includes PA policy for Emergency Work, which is work that must be done immediately to:

- Save lives;
- Protect public health and safety;
- Protect improved property; or
- Eliminate[208] or lessen an immediate threat of additional damage.[209]

"Immediate threat" is the threat of additional damage or destruction from an incident that can reasonably be expected to occur within 5 years of the declared incident.[210]



Debris removal and emergency protective measures are only eligible if the work addresses an immediate threat.

For PNPs, the facility must be eligible in order for the work to be eligible. For State, Territorial, Tribal, and local governments, the facility must be eligible in order for temporary repairs and mold remediation to be eligible. Facility eligibility is not applicable to other Emergency Work.

**Figure 10. Emergency Work Eligibility**

For flood incidents specifically, an immediate threat is a threat from a 5-year flood (a flood that has a 20 percent chance of occurring in any given year). For other incidents, an immediate threat means imminent danger from an incident that can reasonably be expected to occur within 5 years of the declared incident. The declared incident must have caused the immediate threat to exist. However, the threat itself can be from any type of incident; it is not limited to the type of incident that caused the initial damage or threat.

The deadline to complete Emergency Work is 6 months from the declaration date unless the Recipient or FEMA authorize an extension.[211] Although regulations allow 6 months to complete Emergency Work, eligible Emergency Work is that which is necessary to address an immediate threat (as shown in Figure 10. *Emergency Work Eligibility*). FEMA considers the urgency with which the Applicant proceeds with work when evaluating eligibility. The Applicant should not delay in following its normal policies and procedures when taking actions to address threats to life, public health and safety, and improved property.

For PNP Applicants, eligible Emergency Work is generally limited to that associated with an eligible PNP facility as follows:

- Debris removal from the facility property; and

---

[207] 44 C.F.R. § 206.201(b).

[208] While the regulatory definition of the term "Emergency Work" includes the term "avert," the regulatory language used for the specific eligibility criteria for debris removal and emergency protective measures includes the term "eliminate," not "avert."

[209] In addition to addressing immediate threats to life, health and safety, and improved property, debris removal may be authorized to ensure economic recovery of the affected community.

[210] 44 C.F.R. § 206.221(c).

[211] 44 C.F.R. §§ 206.204(c) and (d).

- Emergency protective measures to prevent damage to the facility and its contents.

In limited circumstances, PNPs may be eligible for other types of Emergency Work when essential components of a facility are urgently needed to save lives or protect health and safety (see Chapter 7:II.D. *Emergency Protective Measures Conducted by Private Nonprofit Organizations* for details).

For SLTT Applicants, evaluating facility eligibility is not necessary for most Emergency Work. For these Applicants, eligibility of Emergency Work is primarily based on evaluation of an immediate threat and legal authority to perform the work. The Applicant must provide the following:

- ☐ Detailed description of work performed (required);
- ☐ Description of immediate threat (required if requested); and
- ☐ Records demonstrating presence of immediate threat (e.g., technical reports, safety inspector reports, photographs) (required if requested).

Environmental and Historic Preservation Considerations

The Applicant should make every effort to inform the Recipient and FEMA of necessary Emergency Work prior to performing the work, when appropriate, to afford FEMA the opportunity to perform EHP reviews and consultations. The Applicant is responsible for obtaining all required EHP permits from the appropriate agencies before proceeding with Emergency Work. FEMA EHP staff is available to assist the Applicant with ensuring the work is compliant with EHP laws, regulations, and EOs.

When performing Emergency Work, the Applicant should avoid new ground disturbance when possible. If the Applicant cannot avoid new ground disturbance, it must consider impacts to natural and cultural resources and obtain all necessary permits. To facilitate EHP review, the Applicant should provide:

- ☐ Site map (including geographical coordinates in latitude, longitude in decimal degrees) showing the location of all proposed areas where the Applicant will conduct site work or construction and the extent of ground disturbance (including any staging areas, access roads, parking, landscaping, grading, or utilities);
- ☐ Construction dates and photographs of all facilities in the project area;
- ☐ Any known environmental issues or historic preservation concerns, such as, but not limited to, threatened and endangered species including their critical habitat, location in floodplain or wetlands, presence of asbestos within the facility, or facility's location in an archaeologically sensitive area;
- ☐ Environmental assessments;
- ☐ Historic property designations or surveys, including archaeological surveys; and
- ☐ Copies of permits and correspondence with regulatory agencies, including but not limited to:
  - o State, Territorial, or Tribal Historic Preservation Officer (SHPO/THPO) (historic properties);

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- o U.S. Army Corps of Engineers (work in navigable waters, work involving dredging or discharging dredged materials or fill in waterways or wetlands);
- o U.S. Fish and Wildlife Service (federally listed threatened and endangered species, migratory birds, bald and golden eagles, work in Coastal Barrier Resource System areas, work in or near waterways or wetlands);
- o National Oceanic and Atmospheric Administration (federally listed threatened and endangered species, work in in essential fish habitat, work in National Marine Sanctuaries);
- o EPA (work involving underground injection, work with the potential to increase contamination of sole source aquifers); and
- o State, Territorial, or Tribal environmental agencies (permits for burning, staging, or disposing of debris).

# I.   Debris Removal (Category A)

Debris removal activities, such as clearance, removal, and disposal, are eligible as Category A if the removal is in the public interest based on whether the work:

- Eliminates immediate threats to lives, public health, and safety;
- Eliminates immediate threats of significant damage to improved public or private property;
- Ensures economic recovery of the affected community to the benefit of the community at large;[212] or
- Mitigates risk to life and property by removing Substantially Damaged[213] structures and associated structures and appurtenances as needed to convert property acquired using HMGP funds to uses compatible with open space, recreation, or wetlands management practices. Such removal must be completed within 2 years of the declaration date unless extended by the FEMA Assistant Administrator of the Recovery Directorate.[214]

Debris includes, but is not limited to, vegetative debris, construction and demolition debris, sand, mud, silt, gravel, rocks, boulders, white goods, and vehicle and vessel wreckage.

For a PNP, eligible debris removal is limited to that associated with an eligible facility, including debris on the property of the eligible facility.

Removal of debris from improved public property and public rights-of-way (ROWs), including Federal-aid roads,[215] is eligible. If SLTT governments authorize residents to place incident-

---

[212] This condition is generally restricted to debris removal from large commercial areas when a significant percentage of the commercial sector of a community is impacted and coordinated debris removal is necessary to expedite restoration of the economic viability of the affected community.

[213] Substantial Damage is damage of any origin sustained by a structure whereby the cost of restoring the structure to its before-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

[214] Stafford Act § 407, 42 U.S.C. § 5173; 44 C.F.R. § 206.224(a).

[215] The term "Federal-aid roads" means the highways on the Federal-aid highway system and all other public roads not classified as local roads or rural minor collectors. The Federal-aid highway system means the National Highway System and the Dwight D. Eisenhower National System of Interstate and Defense Highways (the Interstate System).

related debris on public ROWs, FEMA provides PA funding to remove the debris from the ROWs for a limited timeframe.

The Applicant needs to provide:

☐ Estimated debris quantities by type (required for all uncompleted work);

☐ Photographs of debris impacts, if available;

☐ Location of temporary reduction sites and permanent disposal sites (required);

☐ Copies of permits for reduction and disposal sites (required);

☐ Quantities of debris removed, reduced, disposed, and recycled (by type) with load tickets to support quantities (required if contracted, FEMA reviews a representative sample);

☐ Tower logs (required if contracted, FEMA reviews a representative sample);

☐ Documentation to substantiate legal responsibility (required);

☐ The basis of the immediate threat determination (required);

☐ Location of debris (required); and

☐ Documentation to substantiate the debris was deposited by the incident and was not pre-existing (e.g., waterway soundings that show pre-and post-incident levels) (required).

Removal of debris placed on the public ROWs from commercial properties is ineligible unless it is pre-approved by FEMA (see Chapter 7:I.F.2(c). *Removal from Commercial Property (Requires FEMA's Pre-approval)*. Additionally, removal of materials related to the construction, repair, or renovation of either residential or commercial structures is ineligible.

Debris removal from the following is ineligible:



- Federally maintained navigable channels and waterways;
- Flood control works under the authority of the Natural Resources Conservation Service (NRCS). Flood control works under the specific authority of NRCS are those that are part of the Watershed and Flood Prevention Operations (WFPO) Program under PL 83-566;[216]
- Agricultural land; and
- Natural, unimproved land, such as heavily wooded areas and unused areas.[217]

Removing debris to restore the pre-disaster capacity of engineered facilities may be eligible as Permanent Work if the Applicant can substantiate the pre-disaster capacity and maintenance of that facility as described in Chapter 8:IX.B.1. *Restoring the Capacity of Channels, Basins, and Reservoirs*.

Removal and disposal of pollutants and hazardous substances are eligible as Category B work in accordance with Chapter 7:II.K. *Hazardous Materials*.

---

[216] www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/wfpo.
[217] 44 C.F.R. § 206.224(b).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Environmental and Historic Preservation Considerations

Although debris removal is usually statutorily excluded from NEPA review,[218] FEMA must ensure compliance with other Federal laws, regulations, and EOs prior to funding the work. Accordingly, FEMA must ensure that the Applicant's debris removal operations avoid impacts to such resources as floodplains, wetlands, federally listed threatened and endangered species and their critical habitats, and historic properties (including maritime or underwater archaeological resources if waterways are impacted). The Applicant must stage debris at a safe distance from property boundaries, surface water, floodplains, wetlands, structures, wells, and septic tanks with leach fields. Additional coordination may be necessary for debris removal from waterways, stump removal, and use of fill.

The Applicant should contact applicable Federal, State, Territorial, and Tribal regulatory agencies to ensure compliance with requirements and permits for debris-related operations. Upon completion of debris removal and disposal, site remediation may be necessary at staging sites and other impacted areas. See more detailed discussion of EHP considerations above in Chapter 7, I.

## A.    Alternative Procedures for Debris Removal

The Applicant may elect to participate in the Alternative Procedures for debris removal and receive reimbursement for straight-time for the Applicant's budgeted employees that conduct debris removal activities. The Applicant opts-in by including straight-time in their debris removal (Category A) project claims.

## B.    Hazardous Limbs, Trees, and Stumps

Eligible vegetative debris may include tree limbs, branches, stumps, or trees that are still in place, but damaged to the extent they pose an immediate threat. These items are ineligible if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over improved property or public-use areas, such as trails, sidewalks, or playgrounds.

Contractors typically charge debris removal based on a unit price for volume (cubic yards) or weight (tons). A hazardous tree or stump may be collected individually. When these items are collected individually, contractors often charge a price per tree or stump based on its size. FEMA encourages Applicants to procure branch or limb removal from trees on a one-time charge per tree basis as opposed to a unit price per limb or branch to facilitate more cost-effective operations. FEMA has specific eligibility criteria and documentation requirements for funding these items based on a price per each item instead of by volume or weight. If the Applicant does not provide sufficient documentation, it jeopardizes its PA funding.

Bracing a tree is eligible (as Category B) only when doing so is less costly than removal and disposal. If the Applicant chooses to brace a tree rather than remove it, the tree is ineligible for removal later if it dies.

Pruning, maintenance, trimming, and landscaping are ineligible.

---

[218] Stafford Act § 316, 41 U.S.C. § 5159.

## 1.    Broken Limb or Branch Removal

Removal of broken limbs or branches that are 2 inches or larger in diameter (measured at the point of break) that pose an immediate threat are eligible. An example is a broken limb or branch that is hanging over improved property or public-use areas, such as trails, sidewalks, or playgrounds if it could fall and cause injury or damage to improved property.

FEMA does not fund removal of broken limbs or branches located on private property unless:

- The limbs or branches extend over the public ROW;
- The limbs or branches pose an immediate threat; and
- The Applicant removes the hazard from the public ROW (without entering private property).

Only the minimum cut necessary to remove the hazard is eligible. For example, cutting a branch at the trunk is ineligible if the threat can be eliminated by cutting it at the closest main branch junction.

## 2.    Tree Removal

FEMA considers incident-damaged trees to be hazardous and eligible if the tree has a diameter of 6 inches or greater measured 4.5 feet above ground level, and the tree:

- Has a split trunk;
- Has a broken canopy; or
- Is leaning at an angle greater than 30 degrees.

For trees that have 50 percent or more of the root-ball exposed, removal of the tree and root-ball and filling the root-ball hole are eligible. For contracted removal of a tree with a root-ball, FEMA will not reimburse two separate unit costs to remove the tree and its root-ball.

For trees that have less than 50 percent of the root-ball exposed, FEMA only provides PA funding to flush cut the item at ground level and dispose of the cut portion based on volume or weight. Grinding any residual stump after cutting the tree is ineligible.

## 3.    Stump Removal

For stumps that have 50 percent or more of the root-ball exposed, removal of the stump and filling the root-ball hole are eligible. If grinding a stump in-place is less costly than extraction, grinding the stump in-place is eligible.

Stump removal in areas with known or high potential for archaeological resources usually requires that FEMA further evaluate and consult with SHPO or THPO. If the Applicant discovers any potential archeological resources during stump removal, the Applicant must immediately cease work and notify FEMA.

*(a)    Contracted Stump Removal*

FEMA only reimburses contracted costs charged on a per-stump basis if:

- The stump is 2 feet or larger in diameter measured 2 feet above the ground; and
- Extraction is required as part of the removal.

The Applicant needs to ensure the price for stump removal includes extraction, transport, disposal, and filling the root-ball hole.

For stumps that have less than 50 percent of the root-ball exposed, FEMA only provides PA funding to flush cut the item at ground level and dispose of the cut portion based on volume or weight. Grinding any residual stump is ineligible.

For stumps smaller than 2 feet in diameter, or for stumps of any size that do not require extraction, FEMA only provides PA funding based on volume or weight as removal of these stumps does not require special equipment. If the Applicant claims reimbursement of these stumps on a per stump basis, FEMA limits PA funding based on a unit price for volume or tons, calculated using Appendix E: *Stump Conversion Table*.

If the Applicant incurs additional costs in picking up stumps 2 feet or larger in diameter that the contractor did not extract, it should complete Appendix F: *Hazardous Stump Worksheet* and present documentation to substantiate the costs as reasonable based on the equipment required to perform the work.

### 4.    Documentation Requirements for Hazardous Limbs, Trees, and Stumps

The Applicant must retain, and provide when requested, all of the following documentation to support the eligibility of contracted work to remove tree limbs, branches, stumps, or trees that are still in place:

- ☐ Specifics of the immediate threat with the location (geographical coordinates in latitude, longitude) and photograph or video documentation that establishes the item is on public property (required, FEMA reviews a representative sample);
- ☐ Quantity removed (Note: If a contractor charged an individual price for each limb, tree, or stump removed, FEMA requires the diameter of each item removed. For stumps, the measurement must be 2 feet up the trunk from the ground. For trees, it must be 4.5 feet up from the ground.) (required);
- ☐ Quantity, location, and source of material to fill root-ball holes (required); and
- ☐ Equipment used to perform the work (required).

## C.    Waterways

Debris removal from waterways that is necessary to eliminate the immediate threat to life, public health and safety, or improved property is eligible. Removal of debris in a waterway that does not meet this criterion is ineligible, even if the debris is deposited by the incident.

The EPA and U.S. Coast Guard (USCG) have the specific authority to remove hazardous materials, as described in the previous section. EPA is responsible for removing such material from inland water zones and USCG is responsible for coastal water zones. Debris removal from waterways usually requires coordination with the U.S. Army Corps of Engineers (USACE) for the use of a Nationwide permit and with the National Marine Fishery Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) to ensure compliance with Section 7 of the Endangered Species Act (ESA).

1.    **Navigable Waterways**

If the Applicant has legal responsibility for maintenance of a navigable waterway, removal and disposal of debris that obstructs the passage of vessels is eligible to a maximum depth of 2 feet below the low-tide draft of the largest vessel that utilized the waterway prior to the incident. Any debris below this zone is ineligible unless it is necessary to remove debris extending upward into an eligible zone.

If a tree is still rooted to an embankment and is floating or submerged, the cost to cut the tree at the water's edge is eligible.

Debris removal from federally maintained navigable waterways is ineligible. USCG and the USACE have specific authorities for removal of hazardous substances, vessels, and other obstructions from federally maintained navigable waterways.

2.    **Non-navigable Waterways, Including Flood Control Works and Natural Waterways**

Debris deposited by the incident may obstruct a natural waterway (that is, a waterway that is not improved or maintained) or a constructed channel, including flood control works. In these cases, removal of the debris from the channel is eligible if the debris poses an immediate threat, such as when the debris:

- Obstructs, or could obstruct, intake structures;
- Could cause damage to structures, such as bridges and culverts; or
- Is causing, or could cause, flooding to improved public or private property during the occurrence of a 5-year flood.

Removal of the obstruction is eligible in **streams** where debris removal might also be eligible under the NRCS Emergency Watershed Protection Program (EWP)[219] unless NRCS provides assistance for the debris removal. However, FEMA, the Recipient, and the Applicant need to coordinate with NRCS first to ensure that any work performed does not jeopardize other assistance that may be eligible under the EWP.



Debris removal from **flood control works** that are under the specific authority of NRCS is ineligible for PA funding, even if NRCS does not have sufficient funding or does not provide assistance. Flood control works under the specific authority of NRCS are those that are part of the WFPO Program under PL 83-566.[220]

For flood control works that are eligible for the USACE Rehabilitation and Inspection Program (RIP),[221] debris

---

[219] www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/ewpp.
[220] www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/wfpo.
[221] www.usace.army.mil/Missions/CivilWorks/LeveeSafetyProgram/LeveeInspections.aspx.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

removal is eligible for PA funding. USACE does not reimburse Applicants for debris removal but conducts this activity directly when necessary.

### 3.    Identifying Debris Impact Locations

The Applicant is responsible for identifying debris deposited by the incident that poses an immediate threat. Random surveys to look for debris, including surveys performed using side scan sonar, are ineligible. However, if the Applicant identifies an area of debris impacts and demonstrates the need for a survey to identify specific immediate threat, FEMA may provide PA funding for the survey in that location, including the use of side scan sonar.

### D.    Privately Owned Vehicles and Vessels on Public Property

Removal of privately-owned vehicles and vessels from public property is eligible if all of the following conditions are met:

- The vehicle or vessel blocks access to a public-use area;
- The vehicle or vessel is abandoned;
- The Applicant follows applicable SLTT government ordinances or laws for private vehicle or vessel removal; and
- The Applicant documents the handling of the vehicle or vessel.

The Applicant needs to retain documentation to support it met these criteria.

A limited timeframe for vehicle and vessel storage is eligible if it is necessary to remove the item prior to being able to identify the owner. If the owner is identified, the Applicant should work with private property owners to pursue and recover storage and removal costs and credit FEMA the Federal share of any funds received.

### E.    Disposal

FEMA provides PA funding for various costs related to disposing of debris. The Applicant should dispose of debris in an efficient and cost-effective manner.

Vegetative debris is bulky and can consume a significant volume of landfill space. To minimize the use of landfill space, FEMA encourages the Applicant to reduce the volume of vegetative debris before burying. Costs to reduce vegetative debris using methods such as mulching, grinding, or burning are eligible.

When removing sand, disposal of sand spoils on a public beach may be eligible as part of the debris removal project when it is the most cost-effective method of disposal.

Certain types of construction and demolition debris are reusable or recyclable. The Applicant should conserve landfill space by separating materials for reuse or recycling.

### 1.    Recycling Revenue

If the Applicant receives revenue for recycling debris, FEMA reduces PA funding by the amount of revenue received. The Applicant may deduct costs for administering and marketing the sale of the salvageable materials from the fair market value.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

If a contract allows the contractor to take possession of salvageable material and benefit from its sale to lower bid prices, there is no salvage value to be recovered at the end of the project. Therefore, the Applicant has no further obligation to FEMA.

### 2.    Temporary Staging Sites

Establishing and operating a temporary staging site necessary for debris separation and reduction is eligible. The cost to lease property is eligible. Additionally, if the terms of the lease require that the Applicant restore the leased property back to its condition prior to the Applicant's use, the costs related to that restoration are also eligible as part of the Category A project. If leased, the Applicant must provide the lease agreement.

### 3.    Hand-Loaded Trucks and Trailers

FEMA has determined that, for vegetative debris, hand-loaded trucks and trailers achieve approximately half the compaction level of mechanically loaded trucks and trailers. Therefore, FEMA only provides PA funding for 50 percent of the vegetative debris in hand-loaded trucks and trailers.

Similarly, trucks without solid tailgates cannot be compacted to full capacity. Therefore, FEMA only funds up to a maximum of 85 percent of the debris in trucks without solid tailgates.

The Applicant must document the types and total quantity of hand-loaded debris, and the types and total quantity of debris hauled in trucks without solid tailgates and provide this information to FEMA to ensure appropriate reductions are taken for this debris.

### 4.    Landfills and Tipping Fees

Landfill tipping fees usually include fixed and variable costs, along with special taxes or fees assessed by the jurisdiction in which the landfill is located. Eligible tipping fee costs are limited to the variable and fixed costs that are directly related to landfill operations, such as recycling tax. The components of tipping fees that are not directly related to landfill operations, such as special taxes or fees related to other government services or public infrastructure, are ineligible as part of the tipping fee. When providing PA funding for tipping fees, FEMA removes any ineligible components.



The Applicant may use a significant portion of the available capacity of a landfill to dispose of incident-related debris. Although FEMA provides PA funding for tipping fees, it cannot provide PA funding for the value of the loss of landfill capacity due to incident-related debris.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## F.      Monitoring Contracted Debris Removal Operations

FEMA requires the Applicant to monitor all contracted debris operations to ensure that the quantities and work claimed are accurate and eligible. This includes documenting debris quantities by types, quantities reduced, reduction methods, and pickup and disposal locations. If the Applicant does not monitor contracted debris removal operations, it jeopardizes its PA funding for that work.

The Applicant may use force account resources (including temporary hires), contractors, or a combination of these for monitoring. It is not necessary, or cost-effective, to have Professional Engineers or other certified professionals perform debris monitoring duties. FEMA considers costs unreasonable when associated with the use of staff that are more highly qualified than necessary for the associated work. If the Applicant uses staff with professional qualifications to conduct debris monitoring, it must document the reason it needed staff with those qualifications.

FEMA provides training to the Applicant's force account debris monitors (including its temporary hires) upon request.

Eligible activities associated with debris monitoring include, but are not limited to:

- Field supervisory oversight;
- Monitoring contracted debris removal at both the loading and disposal sites
- Compiling documentation, such as load tickets and monitor reports, to substantiate eligible debris; and
- Training debris monitors on debris removal operations, monitoring responsibilities and documentation processes, and FEMA debris eligibility criteria.

## G.      Debris Removal from Private Property

Debris removal from private property (PPDR) is the responsibility of the property owner and is usually ineligible under the PA Program. In limited circumstances, based on the severity of the impact of an incident and whether debris on private property is so widespread that it threatens public health and safety or the economic recovery of the community, FEMA may determine that debris removal from private property is eligible under the PA Program. In such cases, FEMA works with the SLTT governments to designate



**Figure 11. Debris on Private Property**

specific areas where debris removal from private property, including private waterways, is eligible. The debris removal must be in the public interest, not merely benefiting an individual or a limited group of individuals. Figure 11. *Debris on Private Property* is an example of the level of debris impacts that may warrant FEMA assistance for PPDR.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 1.    Approval Process

The Applicant must submit a written request to FEMA identifying the specific properties or areas of properties where private property debris removal activities will occur. Once FEMA receives the request, it engages with the Recipient and Applicant to review the request and conduct site inspections. With exception of debris removal from commercial property, the Applicant does not need to wait for FEMA approval to start work. However, for the Applicant to receive PA funding, FEMA must determine that the PPDR work at each property is eligible.



7.II.U. Demolition of Private Structures

FEMA only approves PA funding for PPDR if the Applicant demonstrates all of the following with sufficient documentation:

### (a)    Legal Authority and Indemnification

FEMA accepts a written statement from an authorized Applicant official that:

- ☐ Certifies the Applicant has legal authority and responsibility to remove debris from private property;
- ☐ Cites all applicable sources of authority (law, ordinance, code, contract, etc.); and
- ☐ Indemnifies the United States for any claim arising from the debris removal.

### (b)    Public Interest.

The Applicant must demonstrate that the PPDR was in the public interest.[222] This includes:

- ☐ The basis for the determination that removing the debris from the private property locations requested was in the public interest. The determination must be made by the State, Territorial, Tribal, county, or municipal government's public health authority or other public entity that has legal authority to make a determination that disaster-generated debris on private property constitutes an immediate threat to life, public health, or safety, or to the economic recovery of the community at large.
- ☐ The established, specific legal requirements for declaring the existence of a threat to public health and safety.

FEMA evaluates the submission to determine if it concurs that PPDR is in the public interest and provides a written response specifying any properties or area of properties for which it approves funding for debris removal.

## 2.    Removal from Private Roads

Private roads are those that are not owned or operated by or otherwise the legal responsibility of a Federal or SLTT entity (including orphan roads, roads in gated communities, homeowners' association roads, etc.). If the public has unrestricted access (no locks, gates, or guards) and

---

[222] Stafford Act § 407, 42 U.S.C. § 5173; 44 C.F.R. § 206.224(b).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

frequently uses the private road, then removal and disposal of the debris, including debris placed at the curbside by residents, is in the public interest and the Applicant is not required to submit documentation demonstrating the debris removal is in the public interest. This does not include debris on private driveways or parking lots. It also does not include removal and disposal activities from private roads in areas with restricted access (roads behind locks, gates, or guards) or private roads that are unrestricted but rarely used by the public. The Applicant must provide further documentation to establish that removal is in the public interest in these areas and, though not required, Applicants should consider obtaining approval from FEMA prior to starting removal and disposal. Debris clearance (push or cut and toss) for emergency access may be eligible as Category B work if it meets the criteria in Chapter 7:II.J. *Emergency Access*.

### 3.     Removal from Private Residential Property

Debris removal from residential property is usually not in the public interest because the debris does not typically present an immediate health and safety threat to the general public. If the incident generates debris quantities and/or types of debris on residential property that is so widespread or of such magnitude that it creates an immediate threat to public health and safety, debris removal may be in the public interest. To determine if removal of debris from private residential property is in the public interest, FEMA evaluates the public health determination (see Chapter 7:I.E.1(b). Public Interest, and will consider:

- Whether the debris is located in open areas accessible to the public (e.g., in a yard with no fence barrier next to a public sidewalk), located in maintained areas, or creating a health and safety hazard (such as a rodent infestation);
- Volume of debris;
- Height of debris;
- Number of houses and blocks with large volumes of debris; and
- Amount of the public population affected.

Given these additional considerations, Applicants should consider obtaining approval from FEMA prior to starting work.

### 4.     Removal from Commercial Property (Requires FEMA's Pre-approval)

Removal of debris from commercial properties, such as industrial parks, golf courses, cemeteries, apartments, condominiums, and trailer parks is generally ineligible because commercial enterprises are expected to retain insurance that covers debris removal. In very limited, extraordinary circumstances, FEMA may provide an exception. In such cases, the Applicant must meet the requirements of Chapter 7:I.E.1. Approval Process and FEMA must approve the work prior to the Applicant removing the debris.

### 5.     Duplication of Benefits

The Applicant needs to work with private property owners to pursue and recover insurance proceeds and credit FEMA the Federal share of any insurance proceeds received. In some circumstances, FEMA may provide IA assistance to individuals for debris removal; consequently, FEMA PA staff coordinate closely with IA staff to ensure FEMA does not fund the same work under both programs.

## II.    Emergency Protective Measures (Category B)

Emergency protective measures conducted before, during, and after an incident are eligible if the measures:

- Eliminate or lessen immediate threats to lives, public health, or safety; OR
- Eliminate or lessen immediate threats of significant additional damage to improved public or private property in a cost-effective manner.[223]

FEMA may require certification by Federal or SLTT government officials that a threat exists, including:

- Identification and evaluation of the threat; and
- Recommendations of the work necessary to cope with the threat.[224]

Environmental and Historic Preservation Considerations

Although emergency protective measures are usually statutorily excluded from NEPA review, FEMA **must** ensure compliance with other Federal laws, regulations, and EOs prior to funding the work. Accordingly, FEMA **must** ensure that the Applicant's emergency protective measures avoid impacts to such resources as floodplains, wetlands, federally listed threatened and endangered species and their critical habitats, and historic properties. Additional coordination may be necessary for projects such as, but not limited to, new construction related to the temporary relocation of emergency services, mosquito abatement, disposal of contaminated sandbags, or the construction of temporary levees, roadways, or bridges. See more detailed discussion of EHP considerations above in Chapter 7:I.

### A.    Saving Lives and Protecting Public Health and Safety

Emergency protective measures save lives or protect public health or safety. Eligible emergency protective measures and costs include, but are not limited to:

- Transporting and pre-positioning equipment and other resources for response;
- Flood fighting;
- EOC-related costs;
- Emergency access;
- Supplies and commodities;
- Medical care and transport;
- Evacuation and sheltering, including that provided by another State or Tribal government;
- Childcare;
- Safety inspections;
- Animal carcass removal;[225]

---

[223] 44 C.F.R. § 206.225(a)(3).

[224] 44 C.F.R. § 206.225(a)(2).

[225] FEMA may fund the removal of animal carcasses as Category A if the removal is part of the Applicant's overall debris disposal operation as opposed to a separate and distinct operation.

- Demolition of structures[226];
- Search and rescue to locate survivors, household pets, and service animals requiring assistance;
- Firefighting;
- Security, such as barricades, fencing, or law enforcement;
- Use or lease of temporary generators for facilities that provide essential community services;
- Dissemination of information to the public to provide warnings and guidance about health and safety hazards using various strategies, such as flyers, public service announcements, or newspaper campaigns;
- Searching to locate and recover human remains;
- Storage and interment of unidentified human remains; and
- Mass mortuary services.

The following are eligible under limited circumstances based on specific criteria described in each of the referenced sections:

- Expenses related to operating a facility or providing an emergency service (see Chapter 7:II.F. *Expenses Related Operating a Facility or Providing a Service*);
- Mosquito abatement (see Chapter 7:II.Q. *Mosquito Abatement*);
- Temporary relocation of essential services (see Chapter 7:II.V. *Temporary Relocation of Essential Services*); and
- Snow-related activities when specifically authorized in the declaration (see Chapter 7:II.W. *Snow-Related Activities*).

## B.    Protecting Improved Property

Eligible emergency protective measures to protect improved property[227] include, but are not limited to:

- Constructing emergency berms or temporary levees to provide protection from floodwaters or landslides;
- Emergency repairs necessary to prevent further damage, such as covering a damaged roof to prevent infiltration of rainwater;
- Buttressing, shoring, or bracing facilities to stabilize them or prevent collapse;
- Emergency slope stabilization;
- Mold remediation;
- Removal and storage of contents from eligible facilities for the purpose of minimizing additional damage;
- Extracting water and clearing mud, silt, or other accumulated debris from eligible facilities if the work is conducted expeditiously for the purpose of addressing an immediate threat (if the work is only necessary to restore the facility, it is Permanent Work, not Emergency Work);

---

[226] FEMA usually reimburses demolition of a public structure as part of the Permanent Work project to replace the facility.

[227] 44 C.F.R. § 206.221(d). Improved property means a structure, facility or item of equipment which was built, constructed or manufactured. Land used for agricultural purposes is not improved property.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Taking actions to save the lives of animals that are eligible for replacement (see Chapter 8:IX.C.5. *Animals*).

## C.    Emergency Protective Measures on Private Property

In limited circumstances, FEMA may determine that emergency protective measures conducted on private property are eligible under the PA Program if:

☐ The immediate threat is widespread, affecting numerous homes and businesses such that it is a threat to the health and safety of the general public;

☐ The Applicant has legal authority to perform the work; and

☐ The Applicant obtained rights-of-entry and agreements to indemnify and hold harmless the Federal government.

Situations where this may occur are generally limited to:

- Demolition of unsafe private structures that endanger the public (Chapter 7:II.U. *Demolition of Private Structures*);
- Installation of fiber-reinforced sheeting to cover damaged roofs, commonly referred to as Operation Blue Roof (DFA only) (Chapter 7:II.X.1. *Operation Blue Roof*);
- Provision of emergency access (Chapter 7:II.J. *Emergency Access*);
- Pumping of flooded basements;
- Pumping of septic tanks or decontamination of wells causing a pollution threat (Chapter 7.II.K. *Hazardous Materials*);
- Residential electric meter repair (Chapter 7:II.R. *Residential Electrical Meter Repair*);
- Safety inspections (Chapter 7:II.S. *Safety Inspections*); and
- Stabilizing a slope (Chapter 7:II.X.2. *Slope Stabilization*).

Upon submittal of its claim, the Applicant must include the following support documentation for the work to be eligible:

☐ A detailed explanation documenting the Applicant's legal authority and responsibility to enter private property;

☐ The basis for the determination that a threat exists to the general public; and

☐ Copies of the rights-of-entry and agreements to indemnify and hold harmless the Federal government.

If the above criteria are not met, the private property owner may be eligible for assistance under FEMA's IA Programs. FEMA PA and IA staff coordinate closely to ensure FEMA does not fund the same work under both programs.

## D.    Emergency Protective Measures Conducted by Private Nonprofit Organizations

For PNPs, eligible emergency protective measures are generally limited to activities associated with preventing damage to an eligible facility and its contents.

Emergency services are usually the responsibility of SLTT governments. Therefore, PNPs are generally not legally responsible for those services and FEMA does not provide PA funding to PNPs for the costs associated with providing those services. When a PNP provides emergency services at the request of, and certified by, the legally responsible government entity, FEMA

provides PA funding through that government entity as the eligible Applicant. These services include:

- Fire and rescue activities;
- Animal control;
- Emergency ambulance service for evacuation;
- 211 call services, if tracked and related to eligible work; and
- Other similarly urgent governmental services.

PNPs that own or operate a medical or custodial care facility are eligible for direct reimbursement of costs related to patient evacuation. In limited circumstances, FEMA may also reimburse a PNP directly when essential components of a facility are urgently needed to save lives or protect health and safety, such as an emergency room of a PNP hospital or a PNP sewage or water treatment plant.

Additionally, if a PNP volunteer fire department operates based on established agreements with a SLTT government that designates the volunteer fire department as an official recognized entity legally authorized to provide emergency services in areas of coverage specifically designated by the SLTT government, FEMA may reimburse the volunteer fire department directly as an eligible Applicant.

## E.    Pre-positioning Resources

Costs related to pre-positioning resources specifically for the declared incident are eligible if the resources are used in the performance of eligible Emergency Work.

Additionally, costs related to pre-positioning resources outside of the declared area are eligible when related to conducting search and rescue, evacuation, sheltering, or providing emergency medical care during the evacuation period (such as ambulances, buses, and staff) provided the resources were ultimately used for the declared area.

## F.    Expenses Related to Operating a Facility or Providing a Service

The Applicant may incur increased costs related to operating a facility or providing a service as a result of the incident because of an increased demand for the services the facility provides.

These additional costs are only eligible if:

- The services are specifically related to eligible emergency actions to save lives or protect public health and safety or improved property;
- The costs are for a limited timeframe based on the emergency or exigency of the circumstances; and
- The Applicant tracks and documents the additional costs.

Increased operating costs that may be eligible for a limited time, include but are not limited to, costs for:

- Generators at a hospital or police station;
- Water testing and treatment, including supplies, in the immediate aftermath of the incident to counter a specific threat;
- Fuel for increased use of a pumping station; and
- EOC facility costs (e.g., utilities).

Increased operating costs that are ineligible, even for a limited time, include but are not limited to, costs for:

- Patient care, except as noted in Chapter 7:II.N. *Medical Care*;
- Administrative activities;
- Provision of food, except as noted in Chapter 7:II.L. *Supplies and Commodities*; and M. *Meals*;
- Costs related to staff that were retained to work additional hours, but did not perform eligible Emergency Work (e.g., staff working additional shifts due to other staff's inability to get to work);
- Obtaining electrical power from an alternate source;
- Obtaining water from an alternate source;
- School make-up days, including contracted costs for bus service for make-up days;
- Provision of school bus service including fuel or mileage for transporting students from alternate locations or to alternate schools or temporary facilities; and
- Modification or construction of a new landfill to add landfill capacity.

For PNPs, operating costs are generally ineligible even if the services are emergency services, unless the PNP performs an emergency service at the request of and certified by the legally responsible government entity. In such case, FEMA provides PA funding through that government entity as the eligible Applicant.

## G.    Emergency Public Transportation and Communication (DFA only)

A SLTT government may provide emergency communication services and public transportation when existing systems are damaged to the extent vital functions of community life or incident response are disrupted. The costs of these services are ineligible for reimbursement.[228] However, FEMA may provide short-term DFA for these services.[229]

## H.    Flood Fighting

Flood fighting activities may include, but are not limited to, sandbagging, dewatering behind a levee by breaching or pumping, or increasing the height of a levee. These activities are eligible if necessary to reduce an immediate threat to life, public health and safety, or improved property. These activities are eligible even if they are associated with a facility that is eligible for the USACE RIP, as USACE cannot reimburse the Applicant for flood fighting. However, they are ineligible if associated with flood control works under the specific authority of NRCS.

The repair of deliberate breaches made by the Applicant to accomplish dewatering is eligible as part of the Emergency Work Project.

Dewatering agricultural and natural areas behind levees and other water control structures is ineligible.

---

[228] Transportation costs for the purpose of evacuation are eligible for reimbursement as described in Chapter 7:II.O. *Evacuation and Sheltering*.
[229] Stafford Act §§ 418 and 419, 42 U.S.C. §§ 5185 and 5186; 44 C.F.R. §§ 206.225(c) and (d).

## I.    Emergency Operations Centers

The Applicant may use its EOC to direct and coordinate resources and response activities for a period of time. Response activities conducted at EOCs are eligible provided they are associated with eligible work. Costs associated with operating the EOC are also eligible, including, but not limited to:

- Increased utility costs;
- Costs to lease a facility;
- Supply costs; and
- Meal costs, as described in Chapter 7:II.M. *Meals*.

## J.    Emergency Access

There are times when the incident causes damage or debris blockage to access routes to an essential community service, or to a community with survivors. If the extent of damage or blockage makes these areas inaccessible, work related to providing access is eligible. This includes clearing debris from or conducting emergency repairs to an access facility, such as a road or bridge. Eligible work is limited to that necessary for the access to remain passable. Any debris removal or additional debris clearance is Category A and funded based on the criteria in Chapter 7:I. *Debris Removal (Category A)*.



Private roads are those that are not owned or operated by or otherwise the legal responsibility of a local, county, Tribal, Territorial, State, or Federal entity. Clearance of debris from private roads-including orphan roads, roads in gated communities, homeowners' association roads, etc. is in the public interest if the debris impairs emergency access by local emergency responders, ambulances, fire, and police. For example, downed trees may be cut and moved off the roadway. Eligible work is limited to that necessary for roads to remain passable but might include removal and disposal during the initial pass as necessary to ensure emergency access. The Applicant is not required to submit documentation demonstrating that debris clearance is in the public interest.

The Applicant must complete all necessary legal processes or obtains rights-of-entry and agreements to indemnify and hold harmless the Federal Government.

Emergency repairs to privately-owned roads, including those within gated communities, are eligible only when all of the following conditions are met:

- There is no other access point;
- Repair of the damage economically eliminates the need for temporary housing; and
- The Applicant completes all legal processes and obtains rights-of-entry and agreements to indemnify and hold harmless the Federal Government.

Upon submittal of its claim, the Applicant must include documentation supporting that it met the conditions above in order for the work to be eligible.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## K.    Hazardous Materials

Removal and disposal of pollutants and hazardous substances are eligible. Eligible activities include:

- Separation of hazardous materials from other debris;
- Specialized procedures for handling and disposing of hazardous materials;
- Control or stabilization of the hazardous material;
- Pumping water contaminated with the hazardous material; and
- Clean-up and disposal of the hazardous material.

Testing for contaminants in water, air, or soil necessary to ensure elimination of the immediate threat is eligible in accordance with Chapter 7:II.F. *Expenses Related to Operating a Facility or Providing a Service*. However, testing for the purpose of long-term cleanup actions is ineligible.

The Applicant must comply with Federal and SLTT government environmental requirements for handling hazardous materials. Before handling or disposing of hazardous materials, the Applicant should contact the appropriate Federal or SLTT agency to obtain required permits, notify proper agencies of hazardous materials storage, and to coordinate the creation of any required facility specific Emergency Response Plans for spills, safety and proper handling. Additionally, appropriate certified hazardous waste specialists should handle, capture, recycle, reuse, or dispose of hazardous materials. When providing PA funding for work involving the handling of hazardous materials, FEMA must ensure compliance with the Resource Conservation and Recovery Act (RCRA).

Additionally, the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) authorizes the Federal Government to respond directly to releases or threatened releases of hazardous substances that may endanger public health or the environment. Under CERCLA and the Clean Water Act (CWA), EPA[230] and the USCG have the authority to respond to actual or potential discharges of oil, hazardous substances, pollutants, and contaminants that may present an imminent and substantial danger to public health or welfare. EPA has responsibility for responses in the inland zone[231] and the USCG has responsibility for responses in the coastal zone.[232] Response actions may include containment, stabilization, decontamination, collection (e.g., orphan tanks, drums), and disposal.

## L.    Supplies and Commodities

The purchase of supplies and commodities required for emergency protective measures is eligible.

Costs related to the Applicant purchasing supplies or using its own stock to perform Emergency Work are eligible and reimbursed in accordance with Chapter 6:III.5. *Supplies*. Examples

---

[230] See Recovery Policy 9523.8, *Mission Assignments for ESF#10*, for discussion on U.S. Environmental Protection Agency (EPA) and U.S. Coast Guard (USCG) authority with respect to removal of hazardous waste: www.fema.gov/sites/default/files/2020-07/fema_ESF_10_Oil-Hazardous-Materials.pdf.

[231] The inland zone is the environment inland of the coastal zone, excluding the Great Lakes and specified ports and harbors on inland rivers. Precise boundaries are identified in Federal regional contingency plans.

[232] The coastal zone includes coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of coastal States, including islands, transitional and intertidal areas, salt marshes, wetlands, and beaches.

include, but are not limited to, safety equipment, personal protective equipment, radios, power tools, sand, and tarps.

Purchasing and packaging life-saving and life-sustaining commodities and providing them to the impacted community are eligible. Examples of such commodities include, but are not limited to, food, water, ice, personal hygiene items, cots, blankets, tarps, plastic sheeting for roof damage, and generators, as well as food and water for household pets and service animals. The cost of delivering these same commodities to unsheltered residents in communities where conditions constitute a level of severity such that these items are not easily accessible for purchase is also eligible. This includes food and water for household pets whose owners are in shelters.



The cost of leasing distribution and storage space for the commodities is also eligible.

## M.    Meals

Applicants often provide meals for emergency workers. Provision of meals, including beverages and meal supplies, for employees and volunteers engaged in eligible Emergency Work, including those at EOCs, is eligible provided the individuals are not receiving per diem and one of the following circumstances apply:

- Meals are required based on a labor policy or written agreement that meets the requirements of Chapter 6. *Cost Eligibility*;
- Conditions constitute a level of severity that requires employees to work abnormal, extended work hours without a reasonable amount of time to provide for their own meals; or
- Food or water is not reasonably available for employees to purchase.

FEMA only reimburses the cost of meals that are brought to the work location and purchased in a cost-effective and reasonable manner, such as bulk meals. FEMA does not reimburse costs related to group outings at restaurants or individual meals.[233]

## N.    Medical Care

When the emergency medical delivery system within a declared area is destroyed, severely compromised or overwhelmed, FEMA may fund extraordinary costs associated with operating emergency rooms and with providing temporary facilities for emergency medical care of survivors. Costs associated with emergency medical care should be customary for the emergency medical services provided. Costs are eligible for up to 30 days from the declaration date unless extended by FEMA.

---

[233] FEMA reimburses meal costs as part of a contract in accordance with the contract terms provided it meets the requirements in Chapter 4:VIII. *Procurement and Contracting Requirements*.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Eligible medical care includes, but is not limited to:

- Triage and medically necessary tests and diagnosis;
- Treatment, stabilization, and monitoring;
- First-aid assessment and provision of first aid;
- A one-time 30-day supply of prescriptions for acute conditions or to replace maintenance prescriptions;
- Vaccinations for survivors and emergency workers to prevent outbreaks of infectious and communicable diseases;
- Durable medical equipment;
- Consumable medical supplies;
- Temporary facilities, such as tents or portable buildings for treatment of survivors;
- Leased or purchased equipment for use in temporary medical care facilities;
- Security for temporary medical care facilities; and
- Use of ambulances for distributing immunizations and setting up mobile medical units.



Long-term medical treatment is ineligible. FEMA determines the reasonableness of these costs based on Medicare's cost-to-charge ratio (a ratio established by Medicare to estimate a medical service provider's actual costs in relation to its charges).

FEMA does not provide PA funding for these costs if underwritten by private insurance, Medicare, Medicaid, or a pre-existing private payment agreement.[234] The Applicant must take reasonable steps to provide documentation on a patient-by-patient basis verifying that insurance coverage or any other source funding including private insurance, Medicaid, or Medicare, has been pursued and does not exist for the costs associated with emergency medical care and emergency medical evacuations.

Ineligible costs include:

- Medical care costs incurred once a survivor is admitted to a medical facility on an inpatient basis;
- Costs associated with follow-on treatment of survivors beyond 30 days of the declaration; and
- Administrative costs associated with the treatment of survivors.

---

[234] Stafford Act § 312, 42 U.S.C. § 5155.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## O.    Evacuation and Sheltering

Evacuation and sheltering of survivors are eligible activities. This includes household pets and service and assistance animals, but not exhibition or livestock animals.

### 1.    Evacuation

Transportation to evacuate (and subsequently return) survivors, household pets, service animals, assistance animals, luggage, and durable medical equipment is eligible. This includes emergency medical transportation. The mode of transportation should be customary and appropriate for the work required.



Eligible activities include, but are not limited to:

- Transferring patients from inoperable, compromised, or overwhelmed eligible medical or custodial care facilities to another medical facility or to a shelter;
- Transferring patients back to original medical or custodial care facility, when appropriate;
- Transporting survivors, including shelterees, who require emergency medical care to and from the nearest existing or temporary medical care facility equipped to adequately treat the medical emergency. Transport may include emergency air, sea, or ground ambulance services if necessary;
- Use of equipment such as buses, trucks, or other vehicles (including accessible vehicles) to provide one-time transportation to evacuate survivors and their household pets and service and assistance animals to emergency shelters from pre-established pick-up locations. This includes standby time for drivers and contracted equipment while waiting to transport survivors;
- Paratransit transportation services, such as vans, minibuses, and buses, (including accessible vehicles) to transport senior citizens, individuals with disabilities (including mobility disabilities) or access and functional needs, individuals in nursing homes and assisted-living facilities, and homebound individuals impacted by the incident;
- Tracking of evacuees, household pets, service animals, luggage, and durable medical equipment. This includes the use of animal microchips for the purpose of tracking evacuated animals;
- Food and water provided during transport;
- Emergency medical care provided during transport, including emergency medical personnel and supply costs;
- Stabilization of individuals injured during evacuation; and

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Costs incurred in advance of an incident necessary to prepare for evacuations in threatened areas. Costs may include mobilization of ambulances and other transport equipment. Contracts for staging ambulance services must be part of the State, Territorial, Tribal, or regional evacuation plan. Costs of staging ambulances are eligible even if the incident does not impact the area normally served by those ambulances. PA funding for activating, staging, and using ambulance services ends when any of the following occurs:



  - FEMA, and the State, Territorial, or Tribal government, determines that the incident did not impact the area where it staged ambulances;
  - Evacuation and return of medical patients and individuals with disabilities or access and functional needs is complete; or
  - The immediate threat caused by the incident has been eliminated and the demand for services has returned to normal operation levels.

  FEMA does not provide PA funding for ambulance services that are covered by private insurance, Medicare, Medicaid, or a pre-existing private payment agreement.[235]

## 2.    Sheltering

FEMA provides PA funding to SLTT government Applicants for costs related to emergency sheltering for survivors. Typically, such sheltering occurs in facilities with large open spaces, such as schools, churches, community centers, armories, or other similar facilities. FEMA refers to these shelters as congregate shelters.

Eligible costs related to sheltering include, but are not limited to, the items listed below, as necessary based on the type of shelter and the specific needs of the shelterees. If any of the items listed are donated, including labor, the Applicant may offset the non-Federal share of its eligible Emergency Work Projects in accordance with Chapter 6:XIV. *Donated Resources*. Sheltering and caring for household pets is only eligible while the pet owner is in an emergency shelter.

*(a)        Shelter Facility Costs*

Eligible shelter facility costs include, but are not limited to:

- Facility lease or rent, including space for food preparation;
- Utilities such as power, water, and telephone;
- Minor facility modifications if necessary to make the facility habitable, compliant with the Americans with Disabilities Act (ADA), functional as a childcare facility, or functional as an animal shelter;
- Restoration to return the facility to its condition prior to use;
- Generator costs; and
- Secure storage space for medical supplies.

If an eligible SLTT government Applicant owns or leases the shelter facility, and a volunteer agency operates the shelter, the facility costs described above are eligible. However, the labor

---

[235] Ibid.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

costs for the volunteer agency's workers are ineligible (except as a donated resource in accordance with the criteria in Chapter 6:XIV. *Donated Resources*).

*(b)        Shelter Staff Costs*

Eligible shelter staff costs include, but are not limited to:

- Medical staff;
- Personal assistance service staff;
- Veterinary and animal care staff;
- Public Information Officer;
- Social workers;
- Food service workers;
- Custodial and facilities staff; and
- National Guard personnel (See Chapter 6:XI. *National Guard*).

*(c)        Shelter Supplies and Commodities*

Eligible shelter supplies and commodities include, but are not limited to:

- Hot and cold meals, snacks, beverages, and related supplies for survivors;
- Cooking and serving supplies;
- Food, water, and bowls for household pets and service and assistance animals;
- Durable medical equipment;
- Consumable medical supplies;
- Medication for animal decontamination and parasite control;
- Infant formula, baby food, and diapers;
- Refrigerators, microwaves, and crock pots;
- Cots, cribs, linens, blankets, pillows, tables, and chairs;
- Crates, cages, leashes, and animal transport carriers;
- Personal hygiene kits with items such as shampoo, soap, toothpaste, a toothbrush, towels, and washcloths;
- Animal cleaning tables and supplies;
- Televisions or radios – one per 50 shelterees;
- Basic cable service;
- Computers – one per 25 shelterees;
- Internet service, including Wi-Fi;
- Washers and dryers – one of each per 50 shelterees; and
- Toys and books.

*(d)        Shelter Services*

Shelter services are only eligible for the time the facility is actively used to shelter survivors. Eligible shelter services include, but are not limited to:

- Shelter management;
- Supervision of paid and volunteer staff;
- Cleaning the shelter, linens, and animal crates;
- Shelter safety and security;

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Use of equipment, such as ambulances, buses, trucks, or other vehicles, to provide sheltering support;
- Phone banks for survivors;
- Care for survivors with disabilities or access and functional needs, including the provision of the following personal assistance services:
    o Grooming, eating, walking, bathing, toileting, dressing, and undressing;
    o Transferring (e.g., movement between a cot and wheelchair or wheelchair to restroom facilities);
    o Maintaining health and safety;
    o Assistance with self-administering medications; and
    o Communicating or accessing programs and services;
- Emergency medical and veterinary services for sheltered survivors, household pets, and service and assistance animals, including:
    o Emergency and immediate life stabilizing care, including necessary prescriptions (not to exceed 30-day supply);
    o Triage, medically necessary tests, diagnosis, treatment, stabilization, and monitoring;
    o First-aid assessment;
    o Provision of first aid and health information;
    o Care for evacuees with chronic conditions;
    o Administering vaccinations to shelterees and workers for transmissible or contagious diseases, including, but not limited to, tetanus and hepatitis;
    o Administering vaccinations to household pets, and service and assistance animals, for transmissible or contagious diseases, including, but not limited to, Bordetella (kennel cough). The vaccinations need to be effective while the animal is in the shelter;
    o Medical waste disposal;
    o Mental-health care;
    o Outpatient costs for sheltered survivors requiring emergency life-sustaining treatment not available at the shelter for the period of time that a survivor is housed in the shelter. Eligible outpatient services are limited to:
        - Physician services in a hospital outpatient department, urgent care center, or physician's office;
        - Related outpatient hospital services and supplies, including X-rays, laboratory and pathology services, and machine diagnostic tests; and
        - Local professional transport services to and from the nearest hospital equipped to adequately treat the emergency.
- Sheltering self-evacuees (self-evacuee transportation costs are ineligible); and
- Costs paid to the American Red Cross (ARC) or other Non-governmental Organizations (NGO) to operate shelters under a written agreement (costs that ARC or other NGOs incur under their own organizational mission – i.e., independent of any Federal or SLTT request – are ineligible for reimbursement).

*(e)        Non-congregate Sheltering*

Generally, FEMA does not provide PA funding for emergency sheltering in non-congregate environments, which are locations where each individual or household has living space that offers some level of privacy (e.g., hotels, motels, casinos, dormitories, retreat camps, etc.). In limited circumstances, such as when congregate shelters are not available or sufficient, FEMA may reimburse costs related to emergency sheltering provided in non-congregate environments. FEMA's Assistant Administrator for Recovery has the authority to approve this policy exception. The Applicant must submit a request for PA funding for costs related to emergency, non-congregate sheltering and obtain FEMA approval prior to sheltering survivors in non-congregate facilities. At a minimum, the Applicant should include the following information in its request:



www.fema.gov/assistance/individual/program-policy-guide

- Justification for the necessity of non-congregate sheltering;
- Whether the State, Territorial, or Tribal government has requested Transitional Sheltering Assistance;
- The type of non-congregate sheltering available and which type the Applicant intends to utilize;
- An analysis of the available options with the associated costs of each option; and
- The timeframe requested (i.e., date of activation and length of time).[236]

FEMA limits any approval to that which is reasonable and necessary to address the needs of the incident (usually no more than 30 days). FEMA determines the eligible costs based on the contractual agreement, including reimbursement for repairing damage if it is the Applicant's legal responsibility based on the agreement. The Applicant must obtain FEMA approval for any time extensions, which should include a detailed justification for the continued need and a revised analysis of options, including the costs for each option.

If FEMA approves the request, the Recipient must provide sufficient data and documentation to establish eligibility (including the need for non-congregate sheltering resulting from the disaster, reasonableness, and costs). Sufficient documentation includes:

- The number of non-congregate shelterees:
  - By age groups 0-2, 3-6, 7-12, 13-17, 18-21, 22-65, and 66+;
  - With disabilities or access and functional needs;
  - Registered for assistance from FEMA's IA Programs; and
  - Referred to State, Territorial, Tribal, or non-governmental organization programs for assistance;
- Number of household pets, and assistance and service animals sheltered, and the type of shelter provided (e.g., stand alone, co-located, or co-habitational;
- Length of stay per "household unit"; and

---

[236] 44 C.F.R. §§ 206.225(a)(2) and 206.202(c) and (d).

V4 2020                                                                                          Page 123

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Number of meals and other services provided.

As with any activity, lack of full documentation may result in FEMA determining that some or all of the costs are ineligible.

### 3. Childcare Services

FEMA reimburses SLTT governments for the cost of providing licensed childcare services to support sheltered populations. This includes the cost of the labor, facility, supplies, and commodities. Additionally, FEMA may provide PA funding for the cost of childcare services that the eligible Applicant provides to other survivors, and beyond the period of emergency sheltering, with certification that temporary childcare is necessary to meet immediate threats to life, public health and safety, or property.

Childcare includes services such as:

- Day care for children; and
- Before- and after-school care.

The Applicant may provide these services within a shelter facility or in a separate facility, as appropriate. FEMA PA and IA staff coordinate to ensure no duplication with IHP assistance.

### 4. Host-State or Host-Tribe Evacuation and Sheltering

If the impacted State or Tribe (Impact-State or Impact-Tribe)[237] has evacuation and sheltering needs beyond its ability to address within its jurisdictional area, it may request assistance either from another State or Tribal government (Host-State or Host-Tribe)[238] through mutual aid agreements such as EMAC, or from FEMA.

If the Impact-State/Tribe requests assistance directly from another State or Tribal government, FEMA reimburses costs based on the mutual aid agreement as described in Chapter 6:IX. *Mutual Aid*. FEMA may also provide PA funding to the Host-State/Tribe directly, even if the Impact-State/Tribe already requested assistance directly from that Host-State/Tribe, provided that:

- The Impact-State/Tribe requested the assistance;
- The Host-State/Tribe agrees to accept evacuees based on need—without restriction;
- An authorized official from the Host-State/Tribe transmits a written agreement to FEMA; and

---

[237] Impact-State or Impact-Tribe means the State or Tribal Government for which the President declared an Emergency or Major Disaster and requested FEMA assistance because of a need to evacuate and/or shelter affected individuals outside the State.

[238] Host-State or Host-Tribe means a State or Tribal Government that by agreement with FEMA provides sheltering or evacuation support to evacuees from an Impact-State or Impact-Tribe.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- The Governor or Tribal Chief Executive of the Host-State/Tribe signs the FEMA/Host-State or FEMA/Host-Tribe Agreement pursuant to the terms and conditions in 44 C.F.R. § 206.44, FEMA-State Agreements, to establish the Host-State/Tribe as the Recipient.[239]

If the Impact-State/Tribe requests assistance from FEMA, FEMA determines whether potential Host-States/Tribes have sufficient capability to meet some or all of the sheltering and evacuation needs of the Impact-State/Tribe. If FEMA determines a Host-State/Tribe has sufficient capability and the Host-State/Tribe meets the three conditions described above, FEMA provides PA funding to the Host-State/Tribe directly.[240]

When FEMA provides PA funding directly to the Host-State/Tribe, FEMA reimburses 100 percent of the Host-State/Tribe's eligible costs, including straight-time and benefits of the Host-State/Tribe's permanent employees[241] so that it does not have any out-of-pocket costs. In these cases, the Impact-State/Tribe is responsible for the non-Federal cost share and must subsequently reimburse FEMA for the non-Federal cost share of the eligible costs incurred by the Host-State/Tribe. The non-Federal cost share is based on the Category B cost-share amount designated in the declaration. The Impact-State/Tribe cannot offset its non-federal cost share with the Host-State/Tribe's volunteer labor.

In addition to the other eligible evacuation and sheltering costs described in this chapter, FEMA also reimburses the Host-State/Tribe for the following:

- Straight-time and benefits of entities' employees that provide assistance under a mutual aid agreement or a contract with the Host-State/Tribe such as a local government or PNP;
- Costs to provide the requested shelter capacity, even if the shelter was underused or not used at all;
- Costs related to arrest and incarceration of evacuees who commit unlawful acts in the Host-State/Tribe congregate shelter, including costs incurred by on-duty law enforcement officers in order to detain, take into custody, or make an arrest (costs of chemical tests, processing, charging, booking, and holding such persons are ineligible costs). Costs to transport a detainee back to the shelter is eligible if the individual was not charged;
- When patients in hospitals in the Impact-State/Tribe are evacuated, transported, and admitted into hospitals in the Host-State/Tribe through mission assignment with HHS, and the patients are treated and discharged but require follow-on care while awaiting transport, and shelters are not available, the costs that the Host-State/Tribe's hospital incurs for hotel rooms during patients' follow-on care until the patients can be transported back to the Impact-State/Tribe, provided that Medicare, Medicaid, or private insurance does not cover these costs;
- Bus or shuttle transport to pick up evacuees at the airport, train station, or bus terminal when the expected plane, train, or bus is re-routed, canceled, or rescheduled;
- Ambulance costs for hospital-to-hospital transfers, provided it is a transfer within the Host-State/Tribe;
- When the Impact-State/Tribe determines that it is safe for re-entry, it coordinates with the Host-State/Tribe and FEMA to return evacuees, household pets, and service and

---

[239] 44 C.F.R. § 206.202(f)(1)(i).
[240] 44 C.F.R. § 206.208(c)(3).
[241] 44 C.F.R. § 206.202(f)(1)(ii).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

assistance animals to the Impact-State/Tribe by air, rail, or bus. Return transportation costs are eligible along with food, water, and security during transport;

- Return transportation costs for family members of the Impact-State/Tribe evacuee who was admitted to a hospital after the congregate shelters close;
- When evacuees are discharged from a hospital after all congregate shelters have closed and transportation cannot be arranged for departure on the same day discharged, FEMA reimburses up to 5 nights of hotel lodging while awaiting return transport; and
- FEMA reimburses a State agency from the Impact-State/Tribe for transportation costs and related expenses to transport deceased evacuees and accompanying family members to the Impact-State/Tribe. The cost of the State/Tribe-mandated embalming or cremation of the body prior to return are also eligible.

The Host-State/Tribe must determine whether any ambulance or medical service costs are covered by a patient's private insurance, Medicare, Medicaid, or a pre-existing private payment agreement as FEMA deducts this amount from the Host-State/Tribe's eligible cost.

Fees that the Host-State/Tribe waives for the use of State parks by self-evacuees with recreational vehicles (RVs) are ineligible. Additionally, purchase and distribution of gas cards, bus passes, cash vouchers, debit cards, food vouchers, or direct payments to evacuees are ineligible.

## P.    Infectious Disease Incident

The HHS Centers for Disease Control and Prevention (CDC) has primary authority to enable support and assistance to SLTT governments in response to an infectious disease incident. FEMA may provide assistance for the rescue, evacuation, and movement of persons; movement of supplies; and care, shelter, and other essential needs of affected human populations. Any assistance provided by FEMA in response to an infectious disease incident is done in coordination with the CDC. The Office of Response and Recovery Fact Sheet FP 104-009-001, *Infectious Disease Event*, provides additional details.[242]

## Q.    Mosquito Abatement

Mosquito abatement measures may be eligible when a SLTT government public health official validates in writing that a mosquito population poses a specific health threat as discussed further in Appendix G: *Mosquito Abatement*. FEMA consults with the CDC to determine the eligibility of mosquito abatement activities. FEMA only provides PA funding for the increased cost of mosquito abatement. This is the amount that exceeds the average amount based on the last 3 years of expenses for the same period.

## R.    Residential Electrical Meter Repair

In rare cases, to reduce the number of survivors needing shelter, FEMA may provide limited PA funding to a SLTT government to repair residential electrical meters. To receive PA funding, the SLTT government must:

☐ Issue a finding of an immediate threat to safety due to loss of power caused by damaged meters or weather heads;

---

[242] www.fema.gov/sites/default/files/2020-10/fema_infectious-disease-fact-sheet_orr_05-13-2016.pdf.

☐ Request participation in this program; and

☐ Receive FEMA approval for each identified property.

Only residential properties are eligible for this program. Commercial properties, including apartment complexes, are ineligible.

If approved, the applicable SLTT government must:

☐ Obtain a signed right-of-entry from each residential property owner;

☐ Take reasonable measures to document any known insurance proceeds;

☐ Contract with licensed electricians to perform electrical meter repair;

☐ Coordinate the work with the property owner, the power company, and the contracted electricians; and

☐ Be responsible for payment of the non-Federal share.

Eligible work is limited to that associated with repairing damage to items otherwise installed and maintained by a homeowner's electrician, including the weather head, service cable, and meter socket.

FEMA generally provides PA funding up to $800 per meter per residential dwelling. This amount includes equipment, materials, labor, and inspection fees to restore the meter to current local codes. It is also inclusive of limited debris clearance when necessary to access the damaged meter or weather head. Removal and disposal of the debris is ineligible. Eligible work is limited to that completed within 30 days from the declaration date unless extended by FEMA.

FEMA does not provide PA funding for repair costs if it is not safe to restore power to the residence or if other impacts would restrict the dwelling from being habitable even after power restoration.

FEMA PA and IA staff coordinate closely to ensure FEMA does not fund the same work under both programs.

## S.    Safety Inspections

Post-incident safety inspections for public and private facilities are eligible, as well as posting appropriate placards (e.g., "red-tagging" a building that is unsafe).

The specific purpose of the inspection must be to determine whether the facility is safe for entry, occupancy, and lawful use. The Applicant must clearly substantiate that the purpose of the inspection was for safety and not to assess damage. Building inspections are ineligible if the purpose of the inspection is to:

• Determine whether the building is Substantially Damaged for the purpose of compliance with the community's floodplain management ordinance;

• Determine whether the building needs to be elevated or relocated, in accordance with the community's floodplain management ordinance; or

• Ensure that repairs are completed in accordance with the community's building code or standard.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## T.    Animal Carcasses

Removal and disposal of animal carcasses, including interim processing,[243] is eligible. If the removal and disposal is conducted as part of the overall debris removal operations, the work may be funded as Category A.

FEMA may require certification from the SLTT government health department, HHS, or the U.S. Department of Agriculture (USDA) that a threat to public health and safety exists.

When few in number, smaller animal carcasses (e.g., rodents, skunks, or possums) do not usually pose an immediate threat to public health or safety. Removal and disposal of these carcasses is ineligible.

FEMA does not provide PA funding when another Federal agency has authority to provide assistance for carcass removal and disposal. NRCS has authority to remove animal carcasses and to provide technical assistance to the Applicant under its EWP program. The USDA's Farm Service Agency may provide assistance for farmland debris cleanup. The EPA and USCG have authority to provide technical assistance and to remove animal carcasses contaminated with oil, hazardous substances, pollutants, or contaminants.[244]

## U.    Demolition of Private Structures

Emergency demolition of structures located on private property may be eligible when partial or complete collapse is imminent, and that collapse poses an immediate threat to the general public.

In some instances, restricting public access to an unsafe structure and the surrounding area, such as securing the area with a fence, is sufficient to alleviate the immediate threat and is more cost-effective than demolition. In these cases, demolition is ineligible.

If a structure is condemned prior to the incident, emergency protective measures related to that structure are ineligible.

FEMA reviews the Applicant's demolition process for compliance with all applicable EHP laws, regulations, and EOs.

## 1.    Conditions for Eligibility

For demolition to be eligible, the Applicant must:

- Certify that the structures are unsafe and pose an immediate threat to lives or public health and safety;
- Provide documentation to confirm its legal authority and responsibility to enter private property and demolish privately-owned unsafe structures. This includes:
  - o Citation of the law, ordinance, code, or emergency powers for which it is exercising its legal authority to demolish privately-owned unsafe structures. The authority cited must be applicable to the structural condition representing the immediate threat and not merely the Applicant's uniform level of services.

---

[243] Interim processing may include burning, incinerating, rendering, mounding, composting, or other pre-processing activities.

[244] See Recovery Policy 9523.8, *Mission Assignments for ESF#10*, for discussion on EPA and USCG authority with respect to removal of hazardous waste: www.fema.gov/sites/default/files/2020-07/fema_ESF_10_Oil-Hazardous-Materials.pdf.

- Confirmation that a legally authorized official of the Applicant has ordered the exercise of public emergency powers or other appropriate authority to enter onto private property in the designated area in order to demolish privately-owned unsafe structures and remove the resulting debris; and
- Indemnify the Federal Government and its employees, agents, and contractors from any claims arising from the demolition of privately-owned unsafe structures and removal of the resulting debris.

Before FEMA will provide PA funding, the Applicant must provide confirmation that it satisfied all legal processes and obtained permission requirements from the property owners (rights-of-entry) and agreements to indemnify and hold harmless the Federal Government. Additionally, the Applicant must provide documentation to support that it obtained all necessary permits and complied with EHP requirements.

## 2.      Commercially Owned Structures

Demolition of structures owned by commercial enterprises, including businesses, apartments, condominiums, and mobile homes in commercial trailer parks, are generally ineligible as it is expected that the commercial enterprises retain insurance that cover the cost of demolition. In very limited, extraordinary circumstances, FEMA may provide an exception. In such cases, the Applicant must meet the requirements of Chapter 7:I.G. *Debris Removal from Private Property*.

## 3.      Eligible Work

If FEMA approves the demolition of private structures, eligible work associated with the demolition includes, but is not limited to:

- Capping wells;
- Pumping and capping septic tanks;
- Filling open below-grade structures, such as basements and swimming pools;
- Testing for hazardous materials;
- Securing utilities;
- Obtaining permits and licenses; and
- Performing title searches.

Fees for permits, licenses, and titles issued directly by the Applicant are ineligible unless the Applicant demonstrates that the fees are above and beyond its normal administrative costs. Overtime labor directly related to issuing these permits, licenses, and titles for facilities that are eligible for demolition is eligible.

The following work is also eligible and may be funded as Category A if the removal and disposal is conducted as part of the overall debris removal operations:

- Removing demolition debris, including personal effects; and
- Removing hazardous materials, such as asbestos and household hazardous waste.

The Applicant should work with the property owner to pursue and recover insurance proceeds and credit FEMA the Federal share of any insurance proceeds recovered. In some circumstances, the property owner may be eligible for IA funding. FEMA PA and IA staff coordinate closely to ensure FEMA does not fund the same work under both programs.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**4.      Ineligible Work**

Ineligible work associated with the demolition of private structures includes, but is not limited to:

- Removal or covering of concrete pads and driveways except for structures in a FEMA-funded buyout program; and
- Removal of slabs or foundations that do not present a health or safety hazard, except for structures in a FEMA-funded buyout program through the HMGP (the removal of Substantially Damaged structures and associated facilities acquired through HMGP may be eligible as Category A, Debris Removal).

**V.      Temporary Relocation of Essential Services**

If the Applicant provides essential community services at a facility that is unsafe, inaccessible, or destroyed as a result of the incident, temporarily relocation of these services to another facility is eligible.[245] Essential community services are those services of a governmental nature that are necessary to save lives, protect property and the public, and preserve the proper function and health of the community at large. These services differ from the list of eligible PNP essential social services. FEMA evaluates the criticality of the service and safety of the facility to determine the need for temporary relocation. FEMA does not incorporate funds from temporary facilities into fixed cost projects.

**1.      Eligible for Temporary Relocation:**

Essential community services provided by an eligible Applicant are eligible to be relocated. The following services are considered essential community services (these differ from the list of PNP essential social services):

- Education;
- Election and polling;
- Emergency, including police, fire, and rescue;
- Homeless and domestic violence shelters;
- Emergency medical care;
- Prison;
- Utility; and
- Other facilities that provide public health and safety services of a governmental nature.

Services provided in administrative and support facilities essential to the provision of the essential community service are also eligible for relocation. These include administration buildings, student housing, hospital and prison laundry and cooking facilities, parking, and storage if items are needed on-site. Athletic fields and student unions are not considered essential administrative or support services and are ineligible.

If the Applicant provides the service at a leased, private facility prior to the incident, the service is still eligible to be relocated.

---

[245] Stafford Act § 403(a)(3)(D), 42 U.S.C. § 5170b.

## 2.    Ineligible for Temporary Relocation

Facilities that do not provide essential community services are ineligible for temporary relocation. These include facilities and services such as museums, zoos, community centers, shelter workshops, performing arts centers, recreation and parking, athletic stadiums, houses of worship, housing and residential services, custodial care, assisted living, senior citizen centers, alcohol and drug rehabilitation, childcare, libraries, research and warehouse facilities, burial, vocational, academic, athletic, political training, and student union buildings.

## 3.    Determining Eligibility of Temporary Relocation

FEMA determines the eligibility of relocating services to another facility based on the safety of the damaged facility as follows:

- If the facility can be made usable with the performance of emergency protective measures or minor repairs, a temporary facility may not be eligible.
- If the damage is to the extent that it cannot be occupied safely, and restoration cannot be completed without suspending operations of the facility for an unacceptable period of time, then a temporary facility may be eligible.
- If the facility is not damaged but lacks a critical utility or operational item, such as potable water, electricity, or road access, and a temporary facility will restore services to the community before the restoration of the disrupted critical utility or operational item at the current site, then a temporary facility may be eligible.

The capacity of the temporary facility must not exceed the pre-disaster capacity of the facility that housed the displaced services. The Applicant must use the temporary facility to provide the eligible service to the same extent and manner as was provided prior to the incident.

Relocation to a site that requires ground disturbance or alteration of an existing property requires EHP review before the Applicant implements the action.

FEMA does not require the Applicant to obtain and maintain insurance for temporary facilities.

If the Applicant has a facility that does not meet eligibility requirements for temporary relocation and the facility's damage is to such an extent that the contents are at risk, FEMA may provide PA funding for temporary space to store the contents as an emergency protective measure if the space is:

- Limited to an area necessary to house the contents;
- Used solely for storage; and
- Not intended for public access, alternate office space, exhibits, or other purposes.

FEMA is not responsible for damage that may occur to contents in temporary storage.

## 4.    Lease, Purchase, or Construct

When deciding whether to rent or purchase space and equipment, the Applicant should choose the most economical option that meets its needs. The Applicant must provide FEMA with a cost analysis,[246] which should include at least three options with cost estimates based on the timeline to restore the original facility. Cost estimates for leasing a facility must account for the entire timeline of the project. FEMA generally reimburses the least costly option of leasing,

---

[246] 2 C.F.R. § 200.318(d).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

purchasing, or constructing a temporary facility. However, FEMA also considers whether the least costly option is practical when determining eligibility (e.g., if the least costly option for a temporary school is to lease a building in another county, and the next least costly option is to install modular buildings on the current campus, FEMA may reimburse the cost of the modular buildings).

If the Applicant relocates a service from a facility it owns, the lease costs of a temporary facility are eligible if leasing is the least costly option. If the Applicant was leasing the damaged facility and had to temporarily relocate to another leased facility, the increase in rent is eligible.

Purchasing or constructing a temporary facility is eligible if FEMA confirms that it is the least costly option. With exception of modular or manufactured units, the Applicant must obtain FEMA approval prior to purchasing or constructing the facility.

### 5.      Safe Rooms for Temporary School Facilities

Funding for accessible safe rooms as part of a temporary school facility may be eligible if the damaged school contained a safe room or other space that served as a storm shelter and there are no other cost-effective, reasonable alternatives available to address the safety needs of the students and faculty. If approved, the safe room capacity is based on student population and the number of faculty who are expected to use the temporary school facility. The capacity of the safe room cannot exceed the pre-disaster capacity of the safe room in the damaged school. The safe room should be available no later than the opening day of classes at the temporary facility.

If the Applicant wishes to seek funding for a safe room as part of a temporary school facility, it must obtain prior approval from FEMA. The request needs to include:

- A description of the safe room or safe space that was used as a storm shelter prior to the incident;
- The population of students and faculty that need access to the safe room;
- Verification that no other cost-effective reasonable alternatives are within proximity that can be used as a safe space for the school population; and
- An indication that the Applicant will have the safe room installed and operational when school resumes and students occupy the temporary classroom space.

Safe rooms provided as part of a temporary school facility must comply with the requirements of *Safe Rooms for Tornadoes and Hurricanes, Guidance for Community and Residential Safe Rooms* (FEMA P-361).[247]

The timeframe for providing PA funding for the temporary safe room space coincides with the approved timeframe for providing PA funding for the temporary school facility.

### 6.      Temporary Relocation Costs

Eligible work or costs associated with the provision of temporary facilities include, but are not limited to:

- Rental or purchase of equipment necessary to continue the services in the temporary facility;
- Reasonable alterations of the temporary facility, if required to make the space functional based on the pre-disaster use of the damaged facility;

---

[247] www.fema.gov/sites/default/files/2020-07/safe-rooms-tornadoes-hurricanes.pdf.

- Restoration of the temporary facility to its pre-disaster condition when no longer needed
- Moving expenses to and from the temporary facility;
- Minimal life-safety or other building upgrades required by an applicable code or standard in effect at the time the temporary facility is purchased or leased; and
- Public outreach and messaging costs necessary to inform the public that the service will temporarily be provided at a different location.

FEMA does not provide PA funding for utility, maintenance, or operating costs in a temporary facility, even if these costs increase.

## 7.    Time Limitations

The regulatory time limitation for temporary facilities (Emergency Work) is 6 months from the declaration date.[248]

Depending on the extent of damage to the facility, the Applicant may be unable to restore the facility to its pre-disaster design and function within 6 months. Normally, the Recipient has the authority to extend the deadline for Emergency Work for up to 6 additional months.[249] However, for temporary facilities, only FEMA has authority to approve any time extensions to the project deadline.

FEMA considers the timeframe necessary to restore the damaged facility when evaluating time extensions for temporary facilities. If the Applicant requests funding for a temporary facility and knows at that time that the restoration of the original facility will exceed 6 months, FEMA may approve additional time and funding up to 12 months. If the Applicant needs additional time beyond this 12-month deadline, it must submit a written time extension request that includes the status of work and a timeline for completion.

FEMA only approves additional time if the Applicant begins construction on the damaged facility within 12 months of the declaration date, unless circumstances beyond the control of the Applicant prevented the start of construction within this 12-month timeframe.

### (a)    Improved Project

If FEMA approves an Improved Project for a facility for which it also approved temporary relocation of the services to a temporary facility, the temporary facility is only eligible for PA funding for the estimated amount of time necessary to restore the facility to its pre-disaster design and function. If the actual time to restore the facility with the improvements extends beyond this timeframe and causes the Applicant to continue its use of the temporary facility, FEMA does not reimburse any cost associated with that continued use. However, FEMA may reimburse costs associated with relocating its services back into the facility as part of the approved temporary facility project.

### (b)    Alternate Project

If FEMA approves an Alternate Project for a facility for which it also approved temporary relocation of the services to a temporary facility, FEMA does not reimburse any temporary facility costs incurred after the date the Applicant requests that Alternate Project.

---

[248] 44 C.F.R. § 206.204(c)(1).
[249] 44 C.F.R. § 206.204(c)(2)(ii).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*(c)*        *Alternative Procedures Project*

If FEMA approves an Alternative Procedures Project for a facility for which it also approved temporary relocation of the services to a temporary facility, continued PA funding for the temporary facility is dependent upon the SOW of the Alternative Procedures Project.

## 8.        Disposition Requirements

If the Applicant purchased or constructed a temporary facility, it must return to FEMA the Federal share of the equity in the facility. The Applicant must report the equity to FEMA when the approved deadline has expired or when the facility is no longer needed for the authorized purpose, whichever occurs first.

If FEMA only funded a portion of the cost of the facility, the Applicant must return to FEMA the Federal share of FEMA's proportionate equity in the facility. The amount due FEMA is computed by applying FEMA's percentage of participation in the cost of the purchase or construction to the fair market value or sale proceeds, taking into consideration reasonable out-of-pocket costs related to the sale.

The Applicant may either retain the facility or sell it. If the Applicant disposes of real property (land or structures) acquired with PA funding and acquires replacement real property using funds from the same PA project, it may use the net proceeds of the sale to offset the cost of the replacement property.

## W.    Snow-Related Activities

When the President declares an incident as a Snowstorm or specifically authorizes snow assistance in a declaration for a Severe Winter Storm, FEMA provides PA funding for impacts related to snow, but the assistance is limited.[250] See Appendix H: *Snow Assistance*, for detailed information.

## 1.        Limited Time Period

Snow-related activities are eligible for a continuous 48-hour period to address the most critical emergency needs.[251] Each Applicant designates the beginning of its 48-hour period. However, a State or Territorial agency that conducts snow-related activities in multiple locations throughout the State or Territory, such as a Department of Transportation, may use different 48-hour periods for different locations.

Once FEMA approves a project for the Applicant's designated 48-hour period, the Applicant cannot change its selected period.

If the Applicant awards a contract for periods greater than the 48-hour period, PA funding is limited to the costs incurred during the 48-hour period.

The FEMA Assistant Administrator of the Recovery Directorate may extend the eligible period by 24 hours in counties, parishes, or Tribal government areas where the snowfall exceeds the historical record snowfall by at least 50 percent.

---

[250] 44 C.F.R. § 206.227.
[251] 44 C.F.R. § 206.227.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 2.    Eligible Work

Eligible work includes:

- Snow-related activities (for limited time as discussed above):
  - o  Snow removal;
  - o  Snow dumps;
  - o  De-icing;
  - o  Salting; and
  - o  Sanding of roads and other eligible facilities.
- Other emergency protective measures (not restricted to the limited time) including, but not limited to, search and rescue and sheltering.

Limited snow-related activities necessary to carry out emergency protective measures, such as clearing snow in the *immediate* area of a downed power line, are eligible outside of the limited time period and in counties declared but not designated for snow assistance.

For Severe Winter Storm Declarations that do not specifically authorize snow assistance, FEMA only provides PA funding for limited snow-related activities that are necessary to perform otherwise eligible work. For example, snow removal necessary to repair downed power lines is eligible, while normal snow removal from roads (including salting and sanding) is ineligible.

## X.    Emergency Repair or Stabilization

Emergency repair or stabilization of an eligible facility is eligible as Emergency Work if it eliminates or lessens an immediate threat.[252] Work performed under an exigent circumstance that restores the pre-disaster design and function of the facility in accordance with codes and standards is Permanent Work,[253] not Emergency Work.

Emergency repair of a facility is ineligible if another Federal agency has the specific authority to provide assistance for the facility (even if the repair is temporary),[254] such as for:

- Federal-Aid highways – Federal Highway Administration (FHWA); or
- Flood control works – USACE and NRCS.

For Tribal governments specifically, although the Bureau of Indian Affairs' (BIA) or FHWA may have authority to provide temporary emergency repairs of Tribal roads, such roads may be eligible for PA funding provided the Tribal Government does not receive funding from BIA or FHWA for the work.

## 1.    Operation Blue Roof (DFA Only)

Operation Blue Roof provides homeowners with plastic sheeting to cover damaged roofs until arrangements can be made for permanent repairs. The purpose of Operation Blue Roof is to protect property, reduce temporary housing costs, and allows residents to remain in their homes while recovering from the incident. Therefore, only dwellings that can be safely occupied after

---

[252] 44 C.F.R. § 206.201(b).
[253] 44 C.F.R. § 206.201(j).
[254] 44 C.F.R. § 206.226(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

blue roof installation are eligible. The costs of these services are ineligible for reimbursement. However, FEMA may provide DFA for these services.[255]

## 2.    Slope Stabilization

If a landslide or other slope instability is triggered by the incident and poses an immediate threat to life, public health and safety, or improved public or private property, emergency protective measures to stabilize the slope may be eligible.

FEMA only provides PA funding for the least costly option necessary to alleviate the threat. FEMA limits eligible stabilization measures to the area of the immediate threat, not the entire slope. Work must be reasonable relative to the size and scope of the area of instability.

FEMA may authorize funding for post-disaster inspections and limited geotechnical investigations to determine if the instability creates an unsafe condition that poses an immediate threat.

Eligible emergency protective measures include, but are not limited to:

- Emergency drainage measures;
- Emergency ground protection to better stabilize the mass (rip rap, sheeting);
- Partial excavation at the head of a sliding mass to reduce its driving force;
- Backfilling or buttressing at the toe of a sliding mass using measures such as gabions, rock toes, cribwalls, binwalls, and soldier pile walls; and
- Installation of barriers to redirect debris flow.

## 3.    Mold Remediation

The incident may cause facilities to be inundated or exposed to wet and humid weather conditions for extended periods of time. These conditions may cause growth and spreading of mold in structures and on contents, causing threats to public health and increasing the repair cost.

The following remediation activities may be eligible as emergency protective measures:

- Wet vacuuming, damp wiping, or vacuuming with High-Efficiency Particulate Air (HEPA) equipment of the interior space;
- Removal of contaminated gypsum board, plaster (or similar wall finishes), carpet or floor finishes, and ceilings or permanent light fixtures; and
- Cleaning of contaminated heating and ventilation (including ductwork), plumbing, and air conditioning systems or other mechanical equipment.

Pre-remediation mold sampling is only eligible when the sampling reveals the presence of mold. Post-remediation sampling is eligible to confirm that remediation is complete.

The Applicant may use a variety of mold cleanup methods to remediate mold damage based on the extent of damage and type of damaged material. Appendix I: *Mold Remediation*, provides information for consideration when developing a SOW for mold remediation. The Applicant must follow applicable SLTT government guidelines for mold sampling and remediation.

FEMA only provides PA funding for mold sampling performed by an indoor environmental professional, such as a Certified Industrial Hygienist, Certified Indoor Environmental

---

[255] See www.usace.army.mil/Media/Fact-Sheets/Fact-Sheet-Article-View/Article/475463/temporary-roofing/ for additional information.

Consultant, or Certified Microbial Consultant. The indoor environmental professional should not be employed by the remediation company to avoid a conflict of interest. FEMA considers technical evaluations performed by licensed professionals when determining the eligibility of mold remediation.

For mold remediation to be eligible, mold must not be a result of poor facility maintenance or failure to take protective measures to prevent the spread of mold in a reasonable time after the incident. If the Applicant can document and justify why it did not take measures to prevent further contamination, or why measures taken were insufficient to prevent further damage, mold remediation may be eligible.

Examples of extenuating circumstances include:

- Disruption of power;
- Facility is underwater;
- Facility is inaccessible;
- Heating, ventilation, and air conditioning (HVAC) equipment is damaged; and
- Insufficient resources to remediate the entire facility.

FEMA evaluates whether the facility had pre-existing water infiltration conditions when determining whether mold remediation is eligible. For this evaluation, FEMA considers whether there is evidence of:

- Improperly sealed windows or exterior vents;
- Standing water against an exterior wall;
- Poorly maintained drains or gutters with rust or vegetative growth;
- Absence of rain gutters; and
- Leaking ceiling tiles.

### 4. Emergency Berms on Beaches

If a natural or engineered beach has eroded to a point where flooding from a 5-year storm[256] could damage improved property, cost-effective emergency protective measures on the beach that protect the improved property against damage from that 5-year storm are eligible.

Eligible measures typically include the construction of emergency sand berms to protect against additional damage from a 5-year storm. Emergency sand berms are not intended to permanently restore the beach; they are intended only to provide protection from immediate threats. The Applicant may construct emergency berms with sand recovered from the beach or with imported sand. If the Applicant constructs the berms with imported sand, FEMA will only provide PA funding if the sand is from a source that meets applicable environmental regulations and one of the following circumstances exists:

- Recoverable quantities are insufficient; or
- SLTT government regulations prohibit placement of the recovered sand.

To show that a 5-year storm could damage improved property, the Applicant must demonstrate that the stillwater level plus wave runup elevation as determined by computer modeling for a 5-year storm exceeds the post-incident elevation of the primary dune.

---

[256] 44 C.F.R. § 206.221(c). For flood incidents specifically, an immediate threat is a threat from a 5-year flood (a flood that has a 20 percent chance of occurring in any given year).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The 5-year Stillwater Level (SWL) is equal to the average water surface elevation of the rise in seawater level (surge) resulting from a 5-year storm, plus wave setup and the astronomical tide. The 5-year Total Water Level (TWL) is equal to the elevation of the wave runup predicted for a 5-year storm plus the SWL. Locations where the elevation of the post-incident profile is less than the TWL are eligible for placement of an emergency berm. See Figure 12 below.



**Figure 12. Determining Eligibility of Emergency Berms on Beaches**

Based on the average expected erosion for a 5-year storm, FEMA only provides PA funding for emergency berms constructed with up to 6 cubic yards per linear foot of sand above the 5-year stillwater level or the berm's pre-incident profile, whichever is less. In some cases, placing sand below the 5-year stillwater level may be necessary to provide a base for berm. The placement of that sand is also eligible as part of the emergency protective measure.

Placement of dune grass on an emergency dune or berm is only eligible if it is required by permit and is an established, enforced, uniform practice that applies to the construction of all emergency berms within the Applicant's jurisdiction, regardless of the circumstance. The Applicant must include the grass placement cost in the dune or berm construction cost when evaluating cost-effectiveness. Any maintenance of the dune grass after the initial installation is ineligible.

## III.  Damage Caused During Performance of Emergency Work

The Applicant may damage improved property, supplies, or equipment during the performance of eligible emergency response activities or debris removal operations.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The repair of damage to public property, supplies, or equipment is eligible as part of the respective Emergency Work (Category A or B) Project[257] if the damage was:

- Due to severe conditions resulting from the incident;
- Unavoidable; and
- Not due to improper or excessive use.

Replacement of damaged crops, trees, shrubs, or other ground cover is ineligible, unless the replacement meets the criteria in Chapter 8:IX.E. *Parks, Recreational, Other (Category G)*.

For equipment damage, FEMA requires maintenance records to demonstrate that the equipment was regularly maintained and in good operational order prior to the incident, and details regarding when, where, and how the damage occurred.

Repair of damage to private property is only eligible if the above criteria is met and one of the following:

- The property is an easement and the Applicant is legally responsible for repairing the damage it causes to the easement; or
- The Applicant leased the property either for sheltering or for a temporary debris staging site, and the lease agreement establishes that the Applicant is legally responsible for the repair.

Damage caused by snow-related activities conducted outside of the authorized period, as described in Chapter 7:II.W. *Snow-Related Activities*, is ineligible.

---

[257] Although the repairs may be Permanent Work, FEMA includes it on the Emergency Work project as damage resulting from the emergency work.

# CHAPTER 8: PERMANENT WORK ELIGIBILITY

Permanent Work (Categories C–G) is work required to restore a facility to its pre-disaster design (size and capacity) and function in accordance with applicable codes and standards.[258] Emergency repair or stabilization to eliminate or lessen an immediate threat is Emergency Work. All Permanent Work is subject to the eligibility of the facility as described in Chapter 4:II. *Facility Eligibility* and shown in Figure 13. *Permanent Work Eligibility*. This chapter provides PA Policy for Permanent Work.



Permanent Work is only eligible if the facility is eligible.

**Figure 13. Permanent Work Eligibility**

Pre-disaster design means the size or capacity of a facility as originally constructed or subsequently modified. It does not mean the capacity at which the Applicant was using the facility at the time of the incident if different from the most recent designed capacity.[259]



Pre-disaster function is the function for which the facility was originally designed or subsequently modified. For example, if the Applicant designed and constructed an administrative building, but later altered it in accordance with applicable construction codes or standards to use as a school, the pre-disaster function would be as a school. If the facility was serving an alternate function at the time of the incident, but was not altered to provide that function, FEMA provides PA funding to restore the facility either to the original pre-disaster function, OR pre-disaster alternate function, whichever costs less.[260]



---

[258] 44 C.F.R. § 206.201(j). Although this section of 44 C.F.R. does not reference function as part of the definition of Permanent Work, 44 C.F.R. § 206.203(d)(2) states that if the Applicant does not restore the function, it is an Alternate Project. See Chapter 8:VIII. *Capped Projects* for discussion on Alternate Projects.

[259] 44 C.F.R. § 206.201(k).

[260] 44 C.F.R. § 206.226(k)(1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FEMA may approve changes to the pre-disaster design or construction method (including materials) if the changes are required due to access issues, site conditions, or to tie into existing infrastructure. The changes must not impact the capacity or function of the facility. The Applicant must show that the changes are reasonable based on the type and extent of restoration and are consistent with the Applicant's general construction practices.

In cases where ineligible damage, such as a pre-existing condition, if not repaired, may compromise repair of eligible damage, FEMA may make PA funding for repair of the eligible damage contingent upon the Applicant repairing the ineligible damage. For example, FEMA may determine that repairs to a damaged bridge deck are eligible. However, the deck cannot be repaired unless the Applicant replaces rotting timbers that support the deck.

While PA funding is always based on pre-disaster size, capacity, and function, FEMA has developed procedures under Section 428 of the Stafford Act to maximize the ability of Applicants to drive their own recovery. Under this process, Section 428 Alternative Procedures are considered for all large Permanent Work Projects. This approach standardizes a single process for the development and consideration of fixed cost estimates as the first option for all Permanent Work Projects. This ensures Applicants have awareness of the opportunities and benefits provided by the Alternative Procedures, including: flexibility in meeting post-disaster recovery needs, as opposed to being limited to rebuilding back to what existed prior to the disaster; ability to share funds across all Alternative Procedures Permanent Work Projects; ability to retain and use excess funds to reduce risk and improve future disaster operations (subject to timely closeout); and eligibility for cost-effective hazard mitigation on Replacement Projects. Applicants will be able to agree to a fixed cost estimate or choose to pursue funding under standard, actual cost procedures.

## I.    Environmental and Historic Preservation Considerations

The Applicant needs to make every effort to afford FEMA the opportunity to perform EHP reviews prior to starting any work that has potential to impact the environment or historic properties, including archaeological resources. This includes, but is not limited to, demolition, site preparation, and ground disturbing activities. FEMA must ensure that the project complies with appropriate EHP laws, regulations, and EOs. If the Applicant starts this work prior to FEMA's completion of the EHP review, it jeopardizes PA funding for the entire project.[261]

Permanent Work Projects that restore a damaged facility essentially to pre-disaster design are excluded from National Environmental Policy Act (NEPA) review through a statutory exclusion (STATEX).[262] All others require NEPA review. Many qualify for one of the Categorical Exclusions (CATEXs) under NEPA which apply to actions that typically have little or no impact on the environment, as long as there are no "extraordinary circumstances" as defined by DHS.[263] An example of an extraordinary circumstance is a potentially significant impact on species, habitats, historic properties, or environmentally sensitive areas protected under Federal law. If any extraordinary circumstances apply, the project does not qualify for a CATEX. Although

[261] Stafford Act § 316, 41 U.S.C. § 5159; 2 C.F.R.§ 200.300.
[262] Stafford Act § 316, 41 U.S.C. § 5159.
[263] See FEMA Instruction 108-1, Section 3.2 and DHS Instruction 023-01-001-01, Appendix A: _Environmental and Historic Preservation Compliance_.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

many projects are statutorily excluded from NEPA review or covered by a CATEX, Permanent Work Projects require review for compliance with other EHP laws, regulations, and EOs.

Projects that involve changes in the location, footprint, alignment, or size of a facility may not meet a CATEX and may adversely affect or have impacts on wetlands; floodplains, flood heights, or upstream/downstream velocities; federally listed threatened and endangered species and their critical habitats; essential fish habitats; historic properties, including archaeological sites; and other environmental or historic resources. If a project does not meet a CATEX, it will require a higher level of NEPA analysis. The most common higher-level analysis is referred to as an environmental assessment (EA).[264] In rare circumstances, a project may require an environmental impact statement (EIS),[265] the highest level of analysis, which requires a much more detailed analysis than an EA. FEMA is responsible for NEPA compliance and identifying the required level of review.[266] FEMA may conduct the EA or EIS. If the Applicant chooses to conduct the EA or EIS, it must obtain FEMA approval prior to initiating the EA or EIS and submit the EA or EIS to FEMA for review and approval prior to construction. When the Applicant conducts the EA or EIS, FEMA reimburses the associated cost based on the cost share of the project.

FEMA may be required to consult with Federal, State, Territorial, and Tribal government resource agencies before the Applicant begins work. These agencies may include, but are not limited to, USFWS and NMFS for impacts to federally listed threatened and endangered species; USFWS for impacts to Coastal Barrier Resource System zones and bald or golden eagles; NMFS for impacts to essential fish habitat or marine mammals; USACE for projects in navigable waters or that involve dredging or filling in U.S. waters; and SHPO or THPO for effects to historic properties. If the Applicant begins construction work before FEMA completes its EHP review, the Applicant jeopardizes PA funding for that project. FEMA may not be able to conduct consultation with resource agencies after the Applicant initiates work on a project because it forecloses on an agencies' ability to comment on, or consider, alternatives that would avoid, minimize, or mitigate adverse impacts to the environment or effects to historic properties.

Similar to NEPA, Section 106 of the National Historic Preservation Act (NHPA) requires Federal agencies to consider actions on historic properties. While some Permanent Work Projects meet allowances within a Statewide Programmatic Agreement or only require a consultation letter to a SHPO/THPO, projects that adversely affect historic properties, including archaeological sites, may require the negotiation of a Memorandum of Agreement (MOA) or a project specific Programmatic Agreement to resolve adverse effects. Depending on the historic property, its level of significance, the level of controversy or if it is a National Historic Landmark (NHL), in addition to SHPO/THPO, FEMA may be required to invite the Advisory Council on Historic Preservation (ACHP) and the National Park Service (NPS) to participate in consultation. These Section 106 agreements to resolve adverse effects may have significant time and cost implications.

Consultations undertaken pursuant to the ESA will typically include required conservation measures for threatened and endangered species and their habitat. Applicants should address environmental planning at the beginning of the project scoping and project development stages

---

[264] FEMA Instruction 108-1, Section 3.2.
[265] Ibid.
[266] The National Environmental Policy Act of 1969, as amended, Public Law 91-190, 42 U.S.C. §§ 4321–4347.

to help avoid delays and additional costs at the EHP compliance stage. Early environmental planning should include consideration of potential project-related conservation and mitigation measures. When EHP laws, regulations, or EOs require actions to mitigate adverse effects, the Applicant is responsible for all costs associated with performing the required mitigation measures, unless such actions are directly related to the restoration of disaster-related damage.

FEMA is responsible for reviewing connected actions associated with a proposed project, even if FEMA is not funding the connected action. Actions are connected if they: automatically trigger other actions; cannot or will not proceed unless other actions are taken previously or simultaneously; or are interdependent parts of a larger action and depend on the larger action for their justification.

Some projects, such as Improved or Alternate Projects, may involve significant changes to the pre-disaster configuration of a facility (e.g., location, footprint, or size). FEMA conducts EHP compliance reviews on the actual SOW to be performed, prior to approving the project.

To facilitate EHP review, the Applicant should provide:

- ☐ Site map (including geographical coordinates in latitude, longitude) showing the location of all proposed areas where the Applicant will conduct site work or construction and the extent of ground disturbance (including any staging areas, access roads, parking, landscaping, grading, or utilities);
- ☐ Construction dates and photographs of all facilities in the project area;
- ☐ Photographs of all facilities in the project that may be affected by the project;
- ☐ Any known environmental issues or historic preservation concerns, such as, but not limited to, threatened and endangered species including their critical habitat, location in floodplain or wetlands, presence of asbestos within the facility, or facility's location in an archaeologically sensitive area;
- ☐ Environmental assessments;
- ☐ Historic property designations or surveys, including archaeological surveys;
- ☐ Available information about the presence of any resources protected under Federal law (see Appendix A: Environmental and Historic Preservation Compliance for a list of frequently-encountered laws); and
- ☐ Copies of permits and correspondence with regulatory agencies, including but not limited to:
  - o SHPO/THPO (historic properties, including archeological sites);
  - o USACE (work in navigable waterways, dredging or discharging dredged materials or fill in waterways or wetlands, culvert repair, culvert installation, culvert upsizing, riprap work, bridge work, work involved in a stream, or work in a wetland);
  - o USFWS (federally listed threatened and endangered species, migratory birds, bald and golden eagles, work in Coastal Barrier Resource System areas, work in or near waterways or wetlands);
  - o National Oceanic and Atmospheric Administration (federally listed threatened and endangered species, essential fish habitat, work in National Marine Sanctuaries);

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- o EPA (work involving underground injection, work with the potential to increase contamination of sole source aquifers); and
- o State, Territorial, or Tribal environmental agencies.

## II.    Requirement to Obtain and Maintain Insurance

Applicants that receive PA funding for permanent work to replace, repair, reconstruct, or construct a facility must obtain and maintain insurance to protect the facility against future loss.[267] This requirement applies to insurable facilities or property (buildings, contents, equipment, and vehicles), including those funded as an Alternate, Improved, or Alternative Procedures Project. FP 206-086-1 *Public Assistance Policy on Insurance*, describes these requirements in detail.[268]

The Applicant must insure facilities with the types and extent of insurance reasonably available, adequate, and necessary to protect against future loss to the property.[269] The type of insurance refers to the hazard(s) that caused the damage and extent refers to the amount of insurance required, which is calculated based on the eligible costs prior to any reductions (including the non-Federal share reduction).

The Applicant is not required to obtain and maintain insurance on facilities with $5,000 or less in eligible costs (prior to any reductions).[270]

The Applicant may request that FEMA modify the insurance requirement when:

- The required insurance is not reasonably available;
- An alternative to the insurance requirement provides adequate protection against future loss to the property; or
- The required insurance is not necessary to protect against future loss to the property.

Additionally, FEMA does not require greater types and amounts of insurance than are certified as reasonably available, adequate, or necessary by the appropriate State or Territorial Insurance Commissioner.[271] The State or Territorial Insurance Commissioner cannot waive Federal insurance requirements but may certify the types and extent of insurance reasonable to protect against future loss to an insurable facility.[272]

The Applicant may comply with the insurance requirement for both flood and non-flood hazards with coverage available through commercial property insurance, which may include blanket insurance policies, standard flood insurance policies, insurance pools, or a combination of these sources.[273] In some cases, with FEMA approval, the Applicant may comply with the insurance requirement using a self-insurance plan.[274]

If the Applicant does not comply with the requirement to obtain and maintain insurance, FEMA will deny or deobligate PA funds related to the noncompliance from the current disaster.

---

[267] Stafford Act § 311, 42 U.S.C. § 5154; 44 C.F.R. § 206 Subpart I.
[268] FEMA FP 206-086-1 Public Assistance Policy on Insurance.
[269] Stafford Act § 311, 42 U.S.C. § 5154; 44 C.F.R. § 206 Subpart I.
[270] 44 C.F.R. § 206.253(d).
[271] 44 C.F.R. § 206.253(c).
[272] 44 C.F.R. §§ 206.252(d) and 206.253(c).
[273] 44 C.F.R. § 206.253(b)(2).
[274] Stafford Act § 311(c), 42 U.S.C. § 5154(c); 44 C.F.R. Part 75.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Additionally, the facilities for which the Applicant failed to comply are ineligible for future PA funding.

## A.    Insurance Reductions and Impact on Facility Eligibility in Subsequent Disasters

If the Applicant does not maintain the required insurance from a previous disaster, then the facility is ineligible for PA funding in a subsequent disaster, regardless of the hazard(s) that caused the damage.[275]

When the Applicant receives PA funding for a facility damaged by the same hazard in a subsequent disaster, FEMA reduces funding in this subsequent disaster by the amount of insurance required from the previous disaster. If FEMA or the State or Territorial Insurance Commissioner certification modified the Applicant's insurance requirement, FEMA reduces funding by the modified insurance amount. If the Applicant's anticipated or actual insurance proceeds are higher than the amount of insurance required in the previous disaster, FEMA reduces funding by the anticipated or actual amount of insurance proceeds to avoid a duplication of benefits.

# III.  Codes and Standards

FEMA provides PA funding to restore facilities based on pre-disaster design and function in conformity with current applicable codes, specifications, and standards.[276] The Applicant needs to provide documentation to support the eligibility of code or standard upgrades, including, but not limited to, the requirement to apply the codes or standards and to support they were formally adopted, implemented, and uniformly applied.

## A.    Eligibility Criteria

Facility repairs and new construction may "trigger" upgrade requirements established by codes or standards. Upgrades required by Federal or SLTT repair or replacement codes or standards are eligible only if the code or standard:[277]

- Applies to the type of restoration required;
- Is appropriate to the pre-disaster use of the facility;
- Is reasonable, in writing, formally adopted by the SLTT government, and implemented by the Applicant on or before the declaration date, OR is a legal Federal requirement;
- Applies uniformly; and
- Was enforced during the time it was in effect.

## 1.    Applies to the Type of Restoration Required

Codes and standards must apply to the type of restoration required. Codes and standards for new construction are often different than codes and standards for repair work. If FEMA determines a facility is eligible for replacement, compliance with current codes and standards for new construction is eligible. If FEMA determines a facility is ineligible for replacement, only code-required upgrades applicable to repairs are eligible.

---

[275] Stafford Act § 311(b), 42 U.S.C. § 5154(c); 44 C.F.R. § 206.253(f).
[276] Stafford Act § 406(e), 42 U.S.C. § 5172(e); 44 C.F.R. § 206.226(d).
[277] 44 C.F.R. § 206.226(d).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

A code or standard may include a trigger that requires:

- Upgrades to all structural components; or
- In addition to upgrading all structural components, bringing the non-structural components into conformance with current codes or standards for new construction.

If an upgrade to an entire structural or non-structural system within a building is triggered, the upgrade is only eligible if there is a direct relationship between the upgrade work and eligible damage.[278] Only upgrade work within the same system as the damage is eligible.

FEMA evaluates the eligibility of the work to upgrade or change the configuration of damaged systems for reasonableness with respect to the type and extent of damage.



## 2.    Appropriate to Pre-disaster Use

Codes and standards must be appropriate to the pre-disaster use of the facility. FEMA determines the eligibility of code-required upgrades based on the facility's pre-disaster design or actual use at the time of the disaster. The least costly of the following is eligible:

- Pre-disaster use of the facility, if serving the same function for which it was originally designed; or
- Alternate use of the facility, if serving an alternate function at the time of the incident.



## 3.    Reasonable

Codes and standards must be reasonable. When determining reasonableness, FEMA:

- Examines the general reasonableness of the code or standard and the trigger for application of the code or standard;

---

[278] 44 C.F.R. § 206.223(a)(1).

- Determines whether the upgrade and trigger relate to the type of restoration required by the damage and whether the upgrade and trigger are justified based on the extent of damage;
- Considers whether the upgrade and the trigger are technically defensible from an engineering perspective; and
- Determines whether the cost of the upgrade is reasonable.

FEMA may determine a very large upgrade based on a very low trigger to be unreasonable.



### 4.        Written, Formally Adopted, and Implemented

Codes and standards must be in writing, formally adopted by the SLTT government, and implemented by the Applicant on or before the declaration date, OR be a legal Federal requirement, such as an ADA or seismic safety requirement. An appropriate legislative body or regulatory authority within the jurisdiction must:

- Approve the code or standard;
- Make it a matter of public record; and
- Formally incorporate it into the building code or other applicable ordinance.

The code or standard must apply to the facility in question. For example, if a State has jurisdiction over a particular type of work and formally adopts a code or standard related to that work, a Tribal or local government in that State does not necessarily have had to formally adopt the code or standard for it to apply to its facility. The Tribal or local government meets the above requirement if it shows that it implements the code or standard consistently.

FEMA does not recognize codes or standards adopted by a PNP specifically for its facilities when determining whether compliance with codes or standards is eligible. FEMA also does not accept codes or standards adopted by agencies or divisions of SLTT governments that are not authorized to set codes or standards within the broad governmental jurisdiction of the SLTT government.



## 5.    Applies Uniformly

Codes and standards must apply uniformly to all similar types of facilities, whether private or public, eligible or ineligible, in the Applicant's jurisdiction or (if applicable) in a particular hazard zone within its jurisdiction.

For FEMA to find that a code or standard and its triggers are uniformly applied, the code or standard must meet all of the following conditions. The code or standard must:

- Provide for uniform accountability in the event of noncompliance;
- Not be subject to discretionary enforcement by public officials; and
- Not allow for selective application.

A code or standard must meet three tests to demonstrate that it is not selectively applied:

- The upgrade is generally triggered regardless of the cause of damage and is also triggered for renovations or improvements.
- The code or standard is applied regardless of the source of funding for the work.
- The code or standard is not applied selectively based on the availability of funds.



## 6.    Enforced

The code or standard must have been enforced during the time it was in effect. FEMA may provide PA funding for costs related to an upgrade based on confirmation of previous enforcement and in reliance on continued enforcement. If the local jurisdiction subsequently violates this criterion, no further work to comply with the code or standard is eligible within the local jurisdiction.

If FEMA determines a jurisdiction has had no reasonable opportunity to enforce the code or standard, the upgrade may be eligible. A reasonable opportunity to enforce may be lacking when a code or standard is new or when a facility affected by the code or standard has not been damaged during the time the code or standard was in effect.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## B.    FEMA Consensus-Based Codes, Specifications and Standards

For buildings, electric power, roads, bridges, potable water supply, and wastewater, FEMA requires that Applicants incorporate specific codes, specifications, and standards in accordance with FEMA Recovery Interim Policy FP 104-009-11 *Consensus-Based Codes, Specifications and Standards for Public Assistance.*[279]

## C.    Ineligible Upgrades

Upgrades recommended by design standards, guidelines, policies, industry practices, or other non-mandatory provisions are ineligible if the provisions do not meet all of the criteria noted in Chapter 8:III.A. *Codes and Standards, Eligibility Criteria.* Upgrades that are deemed ineligible but enhance a facility's ability to resist similar damage in a future incident, may be eligible as mitigation (See Chapter 8:IV. *Hazard Mitigation*).

## D.    Historic Preservation Compliance

### 1.    Federal Requirement

If the facility is listed in, or meets the criteria to be listed in, the National Register of Historic Places, and an applicable code or standard requires repair in a certain manner, costs associated with work to comply with that code or standard are eligible, even if repair costs exceed replacement costs. This is an exception to the regulatory requirement that when a facility is eligible for replacement, FEMA limits eligible costs to the less expensive of repairs or replacement (see Chapter 8:V.C. *Repair vs. Replacement, Eligible Funding*).[280]

### 2.    State, Territorial, or Tribal Government Requirement

If a State, Territorial, or Tribal historic building code or standard requires specific work be performed, FEMA evaluates the code or standard using the eligibility criteria in Chapter 8:III.A. *Codes and Standards, Eligibility Criteria.* Most State historic building codes and standards encourage code officials to allow *less* intrusive alternatives to requirements of the prevailing codes or standards, but do not require any particular work be performed. As a result, the codes and standards usually fail to meet the eligibility criteria.

## E.    Floodplain Management and Wetland Protection

When providing PA funding for a project in or impacting a floodplain or wetland, the following requirements apply.

For any structure (walled or roofed buildings, including mobile homes and gas or liquid storage tanks)[281] built, replaced, or Substantially Improved in a Special Flood Hazard Area (SFHA), the Applicant must, at a minimum, either elevate or floodproof the lowest floor (including the basement) to or above the 100-year base flood elevation (BFE).[282] The BFE is based on the best

---

[279] Stafford Act § 406(e)(1)(A)(ii), 42 U.S.C. § 5172 as amended by the Disaster Recovery Reform Act. The interim policy is available here.

[280] 44 C.F.R. § 206.226(f)(2) and (3).

[281] 44 C.F.R. § 9.4.

[282] 44 C.F.R. § 9.11(d)(3)(i) and (iii).

available information in accordance with FEMA Policy 104-008-2: *Guidance on the Use of Available Flood Hazard Information*.[283]

If the structure contains a critical action and is in the 100 or 500-year floodplain, the Applicant must, at a minimum, elevate the lowest floor (including the basement) to or above the 500-year flood elevation.[284] If the structure in the 100 or 500-year floodplain is nonresidential, the Applicant may opt to floodproof to the required level instead of elevating.[285]



Critical actions are actions for which even a slight chance of flooding is too great and are further defined in 44 C.F.R. § 9.4, which includes examples of actions that FEMA deems critical. The minimum floodplain of concern for critical actions is the 500-year floodplain (also referred to as the critical action floodplain). If an action is not specified in 44 C.F.R. § 9.4, FEMA utilizes the U.S. Water Resource Council Floodplain Management Guidelines[286] to determine whether a proposed action is deemed a critical action by considering the following:

- The potential for additional impacts if the proposed project is flooded in a future incident (e.g., the facility contains volatile or toxic materials);
- The ability for occupants of buildings such as hospitals, schools, and nursing homes to evacuate in time to avoid loss of life and injury given the flood warning lead-time available in a future incident; and
- The potential for emergency services and utilities to become inoperative, or essential and irreplaceable records to be lost if a facility is flooded in a future incident.

Further, if the structure is substantially improved in a Coastal High Hazard Area, the Applicant must elevate the facility to the BFE (the 500-year

---

[283] www.fema.gov/sites/default/files/2020-04/Available_Flood_Hazard_Information_Policy_104-008-2.pdf.

[284] 44 C.F.R. § 9.11(d)(3)(i) and (ii).

[285] 44 C.F.R. § 9.11(d)(3)(iii).

[286] www.energy.gov/nepa/downloads/floodplain-management-guidelines-implementing-eo-11988-water-resources-council-1978.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

flood elevation for critical actions) (including wave height) on open works (walls columns, piers, piles, etc.) and anchor it properly.[287] New construction is prohibited in a Coastal High Hazard Area and within regulatory floodways unless the structure has a functionally dependent use; or facilitates open space use.[288]

### F.    Requirement for Communities Participating in the National Flood Insurance Program

A community that participates in the National Flood Insurance Program (NFIP) must adopt and enforce a floodplain management ordinance that meets or exceeds the minimum NFIP requirements.[289] Such an ordinance must contain construction requirements for new construction or Substantial Improvement of buildings located in a SFHA. In addition to other requirements, the ordinance must require that new or Substantially Improved buildings be elevated so that the lowest floor is at or above the BFE or floodproofed to a level equal to or above the BFE (some communities have more restrictive ordinances that require elevation or floodproofing to greater levels.)

Work required for compliance with the floodplain ordinance is eligible provided the ordinance meets the eligibility criteria for codes and standards and the Substantial Improvements are disaster-related repairs. If the cost to repair a facility in accordance with the floodplain ordinance is greater than the cost to replace the facility in accordance with the ordinance, the eligible cost is capped at the replacement cost.

### G.    Accessibility for Individuals with Disabilities

The ADA and other disability rights laws such as the Architectural Barriers Act (ABA) require that all newly constructed facilities be accessible to and usable by individuals with disabilities[290] and that repairs that might affect the ability of individuals with disabilities to use the facility comply with accessibility standards.[291] In some circumstances, FEMA provides PA funding for accessibility compliance requirements.

FEMA provides PA funding regardless of whether the facility was in compliance prior to the incident, provided the Applicant was not cited for a violation. If the Applicant was notified of being in violation of a requirement prior to the incident and did not bring the facility into compliance, then accessibility requirements related to the violation are ineligible.

---

[287] 44 C.F.R. § 9.11(d)(2) and (7).
[288] 44 C.F.R. § 9.11(d)(1)
[289] 44 C.F.R. § 60.3.
[290] 42 U.S.C. § 12101 et seq.; 28 C.F.R. § 35.151(a)
[291] 42 U.S.C. § 12147(a); 28 C.F.R. § 35.151(b).

Some special provisions apply when ADA requirements "threaten or destroy the historic significance of qualified historic buildings and facilities."[292] FEMA addresses these provisions during its consultation with the SHPO or THPO and incorporates them into the agreement regarding the repairs to the building.

FEMA may also provide PA funding for additional SLTT government ADA requirements that meet the eligibility criteria for codes or standards, as described in Chapter 8:III.A. *Codes and Standards, Eligibility Criteria*.

### Facilities Eligible for Repair

If the primary function area sustained eligible disaster damage, FEMA may provide PA funding for reasonable changes required by an eligible code or standard to increase accessibility to undamaged elements that serve the primary function area and the path of travel to the primary function area such as an accessible entrance, accessible routes to the primary function area, restroom access, accessible drinking fountains, and other elements.

To be eligible for PA funding, the required alterations must have a reasonable and technically supportable relationship to the damaged elements of the facility. As a result, there may be alterations required that are ineligible for PA funding.

PA funding for alterations to the path of travel requirements cannot exceed the ADA requirement of 20 percent of the total cost to repair the primary



www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/guide-to-the-ada-standards

**Accessible Path of Travel**

*The accessible path of travel extends from the altered primary function area to site arrival points (public sidewalks, parking. passenger loading zones, public transit stops located on the site).*



*The path of travel also includes an accessible restroom (for each sex unless only unisex restrooms are provided), telephone, and drinking fountain serving the primary function area, where such elements are provided.*

**Figure 14. Path of Travel**

---

[292] 28 C.F.R. § 36.405.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

function area.[293] The 20 percent calculation is defined at 28 C.F.R. § 35.151(b)(4)(iii). If the costs for ADA upgrades exceed the 20 percent, the Applicant must prioritize the accessible elements as described in 28 C.F.R. § 35.151 (b)(4)(iv).

If the Applicant engages in repairs that are ineligible for PA funding, the cost of requirements triggered by those repairs are ineligible.

## H.   Permit Requirements

If a Federal or SLTT government permitting agency requires additional work based on a code or standard that does not meet the eligibility criteria in Chapter 8:III.A. *Codes and Standards, Eligibility Criteria*, the cost of the additional work is only eligible if the work:

- Does not change the pre-disaster size, capacity, or function of the facility;
- Applies to the type of repair or restoration required;
- Is reasonable based on the type and extent of damage; and
- Is an established, enforced, uniform practice that applies to all similar types of facilities within the Applicant's jurisdiction, regardless of the circumstance.

# IV.  Hazard Mitigation

Hazard mitigation is any sustained action taken to reduce or eliminate long-term risk to people and property from natural hazards and their effects. FEMA has authority to provide PA funding for cost-effective hazard mitigation measures for facilities damaged by the incident.[294]

In addition to providing funding for hazard mitigation under the PA Program, FEMA also provides hazard mitigation funding under its Hazard Mitigation Assistance (HMA) programs. FEMA's Federal Insurance and Mitigation Administration administers the HMA programs, which are briefly described in Figure 15. *FEMA Hazard Mitigation Programs*. The eligibility criteria, procedures, and timelines for implementation of the hazard mitigation measures funded under the HMA programs differ from the hazard mitigation measures funded under the PA Program.

---

[293] For calculation purposes, the total costs of the primary function area repair include the repair costs of the roof, HVAC system, mechanical rooms, janitorial closets, locker rooms, and private offices directly associated with the repair of the primary function area.

[294] Stafford Act § 406(e), 42 U.S.C. § 5172; 44 C.F.R. § 206.226(e).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

   

**PA Program**　　　　　　　　　　　　　**HMA Programs**

*Disaster-related program*　*Disaster-related program*　　　*Non-disaster-related programs*

 **PA:** Mitigation of incident caused damage

 **HMGP:** Multi-hazard, statewide mitigation

 **FMA:** Flood mitigation for insured properties

 **PDM:** Multi-hazard, project-specific

Funding: Available for damaged and non-damaged facilities based on a percentage of dollars obligated to the PA and IA programs

Funding: Available for disaster-damaged facilities only*

NOTE:　PA = Public Assistance　　　　FMA = Flood Mitigation Assistance
　　　　HMA = Hazard Mitigation Assistance　PDM = Pre-Disaster Mitigation
　　　　HMGP = Hazard Mitigation Grant Program　IA = Individual Assistance

* See exception for Alternative Procedure Projects in Chapter 2, Section VII.G.4(c).

**Figure 15. FEMA Hazard Mitigation Programs**

FEMA refers to PA-funded hazard mitigation as PA mitigation and mitigation funded under HMGP as HMGP mitigation.

The Applicant may use both PA mitigation and HMGP mitigation funds to implement mitigation measures on the same facility, but not for the same work. The Applicant cannot use funds from one of these mitigation programs to meet the non-Federal cost share of work funded under the other mitigation program.

This document provides details regarding PA mitigation funding. FEMA's *Hazard Mitigation Assistance Guidance* provides further details on HMGP mitigation funding and the HMA programs.[295]





www.fema.gov/state-hazard-mitigation-officers

## A.　Public Assistance Hazard Mitigation

FEMA evaluates proposed PA mitigation measures for eligibility, cost-effectiveness, technical feasibility and effectiveness, and compliance with EHP laws, regulations, and EOs. In addition, FEMA ensures that the mitigation does not negatively impact the facility's operation or surrounding areas or create susceptibility to damage from another hazard.

---

[295] www.fema.gov/grants/mitigation/hazard-mitigation-assistance-guidance.

To be eligible for PA funding, the mitigation measures must directly reduce the potential of future damage to the damaged portion(s) of the facility. Generally, eligible PA mitigation measures are those the Applicant performs on the damaged portion(s) of the facility. If the Applicant proposes mitigation measures that are distinct and separate from the damaged portion(s) of the facility, FEMA evaluates the proposal and determines eligibility on a case-by-case basis considering how the mitigation measure protects the damaged portion(s) of the facility and whether the mitigation measure is reasonable based on the extent of damage. Some examples of such measures include:

- Constructing floodwalls around damaged facilities;
- Installing new drainage facilities (including culverts) along a damaged road;
- Adding fire suppression systems at facilities damaged by wildfire; and
- Dry floodproofing both damaged and undamaged buildings that contain components of a system that are functionally interdependent (i.e., when the entire system is jeopardized if any one component of the system fails).

If FEMA determines mitigation measures to undamaged portions ineligible as PA mitigation the Applicant may request HMGP funding from the State, Territorial, or Tribal government to provide protection to undamaged portions, while utilizing PA mitigation funds to provide protection to damaged portions.

PA mitigation opportunities usually present themselves during facility repair. However, in cases where the Applicant needs to repair a facility in an expedited manner, it may miss an opportunity to implement mitigation measures during repair. If the Applicant implements mitigation measures after the PA-funded repair is complete, the mitigation work may still be eligible for PA funding; however, FEMA will not provide PA funding for any duplicative work triggered by the subsequent mitigation.



Building Science - Multi-Hazard Publications | FEMA.gov

In some instances, the Applicant may implement mitigation measures after the incident occurs but before the incident is declared or before FEMA has the opportunity to evaluate the measure for eligibility. In these cases, the mitigation work may still be eligible for PA funding if it is cost-effective and FEMA confirms compliance with applicable EHP laws, regulations, and EOs.

If FEMA approves PA funding for mitigation and the Applicant does not complete the PA mitigation work, FEMA will deobligate the PA mitigation funds.

## Cost-effective Evaluation

PA mitigation measures must be cost-effective.[296] FEMA considers PA mitigation measures to be cost-effective if any of the following criteria are met:

---

[296] 44 C.F.R. § 206.226(e).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- The cost for the mitigation measure does not exceed 15 percent of the total eligible repair cost (prior to any insurance reductions) of the facility or facilities for which the mitigation measure applies;
- The mitigation measure is specifically listed in Appendix J: *Cost-Effective Public Assistance Hazard Mitigation Measures*, AND the cost of the mitigation measure does not exceed 100 percent of the eligible repair cost (prior to any insurance reductions) of the facility or facilities for which the mitigation measure applies; and
- The Recipient or Applicant demonstrates through an acceptable benefit-cost analysis (BCA) methodology that the measure is cost-effective. FEMA's BCA software[297] provides appropriate BCA methodologies.

Many mitigation measures that do not meet the first two requirements above prove to be cost-effective based on a BCA. If the mitigation measure is not cost-effective based on the first two criteria, FEMA, the Recipient, and the Applicant work together to develop a BCA to determine whether it is cost-effective.

A BCA is based on a comparison of the total estimated cost for the PA mitigation measure to the total value of expected benefits to society. FEMA's BCA methodology considers common project benefits, which include reductions in the magnitude or frequency of:

- Damage to the facility and its contents;
- The need for emergency protective measures;
- The need for temporary facilities;
- Loss of function;
- Casualties (typically included only for earthquake, tornado, and wildfire mitigation); and
- Previous impacts regardless of whether the impacts occurred in Federal declarations (only if documented).

## B.    Public Assistance Mitigation Funds for Capped Projects

### 1.    Improved Project

If the capped amount for an Improved Project includes PA mitigation funds and the Applicant either does not complete the PA mitigation work, or replaces or relocates the original facility, FEMA deobligates the PA mitigation funds.

### 2.    Alternate Project

If the SOW to restore a facility includes PA mitigation, and the Applicant elects to proceed with an Alternate Project, FEMA does not include costs related to the PA mitigation in the capped amount for the Alternate Project.

### 3.    Alternative Procedures Project

When the Applicant is restoring the function, but changing the pre-disaster capacity of a facility, the proposed PA mitigation SOW is developed based on the actual SOW to be performed; however, the cost-effectiveness is evaluated based on the fixed-cost amount accepted for the pre-disaster restoration SOW. If the capacity is increased, the proposed hazard mitigation SOW and cost is limited to the SOW and cost necessary to mitigate to the pre-disaster capacity of the

---

[297] www.fema.gov/grants/guidance-tools/benefit-cost-analysis.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

damaged facility. If the Applicant does not complete the approved PA mitigation, FEMA deobligates the portion of the fixed-cost amount related to hazard mitigation.

# V.   Repair vs. Replacement

When evaluating whether a damaged facility is eligible for replacement, FEMA compares the repair cost with the replacement cost and evaluates the feasibility of repairing the facility.[298]

A facility is considered repairable when:

- The cost to repair the disaster-related damage does not exceed 50 percent of the cost to replace the facility based on its pre-disaster size, capacity, and function; and
- It is feasible to repair the facility so that it can perform the pre-disaster function as well as it did prior to the incident.[299]

The comparison of the repair cost to the replacement cost results in a fraction that expresses repair as a percentage of replacement. The percentage is calculated with the repair cost as the numerator and the replacement costs as the denominator. FEMA refers to this as the "50% Rule."

The purpose of the 50% Rule is to make an early determination on whether it is more prudent to repair or replace a facility. It is not intended to be a full calculation of all eligible project costs.

## A.    Calculation

The repair cost (numerator) is the cost of repairing disaster-related damage only and includes costs related to compliance with codes and standards that apply to the repair of the damaged elements only.[300] The numerator does not include costs associated with:

- Upgrades of non-damaged elements even if required by codes or standards (e.g., elevation of an entire facility triggered by repair);
- Demolition beyond that which is essential to repair the damaged elements;
- Site work;
- Soft costs;
- Contents;
- Hazard mitigation measures; or
- Emergency Work.

The replacement cost (denominator) is the cost of replacing the facility based on its pre-disaster design (size and capacity) and function in accordance with applicable codes or standards. The denominator does not include costs associated with:

- Demolition;
- Site work;

---

[298] 44 C.F.R. § 206.226(f).
[299] 44 C.F.R. § 206.226(f)(1).
[300] This includes consensus-based codes, specifications, and standards.

- Soft costs;
- Contents;
- Hazard mitigation measures; or
- Emergency Work.

Although certain costs are not included in the 50% Rule calculation to determine whether the facility is eligible for replacement, the costs may be eligible for PA funding subject to all other eligibility requirements.

## B.    Written Request

The Applicant should submit its request for replacement within one year of the Declaration. The request should include both repair and replacement cost estimates with supporting documentation, prepared in accordance with the requirements described in Chapter 9:II.E.2. *Applicant Estimates*.

FEMA professionally licensed engineers and architects, qualified cost estimators, construction managers, and staff with other technical expertise, as necessary, develop or review and validate the estimates used in the 50% Rule calculations. For any replacement requests over $5 million, FEMA submits the estimates to an independent third-party for an additional review of the estimates. FEMA considers the results of the third-party review prior to approving replacement.

## C.    Eligible Funding

If the estimated repair cost exceeds 50 percent of the estimated replacement cost,[301] the actual replacement cost is eligible. The Applicant may elect to repair the facility in conformance with applicable codes and standards. In this case, FEMA limits the eligible cost to the estimated cost of repair or replacement, whichever is less.[302]



If the facility is not eligible for replacement based on the 50% Rule but the **total** estimated repair cost exceeds the **total** estimated replacement cost (not the estimated costs used for the 50 percent calculation), FEMA caps the total eligible cost at the **total** estimated replacement cost.

Relocation is only eligible for PA funding if it meets the requirements of Chapter 8:VI. *Relocations*. If compliance with a code or standard is not feasible without relocating a facility and

---

[301] For repair versus replacement, the term "replacement cost" means the cost of replacement in accordance with applicable codes and standards.
[302] 44 C.F.R. § 206.226(f)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

relocation is not eligible for PA funding based on Chapter 8:VI. *Relocations*, then FEMA caps the funding without including the costs related to relocation and considers it an Improved Project.

Demolition of a facility that is eligible for replacement is eligible as part of the work to replace the facility. Eligible costs include removal of the associated demolition debris.

PA mitigation funding cannot be applied to replacement facilities, unless the facility is part of an Alternative Procedures Project (described in Chapter 8:VIII. *Capped Projects*) or the mitigation measure is listed in Appendix J: *Cost Effective Public Assistance Hazard Mitigation Measures*.

As discussed in Chapter 8:III.D.1. *Historic Preservation Compliance, Federal Requirement*, if an applicable code or standard requires that a



Chapter 8:V. *Repair vs. Replacement*

8:VI. *Relocation*    8:IV. *Hazard Mitigation*

historic facility be restored in a certain manner and does not allow other options, the cost to restore the facility in accordance with the code or standard is eligible and may exceed the estimated replacement cost.[303] A historic facility is defined as one listed in, or eligible for listing in, the National Register of Historic Places.

## D.    Replacement of Components of a Facility or System

FEMA does not apply the 50% Rule to a facility's structural or mechanical components (e.g., windows, roofs, HVAC; electrical, plumbing). For example, FEMA does not apply the 50% Rule to a damaged HVAC system to determine whether the system should be repaired or replaced because it is a component of a building. If the HVAC system is repairable, as determined by an inspector or engineer with appropriate technical expertise, FEMA limits its funding to the repair of the system.

For facilities that are systems composed of multiple components that are easily segregated, FEMA applies the 50% Rule to individual components of the system, rather than the entire system. The following are examples of facilities that are systems to which FEMA applies the 50% Rule calculation to individual components:

- Drainage channel or irrigation system: a section from damaged node to damaged node, which is where there are intersections or connecting points.
- Water or sewer line system: a section of piping from damaged manhole to damaged manhole, a lift station, or a manhole structure.
- Water or wastewater treatment plant: a control building, clarifier, or sedimentation pond.
- Roadway: each damaged roadway section.

Electrical distribution systems are evaluated for replacement based on the criteria in Chapter 8:IX.D.2. *Power: Transmission and Distribution System Conductor Replacement*.

---

[303] 44 C.F.R. § 206.226(f)(3).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The following are examples of facilities to which FEMA applies the 50% Rule to the entire facility:

- Bridges;
- Culverts;
- Buildings;
- Pumping stations;
- Piers;
- Pools, including integral pumping;
- Bath houses or rest rooms;
- Equipment;
- Lighting structures; and
- Signs.

## VI. Relocation

FEMA may approve funding for and require restoration of an Applicant's destroyed (i.e., eligible for replacement) facility at a new location. FEMA only provides PA funding when all of the following conditions apply:

- The facility is subject to repetitive heavy damage because of its location. For example, facilities located in a SFHA or wildland-urban interface[304] and subject to repetitive heavy flood or fire damage;
- Project approval is not barred by other regulations;[305] and
- The overall project, including all costs, is cost-effective. If the cost to relocate the facility is less than the eligible cost to replace the facility at its original location (the value of the land at the original site is not included as part of this evaluation) then the project is cost effective. In instances where the cost of relocation exceeds the cost to replace the facility at its original location FEMA may use its BCA process and software to determine cost effectiveness.

An applicable Federal or SLTT code or standard, such as a floodplain management regulation, may also require that a damaged facility be relocated away from a hazardous area (e.g. floodway). If the facility is destroyed (i.e. eligible for replacement), FEMA determines whether relocation is cost-effective in the same manner as described above.

If the Applicant requests relocation of a facility that FEMA is not requiring to be relocated, FEMA may provide funding for the relocation if it is more cost-effective than replacing it at the current location. In the case of a request for relocation, FEMA evaluates the cost effectiveness as a PA mitigation measure using its BCA process and software[306] to compare the benefits of the damage prevented to the facility at its original location against the cost of replacement and relocation at the new location.

---

[304] The wildland-urban interface (WUI) is the area between wildland and urban land.
[305] 44 C.F.R. § 206.226(g)(1).
[306] www.fema.gov/grants/guidance-tools/benefit-cost-analysis.

If relocation is not feasible, cost effective, or eligible for PA funding the Applicant may request an Improved, Alternate, or Alternative Procedures Project as detailed in Chapter 8:VIII. *Capped Projects*.

## A.    Eligible Work and Funding

Eligible work associated with relocation includes land acquisition and construction of necessary support facilities, such as roads, parking lots, and utilities. Demolition and removal of the original facility are also eligible if deemed necessary.[307] FEMA limits PA funding to the amount necessary to make the relocated facility and its associated components operational.

FEMA considers the proximity of the new site to utilities (water, sewer, and electric) and approves the least costly solution. Construction of an off-site support facility is only eligible if it is a utility that would serve the relocated facility exclusively.

For land acquisition, if the facility was located on 10 acres of land at the time of the incident, and FEMA determines that 10 acres is not necessary for the operation of the facility, FEMA limits PA funding to the necessary amount of land.

In situations where the Applicant owns the facility, but not the land or the support facilities at the original location, the cost to purchase the land or build support facilities is ineligible.

When FEMA requires relocation, FEMA does not provide future PA funding for repair or replacement of the original facility or for other facilities at the original site unless the facility facilitates an open space use.[308] For example, if the Applicant converts the original site to a park, FEMA may provide PA funding in the future for park components, such as benches, tables, restrooms, or gravel roads.

## B.    Sale or Lease of Property at Original Site

The Applicant may sell or lease the original facility or the land on which a relocated facility was originally located. The Applicant must inform the purchaser of the property that FEMA will not provide future PA funding for repair or replacement of the original facility or for other facilities at the original site unless the facility facilitates an open space use.

The property which the facility is relocated to, and the relocated facility itself, are subject to the real property provisions of 2 C.F.R. part 200 including disposition and reporting requirements under 2 C.F.R. §§ 200.311 and 329, respectively.

If the Applicant takes an action, such as demolition, using PA funds at the original site, FEMA must complete an EHP review before the action occurs.

# VII. Facility Located in or Impacting a Floodplain

When FEMA provides PA funding for restoration of a facility located in or impacting a floodplain, FEMA is required to ensure minimization of harm to or within the floodplain.

---

[307] 44 C.F.R. § 206.226(g)(2).
[308] 44 C.F.R. § 206.226(g)(3).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## A.    8-Step Decision-making Process

FEMA is responsible for determining whether a PA project will have an adverse impact on the 100-year floodplain (500-year floodplain for critical actions). To make this determination, FEMA initiates the 8-step decision-making process defined in 44 C.F.R. § 9.6. As part of this process FEMA evaluates the impacts the project may have on the floodplain and practicable alternatives for environmental, social, economic, technical, and legal factors, as defined in 44 C.F.R. § 9.9. Some alternatives may not be eligible for PA funding. For example, if the 8-step review process identifies relocation of a facility as a practicable alternative to repairing it in the SFHA, but the facility is ineligible for relocation as described in Chapter 8:VI. *Relocations*, then costs associated with relocating the facility are ineligible for PA funding. FEMA considers whether each alternative identified is eligible for PA funding and, if not, whether the Applicant has funding available to proceed with the alternative without PA funding.

Projects in the 100-year floodplain (500-year floodplain for critical actions) are only eligible if, as a result of completing the 8-step process, FEMA is unable to identify a practicable alternative to restoring the facility within the floodplain. The 8-step process is not required for projects where the repair cost is less than $5,000.[309]

## B.    Facility Located in a Special Flood Hazard Area

SFHAs[310] are areas that are subject to inundation during a 100-year flood (a flood having a 1 percent chance of occurrence in a given year).

### 1.    National Flood Insurance Program

For an NFIP-insurable facility located in an SFHA, FEMA must reduce PA funding when the facility is:

- Located in an area that FEMA has identified as an SFHA for more than 1 year;
- Damaged by flooding; and
- Uninsured for flood loss.

If the Applicant believes that its property is incorrectly identified on a Flood Insurance Rate Map (FIRM) as being located within the SFHA, it may request a Letter of Map Amendment or Letter of Map Revision from FEMA within 6 months of the declaration. If the Applicant's request is approved and FEMA determines that the property is not located in an SFHA, FEMA may reinstate PA funding. Costs incurred in pursuit of a Letter of Map Amendment or Letter of Map Revision are ineligible for PA funding.

If the Applicant does not have flood insurance for the facility or carries inadequate flood insurance for the insurable facility, FEMA reduces eligible project costs by the lesser of:

- The maximum amount of insurance proceeds that could have been obtained from an NFIP standard flood insurance policy for the building and its contents;[311] or
- The value of the building and its contents at the time of the incident.

---

[309] 44 C.F.R. § 9.5(c)(13).
[310] 44 C.F.R. § 206.251.
[311] 44 C.F.R. § 206.252(a).

FEMA does not apply this reduction to PNP facilities in communities that do not participate in the NFIP.[312] However, for FEMA to provide PA funding for the PNP facility, the community must agree to participate in the NFIP within 6 months of the declaration and the PNP must purchase the required flood insurance; or the PNP must obtain and maintain flood insurance from another source.[313]

 **Intent of Permanent Work Alternative Procedures**

The intent of the PA Alternative Procedures for Permanent Work is to provide the Applicant with a flexible avenue to drive its own recovery outcomes. Instead of driving the Applicant's recovery within the confines of what the PA Program can fund, PA staff develop projects and identify the amount of PA funds that are available for Applicants to use toward a strategic recovery outcome. The Recipient and Applicant may also work together with various Federal agencies and other stakeholders to identify other available sources of funding that may also be applied to achieve the desired outcome.

# VIII. Capped Projects

FEMA provides three options that provide flexibility for the Applicant to use PA funding differently than restoring the pre-disaster design and function of the facility. For these options, FEMA caps the amount of PA funding based on the estimated amount to restore the damaged facility to its pre-disaster design and function, including current eligible codes and standards as defined in Chapter 8:III. *Codes and Standards*.[314]

The three capped project options are:

- Alternative Procedures Project under Section 428 (Large Projects only):[315] This type of project offers the maximum amount of flexibility with how the Applicant may use PA funding, including use of excess funds which are not eligible under the Improved or Alternate Project options. The Applicant may use funds across all Permanent Work Alternative Procedures Projects with no requirement to rebuild communities back to what existed prior to the disaster. Alternative Procedures Projects are subject to acceptance of a fixed-cost offer within the deadlines described in Chapter 9:II.E.6(a). *Fixed Cost Offer Deadlines*.
- Improved Project: The Applicant may wish to make improvements to a damaged facility that are not required by eligible codes or standards. A project that restores the pre-disaster function of a facility and incorporates improvements or changes to the pre-disaster design is an Improved Project.
- Alternate Project: The Applicant may determine that the public welfare is not best served by restoring the function of the damaged facility. When this occurs, the Applicant must obtain FEMA's approval to apply PA funding toward a different facility (or facilities). FEMA refers to this as an Alternate Project.[316] The Alternate Project must be a

---

[312] 44 C.F.R. § 206.252(b).
[313] Ibid.
[314] This includes consensus-based codes, specifications, and standards.
[315] Stafford Act § 428, 42 U.S.C. § 5189f.
[316] 44 C.F.R. § 206.203(d)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

permanent project that benefits the general public, serving the same general area that was being served by the original facility.

Capped projects may involve significant changes to the pre-disaster configuration of a facility (e.g., location, footprint, or size). FEMA conducts EHP compliance reviews on the actual proposed SOW to be performed, prior to approving the project.

## A.    Capped Project Funding

### Alternative Procedures Project Funding Under Section 428

FEMA caps Federal funding for an Alternative Procedures Project based on the aggregate Federal share of the approved estimated cost:

- To restore the damaged facilities to pre-disaster design and function in accordance with eligible codes and standards; and
- For cost-effective PA mitigation measures associated with the actual restoration SOW that the Applicant will perform.

### Improved Project Funding

FEMA limits Federal funding for an Improved Project to the lesser of the following:

- The Federal share of the approved estimate to restore the damaged facility to its pre-disaster design and function; or
- The Federal share of the actual costs of completing the Improved Project.[317]

FEMA only increases eligible funding for an Improved Project if the Applicant identifies an error or omission in the original SOW or cost estimate related to restoring the facility to its pre-disaster design and function.

### Alternate Project Funding

FEMA limits Federal funding for an Alternate Project to the lesser of:

- The Federal share of the approved estimate to restore the damaged facility to its pre-disaster design and function; or
- The Federal share of the actual cost of completing the Alternate Project.[318]

## B.    Use of Capped Project Funds

FEMA has different requirements for how the Applicant can use the funds related to each type of capped project.

---

[317] 44 C.F.R. § 206.203(d)(1).
[318] 44 C.F.R. § 206.203(d)(2)(ii) and (iii).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 1.    Use of Alternative Procedures Project Funds

FEMA will complete a fixed-cost estimate for all large Permanent Work Projects. FEMA will transmit this estimate as a fixed-cost offer to the Applicant for consideration. When the Applicant accepts a fixed cost offer for a Large Project in accordance with Chapter 9:II.E.6(a). *Fixed Cost Offer Deadlines*, FEMA considers it an Alternative Procedures Project and the Applicant is:



- Not required to rebuild back to what existed prior to the disaster;
- Allowed to share funds across all Alternative Procedures Permanent Work Projects;
- Not required to track costs to specific work items or facilities as funds can be shared across all Alternative Procedures Permanent Work Projects;
- Allowed to retain and use excess funds to reduce risk and improve future disaster operations (subject to timely closeout); and
- Eligible for cost-effective hazard mitigation on Replacement Projects.

The Applicant may use Alternative Procedures Permanent Work Project funds, including any excess funds across all of its Alternative Procedures Permanent Work Projects.

The Applicant may request to use the funds for any of the activities defined as eligible under the *Use of Fixed-Cost Funds* column in the table below. Once FEMA approves, and the Applicant completes, the SOW associated with these activities, the Applicant may use any excess funds for the expanded list of eligible activities listed under the *Use of Excess Funds* column.

Any excess funds remaining after the approved SOW is complete may be used for cost- effective activities that reduce the risk of future damage, hardship, or suffering from a major disaster, and activities that improve future PA operations or planning. The Applicant must submit a proposed SOW for use of any excess funds, along with a project timeline to the Recipient within 90 days of completing its last Alternative Procedures Project. The Recipient must forward the request to FEMA within 180 days of date the last Alternative Procedures Project was completed. FEMA evaluates the proposed use of excess funds for reasonableness to ensure prudent use of funds. FEMA also evaluates the submitted project timeline and approves an appropriate deadline for work completion, not to exceed the overall disaster period of performance.

The following table lists examples of eligible and ineligible types of work and costs when using fixed-cost funds and excess funds.

| Type of Work or Cost (all work or costs listed must otherwise be eligible for PA) | Use of Fixed-Cost Funds | Use of Excess Funds |
|---|---|---|
| Restoration of disaster-damaged facilities and equipment | Eligible | Eligible |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | |
|---|---|---|
| Alternate Projects (e.g., purchasing equipment, constructing new facilities, improvements to undamaged facilities such as shelters and emergency operation centers) in declared areas | Eligible | Eligible |
| Cost-effective hazard mitigation measures for undamaged facilities | Ineligible | Eligible |
| Covering future insurance premiums, including meeting obtain and maintain (O&M) insurance requirements, on damaged or undamaged facilities | Ineligible | Eligible |
| Work on facilities that are ineligible due to a failure to meet previous O&M requirements | Ineligible | Ineligible |
| Conducting or participating in training for response or recovery activities, including Federal grants management or procurement courses | Ineligible | Eligible |
| Planning for future disaster response and recovery operations, such as developing or updating plans (e.g., Debris Management Plans, Hazard Mitigation Plans, Pre- disaster Recovery Plans, Emergency Management Plans), integrating these plans into other plans, preparedness activities, exercises, and outreach | Ineligible | Eligible |
| Salaries for PA or emergency management staff. This may include but is not limited to, staff performing PA award or subaward administration, monitoring, and closeout activities for other PA disaster awards, and staff developing or updating disaster plans | Ineligible | Eligible |
| Paying down debts | Ineligible | Ineligible |
| Covering operating expenses | Ineligible | Ineligible |
| Covering budget shortfalls | Ineligible | Ineligible |
| Covering the non-Federal cost share of FEMA projects or other Federal awards | Ineligible | Ineligible |

Obtain-and-maintain requirements for insurance apply to work funded with excess funds, as appropriate.

If the Applicant does not accept the fixed-cost offer, the project will be processed utilizing standard procedures and final funding will be based on actual costs. The flexible use of funds and the use of excess funds are not available under standard procedures.

## 2.    Use of Improved Project Funds

The Applicant may use Improved Project funds to improve the damaged facility. The facility must have the same function and at least the same capacity that existed immediately prior to the disaster. The following are examples of Improved Projects:

- Laying asphalt on a gravel road;
- Replacing a firehouse that originally had two bays with a firehouse that has three bays;
- Incorporating requirements dictated by a code or standard that does not meet PA eligibility criteria; and

- Relocating a facility when FEMA is not requiring the relocation.

The Applicant must obtain approval from the Recipient.[319] If the Improved Project significantly changes the pre-disaster configuration of the facility, the Recipient must forward the request to FEMA to ensure that the Improved Project complies with appropriate EHP laws, regulations, and EOs.

The Applicant can combine PA funds with funding from another Federal agency to construct the Improved Project. However, the Applicant cannot use funding from another Federal agency toward the non-Federal cost share of the PA-funded project, unless the legislation for the other grant allows such use. CDBG[320] is an example of a Federal program that, in certain circumstances, allows use of its funding to meet the non-Federal share of another Federal grant program.

### 3.    Use of Alternate Project Funds

The Applicant may use Alternate Project funds toward a project that does not restore the pre-disaster function of the damaged facility. This includes:

- Repair, expand, mitigate, or construct a facility that would otherwise be an eligible facility under the PA Program;[321]
- Demolish facilities;
- Purchase capital equipment that has a useful life of at least 1 year and is equal to, or greater than, $5,000 per unit;
- Fund project shortfalls due to mandatory flood insurance reductions taken from PA Program funding for repairs to buildings in SFHAs (see Chapter 8:VII.B.1. *National Flood Insurance Program*);
- Supplement funds for an Improved Project; and
- Conduct cost-effective hazard mitigation measures, regardless of whether the facility was damaged by the incident and whether the measures reduce the risk of future damage from the same type of incident or of the same type of damage caused by the incident. Alternate Project funds may be use used for hazard mitigation provided that:
  o Funding does not duplicate other FEMA mitigation funding; and
  o Measures reduce the risk of future damage to a facility that is otherwise eligible either under the PA or HMA programs. If the measures are the same type as those eligible for HMA funding, they must meet a need for governmental services and functions or eligible PNP services and functions in the area affected by the incident.

If the Alternate Project involves construction, the Applicant must obtain FEMA approval prior to the start of construction as FEMA must ensure that it complies with appropriate EHP laws, regulations, and EOs.[322]

The Applicant may not use Alternate Project funds to:

- Meet budget shortfalls;
- Create a new community plan;

---

[319] 44 C.F.R. § 206.203(d)(1).
[320] www.hud.gov/program_offices/comm_planning/communitydevelopment.
[321] 44 C.F.R. § 206.203(d)(2)(iv).
[322] 44 C.F.R. § 206.203(d)(2)(v).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Landscape;
- Pay for operating expenses;[323]
- Purchase supplies, furniture, or equipment costing less than $5,000 per unit;
- Pay the non-Federal share of any PA project;[324]
- Fund buyouts for mitigation, such as acquisition of flood-prone property to create open space;
- Supplement funds on projects that utilize other Federal agency grants; or
- Fund a project located in a FEMA-designated floodway.

## C.    Disposition of Original Facility

For Alternate and Alternative Procedures Projects, if the Applicant does not repair, replace, or sell the damaged facility for which the capped project funding was based, and that facility is unsafe if not repaired, the Applicant must render the facility safe and secure (e.g., by restricting access, locking doors and windows, constructing a fence around the property) or demolish it.

If the Applicant receives funds for salvaged components of the facility, FEMA adjusts the capped project by the value or anticipated fair market value of salvaged materials less the estimated costs necessary to demolish the facility, grade the site, or make the facility safe and secure.

For any action at the original site, such as demolition, that is completed using PA funds, FEMA must conduct an EHP review. However, if the Applicant completes the work at the original site using non-PA funds, a FEMA EHP review is not required.

If the Applicant opts to keep a damaged facility for a later use, the facility may be eligible for PA funding in future incidents, provided the Applicant repaired the facility in accordance with current codes and standards, and completed any mitigation measures that FEMA included in the original SOW prior to the incident.

# IX.  Eligibility Considerations by Facility

This section details the types of facilities captured within each category of work along with specific eligibility criteria related to one or more of the facilities within each category. See Appendix N: *Work Eligibility Considerations by Type of Facility* for a summary of eligibility by facility type.

## A.    Roads and Bridges (Category C)

Roads may be paved, gravel, or dirt. Road components include, but may not be limited to:

- Surfaces;
- Bases;
- Shoulders;
- Ditches;
- Drainage structures, such as culverts;
- Low water crossings; and

---

[323] Ibid.
[324] Ibid.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Associated facilities, such as lighting, sidewalks, guardrails, and signs.

Bridge components include, but may not be limited to:

- Decking;
- Guardrails;
- Girders;
- Pavement;
- Abutments;
- Piers;
- Slope protection;
- Approaches; and
- Associated facilities, such as lighting, sidewalks, and signs.

Permanent Work to restore roads and bridges is eligible unless restoration is under the specific authority of another Federal Agency such as FHWA. However, for Tribal governments specifically, although BIA or FHWA may have authority to provide Permanent restoration of public Tribal roads, such roads may be eligible for PA funding provided the Tribal Government does not receive funding from BIA or FHWA for the same work.

FHWA has authority to restore public roads under the Emergency Relief (ER) Program.[325] Roads that are eligible for ER assistance are identified as Federal-aid routes, which include highways on the Federal-aid highway system and all other public roads not classified as local roads or rural minor collectors. The ER Program is activated separately from Presidential declarations under the Stafford Act and may not be activated for all incidents. Federal-aid routes are ineligible for Permanent Work even if the ER Program is not activated or if the program is activated but FHWA does not provide funding for the work. FHWA also has authority to assist with restoration of transportation facilities under the Emergency Relief for Federally Owned Roads Program (ERFO).[326]

Private roads are those that are not owned or operated by or otherwise the legal responsibility of a Federal or SLTT entity (including orphan roads, roads in gated communities, homeowners' association roads, etc.). These roads are ineligible. However, roads owned by a Tribal government may be eligible even if they are not open to the general public.

Work to repair scour or erosion damage to a channel or stream bank is eligible if the repair is necessary to restore the structural integrity of an eligible road, culvert, or bridge. Earthwork in a channel or stream embankment that is not related to restoring the structural integrity of an eligible facility is ineligible.

## 1.    Maintenance

The incident may cause minor damage to roads that result in damage similar to that which may occur over time from other causes, such as the age of the road, traffic flow, and frequent rain. Costs related to maintenance of roads are ineligible. Therefore, distinguishing between pre-existing damage and damage caused by the incident is often difficult. For the repair of this type

---

[325] www.fhwa.dot.gov/programadmin/erelief.cfm.
[326] flh.fhwa.dot.gov/programs/erfo/.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of damage to be eligible, the Applicant must demonstrate that the damage was directly caused by the incident.

When evaluating eligibility of reported road damage, in addition to evaluating how the incident caused the damage, FEMA reviews maintenance records or documentation establishing that the Applicant has a routine maintenance program. In the absence of maintenance records, FEMA reviews material purchase invoices and activity logs and inspects other sections of the Applicant's road system to confirm the performance of regular maintenance activities.

Work to repair potholes or fatigue cracking is usually ineligible as this type of damage is rarely caused directly by one incident.

## B. Water Control Facilities (Category D)

Water control facilities are those facilities built for the following purposes:

- Channel alignment;
- Recreation;
- Navigation;
- Land reclamation;
- Irrigation;
- Maintenance of fish and wildlife habitat;
- Interior drainage;
- Erosion prevention;
- Flood control; or
- Storm water management.

They include:

- Dams and reservoirs;
- Levees and floodwalls;
- Lined and unlined engineered drainage channels;
- Canals;
- Aqueducts;
- Sediment and debris basins;
- Storm water retention and detention basins;
- Coastal shoreline protective devices;
- Irrigation facilities;
- Pumping facilities; and
- Navigational waterways and shipping channels.

### 1.    Restoring the Capacity of Channels, Basins, and Reservoirs

Restoring the pre-disaster carrying or storage capacity of engineered channels, debris and sediment basins, storm water detention and retention basins, and reservoirs may be eligible, but only if the Applicant provides documentation to establish:

- The pre-disaster capacity of the facility; and
- That the Applicant maintains the facility on a regular schedule.

If the Applicant chooses to remove non-incident-related material along with that deposited as a result of the incident, the project is considered an Improved Project.

### 2.    Flood Control Works

Flood control works are those structures such as levees, flood walls, flood control channels, and water control structures designed and constructed to have appreciable effects in preventing damage by irregular and unusual rises in water levels.

Generally, flood control works are under the authority of USACE or NRCS and restoration of damaged flood control works under the authority of another Federal agency is ineligible. Flood control works under the specific authority of NRCS are those that are part of the Watershed and Flood Prevention Operations (WFPO) Program under PL 83-566.[327]

Secondary levees riverward of a primary levee are ineligible, unless the secondary levee protects human life.

### C.    Buildings and Equipment (Category E)

Buildings, including:

- All structural and non-structural components, including mechanical, electrical, and plumbing systems;
- Contents and equipment within the building; and
- Furnishings.

Equipment includes:

- Vehicles; and
- Construction equipment.

Repair or replacement of buildings and equipment is eligible.

---

[327] www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/wfpo.

## 1.    Buildings

A Public Housing Authority facility is only eligible for Permanent Work if Congress does not appropriate funds to HUD for emergency capital needs for the facility.

For buildings and building systems, distinguishing between damage caused by the incident and pre-existing damage may be difficult. Before making an eligibility determination, FEMA considers each of the following:

- Evidence of regular maintenance;
- Evidence of pre-disaster condition, such as interior water stains from a leaky roof (in such cases, FEMA evaluates whether the roof was repaired prior to the incident);
- The severity and impacts of the incident; and
- Whether the Applicant took prudent actions to prevent additional damage.

Mold remediation and removal of mud, silt, or other accumulated debris is eligible as Permanent Work when conducted in conjunction with restoration of the facility.

### (a)    Earthquake Damage to Welded Steel Moment Frame Buildings

FEMA has specific eligibility criteria for evaluating and repairing earthquake damage to buildings constructed with welded steel moment frames. FEMA bases the eligibility criteria on *Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment Frame Buildings* (FEMA 352).[328]

The repair of the damaged frame connections to pre-earthquake design in accordance with FEMA 352, Chapter 6, is eligible, but only if FEMA approves a specific SOW for the repairs prior to the Applicant performing the work. Repair of the architectural finishes and fire retardants removed in the area of the damage are also eligible.

## 2.    Equipment and Supplies

Repairing damaged—or replacing destroyed—equipment and supplies with the same number of equivalent items is eligible.[329] Equivalent items are similar in age, condition, and capacity.

The Applicant may replace equipment or supplies with different items used for the same general purpose. However, FEMA caps the eligible cost at the estimated amount for items equivalent to those damaged.

When equipment is not repairable, FEMA uses "blue book" values or similar price guides to estimate the eligible cost.

When a used item is not reasonably available (within a reasonable cost, time, or distance) or does not meet applicable national consensus standards, the purchase of a new item with similar capacity is eligible.

If the cost to replace the item is less than the cost to repair it, FEMA limits PA funding to the replacement cost.

---

[328] www.nehrp.gov/pdf/fema352.pdf.
[329] 44 C.F.R. § 206.226(h).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

### 3.    Files

Eligible activities associated with the recovery of files include, but are not limited to:

- Recovery of damaged hard copies;
- Stabilizing the damaged hard copies;
- Sanitizing damaged hard copies;
- Photocopying or scanning damaged hard copies to re-establish files; and
- Recovering data from water-damaged computer hard drives.

Recovery of damaged hard copies includes labor and materials, such as bags, boxes, and containers. Stabilizing damaged hard copies includes freeze-drying. Photocopying or scanning includes labor and materials such as new folders and paper.

Not all activities are eligible. Examples of ineligible activities include:

- Establishing new information databases;
- Manually entering data that was lost in damaged computers;
- Scanning re-established hardcopy files into computers to create digital files; and
- Deciphering photocopies of damaged hard copies.

### 4.    Research-Related Contents

Reagents and specimen collections are eligible for replacement based on the following criteria.

The number of units of each reagent eligible for replacement is equal to the number lost OR to the number necessary to restore basic research activity, whichever is less.

FEMA reimburses the purchase price from commercial sources or other institutions, whichever is less. The replacement of reagents that are so unique that they are considered an outcome of a research program is ineligible.

Replacing a representative, but not necessarily a whole portion, of a specimen collection may be eligible. To be eligible for replacement, the specimen types should be available for purchase from commercial sources or other institutions and support an ongoing eligible educational or medical program.



### 5.    Animals

Animals housed or exhibited in an eligible facility are eligible for replacement with the same number of comparable animals if they are:

- Injured to the extent they are no longer able to function for the intended purpose;
- Killed;
- A destroyed specimen; or
- A damaged specimen that is not recoverable.

V4 2020                                                                                   Page 173

The animal is ineligible for replacement if a comparable animal is not available for purchase or the Applicant is unable to obtain a comparable one at a reasonable cost.

Eligible animals may include, but are not limited to:

- Police animals;
- Trained and certified rescue dogs;
- Animals in museums, zoos, or publicly owned nature centers;
- Fish in fish hatcheries;
- Taxidermy specimens (animals preserved and mounted in lifelike representations);
- Animals used by rehabilitation facilities as part of diagnosis or treatment; and
- Laboratory animals used in an active research program.

The replacement of animals on loan to an eligible facility at the time they are destroyed is eligible if the Applicant substantiates legal responsibility.

Additionally, FEMA may provide PA funding for actions taken to save the lives of these animals as a Category B emergency protective measure.

*(a)         Determining Costs*

The estimated cost to replace an animal is usually determined through market surveys. Costs associated with acquiring donated, loaned, or wild animals as replacement animals are eligible if they do not exceed the estimated cost of purchasing a comparable animal.

When a destroyed animal is replaced through a donation or loan of a comparable animal, costs associated with the purchase of another comparable animal are ineligible.

For laboratory animals, eligible costs associated with replacement include, but are not limited to, the replacement cost of a laboratory animal that is as genetically close as possible to, but does not exceed, the genetic progression of the lost animal AND can be reasonably procured commercially. If an identically genetic animal is not available, the eligible cost is based on a readily procured animal that is as genetically close as possible to the original animal. The Applicant, using its scientific research staff, an independent member of the scientific community, or a certified expert, needs to make reasonable decisions on the genetic likeness of the replacement lab animals.

Ineligible costs associated with replacing laboratory animals include:

- The cost of reproducing a new animal with all the characteristics of the lost animal to re-establish research;
- The cost of using a laboratory to perform a breeding program to advance benchmark stock to the genetic changes lost because of the incident;
- The cost associated with surgery required to replace a surgically altered animal; and
- The cost associated with the replacement of a laboratory animal when an animal of similar genetic characteristics can be obtained at no cost from other researchers or institutions.

If the Applicant requests, and the Recipient approves, other than in-kind and exact number of replacement animals, FEMA caps the Federal share based on the estimated in-kind replacement costs.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 6.    Irreplaceable Collections and Individual Objects

Collections and individual objects are artifacts, specimens, artworks, archives, public records, and other items that are often considered irreplaceable because of their artistic, educational, historic, legal, scientific, or social significance. They are nonliving and, therefore, do not include animals or plant material, and are usually one-of-a-kind. Eligible collections and individual objects may be in storage or on display in a public or PNP facility and may include items located outdoors, such as sculptures and public art installations.



Stabilization of damaged collections or individual objects is eligible. Stabilization is a series of treatment measures to maintain the integrity of a collection or object and to minimize deterioration. Stabilization involves taking the minimum steps necessary to return a collection or object to a condition in which it can function in the same capacity as it did prior to the incident. This includes:

- Treating damaged items through proper environmental controls, such as temperature and humidity; and
- Chemical or mechanical cleaning to stabilize items to prolong their existence, maintain their integrity, and minimize further deterioration from the damaging effects of the incident.

Additional treatment beyond stabilization is eligible if it is necessary to maintain the integrity of the collection or object and return it to its pre-disaster function.

In some cases, costs associated with restoring an item to pre-disaster—but not original— condition may be eligible. For example, repairing a tear in a painting that was a direct result of the incident may be eligible, whereas costs to remove signs of pre-disaster aging, such as layers of old varnish, are ineligible.

Costs associated with the development of a treatment plan for a damaged collection or individual object are eligible. Treatment needs to be conducted by qualified

conservation professionals with the appropriate specialty and in accordance with the American Institute for Conservation Code of Ethics and Guidelines for Practice.[330] FEMA, in consultation with the Recipient and Applicant, may recommend no treatment when non-intervention best serves to promote the preservation of damaged items.

Collections and individual objects damaged to the extent that stabilization is not practicable or possible are considered destroyed. Replacement of destroyed collections or individual objects is ineligible.

Restoring materials, equipment, and exhibition furnishings associated with the storage, display, preservation, or exhibition of collections and individual objects is eligible. These may include, but are not limited to:

- Equipment regulating temperature or humidity;
- Exhibit panels;
- Models; and
- Video and audio equipment.

### 7.    Library Books and Publications

Replacement of damaged or destroyed library books and publications is eligible based on the pre-disaster inventory of the quantities of the books and publications. Re-shelving, cataloging, and other work incidental to the replacement of library books and publications is also eligible.[331]

However, special library collections, including rare books, manuscripts, and other fragile materials, are only eligible for treatment, not replacement.

### D.    Utilities (Category F)

Utilities include:

- Water storage facilities, treatment plants, and delivery systems;
- Power generation, transmission, and distribution facilities, including, but not limited to, wind turbines, generators, substations, and power lines;
- Natural gas transmission and distribution facilities;
- Sewage collection systems and treatment plants; and
- Communication systems.

### 1.    Right-of-Way Clearance

The Applicant may need to clear its ROW to obtain access to repair a utility. It is the Applicant's responsibility to maintain its ROW. FEMA may fund limited clearance of incident-related debris from the ROW to enable access to the facility. Additionally, if trees in the vicinity of the facility were damaged by the incident and an arborist confirms that the trees cause an immediate threat of further damage to the facility (e.g., overhead power lines), FEMA may provide PA funding to remove those trees. Any further clearance of debris in the ROW is ineligible for FEMA funding.

---

[330] www.culturalheritage.org/about-conservation/code-of-ethics.
[331] 44 C.F.R. § 206.226(i).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 2.    Power: Transmission and Distribution System Conductor Replacement

For electrical transmission or distribution systems, determining the disaster-related damage to some components, such as poles, guys, and cross-arms, can usually be accomplished by visual inspection. However, determining the full extent of disaster-related damage to conductors is more challenging, particularly with older systems. A conductor is eligible for replacement when it is stretched beyond the point where it can be effectively repaired and re-sagged to meet appropriate clearances, sag, and tension, and to meet pre-disaster reliability.



A conductor is only eligible for replacement (reconductoring) when the Applicant cannot effectively repair it because one of the following exists within a line section:

- Twenty-five percent or more of the conductor spans have visible damage, such as broken strands, splices, or sleeves (installed as a result of the incident) or severe pitting, burns, or kinks;
- Thirty percent or more of the line spans are visually stretched (out of sag), or do not meet clearance requirements such as conductor-to-conductor or conductor-to-ground clearance;
- Forty percent or more of the supporting poles need to be replaced or plumbed (straightened). A pole is considered to be in need of straightening if it is leaning such that it is unsafe to climb;
- Forty percent or more of the supporting structures (other than poles) have damage such as broken cross-arms, braces, ties, insulators, guys, pulled anchors, or bent pins. If more than one element of the support structure is damaged, it still only counts as one damaged support structure. If a pole is counted under the previous bullet, FEMA does not count the supporting structure under this criterion;
- Sixty-five percent or more of any combination of the damage described in the bullets above; or
- Evidence provided by a licensed Professional Engineer that demonstrates the conductor is damaged beyond repair.

V4 2020

If the Applicant provides sufficient documentation establishing the pre-disaster condition and a line section of its system meets one of the six criteria above, that line section is eligible to be reconductored.

The use of #2 Aluminum Conductor Steel Reinforced (ACSR) is considered a lower cost alternative to replacing conductor with equal or lesser amperage capacity such as copper weld conductor, hard and soft drawn copper wire, smaller ACSR, and Amerductor. Therefore, if a conductor with equal or lesser amperage capacity to #2 ACSR is eligible for reconductoring, the line section is eligible to be replaced with #2 ACSR. When the Applicant replaces conductor with #2 ACSR, adjustments to other components of the electric distribution and transmission systems to accommodate #2 ACSR, including, but not limited to, adjusting span lengths between utility poles and increasing pole heights and standards to meet appropriate design requirements are eligible. The Applicant does not need to cite a code or standard for this additional work even though the appropriate design requirements may come from Federal or SLTT codes or standards, including National Electrical Safety Code or Rural Utilities Service (RUS) standards.

If the Applicant prefers to reconductor a line with conductor of lesser amperage capacity than #2 ACSR, such as #4 ACSR (including associated adjustments in span lengths and pole heights), FEMA provides PA funding for the work if the cost is less than the cost of reconductoring with #2 ACSR (including associated adjustments in span lengths and pole heights).

If the Applicant plans to upgrade its conductor to an amperage capacity above #2 ACSR, and there is no code or standard requiring the upgrade that meets the eligibility requirements discussed in B, the additional upgrades are ineligible and the Applicant must request an Improved Project.

If the damage does not meet the criteria for replacement, only the repair of the damaged line section(s) is eligible.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## E.    Parks, Recreational, Other (Category G)

Eligible publicly owned facilities in this category include:

- Mass transit facilities such as railways;
- Beaches;
- Parks;
- Playground equipment;
- Swimming pools;
- Bath houses;
- Tennis courts;
- Boat docks;
- Piers;
- Picnic tables;
- Golf courses;
- Ball fields;
- Fish hatcheries;
- Ports and harbors; and
- Other facilities that do not fit in Categories C–F.

Unimproved natural features are ineligible.

Plantings (such as trees, shrubs, and other vegetation) are eligible when they are part of the restoration of an eligible facility for the purpose of erosion control, to minimize sediment runoff, or to stabilize slopes, including dunes on eligible improved beaches.

Grass and sod replacement are eligible if it is an integral part of the restoration of an eligible recreational facility. Vegetation replacement is also eligible if necessary to restore the function of the facility (e.g., if vegetation is a component of a sewage filtration system).

Plantings required to mitigate environmental impacts, such as those required to address impacts to wetlands or endangered species habitat, are only eligible if required by a Federal or SLTT code or standard or permit that meets the criteria described in Chapter 8:III.H. *Permit Requirements*.

Long-term monitoring to ensure vegetative growth is ineligible even if it meets the requirements above.

Plantings ineligible for replacement include, but are not limited to:

- Replacement of trees, shrubs, and other vegetation;
- Replacement of destroyed crops; and
- Cosmetic or aesthetic vegetation, such as landscaping around public facilities or in median strips along roadways. This restriction applies even when the vegetation is damaged during performance of eligible work, such as when repairing underground utilities within landscaped areas.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 1.    Beaches

Replacement of sand on beaches is only eligible under certain conditions.[332] A beach is considered an eligible facility when all of the following conditions exist:

- The beach is not a federally constructed shoreline under the specific authority of USACE (i.e., not a specifically authorized and constructed Coastal Storm Risk Management Project);[333]
- The beach was constructed by the placement of imported sand—of proper grain size—to a designed elevation, width, and slope;[334] and
- The Applicant has established and adhered to a maintenance program involving periodic renourishment with imported sand to preserve the original design or a specific engineered design that is justified and clearly stated in the maintenance program.[335] Placement of sand under the following circumstances does not meet this requirement:
  - Emergency or "one-time" nourishment, even if to a design;
  - Emergency or "as-needed" renourishments when the beach has eroded to a critical condition where all original nourishment is gone;
  - Partial renourishments or "hot-spot" nourishments; or
  - Renourishment using material from a channel maintenance project when dredge spoils do not meet compatibility design criteria and the amount placed is dependent on the amount dredged, not the beach design.



---

[332] 44 C.F.R. §§ 206.226(j) and 206.201(c).
[333] 44 C.F.R. § 206.226(a).
[334] 44 C.F.R. § 206.226(j)(2)(i).
[335] 44 C.F.R. § 206.226(j)(2)(ii).



**Figure 16. Typical Beach Profile**

The amount of sand eligible for replacement is limited to the amount lost due to the incident. The Applicant needs to substantiate the amount of sand claimed with pre-and post-incident profiles that extend at least to the seaward edge of the sub-aqueous nearshore zone (Depth of Closure) (see Figure 16. *Typical Beach Profile*). If pre-storm profiles are not available, documentation may include design documents and renourishment history. The Applicant needs to adjust quantities to account for any erosion that occurred between the pre- and post-incident profiles.

Replacing sand that eroded prior to the incident is ineligible. However, the Applicant is encouraged to renourish the project to achieve the design profile.

## F.    Landslides and Slope Stabilization

If an eligible facility is located on a slope and is damaged as a result of a landslide or slope instability triggered by the incident, FEMA determines the stability of the slope that supports the facility before it approves PA funding to restore the facility. Restoration of the integral ground that supports the facility may also be eligible. The impact of slope stability on eligibility is as follows:

- If the site is stable, permanent restoration of the facility and its integral ground is eligible.
- If the site is unstable and there is no evidence of pre-disaster instability after the facility was constructed, permanent restoration of the facility and its integral ground is eligible, including measures to stabilize the integral ground.
- If the site is unstable and there is evidence of pre-disaster instability after the facility was constructed, restoration of the facility's integral ground is ineligible. Restoration of the

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

facility is eligible only upon the Applicant stabilizing the site and restoring the integral ground.

Site inspections and limited geotechnical assessments to determine site stability and to obtain a technical opinion of the cause of the slope failure are eligible.

Permanent repair to stabilize natural ground that is not integral to an eligible facility's function is ineligible.

FEMA may approve permanent relocation of the facility if the facility is subject to repetitive heavy damage and relocation is cost-effective. Eligible costs for relocation are described in Chapter 8:VI. *Relocation.*

The Applicant may request an Alternate Project if restoration of the facility is not feasible because of soil instability.

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 9:   SCOPE OF WORK AND COST DEVELOPMENT

Once FEMA, the Recipient, and the Applicant agree on the damage description and dimensions, either the Applicant submits the SOW and cost for FEMA review and validation, or FEMA submits the project to its CRC to develop the SOW and cost. This is Phase III of the PA Program delivery process, *Scoping and Costing*, and is described in this chapter.

## I.    Scope of Work Development

For completed work, the Applicant must describe the completed SOW for each of the projects and provide supporting documentation.

For Emergency Work, the SOW includes work required to address immediate threats and to remove debris and must include quantitative information. For Permanent Work, the SOW includes a description of how the Applicant plans to repair, or has repaired, the damage, including repair dimensions and hazard mitigation description and dimensions.

The Applicant should provide the following for each site (not an all-inclusive list):

- ☐ Whether the work is complete;
- ☐ Who performed, or will perform, the work (e.g., force account, contract, etc.);
- ☐ Proposed or completed, repair scope of work, including PA mitigation measures; and
- ☐ Technical studies, reports, and assessments.

## II.    Cost Development

FEMA or the Recipient assists the Applicant with preparing project applications based on actual or estimated costs.

### A.    Project Thresholds

FEMA establishes a minimum project threshold for each Federal fiscal year. The threshold applies to incidents declared within that fiscal year and is based on the Consumer Price Index. If a project application totals less than the minimum threshold[336] after the Applicant has accounted for all project costs—including insurance proceeds and other reductions to avoid duplication of benefits—the project is ineligible.[337]



The minimum threshold applies to each project application and not to each damage line item. FEMA does not combine work among several sites onto one project application for the **sole** purpose of reaching the minimum threshold. Because of the administrative cost involved, FEMA does not process project applications under the minimum threshold unless the

---

[336] The minimum threshold is available at: https://www.fema.gov/assistance/public/applicants/per-capita-impact-indicator.

[337] 44 C.F.R. § 206.202(d)(2).

Applicant is eligible, is disputing the SOW or costs, and is planning to appeal an amount that would increase the project amount to at least the minimum threshold. The minimum threshold does not apply to Donated Resources or Management Costs; however, these projects are only eligible when the donated resources or management costs are related to an eligible project that meets the minimum threshold.

FEMA also establishes a dollar threshold each Federal fiscal year for the implementation of Simplified Procedures under Section 422 of the Stafford Act. This threshold defines a project as large or small.[338]

- A Large Project has costs equal to or greater than the threshold.
- A Small Project has costs below the threshold.[339]

The threshold applies to incidents declared within that fiscal year. FEMA administers funding for Large and Small Projects differently. For Large Projects that are not capped, FEMA adjusts any estimated costs to the actual incurred amount so that the final approved funding is based on actual costs.[340] For Small Projects, FEMA does not adjust estimated costs to the actual incurred amount.[341] FEMA determines whether a project is large or small based on the final approved amount of eligible costs after any cost adjustments, including insurance reductions.

## B.    Expedited Projects for Emergency Work

FEMA may provide expedited funding for Emergency Work Projects (Category A or B) that meet or exceed the Large Project threshold. FEMA funds Expedited Projects at 50 percent of the Federal share of the estimated project cost. Requests for Expedited Projects must be submitted to FEMA within 60 days of the Applicant's Recovery Scoping Meeting. To support its request, the Applicant must provide enough information for FEMA to validate that the work and costs are eligible. FEMA will work to obligate funding within 90 days of receipt of the request. Therefore, the PA Group Supervisor notifies the CRC as soon as possible after receiving a request.

The Applicant must substantiate its legal responsibility for the work. The Applicant needs to provide the following broken down by the Applicant's monthly (or bi-weekly) operational periods (if Category A or B has an increased Federal cost share for a limited timeframe, the Applicant needs to separate work anticipated to be completed within the increased cost share timeframe from work anticipated to be completed after the increased cost share period (See Chapter 6:XIII. *Increased Federal Cost Share for a Limited Timeframe*):

- A detailed description of the work and documentation to substantiate that the work is eligible. This includes:
    o Description of immediate threat;
    o Detailed description of work activities;
    o Work locations; and
    o Additionally, for debris: estimated quantities by type of debris substantiated with photographs or video, temporary staging and disposal locations with copies of permits and reduction methods.

---

[338] The project threshold amount is available at: www.fema.gov/assistance/public/applicants/per-capita-impact-indicator.
[339] Stafford Act § 422, 42 U.S.C. § 5189; 44 C.F.R. § 206.203(c).
[340] 44 C.F.R. § 206.205(b).
[341] 44 C.F.R. § 206.205(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- The total estimated cost with documentation to support the basis of the estimate and substantiate that the cost estimate is reasonable. This includes:
  - Insurance documentation
  - For Force Account labor or other hourly labor costs such as mutual aid labor:
    - Number of personnel;
    - Average hours per day;
    - Average days per week;
    - Average pay rate;
    - Lodging and per diem rates; and
    - Mutual Aid Agreement, Memorandum of Understanding or other written agreement
  - For Force Account equipment:
    - Amount of equipment by type;
    - Average hours per day;
    - Average days per week; and
    - Hourly rate
  - For rented equipment:
    - Rental agreement with pricing
  - For contract work:
    - Request for proposals, bid documents, contracts;
    - If bids have not yet been received, the Applicant may submit a unit price estimate; and
    - Debris monitor information

FEMA estimates the work based on cost information provided by the Applicant. If the Applicant does not provide sufficient cost information, FEMA may use average historical pricing. For contracted work, FEMA uses the unit cost from the contract if it determines the costs are reasonable; however, this is only for the purpose of expediting funding based on an estimate. FEMA reviews the Applicant's procurement and contracting for compliance and addresses any noncompliance prior to final reconciliation and closeout of the project.

FEMA provides the Federal cost share for the remaining 50 percent of the project cost once the Applicant provides all of the documentation required to support the estimated project cost for a non-Expedited Project.

## C.    Costs for Projects with All Work Completed

For projects with all work complete, the PDMG works with the Applicant to:

- Answer programmatic, EHP, insurance, and hazard mitigation questions;
- Identify information and documentation requirements; and
- Address contextual information needed for supporting the Applicant's claim for completed work.

Once work on a project is 100% complete, the Applicant must submit documentation for the project within 90 days of the Recovery Scoping Meeting or within 90 days of the work completion date, whichever is later, regardless of whether the project has been obligated. FEMA makes its eligibility determination and processes the project based on the documentation

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

received within the 90-day deadline.[342] FEMA denies assistance for work and costs that are not supported with documentation by this deadline. There may be cases where, during review of the documentation submitted, FEMA determines additional information or explanation is required. In this instance, FEMA may generate an RFI specifying a deadline for response.



For Small Projects, FEMA may accept certification in lieu of documentation and may process the projects based on estimated costs even if all work is completed.[343] However, with exception of the scenarios listed in Chapter 12:I.A. *Small Projects*, Small Project estimates are not subsequently adjusted to reflect actual costs. The Applicant must still retain documentation for Net Small Project Overrun appeals and audits.

## D.    Estimating Emergency Work Projects with Work to be Completed

Emergency Work Projects are often difficult to estimate due to the type of work conducted. Unlike Permanent Work, where a detailed SOW is usually determined and estimated with unit pricing in advance, the detailed scope of work to address Emergency Work is often unknown and therefore, difficult to estimate in advance. Additionally, emergency response activities do not generally have established unit pricing and have a lot of variables that can impact pricing. If the Applicant provides sufficient information, FEMA may process Emergency Work Projects based on estimates.

## E.    Estimating Permanent Work Projects with Work to be Completed

When work is not yet complete, FEMA determines the amount of PA funding based on the estimated cost to restore the damaged facility to its pre-disaster design and function, including eligible codes and standards. The amount may include a reasonable amount of anticipated soft costs but does not include costs that are only related to, or only triggered by, changes to the pre-disaster design or function of the damaged facility. These include, but are not limited to, costs related to:

- Engineering and design;
- EHP compliance; and
- Work required by codes or standards.

If FEMA developed the SOW, it also develops the associated cost estimate.

## 1.    Projects Requiring Engineering Analysis

Some projects may require an engineering analysis to determine the method of repair. In these cases, FEMA may provide PA funding for engineering and design services.

---

[342] 44 C.F.R. § 206.205(b)(1) and 2 C.F.R. § 200.343.
[343] Stafford Act § 422, 42 U.S.C. § 5189; 44 C.F.R. § 206.205(a).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 2.        Applicant Estimates

FEMA accepts an Applicant-submitted cost estimate if the estimate:

- Is prepared by a licensed Professional Engineer or other estimating professional, such as a licensed architect or certified professional cost estimator[344] who certifies that the estimate was prepared in accordance with industry standards;
- Includes certification that the estimated cost directly corresponds to the repair of the agreed upon damage;
- Is based on unit costs for each component of the SOW and not a lump sum amount;
- Contains a level of detail sufficient for FEMA to validate that all components correspond with the agreed-upon SOW;
- Is based on the current phase of design or construction inclusive of any known costs;
- Includes actual costs for work completed at the time the cost estimate is developed; and
- Is reasonable.

FEMA evaluates Applicant-submitted estimates for reasonableness based on the criteria in Chapter 6.I. Reasonable Costs using the checklist in Appendix L: *Validation of Applicant-Provided Cost Estimates*.

## 3.        FEMA Estimates

When FEMA develops cost estimates for sites with Permanent Work that is less than 90 percent complete and total costs are expected to meet or exceed the Large Project threshold, FEMA uses the CEF in accordance with the CEF Instruction Guide[345] The CEF Instructional Guide defines various factors and the range of percentage values that FEMA may apply to projects. In rare cases, a factor may need to be reviewed or adjusted. FEMA Headquarters has access to technical assistance to review the appropriate ranges for factors. Only FEMA Headquarters has the authority to approve the use of factors that exceed the CEF specified range or approve additional factors. FEMA will include the CEF contingency factor "Applicant Reserve for Change Orders" but will not include any additional factors or risk premiums associated with capped projects (Improved, Alternate, or Alternative Procedures Projects).

## 4.        Expert Panel Review

A FEMA-funded,[346] independent third-party panel of cost estimating experts may review project estimates. FEMA does not use this panel for appeals. The review is limited to issues pertaining to the estimated cost and the panel does not make decisions related to the eligibility of work. However, it may make determinations about whether cost elements are required to execute the SOW. The panel may review cost documentation for completed work, if necessary.

- All project estimates with an estimated Federal share of $25 million or greater are reviewed by the independent panel.
- FEMA may request the independent panel review for any cost estimate.
- The Applicant may request the panel review the estimate for any project with an estimated Federal share of at least $5 million.

---

[344] In lieu of a license or certification, an individual with professional experience and proficiency in the field of cost estimating may prepare and sign the cost estimate.

[345] www.fema.gov/pdf/government/grant/pa/cef_instruct.pdf.

[346] The expert panel is fully funded by FEMA and does not require a non-Federal cost share.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## 5.        Insurance Reductions

FEMA reduces the estimate to account for insurance coverage based on:

- Actual insurance proceeds, if known; or
- Anticipated insurance proceeds based on the Applicant's insurance policy, if the amount of actual proceeds is unknown.

## 6.        Fixed-Cost Offer for Alternative Procedures Projects

FEMA professionally licensed engineers and architects, qualified cost estimators, construction managers, and staff with other technical expertise, as necessary, develop or review and validate estimates for all large Permanent Work Projects. FEMA transmits the estimates as fixed-cost offers to the Applicant via PA Grants Manager for consideration. If the Applicant accepts the fixed-cost offer for a Large Project, it is considered an Alternative Procedures Project.

FEMA approves the fixed-cost amount upon obligation of the project.[347] Once the fixed-cost amount is obligated, FEMA considers it reasonable and eligible, as long as there is no evidence of fraud and the Applicant complies with Federal grant conditions.

The following table summarizes the differences between the Alternative Procedures policy and the standard PA policy:

| Alternative Procedures Project | Standard Project |
|---|---|
| Fixed-cost project with use of excess funds. | Actual cost project. No retention of excess funds associated with the approved estimate. |
| May use funds across all Alternative Procedure Permanent Work Projects. | Can only use funds toward the specific work identified in each specific project. |
| After FEMA approves a SOW, approval is only required for changes that involve buildings or structures aged 45 years or older, ground disturbing activities, or work in or near water. | After FEMA approves a SOW, approval is required for any change to the SOW. |
| Do not need to track costs associated with changes to the SOW (see Chapter 12:I.C. *Alternative Procedures Permanent Work Projects* for closeout requirements) | Must track costs associated with all changes to the SOW. |
| Do not need to track costs to specific work items. Only need to track the total costs associated with the all of its Alternative Procedures Permanent Work Projects. (see Chapter 12:I.C. *Alternative Procedures Permanent Work Projects* for closeout requirements) | Must track costs specific to each work item within each individual project. |
| Do not need to track work to specific Alternative Procedures Projects. Only need to substantiate that | Must track all work to each individual project. |

---

[347] Obligation constitutes FEMA's acceptance of the fixed amount.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| the work is related to the approved SOW covered across the projects. | |
|---|---|

Once the Applicant accepts a fixed cost offer, it may not revert back to a project funded based on actual costs. FEMA does not adjust the fixed amount even if the Applicant discovers hidden damage while conducting approved work. Prior to closing the project, FEMA adjusts the fixed estimate to account for actual insurance proceeds as described in <u>Chapter 6:XVIII.A. *Insurance Proceeds*</u>. Once FEMA and the Applicant agree to a fixed-cost, FEMA will not adjust funding on the basis of reasonableness or eligibility provided the Applicant completes the approved scope of work. This does not preclude de-obligations on the basis of noncompliance with grant conditions, such as environmental or historic preservation; duplication of benefits, including insurance; or evidence of fraud.

If the estimated amount is less than the Applicant is willing to accept as a fixed cost, the Applicant may decline the offer and FEMA will process the project using standard procedures. In these cases, FEMA obligates the project based on the estimated amount in the offer and adjusts funding based on actual eligible costs at closeout.

*(a)        Fixed Cost Offer Deadlines*

The Applicant has up to 18 months from the disaster declaration date to accept a fixed-cost offer for each project (also subject to 30-day deadline from receipt). If the Applicant is requesting hazard mitigation funding, it must determine the actual SOW and hazard mitigation measures to be performed within the 30-day and 18-month deadlines.

Each time FEMA transmits a fixed-cost offer, the Recipient and Applicant have a combined total of 30 calendar days from the date of FEMA's transmittal of the fixed-cost offer to accept the offer (not to exceed the 18-month deadline). FEMA processes projects without accepted fixed-cost offers by the 30-day and 18-month deadlines using standard PA policies and procedures and adjust funding based on actual eligible costs at closeout.

Time extensions to accept fixed-cost offers must be approved by FEMA's Assistant Administrator for Recovery.

## III.  Compliance Reviews

The CRC conducts a series of reviews for program compliance. The Insurance Specialist reviews the Applicant's insurance documentation, calculates required reductions, and documents insurance obtain and maintain requirements as a condition of the award. FEMA EHP staff review the SOW to determine if the SOW has a potential of impacting environmental or historic resources, FEMA EHP staff review the SOW to determine if modifications would reduce potential impacts. and document the EHP requirements as a condition of the award.

# CHAPTER 10:  OBLIGATION AND RECOVERY TRANSITION

This Chapter describes the final review and obligation process, the Recovery Transition Meeting, and provides an overview of PA considerations for transitioning field operations back to the Regional office, a PA Processing Center, or a Long-Term Recovery Office. It also includes PA policy on appeals and provides a summary of arbitration. Recipients and FEMA conduct final project reviews in Phase IV: *Final Reviews*. FEMA obligates Projects and transitions recovery roles and responsibilities in Phase V of the PA Program delivery process, *Obligation and Recovery Transition*.

## I.    Final Review and Obligation

### A.    Recipient Review

Project applications are routed to the Recipient for review before FEMA conducts the final review. The Recipient reviews project applications to ensure that all of the Applicant's incident-related impacts, repair methods, and costs are properly addressed.

### B.    Final Review

The PAGS performs the Final Review to verify the work and costs described in the project application are eligible before obligating funds. The final reviewer ensures the cost share is accurate.

If the Federal cost share is greater than $1 million, the final reviewer submits the project application to the Million Dollar Review queue. FEMA notifies Congress and the Department of Homeland Security of project applications with a Federal cost share greater than $1 million before obligation (including subsequent project amendments). FEMA refers to this as the Large Project Notification (LPN) process.

If the Federal share is less than $1 million, the final reviewer submits the project application into a queue where FEMA obligates the Federal share of the eligible project cost to the Recipient.[348] Once obligated, the Project constitutes the official record of the approved SOW for the Project.

### C.    Obtaining Funds

Strategic Funds Management is FEMA's process for obligating PA funding based on the Applicant's schedule to execute the work. If a Permanent Work Project is greater than $1 million and the Applicant does not need funds for more than 180 days from the time the Project is ready for obligation, FEMA obligates funds based on the project completion schedule. FEMA's *Strategic Funds Management – Implementation Procedures for the Public Assistance Program* (FEMA SOP 9570.24) addresses this obligation process in detail.[349]

---

[348] 44 C.F.R. § 206.202(e).
[349] www.fema.gov/sites/default/files/2020-07/fema_9570.24_startegic-funds-mgmt_SOP_12-21-2012.pdf.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The Recipient is responsible for notifying the Applicant that funds are available[350] and for distributing the funds to the appropriate Subrecipient.[351] Funds that FEMA has obligated are available to the Recipient to pass through to the appropriate Subrecipient.[352]

## II.    Recovery Transition Meeting

The PDMG coordinates with the Recipient to schedule a Recovery Transition Meeting once the Applicant has signed all of its projects in PA Grants Portal. The transition meeting prepares the Applicant for FEMA's transition of PA Operations from the JFO to the Regional office. The PDMG or Recipient representative contacts the Applicant to coordinate meeting logistics, review discussion topics, and identify appropriate Applicant attendees. FEMA, the Recipient, and the Applicant attend the Recovery Transition Meeting.

FEMA uses this meeting to:

- Ensure all claimed damage is sufficiently and accurately documented;
- Discuss record retention requirements;
- Explain deadlines for completion of work and appeals, including Net Small Project Overruns;
- Ensures the Applicant understands the terms and conditions of the projects (e.g., requirements for environmental and historic preservation, procurement, minimum standards, disposition, etc.);
- Transition primary point-of-contact from field personnel to the Recipient; and
- Discuss questions or concerns.

## III.    Transition Field Operation to Regional or Recovery Office

This section provides an overview of PA considerations for transitioning from the JFO and CRC environment, in which project application development is the predominant activity, to the post-JFO environment (e.g., Regional Office or Long-Term Recovery Office), where program management and closeout are predominant.

A JFO closes when most FEMA program and FCO goals have been met. The FCO coordinates with the FEMA Region, FEMA Headquarters, the PAGS, and other program leads to determine closure. PA considerations include the number of remaining:

- Project applications to be written;
- Project applications in each review queue; and
- Recovery Transition Meetings.

Once the JFO closes, PA operations are transferred to the Regional Office or to a Recovery Operation. The Region regains primary responsibility for ongoing operations and the CRC maintains its support role to the region until all project applications for the incident have been processed through obligation.

The need for a PA Recovery Operation exists when the JFO is ready to close but too much work remains for the Region to assume full responsibility for the operation or if the Regional Office is

---

[350] 44 C.F.R. § 206.200(b)(2)(i).
[351] 44 C.F.R. § 206.202(a).
[352] 44 C.F.R. § 206.200(b)(2)(ii).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

located too far from the incident location. In this situation, a Recovery Operation is set up to finish remaining project amendments, complete  required reviews, resolve outstanding issues, and obligate remaining funds. PA Recovery Operations may include the following:

- PA Processing Center: Established by the respective Regional Office after a small to medium sized disaster when IA is no longer active in the disaster area and the FCO has demobilized; the PAGS may still be active in the Processing Center with oversight provided by the Regional Office; and
- Long-Term Recovery Office: Established by FEMA Headquarters after a large disaster.

Transition from a Recovery Operation to the Regional Office varies by region. It typically occurs when project formulation is complete and outstanding issues have been resolved.

# CHAPTER 11: POST AWARD MONITORING

This chapter provides PA policy and procedures on Phase VI: *Post Award Monitoring and Amendments*. This includes reporting requirements, post award changes in SOW, work completion deadlines, and audits.

## I.    Large Project Quarterly Progress Reports

The Large Project Quarterly Progress Report (QPR) is a tool for FEMA and the Recipient to track the progress of Large Projects. FEMA requires the Recipient to report on the status of all open Large Projects on a quarterly basis.[353] Recipients must submit QPRs to FEMA no later than 30 days after the end of each quarter (see Table 6, *Deadlines for Submitting Quarterly Progress Reports*).

The Subrecipient must submit the following for each incomplete Large Project on a quarterly basis:

- ☐ Total expenditures to date;
- ☐ Status of the project (either construction phase or percent complete);
- ☐ Whether the work is complete (per definition in <u>Chapter 11:V. *Work Completion Deadlines*</u>);
- ☐ Projected or actual work completion date (per definition in <u>Chapter 11:V. *Work Completion Deadlines*</u>); and
- ☐ Any circumstances that could delay the project.

In addition to verifying and submitting the Subrecipient's information above, the Recipient must submit the following for each open Large Project on a quarterly basis:

- ☐ Total amount disbursed to the Subrecipient;
- ☐ Whether final payment was made;
- ☐ Whether time extensions were approved; and
- ☐ Latest approved work completion deadline.

### Table 6: Deadlines for Submitting Quarterly Progress Reports

| Quarter | Dates | Report Due Date |
|---------|-------|-----------------|
| 1 | October 1 – December 31 | January 30 |
| 2 | January 1 – March 31 | April 30 |
| 3 | April 1 – June 30 | July 30 |
| 4 | July 1 – September 30 | October 30 |

## II.    Financial Status Reports

Recipients submit Federal Financial Status Reports (FFRs) (SF-425s) quarterly to the respective FEMA Regional Office.[354] The FFR provides the status of funds for the prime award, the

---

[353] 44 C.F.R. § 206.204(f).
[354] 2 C.F.R. § 200.327.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Recipient's expenditure drawdowns, and whether the Recipient is meeting its cost-share requirements.

## III. Federal Funding Accountability and Transparency Act

The Federal Funding Accountability and Transparency Act (FFATA) requires Recipients to register in the FFATA Subaward Reporting System (FSRS) and report on all awards and subawards equal to or greater than $25,000.

## IV. Post Award Change in Scope of Work

While proceeding with the project, the Applicant must ensure that it uses PA funding only for eligible work as identified in the Project). The Applicant may identify a need to change the SOW. The Applicant should engage the Recipient and FEMA as soon as it identifies a change to the SOW to allow FEMA time to review changes for eligibility and EHP compliance requirements prior to commencement of work. If the Applicant begins work associated with a change before FEMA review and approval, it jeopardizes PA funding.

A change requires a written request with detailed justification and documentation to support the eligibility of the requested revision.[355] If the request involves previously unreported damage, the Applicant must also provide documentation demonstrating how the incident caused the damage. The Recipient must forward the request to FEMA with its written recommendation.[356] Table 7: *Information to Support SOW Changes*, indicates the information necessary for FEMA to evaluate a request for a change in SOW.

FEMA engages subject matter experts for technical assistance when necessary to reach a determination of whether the requested change is eligible for PA funding.

Changes in SOW due to one of the following reasons are generally eligible:

- Alternate repair method is more cost-effective than the original proposed repair method;
- Original repair method is not technically feasible;
- Increase in previously approved quantities due to errors and omissions;
- Hidden damage discovered during construction and is disaster-related; or
- The Applicant wishes to pursue an Improved or Alternate Project.

---

[355] 44 C.F.R. § 206.204(e) and 2 C.F.R. § 200.308.
[356] 44 C.F.R. § 206.204(e).

**Table 7. Information to Support SOW Changes**

| Information to Support SOW Changes |
|---|
| **Change in SOW requests should be submitted prior to the approved project deadline and include the following (not an all-inclusive list):**<br><br>☐ Detailed changes to SOW and cost (required)<br>☐ Reason for changes (required)<br>    • If more cost-effective repair: both cost estimates<br>    • If original SOW not feasible: supporting documentation such as technical reports<br>    • If hidden damage (must be found during performance of eligible work):<br>        o Documentation substantiating the damage is related to the declared incident;<br>        o Photographs documenting damage; and<br>        o Change orders<br>☐ Construction timeline / project schedule<br>    • Time extension, if necessary (include information in Table 8. *Information to Support a Time Extension*) |

## A.     Scope of Work Changes on Permanent Work Alternative Procedures Projects

For Alternative Procedures Projects, once the SOW is approved and a fixed-cost offer is accepted:

- The Applicant must notify FEMA prior to making SOW changes that involve:

     o Buildings or structures that are 45 years of age or older,
     o Ground disturbing activities, or
     o Work in or near waterways.

With exception of buildings or structures that are 45 years of age or older, the Applicant does not need to notify FEMA when it intends to make changes that substantially conform to the approved SOW. Changes that substantially conform include items, such as:

- Substitutions in material type (e.g., pre-cast concrete vs. steel beam, stainless steel vs galvanized fasteners); or
- Interior floor plan reconfigurations (e.g., adding, moving or removing rooms/features).

If the Applicant wishes to change the SOW to the extent that it changes the hazard mitigation, such changes must be approved within the 18-month deadline and the fixed-cost offer amount will be adjusted to reflect the cost of the revised hazard mitigation SOW.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# V.    Work Completion Deadlines

FEMA only provides PA funding for work completed and costs incurred[357] within regulatory deadlines (see Figure 17. *Work Completion Deadlines*). The deadline for Emergency Work is 6 months from the declaration date. The deadline for Permanent Work is 18 months from the declaration date.[358] FEMA considers these timeframes to be a project's approved POP.

| Deadlines for Completion of Work | |
| --- | --- |
| Type of Work | Months |
| Emergency Work | 6 |
| Permanent Work | 18 |

**Figure 17. Work Completion Deadlines**

Work completion is defined as the completion of all work associated with the approved SOW including meeting all compliance requirements. It does not include invoice payments, warranty periods, or PA grant management and administration activities (e.g., compiling and submitting closeout documentation, financial reconciliation, requesting payment, etc.). If the Applicant determines it needs additional time to complete work, it must submit a written request for a time extension to the Recipient with the following information:

- Documentation substantiating delays beyond its control;
- A detailed justification for the delay;
- Status of the work; and
- The project timeline with the projected completion date.[359]

The Recipient has authority to extend deadlines for individual projects based on extenuating circumstances. Except for temporary relocation projects, the Recipient may extend Emergency Work up to an additional 6 months and Permanent Work up to an additional 30 months.[360] The Recipient must notify FEMA when it approves a time extension either via FEMA's systems and reporting mechanisms or written notification.[361]

FEMA has authority to extend individual project deadlines beyond these timeframes if extenuating circumstances justify additional time.[362]

The prime award POP begins on the first day of the incident period and initially extends four years from the declaration date. Project extensions cannot exceed the Recipient's prime award POP. Therefore, the Recipient must request FEMA approval for an extension to the prime award POP if it anticipates project work to extend beyond the end of the prime award POP.[363]

FEMA generally considers the following to be extenuating circumstances beyond the Applicant's control:

- Permitting or EHP compliance related delays due to other agencies involved;
- Environmental limitations (such as short construction window);

---

[357] 2 C.F.R. § 200.309 and 44 C.F.R. § 206.204(d)(2).
[358] 44 C.F.R. § 206.204(c)(1).
[359] 44 C.F.R. § 206.204(d)(2).
[360] 44 C.F.R. § 206.204(c)(2)(ii).
[361] Per 2 C.F.R. § 200.308(d)(2), for non-construction Emergency Work, the Recipient must notify FEMA at least 10 days prior to the project deadline.
[362] 44 C.F.R. § 206.204(d).
[363] The FEMA Chief Financial Officer must approve the request.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Inclement weather (site access prohibited or adverse impact on construction); and
- Lack of availability of materials, equipment, or contractors to complete work.

FEMA generally considers the following to be circumstances within the control of the Applicant and not justifiable for a time extension:

- Permitting or environmental delays due to Applicant delays in requesting permits;
- Lack of funding;
- Change in administration or cost accounting system; and
- Compilation of cost documentation.

Although FEMA only provides PA funding for work performed on or before the approved deadline, the Applicant must still complete the approved SOW for funding to be eligible.[364] FEMA deobligates funding for any project that the Applicant does not complete. If the Applicant completes a portion of the approved SOW and the completed work is distinct from the uncompleted work, FEMA only deobligates funding for the uncompleted work. For example, if one project includes funds for three facilities and the Applicant restores only two of the three facilities, FEMA only deobligates the amount related to the facility that the Applicant did not restore.

Table 8: *Information to Support a Time Extension*, indicates the information that the Applicant should submit to support a request for a time extension.

**Table 8. Information to Support a Time Extension**

| Information to Support a Time Extension |
|---|
| **Request should be submitted prior to current approved deadline, be specific to one project, and include the following information with supporting documentation:**<br>☐ Dates and provisions of all previous time extensions<br>☐ Construction timeline / project schedule in support of requested time (required)<br>☐ Basis for time extension request (required)<br> • Delay in obtaining permits<br>   o Permitting agencies involved and application dates<br> • Environmental delays or limitations (e.g., short construction window, nesting seasons)<br>   o Correspondence with various agencies<br>   o Specific details<br> • Inclement weather (prolonged severe weather conditions prohibited access to the area, or adversely impacted construction)<br>   o Specific details<br> • Other reason for delay<br>   o Specific details |

## VI.  Audits

Recipients and Subrecipients are subject to Federal and non-Federal audits. Records are subject to audit by State or Territorial government auditors, FEMA, the U.S. Department of Homeland

---

[364] 44 C.F.R. § 206.204(d)(2).

Security Office of Inspector General, and the U.S. Government Accountability Office (GAO).[365] FEMA may adjust project funding due to audit findings.

## A.      Single Audits

A Recipient or Subrecipient that expends $750,000 or more in Federal funds during its fiscal year must perform a single or program-specific audit.[366]

## B.      Government Accountability Office

The GAO is the investigatory arm of Congress and is under the direction of the Comptroller General of the United States. GAO is an independent, nonpartisan agency that investigates how the Federal Government spends taxpayer dollars. Its mission is to help improve the performance and accountability of the Federal Government. Although the GAO usually audits FEMA programs, it has authority to audit any project.

## C.      Office of the Inspector General

The Department of Homeland Security's Office of Inspector General (OIG) conducts independent audits and investigations on FEMA programs, operations, activities, and functions; how Recipients and Subrecipients expend Federal funds; and oversight of non-Federal audits such as single audits. The OIG evaluates activities to identify, deter, and address fraud, waste, and abuse. The OIG has authority to audit any project, including Alternative Procedures Projects.

## D.      Recovery of Improper Payments

FEMA conducts audit assessments on drawdowns to recover payments identified as improper as required by the Improper Payments Elimination and Recovery Improvement Act (IPERIA). FEMA's *Public Assistance Recovery of Improper Payments Standard Operating Procedure* (SOP 9570.16)[367] provides additional information.

---

[365] 2 C.F.R. § 200.336.
[366] 2 C.F.R. § 200.501.
[367] www.fema.gov/sites/default/files/2020-06/fema_sop9570.16_improper-payment-recoupment-plan_02-28-2014.pdf.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# CHAPTER 12: FINAL RECONCILIATION AND CLOSEOUT

Phase VII: *Final Reconciliation and Closeout* is the final stage of PA Program delivery process. This chapter provides PA policy and procedural requirements for reconciliation and closeout of Projects, Subrecipients, and the PA award.[368]

## I.    Project Reconciliation and Closeout

FEMA requires timely and complete project-level information from the Recipient as work is completed to facilitate efficient and effective closeout of the Recipient's prime award. This section defines requirements for project-level closeout. To initiate project-level closeout, the Subrecipient must inform the Recipient that its project is complete and the date the work was completed. To ensure a timely closeout process, the Subrecipient should notify the Recipient immediately as it completes each Large Project and when it has completed its last Small Project. Subrecipients should not wait for the Quarterly Progress Report to inform the Recipient as it must meet the 90-day closeout deadlines defined throughout this section.

### A.    Small Projects

Once FEMA obligates a Small Project, FEMA does not adjust the approved amount of an individual Small Project. This applies even when FEMA obligates the Project based on an estimate and actual costs for completing the eligible SOW differ from the estimated amount. To close Small Projects, the Recipient must submit a Small Project Completion Certification and certify that:

- The Subrecipient completed the approved SOWs for all of its Small Projects in accordance with the FEMA-State/Territory/Tribe Agreement; and
- It made all payments in accordance with the FEMA-State/Territory/Tribe agreement.[369]

FEMA only adjusts the approved amount on individual Small Projects if one of the following conditions applies:

- The Subrecipient did not complete the approved SOW;
- The Subrecipient requests additional funds related to an eligible change in SOW; or
- The Project contains inadvertent errors or omissions.

In these cases, FEMA only adjusts the specific cost items affected.

If the total actual cost of all of a Subrecipient's Small Projects combined exceeds the total amount obligated for all of the Small Projects, the Subrecipient may request additional funding. The Subrecipient must request the additional funding through the appeal process, described in Chapter 3:V.C. *Appeal Rights and Requirements*, within 60 days of work completion on its last Small Project.[370] FEMA refers to this as a Net Small Project Overrun (NSPO) appeal. The appeal

---

[368] The language in this document supersedes the language in the December 2013 *Public Assistance Program Management and Grant Closeout Standard Operating Procedure* (SOP) 9570.14.
[369] 44 C.F.R. § 206.205(a).
[370] 44 C.F.R. § 206.204(e)(2).

must include actual cost documentation for all Small Projects that FEMA originally funded based on estimate amounts.[371]

If the Subrecipient is not appealing for an NSPO, the Recipient must submit the certification to FEMA within 180 days from the latest Small Project work completion date or the latest approved deadline of the Subrecipient's Small Projects, whichever is sooner. The Recipient must submit certification of completion of all of its own Small Projects within 90 days of the latest Small Project work completion date or the approved deadline of its last Small Projects, whichever is sooner. [372]

Once FEMA receives the Recipient's certification and completes the necessary review, FEMA closes the respective Small Projects and notifies the Recipient in writing.

## B.    Large Projects

FEMA closes Large Projects individually as each is completed.[373] With exception of Capped Projects, the final eligible amount for a Large Project is the actual documented cost incurred to complete the eligible SOW.[374]

The Subrecipient must provide documentation to support the actual costs within 90 days of work completion.[375] The Recipient must submit a Large Project Expenditure Report and Completion Certification and must certify that:

- ☐  All incurred costs are associated with the approved SOW;
- ☐  The Subrecipient completed all work in compliance with the FEMA-State/Territory/Tribe Agreement; and
- ☐  It made all payments in accordance with 2 C.F.R. § 200.305.[376]

The Recipient must submit its certification of the Subrecipient's completion of each Large Project with the final claim for PA funding for the Project and supporting documentation to FEMA within 180 days of the work completion date or the Project deadline, whichever occurs first.[377] The Recipient must submit its certification for each of its own Large Projects within 90 days of the work completion date or the Project deadline, whichever occurs first. If work on a Large Project is complete prior to obligation, the Applicant must still submit actual cost documentation within the 90 days of work completion. However, the Recipient's certification and final payment of claim is due within 180-days from the date of obligation.

At a minimum, Large Project closeout packages must include:

- ☐  A cost breakdown identifying the individual elements that comprise the total actual costs claimed;
- ☐  Subrecipient's accounting of Project expenditures and dates of expenditures (such as a report from its accounting system);

---

[371] 44 C.F.R. § 206.204(e).
[372] 2 C.F.R. § 200.343.
[373] 44 C.F.R. § 206.205(b).
[374] 44 C.F.R. § 206.203(c)(1).
[375] 44 C.F.R. § 206.205(b)(1) and 2 C.F.R. § 200.343.
[376] 44 C.F.R. § 206.205(b)(1).
[377] 2 C.F.R. § 200.343. FEMA allows 180 days based on the combined allowance of 90 days for the Subrecipient and 90 days for the Recipient.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

☐ All applicable documentation to support the actual costs as identified in <u>Chapter 6. *Cost Eligibility*</u>;

☐ Documentation sufficient for FEMA to validate the work performed was consistent with the approved SOW;

☐ Documentation to substantiate compliance with all terms and conditions of the award (e.g., EHP compliance documentation and insurance policies showing additional coverage obtained); and

☐ A summary explaining the documentation submitted.

Prior to closing Projects, FEMA:

- Verifies there are no outstanding appeals or arbitration cases;
- Reviews the invoices and other documentation related to the work performed to validate it was consistent with the approved SOW, including completion of any approved PA mitigation;
- Determines whether the Subrecipient completed the work within the approved deadline (FEMA limits reimbursement to costs incurred within the deadline);
- Ensures no duplication of funding exists (e.g., with insurance or costs in any other related Projects);
- Validates compliance with cost principles, including, but not limited to:
  o Equipment and property disposition;
  o Procurement and contracting; and
  o Reasonableness of costs (FEMA limits reimbursement to what it can determine to be reasonable).
- Validates compliance with all terms and conditions of the award, including, but not limited to:
  o Code and standard requirements;
  o EHP requirements; and
  o Insurance obtain and maintain requirements.
- FEMA reviews and verifies the accuracy of the actual costs and evaluates and reconciles any cost overruns or underruns. If the information is extensive, such as payroll records or trip tickets, FEMA selects and reviews a representative sample of the documents. If FEMA successfully validates the sample, it considers all of the records to be correct. However, if FEMA identifies errors it works with the Recipient to correct the errors and reviews a larger sample. If necessary, based on the number or significance of the errors, FEMA may return the final claim for correction and resubmittal. For Projects with funding changes, FEMA prepares a project amendment and obligates additional funds or reduces funding based on actual costs to complete the eligible SOW.[378]

If the Project included approved PA mitigation measures; FEMA does not re-evaluate the cost-effectiveness of the PA mitigation based on the final actual cost. If during the review, FEMA determines that the Subrecipient performed work that was not included in the approved SOW, the Subrecipient jeopardizes its funding. FEMA designates the project as an Improved Project,

---

[378] 44 C.F.R. § 206.205(b)(2).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

reviews the additional SOW for EHP compliance, and either deobligates or caps funding at the original estimated amount, depending on the outcome of the review.[379]

For Capped Projects, the Subrecipient must provide documentation to support that it used the funds in accordance with the eligibility criteria described in Chapter 8:VIII.B. *Use of Capped Project Funds*.

If the Applicant did not comply with all Federal requirements (e.g., procurement and contracting, codes and standards, EHP, insurance, etc.), FEMA may deobligate either all or a portion of the funding.

Once FEMA completes its review and funding adjustments, FEMA closes the Project and notifies the Recipient in writing.

## C.    Alternative Procedures Permanent Work Projects

Work must be completed by the end of the latest Alternative Procedures Project period of performance and the Recipient must certify that all incurred costs are associated with the approved SOW and that the Subrecipient completed all work in accordance with FEMA regulations and policies. The Recipient must submit its certification to FEMA within 180 days of the Subrecipient completing its last Alternative Procedures Project or the latest Alternative Procedure Project deadline, whichever occurs first, in order for the Subrecipient to retain and use any excess funds.

The closeout certification must include a final report of Alternative Procedures Project costs and documentation to support the following:

- ☐ Summary of actual work completed;
- ☐ Mitigation measures achieved, if applicable;
- ☐ Compliance with EHP requirements;
- ☐ Compliance with the obtain and maintain insurance requirement;
- ☐ Summary of total actual costs to complete the Alternative Procedure Projects;
- ☐ Compliance with Federal procurement procedures; and
- ☐ Actual insurance proceeds received.

Subrecipients do not need to track costs to specific work items. Subrecipients only need to substantiate and certify that all claimed costs are related to the overall work deemed eligible for the Alternative Procedure Projects.

## D.    Subrecipients

The Recipient needs to request that FEMA close each Subrecipient once all of its respective Projects have been completed and closed for the disaster. The Recipient may either request this in the same submittal as the Subrecipient's last Project closeout request or may submit a separate request. The request should include a Project Completion Certification Report as it lists all of the Subrecipient's Projects.

---

[379] 44 C.F.R. § 206.203(d)(1).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

If all of the Subrecipient's Projects are closed and there are no outstanding audits, FEMA closes the Subrecipient and notifies the Recipient in writing.

## II.   Stafford Act Section 705

Stafford Act Section 705 imposes a 3-year limit on FEMA's authority to recover payments made to SLTT government Recipients and Subrecipients unless there is evidence of fraud. Section 705 does not apply to PNPs. To ensure consistent application of the provisions contained in Section 705, FEMA issued Recovery Policy (FP 205-081-2), *Stafford Act Section 705, Disaster Grant Closeout Procedures*, which describes the limitations and requirements in detail.[380]

## III.   Public Assistance Award Closeout

The Recipient must submit its final FFR (SF-425) with a written request to close the PA award. FEMA and the Recipient certify that all work was completed, all eligible costs have been reimbursed, and financially reconciled. The PA program is programmatically closed when FEMA ensures that all PA Projects awarded for the incident met statutory and regulatory requirements. For FEMA to close the PA award, the following conditions should be met:

- FEMA has issued final determinations on all appeals;
- FEMA has obligated all eligible PA funding;
- The Recipient and Subrecipients have completed all PA Projects and have met the statutory and regulatory requirements governing the program, including compliance with EHP requirements and insurance purchase requirements;
- The Recipient has passed through all obligated funds appropriately and submitted its final expenditure report to FEMA;
- FEMA has adjusted the funding level for the program, as appropriate; and
- Both FEMA and the Recipient have completed all administrative actions related to the PA Program.

The Recipient must liquidate all obligations within 90 days of the end of the prime award period of performance.

## IV.   Documentation Retention Requirements

Subrecipients  must maintain all source documentation for each Project[381] for 3 years after the date of transmission of the final expenditure report for project completion as certified by the Recipient.[382] The Recipient must keep all financial and program documentation[383] for 3 years after the date it submits the final SF-425. There are several exceptions to this timeframe that may require longer retention periods, including exceptions relating to real property and equipment disposition, audits, and litigation.[384] Additionally, SLTT government laws may require longer retention periods.

---

[380] www.fema.gov/sites/default/files/2020-04/FP_205-081-2_Stafford_Act--Section_705_Policy.pdf.
[381] 2 C.F.R. § 200.302(b)(3).
[382] Stafford Act § 705(b)(1), 42 U.S.C. § 5205. See FEMA Policy 205-081-2, *Stafford Act Section 705, Disaster Grant Closeout Procedures* for additional details.
[383] 2 C.F.R. § 200.302(b)(3).
[384] 2 C.F.R. § 200.333.

# ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACSR | Aluminum Conductor Steel Reinforced |
| ADA | Americans with Disabilities Act |
| BCA | Benefit-Cost Analysis |
| BFE | Base Flood Elevation |
| BIA | Bureau of Indian Affairs |
| CAA | Clean Air Act |
| CATEX | Categorical Exclusion |
| CBRA | Coastal Barrier Resources Act |
| CBRS | Coastal Barrier Resource System |
| CDC | Centers for Disease Control and Prevention |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| C.F.R. | Code of Federal Regulations |
| CRC | Consolidated Resource Center |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act |
| DFA | Direct Federal Assistance |
| DMP | Debris Management Plan |
| EA | Environmental Assessment |
| EHP | Environmental and Historic Preservation |
| EIS | Environmental Impact Statement |
| EMAC | Emergency Management Assistance Compact |
| EO | Executive Order |
| EOC | Emergency Operation Center |
| EPA | U.S. Environmental Protection Agency |
| ER | Emergency Relief (Program) |
| ERFO | Emergency Relief for Federally Owned Roads (Program) |
| ESA | Endangered Species Act |
| EWP | Emergency Watershed Protection Program |
| FCO | Federal Coordinating Officer |
| FHWA | Federal Highway Administration |
| FIRM | Flood Insurance Rate Map |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| FMAG | Fire Management Assistance Grant |
| FP | FEMA Recovery Policy |
| FSR | Financial Status Report |
| GPS | Global Positioning System |
| HEPA | High-Efficiency Particulate Air |
| HHS | U.S. Department of Health and Human Services |
| HHW | household hazardous waste |
| HMA | Hazard Mitigation Assistance |
| HMGP | Hazard Mitigation Grant Program |
| HMP | Hazard Mitigation Proposal |
| HUD | U.S. Department of Housing and Urban Development |
| HVAC | heating, ventilation, and air conditioning |
| IBD | Infrastructure Branch Director |
| IA | Individual Assistance |
| IHP | Individuals and Households Program |
| JFO | Joint Field Office |
| NCEI | National Centers for Environmental Information |
| NEPA | National Environmental Policy Act |
| NFIP | National Flood Insurance Program |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| NRCS | Natural Resources Conservation Service |
| NWS | National Weather Service |
| PA | Public Assistance |
| PAGS | Public Assistance Group Supervisor |
| PDA | Preliminary Damage Assessment |
| PNP | Private Nonprofit |
| PDMG | Program Delivery Manager |
| PDTFL | Program Delivery Task Force Leader |
| RA | Regional Administrator |
| RCRA | Resource Conservation and Recovery Act |
| RIP | Rehabilitation and Inspection Program |
| ROW | Right-of-Way |

V4 2020

| RPA | Request for Public Assistance |
| RUS | Rural Utilities Service |
| SBA | U.S. Small Business Administration |
| SFHA | Special Flood Hazard Area |
| SHPO | State Historic Preservation Officer |
| SI | Site Inspector |
| SOW | Scope of Work |
| STATEX | Statutory Exclusion |
| T&M | time and materials |
| TFL | Task Force Leader |
| THPO | Tribal Historic Preservation Officer |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USCG | U.S. Coast Guard |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# REFERENCES AND RESOURCES

**<u>Public Assistance Program References</u>**

- https://www.fema.gov/assistance/public
- Archived Policy Documents:  <u>Archives: FEMA Public Assistance Policy | FEMA.gov</u>
- Archived Publications:  <u>Archive: Public Assistance Publications | FEMA.gov</u>
- *Cost Estimating Format (CEF) for Large Projects Standard Operating Procedure* (FEMA SOP 9570.8):  <u>https://www.fema.gov/assistance/public/cost-estimating-tool</u>
- *Damage Assessment Operations Manual*:  <u>Damage Assessment Operations Manual (fema.gov)</u>
- *Debris Estimating Field Guide* (FEMA 329):  <u>www.fema.gov/pdf/government/grant/pa/fema_329_debris_estimating.pdf</u>
- *Direct Reimbursement for Host-State Evacuation and Sheltering Costs* (FEMA SOP 9570.1):  <u>www.fema.gov/9570.1-host-state-sheltering_sop.pdf</u>
- *Environmental and Historic Preservation (EHP) Fact Sheet for Debris Removal Activities*:  <u>https://www.fema.gov/grants/guidance-tools/environmental-historic</u>
- Equipment Rates:  <u>www.fema.gov/schedule-equipment-rates</u>
- *Infectious Disease Event Fact Sheet* (FP 104-009-001):  <u>Infectious Disease Event, Fact Sheet  (www.fema.gov)</u>
- Mission Assignments for ESF #10 (FEMA 9523.8):  <u>www.fema.gov</u>
- FEMA Recovery Interim Policy, *Consensus-Based Codes, Specifications and Standards for Public Assistance* (FP 104-009-11): <u>Consensus-Based Codes and Standards V2.1 - DRRA 1235(b) (fema.gov)</u>
- FEMA Recovery Policy, *Public Assistance Management Costs (Interim)* (FP 104-11-2):  <u>www.fema.gov/sites/default/files/2020-07/pa_management_costs_interim_policy.pdf</u>
- *Field Manual* (Procurement Information for FEMA Public Assistance Award Recipients and Subrecipients):  <u>Field Manual PDAT (fema.gov)</u>
- *Public Assistance Building Back Better Fact Sheet*:  <u>Public Assistance Building Back Better (fema.gov)</u>
- *Public Assistance Fact Sheet*:  <u>Policy, Guidance and Fact Sheets | FEMA.gov</u>
- *Public Assistance Management Costs Interim Policy Fact Sheet*:  <u>https://www.fema.gov/sites/default/files/2020-07/fema_pa_management-costs-interim_policy.pdf</u>
- *Public Assistance Management Costs Standard Operating Procedures*:  <u>PA Management Costs SOP (fema.gov)</u>
- *Private Nonprofit Houses of Worship Fact Sheet*:  <u>Private Nonprofit Houses of Worship FAQ (fema.gov)</u>
- *Public Assistance Debris Removal Tips Fact Sheet*:  <u>www.fema.gov/sites/default/files/2020-07/fema_pa_debris-removal-tips.pdf</u>
- *Public Assistance Policy on Insurance* (FP 206-086-1):  <u>www.fema.gov/sites/default/files/2020-05/FP206-086-1_PublicAssistancePolicyInsurance_062915.pdf</u>

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- *Public Assistance Policy on Stafford Act Section 705, Disaster Grant Closeout Procedures* (FP 205-081-2): FP 205-081-2 Stafford Act Section 705 Policy (fema.gov)
- *Public Assistance Recovery of Improper Payments Standard Operating Procedures* (FEMA SOP 9570.16): SOP 9570.16 Improper Payment Recoupment (fema.gov)
- *Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment Frame Buildings* (FEMA 352): www.nehrp.gov/pdf/fema352.pdf
- *Safe Rooms for Tornadoes and Hurricanes, Guidance for Community and Residential Safe Rooms* (FEMA P-361): www.fema.gov/sites/default/files/2020-07/safe-rooms-tornadoes-hurricanes.pdf
- Small Business Administration Loans: www.sba.gov/content/sba-loans
- *State-Led Public Assistance Guide*: www.fema.gov/sites/default/files/2020-07/fema_state-led-public-assistance_Guide_2-1-2019.pdf
- *Strategic Funds Management – Implementation Procedures for the PA Program* (FEMA SOP 9570.24): www.fema.gov/2020-07/fema_9570.24_startegic-funds-mgmt.pdf
- *Validation of Small Projects* (FEMA SOP 9570.6): SOP Validation 7-2-cover.doc (fema.gov)

**Forms**

- Application for Federal Assistance (SF-424) and Assurances (SF 424-D): www.grants.gov/forms/sf-424-family.html
- Federal Financial Status Report (FFR) (SF-425): www.grants.gov/forms/post-award-reporting-forms.html
- Request for Public Assistance: www.fema.gov/assistance/public/apply

**Statutes**

- *The Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended* (Stafford Act), Title 42 of the United States Code (U.S.C.) § 5121 et seq.
- www.fema.gov/robert-t-stafford-disaster-relief-and-emergency-assistance-act-public-law-93-288-amended
- Federally Recognized Tribe List Act of 1994: http://uscode.house.gov/statutes/pl/103/454.pdf

**Code of Federal Regulations**

- Title 2 of the Code of Federal Regulations (C.F.R.), Grants and Agreements: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&tpl=/ecfrbrowse/Title02/2tab_02.tpl
- 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt2.1.200&rgn=div5
- 7 C.F.R. § 1730.25, Corrective action (Rural Utilities Service [RUS] borrowers only): www.ecfr.gov/cgi-bin/text-

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt7.11.1730&rgn=div5 #se7.11.1730_125

- 15 C.F.R. Part 774, The Commerce Control List: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt15.2.774&rgn=div5
- 22 C.F.R. Part 121, The United States Munitions List: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt22.1.121&rgn=div5
- 40 C.F.R. Part 261, Identification and Listing of Hazardous Waste: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt40.26.261&rgn=div5
- 40 C.F.R. Parts 1500–1508, NEPA Regulations: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&tpl=/ecfrbrowse/Title40/40cfr v33_02.tpl#1500
- 44 C.F.R., Emergency Management and Assistance: www.ecfr.gov/cgi-bin/text-idx?SID=e9db96b738b11340c696c4ee451d3865&mc=true&tpl=/ecfrbrowse/Title44/44t ab_02.tpl
- 44 C.F.R. Part 9, Floodplain Management and Protection of Wetlands: www.ecfr.gov/cgi-bin/text-idx?SID=e9db96b738b11340c696c4ee451d3865&mc=true&node=pt44.1.9&rgn=div5
- 44 C.F.R. Part 201, Mitigation Planning: www.ecfr.gov/cgi-bin/text-idx?SID=e9db96b738b11340c696c4ee451d3865&mc=true&node=pt44.1.201&rgn=div5
- 44 C.F.R. Part 204, Fire Management Assistance Grant (FMAG) Program: www.ecfr.gov/cgi-bin/text-idx?SID=e9db96b738b11340c696c4ee451d3865&mc=true&node=pt44.1.204&rgn=div5
- 44 C.F.R. Part 206, Federal Disaster Assistance: www.ecfr.gov/cgi-bin/text-idx?SID=e9db96b738b11340c696c4ee451d3865&mc=true&node=pt44.1.206&rgn=div5
- 48 C.F.R. Subpart 2.1, Federal Acquisition Regulation: www.ecfr.gov/cgi-bin/text-idx?SID=6bb67f6254dbbfb229adddfa247ca4eb&mc=true&node=pt48.1.2&rgn=div5#sp 48.1.2.2_11

## Environmental Protection Laws and Executive Orders

- Clean Air Act (CAA): www.epa.gov/air/caa/
- Clean Water Act (CWA): www.epa.gov/laws-regulations/summary-clean-water-act
- Coastal Barrier Resources Act (CBRA): www.fws.gov/ecological-services/habitat-conservation/cbra/Act/index.html
- John H. Chafee Coastal Barrier Resources System (CBRS): www.fws.gov/ecological-services/habitat-conservation/coastal.html
- Coastal Zone Management Act (CZMA): coast.noaa.gov/czm/act/
- Comprehensive Environmental Response Compensation and Liability Act (CERCLA): www.epa.gov/superfund/policy/cercla.htm
- Endangered Species Act (ESA): www.fws.gov/endangered/laws-policies/

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Farmland Protection Policy Act (FPPA): www.nrcs.usda.gov/wps/portal/nrcs/detail/?cid=nrcs143_008275
- Fish and Wildlife Coordination Act: www.fws.gov/laws/lawsdigest/fwcoord.html
- Magnuson-Stevens Fishery Conservation and Management Act: www.fisheries.noaa.gov/resource/document/magnuson-stevens-fishery-conservation-and-management-act
- Migratory Bird Treaty Act: www.fws.gov/laws/lawsdigest/migtrea.html
- National Environmental Policy Act (NEPA): www.epa.gov/nepa
- Resource Conservation and Recovery Act (RCRA): www.epa.gov/rcra
- Wild and Scenic Rivers Act: www.rivers.gov/wsr-act.php
- Executive Order (EO) 11988, Floodplain Management: https://www.fema.gov/emergency-managers/practitioners/environmental-historic/laws/descriptions#11988
- EO 11990, Protection of Wetlands: https://www.fema.gov/emergency-managers/practitioners/environmental-historic/laws/descriptions#11990
- EO 12898, Environmental Justice: https://www.fema.gov/emergency-managers/practitioners/environmental-historic/laws/descriptions#12898

## Historic Preservation Laws and Tools

- Advisory Council on Historic Preservation: www.achp.gov
- American Institute for Conservation Code of Ethics and Guidelines for Practice: www.culturalheritage.org/about-conservation/code-of-ethics
- National Historic Preservation Act (NHPA): www.nps.gov/history/local-law/nhpa1966.htm
- National Register of Historic Places: www.nps.gov/subjects/nationalregister/index.htm

## Other Laws and EOs

- Americans with Disabilities Act (ADA): www.ada.gov
- EO 13717, Establishing a Federal Earthquake Risk Management Standard: www.gpo.gov/fdsys/pkg/FR-2016-02-05/pdf/2016-02475.pdf

## Federal Emergency Management Agency References

- FEMA: www.fema.gov
- FEMA Stafford Act Declaration Process Fact Sheet: https://www.fema.gov/disasters/how-declared
- FMAG Program: www.fema.gov/fire-management-assistance-grant-program
  - FMAG Program Guide (FEMA P-954): www.fema.gov/sites/default/files/2020-06/FMAG-guide-feb-2014_02-28-2014.pdf
- Federal Insurance and Mitigation Administration (FIMA): www.fema.gov/about/offices/insurance-mitigation

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- o FIMA Policy (FP 306-112-1): www.fema.gov/about/offices/insurance-mitigation
- o National Flood Insurance Program (NFIP): www.fema.gov/flood-insurance
- o Hazard Mitigation Assistance (HMA) Programs: www.fema.gov/grants/mitigation
- o HMA Guidance: Hazard Mitigation Assistance Guidance | FEMA.gov
- o Hazard Mitigation Grant Program (HMGP): www.fema.gov/grants/mitigation
- o State Hazard Mitigation Officer: www.fema.gov/grants/mitigation/state-contacts

- Individual Assistance (IA) Programs: www.fema.gov/assistance/individual
  - o Individuals and Households Program (IHP): www.fema.gov/assistance/individual/program
- National Disaster Recovery Framework (NDRF): www.fema.gov/emergency-managers/national-preparedness/frameworks/recovery
- National Response Framework (NRF): www.fema.gov/emergency-managers/national-preparedness/frameworks/response

## Other Federal Agencies

- Bureau of Indian Affairs (BIA): www.indianaffairs.gov
- Federal Highway Administration (FHWA): www.fhwa.dot.gov
  - o FHWA Emergency Relief Program (ERP): www.fhwa.dot.gov/programadmin/erelief.cfm
- National Oceanic and Atmospheric Administration (NOAA): www.noaa.gov
  - o National Marine Fisheries Service (NMFS): www.nmfs.noaa.gov
  - o National Centers for Environmental Information (NCEI), formerly known as the National Climatic Data Center (NCDC): www.ncei.noaa.gov
  - o NWS Cooperative Network Stations: www.nws.noaa.gov/om/coop/
- Natural Resources Conservation Service (NRCS): www.nrcs.usda.gov
  - o NRCS Emergency Watershed Protection Program (EWP): www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/ewpp
- National Weather Service (NWS): www.weather.gov
- U.S. Army Corps of Engineers (USACE): www.usace.army.mil
  - o USACE Rehabilitation and Inspection Program (RIP): www.usace.army.mil/Missions/CivilWorks/LeveeSafetyProgram/LeveeInspections.aspx
- U.S. Coast Guard (USCG): www.uscg.mil
- U.S. Department of Agriculture (USDA): www.usda.gov
  - o Farm Service Agency: www.fsa.usda.gov
- U.S. Department of Health and Human Services (HHS): www.hhs.gov

V4 2020

- o Centers for Disease Control and Prevention (CDC): www.cdc.gov
- U.S. Department of Homeland Security (DHS): www.dhs.gov
  - o DHS Office of Inspector General (OIG): www.oig.dhs.gov
- U.S. Department of Housing and Urban Development (HUD): www.hud.gov
  - o Community Development Block Grant Program:
    www.hud.gov/program_offices/comm_planning/communitydevelopment/program
    s
- U.S. Department of Labor: www.dol.gov
- U.S. Environmental Protection Agency (EPA): www.epa.gov
- U.S. Fish and Wildlife Service (USFWS): www.fws.gov
- U.S. Government Accountability Office (GAO): www.gao.gov

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# TERMS AND DEFINITIONS

**Acquisition cost**

The net invoice price of equipment including the cost of modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose it was acquired. Other charges such as the cost of installation, transportation, taxes, duty, or protective in-transit insurance, shall be included or excluded from the unit acquisition cost in accordance with the Recipient's regular accounting practices.

**Animal**

Any living or dead member of the animal kingdom, including any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod, or other invertebrate or any part thereof.

**Applicant**

A non-Federal entity submitting an application for assistance under the Recipient's Federal award.

**Assistance Animal**

An animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provide emotional support that alleviates identified symptoms or effects of a person's disability. Although dogs are the most common type of assistance animal, other animals can also be assistance animals.

**Award (Federal)**

The financial assistance that a non-Federal entity receives either directly from a Federal awarding agency or indirectly from a pass-through entity; or the cost-reimbursement contract under the Federal Acquisition Regulation that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity.

**Backfill Employee**

A replacement employee who performs the regular duties of other personnel.

**Coastal zone**

The coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of coastal States, including islands, transitional and intertidal areas, salt marshes, wetlands, and beaches.

**Cost-to-charge ratio**

A ratio established by Medicare to estimate a medical service provider's actual costs in relation to its charges.

**Critical action**

An action for which even a slight chance of flooding is too great. The minimum floodplain of concern for critical actions is the 500-year floodplain (also referred to as the critical action floodplain).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Current fair market value

The value of equipment and supplies determined by selling them in a competitive market or by researching advertised prices for similar items on the used market.

## Duplication of Benefits

Funding received from two sources for the same item of work.

## Educational institution

Any elementary school as defined by section 801(c) of the Elementary and Secondary Education Act of 1965; any secondary school as defined by section 801(h) of the Elementary and Secondary Education Act of 1965; or any institution of higher education as defined by section 1201 of the Higher Education Act of 1965.

## Emergency

Any occasion or instance for which the President determines Federal assistance is needed to supplement SLTT efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States.

## Emergency Protective Measure

An action taken by a community before, during, and after an incident to save lives, protect public health and safety, and prevent damage to improved public and private property.

## Emergency Work

Work that must be done immediately to save lives, protect improved property, protect public health and safety, or avert or lessen the threat of a major disaster.

## Equipment

Tangible personal property, including information technology systems, having a useful life of more than 1 year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $5,000.

## Facility

Any publicly or privately-owned building, works, system or equipment—built or manufactured—or an improved and maintained natural feature. Land used for agricultural purposes is not a facility.

## Federal agency

Any department, independent establishment, government corporation, or other agency of the executive branch of the Federal Government, including the United States Postal Service, but not including the American National Red Cross.

## Federal share

The portion of the total project costs that are paid by Federal funds.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Final expenditure report**

The report the Recipient submits to FEMA for all of a Subrecipient's Projects, certifying that the grant terms and conditions have been met and project costs are reconciled.

**Flood control work**

A structure such as a levee, flood wall, flood control channel, or water control structure that was designed and constructed to have appreciable effects in preventing damage by irregular and unusual rises in water level.

**Flood fighting**

An activity or measure (e.g., sandbagging, buttressing) intended to prevent or stop flooding, at levels above flood stage, or to prevent structural failure.

**Force account**

An Applicant's own labor forces and equipment.

**Fringe benefits**

A percentage of the actual wages that pays for employee benefits.

**Immediate threat**

The threat of additional damage or destruction from an event that can reasonably be expected to occur within 5 years.

**Improved property**

A structure, facility, or item of equipment that was built, constructed, or manufactured. Land used for agricultural purposes is not improved property.

**Incident period**

The time span during which the disaster-causing incident occurs.

**Indian Tribal Government**

Any federally recognized governing body of an Indian or Alaska Native Tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe under the Federally Recognized Tribe List Act of 1994, Title 25 of the U.S. Code (U.S.C.) 479a. This does not include Alaska Native corporations, the ownership of which is vested in private individuals.

**Indirect cost**

A cost incurred for a common or joint purpose benefiting more than one cost objective that is not readily assignable to the cost objectives specifically benefited.

**Inland zone**

The environment inland of the coastal zone excluding the Great Lakes and specified ports and harbors on inland rivers. Precise boundaries are identified in Federal regional contingency plans.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Large Project**

A project for which the final obligated (Federal and non-Federal) amount is equal to or *greater* than the annually adjusted cost threshold for small project grants.

**Local government**

A county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments(regardless of whether the council of governments is incorporated as a nonprofit corporation under State law), regional or interstate government entity, or agency or instrumentality of a local government; an Indian Tribe or authorized tribal organization, or Alaska Native village or organization that does not meet the definition of Indian Tribal Government; or a rural community, unincorporated town or village, or other public entity, for which an application for assistance is made by a State or political subdivision of a State.

**Major disaster**

Any natural catastrophe (including any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, for which the President determines causes damage of sufficient severity and magnitude to warrant major disaster assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended to supplement the efforts and available resources of SLTT governments and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby.

**Management cost**

Any indirect cost, any direct administrative cost, and any other administrative expense associated with a specific project under a major disaster or emergency.

**Museum**

A facility that preserves and exhibits a documented collection of artistic, historic, scientific, or other objects.

**Non-Federal entity**

An institution of higher education, nonprofit organization, local government, Indian Tribe, or State that carries out a Federal award as a Recipient or Subrecipient.

**Pass-through entity**

A non-Federal entity that provides a subaward to a Subrecipient to carry out part of a Federal program.

**Period of performance**

The time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award.

**Permanent Work**

Restorative work that must be performed through repairs or replacement to restore an eligible facility on the basis of its pre-disaster design and current applicable codes and standards.

**Personal property**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Property other than real property. It may be tangible, having physical existence, or intangible.

**Pet (household)**

A Domesticated animal that is traditionally kept in the home for pleasure rather than for commercial purposes, can travel in a commercial carrier, and can be housed in a temporary facility. Examples are dogs, cats, birds, rabbits, rodents, and turtles. Household pets do not include reptiles (except turtles), amphibians, fish, insects, arachnids, farm animals (including horses), or animals kept for racing purposes.

**Pre-disaster design**

The size or capacity of a facility as originally designed and constructed or subsequently modified by changes or additions to the original design. It does not mean the capacity at which the facility was being used at the time the major disaster occurred if different from the most recent designed capacity.

**Pre-disaster function**

The function the facility was performing immediately prior to the disaster.

**Private nonprofit organization**

Any nongovernmental agency or entity that currently has an effective ruling letter from the U.S. Internal Revenue Service, granting tax exemption under Sections 501(c), (d), or (e) of the Internal Revenue Code, or satisfactory evidence from the State that the nonrevenue producing organization or entity is a nonprofit one organized or doing business under State law.

**Private roads**

Roads that are not owned or operated by or otherwise the legal responsibility of a Federal or SLTT entity (including orphan roads, roads in gated communities, homeowners' association roads, etc.).

**PNP custodial care facility**

A building, structure, or system, including those for essential administration and support, that is used to provide institutional care for persons who require close supervision and some physical constraints on their daily activities for their self-protection, but do not require day-to-day medical care.

**PNP educational facility**

Classrooms plus related supplies, equipment, machinery, and utilities of an educational institution necessary or appropriate for instructional, administrative, and support purposes.

**PNP emergency facility**

A building, structure, equipment, or system used to provide emergency services, such as fire protection, ambulance, or rescue, to the general public, including the administrative and support facilities essential to the operation of such emergency facilities, even if not contiguous.

**PNP medical facility**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

A hospital, outpatient facility, rehabilitation facility, or facility for long-term care as such terms are defined in Section 645 of the Public Health Service Act (42 U.S.C. 291o) and any similar facility offering diagnosis or treatment of mental or physical injury or disease, including the administrative and support facilities essential to the operation of such medical facilities even if not contiguous.

**Project**

A logical grouping of work required as a result of the declared major disaster or emergency.

**Providing entity**

The entity providing mutual aid assistance to a requesting entity pursuant to a local or statewide mutual aid agreement.

**Public entity**

An organization formed for a public purpose whose direction and funding are provided by one or more political subdivisions of the State.

**Public facility**

Any of the following facilities owned by a SLTT government: any flood control, navigation, irrigation, reclamation, public power, sewage treatment and collection, water supply and distribution, watershed development, or airport facility; any non-Federal aid, street, road, or highway; and any other public building, structure, or system, including those used for educational, recreational, or cultural purposes; or any park.

**Real property**

Land, including land improvements, structures, and appurtenances thereto, but excludes moveable machinery and equipment.

**Recipient**

A non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program.

**Reasonable cost**

A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. In other words, a reasonable cost is a cost that is both fair and equitable for the type of work being performed.

**Rehabilitation facility**

A facility that primarily provides diagnosis and treatment for rehabilitation of injuries, disabilities, or illness. (Consistent with the definition of "comprehensive outpatient rehabilitation facility" in 42 U.S.C. § 1395x(cc)(2)).

**Request for Public Assistance**

The form a public entity or PNP organization uses to apply for assistance under the Public Assistance Program.

**Requesting Entity**

An entity that requests mutual aid assistance from a Providing Entity for work resulting from a declared fire, emergency, or major disaster within its legal jurisdiction.

**Service animal**

A dog that is individually trained to do work or perform tasks for people with disabilities or access and functional needs.

**Simplified acquisition threshold**

The dollar amount below which a non-Federal entity may purchase property or services using small purchase methods. The simplified acquisition threshold is set by the Federal Acquisition Regulation at 48 C.F.R. Subpart 2.1 (Definitions) and in accordance with 41 U.S.C. 1908. As of the publication of this part, the simplified acquisition threshold is $150,000, but this threshold is periodically adjusted for inflation.

**Small Project**

A project for which the final obligated (Federal and non-Federal) amount is less than the annually adjusted cost threshold for small project grants.

**Special Flood Hazard Area**

The land area subject to inundation during a flood having a 1 percent chance of being equaled or exceeded in a given year (also referred to as the base flood or 100-year flood). Special Flood Hazard Areas are shown on FIRMs published by FEMA.

**State**

Any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, U.S. Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

**Subaward**

An award provided by a pass-through entity to a Subrecipient for the Subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.

**Subrecipient**

A non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program. It does not include an individual that is a beneficiary of such program. A Subrecipient may also be a Recipient of other Federal awards directly from a Federal awarding agency.

**Substantial Damage**

Damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

**Supply**

Any tangible personal property other than that meeting the definition of equipment.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Trust land**

Land, the title to which is held by the United States in trust for an Indian Tribe or individual, or which is held by an Indian Tribe or individual subject to a restriction by the United States against alienation. "Trust or restricted interest in land" or "trust or restricted interest in a parcel of land" means an interest in trust land. Collectively referred to as "trust lands."

**Wetland**

An area that is saturated by water with a frequency sufficient to support or, under normal hydrologic conditions would support, a prevalence of vegetation or aquatic life typically adapted to saturated or seasonally saturated soil conditions (e.g., swamp, fresh and saltwater marsh, bog, fen).

**Zoo**

Any facility maintained under the care of a Doctor of Veterinary Medicine, in which live animal(s) are kept for public exhibition or education. Aquariums and wildlife or zoological parks may meet this definition.

# APPENDIX A: ENVIRONMENTAL AND HISTORIC PRESERVATION COMPLIANCE

The following statutes and Executive Orders (EOs) are commonly encountered Federal requirements that were established to protect the environment and preserve the Nation's historic and archaeological resources. FEMA reviews each Public Assistance (PA) project to ensure the work complies with applicable Federal environmental and historic preservation (EHP) laws, their implementing regulations, and applicable EOs. Compliance with all Federal and SLTT laws is a requirement of every FEMA award. SLTT laws, such as hazardous material management laws, vary by location and are not included in this appendix.

FEMA prepares a Greensheet at the beginning of each emergency or disaster declaration with specific information relevant to each State and area. The Greensheet briefly discusses the relevant laws and project types that might trigger application of those laws and informs the Applicant that failure to comply with Federal and SLTT laws may jeopardize funding.

## National Environmental Policy Act

Section 102 of the National Environmental Policy Act (NEPA) requires Federal agencies to integrate environmental values into their decision-making processes by considering the environmental impacts of their proposed actions and reasonable alternatives to those actions.[385] The White House Council on Environmental Quality publishes its NEPA regulations in Title 40 of the Code of Federal Regulations (C.F.R.) Parts 1500–1508. The U.S. Department of Homeland Security publishes policies and procedures for implementing NEPA and provide specific processes that FEMA must follow before funding a project. The NEPA process ensures consideration of environmental consequences of the project before decisions are made and involves the public.

## National Historic Preservation Act

Section 106 of the National Historic Preservation Act (NHPA) requires FEMA to consider the effects an undertaking will have on historic properties and provide the Advisory Council on Historic Preservation the opportunity to comment on the effects of the undertaking.[386] Historic properties include buildings or groups of buildings (districts), structures, objects, landscapes, archaeological sites, and traditional cultural properties included in, or eligible for inclusion in, the National Register of Historic Places.[387]

## Endangered Species Act

The Endangered Species Act (ESA) requires Federal agencies to use their authorities to conserve federally listed threatened and endangered species (listed species) and critical habitats. FEMA must also consult with the U.S. Fish and Wildlife Service (USFWS) and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NMFS), also known as NOAA Fisheries, to ensure that proposed projects will not jeopardize the continued

---

[385] 42 U.S.C. § 4332.
[386] 16 U.S.C. § 470f.
[387] www.nps.gov/subjects/nationalregister/index.htm.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

existence of any listed species or result in the destruction or adverse modification of critical habitat for listed species.[388]

## Clean Water Act

The Clean Water Act (CWA) establishes the basic structure for regulating discharges of pollutants in the waters of the United States (e.g., rivers and streams, lakes and ponds, coastlines, wetlands, estuaries). The CWA makes it unlawful to discharge any pollutant from a specific source into navigable waters without the appropriate CWA permits from the U.S. Army Corps of Engineers (USACE) or State regulatory agency.[389] In addition, the CWA requires authorization for dredging or filling in waters (including disposal of dredged material).

## Rivers and Harbors Act

The Rivers and Harbors Act requires that authorization be obtained from USACE to construct any structure in or over any navigable water, including authorization for projects involving constructing or modifying bridges and causeways over navigable waters or constructing any dam or dike in a navigable water. Typically, requests for this type of authorization are handled together with requests for authorization of projects under Section 404 of the CWA.

## Safe Drinking Water Act

The purpose of the Safe Drinking Water Act is to protect public health by ensuring the quality of drinking water. The law authorizes the U.S. Environmental Protection Agency (EPA) to, among other things, set standards for the levels of individual contaminants allowed in drinking water and designate as aquifers that are the sole or principal source of drinking water for an area as sole source aquifers. For any financial assistance project that has the potential to contaminate an aquifer and that is located in the identified review area for a sole source aquifer, FEMA must consult with the EPA before funding the project.

## Clean Air Act

The Clean Air Act (CAA) protects the Nation's air through the reduction of smog and atmospheric pollution. Air quality compliance often requires certain measures be implemented, such as dust abatement, vehicle emissions control, fuel storage, and distribution procedures. There may be additional requirements in nonattainment areas (defined as those areas that do not meet national standards for air quality and, therefore, require more rigorous compliance measures).[390]

## Coastal Barrier Resources Act

The Coastal Barrier Resources Act (CBRA)[391] established the John H. Chafee Coastal Barrier Resources System (CBRS), which consists of relatively undeveloped coastal barriers along the Atlantic, Gulf, Great Lakes, and Caribbean coasts. CBRA minimizes adverse impacts to these areas by restricting Federal assistance that encourages development within the CBRS. USFWS

---

[388] 16 U.S.C. § 1536, Endangered Species Act Section 7.
[389] 33 U.S.C. § 1251 et seq.
[390] 42 U.S.C. § 7401 et seq.
[391] 16 U.S.C. § 3501 et seq.

publishes maps designating these areas.[392] FEMA must consult with USFWS prior to providing PA funding for work within the CBRS.[393]

## Migratory Bird Treaty Act

The Migratory Bird Treaty Act makes it unlawful to pursue, hunt, take, capture, kill, or sell migratory birds listed in the statute without a waiver from USFWS.[394] FEMA consults with USFWS regarding projects likely to trigger compliance with this Act.

## Bald and Golden Eagle Protection Act

The Bald and Golden Eagle Protection Act prohibits any person from pursuing, capturing, killing, wounding, disturbing, or otherwise taking bald eagles or golden eagles, including their parts (e.g., feathers), nests, or eggs, unless authorized by a permit from the USFWS. The prohibition on disturbance applies to nests and previously used nest sites when eagles are not present if, were an eagle to return, such alterations would lead to injury, death or nest abandonment.

## Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act is the primary law for managing and maintaining sustainable fisheries in waters of the United States. The Magnuson-Stevens Fishery Conservation and Management Act protects essential fish habitat, which includes the waters and substrate necessary to maintain healthy fisheries. FEMA must consult with NMFS when any proposed PA project could have an adverse effect on essential fish habitat (defined as any impact that reduces quality or quantity of essential fish habitat).[395]

## Marine Mammal Protection Act

The Marine Mammal Protection Act prohibits, with certain exceptions, the "take" of marine mammals in U.S. waters or by U.S. citizens on the high seas. The law prohibits attempts to hunt, capture, kill, or harass any marine mammals. The law authorizes NMFS or USFWS (depending on the species in question) to issue incidental take permits and incidental harassment authorizations.

## National Marine Sanctuaries Act (NMSA)

The National Marine Sanctuaries Act, which is part of the Marine Protection, Research and Sanctuaries Act, authorizes the Secretary of Commerce to designate and manage areas of the marine environment as National Marine Sanctuaries (NMS), which NOAA administers. Activities within each NMS are governed by regulations. A sanctuary resource is defined as any living or nonliving resource of a NMS that contributes to the conservation, recreational, ecological, historical, educational, cultural, archeological, scientific, or aesthetic value of the sanctuary. The National Marine Sanctuaries Act prohibits destroying, injuring, or causing the

---

[392] 16 U.S.C. §§ 3501 and 3503. The U.S. Fish and Wildlife Service publishes Coastal Barrier Resource System maps at: www.fws.gov/ecological-services/habitat-conservation/cbra/Maps/index.html.
[393] 16 U.S.C. § 3505.
[394] 16 U.S.C. §§ 703–712.
[395] 16 U.S.C. §§ 1801–1884.

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

loss of any sanctuary resource. A permit is required to conduct any activity within a sanctuary that is otherwise prohibited.

## Coastal Zone Management Act

The Coastal Zone Management Act (CZMA) provides for the management of the Nation's coastal resources. The CZMA establishes a voluntary partnership between the Federal Government and coastal and great lakes States. It requires participating States to develop State coastal zone management plans. PA projects located in, or near, established coastal zone management areas must be consistent with the enforceable policies of the State's federally approved coastal zone management program.[396] Before approving a project in a coastal zone management area, FEMA consults with the State agency overseeing the implementation of the CZMA plan to ensure the project is consistent with the program's provisions.

## Farmland Protection Policy Act

The Farmland Protection Policy Act is intended to minimize the extent to which Federal programs contribute to the conversion of prime or unique farmland, or land of statewide or local importance, to nonagricultural uses and to ensure that Federal programs are administered in a manner that, to the extent practicable, will be compatible with State, local, and private programs and policies to protect farmland. The Farmland Protection Policy Act and U.S. Department of Agriculture (USDA) implementing procedures require FEMA to evaluate whether projects it funds irreversibly convert such farmland to nonagricultural uses and to consider alternative actions that could avoid adverse effects. For projects that have the potential to irreversibly convert such farmland, FEMA must consult with the USDA Natural Resources Conservation Service (NRCS) to identify potential impacts to that farmland.[397]

## Wild and Scenic Rivers Act

The Wild and Scenic Rivers Act protects the free-flowing condition of rivers that are part of the National Wild and Scenic Rivers System (System) or are under study for inclusion in the System because of their scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values (the rivers under study are listed on the Nationwide Rivers Inventory or have been formally identified as Study Rivers). If a proposed project is located on a river covered by the Wild and Scenic Rivers Act (including a designated river, a Study River, or a river on the Nationwide Rivers Inventory),  FEMA must review it for compliance with the Wild and Scenic Rivers Act and consult with the managing agency for the affected designated river.[398]

## Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act (RCRA) established a framework for Federal, State, and local cooperation for controlling the management of hazardous and non-hazardous solid waste. EPA's role is to establish minimum regulatory standards, usually implemented by the States, which can establish their own requirements for solid waste management. RCRA

---

[396] 16 U.S.C. § 1451 et seq.
[397] 7 U.S.C. § 4201 et seq.
[398] 16 U.S.C. § 1271 et seq.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

requires the safe disposal of waste materials, promotes the recycling of waste materials, and encourages cooperation with local agencies.[399]

## Comprehensive Environmental Response, Compensation and Liability Act

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as Superfund, authorizes the Federal Government to respond to releases or threatened releases of hazardous substances into the environment through short-term removals and long-term remedial response actions. Superfund also triggered the development of the National Priorities List, a list of national priorities among the sites with known or threatened releases of hazardous contaminants. The 1986 amendments to CERCLA included the Emergency Planning and Community Right-to-Know Act (EPCRA) which, among other things, creates mechanisms to help local communities plan for chemical emergencies.

## Executive Order 11988, Floodplain Management

EO 11988, Floodplain Management, requires Federal agencies to minimize or avoid, to the extent possible, the long- and short-term adverse impacts associated with occupancy and modifications of floodplain and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. It requires Federal agencies to use a systematic decision-making process to evaluate the potential effects of projects located in, or affecting, floodplains; document each step of the process; and involve the public in the decision-making process. This process is designed to:

- Reduce flood loss risks;
- Minimize the impacts of floods on human safety, health, and welfare; and
- Restore and preserve the natural and beneficial functions of floodplains.

FEMA publishes its implementing regulations for EO 11988 in 44 C.F.R. Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.[400]

## Executive Order 11990, Protection of Wetlands

EO 11990, Protection of Wetlands, requires Federal agencies to avoid to the extent possible, the long- and short-term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative. To meet these objectives, EO 11990 requires Federal agencies to use a systematic decision-making process to evaluate the potential effects of projects in, or affecting, wetlands; document each step of the process; and involve the public in the decision-making process.

FEMA publishes its implementing regulations for EO 11990, Protection of Wetlands in 44 C.F.R. Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.

---

[399] 42 U.S.C. § 6901 et seq.
[400] 44 C.F.R. § 9.6, Decision-making process.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Executive Order 12898, Environmental Justice

EO 12898, Environmental Justice, requires Federal agencies to identify and address any disproportionately high and adverse human health or environmental effects on minority and low-income populations as a result of their actions.

## Executive Order 13112, Invasive Species

EO 13112, Invasive Species, requires agencies to use their programs and authorities to help prevent the introduction, establishment, and spread of invasive species; respond to invasive species outbreaks; restore native species in areas invaded by invasive species; promote public education related to invasive species control; and avoid authorizing, funding, or carrying out activities that promote the introduction, establishment, or spread of invasive species.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX B: PRIVATE NONPROFIT FACILITY ELIGIBILITY EXAMPLES

Below are examples of private nonprofit (PNP) facility eligibility determinations.

## Facility owned by PNP – PNP Leases Portion of Space to For-Profit Service

Parkland Hospital is an eligible PNP that owns a medical office building and leases a portion of it to doctors and laboratories that are providing for-profit services. The for-profit leases are for 70 percent of the floor space, excluding the common area floor space, as defined in this policy.

*Analysis:*

The building is ineligible because the eligible services were offered in less than 50 percent of the building space.

## PNP Recreational Center Providing Eligible Services

The PNP Springtown Recreation Center claims that it provides eligible essential social services in addition to its recreation activities and should be eligible for assistance. The organization claims that its services now include day care for elderly adults, senior citizen center programs, programs for families of domestic abuse, and shelter workshops. These programs are provided by the recreation center staff and offered 5 days a week. Recreation activities are limited to evenings and weekends. The entire center is used for the eligible services.

*Analysis*

The organization would not appear to be eligible based upon its name and presumed mission. A detailed examination is necessary to determine the eligibility of the organization and its facility based upon the eligible services provided. In cases where space is not dedicated to any specific activity, the amount of time dedicated to eligible purposes in such spaces determines eligibility and the level of assistance. Therefore, even though the entire facility is used for eligible purposes, FEMA prorates PA funding based on the proportion of the total time it is used for eligible services.

## Support Facility Owned by PNP

A parking garage is owned by an eligible PNP hospital to support its nearby hospital facility. The ground floor is leased to retail businesses and totals 15 percent of the total space of the garage.

*Analysis*

Title 44 of the Code of Federal Regulations (C.F.R.) § 206.221(e), *Private nonprofit facility*, authorizes assistance for administrative and support facilities essential to the operation of medical facilities and emergency facilities, which in this example includes the parking garage. Because the hospital uses more than 50 percent of the parking garage, the facility is eligible based on primary use. FEMA assistance would be prorated based on the percentage of space used for the eligible parking purpose. The parking garage is eligible only because of its association with the hospital.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## Facilities Owned by PNP Homeowners' Association

The Woodlands Homeowners' Association is a PNP organization responsible for providing certain services for a 200-home development. The Homeowners' Association's facilities are local neighborhood streets, water system, sewage system, fire station, medical clinic, neighborhood park, community center, and a recreational lake and dam.

### Analysis

The Homeowners' Association operates facilities that provide essential social services and therefore is an eligible PNP. The lake and dam, park, and streets do not meet the definition of eligible facilities. The water and sewage systems meet the definition of a utility and are eligible for assistance. The fire station and medical clinic are eligible as emergency and medical facilities. The community center might be eligible if it serves the general public outside the Homeowners' Association community and if it is established and primarily used as a gathering place for a variety of social, educational enrichment, and community service activities.

## Recreational Center – Primarily Athletic Services

Westover Recreation Center sponsors a number of activities.

The center is available for rental Friday, Saturday, and Sunday evening to companies, religious groups, clubs, and civic organizations. It is offered as a location for league parties, office parties, seminars, conferences, and holiday celebrations. The center has rooms set aside for seniors' bridge and other card games, along with occasional workshops for photography, pottery and ceramics, and art.

However, the center is primarily oriented to athletics, as exemplified by a large indoor pool and locker room, a half dozen squash/racquetball courts, a weight/exercise room, and a 9,200-square-foot gymnasium/basketball court.

### Analysis

Although Westover Recreation Center offers a number of activities generally considered eligible community center functions, it is, first and foremost, a recreation center. In contrast to the definition of an eligible community center, it is neither established nor primarily used as a "gathering place for a variety of social, educational enrichment, and community service activities," even though it does offer some of these.

"Facilities established or primarily used for athletic (or) recreational activities are ineligible community centers." It is not necessary to calculate the percentage of time or space devoted to community activities versus athletic and recreational activities, because Westover is overwhelmingly athletic and recreational. For these reasons, a PNP facility similar to Westover would not be eligible.

## Mixed Use Community Center – Nominal Fee

Somerset Community Center consists of a number of meeting rooms, a lending library, social services room, health services room, dining room, activity area with games and a wide-screen TV, darkroom, pianos for practice, ceramics lab, woodshop, computer room, sewing machines, exercise room, and a large foyer. Outside are a fitness trail, garden plots, an outdoor basketball court and softball field, a gazebo, and picnic area.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

A nominal membership fee is charged. Classes are offered in piano, bridge, arts and crafts, and cooking. The center sponsors numerous seniors' activities, which include trips, luncheons, and recreational and educational activities. A lunch program is offered for seniors and their spouses. Some exercise classes are also offered. Health screenings and immunizations are regularly offered. Door-to-door transportation is provided to those who need it.

*Analysis*

By virtue of the wide range of community activities, Somerset Community Center would be an eligible community center. Although it does offer athletic and recreational activities, these are minimal in the time and space allocated to them; therefore, it is not a recreational center. The nominal fee makes it a service to the public.

## School Operated by a Religious Institution

The Community Church operates a State-certified private school offering first through eighth grades. The teaching curriculum includes math, science, English, history, physical education, and religious doctrine. The school has an average attendance of 500 students. The campus consists of three buildings: one used primarily for the secular curriculum, one used primarily for religious instruction, and a chapel primarily used for religious worship. Admissions to the school are restricted to members of Community Church.

*Analysis*

Evaluate the three buildings separately. The two buildings used, respectively, for secular and religious education are eligible as educational facilities. As educational facilities, they are considered to provide critical services and therefore Community Church does not need to apply to SBA to receive funding for permanent work on those buildings. The chapel is eligible as a house of worship. Houses of worship provide noncritical services, so Community Church is required to apply for an SBA loan for the chapel. The restricted admissions process does not affect eligibility. Pursuant to the Stafford Act, no PNP facility is excluded from eligibility because leadership or membership in the organization is limited to people that share a religious faith or practice.

# APPENDIX C: WELDED STEEL MOMENT FRAME

FEMA has specific eligibility criteria for inspecting, evaluating, and repairing earthquake damage to buildings constructed with welded steel moment framing connections subject to brittle fracture, such as those constructed prior to 1995 using the prescribed detail of the 1991 Uniform Building Code (Section 2710(g)(B) or its equivalent). FEMA bases the eligibility criteria on *Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment Frame Buildings* (FEMA 352).[401]

*Reimbursement for Preliminary Post-earthquake Assessment*

The process of preliminary screening, which helps to rapidly identify buildings that are likely to have sustained significant damage to welded steel moment frame connections, is ineligible for Public Assistance (PA) funding. Preliminary screening is typically performed by building department officials immediately following an earthquake to determine if a building needs further evaluation.

Following the preliminary screening, the Applicant may use the preliminary evaluation method described in FEMA 352 to determine, on a preliminary basis, whether a building has sustained either structural or nonstructural damage that results in a hazardous condition. Preliminary evaluations include:

- A general review of the building's construction characteristics to determine its structural system and vulnerable features;
- A visit to the building site to observe its overall condition and note obvious signs of damage; and
- A determination of an appropriate posting category for the building, on the basis of the preceding results and engineering judgment. Posting categories are described by the following designations:
  - Green – Little or no damage. Poses no immediate threat.
  - Yellow – Structural or nonstructural damage. Limited or localized safety hazard.
  - Red – Significant damage to structural elements. Significant safety hazard.

Preliminary evaluation is eligible only when conditions result in a yellow or red designation.

*Reimbursement for Detailed Post-earthquake Evaluations*

As recommended in FEMA 352, the Applicant should conduct a detailed evaluation on all buildings determined to have potential welded steel moment frame fractures, as identified in the preliminary assessment, and designated with a yellow or red posting. Eligible work includes the reasonable evaluation of the effects of the identified, significant connection damage to the future performance of the building structure. To be eligible, this evaluation should be limited to the recommendations in FEMA 352, Chapter 4, as follows:

---

[401] www.fema.gov/media-library/assets/documents/747.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

- Visual bottom flange connection inspections performed at locations selected in accordance with FEMA 352, Chapter 4, Method 2 (Inspection of a Sample of Connections) are eligible.
- The inspection of a sample of the total welded steel moment frame connections in the building, in accordance with guidance provided in FEMA 352, Chapter 4, Method 2 is eligible.
- If an Applicant discovers certain types of damage, additional visual inspection of bottom or top flange connections at locations recommended in FEMA 352, Chapter 4, are also eligible but only after the Applicant informs FEMA of the frame damage already discovered and FEMA approves the follow-on inspection.

The eligible work associated with connection inspection includes:

- Removal of necessary architectural finishes, such as plaster/drywall;
- Removal of fire retardants in the inspection area of the connection.;
- Visual inspection; and
- Nondestructive testing as appropriate, necessary, and approved by FEMA. Testing may include liquid dye-penetrant testing or magnetic particle testing, but not ultrasonic testing.

In circumstances where a building is assigned a green posting, visual inspections are only eligible for those connections where the Applicant has found significant damage (as defined in FEMA 352, Chapter 4) associated with the declared earthquake disaster.

Visual inspection of additional connections (at locations recommended by FEMA 352, following the discovery of damaged connections) will also be eligible, but only after the Applicant has informed FEMA of the frame damage already discovered and FEMA approves the follow-on inspection. FEMA may also approve nondestructive testing if the visual inspections indicate a significant potential for concealed damage.

Except as detailed above, any inspections that do not yield discovery of significant connection damage attributable to the earthquake are ineligible.

Generally, detailed analytical or experimental studies or Level 2 evaluations as described in FEMA 352, Chapter 5, are ineligible unless FEMA provides approval before the Applicant initiates the work.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX D: FREQUENT COMPLIANCE ISSUES WITH COOPERATIVE PURCHASING PROGRAMS

The following is a list of frequent compliance issues with Federal procurement requirements when Tribal or local government or private nonprofit (PNP) Applicants use cooperative purchasing programs for procurements above the simplified acquisition threshold:

## Full and Open Competition

The Applicant must ensure that solicitations used by cooperative purchasing programs include a clear and accurate description of the scope of work or goods actually required. Additionally, cooperative purchasing programs that place overly restrictive requirements on solicitations risk noncompliance with the full and open competition requirements in 2 C.F.R. § 200.319.

## Procurement Method

Cooperative purchasing programs must comply with allowable procurement methods in 2 C.F.R. § 200.320. Some of these methods require that Applicants publicly advertise or publicize the solicitations, solicit bids from an adequate number of known suppliers, and award contracts to the responsible, responsive firm with the lowest price or to the responsive firm whose proposal is most advantageous to the program with price and other factors considered.

## Socio-economic Contracting

The Applicant must ensure cooperative purchasing programs take the applicable affirmative steps to encourage participation of small businesses, minority businesses, and women owned enterprises. Failure to take any of the affirmative steps violates 2 C.F.R. § 200.321.

## Geographic Preferences

Any geographic preferences that a cooperative purchasing program uses in evaluating bids or proposals and any additional terms and conditions in a cooperative purchasing program's pre-negotiated agreements that favor or give preference to local suppliers violates 2 C.F.R. § 200.319(b) and be restrictive of competition.

## Contract Provisions

Cooperative purchase programs at times do not include the federally required contract provisions in the agreements with vendors. In accordance with 2 C.F.R. § 200.326, all contracts must contain the applicable contract clauses described in Appendix II to the Uniform Rules (Contract Provisions for non-Federal Entity Contracts Under Federal Awards).

## Cost or Price Analysis

The Applicant must conduct an independent cost or price analysis when using cooperative purchasing agreements in accordance with 2 C.F.R. § 200.323.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX E: STUMP CONVERSION TABLE

**Diameter to Volume Capacity**

FEMA quantifies the number of cubic yards of debris for each size of stump based on the following formula:

$$\frac{[(\text{Stump Diameter}^2 \times 0.7854) \times \text{Stump Length}] + [(\text{Root-Ball Diameter}^2 \times 0.7854) \times \text{Root-Ball Height}]}{46{,}656}$$

0.7854 is one-fourth Pi and is a constant.
46,656 is used to convert cubic inches to cubic yards and is a constant.

The formula used to calculate the cubic yardage used the following factors, based upon findings in the field:

- Stump diameter measured 2 feet up from the ground
- Stump diameter to root-ball diameter ratio of 1:3.6
- Root-ball height of 31 inches

| Stump Diameter (Inches) | Debris Volume (Cubic Yards) | Stump Diameter (Inches) | Debris Volume (Cubic Yards) |
|---|---|---|---|
| 6 | 0.3 | 46 | 15.2 |
| 7 | 0.4 | 47 | 15.8 |
| 8 | 0.5 | 48 | 16.5 |
| 9 | 0.6 | 49 | 17.2 |
| 10 | 0.7 | 50 | 17.9 |
| 11 | 0.9 | 51 | 18.6 |
| 12 | 1 | 52 | 19.4 |
| 13 | 1.2 | 53 | 20.1 |
| 14 | 1.4 | 54 | 20.9 |
| 15 | 1.6 | 55 | 21.7 |
| 16 | 1.8 | 56 | 22.5 |
| 17 | 2.1 | 57 | 23.3 |
| 18 | 2.3 | 58 | 24.1 |
| 19 | 2.6 | 59 | 24.9 |
| 20 | 2.9 | 60 | 25.8 |
| 21 | 3.2 | 61 | 26.7 |
| 22 | 3.5 | 62 | 27.6 |
| 23 | 3.8 | 63 | 28.4 |
| 24 | 4.1 | 64 | 29.4 |
| 25 | 4.5 | 65 | 30.3 |
| 26 | 4.8 | 66 | 31.2 |

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Stump Diameter (Inches) | Debris Volume (Cubic Yards) | Stump Diameter (Inches) | Debris Volume (Cubic Yards) |
|---|---|---|---|
| 27 | 5.2 | 67 | 32.2 |
| 28 | 5.6 | 68 | 33.1 |
| 29 | 6 | 69 | 34.1 |
| 30 | 6.5 | 70 | 35.1 |
| 31 | 6.9 | 71 | 36.1 |
| 32 | 7.3 | 72 | 37.2 |
| 33 | 7.8 | 73 | 38.2 |
| 34 | 8.3 | 74 | 39.2 |
| 35 | 8.8 | 75 | 40.3 |
| 36 | 9.3 | 76 | 41.4 |
| 37 | 9.8 | 77 | 42.5 |
| 38 | 10.3 | 78 | 43.6 |
| 39 | 10.9 | 79 | 44.7 |
| 40 | 11.5 | 80 | 45.9 |
| 41 | 12 | 81 | 47 |
| 42 | 12.6 | 82 | 48.2 |
| 43 | 13.3 | 83 | 49.4 |
| 44 | 13.9 | 84 | 50.6 |
| 45 | 14.5 | | |

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX F: HAZARDOUS STUMP WORKSHEET

Applicant: _____          Date: _____

Applicant Representative: _____          Signature: _____

FEMA Representative (if available) _____          Signature: _____

| | Physical Location (i.e., Street address, road, cross streets, etc.) | Description of Facility (ROW, Park, City Hall, etc.) | Hazard Yes/No | Global Positioning System (GPS) Location | Tree Size (Diameter) | Eligible Yes/No | Fill for Debris Stumps In CY | Comments (See attached sketch, photo, etc.) |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX G: MOSQUITO ABATEMENT

FEMA may provide reimbursement for mosquito abatement measures at the written request of the SLTT public health officials after FEMA consults with the Centers for Disease Control and Prevention (CDC), based on any of the following:

- Evidence of:
    - Higher levels of disease transmitting mosquitoes in the impacted area following the incident;
    - A significant number of disease-carrying mosquitoes in the area due to the increase in incident-related standing water; or
    - The potential for disease transmission and human exposure to disease carrying mosquitoes based on the detection of arboviral diseases in sentinel organisms (poultry, wild birds, mosquito pools) in the impacted area prior to the incident, discovered during surveillance as part of mosquito abatement activities, or reported human cases in which transmission occurred prior to the incident.

- A determination that a significant increase in the mosquito population and/or the change of biting mosquito species poses a threat to emergency workers who are required to work out-of-doors, thereby significantly hampering response and recovery efforts.

    Such evidence may include an abnormal rise in landing rates or trap counts, significant changes in species composition or estimate of infection rates, when compared to pre-incident surveillance results.



- Verification from medical facilities within the affected area that an increase in the general public's exposure to mosquitoes has directly resulted in secondary infections, especially among those with weakened immune systems such as the elderly, the very young, or the sick. This may occur when increased numbers of residents in impacted areas with extended power outages are forced to open buildings for air circulation.

Where possible, a determination of the need for vector control measures should be based on surveillance data provided by local agencies, or on surveillance conducted as a component of the emergency response. Similarly, termination of control efforts should be based on mosquito

density and disease transmission monitoring, and on the degree of exposure to mosquitoes of residents and responders. Information useful in determining the need for emergency mosquito control measures includes:

- The local jurisdiction's mosquito population density estimates pre- and post-disaster, including information about species composition;
- Arbovirus transmission activity indices, including information about the location of surveillance activities; indices may consist of:
  o Infection rates in mosquitoes;
  o Seroconversion in sentinel chickens;
  o Equine case;
  o Human cases;
- The amount and type of flooding (e.g., saltwater/freshwater, coastal/inland);
- The extent and location of damage to housing;
- The extent, location, and anticipated duration of power interruption;
- The anticipated extent and duration of cleanup and recovery operations; and
- A description of the type of mosquito management required (e.g., aerial or ground- based adulticide applications, larvicide applications), and duration of application to reduce the threat and the areas where the interventions are needed.

To be eligible for Public Assistance funding, insecticide formulations must be among those approved and registered by the U.S. Environmental Protection Agency for use in urban areas for mosquito control and must be applied according to label directions and precautions by appropriately trained and certified applicators. Furthermore, mosquito abatement measures must comply with all Federal and SLTT laws, ordinances, and regulations concerning vector control. Mosquito abatement measures include, but are not limited to the following:

- Adulticiding – The ground or aerial spraying of insecticides to kill adult mosquitoes
- Larviciding – The application of chemicals, including methoprene briquettes, by ground or air to kill mosquito larvae or pupae
- Breeding habitat removal or alteration – The modification of potential breeding habitat to make it unsuitable for mosquito breeding or to facilitate larval control, including:
  o Draining or removing standing water in close proximity to homes, schools, sheltering facilities, and businesses;
  o Increased dewatering through the pumping of existing drainage systems; and
  o Dissemination of information (e.g., inserting flyers with resident's water bills, public service announcements, newspaper campaigns) to direct residents to remove the mosquito breeding habitat.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX H: SNOW ASSISTANCE

Snow-related activities, including snow removal, de-icing, salting, snow dumps, and sanding of roads and other eligible facilities, is only an eligible emergency protective measure when a winter storm results in record or near-record[402] snowfall.[403] FEMA authorizes snow assistance by county based on a finding that the county received record or near-record snowfall or meets the contiguous county criteria as described below. FEMA evaluates Tribal lands either as part of a requested county or separately.

## Record or Near-Record Snowfall

FEMA utilizes data collected by the National Oceanic and Atmospheric Administration's National Centers for Environmental Information (NCEI) to identify the historical 1-, 2-, and 3-day snowfall records for each county. For current event snowfall, FEMA relies primarily on snowfall measurements taken at National Weather Service (NWS) Cooperative Network Stations but accepts measurements from other sources if those measurements are verified as reasonable and accurate by the NWS. Historical 1-, 2-, and 3-day snowfall records by county are available on the NCEI Snow Climatology Database (SCDB) at the following website: www.ncdc.noaa.gov/snow-and-ice/snowfall-extremes. Daily snowfall reports by county are available at: www.ncdc.noaa.gov/snow-and-ice/daily-snow.

FEMA follows the following process to determine record or near-record snowfalls:

- Compare current snowfall amounts with the historical record snowfall amounts for a like number of days without regard for the month in which the record snowfall or current event occurred.
- For multiple-day snowstorms, counties or Tribal lands that meet the 1-day record or near-record requirement on any 1 day, or the 2-day record or near record over 2 consecutive days, or the 3-day record or near record over 3 consecutive days, etc., meets the record or near-record criteria for that county or Tribal lands.
- FEMA relies on the NWS to determine the duration of the snowstorm.
- When data from multiple NWS-verified sources exist within a county or Tribal lands, FEMA compares the highest current event snowfall reported by the NWS within that county or Tribal land with the highest historical record snowfall for that county or Tribal land.
- For counties or Tribal lands that do not have NCEI or NWS historical record snowfall data, use the historical record from the nearest NWS Cooperative Network Station in an adjacent county or Tribal land, even if located in an adjacent State, for determining historical snowfall records.
- If current event snowfall data are not available from the NWS for a county or Tribal land, use the nearest NWS Cooperative Network Station data from an adjacent county, even if located in an adjacent State.
- FEMA may designate a county or Tribal land that does not receive a record or near-record snowfall, but is contiguous to a county (generally referred to as a "core county") that does receive a record or near-record snowfall, for snow assistance if the county or

---

[402] FEMA generally considers near record as being within 10 percent of the record snowfall.
[403] 44 C.F.R. § 206.227.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Tribal land has current event snowfall that meets or exceeds the current event snowfall of the core county, to which it is contiguous. Base this comparison on the highest current event snowfall received by each county as reported by the NWS.

- Consider counties or Tribal areas that experience snowfalls occurring over a period exceeding 3 consecutive days that do not reach record or near-record snowfalls during a 3-day period, and for which there are no historical snowfall records for a period exceeding 3 days with NCEI or NWS, on a case-by-case basis.

## Winter Storm or Snowstorm Declaration Requests

The request for a Major Disaster Declaration must include a request for snow assistance as part of that declaration. All such requests are subject to the requirements and processes established in the Stafford Act and FEMA regulations.[404] In addition to the information required in every declaration request, requests for snow assistance must include the following information:

- Identification of core and contiguous counties for which a snowstorm declaration is requested;
- Duration of snowfall, as identified or confirmed by the NWS; and
- For each requested county or Tribal land, daily snowfall totals from NWS stations or NWS-verified sources and historical record snowfall data from the NCEI.



Generally, the current event weather and snowfall information is included in a statement or report from the NWS describing the event.

FEMA only includes costs related to snow activities as part of the preliminary damage assessment data for counties or Tribal lands that meet the record or near-record criteria or qualify as contiguous counties.

Other categories of work, including Permanent Work, may be authorized for snowstorm or winter storm declarations as appropriate.

---

[404] 44 C.F.R. § 206 Subpart B (206.31–48).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX I: MOLD REMEDIATION

## Mold Remediation Methods

The following list describes common mold remediation methods.

| Method | Application |
|---|---|
| Wet Vacuum | • Use when materials are wet<br>• Use where water has accumulated, such as on floors, carpets and hard surfaces<br>• Do not use when sufficient liquid is not present |
| Damp Wipe | • Wipe or scrub non-porous (hard) surfaces with water and detergent<br>• Follow instructions listed on the product label |
| High Efficiency Particulate (HEPA) Vacuum | • Final clean-up after thoroughly dry and contaminated materials are removed<br>• Recommended for cleanup of dust outside of the remediation area<br>• Properly seal HEPA filter<br>• Personal protection equipment is highly recommended; filter and contents must be disposed of in well-sealed bags |
| Discard | • Use for building materials and furnishings that cannot be remediated<br>• Seal contents in two bags using 6-mil polyethylene sheeting<br>• Cover large items in polyethylene sheeting and seal with duct tape<br>• Sealing materials must be within containment area to limit further contamination |

*Summarized from Indoor Environments Division of the U.S. Environmental Protection Agency, "Mold Remediation in Schools and Commercial Buildings": www.epa.gov/mold/mold_remediation.html.*

## Application of Remediation Methods

The following list outlines typical mold remediation actions.

| Water Damaged Material | Action |
|---|---|
| Books and paper | • Non-valuable items – discard<br>• Valuable/important – photocopy and discard originals<br>• Invaluable items – freeze in frost-free freezer or meat locker, or freeze dry |
| Carpet and backing | • Wet vacuum<br>• Reduce ambient humidity levels with dehumidifier<br>• Accelerate drying process with fans |
| Ceiling tiles | • Discard and replace (replacement only eligible as Permanent Work) |
| Cellulose insulation | • Discard and replace (replacement only eligible as Permanent Work) |
| Concrete or cinder block surfaces | • Wet vacuum<br>• Accelerate drying process with dehumidifiers, fans, and/or heaters |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Water Damaged Material | Action |
|---|---|
| Fiberglass Insulation | • Discard and replace (replacement only eligible as Permanent Work) |
| Hard surfaces, porous floorings (linoleum, ceramic tile, vinyl) | • Vacuum or damp wipe with water and mild detergent<br>• Scrubbing may be necessary<br>• Allow to dry |
| Upholstered furniture | • Wet vacuum<br>• Accelerate drying process with dehumidifiers, fans, and/or heaters |
| Wallboard (drywall and gypsum board) | • If obvious swelling and seams are not intact – discard<br>• If no obvious swelling and seams are intact – may be dried in place<br>• Ventilate wall cavity |
| Window drapes | • Launder or clean according to manufacturer's instructions |
| Wood surfaces | • Remove water with wet vacuum<br>• Accelerate drying process with dehumidifiers, fans, and/or heaters<br>• Wet paneling – discard and ventilate wall cavity |

*Summarized from Indoor Environments Division of the U.S. Environmental Protection Agency, "Mold Remediation in Schools and Commercial Buildings": www.epa.gov/mold/table1.html.*

V4 2020

Page 241

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX J: COST-EFFECTIVE PUBLIC ASSISTANCE HAZARD MITIGATION MEASURES

FEMA considers the following mitigation measures to be cost-effective Public Assistance (PA) mitigation if the measures do not exceed 100 percent of the eligible repair cost (prior to any insurance reductions). The mitigation measures must meet all eligibility requirements described in Chapter 8:IV. *Hazard Mitigation*. There may be instances where these measures are required by codes or standards. In such cases FEMA first evaluates whether the work is eligible as a code or standard (See Chapter 8:II. *Codes and Standards*).

I.  Drainage Structures:

For Sections I.A. and I.C. (below), PA and environmental and historic preservation (EHP) staff coordinate to determine whether a hydrologic and hydraulic (H&H) study is needed. The Applicant must submit an H&H study to determine the appropriate culvert size with no adverse up or downstream impacts and National Flood Insurance Program regulations when:

- The facility is in a special flood hazard area;
- There is a potential adverse impact to the floodplain;[405]
- There is a potential adverse impact to a federally listed threatened or endangered species, critical habitat, or essential fish habitat;[406] or
- It is required to demonstrate compliance with the Clean Water Act.

A.  Replace the structure with multiple structures or a larger structure. The Applicant may use existing SLTT drainage criteria for sizing replacement culverts. The Applicant must consider replacement structures with regard to the total drainage system.



B.  For the purpose of erosion control, add properly designed entrance and exit structures, such as a headwall, wingwalls, flared aprons, or energy dissipation measures to increase efficiency and help to minimize scour and erosion. Depending on the severity of erosion, solutions for bank protection may include gabion baskets, rip rap,

---

[405] 44 C.F.R. §§ 9.11(d)(4) and 60.3(b)(7), (c)(10), and (d)(3).

[406] Endangered Species Act 16 U.S.C. §§ 1531-1544 and Magnuson-Stevens Fishery Conservation and Management Act.

V4 2020

cast-in-place concrete, crushed stone or rock, grouted rip rap[407], sheet-piling, geotextile fabric, or similar measures to control erosion. Alternatively, the use of vegetation or a combination of vegetation and construction materials such as live fascines, vegetated geogrids, live crib walls, brush mattresses, root wads, or similar measures are eligible. The Applicant should consider using green infrastructure techniques such as bioswales, bioretention, rain gardens and similar techniques that may be used in public drainage systems.

C. Culverts:

1. Where the alignment of a culvert is inconsistent with existing water flow, realign the culvert vertically or horizontally or relocate the culvert to improve hydraulics and minimize erosion and scour. The Applicant must consider realignment of structures with regard to the total drainage system.

2. Extend the culvert discharge to mitigate erosion and scour by extending the discharge end beyond the toe of the embankment.

3. Install a debris barrier to prevent debris blockage or fins designed to orient floating debris for passage through the culvert.

4. Install a debris barrier riser to allow debris to float up with the rising floodwaters without blocking flow into the culvert.

II. Transportation Facilities:

A. Bridges:

1. Where traffic counts are low, replace with low-water crossings.

2. Install cables to restrain a bridge from being knocked off piers or abutments during floods or earthquakes.

3. Install girder and deck uplift tie-downs to prevent their displacement from the substructure.

4. Install Longitudinal Peaked Stone Toe Protection with nature planting, upstream of a failed abutment, to provide a stable floodplain bench for the protection of the abutment and the adjoining bridge approach. Consider other relevant Bio-engineering applications such as engineered logjams, log vanes or log bendway weir.

B. Marine Pier Ramps: If attached to decking, install open decking or floating decking with uplift-resistant tie-downs and fasteners.

C. Roadways and Railways: Where shoulders are susceptible to overflow from adjacent water courses, stabilize shoulders and embankments with geotextile fabric and revetments.

D. Roadways: Use geotextile drainage blankets between the pavement section and subbase to strengthen subgrade.

---

[407] Projects involving grouted rip rap may be subject to an environmental assessment and may not be allowable in all instances.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

III. Mechanical, Electrical, Plumbing (MEP) Components:

   A. Provide seismic bracing for electrical lines, conduit, piping, duct-work, water heaters, and other MEP equipment. Components can be wall mounted, floor mounted, or suspended.

   B. Roof-Mounted Equipment: Secure to roof top via a continuous load path, using tie-downs, straps, or other anchoring systems that will resist expected wind forces.

   C. Elevate or dry floodproof components or systems vulnerable to flood damage, including equipment controls, electrical panels; heating, ventilation, and air conditioning/machinery rooms; emergency generators; and fuel tanks. When wiring cannot be elevated, replace with equipment suitable for submerged applications.

   D. Install switches, circuit isolation and/or quick connect capability to facilitate rapid connection of backup power for any damaged or susceptible mechanical and electrical components.

   E. Install camlocks, transfer switches, and electrical panels to facilitate the connection of portable emergency generators.

IV. Pipes:

   A. Install pipe joint restraints, flexible piping at pipe/conduit connections, or replace pipes with more ductile material.

   B. Install continuous lining or encasement to prevent infiltration or structural collapse.

   C. Underground Pipes: Install shut-off valves so that damaged sections of pipe can be isolated.

V. Water/Wastewater:

   A. Pumps: If pumps and their attached motors are damaged by stormwater inundation, replace them with submersible or inline pumps as appropriate.

   B. Sewer Access Covers: Elevate to the hydraulic grade line. When elevation is not feasible or practicable, install devices to prevent infiltration into access holes such as cast-iron watertight frames and covers.

   C. Well Systems: Seal exposed portions of well casing or raise the elevation of the well head to prevent infiltration of flood waters.

   D. Raw water intakes: Install buttressing to prevent damage from erosion, scour, and flood debris.

VI. Electric Power Systems:

   A. Provide looped distribution service or other redundancies in the electrical service to critical facilities, such as hospitals and fire stations.

   B. Install surge suppressors and lightning arrestors.

   C. Transformers:

      1. Elevate pad transformers above the Base Flood Elevation.

2. Support pole-mounted transformers with multiple poles.

D. Power Poles:

1. Replace damaged poles with higher-rated poles (preferably two classes stronger) of the same or different material. When replacing poles with higher-rated poles, install guys and anchors to provide lateral support for poles supporting pole-mounted transformers, regulators, capacitor banks, reclosers, air-break switches, or other electrical distribution equipment.

2. Remove large diameter lines.

3. Add cross-bracing to H-frame poles to provide additional strength.

4. Power Lines: Add guy-wires or additional support.

VII. Storage Tanks:

A. Anchor or otherwise protect from movement by strengthening or stiffening base connections.

B. Install self-initiating disconnects and shut-off values between tanks and distribution lines to minimize damage and leaks.

VIII. Buildings and Structures:

A. For small support buildings subject to uplift or rollover from high winds, securely anchor the buildings to foundations to prevent toppling or becoming missile hazards.

B. Elevate or dry or wet floodproof buildings.

C. Footings: Where spread footings have been undercut by scour, underpin footings.

D. Siding: Replace with a stronger siding with stronger attachments to the wall sheathing and structure.

E. Vents: Replace with water-resistant vents.

F. Non-structural Building Components: Brace interior walls, partitions, parapets, anchor veneer or cladding, suspended light features, drop ceilings, soffits, and other non-structural elements that could collapse and cause injury or block safe exit of a building during an earthquake or high-wind event.

G. Furnishings: Provide seismic ties, straps, or clips to secure replaced furniture, cabinets, computers, bookcases, and other furnishings.

H. Roofs

1. Install hurricane clips, fasteners, anchors, straps, and connectors that are compatible with the roof system and corrosion-resistant in coastal areas.

2. Strengthen the high-wind pressure areas (e.g., corner zones, roof soffits, overhangs).

3. Strengthen roof openings, such as hatches and skylights.

4. Low Slope Roofs: Replace entire roof covering with a fully adhered roof covering, such as a modified bitumen membrane roof. FEMA does not provide PA mitigation

funding for loose laid insulation or membranes as punctures can cause large amounts of water intrusion. Additionally, FEMA does not provide PA mitigation funding for loose laid roof membranes with loose ballast stones as the stones can become projectiles in high winds and cause damage.

5. Gable Roofs: Replace the gable-end framing with hipped roof framing to reduce wind forces (lower edge pressure; reduced projected wind area) and strengthen the roof framing.

6. Gutters and Downspouts: Upgrade to direct water away from the structure to prevent interior or basement water damage.

I. Doors and Windows:

1. Upgrade the weather stripping to prevent water infiltration.

2. Replace doors, door frames, hinges, and hardware with wind-resistant units.

3. Strengthen windows.

4. Replace glass with impact-resistant material.

5. Install shutters on windows:

   a. Of critical facilities, such as hospitals.

   b. On the lower floors of noncritical facilities most likely to be struck by debris.

   c. Of buildings with very high-value contents that can be damaged by water (such as libraries and document centers).

   d. Of buildings when failure of roofing materials or other portions of nearby structures could create impact hazards.

IX. Signage: Replace sign panels and their supports with a stronger type of system of supports and panels. Consider using multiple support posts and stronger panels and fasteners.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX K: CONTRACT PROVISIONS

The following is a list of frequent compliance issues with Federal procurement requirements when Tribal or local government or private nonprofit (PNP) Applicants use cooperative purchasing programs for procurements.

If an Applicant plans to use Federal funds to pay or reimburse equipment expenses or services under a contract, that contract must contain the applicable clauses described in <u>Appendix II to the Uniform Rules</u> (Contract Provisions for Non-Federal Entity Contracts Under Federal Awards) under 2 C.F.R. § 200.326. Additionally, FEMA recommends certain contract clauses recommended by FEMA.

This appendix outlines the federally required contract provisions in addition to FEMA-recommended provisions applicable to PA applicant contracts. For some of the required clauses, sample language or references to find sample language are listed below. Sample language for certain required clauses (remedies, termination for cause and convenience, changes) is not listed since these must be drafted in accordance with the non-Federal entity's applicable local laws and procedures. For the clauses which require that exact language be included, the required language is specifically identified below.

The non-Federal entity alone is responsible for ensuring that all language included in their contracts meets the requirements of 2 C.F.R. § 200.326 and 2 C.F.R. Part 200, Appendix II.

<u>REMEDIES</u>: Applies to all FEMA grant and cooperative agreement programs.

Contracts for more than the simplified acquisition threshold, currently set at $250,000, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate. See 2 C.F.R. Part 200, Appendix II, A.

<u>TERMINATION FOR CAUSE AND CONVENIENCE</u>: Applies to all FEMA grant and cooperative agreement programs.

All contracts exceeding $10,000 must address termination for cause and for convenience by the non-Federal entity, including how it will be affected and the basis for settlement. See 2 C.F.R. Part 200, Appendix II, B.

<u>EQUAL EMPLOYMENT OPPORTUNITY:</u> This requirement applies to all FEMA grant and cooperative agreement programs and exact language below is required.

<u>Standard</u>: Except as otherwise provided under 41 C.F.R. Part 60, all contracts that meet the definition of "federally assisted construction contract" in 41 C.F.R. § 60-1.3 must include the equal opportunity clause provided under 41 C.F.R. § 60- 1.4(b), in accordance with Executive Order 11246, *Equal Employment Opportunity* (30 Fed. Reg. 12319, 12935, 3 C.F.R. Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, *Amending Executive Order 11246 Relating to Equal Employment Opportunity,* and implementing regulations at 41 C.F.R. Part 60 (Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor). <u>See</u> 2 C.F.R. Part 200, Appendix II, C.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Key Definitions.

Federally Assisted Construction Contract. The regulation at 41 C.F.R. § 60-1.3 defines a "federally assisted construction contract" as any agreement or modification thereof between any applicant and a person for construction work which is paid for in whole or in part with funds obtained from the Government or borrowed on the credit of the Government pursuant to any Federal program involving a grant, contract, loan, insurance, or guarantee, or undertaken pursuant to any Federal program involving such grant, contract, loan, insurance, or guarantee, or any application or modification thereof approved by the Government for a grant, contract, loan, insurance, or guarantee under which the applicant itself participates in the construction work.

Construction Work. The regulation at 41 C.F.R. § 60-1.3 defines "construction work" as the construction, rehabilitation, alteration, conversion, extension, demolition or repair of buildings, highways, or other changes or improvements to real property, including facilities providing utility services. The term also includes the supervision, inspection, and other onsite functions incidental to the actual construction.

Required Language: 41 C.F.R. Part 60-1.4(b) requires the insertion of the following contract clause.

During the performance of this contract, the contractor agrees as follows:

(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to the following:

Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

(3) The contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has inquired about, discussed, or disclosed the compensation of the employee or applicant or another employee or applicant. This provision shall not apply to instances in which an employee who has access to the

compensation information of other employees or applicants as a part of such employee's essential job functions discloses the compensation of such other employees or applicants to individuals who do not otherwise have access to such information, unless such disclosure is in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or is consistent with the contractor's legal duty to furnish information.

**(4)** The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor union or workers' representatives of the contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

**(5)** The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

**(6)** The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the administering agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

**(7)** In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts or federally assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

**(8)** The contractor will include the portion of the sentence immediately preceding paragraph (1) and the provisions of paragraphs (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the administering agency may direct as a means of enforcing such provisions, including sanctions for noncompliance:

*Provided,* however, that in the event a contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the administering agency, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

The applicant further agrees that it will be bound by the above equal opportunity clause with respect to its own employment practices when it participates in federally assisted construction work: *Provided,* that if the applicant so participating is a State, Territorial, or local government,

the above equal opportunity clause is not applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under the contract.

The applicant agrees that it will assist and cooperate actively with the administering agency and the Secretary of Labor in obtaining the compliance of contractors and subcontractors with the equal opportunity clause and the rules, regulations, and relevant orders of the Secretary of Labor, that it will furnish the administering agency and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist the administering agency in the discharge of the agency's primary responsibility for securing compliance.

The applicant further agrees that it will refrain from entering into any contract or contract modification subject to Executive Order 11246 of September 24, 1965, with a contractor debarred from, or who has not demonstrated eligibility for, Government contracts and federally assisted construction contracts pursuant to the Executive Order and will carry out such sanctions and penalties for violation of the equal opportunity clause as may be imposed upon contractors and subcontractors by the administering agency or the Secretary of Labor pursuant to Part II, Subpart D of the Executive Order. In addition, the applicant agrees that if it fails or refuses to comply with these undertakings, the administering agency may take any or all of the following actions: Cancel, terminate, or suspend in whole or in part this grant (contract, loan, insurance, guarantee); refrain from extending any further assistance to the applicant under the program with respect to which the failure or refund occurred until satisfactory assurance of future compliance has been received from such applicant; and refer the case to the Department of Justice for appropriate legal proceedings.


**CONTRACT WORK HOURS AND SAFETY STANDARDS ACT:** This requirement applies to all FEMA contracts awarded by the non-federal entity exceeding $100,000 under grant and cooperative agreement programs that involve the employment of mechanics or laborers. It is applicable to construction work. These requirements do not apply to the purchase of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

Standard: Where applicable (see 40 U.S.C. §§ 3701-3708), all contracts awarded by the non-Federal entity exceeding $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. §§ 3702 and 3704, as supplemented by Department of Labor regulations at 29 C.F.R. Part 5. See 2 C.F.R. Part 200, Appendix II, E. Under 40 U.S.C. § 3702, each contractor must be required to compute the wages of every mechanic and laborer based on a standard work week of 40 hours. Work exceeding the standard work week is permissible provided that the worker is compensated at a rate of not less than one and a half times the basic rate of pay for all hours worked beyond 40 hours in the work week. Further, no laborer or mechanic must be required to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous.

Suggested Language: 29 C.F.R. § 5.5(b) provides contract clause language concerning compliance with the Contract Work Hours and Safety Standards Act. FEMA suggests including

V4 2020                                                                 Page 250

the following contract clause:

Compliance with the Contract Work Hours and Safety Standards Act.

**(1)** *Overtime requirements.* No contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such workweek.

**(2)** *Violation; liability for unpaid wages; liquidated damages.* In the event of any violation of the clause set forth in paragraph (b)(1) of this section the contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the clause set forth in paragraph (b)(1) of this section, in the sum of $26 for each calendar day on which such individual was required or permitted to work in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in paragraph (b)(1) of this section.

**(3)** *Withholding for unpaid wages and liquidated damages.* The (**write in the name of the Federal agency or the loan or grant recipient**) shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the contractor or subcontractor under any such contract or any other Federal contract with the same prime contractor, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph (b)(2) of this section.

**(4)** *Subcontracts.* The contractor or subcontractor shall insert in any subcontracts the clauses set forth in paragraph (b)(1) through (4) of this section and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the clauses set forth in paragraphs (b)(1) through (4) of this section.

**CLEAN AIR ACT AND THE FEDERAL WATER POLLUTION CONTROL ACT:** This requirement applies to contracts awarded by a non-Federal entity of amounts exceeding $150,000 under a federal grant.

Standard: If applicable, contracts must contain a provision that requires the contractor to agree to comply with all applicable standards, orders, or regulations issued pursuant to the Clean Air Act

V4 2020                                                                                     Page 251

(42 U.S.C. §§ 7401-7671q.) and the Federal Water Pollution Control Act as amended (33 U.S.C. §§ 1251-1387). Violations must be reported to FEMA and the Regional Office of the Environmental Protection Agency. See 2 C.F.R. Part 200, Appendix II, G.

Suggested Language: The following provides a sample contract clause.

Clean Air Act

1.  The contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.

2.  The contractor agrees to report each violation to the (**name of applicant entering into the contract**) and understands and agrees that the (**name of the applicant entering into the contract**) will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

3.  The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FEMA.

Federal Water Pollution Control Act

1.  The contractor agrees to comply with all applicable standards, orders, or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq.

2.  The contractor agrees to report each violation to the (**name of the applicant entering into the contract**) and understands and agrees that the (**name of the applicant entering into the contract**) will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

3.  The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FEMA.

**DEBARMENT AND SUSPENSION:** This requirement applies to all FEMA grant and cooperative agreement programs.

Standard: Non-Federal entities and contractors are subject to the debarment and suspension regulations implementing Executive Order 12549, *Debarment and Suspension* (1986) and Executive Order 12689, *Debarment and Suspension* (1989) at 2 C.F.R. Part 180 and the Department of Homeland Security's regulations at 2 C.F.R. Part 3000 (Non-procurement Debarment and Suspension).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Requirements:

1. These regulations restrict awards, subawards, and contracts with certain parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in Federal assistance programs and activities. See 2 C.F.R. Part 200, Appendix II, ¶ H; and 2 C.F.R. § 200.213. A contract award must not be made to parties listed in the SAM Exclusions. SAM Exclusions is the list maintained by the General Services Administration that contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549. SAM exclusions can be accessed at www.sam.gov. See 2 C.F.R. § 180.530.

2. In general, an "excluded" party cannot receive a Federal grant award or a contract within the meaning of a "covered transaction," to include subawards and subcontracts. This includes parties that receive Federal funding indirectly, such as contractors to recipients and subrecipients. The key to the exclusion is whether there is a "covered transaction," which is any non-procurement transaction (unless excepted) at either a "primary" or "secondary" tier. Although "covered transactions" do not include contracts awarded by the Federal Government for purposes of the non-procurement common rule and DHS's implementing regulations, it does include some contracts awarded by recipients and subrecipients.

3. Specifically, a covered transaction includes the following contracts for goods or services:

   a. The contract is awarded by a recipient or subrecipient in the amount of at least $25,000.

   b. The contract requires the approval of FEMA, regardless of amount.

   c. The contract is for federally required audit services.

   d. A subcontract is also a covered transaction if it is awarded by the contractor of a recipient or subrecipient and requires either the approval of FEMA or is in excess of $25,000.

Suggested Language: The following provides a debarment and suspension clause. It incorporates an optional method of verifying that contractors are not excluded or disqualified.

Suspension and Debarment

1. This contract is a covered transaction for purposes of 2 C.F.R. pt. 180 and 2 C.F.R. pt. 3000. As such, the contractor is required to verify that none of the contractor's principals (defined at 2 C.F.R. § 180.995) or its affiliates (defined at 2 C.F.R. § 180.905) are excluded (defined at 2 C.F.R. § 180.940) or disqualified (defined at 2 C.F.R. § 180.935).

V4 2020    Page 253

2.  The contractor must comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.

3.  This certification is a material representation of fact relied upon by (**insert name of recipient/subrecipient/applicant**). If it is later determined that the contractor did not comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, in addition to remedies available to (**insert name of recipient/subrecipient/applicant**), the Federal Government may pursue available remedies, including but not limited to suspension and/or debarment.

4.  The bidder or proposer agrees to comply with the requirements of 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C while this offer is valid and throughout the period of any contract that may arise from this offer. The bidder or proposer further agrees to include a provision requiring such compliance in its lower tier covered transactions.

**BYRD ANTI-LOBBYING AMENDMENT:** This requirement applies to all FEMA grant and cooperative agreement programs. Contractors that apply or bid for a contract of $100,000 or more under a federal grant must file the required certification. See 2 C.F.R. Part 200, Appendix II, I; 31 U.S.C. § 1352; and 44 C.F.R. Part 18.

Standard: Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, officer or employee of Congress, or an employee of a Member of Congress in connection with obtaining any Federal contract, grant or any other award covered by 31 U.S.C. § 1352. FEMA's regulation at 44 C.F.R. Part 18 implements the requirements of 31 U.S.C. § 1352 and provides, in Appendix A to Part 18, a copy of the certification that is required to be completed by each entity as described in 31 U.S.C. § 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier-to-tier up to the Federal awarding agency.

Suggested Language:

Byrd Anti-Lobbying Amendment, 31 U.S.C. § 1352 (as amended)

Contractors who apply or bid for an award of $100,000 or more shall file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, officer or employee of Congress, or an employee of a Member of Congress in connection with obtaining any Federal contract, grant, or any other award covered by 31 U.S.C. § 1352. Each tier shall also disclose any lobbying

V4 2020                                                                                             Page 254

with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier-to-tier up to the recipient who in turn will forward the certification(s) to the awarding agency.

Required Certification: If applicable, contractors must sign and submit to the non-Federal entity the following certification.

APPENDIX A, 44 C.F.R. PART 18 – CERTIFICATION REGARDING LOBBYING

Certification for Contracts, Grants, Loans, and Cooperative Agreements

The undersigned certifies, to the best of his or her knowledge and belief, that:

1.  No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3.  The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

The Contractor,_____, certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, the Contractor understands and agrees that the provisions of 31 U.S.C. Chap. 38, Administrative Remedies for False Claims and Statements, apply to this certification and disclosure, if any.

V4 2020                                                                                      Page 255

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

_____
Signature of Contractor's Authorized Official


_____
Name and Title of Contractor's Authorized Official


_____
Date

**<u>PROCUREMENT OF RECOVERED MATERIALS</u>:** This requirement applies to all contracts awarded by a non-federal entity under FEMA grant and cooperative agreement programs.

<u>Standard</u>: A non-Federal entity that is a state agency or agency of a political subdivision of a state and its contractors must comply with Section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. See 2 C.F.R. Part 200, Appendix II, J; and 2 C.F.R. § 200.322.

<u>Requirements</u>: The requirements of Section 6002 include procuring only items designated in guidelines of the EPA at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired by the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

<u>Suggested Language</u>:

1. In the performance of this contract, the Contractor shall make maximum use of products containing recovered materials that are EPA-designated items unless the product cannot be acquired—
   a. Competitively within a timeframe providing for compliance with the contract performance schedule;
   b. Meeting contract performance requirements; or
   c. At a reasonable price.

2. Information about this requirement, along with the list of EPA-designated items, is available at EPA's Comprehensive Procurement Guidelines web site, https://www.epa.gov/smm/comprehensive- procurement-guideline-cpg-program.

3. The Contractor also agrees to comply with all other applicable requirements of Section 6002 of the Solid Waste Disposal Act."

V4 2020                                                                                   Page 256

**RECOMMENDED CONTRACT PROVISIONS**

The Uniform Rules authorize FEMA to require additional provisions for non-Federal entity contracts. Although FEMA does not currently require additional provisions, FEMA recommends the following for PA applicant contracts:

**ACCESS TO RECORDS.**

Standard: All recipients, subrecipients, successors, transferees, and assignees must acknowledge and agree to comply with applicable provisions governing DHS access to records, accounts, documents, information, facilities, and staff. Recipients must give DHS and FEMA access to, and the right to examine and copy, records, accounts, and other documents and sources of information related to the federal financial assistance award and permit access to facilities, personnel, and other individuals and information as may be necessary, as required by DHS regulations *and* other applicable laws or program guidance. See DHS Standard Terms and Conditions: Version 8.1 (2018). Additionally, FEMA is prohibited from providing reimbursement to any SLTT government, or PNP organization for activities made pursuant to a contract that purports to prohibit audits or internal reviews by the FEMA administrator or Comptroller General.

Suggested Language:

Access to Records. The following access to records requirements apply to this contract:

1. The Contractor agrees to provide (**insert name of state agency or local or Indian tribal government**), (**insert name of recipient**), the FEMA Administrator, the Comptroller General of the United States, or any of their authorized representatives access to any books, documents, papers, and records of the Contractor which are directly pertinent to this contract for the purposes of making audits, examinations, excerpts, and transcriptions.

2. The Contractor agrees to permit any of the foregoing parties to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonably needed.

3. The Contractor agrees to provide the FEMA Administrator or his authorized representatives access to construction or other work sites pertaining to the work being completed under the contract.

4. In compliance with the Disaster Recovery Act of 2018, the (**write in name of the non-federal entity**) and the Contractor acknowledge and agree that no language in this contract is intended to prohibit audits or internal reviews by the FEMA Administrator or the Comptroller General of the United States.

**CHANGES:** FEMA recommends, therefore, that a non-Federal entity include a changes clause in its contract that describes how, if at all, changes can be made by either party to alter the

V4 2020                                                                                                    Page 257

method, price, or schedule of the work without breaching the contract. The language of the clause may differ depending on the nature of the contract and the end-item procured.

Standard: To be eligible for FEMA assistance under the non-Federal entity's FEMA grant or cooperative agreement, the cost of the change, modification, change order, or constructive change must be allowable, allocable, within the scope of its grant or cooperative agreement, and reasonable for the completion of project scope.

**DHS SEAL, LOGO, AND FLAGS**: FEMA recommends that Applicants include a provision that a contractor shall not use the DHS seal(s), logos, crests, or reproductions of flags or likenesses of DHS agency officials without specific FEMA pre-approval.

Standard: Recipients must obtain permission prior to using the DHS seal(s), logos, crests, or reproductions of flags or likenesses of DHS agency officials. See DHS Standard Terms and Conditions: Version 8.1 (2018).

Suggested Language: "The contractor shall not use the DHS seal(s), logos, crests, or reproductions of flags or likenesses of DHS agency officials without specific FEMA pre-approval."

**COMPLIANCE WITH FEDERAL LAW, REGULATIONS, AND EXECUTIVE ORDERS:** FEMA recommends that Applicants include an acknowledgement that FEMA financial assistance will be used to fund the contract along with the requirement that the contractor will comply with all applicable Federal law, regulations, executive orders, and FEMA policies, procedures, and directives.

Standard: The recipient and its contractors are required to comply with all Federal laws, regulations, and executive orders.

Suggested Language: "This is an acknowledgement that FEMA financial assistance will be used to fund all or a portion of the contract. The contractor will comply with all applicable Federal law, regulations, executive orders, FEMA policies, procedures, and directives."

**NO OBLIGATION BY FEDERAL GOVERNMENT**: FEMA recommends that the non-Federal entity include a provision in its contract that states that the Federal Government is not a party to the contract and is not subject to any obligations or liabilities to the non-Federal entity, contractor, or any other party pertaining to any matter resulting from the contract.

Standard: FEMA is not a party to any transaction between the recipient and its contractor. FEMA is not subject to any obligations or liable to any party for any matter relating to the contract.

Suggested Language: "The Federal Government is not a party to this contract and is not subject to any obligations or liabilities to the non-Federal entity, contractor, or any other party pertaining to any matter resulting from the contract."

V4 2020                                                                                    Page 258

**PROGRAM FRAUD AND FALSE OR FRAUDULENT STATEMENTS OR RELATED ACTS:** FEMA recommends that the non-Federal entity include a provision in its contract that the contractor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to its actions pertaining to the contract.

Standard. Recipients must comply with the requirements of The False Claims Act (31 U.S.C. §§ 3729-3733) which prohibits the submission of false or fraudulent claims for payment to the federal government. See DHS Standard Terms and Conditions: Version 8.1 (2018); and 31 U.S.C. §§ 3801-3812, which details the administrative remedies for false claims and statements made. The non-Federal entity must include a provision in its contract that the contractor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to its actions pertaining to the contract.

Suggested Language. "The Contractor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to the Contractor's actions pertaining to this contract."

V4 2020

Page 259

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX L: VALIDATION OF APPLICANT-PROVIDED COST ESTIMATES

This Appendix provides a checklist that FEMA Public Assistance (PA) staff must use to review and validate cost estimates submitted to FEMA for Permanent Work. FEMA staff may also use relevant portions of this checklist for Emergency Work. FEMA includes this checklist in the associated subaward file in PA Grants Manager.

The steps for validating Applicant-provided cost estimates are as follows:

1. **Verify that the estimate:**

   ☐ Is prepared by a licensed Professional Engineer or other estimating professional, such as a licensed architect or certified professional cost estimator[408] who certifies that the estimate was prepared in accordance with industry standards;

   ☐ Includes certification that the estimated cost directly corresponds to the repair of the agreed upon damage;

   ☐ Is based on unit costs for each component of the scope of work (SOW) and not a lump sum amount; and

   ☐ Contains a level of detail sufficient for FEMA to validate that all components correspond with the agreed-upon SOW.

2. **Review the scope of work and cost estimate to verify only eligible items are included:**

   ☐ The scope of work items in the cost estimate are required based on the agreed-upon damage description and dimensions.

   ☐ The scope of work included ineligible items, and FEMA has removed the ineligible components from the estimate (documentation detailing the components removed and reason for removal is attached).

   ☐ The scope of work included ineligible items, and FEMA is returning the estimate to the Applicant to revise.

---

[408] In lieu of a license or certification, an individual with professional experience and proficiency in the field of cost estimating may prepare and sign the cost estimate.

V4 2020                                                                                   Page 260

3.  **Determine whether unit costs are from an approved source of industry standard information and whether current cost data publications were used:**

    There are numerous sources that may be used in the preparation of cost estimates.

    ☐  The Applicant used the following appropriate cost estimating resource(s):

        ☐  Industry standard construction cost estimating resource

            ☐  RSMeans

            ☐  XActimate

            ☐  BNi Costbooks

            ☐  Marshall & Swift

            ☐  Sweet's Unit Cost Guide

            ☐  Other_____

        ☐  Local cost data from_____

        ☐  Contract unit costs from recently completed projects

        ☐  Other: _____

    ☐  FEMA returned the estimate to the Applicant to revise as the Applicant did not use an appropriate cost estimate resource.

4.  **Determine the components of unit costs:**

    Ensure that the components that make up the unit costs are fully understood. The purpose of this review is to ensure that components of the unit costs are not duplicated elsewhere in the cost estimate.

    ☐  The estimate contained sufficient information related to the components of the unit costs:

        ☐  Each unit cost represented a complete and in-place cost that included all labor, equipment, materials, small tools, incidentals, and hauling costs necessary to complete that element of work.

        ☐  Unit costs were analyzed to determine if general contractor overhead and profit were included in the unit costs:

            ☐  Both general contractor and subcontractor overhead and profit are included in the unit costs and these costs are not duplicated elsewhere in the estimate or in the Cost Estimating Format (CEF).

            ☐  Overhead and profit are not included in the unit costs.

            ☐  Overhead and profit are duplicated in the estimate.

            ☐  Costs for surveying, construction inspection, and permit compliance fees are not duplicated (i.e., not included within a unit cost and separately in the estimate).

        ☐  The estimate did not contain sufficient information related to the components of the unit costs. FEMA requested additional information from the Applicant.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**5. Validate the cost estimate for completeness and reasonableness.**

☐ The costs of work items are reasonable based on a representative sample.

☐ FEMA has determined costs for items of work in the estimate to be unreasonable (see attached). Therefore, the estimate was returned to Applicant to revise.

☐ All items of work included in the cost estimate are eligible.

☐ FEMA has removed ineligible items of work from the cost estimate (see attached).

☐ All work activities required to complete the work are quantified with unit costs.

☐ The cost estimate included lump sum amounts for work activities that need to be adjusted to unit prices. FEMA has returned the estimate to the Applicant for revision.

☐ The appropriate locality adjustment factor from the cost estimating publication is used for each line item, as applicable. Where historical costs were used, a locality adjustment was not applied, but cost escalation factors were added.

☐ The appropriate locality adjustment factor from the cost estimating publication was not used (see attached) or, as historical costs were used, a locality adjustment was inappropriately applied.

☐ Cost items checked are within 10 percent of the local average weighted unit prices or industry standard construction cost data (based on a review of at least six of the ten largest cost items against local average weighted unit prices or industry standard construction cost data (or there were less than ten cost items and all were reviewed) and based on reviewing at least 25 percent of the remaining cost items against local average weighted unit prices or industry standard construction cost data.

☐ Cost items checked are not within 10 percent of the local average weighted unit prices or industry standard construction cost data; therefore, the estimate was returned to Applicant to revise.

Date Review Completed_____

Date of Information Requests to Applicant_____

Name of Reviewer_____

Reviewer Signature_____

V4 2020                                                                                          Page 262

# APPENDIX M: ALTERNATIVE PROCEDURES FOR PERMANENT WORK

Alternative Procedures for Permanent Work under Section 428 of the Stafford Act is designed to achieve better recovery outcomes and simplify the delivery of assistance.

## Objectives

- Focus on outcome-based recovery;
- Enable applicants to use funds in a manner that best meets their specific needs for recovery;
- Promote long-term resiliency;
- Improve future preparedness; and
- Simplify the delivery of assistance.

## Benefits of using the Pilot

- No requirement to rebuild communities back to what existed prior to the disaster.
- Applicants can share funds across all Permanent Work Pilot Projects.
- Excess funds may be used to reduce risk and improve future disaster operations.
- Hazard mitigation funding may be added to Replacement Projects.

## Project Requirements

- In order to receive the benefits:
  - ✓ The project must be a Large Project.
  - ✓ Applicants must accept a fixed cost offer.
- The fixed cost is based on the estimated amount to rebuild to pre-disaster design and function.
- FEMA processes any project that does not have a fixed cost accepted within 18 months of the declaration date using standard PA policies.
- FEMA will consider time extensions on a case by case basis.

The attached table summarizes the differences between the Alternative Procedures and standard PA procedures:

| Alternative Procedures | Standard Procedures |
|---|---|
| Fixed-cost project with use of excess funds. | Actual cost project. No retention of excess funds associated with the approved estimate. |
| May use funds across all Alternative Procedures Projects. | Can only use funds toward the specific work identified in each specific Project. |
| After FEMA approves a SOW, FEMA only requires approval for changes that involve buildings or structures aged 45 years or older, ground disturbing activities, or work in or near water. | After FEMA approves a SOW, FEMA requires approval for any change to the SOW. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| Do not need to track costs associated with changes to the SOW. | Must track costs associated with all changes to the SOW. |
| Do not need to track costs to specific work items. Only need to track the total costs associated with the Alternative Procedures Projects. | Must track costs specific to each work item within each individual project. |
| Do not need to track work to specific projects. Only need to substantiate that the work is related to the approved SOW covered in the Alternative Procedures Projects. | Must track all work to each individual project. |

V4 2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# APPENDIX N: WORK ELIGIBILITY CONSIDERATIONS BY TYPE OF FACILITY

| Work Eligibility Considerations: All Facilities | | |
|---|---|---|
| **PAPPG Reference** | **Topic** | **Applicability** |
| Chapter 4:II, *Facility Eligibility* | **Facility Eligibility** | All Permanent Work. |
| Chapter 4:I, *General Work Eligibility* | **General Work Eligibility**<br>○ Result of Declared Incident<br>○ Within Designated Area<br>○ Applicant's Legal Responsibility | All work. |
| Chapter 6, *Cost Eligibility* | **Cost Eligibility** | All eligible work. |
| Chapter 7, *Emergency Work Eligibility* | **Emergency Work Eligibility** | All Emergency Work. |
| Chapter 7:I, *Debris Removal (Category A)* | **Debris Removal Eligibility** | All Debris Removal Work. |
| Chapter 4:I.C; Chapter 7 and ; Appendix A | **Environmental and Historic Preservation (EHP) Compliance** | All work (including ground disturbance for any staging areas, access roads, parking, landscaping, grading, or utilities). |
| Chapter 8:III, Codes and Standards | **Codes and Standards** | Upgrades to pre-disaster design required by codes or standards. |
| Chapter 8:IV, *Hazard Mitigation*; and Appendix J | **Hazard Mitigation** | Hazard mitigation is any sustained action (work) taken to reduce or eliminate long-term risk to people and property from natural hazards and their effects |
| Chapter 8:V, *Repair vs. Replacement* | **Replacement** | The purpose of the 50% Rule is to make an early determination on whether it is more prudent to repair or replace a facility. It is not intended to be a full calculation of all eligible project costs. |
| Chapter 8:VI, *Relocation* | **Permanent Relocation** | FEMA may approve funding for and require restoration of an Applicant's destroyed (i.e., eligible for replacement) facility at a new location. |
| Chapter 8:III.E, *Floodplain Management and Wetland Protection* and VII, *Facility Located in or Impacting a Floodplain* | **Floodplain Considerations** | All Permanent Work in or impacting the floodplain |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Work Eligibility Considerations: All Facilities | | |
|---|---|---|
| Chapter 8:IX.F, *Landslides and Slope Stabilization* | **Landslides and Slope Stabilization** | Facilities damaged due to a landslide or slope instability triggered by the incident. |
| Chapter 7:II.V, *Temporary Relocation of Essential Services* | **Temporary Relocation** | Certain essential community service facilities. |

| Work Eligibility Considerations: Roads and Bridges | | | | |
|---|---|---|---|---|
| Road (including surface, base, shoulders, roadside ditches, guardrails, lighting, signage, sidewalks, etc.), drainage structure (culvert, low-water crossing), bridge (including, but not limited to, decking, pavement, piers, girders, abutments, slope protection, approaches, guardrails, lighting, signage, sidewalks) | | | | |
| EHP laws, regulations, and executive orders (EOs) that frequently apply: NEPA; NHPA, ESA, CWA, CAA, EOs 11988 and 11990; projects involving work in waterways usually require Section 404 permits – permits issued by the USACE as required by the CWA. | | | | |
| **PAPPG Reference** | **Category** | **Eligible Work (including, but not limited to):** | **Ineligible Work and Costs** | **Other Considerations** |
| Chapter 7:I | A | **Debris removal and disposal to eliminate an immediate threat** | o Removal of debris placed on public ROWs from commercial properties unless pre-approved by FEMA<br>o Removal of materials related to the construction, repair, or renovation of either residential or commercial structures | Must distinguish between incident-related debris versus debris generated by other recent events. |
| Chapter 7:II.J | B | **Emergency access**<br>**If the extent of damage or blockage makes these areas inaccessible, work related to providing access is eligible.**<br>o This includes clearing debris from or conducting emergency repairs to an access facility, such as a road or bridge.<br>o Eligible work is limited to that necessary for the access to remain passable | o Removal of debris from a privately-owned access facility UNLESS no other access point exists, and damage or debris impedes emergency access.<br>o Emergency repairs to privately-owned roads UNLESS no other access point exists, damage impedes emergency access, and repair eliminates temporary housing needs. | The Applicant must complete all necessary legal processes or obtains rights-of-entry and agreements to indemnify and hold harmless the Federal Government. |

## Work Eligibility Considerations: Roads and Bridges

Road (including surface, base, shoulders, roadside ditches, guardrails, lighting, signage, sidewalks, etc.), drainage structure (culvert, low-water crossing), bridge (including, but not limited to, decking, pavement, piers, girders, abutments, slope protection, approaches, guardrails, lighting, signage, sidewalks)

EHP laws, regulations, and executive orders (EOs) that frequently apply: NEPA; NHPA, ESA, CWA, CAA, EOs 11988 and 11990; projects involving work in waterways usually require Section 404 permits – permits issued by the USACE as required by the CWA.

| Chapter 7:II.X | B | Emergency repairs to address an immediate threat | o Emergency repair of Federal-Aid highways (under FHWA authority). | |
|---|---|---|---|---|
| Chapter 6:XXI.A and B;  Chapter 8:IX.A | C | Restoration: Permanent repair or replacement | o Loss of useful service life.<br>o Loss of toll revenue.<br>o Construction of additional lanes even if required by a code or standard, except when code requires changing a one lane bridge to two lanes.<br>o Costs related to maintenance of roads are ineligible.<br>o Federal-aid routes are ineligible for Permanent Work. | o Must distinguish between minor incident-related damage and damage related to age of the road, traffic flow, and frequent rain events.<br>o Need date of construction for culvert and any nearby structures that may be altered or affected by the project.<br>o Hydrology and hydraulic study to evaluate upstream and downstream impacts are necessary if replacing culvert with larger culvert. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Work Eligibility Considerations: Water Control Facilities | | | | |
|---|---|---|---|---|
| Dam or reservoir, irrigation and water conveyance (canal, pipeline, lateral, pump station, siphon), aqueducts, drainage channels, sediment and debris basins, stormwater retention and detention basins, coastal shoreline protection facilities (seawall, revetment), flood control work (levee, floodwall, flood control channel, dam, or basin, and other structure primarily used for flood control), navigational waterways, and shipping channels | | | | |
| EHP laws, regulations, and EOs that frequently apply: NEPA; NHPA, ESA, CWA, EOs 11988 and 11990; projects involving work in waterways usually require Section 404 permits – permits issued by the USACE as required by the CWA. | | | | |
| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 7:I.C | A | **Debris removal and disposal (from natural feature or engineered facility) to eliminate an immediate threat**<br>o For navigable waterways, debris removal eligibility is limited to a max depth of 2 feet below the low tide draft of the largest vessel that utilized the waterway prior to the incident.<br>o For non-navigable waterways, debris removal is only eligible to the extent that it is necessary to eliminate an immediate threat if the debris:<br>- Obstructs, or could obstruct, intake structures;<br>- Could cause damage to structures; or<br>- Is causing, or could cause, flooding to property during the occurrence of a 5-year flood. | o Removal of debris to eliminate a threat of flooding to agricultural land.<br>o Random surveys to look for debris.<br>o Debris removal from flood control works that are under the specific authority of NRCS and/or USACE. | o Must distinguish between incident-related debris versus pre-existing debris and debris generated by other incidents.<br>o Cannot duplicate funding provided by another Federal agency (e.g., USACE or NRCS). |

| | | Work Eligibility Considerations: Water Control Facilities | | |
|---|---|---|---|---|
| Dam or reservoir, irrigation and water conveyance (canal, pipeline, lateral, pump station, siphon), aqueducts, drainage channels, sediment and debris basins, stormwater retention and detention basins, coastal shoreline protection facilities (seawall, revetment), flood control work (levee, floodwall, flood control channel, dam, or basin, and other structure primarily used for flood control), navigational waterways, and shipping channels | | | | |
| EHP laws, regulations, and EOs that frequently apply: NEPA; NHPA, ESA, CWA, EOs 11988 and 11990; projects involving work in waterways usually require Section 404 permits – permits issued by the USACE as required by the CWA. | | | | |
| Chapter 7:II.H; Chapter 8:IX.2 | B | **Flood-fighting (on natural feature or engineered facility) or emergency repairs (engineered and maintained facility only) to address an immediate threat**<br><br>o The repair of deliberate breaches or removal of flood-fighting measures is eligible as part of the Category B emergency protective measure project. | o Emergency protective measures to reduce the threat of flooding to agricultural land.<br>o Emergency repair of flood control works that are under the authority of USACE or NRCS.<br>o Flood-fighting measures on a flood control work that is under the authority of the NRCS.<br>o Permanently increasing height or capacity of a flood control work.<br>o De-watering of flooded areas primarily for the purpose of drying land.<br>o Emergency repair of a secondary levee riverward of a primary levee.<br>o Emergency repairs of flood control works under the authority of NRCS and USACE and of federally constructed coastal shoreline protective features under the authority of USACE. | o USACE can conduct flood fighting activities. USACE cannot reimburse Applicants for flood fighting efforts. |
| Chapter 8:IX.B.1 and 2 | D | **Debris and silt removal required to restore capacity (engineered and maintained facilities only)**<br><br>o Eligible, but only if the Applicant provides documentation to establish the pre-disaster capacity of the facility AND that the facility was actively used and maintained with a regular clearance schedule. | o Restoration of flood control works under the authority of USACE or NRCS. | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | | Work Eligibility Considerations: Water Control Facilities | | |
|---|---|---|---|---|---|
| | | | Dam or reservoir, irrigation and water conveyance (canal, pipeline, lateral, pump station, siphon), aqueducts, drainage channels, sediment and debris basins, stormwater retention and detention basins, coastal shoreline protection facilities (seawall, revetment), flood control work (levee, floodwall, flood control channel, dam, or basin, and other structure primarily used for flood control), navigational waterways, and shipping channels | | |
| | | | EHP laws, regulations, and EOs that frequently apply: NEPA; NHPA, ESA, CWA, EOs 11988 and 11990; projects involving work in waterways usually require Section 404 permits – permits issued by the USACE as required by the CWA. | | |
| Chapter 8:IX.B.2 | D | | **Restoration: Permanent Repair or Replacement**<br>o  PNP irrigation facilities are only eligible if they provide water for essential services of a governmental nature to the general public for water for drinking water supply, fire suppression, or electricity generation. | o  Restoration of natural channels, lakes, and shorelines—that is, any feature that is not improved and maintained.<br>o  Restoration of PNP irrigation systems that provide water solely for agricultural purposes.<br>o  Restoration of federally constructed coastal shoreline protective features.<br>o  Restoration of flood control works under the authority of USACE or NRCS. | |

## Work Eligibility Considerations: Buildings, Vehicles, and Equipment

EHP laws, regulations, and EOs that frequently apply: NEPA, NHPA, CAA, ESA and EOs 11988 and 11990

| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Chapter 7:II.B | B | Extracting water and clearing mud, silt, or other accumulated debris from eligible facilities if the work is conducted expeditiously for the purpose of addressing an immediate threat (if the work is only necessary to restore the facility, it is Permanent Work, not Emergency Work) | o Conducted on private property UNLESS FEMA approves the work because:<br>- The immediate threat is widespread, affecting numerous homes and businesses such that it is a threat to the health and safety of the general public;<br>- The Applicant has legal authority to perform the work; and<br>- The Applicant obtained rights-of-entry and agreements to indemnify and hold harmless the Federal Government. | |
| Chapter 8:IX.C.1 | E | Removal of mud, silt, or other accumulated debris is eligible as Permanent Work when conducted in conjunction with restoration of the facility. | | |
| Chapter 7:II.B | B | Mold remediation to address immediate threat of additional damage<br>o Includes post-remediation sampling to confirm remediation is complete. | o Mold remediation required as a result of poor facility maintenance or failure to take protective measures in a reasonable amount of time following the incident. | o Pre-remediation mold sampling is only eligible when sampling reveals presence of mold. |
| Chapter 8:IX.C.1 | E | Mold remediation when conducted in conjunction with restoring the facility<br>o Post-remediation sampling to confirm remediation is complete. | o Mold remediation required as a result of poor facility maintenance or failure to take protective measures in a reasonable amount of time following the incident. | o Pre-remediation mold sampling is only eligible when sampling reveals presence of mold. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Work Eligibility Considerations: Buildings, Vehicles, and Equipment | | | | |
|---|---|---|---|---|
| EHP laws, regulations, and EOs that frequently apply: NEPA, NHPA, CAA, ESA and EOs 11988 and 11990 | | | | |
| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 7:II. | B | **Emergency protective measures to address an immediate threat**<br>o Buttressing, bracing, or shoring.<br>o Barricading and safety fencing.<br>o Flood protection, such as sandbagging.<br>o Emergency repairs to prevent further damage. | | |
| Chapter 7:II.U | B | **Demolition to address an immediate threat**<br>o Demolition of private structures may be eligible when collapse is imminent, and an immediate threat exists to the general public subject to additional requirements. | o Removal of slabs or foundations that do not present a health or safety hazard.<br>o Removal or covering concrete pads and driveways.<br>o Exception to both – Structures in a buyout program funded by FEMA through the HMGP. | o If securing an unsafe structure and the surrounding area to prevent access is sufficient to alleviate the threat to public safety, demolition may not be necessary or eligible. |
| Chapter 7: II.S | B | **Safety inspections**<br>o To establish whether a building is safe for entry, occupancy, and lawful use, as well as posting appropriate placards.<br>o Eligible for both public and private buildings. | o Inspections associated with:<br> ▪ A determination of Substantial Damage under the community's floodplain management ordinance.<br> ▪ A determination of whether the building needs to be elevated or relocated.<br> ▪ Ensuring repairs are completed in accordance with building codes and standards. | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Work Eligibility Considerations: Buildings, Vehicles, and Equipment | | | | |
|---|---|---|---|---|
| EHP laws, regulations, and EOs that frequently apply: NEPA, NHPA, CAA, ESA and EOs 11988 and 11990 | | | | |
| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 6:XVII, 8:IX.C.1 and Appendix C | E | **Post-earthquake inspection and evaluation of welded steel moment frames in buildings**<br>○ To determine the level of disaster-related damage requiring repair. | ○ Preliminary assessment to determine which buildings are likely to have sustained damage to welded steel moment frame connections.<br>○ Detailed analytical or experimental studies.<br>○ Inspections that do not yield discovery of significant connection damage attributable to the earthquake. | ○ The repair of the damaged frame connections to pre-earthquake design in accordance with FEMA 352, Chapter 6, is eligible, but only if FEMA approves a specific SOW for the repairs prior to the Applicant performing the work.<br>○ Repair of the architectural finishes and fire retardants removed in the area of the damage are also eligible. |
| Chapter 6:XXI.C.; 8:I.; III.; VII, IX.C, C.1 and C.2 | E | **Restoration – Permanent repair or replacement**<br>○ Repair or replacement of buildings (to achieve pre-disaster design, capacity, and / or function)<br>○ Repair or replacement of building components, vehicles or equipment with items similar in age, condition, and capacity. | ○ Tax assessments.<br>○ Additional capacity necessary due to increased population or use, even if required by code.<br>○ Americans Disabilities Act (ADA), if the Applicant was notified of being in violation of a requirement prior to the incident and did not bring the facility into compliance, then accessibility requirements related to the violation are ineligible. | ○ Need date(s) of construction of all facilities in the project area.<br>○ Check National Register of Historic Places or a State historic register.<br>○ Identify whether the building is located in the 100-year floodplain (500-year for critical actions).<br>○ Public Housing Authority facility(s) is only eligible for Permanent Work if Congress does not appropriate funds to HUD for emergency capital needs for the facility.<br>○ Must consider the age of the building, roof, and building systems; evidence of regular maintenance; severity and impacts of incident when distinguishing between incident-related damage and pre-existing damage.<br>○ Comply with federally required codes and standards when repairing or replacing building. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | | Work Eligibility Considerations: Contents | | |
|---|---|---|---|---|
| Furnishings, equipment, consumable supplies, files, records, research-related contents, animals, irreplaceable collections and individual objects, library books, and publications. | | | | |
| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 7.II.B | B | **Address an immediate threat**<br>o Removal and storage of contents to minimize additional damage | | |
| Chapter 8:IX.C | E | **Restoration – Permanent repair or replacement**<br>o Replacement of destroyed contents with items similar in age, condition, and capacity.<br>o Recovering and stabilizing records.<br>o Stabilization of irreplaceable collections and individual objects is eligible.<br>o Re-shelving, cataloging, and other work incidental to the replacement of library books and publications. | o Replacing used items with new items, unless a used replacement item is not reasonably available.<br>o Establishing new information databases.<br>o Manually re-entering data into new computers<br>o Scanning re-established hardcopy files into computers to create digital files.<br>o Deciphering photocopies of damaged hard copies.<br>o Research-related contents and animal replacement, if a comparable item/animal is not available for purchase at a reasonable cost.<br>o Replacement of rare books, collections, or objects. | o Applicants may replace contents with different items used for the same general purpose.<br>o Eligible funding is capped at the estimated cost for equivalent items. |

| Work Eligibility Considerations: Utilities | | | | |
|---|---|---|---|---|
| Water storage, treatment plants, and delivery systems; power generation, transmission, and distribution facilities, including, but not limited to, natural gas systems, wind turbines, generators, substations, and power lines; sewage collection systems and treatment plants; communication systems | | | | |
| EHP laws, regulations, and EOs that frequently apply: NEPA, NHPA, ESA, CAA, CWA, and EOs 11988 and 11990 | | | | |
| PAPPG Reference | Category | Eligible Work (including, but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 6:XXI. A and D; 7:II.X | B | **Emergency protective measures to address an immediate threat**<br>o Buttressing, bracing, or shoring.<br>o Barricading and safety fencing.<br>o Flood protection, such as sandbagging.<br>o Emergency repairs to prevent further damage.<br>o Residential electrical meter repair | o Revenue lost due to shutdown of a utility.<br>o Increased operating costs, such as increased costs for obtaining an alternative source of power because of the shutdown of a power generation plant. | o Work performed under an exigent circumstance that restores the pre-disaster design and function of the facility in accordance with codes and standards is Permanent Work (Category F), not Emergency Work (Category B). |
| Chapter 6:XVII and 8:IX.D | F | **Restoration**<br>o Permanent repair or replacement of any component of system, including buildings, structures, or systems, even if not contiguous.<br>o Electrical conductor replacement subject to specific criteria.<br>o Inspection or assessment of damaged components of a system.<br>o Inspection or assessment of an inaccessible structure or component of a system may be eligible, but only when there is evidence of damage, such as when sunken ground appears above a water pipeline. | o General post-disaster surveys, inspections, and assessments, such as video inspection of sewer lines. | o Rural electric cooperatives, municipal utilities, and public power districts frequently use time and equipment contracts for power distribution system repairs. Costs under these contracts are subject to certain criteria.<br>o Limited ROW clearance required to access a damaged facility may be eligible. |

| Work Eligibility Considerations: Parks, Recreation, and Other | | | | |
|---|---|---|---|---|
| EHP laws, regulations, and EOs that frequently apply: NEPA, NHPA, CZMA, CBRA, ESA, CWA, and EOs 11988 and 11990 | | | | |
| PAPPG Reference | Category | Eligible Work (including; but not limited to): | Ineligible Work and Costs | Other Considerations |
| Chapter 7:II. | B | **Emergency protective measures to address an immediate threat**<br>o Buttressing, bracing, or shoring.<br>o Barricading and safety fencing.<br>o Flood protection, such as sandbagging.<br>o Emergency repairs or stabilization to eliminate or lessen an immediate threat. | o Work performed under an exigent circumstance that restores the pre-disaster design and function of the facility in accordance with codes and standards is Permanent Work, not Emergency Work | |
| Chapter 8:IX.E | G | **Restoration – Permanent repair or replacement**<br>o Restoration of engineered beaches is subject to specific eligibility criteria. | o Restoration of federally constructed beaches or shoreline protection facilities.<br>o Restoration of PNP parks and recreational facilities, including supporting facilities such as roads, buildings, and utilities.<br>o Restoration of natural, unimproved features.<br>o Replacement of dead trees, shrubs, and other vegetation (unless necessary for slope stabilization, erosion control, minimizing sediment runoff, or restoring the function of the facility).<br>o Replacement of destroyed crops; cosmetic or aesthetic vegetation. | |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT

# 8

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH

ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## COUNTY OF MONTGOMERY, PA

**DISASTER DEBRIS MONITORING SERVICE**
**SUBMITTED: SEPTEMBER 6, 2021**

**Prepared by:**
DebrisTech, LLC
925 Goodyear Blvd
Picayune, MS 39466

**Contact:**
Brooks Wallace, P.E.
601-916-1113 (cell)
brooks@debristech.com

**Protecting Communities. Leading Recovery.**



ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## Letter Of Transmittal

September 6, 2021

County of Montgomery, PA

Subject : RFP Disaster Debris Monitoring Service

Selection Committee,

DebrisTech, LLC is a full-service debris monitoring firm built upon a foundation of experience, knowledge, and technology. The core of our services is centered around streamlining the recovery process by automating the data collection for reimbursement purposes. This ultimately ensures the entire process operates quickly and efficiently. The individuals comprising our team possess direct and relevant experience in the field of disaster response and recovery, specifically disaster debris management monitoring. Our Principal engineers and management team have a combined century of experience in navigating FEMA regulations, disasters, and debris management monitoring.

A unique part of our team, is an Automated Debris Management System that captures time, date, GPS, and photos at all steps of the debris removal process. The ADMS incorporates cutting edge technology and industry-first process automation, serving as a real-time audit system for all debris removal operations and providing an extra layer of documentation from cradle to grave. We can provide an ESRI feature service that can integrate with the existing GIS system, as well as use shape files to determine the location  zone that the load of debris is located and whether or not it's within the contractor's responsibility. The ADMS implements a geofence around cities, parks, right-of-ways, or other designated areas and alerts the monitor when the boundary has been breached. Our FEMA certified project management team implements FEMA compliant documentation methodology and innovative reporting technology. In the field, load data is collected and reported live to the management team for review. After review the data is sent to the designated individuals to show daily and cumulative totals of the type, quantity, zone, and disposal sites of collected debris.

DebrisTech is experienced and capable of providing our clients with fully compliant debris management monitoring and management of contractor invoice reconciliation. Our data reconciliation methods are second to none based on speed and accuracy. We verify the contractor's invoice typically within one day and promptly recommend it for correction or payment. We are also prepared to assist in the procurement process for the debris removal contractor by providing RFP templates and proposal evaluation assistance. These innovative features and practices, partnered with our debris monitoring experience, make us uniquely qualified to fulfill any debris monitoring scope of work.

DebrisTech has responded in the mandated time requirement, to more than one hundred contract activations across the country and are prepared to do the same for the County of Montgomery. Recent projects have showcased our company's ability to utilize local suppliers, manage large workforces, and carry all expenses associated with a staff of 600 or more. I will personally oversee the administration of our management team in response to this activation. Please feel free to contact me directly as the authorized negotiator at 601-916-1113 or brooks@debristech.com.

Thank you,

Brooks R. Wallace, P.E., President

925 Goodyear Boulevard ~ Picayune, Mississippi 39466 ~ www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DEBRISTECH**
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

# Executive Summary

## DebrisTech, LLC

When a major disaster strikes, it is critical that response and recovery efforts be carried out quickly, safely, and efficiently. Since 2010, our Automated Debris Management System provides real time access to all aspects of debris removal operations through the DebrisTech Central Information Database. Debris Removal Monitors, equipped with our tracking devices, keep a bullet-proof digital record from start to finish.

Modeled after proven debris monitoring methods, DebrisTech replaces hand written tickets with real time data collection devices, raising the bar for documentation and security. Built-in automated fraud detection and audit tools reduce the risk of fraudulent activities and minimize the potential of costly de-obligations. The system can also provide agencies, such as FEMA or the Inspector General, real time access to the data. This access allows auditors to begin their task early, meaning quicker reimbursement and recovery.

DebrisTech takes pride in cultivating personal, lasting relationships with our Clients. We realize that most of our Clients call on us during times of distress and we recognize the tremendous responsibility associated with accurately and thoroughly documenting the debris removal process. DebrisTech is committed to providing the attention and service that is second to none.

### FEMA Compliance
Monitoring the debris removal process from site loading to disposal with electronic tracking ensuring FEMA COMPLIANCE. Accurate documentation of debris removal and disposal operations and eligible associated costs is essential for any and all grant reimbursements from FEMA. DebrisTech's Debris Monitoring System Documentation will verify to FEMA that your debris removal operations are eligible for reimbursement, costs are reasonable, contract and procurement processes are appropriate, quantification of the debris is accurate, and the tracking of the debris to its final disposition is recorded and in absolute compliance with all regulatory requirements. Our debris monitors understand FEMA policies and guidelines, including eligibility issues and specifically those relating to debris. However, each disaster is unique and we will work with you and FEMA to develop any specific protocols necessary for your particular situation.

DebrisTech will Identify possible health/safety risks, verify operational compliance with FEMA eligibility criteria, check debris loading, staging, reduction, and disposal sites to ensure compliance with PA eligibility criteria, validate truck and trailer capacity certifications, evaluate operational efficiency , and oversee documentation requirements as outlined by FEMA. Our goal is to handle all monitoring of the debris removal process to ensure all guidelines are followed and your operations meet FEMA eligibility requirements.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                           **Section** : Executive Summary

DebrisTech has helped communities across the country pick up the pieces after major disasters. Our team members have lived through hurricanes and other disasters, and we've seen first-hand what it means to a community and its residents. Our mission is to alleviate the burden of monitoring the process of the debris removal so that the leaders and residents of stricken communities can focus on each other and begin to heal, and ensuring that all costs incurred are eligible for reimbursement by FEMA. Debris removal monitoring is a very engaged process requiring focus and understanding of many areas of operation and federal guidelines. DebrisTech fully understands that these areas include:

- Understanding of Removal Contracts and Reimbursements
- Accurate and Objective Estimation of Debris Quantities
- Understanding of All Phases of Debris Management Operations
- Knowledge of Loading Sites, DMSs, and Final Disposition Sites
- Accurate Differentiation of Debris Types
- Adherence to and Understanding of Site Safety Procedures
- Effective and Efficient Communication
- Experience and Knowledge of Construction Machinery

## GIS Compatible Geo-Fencing

The DebrisTech System also has interactive mapping features that allow authorized users to view the exact pickup and disposal location for each debris ticket in real-time. Once GIS boundaries are uploaded, the ADMS denies debris ticket acceptance if the contractor loads outside of the prescribed work zone. The ADMS assigns loads to certain districts of the clients maintained territories, such as city council districts or certain private communities

## Project Schedule

Before a disaster, DebrisTech helps the Client with its Debris Management Plan to ensure it meets FEMA regulations. We acts as advisors to the Client to maximize its return with FEMA. Our services in the planning stages will be at NO COST to the Client. The planning stage is a service DebrisTech provides as the Client's Monitoring Firm. With our ADMS, you have 24/7 access to the database that provides real-time updates on the progress of the Cleanup.

## Hiring Locally

DebrisTech understands the importance of utilizing local resources following a natural disaster. It is DebrisTech's policy to hire as many local workers as are available in the project area to fill the field coordinator, load monitor, and tower monitor positions. Because we utilize Apple's iPads for our load ticketing device, the training process is very efficient and takes less than 3 hours typically. This hiring and training process begins as soon as our management team reaches the area and continues until an adequate workforce establishes. We always work very closely with the Debris Removal Contractor to make sure that we have enough monitors available to meet their needs.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                                **Section** : Executive Summary

Below is a table that summarizes the activities that will take place over the duration of the project:

| Prior to Award | 0-24 Hours | 0-24 Hours | 48 Hours | 1 Week | 1 Month |
|---|---|---|---|---|---|
| Allocate Necessary Equipment | Meet with Leadership | Begin Training Bring in Monitors Training | 1 Monitor Per Contractor Training | Maintain 1/1 Ratio Training | Start Invoicing to expedite reimbursement |
| Notify Key Personnel | Mobilize Key Personnel | Meet with other Contractor | Maintain Data Base with Official | Determine if Monitor Ratio is adequate | Continuing updates on Progress |
| Notify Monitors in the Area | Begin onboarding Process | Generate Custom Database/ Meet with GIS | Start Clean up Operations with Contractors | Removal Invoice Reconciliation | Removal Invoice Reconciliation |

## Litigation

DebrisTech, LLC certifies that neither the Company, nor any employee of the Company, has any conflict of interest, either direct or indirect, about the services sought herein pursuant to Federal or State Law or regulations.

DebrisTech, LLC certifies that it has never had any contract cancelled since formation in August of 2010.

DebrisTech certifies that it is not operating under Chapter 11 or any other financial restraints that would preclude its ability to eater into equipment leasing or rental arrangement.

DebrisTech certifies that it has not been prohibited from doing business with any government entity for any reason since its formation in 2010.

DebrisTech certifies that it has specific experience providing disaster debris monitoring following natural or manmade disasters.

DebrisTech is not currently involved in and has not had any claims, arbitrations, administrative hearings, or lawsuits related to debris monitoring, disaster recovery, or consulting brought against our company.

## Financial Stability

DebrisTech, LLC is a financially sound company with the ability to endure substantial payroll requirements for multiple projects of any size. A disaster of this magnitude effects many local governments. Our list of past clients shows that our firm frequently responds to multiple projects simultaneously. This level of response requires precise coordination of multiple project management teams and the capital to consistently fund payroll.

## Meeting Scope of Services

DebrisTech, LLC is fully capable of meeting the debris monitoring scope of services listed in this RFP. We understand that this will require immediate response upon activation. Since 2010, we have provided our clients with all the data necessary to receive reimbursement for their debris removal cost. The company President, Brooks Wallace, and principals, Les Dungan, Jeff Dungan, Lee Mock and Ryan Holmes assure the mobilization requirements will be met.

Brooks Wallace, P.E. is the President of DebrisTech, LLC.  DebrisTech is a Mississippi Limited Liability Company that will be authorized to perform business in Pennsylvania. The federal identification number is 27-3362906.

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Section 1 : Qualifications of the Firm



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Section 1 :** Qualification Of The Firm

# Documentation of Experience



DebrisTech has helped communities across the country pick up the pieces after major disasters. Our team members have lived through hurricanes and other disasters, and we've seen first-hand what it means to a community and its residents. Our mission is to alleviate the burden of monitoring the process of the debris removal so that the leaders and residents of stricken communities can focus on each other and begin to heal, and ensuring that all costs incurred are eligible for reimbursement by FEMA. Debris removal monitoring is a very engaged process requiring focus and understanding of many areas of operation and federal guidelines. DebrisTech fully understands that these areas include:

- Understanding of Removal Contracts and Reimbursements
- Accurate and Objective Estimation of Debris Quantities
- Understanding of All Phases of Debris Management Operations
- Knowledge of Loading Sites, DMSs, and Final Disposition Sites
- Accurate Differentiation of Debris Types
- Adherence to and Understanding of Site Safety Procedures
- Effective and Efficient Communication
- Experience and Knowledge of Construction Machinery

**Let our experience and understanding work for you.**

**Protecting Communities. Leading Recovery.**

# Kentucky Ice Storms (DR-4592-KY)

DebrisTech fulfilled the debris monitoring responsibilities of the state contract on behalf of ER Assist, the state Public Assistance contractor, following this disaster. Our staff was responsible for hiring, training, monitoring, documenting, and removal invoice reconciliation.



**FEMA-4592-DR, Kentucky Disaster Declaration as of 04/09/2021**

**DT108 - Boyd County** - March, 2021 - June, 2021 - 12,105.9 Tons

Jason Queen, FEMA Coordinator - 606-393-1801

**DT07 - Carter County**- August 25, 2020 - Present 137,055.5 CY

Tom Thompson, EM Director - 606-474-9827

**DT110 - Elliot County** - April, 2021 - August, 2021 89,011.2 CY

Jim Skaggs, EM Director - 606-738-6011

**DT109 - Johnson County** - June, 2021 - Present - 79,067.7 CY

Jerry McClure, EM Director - (606) 789-2550

**DT113 - Morgan County** - April, 2021 - August 2021 - 58,524.5 CY

Irene Jenkins, EM Director - (606) 743-4169

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                              **Section 1** : Qualifications of the Firm

# Iowa Severe Storms (DR-4557-IA)

DebrisTech is eligible to respond to this request for proposals based on experience acquired from providing debris monitoring services in response to more than 100 contract activations across 12 states and the commonwealth of Puerto Rico since 2010. Below are very recent examples of the firm assisting similarly effected governments following two



**DT080**

**Madrid, IA** - August 20, 2020 - October 6, 2020 CY 25,767.4, 1 DMS

Tom Brown, Mayor- 515-795-3930

**DT081 - City of Cedar Rapids, IA** - August 25, 2020 - Present CY 3,301,183.7  16 DMS

John Riggs, Housing & Enforcement Manager - 319-286-5981 J.riggs@cedar-rapids.org

**DT082 - City of Marion, IA** - September 2, 2020 - Present CY 1,102,111, 3 DMS

Ryan Miller, Public Services Director - 319-377-6367 rmiller@cityofmarion.org



# Recent Experience

DebrisTech is eligible to respond to this request for proposals based on experience acquired from providing debris monitoring services under 85 contract activations across 11 states and the commonwealth of Puerto Rico since 2010. Below are eight very recent examples of the firm assisting similarly effected governments following two separately declared disasters.

2020 - Mississippi SEVERE STORMS, TORNADOES, STRAIGHT-LINE WINDS, AND FLOODING (DR-4536-MS)

2020 - Mississippi SEVERE STORMS, TORNADOES, STRAIGHT-LINE WINDS, AND FLOODING (DR-4551-MS)

**DT065 - Jefferson Davis County, MS** - April 27, 2020 - July 30, 2020 CY 237,697.1

Bobby Rushing, Board President - 601-792-4336 - brushing@co.jefferson-davis.ms.us

**DT066 - Lamar County, MS** - April 23, 2020 - May 14, 2020 CY 14, 790.7

Tommy Jones, Road Manager - 601-606-5768t - tjones@lamarcountyms.gov

**DT067 - Jones County, MS** - May 4, 2020 - August 12, 2020 CY 271,393.2

Daniel Ashley, Chief Administrative Officer - 601-649-1280

**DT068 - City of McComb, MS** - April 30, 2020 - July 12, 2020 CY 107,080.9

Quodiniah Lockley, Mayor - 601-684-4000 - qlockley@mccomb-ms.gov

**DT070 - Marion County, MS** - June 2, 2020 - Present CY 38,910.9

Terry Broome, Board President - 601-736-7382 - terrybroome@co.marion.ms.us

**DT071 - Walthall County, MS** - June 1, 2020 - July 28, 2020 CY 68,492.1

Larry Montgomery, Board President - 601-876-2611 - cginn@co.walthall.ms.us

**DT072 - Lawrence County, MS** - June 1, 2020 - July 11, 2020 CY 42,387.7

Steve Garret, Board President - 601-587-3003 - hrains@co.lawrence.ms.us

**DT073 - Pike County, MS** - July 15, 2020 - August 5, 2020 CY 36,771.2

Tami Dangerfield, County Admin. - 601-783-5289 - tamid@pikecountyms.gov



FEMA-4551-DR, Mississippi Disaster Declaration as of 07/09/2020



FEMA-4536-DR, Mississippi Disaster Declaration as of 05/29/2020

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**    **Section 1 :** Qualification of the Firm



# City of Dallas, TX



## Project Highlights

- 409,330.6 CY of Debris Monitored and Documented

- 6,191 Leaners and 2,700 Hangers Documented

- 48 Debris Removal Crews

- 3 Disposal Sites in Operation

- Focus on Vegetation & Waterway Clearing

On the evening of October 20, 2019 a discrete supercell of thunderstorms developed across the Dallas–Fort Worth metroplex, generating several tornadoes. One of those tornadoes was an EF3 and caused damage in the Dallas suburbs, becoming the costliest tornado event in Texas history, at $1.55 billion. A later squall line contributed to additional tornadoes and a widespread swath of damaging winds as the system tracked eastward.

**The City of Dallas, TX** promptly advertised for debris management services and debris monitoring services. DebrisTech was selected to provide debris monitoring services. Once selected, standard protocols where initiated to alert previously notified debris monitors in the area to coordinated on boarding and specific duty/safety training. After consulting with the management/removal contractor it was determined that 60 monitors would be required to properly monitor the removal operation. Our management team responded with in 24 hours and was fully staffed with in 48 hours completely documenting the required aspect of the removal operations.

The initial operation was to gather debris from the right of way and process it at separate Temporary Debris Management Sites before hauling it out to a permanent disposal site east of Dallas. Parks and drainage waterways experienced extensive damage from the EF3 level winds. Our monitors utilized the ADMS to capture crucial data that was required if the city was to receive any reimbursement from FEMA for the clearing and removal services.

## Service Date
October 2019 - February 2020

## Client Contact Information
Mr. Tim Oliver
Solid Waste Director
214-670-5111
timothy.oliver@dallascityhall.com

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**



# Puerto Rico DTOP – Hurricane Maria



## Project Highlights

- 1,303,358.2 CY of Vegetative Debris Monitored and Documented and counting

- 78,358.7 CY of C&D Debris Monitored and Documented and counting

- 300 Debris Removal/Trimming Crews

- 8 Disposal Sites in Operation

On September 20, 2017, Puerto Rico, the American Territory roughly 1,000 miles off the coast of Florida, was assaulted by the tenth most intense storm recorded in the Atlantic Ocean. Hurricane Maria swept across the 3,500 sq miles Island leaving devastation in its wake. That record-setting storm left more than 90% of the island in the dark; with a debris field that encompassed all of Puerto Rico.

The Government of Puerto Rico elected to divide the Island into 5 Zones and hired two, third party private consultants to Monitor and Document the removal and disposal of the storm generated debris. DebrisTech was selected to monitor the East and the North DTOP zones. These zones experienced the first effects of the destructive waves and winds brought on by Maria.

Utilizing DebrisTech's ADMS to monitor and record the Contractor's activities, the local government is able to track and manage their recovery in these zones with access to real-time information.

DebrisTech mobilized within 24 hours after Notice to Proceed while amassing a staff of 40 trained monitors and a management staff of 16 full-time DebrisTech employees keeping pace with the local government's desire to begin the recovery process as soon as possible.

DebrisTech is honored to be considered one of the top 2 firms in our respected field based on our past and current performances aiding cities, counties, states, and territories across the country in recovering from their own unexpected natural disasters. Due to the amount of personnel demand over a sustained period, coupled with agreed upon payment terms, this project is a shining example of DebrisTech's ability to engage in multi-million dollar endeavors across the country.

## Service Dates:

November 2017 - Present

## Client Contact Information

Ing. Emilio Garay Vega; PE, RPA
Special Assistant to the Executive Director of DTOP
787-722-2929 ext. 3034
mailto:egaray@dtop.pr.gov

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**   **Section 1 :** Qualification of the Firm

## "The Beaches" – Florida



In 2014 the **City of Jacksonville Beach** procured DebrisTech to provide debris monitoring services until 2019 and is now extended until 2025. This pre-procured contract and their approved debris management plan have allowed them to be fully prepared for the last 3 major hurricanes to effect Jax Beach. DebrisTech was present in the EOC within hours of each storm's passing to begin the first push and the required debris removal documentation.

Upon activation in 2016 for Hurricane Matthew, DebrisTech was recognized as a necessity by two neighboring beach cities, **Neptune Beach and Atlantic Beach**. These cities utilized the cooperative purchasing clause in Jacksonville Beach's RFP to enter into an agreement with DebrisTech to provide debris monitoring services in October of 2016.

DebrisTech was responsible for documenting every hazardous limb and tree, along with every load of storm-generated debris, from these 3 cities. DebrisTech also documented the removal of this debris to its final resting place in the haul out phase.

After Irma in 2017, DebrisTech was able to monitor and document the removal of all eligible storm-generated debris, along with hundreds of hazardous trees and limbs, from the public right of way for all 3 cities. Because of the geographic proximity of these cities, DebrisTech was able to leave 1 project manager to service and address any concerns brought up by each city.

## Project Highlights

- 240,000 CY of Debris Monitored and Documented

- 1,500 Hazardous Hanger and Leaner Tickets Processed

- Vegetative, C&D, and HHW Debris Classified, Removed, and Disposed

- 3 Temporary Disposal Sites

- 40 Monitors and other Staff members

## Service Dates:

October 2016 -January 2017

October 2017 - January 2018

## Client Contact Information

Dennis Dupries, Construction Engineering Project Manager, Jacksonville Beach

904-247-6220

ddupries@jaxbchfl.net

Leon Smith, Public Works Director, Neptune Beach

904-270-2423

leonsmith@neptune-beach.com

Scott Williams, Director of Public Works, Atlantic Beach

904-247-5834

swilliams@coab.us

**Protecting Communities. Leading Recovery.**

## Recent Debris Monitoring Clients

| Event | Client | Point of Contact | Title | Contact |
|---|---|---|---|---|
| Ice Storm 2021 | Boyd County, KY | Jason Queen | FEMA Coordinator | 606-694-0715 |
| Ice Storm 2021 | Carter County, KY | Mike Malone | County Judge Executive | 606-474-5366 |
| Ice Storm 2021 | City of Natchez, MS | Richard Burke | Assistant Mayor | 601-445-7555 |
| Ice Storm 2021 | Warren County, MS | Jim Garner | County Engineer | 601-618-7777 |
| Hurricane Zeta 2020 | Greene County, MS | Jason Lamb | County Engineer | 601-310-4205 |
| Hurricane Zeta 2020 | Town of Leakesville, MS | Rex Garretson | Town Clerk | 601-394-2383 |
| Hurricane Zeta 2020 | George County, MS | Connie Shockley | Purchasing Clerk | 601-947-7506 |
| Hurricane Zeta 2020 | City of Selma, AL | Meredith Stone | City Engineer | 334-875-1960 |
| Hurricane Zeta 2020 | City of Pass Christian, MS | Marian Govenor | City Clerk | 228-452-3311 |
| Ice Storm 2020 | City of King Fisher, OK | Dave Slezickey | City Manager | (405) 375-3705 |
| Hurricane Zeta 2020 | City of Bay St. Louis, MS | Kim Favre | Public Works Director | (228)466-5505 |
| Ice Storm 2020 | City of Peidmont, OK | Andy Logan | Emergency Manager | (405) 850-9684 |
| Hurricane Zeta 2020 | Forsyth County, GA | Eric Johnson | County Manager | (770) 781-2101 |
| Ice Storm 2020 | City of Mustang, OK | Jess Schweinberg | Mayor | (405) 376-4521 |
| Ice Storm 2020 | City of Moore, OK | Brooks Mitchell | City Manager | (405) 793-5200 |
| Ice Storm 2020 | City of Midwest City, OK | Patrick Menefee | City Engineer | (405) 739-1213 |
| Ice Storm 2020 | City of El Reno, OK | Matt Sandidge | City Manager | 405-295-9312 |
| Hurricane Zeta 2020 | St. Charles Parish, LA | Chandra Sampey | Contract Monitoring Specialist | 985-783-5102 |
| Hurricane Zeta 2021 | City of Baker, LA | Darnell Waites | Mayor | 225-615-4194 |
| Hurricane Zeta 2021 | City of Carencro, LA | Don Chauvin | City Manager | 337-896-8481 |
| Hurricane Zeta 2020 | City of Ocean Springs, MS | Patty Gaston | City Clerk | 228-217-8692 |
| Hurricane Sally 2020 | City of Robertsdale, AL | Greg Smith | City Engineer | 251-747-7374 |
| Hurricane Laura 2020 | Matagorda Co., TX | Kristen Kubecka | County Auditor | 979-244-7614 |
| Derecho 2020 | City of Marion, IA | Ryan Miller | Public Services Director | 319-377-6367 |
| Derecho 2020 | City of Cedar Rapids, IA | John Riggs | Housing & Enforcement Manager | 319-286-5981 |
| Derecho 2020 | City of Madrid, IA | Tom Brown | Mayor | 515 7953930 |
| Hurricane Hanna 2020 | Matagorda Co., TX | Kristen Kubecka | County Auditor | 979-244-7614 |
| Flash Flood 2020 | St. Charles Parish, LA | Chandra Sampey | Contract Monitoring Specialist | 985-783-5102 |
| Tornado 2020 | Jefferson Davis County, MS | Bobby Rush | Board President | 601-792-4336 |
| Tornado 2020 | Walthall County, MS | Larry Montgomery | Board President | 601-876-2611 |
| Tornado 2020 | Marion County, MS | Terry Broome | President, Board of Supervisors | 601-736-7382 |
| Tornado 2020 | Pike County, MS | Tami Dangerfield | County Administrator | 601-783-5289 |
| Tornado 2020 | City of McComb, MS | Quodiniah Lockley | Mayor | 601-684-4000 |
| Tornado 2020 | Jones County,  MS | Daniel Ashley | Chief Administrative Officer | 601-649-1280 |
| Tornado 2020 | Lawrence County, MS | Steve Garrett | Board President | 601-587-3003 |
| Tornado 2020 | Lamar County, MS | Tommy Jones | Road Manager | 601-606-5768 |
| Straight Line Wind 2019 | City of Waverly, TN | Corey Burkett | Public Works Director | 931-296-2101 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                                                   Section 1 : Qualifications of the Firm

| | | | | |
|---|---|---|---|---|
| Tropical Storm Olga 2019 | City of Corinth, MS | Clayton Mills | Public Works Director | 662-415-2101 |
| Tornado 2019 | Lee County, MS | Lee Bowdry | EM Director | 662-432-2950 |
| Hurricane Harvey 2017 | Port Aransas | David Parsons | City Manager | 361-749-4111 |
| Tornado 2019 | City of Dallas, TX | Tim Oliver | Director of Sanitation | 214-670-3111 |
| Tornado 2019 | Yazoo County, MS | Jack Willingham | Emergency Management Director | 662-571-0378 |
| Tornado 2019 | City of McComb, MS | Quodiniah Lockley | Mayor | 601-684-4000 |
| Tornado 2019 | Monroe County, MS | Sonny Clay | Road Manager | 662-319-7881 |
| Tornado 2019 | City of Columbus, MS | Casey Bush | Public Works Director | 662 329-5116 |
| Hurricane Michael 2018 | Wiregrass Electric Coop | Jason Thrash | Project Engineer | 334-712-0714 |
| Hurricane Michael 2018 | Baker County, GA | Sherry Bailey | County Administrator | 229-734-3007 |
| Hurricane Michael 2018 | Lee County, GA | Mike Sistrunk | Co-County Manager | 229-759-6000 |
| Hurricane Michael 2018 | Miller County, GA | Corey Thomas | Deputy EMA Director | 229-758-4122 |
| Hurricane Michael 2018 | Mitchell County, GA | Clark Harrell | County Administrator | 229-336-2000 |
| Hurricane Michael 2018 | Panama City, FL | Shane Dougherty | Solid Waste Superintendent | 850-872-3172 |
| Hurricane Michael 2018 | Bay County, FL | Don Murray | General Services Director | 850-248-8732 |
| Hurricane Florence 2018 | Pamlico County, NC | Tim Buck | County Manager | 252-745-3133 |
| Hurricane Florence 2018 | Town of Hope Mills, NC | Melissa Adams | Town Manager | 910-426-4114 |
| Hurricane Florence 2018 | Cape Carteret, NC | Zachary Steffey | Town Manager | 252-393-8483 |
| Hurricane Maria 2017 | Puerto Rico Department of Transportation and Public Works | Ing. Emilio Garay Vega; PE, RPA | Special Assistant to the Executive Director of DTOP | 787-722-2929 ext. 3034 |
| Hurricane Maria 2017 | Puerto Rico Aqueduct and Sewer Authority | Arnoldo Colon Maldonado | Corporate & Strategic Planning Vice President | 787-620-2277 ext. 2412 |
| Hurricane Maria 2017 | Puerto Rico Department of Recreation and Sports | Cedric Sasso | Finance Director | 787-247-5444 |
| Hurricane Irma 2017 | McIntosh County, GA | Adam Poppell III | County Attorney | 912-437-2181 |
| Hurricane Maria 2017 | Forsyth County, GA | Chris Grimes | EMA Director | 770-205-5674 |
| Hurricane Maria 2017 | Bibb County, GA | Spencer Hawkins | Emergency Mgt | 478-832-6300 |
| Hurricane Maria 2017 | Jacksonville Beach, FL | Dennis Dupries | Engineering Project Manager | 904-226-3811 |
| Hurricane Harvey 2017 | Matagorda Co., TX | Kristen Kubecka | County Auditor | 979-244-7614 |
| Tennessee Straight Line Winds 2017 | City of Memphis, TN | Phillip Davis | Deputy Director of Solid Waste | 901-576-6872 |
| Mississippi Straight Line Winds 2017 | Holmes County, MS | Charlie Joiner | County Administrator | 662-834-0911 |
| Mississippi Straight Line Winds 2017 | City of Durant, MS | Tasha Davis | Mayor | 662-653-3221 |
| Mississippi Straight Line Winds 2017 | Yazoo County, MS | Donna Kraft | County Administrator | 662-746-8668 |

**Protecting Communities. Leading Recovery.**



| | | | | |
|---|---|---|---|---|
| Mississippi Straight Line Winds 2017 | Montgomery County | Ryan Wood | Chancery Clerk | 662-283-2333 |
| Jan Tornado 2017 | City of Hattiesburg | Larry Barnes | Public Works Director | 601-545-4545 |
| Jan Tornado 2017 | Lamar County, MS | Joseph Waits | County Administrator | 601-794-1008 |
| Hurricane Matthew 2016 | Jacksonville Beach, FL | Ty Edwards | Public Works Director | 904-226-3811 |
| Hurricane Matthew 2016 | Atlantic Beach, FL | Don Jacobovitz | Public Works Director | 386-916-7381 |
| Hurricane Matthew 2016 | McIntosh County, GA | Adam Poppell III | County Attorney | 912-437-2181 |
| Summer Floods 2016 | Tangipahoa Parish, LA | Wesley Danna | Parish Supervisor | 985-474-1003 |
| Summer Floods 2016 | City of Central, LA | Jr. Shelton | Mayor | 225-936-9687 |
| Summer Floods 2016 | City of Baker, LA | Darnell Waites | Mayor | 225-615-4194 |
| Summer Floods 2016 | City of Clinton, LA | Lori Ann Bell | Mayor | 225-244-2288 |
| Spring Floods 2016 | Tangipahoa Parish, LA | Wesley Danna | Parish Supervisor | 985-474-1003 |
| Spring Floods 2016 | Caldwell Parish, LA | Wanda Stowe | Sec/Treasurer | 318-649-2681 |
| Tornado 2015 | Marshal County, MS | Larry Hall | County Administrator | 662-544-1952 |
| Tornado 2015 | Benton County, MS | Ricky Pipkin | President,Board of Supervisors | 662-541-6853 |
| Tornado 2014 | Marion County, MS | Terry Broome | President,Board of Supervisors | 601-736-7382 |
| Tornado 2014 | City of Tupelo, MS | Don Lewis | Chief of Operations | 662-871-8169 |
| Tornado 2014 | Itawamba County, MS | Gary Franks | County Administrator | 662-401-4967 |
| Tornado 2014 | Winston County, MS | Julie Cunningham | Chancery Clerk | 662-773-3631 |
| Tornado 2014 | City of Pearl, MS | Brad Rogers | Mayor | 601-540-3962 |
| Tornado 2014 | Lamar County, MS | Chuck Bennet | County Commissioner | 601-794-3406 |
| EF5 Tornado 2013 | Moore, OK | Stan Drake | Deputy City Manager | 405-793-5200 |
| EF5 Tornado 2013 | Mustang, OK | Justin Battles | Assistant City Director | 405-376-4521 |
| Super Storm Sandy | Nassau County, NY | Richard Iadevaio | Superintendent of Highway Construction | 516-571-6824 |
| Super Storm Sandy | Long Beach, NY | Jim Lacarrubba | Commissioner of Public Works | 516-431-1011 |
| Super Storm Sandy | Town of Hempstead, NY | Craig A. Mollo | Deputy Commissioner of Highways | 516-812-3455 |
| Super Storm Sandy | Village of Garden City, NY | Ed Fronckwicz | Recreation Department | 516-465-4079 |
| Hurricane Isaac 2012 | Lincoln County, MS | David Fields | County Administrator | 601-835-3421 |
| Hurricane Isaac 2012 | Pearl River County, MS | Adrain Lumpkin | County Administrator | 601-403-2302 |

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Section 2 : Qualification of the Staff

**DEBRISTECH**

ELECTRONIC DEBRIS MANAGEMENT SYSTEM

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DebrisTech                                            **Section 2 :** Qualifications of the Staff

# Key Personnel



## Brooks Wallace, P.E., President

**brooks@debristech.com**

Brooks R. Wallace, P.E. created DebrisTech in 2010 in response to a need for real-time auditing of debris removal projects. He has a vast array of experience in the field of civil engineering, Point of Sale Systems, and debris removal monitoring. Working as an engineer on numerous projects in South Mississippi, including the aftermath of Hurricane Katrina, he was able to identify vulnerabilities and inefficiencies in the process of debris removal operations and monitoring. He realized that the technology was available to provide real-time data to FEMA and municipal supervisors overseeing cleanup efforts while creating a database of information that could be referenced at any time for compliance purposes. Utilizing the technology currently available, Mr. Wallace developed the software platform for what has evolved into a system that is revolutionizing the process of debris monitoring and compliance.

A civil engineer by trade, Mr. Wallace has dealt with countless municipal and county projects involving infrastructure upgrades and the modernization of local and regional maps and surveys. He has worked with law enforcement agencies, municipal governments, state agencies, and FEMA on projects ranging from smart growth plans to large-scale utility and resource redesigns.

Mr. Wallace will perform contractual negotiations, contractor invoicing, software development, and asset/personnel assignment. He is proficient in preparation planning, analysis, monitoring procedures, and personnel management. The technology he developed, along with previous experience, creates an invaluable leader for the DebrisTech team.

## Experience
DebrisTech, LLC

    Founder/Creator - 2010 - Present

Dungan Engineering, P.A.

    Principal Engineer - 2002 - Present

## Education
University of Mississippi

    Bachelor of Science, Civil Engineering

## Disasters Worked
2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021 DR-4598-MS-Mississippi Severe Winter Storms

2021DR-4592-KY Ice Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2019 DR-4470 Mississippi Severe Storms

2019 EF1 Tornado Dallas, TX

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4406 Hurricane Michael (AL)

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

2018 DR-4393 Hurricane Florence (NC)

2017 DR-4339 Hurricane Maria (PR)

2017 DR-4336-PR Hurricane Irma (PR)

2017 DR-4338 Hurricane Irma (GA)

2017 DR-4337 Hurricane Irma (FL)

2017 DR-4332 Hurricane Harvey (TX)

2017 DR-4320 Straight-line Winds (TN)

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                                                    **Section 2 :** Qualifications of the Staff

## Disasters Providing Monitoring Services

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021 DR-4598-MS-Mississippi Severe Winter Storms

2021DR-4592-KY Ice Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2019 DR-4470 Mississippi Severe Storms

2020 DR-4473-PR Earthquakes

2020 EM-3426-PR Earthquakes

2019 DR-4470 Mississippi Severe Storms

2019 EF1 Tornado Dallas, TX

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4406 Hurricane Michael (AL)

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

2018 DR-4393 Hurricane Florence (NC)

2017 DR-4339 Hurricane Maria (PR)

2017 DR-4336-PR Hurricane Irma (PR)

2017 DR-4338 Hurricane Irma (GA)

2017 DR-4337 Hurricane Irma (FL)

2017 DR-4332 Hurricane Harvey (TX)

2017 DR-4320 Straight-line Winds (TN)

2017 DR-4314 Straight-line Winds (MS)

2017 DR-4297 Tornadoes (GA)

2017 DR-4295 Tornadoes (MS)

2016 DR-4284 Hurricane Matthew (GA)

2016 DR-4283 Hurricane Matthew (FL)

2016 DR-4277 Flooding (LA)

2016 DR-4263 Flooding (LA)

2015 DR-4248 Tornadoes (MS)

2015 DR-4247 Ice Storm (OK)

2015 DR-4205 Tornadoes (MS)

2015 Avian Influenza (IA)

2014 DR-4175 Tornadoes (MS)

2013 DR-4117 Tornadoes (OK)

2013 DR-4101Tornadoes (MS)

2012 DR-4085 Hurricane Sandy (NY)

2012 DR-4081 Hurricane Isaac (MS)

2008 DR-1786 Hurricane Gustav (LA)

2005 DR-1602 Hurricane Katrina (MS)

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Ryan Holmes, P.E.

ryan@debristech.com

Ryan A. Holmes is a licensed engineer and Principal at DebrisTech. Collateral duties include business development, project management, and marketing. Mr. Holmes has over 15 years of diversified civil engineering experience. He is uniquely talented, drawing from his experience with municipal, county, and state governments, along with private clients. Mr. Holmes has worked on numerous debris removal projects, including several projects along the Mississippi coast in the aftermath of Hurricanes Katrina and Isaac, and along the east coast following Hurricanes Matthew and Irma. He continues to aid in the recovery efforts in Puerto Rico while utilizing DebrisTech's cutting edge technology, Mr. Holmes has successfully assisted the aforementioned communities with "cradle to grave" documentation of debris collection and disposal.

Past experience, together with these skills, make Mr. Holmes a valuable asset to DebrisTech. He provides vision and leadership for our clients, integrating new technology and delivery of unparalleled debris monitoring and compliance. DebrisTech has offered an opportunity for Mr. Holmes to showcase his diversified talents to provide practical applications of advanced technology in a way that is easily deployable and repeatable. His skills in dealing with municipalities and government agencies have elevated DebrisTech as a leader in the debris removal monitoring industry.

## Experience

DebrisTech, LLC

　　Principal and Owner - 2012 - Present

Dungan Engineering, P.A.

　　Principal Engineer - 2007 - Present

## Education

University of Mississippi

　　Bachelor of Science, Civil Engineering

# Disasters Worked

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021 DR-4598-MS-Mississippi Severe Winter Storms

2021 DR-4592-KY Ice Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2019 DR-4470 Mississippi Severe Storms

2019 EF1 Tornado Dallas, TX

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4406 Hurricane Michael (AL)

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**  Section 2 : Qualifications of the Staff



# H. Les Dungan, III, P.E., P.L.S.

les@dunganeng.com

H. Les Dungan, III, P.E., P.S. has 27 years of experience in the field of civil engineering. With a career that began in the government ranks with time working with the Mississippi Department of Environmental Quality and Natural Resources Conservation Service, he now serves as a self-employed consultant to various counties and municipalities in South Mississippi. Mr. Dungan has served as County Engineer for Jefferson Davis County and City Engineer for the Town of Prentiss for 20 years. He has also served as County Engineer for Pearl River County for 15 years.

Mr. Dungan has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricane Katrina, Mr. Dungan was able to provide the technical support needed in order for Pearl River County to have the confidence to use local contractors to perform the immense clean-up operation.

As a civil engineer, Mr. Dungan has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on projects ranging from bridge replacement to water treatment plants.

With DebrisTech, Mr. Dungan hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage, along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC.

## Education

Bachelor of Science Civil Engineering
Mississippi State University, 1987

## Positions

- Principal & Owner
  DebrisTech
  2010 - Present

- Principal Engineer
  Dungan Engineering, P.A.
  1993 - Present

## Disasters Worked

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021DR-4592-KY Ice Storms

2021 DR-4598-MS-Mississippi Severe Winter Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                    Section 2 : Qualifications of the Staff



# Jeff J. Dungan, P.E., P.L.S.

[jeff@dunganeng.com](mailto:jeff@dunganeng.com)

Jeff J. Dungan, P.E., P.S. has 26 years of experience in the field of civil engineering. With a career that began with Anderson Engineering in Columbia, Mississippi, he now serves as co-founder and Principal with Dungan Engineering, PA serving counties and municipalities in South Mississippi. Mr. Dungan has served as County Engineer for Lawrence, Walthall and Marion County and City Engineer for the Town of Tylertown for over 15 years.   He has also served as County Engineer in Lincoln County for the past 8 years.

Mr. Dungan has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricanes Katrina, Gustav and Isaac, Mr. Dungan was able to provide the technical support needed by many local governments throughout the south.  His services enabled these local governments to have the confidence to use local contractors to perform the immense clean-up operation efficiently and at a reasonable cost.

As a civil engineer, Mr. Dungan has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on many types of projects, such as roadway construction and maintenance, bridge replacements,  water and waste-water treatment plants, industrial buildings and airports.

With DebrisTech, Mr. Dungan hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage,  along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC.

## Education

Bachelor of Science Civil Engineering
Mississippi State University, 1988

## Positions

- Principal & Owner
  DebrisTech
  2010 - Present

- Principal Engineer
  Dungan Engineering, P.A.
  1993 - Present

## Disasters Worked

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021DR-4592-KY Ice Storms

2021 DR-4598-MS-Mississippi Severe Winter Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                          **Section 2 :** Qualifications of the Staff



# J. Lee Mock, P.E., P.L.S.

lee@dunganeng.com

Mr. Mock has 20+ years of experience in the field of civil engineering. With a natural bent for precision, a keen attention to detail, and driven to work with both efficiency and excellence, Mr. Mock embodies the company-wide commitment to solving problems and creating solutions for every project and every client.

Mr. Mock has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricanes Katrina and Issac.

As a civil engineer, Mr. Mock has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on projects ranging from bridge replacement and dam rehabilitation to water and wastewater treatment plant designs.

With DebrisTech, Mr. Mock hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage, along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC.

## Education

Bachelor of Science Civil Engineering

Mississippi State University, 1994

Bachelor of Business Administration

University of Mississippi, 1990

Associate of Arts

Pearl River Community College, 1988

## Positions

- Principal & Owner
  DebrisTech
  2010 - Present

- Principal Engineer
  Dungan Engineering, P.A.
  1994 - Present

## Disasters Worked

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021DR-4592-KY Ice Storms

2021 DR-4598-MS-Mississippi Severe Winter Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2019 DR-4470 Mississippi Severe Storms

2019 EF1 Tornado Dallas, TX

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4406 Hurricane Michael (AL)

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Tyler Williamson

twilliamson@debristech.com

Tyler Williamson is a Project Manager with DebrisTech. Collateral duties include overseeing the daily operations of the assigned projects, including coordinating the recovery efforts with the client, FEMA PA consultants, local, state and federal agencies. He has exceptional documentation practices and excels in strategical planning. Mr. Williamson has several years of experience with DebrisTech at nearly every position in the company. He has worked on more than 40 debris removal and disaster recovery projects. He is leading our efforts in Oregon with the training and supervision of hundreds of debris monitors. He also manages data, produces daily reports, for the debris monitoring effort for the several project through the South East. Mr. Williamson has helped clients address their recovery needs through expertise, technology and knowledge. Utilizing past experience, together with these ever developing skills, make him a valuable asset to DebrisTech.

## Experience

**DebrisTech, LLC**

Project Manager - Operations Manager-2015 - Present

Data Manager - Field Monitor - Field Supervisor - 2014

## Education
**University of Mississippi**

Bachelor of Science in Business Administration, Managerial Finance

**Hinds County Community College**

Associate of Arts

## Disasters Worked
2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021 DR-4598-MS-Mississippi Severe Winter Storms

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally 2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2020 DR-4473-PR Earthquakes

2020 EM-3426-PR Earthquakes

2019 DR-4465 Hurricane Dorian

2019 EF1 Tornado Dallas, TX

2019 DR-4470 Mississippi Severe Storms

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4399 Hurricane Michael (FL)

2017 DR-4339 Hurricane Maria (PR)

2017 DR-4336-PR Hurricane Irma

2017 DR-4338 Hurricane Irma (GA)

2017 DR-4337 Hurricane Irma (FL)

2017 DR-4332 Hurricane Harvey (TX)

2017 DR-4320 Straight-line Winds (TN)

2017 DR-4314 Straight-line Winds (MS)

2017 DR-4297 Tornadoes (GA)

2016 DR-4284 Hurricane Matthew (GA)

2016 DR-4283 Hurricane Matthew (FL)

2016 DR-4277 Flooding (LA)

2015 Avian Influenza (IA)

2014 DR-4175 Tornadoes (MS)

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                           **Section 2 :** Qualifications of the Staff



# John McNeese

jmcneese@debristech.com

John McNeese is a Project Manager and has been working with the DebrisTech management team since 2012. He began as an instrumental part in leading the recovery efforts in Moore, Ok following the aftermath of one of the most devastating tornadoes in US history. Having an extensive background in communications, cost evaluation and construction, John excelled as a liaison between the client and contractor, aiding in the reimbursement process involved with federal funding. Prior to DebrisTech, John had been involved in recovery efforts as a debris contractor following Hurricane Katrina in 2005 and a project manager during the BP Oil Spill in 2010.  Both of these events are considered two of the most historically devastating disasters along the Mississippi Gulf Coast. Mr. McNeese has since served as a project manager in Puerto Rico following Hurricane Maria, overseeing more than 450 employees and approximately 100 million dollars in debris removal costs. He is currently serving as a project manager for DebrisTech in Mississippi, following a series of devastating Ice Storms.

## Experience

**DebrisTech, LLC**

   2012 - Present - Project Manager

**Wallace Environmental**

   2010 - 2011 - Project Manager

**TL Wallace Construction**

   2010 - Project Manager

**Holiday Construction**

   2005 - 2006- Project Manager - Equipment Operator

**Independent Contractor**

1997 - 2016 Commercial/Residential/Farm and Land Appraiser

## Education

**University of Mississippi**

   Bachelor of Science, University Studies

# Disasters Worked

2021DR-4592-KY Ice Storms

2021 DR-4598-MS-Mississippi Severe Winter Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2019 DR-4470 Mississippi Severe Storms

2019 DR-4465 Hurricane Dorian

2019 DR-4450 Mississippi Severe Storms

2019 DR-4429 Mississippi Severe Storms

2018 DR-4406 Hurricane Michael (AL)

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

2018 DR-4393 Hurricane Florence (NC)

2017 DR-4339 Hurricane Maria (PR)

2017 DR-4332 Hurricane Harvey (TX)

2017 DR-4314 Straight-line Winds (MS)

2017 DR-4295 Tornadoes (MS)

2016 DR-4277 Flooding (LA)

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Dennis Cruthirds

dennis@debristech.com

Dennis Cruthirds is a Project Manager with DebrisTech. His duties include the daily operations of the project, quality assurance/quality control of monitoring operations, the documentation of employee time, and delivering updates to the client's representative. Mr. Cruthirds has 12 years of experience in construction material testing and 16 years of debris monitoring. He brings a wealth of knowledge, capabilities, and experience to our clients and has worked on numerous debris removal monitoring and disaster recovery projects. During his career, Mr. Cruthirds has successfully managed the monitoring of millions of cubic yards of debris for some of the most catastrophic disasters across the nation. He has served as a project/site manager in Iowa, after the effects of a Derecho. He is currently over seeing operations in Kentucky His personality and experience affords him a perfect relationship with contractors, as well as our clients.

## Experience

**DebrisTech, LLC**

2012 - Present - Project Manager

**Dungan Engineering, P.A.**

2007 - 2018 - CMT Lab Manager - CMT Inspector

2005 - 2008 - Field Monitor - Field Supervisor - Operations Manager

## Education

**Emergency Management Institute - FEMA Certified**

IS-00008.a, IS-00019.15, IS-00020.15, IS-00021.15,

IS-00022, IS-00026, IS-00027, IS-00029, IS-00033.15,

IS-00042, IS-00100.b, IS-00100.pwb, IS-00100.fda,

IS-00107.15, IS-00144, IS-00207, IS-00247, IS-00250.a,

IS-00265, IS-00293, IS-00324.a, IS-00325, IS-00346,

IS-00366, IS-00362.a, IS-00386, IS-00395, IS-00403,

IS-00420, IS-00520, IS-00522, IS-00546.a, IS-00547.a,

IS-00548, IS-00551, IS-00558, IS-00613, IS00632.a,

IS-00634, IS-00660, IS-00662, IS-00701.a, IS-00702.a,

IS-00703.a, IS-00706, IS.00720, IS-00775, IS-0080'

IS-00802, IS-00804, IS-00808, IS-00809, IS-00810,

IS-00811, IS-00813, IS-00003, IS-00005.a, IS-00008.a, IS-00011.a, IS-00015.b, IS-00101.c, IS-00102.c,

IS-00103, IS-00405, IS-00906, IS-00907, IS-00908,

IS-00909, IS-00912, IS-00914

## Disasters Worked

2021DR-4592-KY Ice Storms

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

2018 DR-4400 Hurricane Michael (GA)

2018 DR-4399 Hurricane Michael (FL)

2017 DR-4339 Hurricane Maria (PR)

2017 DR-4332 Hurricane Harvey (TX)

2017 DR-4314 Straight-line Winds (MS)

2017 DR-4295 Tornadoes (MS)

2016 DR-4277 Flooding (LA)

2016 DR-4263 Flooding (LA)

2015 DR-4205 Tornadoes (MS)

2014 DR-4175 Tornadoes (MS)

2013 PP Tornadoes (OK)

2012 DR-4085 Hurricane Sandy (NY)

2012 DR-4081 Hurricane Isaac (MS)

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DebrisTech

**Section 2 :** Qualifications of the Staff



# Macon "Corey" Holliman

cholliman@debristech.com

Corey Holliman is our Data Manager who is dedicated to providing all software alterations, reports, or debris related information to all our clients. His skills and natural attention to detail are a pivotal part of the DebrisTech service.

Before DebrisTech he assisted firm with client interface creation, platform improvements, and automated reporting. Those experiences are a natural fit for DebrisTech. Corey uses our ADMS software to dispense the required information to our staff and clients for any assistance and reimbursement applications.

## Experience

**DebrisTech, LLC**

   2019 - Present - Data Manager

## Education

**University of Southern Mississippi**

   Bachelor of Science - Computer Science

**Skills**

   JavaScript/TypeScript

   CSS/SCSS/HTML5

   JSON APIs/RESTful

   ASP.NET/Express.js

# Disasters Worked

2020 DR-4562-OR-Oregon WILDFIRES AND STRAIGHT-LINE WINDS

2021 DR-4598-MS-Mississippi Severe Winter Storms

2021DR-4592-KY Ice Storms

2020 DR-4576-MS Hurricane Zeta

2020 DR-4579-GA Topical storm Zeta

2020 DR-4563-AL Hurricane Sally

2020 DR-4654-FL Hurricane Sally

2020 DR-4572-TX Hurricane Laura

2020 DR-4557-IA Iowa Severe Storms - Derecho

2020 EM-3530 Texas Hurricane Hanna

2020 EM-3527 Louisiana Tropical Storm Cristobal

2020 DR-4551 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4536 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4478 Mississippi Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4476 Tennessee Severe Storms, Tornadoes, Straight-line Winds, And Flooding

2020 DR-4528 Mississippi Covid-19 Pandemic

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**ELECTRONIC DEBRIS MANAGEMENT SYSTEM**

# County of Montgomery, PA Organizational Chart

**Principals**
Brooks R. Wallace, P.E.
Ryan A. Holmes, P.E.
H. Les Dungan, III, P.E., P.L.S.
Jeff J. Dungan, P.E., P.L.S.
J. Lee Mock, P.E., P.L.S.

**Project Manager**
John McNeese

**Operations Manager**

**Field Supervisor**

**Field Supervisor**

**10 Load Site Monitors**

**10 Load Site Monitors**

The number of Monitors will be dependent on the number of loading operations being operated by the Debris Removal Contractor.
The Field Supervisor position will be staffed at one Supervisor per ten Monitors.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Section 3 : Technical Approach



# Technical Approach

## Understanding Project Approach

DebrisTech understands that Montgomery County requires disaster debris monitoring services to support the oversight and management of debris removal contractors. DebrisTech shall be prepared to provide a range of services, including field monitoring and other services as needed and ordered.

The Client requires the experience and support of DebrisTech's Debris Removal Monitoring Management Team following a natural disaster.  DebrisTech will provide services which may include:

1.  Coordinate daily briefings, work progress, staffing, and key items with local officials.

2.  Selection and permitting of DMS locations and any other permitting/regulatory issues as necessary.

3.  Scheduling work for all team members and contractors on a daily basis.

4.  Hiring, training, scheduling, and managing field staff.

5.  Monitoring recovery contractor operations and making/implementing recommendations to improve efficiency as well as speed up recovery work and assure all debris removal work meets FEMA eligibility guidelines.

6.  Assisting local officials with responding to public concerns and comments.

7.  Certifying contractor vehicles for debris removal using methodology and documentation practices appropriate for contract monitoring.

8.  Furnishing and operating an automated/electronic **(paperless)** debris tracking system.

9.  Develop daily operational reports to keep the client informed of work progress.

10. Development of maps, GIS applications, etc. as necessary.

11. Comprehensive review, reconciliation, and validation of debris removal contractor(s) invoices prior to submission to  the client for processing.

12. Project Worksheet and other pertinent report preparation required for reimbursement by FEMA, and any other applicable agency for disaster recovery efforts by local staff and designated debris removal contractors.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## Positional Duties

### 1. General

1.1. The Client requires the support of DebrisTech's Debris Removal Monitoring Team following a debris-generating event such as a hurricane, storm, or other event and debris management expertise.  The debris monitoring is necessary to assure Federal Emergency Management Agency (FEMA) emergency plan and debris removal contract requirements are met by debris removal contractor. Documenting the removal of debris from public access roads, rights-of-way, and public property, monitoring the debris management sites, is DebrisTech's primary concern. The Client will assign a Debris Manager (DM). The Debris Manager will be the primary point of contact for DebrisTech and will resolve contract administration issues or questions.

1.2. Within 48 hours of notification, DebrisTech will provide adequate number of professionals and qualified personnel to monitor all debris loading sites and debris management sites. DebrisTech will increase its staffing from this point depending on the amount of removal equipment provided by the removal contractor. Major increases to the debris. monitoring staff will be disclosed to the client's designated debris manager.

1.3. DebrisTech shall provide all debris monitors with appropriate personal protective equipment to include, but not be limited to: eye protection, hearing protection, safety vests, and hard hats, to comply with all federal, state, and local requirements.

1.4. DebrisTech supervision is responsible for resolving issues with truck drivers, and other contractor's personnel.

1.5. DebrisTech will utilize the DebrisTech Electronic Debris Management System to collect and report documentation of debris removal activities.

1.6. DebrisTech will provide temporary office space as necessary.

### 2. Load Site Monitoring Services

2.1. The primary function of the Loading Site Monitors is to issue debris load tickets  for eligible debris removed from the Right of Way (RoW).

2.2. DebrisTech will within 48 hours, be prepared to provide qualified on site personnel to monitor debris removal operations at all debris loading sites located  throughout the Client's designated area.  Additional sites may be added as debris removal efforts increase.  Each loading site may operate,  approximately 12–14 hours per day, 7 days per week.  The Client's Debris Manager in coordination may determine the exact number and location of loading sites with the debris removal contractor.

2.3. DebrisTech will provide all employees with DebrisTech handheld devices. These devices will allow each employee to capture all required data for each load of debris, such as: GPS coordinates, digital photographs, truck number, load number, debris type, and monitor identity. All DebrisTech devices communicate

wirelessly with the DebrisTech Central Information Database. DebrisTech will also provide the Client with management, supervision, labor, and equipment necessary to initiate debris load tickets to document the removal of eligible debris from public access roads, public rights-of-way, and public property within the Client's designated area.

2.4. DebrisTech will be prepared to provide a Loading Site Monitor per site per day at a minimum of a 12-14 hour shift.

2.5. All Loading Site Monitors will speak English, be a minimum of eighteen (18) years of age and have a valid driver's license issued in the United States.

2.6. Supervisors and all identified Loading Site Monitors will attend a ½ day debris monitor training session. Training will be the responsibility of DebrisTech and will be coordinated with the The Client's Debris Manager.

2.7. Monitors will be capable of working in an outside environment and be able to climb a staircase ladder of 10 feet high and lift 30 lbs.

2.8. The function of the Debris Monitor is to verify that only eligible debris is being removed from designated public rights-of-way and public property before it can be loaded into a debris removal vehicle.

2.9. DebrisTech will provide at least one (1) monitor for each debris removal vehicle to monitor and verify eligible debris removal from designated public access roads within the debris pickup zone.

2.10. DebrisTech will provide all employees with DebrisTech handheld devices. These devices will allow each employee to capture all required data for each load of debris, such as: GPS coordinates, digital photographs, truck number, load number, debris type, and monitor identity. All DebrisTech devices communicate wirelessly with the DebrisTech Central Information Database.

## 3. Debris Management Site Monitoring Services

3.1. DMS Monitors are responsible for documenting the the amount (volume/weight) of debris entering the DMS.

3.2. DMS Monitors are responsible for documenting that the removal vehicles are empty when leaving the DMS

3.3. The primary function of the Debris Management Site Monitors is to complete the documentation of the load and estimate volumes that have been transported to the debris management site for processing or storage, and/or disposal.

3.4. DebrisTech will provide all employees with DebrisTech handheld devices along with all necessary equipment to document disposal of the debris.

3.5. Monitors will speak English, be capable of working in an outside environment, and be able to climb a staircase ladder of 10 feet high.

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3.6. Monitors will be a minimum of eighteen (18) years of age and have a valid driver's license issued in the United States.

3.7. Supervisors and all identified Debris Management Site Monitors will attend a ½ day debris monitor training session.  Training will be the responsibility of DebrisTech and will be coordinated with the Client's Debris Manager.

3.8. Site Monitors will be capable of working in an outside environment and be able to climb a staircase ladder of 10 feet high and lift 30 lbs.

## 4. Field Supervisors

4.1. Field Supervisor are to verify that only <u>eligible</u> debris is  being removed from designated public rights-of-way and public property within assigned debris pickup zones in the Client's designated area.

4.2. Field Supervisors will be  prepared to operate a minimum of 12 to 14 hours per day, 7 days per week and will be responsible for 10 load site monitors each.

4.3. Field Supervisors are expected to remain in contact with their assigned 10 debris monitors throughout the day and report their monitors location and removal vehicle information.

4.4. DebrisTech will provide all Field Supervisors with DebrisTech handheld devices.

4.5. Make multiple visits to all  assigned loading sites and debris management sites on a random daily basis.

4.6. DebrisTech will provide all employees with **DebrisTech handheld devices.** These devices will allow each employee to capture all required data for each load of debris, such as: GPS coordinates, digital photographs, truck number, load number, debris type, and monitor identity.

4.7. All Field Supervisors will speak English, be a minimum of eighteen (18) years of age and have a valid driver's license issued in the United States.

4.8. Field Supervisors and all identified Debris Monitors will attend a ½ day debris monitor training session. Training will be the responsibility of DebrisTech and will be coordinated with the Client's Debris Manager.

4.9. Field Supervisors will be capable of working in an outside environment and be able to climb a staircase ladder of 10 feet high and lift 30 lbs.

## 5.   Operations Manager

5.1. Operations Manager primary goal is to execute the operations plan as directed by the project manager.

5.2. Coordinate debris monitoring operations to Field Supervisors.

5.3. Lead Field Supervisors in daily supervisor meetings.

5.4. Reviewing project clocking and clock out records.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5.5. Make multiple visits to all debris management sites on a random daily basis.

## 6. Project Manager

6.1. The project manager will serve as the primary point of contact for DebrisTech to the client.

6.2. The Project Manager will be involved in all aspects of the project.

6.3. Reports directly to the president of the company, Brooks Wallace.

## 7. Data Manager

7.1. DebrisTech Data Managers are assigned multiple projects. Their duties are often preformed remotely in a location with the best possible internet connection.

7.2. Their primary role is to review every load removed from the RoW.

7.3. During this review process the data manger determine wether the ticket was recorded out of the project work zone, location eligibility, and correct debris type.

7.4. This position also communicates directly with the operations manager about data collection errors in the field to be addressed as quickly as possible.

## 8. Safety

8.1. All debris monitors are informed of safety procedure around large equipment in the afford mentioned training course administer by the management team.

8.2. DebrisTech will ensure that DebrisTech personnel adhere to all debris management site safety requirements.

8.3. PPE



     8.3.1. Hard Hat

     8.3.2. High Vis Safety Vest

     8.3.3. Safety Glasses

     8.3.4. CELL PHONE

     8.3.5. Recommend Clothing

     8.3.6. Long Pants

     8.3.7. Collared Shirt

     8.3.8. Close Toed Shoe

## Protecting Communities. Leading Recovery.



# Technical Approach with ADMS

In response to a disaster, DebrisTech sends one of its Mobile Command and Communications Centers to the project area. Each Mobile Command and Communications Center is a specially equipped, self-contained unit that provides office and living quarters for its vital team members. Each unit has computers, printers, badging and placarding systems, communication systems, training systems, and an appropriate number of load and disposal site deployment kits. The load deployment kits contain enough ruggedized tablets to document every removal crew and DMS.

The disposal site kits typically include 4 tablets with MLPs, remote scanners, laser printers, paper, and printer cartridges. The kits permitted for carry-on luggage and, when necessary, may travel ahead of the Mobile Command and Communications Center by airline, if necessary. By following our emergency response project schedule our team has responded to over one hundred contract activations for the services described in the RFP.



| 02 Monitor Scans Truck Barcode | 04 Data is transmitted to the Database | 06 Load Ticket & Barcode Scanned | 08 Monitor Records Judged Load | 10 Data is transmitted to the Database |

| 01 Debris is Loaded on Truck | 03 Photo, GPS Location & Time Stamp acquired | 05 Truck Arrives at Disposal Site | 07 Photo, GPS Location & Time Stamp acquired | 09 Disposal Ticket Printed |

## Real-time Data

The DebrisTech Electronic Debris Management System provides real time access to all aspects of debris removal operations through the DebrisTech Central Information Database. Data is fed to the Central Information Database in real time by Debris Removal Monitors with DebrisTech devices. Authorized users have access to many different reports summarizing daily, weekly, or monthly activity by truck number, subcontractor, Right of Entry number, etc.

This allows the debris management team to track the location and progress of debris removal crews, track the type and quantity of debris being collected, as well as fully document the loading and disposal locations, time, date, contractor, personnel and equipment used. The real time system eliminates the need for a large administrative staff to manually enter paper tickets.



000140653



000140653

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**  **Section 3 :** Technical Approach



# Cradle-to-Grave Documentation

The DebrisTech Electronic Debris Management System provides accurate accounting for all loads and detailed information on stumps and leaning trees. A barcode application tool is provided to attach a unique barcode to each tree surveyed. A digital photo, GPS coordinates, timestamp, tree/ stump size, inspector ID are collected with that barcode at three critical points of the removal process.

• When Originally Surveyed and Marked for Removal

• When Loading for Transport to the Disposal Site

• When Offloaded at the Disposal Site

A unique truck/trailer barcode scanned at the loading and offloading points provides additional information.

# Scaleable

Because DebrisTech is standardized on Apple's iPads as the basis for its field unit and has partnered with national cellular providers, ramping up to hundreds of units can be done in a brief period. DebrisTech has created a customization system that can transform a best of class consumer-grade tablet to a ruggedized Debris Removal Monitoring Device in minutes — utilizing the iPad's and AppleTV's mirroring feature. The Mobile Command and Communications Center's outdoor video screen, DebrisTech's first responders, can train large groups of locally hired monitors at any location. Because of the iPad's inherently user-friendly and straightforward design, a typical training class usually lasts less than 2 hours. In a typical deployment, DebrisTech's first responders arrive and assess the severity of the event and determine how many support personnel are required to deploy and fully support the system.

Once the deployment begins, a new server instance of the DebrisTech Debris Management Database System is created and replicated at two or more locations. In the case of this contract, a third replication is set up for government use. One server instance is designated as the primary server, and field devices submit their data to it through a secure channel over a common carrier. The other servers are updated within minutes (usually seconds) and contain an exact copy of the records submitted by the field devices. One of the secondary servers is designated as a failover server should the primary server fail, or be inaccessible due to a regional communications outage. A redundant primary fiber loop serves DebrisTech's primary server location, and its secondary and tertiary servers are geographically remote and served by different ISPs. Upon completion of a mission, a copy of all data collected is delivered to the Client in Microsoft Excel and PDF format. DebrisTech is capable of meeting the daily reporting desired by the client. The data can also remain accessible through the DebrisTech Debris Management Database for any period as required by the contract. DebrisTech currently maintains 1000 devices, 400 ready to be deployed.

# Paper Not Necessary

The DebrisTech Automated Debris Management System is modeled after a proven debris monitoring method that utilized a combination of handwritten paper tickets, electronic databases, and a Geographic Information System (GIS). The DebrisTech system follows this same model but replaces the handwritten tickets with real-time data collection devices. Paper receipts are still available but are no longer the primary record. DebrisTech handheld devices and software add a new level of documentation and security features. The built-in automated fraud

**Protecting Communities. Leading Recovery.**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                                      **Section 3 :** Technical Approach

detection and audit tools significantly reduce the potential for fraudulent activities that might result in costly de - obligations. The system can also provide real-time access to agencies, such as FEMA or the Inspector General, so that auditors can begin their task early, rather than months or years later.

The DebrisTech Automated Debris Management System provides real-time access to all aspects of debris removal operations through the DebrisTech Central Information Database. Data is fed to the Central Information Database in real-time by Debris Removal Monitors with DebrisTech devices. Authorized users have access to many different reports summarizing daily, weekly, or monthly activity by truck number, subcontractor, Right of Entry number, and other required documentation. This allows the debris management team to track the location and progress of debris removal crews, track the type and quantity of debris being collected, as well as fully document the loading and disposal locations, time, date, contractor, personnel, and equipment used. The real-time system eliminates the need for a large administrative staff to enter paper tickets manually.

## GIS Compatible Geo-Fencing

The DebrisTech System also has interactive mapping features that allow authorized users to view the exact pickup and disposal location for each debris ticket in real-time. Once GIS boundaries are uploaded, the ADMS denies debris ticket acceptance if the contractor loads outside of the prescribed work zone. The ADMS assigns loads to certain districts of the clients maintained territories, such as city council districts or certain private communities.

## Administration View

In the desktop platform, clicking on the load's truck icon from the debris ticket list displays the pickup and disposal point for a specific load on a map. Clicking on the Truck icon in the header displays all loads in the current filter on a map. This feature is especially useful when trying to determine where a specific truck or subcontractor is working or has worked, or simply to see where debris removal operations are taking place in real-time. These are but a few of the extensive Geographical Information System (GIS) capabilities present in the system.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                           **Section 3 :** Technical  Approach



DebrisTech has been activated by more than one hundred government entities and produced an unmatched quality of documentation of the debris removal operations in these affected areas.

A redundant primary fiber loop serves DebrisTech's primary server location, and its secondary and tertiary servers are geographically remote and served by different ISPs. Upon completion of a mission, a copy of all data collected is delivered to the Client in Microsoft Excel and PDF format. The data can also remain accessible through the DebrisTech Debris Management Database for any period as required by the contract. Site Managers and Tower personnel are issued DebrisTech handheld scanning devices, loaded with custom software explicitly configured for their role. DebrisTech handhelds scan barcodes, take digital photographs, apply GPS location tagging, accept manual inputs in open fields, and communicate via the Internet using the cellular network and other means if required. When loading and disposal data is collected, it uploaded wirelessly to the DebrisTech Central Information Database. If cellular service is not available, the data is queued on the device and transmitted via cellular network connectivity or when the devices are in the range of the Mobile Command and Communications Center for download and transmission of the data via satellite communications.

## Mobilization

Within 24 hours of notification, DebrisTech provides an adequate number of professionals and qualified personnel to the project area to begin the startup of the Debris Removal Operation. DebrisTech continues to increase its staffing from this point meet the requirements of the local government's contractor(s). Because we have worked constantly on various debris removal jobs since late 2015, we currently have a large staff of highly qualified individuals that are available to work on this project. DebrisTech is prepared to deploy as many resources as needed to meet the demands of this project. DebrisTech establishes local office(s) for hiring, training, and coordination of operations between the contractor and the government. This office is our base of operations for the duration of the project. DebrisTech's primary server location is served by a redundant primary fiber loop and its secondary and tertiary servers are geographically remote and served by different ISPs. Upon completion of a mission, a copy of all data collected is delivered to the Client in Microsoft Excel and PDF format. The data can also remain accessible through the DebrisTech Debris Management Database for any period as required by the contract. Site Managers and Tower personnel are issued DebrisTech handheld scanning devices, loaded with custom software explicitly configured for their role. DebrisTech handhelds scan barcodes, take digital photographs, apply GPS location tagging, accept manual inputs in open fields, and communicate via the Internet using the cellular network and other means if required. When loading and disposal data is collected, it uploaded wirelessly to the DebrisTech Central Information Database. If cellular service is not available, the data is queued on the device and transmitted via cellular network connectivity or when the devices are in the range of the Mobile Command and Communications Center for download and transmission of the data via satellite communications.

## Vehicle Registration

Each vehicle registration identifies the mission (contract number) and a responsible governmental entity. Each registration record permanently ties to the bar code that is affixed to the truck body or trailer body, supplying unique identification data for contractor vehicles and equipment. Standard forms of measure (e.g. feet and inches) records the vehicle volume capacity utilizing industry-standard equations in each registration record created. Optionally, each driver of each truck may be issued a unique barcoded DebrisTech ID that ties the driver to the load and haul vehicle. Each member of the certification team is issued a unique barcoded ID that is scanned and becomes part of the certification registration form. The member certifying the vehicle must also sign the electronic form, using the signature capture feature. The DebrisTech System automatically rejects vehicles that are not certified and associated with the current event and responsible government entity.

Vehicles that need recertification (obscured bar code placards, changes in sideboards, a spot check of capacities for random audits, etc.) can be compared electronically and automatically to the audit tables and other CQC audit

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

records of previous certifications and registrations. Certification records are available online and in downloadable and printable form for authorized users. Each monitor is also issued a unique identification badge that contains the employee identification barcode and Project ID barcode. Like the other barcodes, they are used to easily mark the ticket with the identity of the monitor or inspector that collects and reviews the data. Still, they can be used to circumvent the signature capture requirement. Each ticket has its barcode scanned using specially configured



iPads. A limited number of these secure ticket objects are issued to monitors and inspectors. Without a physical ticket, no electronic tickets can be created. This authentication is the first of a three-factor ticket authentication system. The uniquely configured iPad is the second factor. The apps used for collecting data are registered individually to unique serialized iPad IDs and cannot function on unauthorized devices. These iPads, in most cases, are issued to individuals. Still, a third factor, a real signature by the monitor or inspector is required at each data collection point through a built-in signature capture feature of the iPad. This factor reminds the submitter that they are personally responsible for the accuracy of the data submitted.

## Invoicing and Contractor Invoice Reconciliation

DebrisTech conducts a thorough review and reconciliation of the contractor(s) invoices submitted to the applicant. The DebrisTech, FEMA certified truck certification forms, and debris ticket database are used to verify each load billed by the contractor. The review includes a review of the collection date, time, and location from the removal location and the measurement and disposal locations. DebrisTech also compares the volume/weight of every load from the invoice with our digital recorded records. After review, DebrisTech submits the finalized invite with a recommendation for payment to the Client. The recommendation includes a letter from the principal summarizing the reconciliation, including discrepancies addressed, and copies of the invoice recommended for payment.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                    **Section 3 :** Technical  Approach



## Monitoring Project Schedule

Before a disaster, DebrisTech helps the Client with its Debris Management Plan to ensure it meets FEMA regulations. We acts as advisors to the Client to maximize its return with FEMA. Our services in the planning stages will be at NO COST to the Client. The planning stage is a service DebrisTech provides as the Client's Monitoring Firm. Our ADMS, you have 24/7 access to the database that provides real-time updates on the progress of the Cleanup.

Below is a table that summarizes the activities that will take place over the duration of the project:

| 0-24 Hours | 24 Hours | 24 Hours | 24 Hours | 1 Week | 1 Month |
|---|---|---|---|---|---|
| Mobilize Key Personnel | Bring in Leadership | Begin Training Bring in Monitors Training | 1 Monitor Per Contractor Training | Maintain 1/1 Ratio Training | Start Invoicing to expedite reimbursement |
| Set up in Disaster Center | Help estimation of debris quantity | Meet with other Contractor | Maintain Data Base with Official | Determine if Monitor Ratio is adequate | Continuing up-dates on Progress |
| Place notice for Monitors in Area | Start Hiring Process | Start Clean up Operations with Contractors | | Continue Debris Monitoring Operations | |

## Litigation

DebrisTech, LLC certifies that neither the Company, nor any employee of the Company, has any conflict of interest, either direct or indirect, about the services sought herein pursuant to Federal or State Law or regulations.

DebrisTech, LLC certifies that it has never had any contract cancelled since formation in August of 2010.

DebrisTech certifies that it is not operating under Chapter 11 or any other financial restraints that would preclude its ability to eater into equipment leasing or rental arrangement.

DebrisTech certifies that it has not been prohibited from doing business with any government entity for any reason since its formation in 2010.

DebrisTech certifies that it has specific experience providing disaster debris monitoring following natural or manmade disasters.

DebrisTech is not currently involved in and has not had any claims, arbitrations, administrative hearings, or lawsuits related to debris monitoring, disaster recovery, or consulting brought against our company.

## Financial Stability

DebrisTech, LLC is a financially sound company with the ability to endure substantial payroll requirements for projects of any size. A disaster of significant magnitude effects many local governments. Our list of past clients shows that our firm frequently responds to multiple projects simultaneously. This level of response requires precise coordination of multiple project management teams and the capital to consistently fund payroll.

## Personnel and Staffing Plan

DebrisTech has responded to over one hundred client contract activations across the country. They expect us to match their sense of urgency when responding to a disaster and without fail. We have never failed to meet those



expectations from City of Carencro, LA to large-scale activations in Puerto Rico's Department of Transportation and Public Works (DTOP).

DebrisTech will provide one of our qualified experienced project management teams to oversee the debris monitoring responsibilities. Tyler Williamson is the proposed project manager, along with Robert Ellis as the operations manager, and Brook Wallace as the managing principal. The combination of these three professionals has aided the recovery of dozens of municipalities across twelve states, and overseen the removal of millions of cubic yards of debris. We pledge to have this team or a team that is equally qualified available on issuance of a notice to proceed.

DebrisTech has the full time staff available to services this projects requirements and the project requirements of all our Clients. However, in certain scenarios we need additional local resources from the community. Our hiring teams are deployed and immediately begin broadcasting employment opportunity adds through <u>indeed.com</u> and other local employment notification systems. The hiring team meets any specific requirements of our clients. The  hiring team is trained to be quickly mobilized and set up to allow near immediate response for field staffing needs in accordance with the notice to proceed. The typical hiring team is staffed by three trained representatives and can process as many as 100 potential associates per day. The hiring team can be quickly scaled out to meet the most demanding needs for field staff. We advertise locally and reaches out to local workforce centers to utilize persons seeking employment in the community. We focus on local hires and the ability to onboard, train, and support a local team of associates, who monitor the work being performed in their own communities. Our local hires are fully supported with the DebrisTech ADMS and the experienced managers.

DebrisTech has operated as a trusted contractor who operates as a partner with its clients to respond immediately to a disaster. We strive to provide the highest quality of services even during immediate activations through a project. Our staff has experience with hiring over 5,000 monitors across more than 100 contract activations in the last 11 years. Every DebrisTech manager and associate understands our primary role is to throughly document the removal of eligible storm debris. In a concerted effort to maximize the reimbursement of funds from FEMA. There is no doubt our experience with multiple activations will the city respond to any disaster in a timely manner.

## Site Safety Plan

DebrisTech personnel are not responsible for the operations of the site. The chosen Debris Removal Contractor is responsible for the operations, conditions, and safety of the debris management site. Monitors are responsible for their own personal safety. The DebrisTech management staff make every possible effort to educate the monitors of the potential dangers involved with debris removal and how to prevent or avoid accidents.

## SubContractors

DebrisTech conscientiously looks for opportunities to work with small, women-, minority-owned and disadvantaged business enterprises who's specific capabilities complement our own skills for the benefit of our. We have established working relationships with a number of small, women-, and minority-owned firms, and have worked with many agencies having equal employment opportunity requirements. In addition, we maintain contact and knowledge of the qualifications of these firms in an effort to select appropriate subcontractors for specific projects. Should the need for a subcontractor arise during a project, we contact a subcontractors whose capabilities meet the requirements.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                                **Section 3 :** Technical Approach



# Available Resources

## Equipment Resources

DebrisTech understands providing debris monitoring services is a time sensitive industry. The requirements described in the RFP will be met with in the mandated time period. In an effort to assure our preparedness for future disaster responses, DebrisTech maintains a surplus of a minimum of 200 devices ready to be deployed. DebrisTech has responded to the largest scale events that required hundreds of staff and equipment to meeting the needs of multiple clients simultaneously.

Availible Equipment and Readily Available Equipment :

| | |
|---|---|
| Mississippi Based Project Managers | 12 |
| ADMS Devices | 1,000 |
| TDMS Case | 60 |
| Time and Materials Forms* | 1,000 |
| Truck Certification Placards* | 1,000 |
| Project Management Kits | 25 |
| HR Hiring Kits* | 25 |
| Stump Cases | 25 |
| Laptops | 35 |
| Mobile Wireless (MiFi) | 25 |
| Scanner | 120 |
| Printers | 170 |
| Mobile Command Vehicles | 17 |

*All paper Field Documents are replenished as needed.

DebrisTech has agreements and relationships with emergency providers able to fill any equipment shortcoming in 24 hours or less. ADMS units are programmed and deployed in 24 hours or less.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**DebrisTech**                                          **Section 3 :** Technical  Approach



# Sample Reports

DebrisTech is the sole owner and developer of its ADMS. There is not another system like it in the industry. All DebrisTech Devices are stored in Picayune, MS. Currently DebrisTech maintains 1,000 devices ready to be used at a moments notice. The software of the ADMS is developed, updated, and maintained by DebrisTech at its headquarters.  DebrisTech has the ability to customize each database to meet the specific needs of any client in any situation. The reports cited below are the type of reports our clients can expect from DebrisTech.

- DebrisTech Debris e-Ticket - presents documentation of all three phases of a load's cradle to grave disposal

- DebrisTech Debris Removal Daily Report - executive summary presenting the need to know information from any given day

- DebrisTech Stump e-Ticket - presents documentation of an individual loose stump's removal and disposal

- DebrisTech Hazardous Tree e-Ticket - presents documentation of removal of an individual hazardous tree

- DebrisTech Truck Certification Form - presents documentation of measurement and ownership of any truck for a project

- DebrisTech Punch-List Pre Work e-Ticket - presents time and location of a overlooked or remaining debris



# DEBRISTECH *e-Ticket* 000251753

ELECTRONIC DEBRIS MANAGEMENT SYSTEM

**Truck Nums:** 00001652



**ROE Numbers:** 1002

**Project:** City of Memphis, TN - 2017 Debris Removal

**Sub:** Michaels Tree & Loader

**Prime:** Michael's Tree and Loader

**Owner:** Michaels Tree And Loader

| Monitor: | DebrisTech, LLC | Debris: | Vegetative | % Full: | 75 |
|---|---|---|---|---|---|

| | Transit Time | | Haul(d)* | Haul(r)* | Pay (CY): | 45.0 |
|---|---|---|---|---|---|---|
| | 0:24 | | 4.9 | 6.4 | | |

| Load Info | Measurement Info | Disposal Info |
|---|---|---|
| **Time:** 12:13:58 **Date:** 11/3/17 | **Time:** 12:38:38 **Date:** 11/3/17 | **Time:** 12:50:32 **Date:** 11/3/17 |
| **Loc:** 35.1368, -89.9533 | **Loc:** 35.0666, -89.9371 | **Loc:** 35.0668, -89.9371 |
| **Mon:** Shenicia Lyas | **Mon:** Alfred Bowens | **Mon:** Alfred Bowens |







www.DebrisTech.com   *(d)irect  (r)oute in miles  Route Distance Provided by MapQuest and OpenStreetMap

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents



ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## Marion County Board of Supervisors
## Marion County Tornado Debris Removal

### Debris Removal Daily Report - 02/12/2015

| Contractor: | Looks Great Services of MS, Inc. | Total Work Days To Date: | 22 |
|---|---|---|---|
| Monitoring Firm: | Arx Disaster Management, Inc. | Total Days into Contract Period: | 32 |

### Production Data

| | | | | Volume (CY) | Weight (Tons) |
|---|---|---|---|---|---|
| Trucks in Operation Today: | 3 | Today's Debris Production: | | 565.4 | 0.0 |
| Average Loads Per Truck: | 4 | Average Daily Production: | | 1,933.6 | 0.0 |

### Debris Quantity Summary - Right of Way

| | Today | To Date | | Volume (CY) Today | Volume (CY) To Date | Weight (Tons) Today | Weight (Tons) To Date |
|---|---|---|---|---|---|---|---|
| Vegetative Loads: | 2 | 405 | Vegetative Debris: | 92.2 | 17,515.0 | 0.0 | 0.0 |
| C & D Loads: | 4 | 589 | C & D Debris: | 207.2 | 24,487.3 | 0.0 | 0.0 |
| Wood Chip Loads: | 0 | 0 | Wood Chips: | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Debris Loads: | 6 | 12 | Other Debris: | 266.0 | 537.6 | 0.0 | 0.0 |

### Debris Quantity Summary - PPDR Program

| | Today | To Date | | Volume (CY) Today | Volume (CY) To Date | Weight (Tons) Today | Weight (Tons) To Date |
|---|---|---|---|---|---|---|---|
| Vegetative Loads: | 0 | 0 | Vegetative Debris: | 0.0 | 0.0 | 0.0 | 0.0 |
| C & D Loads: | 0 | 0 | C & D Debris: | 0.0 | 0.0 | 0.0 | 0.0 |

### Debris Quantity Summary - Total Project

| | Today | To Date | | Volume (CY) Today | Volume (CY) To Date | Weight (Tons) Today | Weight (Tons) To Date |
|---|---|---|---|---|---|---|---|
| Total Loads Generated: | 12 | 1,006 | Total Cubic Yards: | 565.4 | 42,539.9 | 0.0 | 0.0 |

### Leaner / Hanger / Stump Summary

| | Today | To Date | | Today | To Date |
|---|---|---|---|---|---|
| Leaning Trees: | 0 | 276 | Hanging Limbs: | 0 | 194 |
| Stumps: | 20 | 20 | White Goods: | 0 | 0 |

Note: The Quantities Listed on this Report are for Progress Reporting Only and may not Reflect Final Pay Quanties.

www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM

| | |
|---|---|
| **Stump Number:** | 011600 |
| **Stump Dia. (in):** | 24 |

## *e-Ticket*

## *City of Hattiesburg, MS*
## *City of Hattiesburg, MS - 2017 Tornado Debris Removal*

**Prime Contractor:**  City of Hattiesburg

**Truck Owner:**  Dawn Til Dusk

**Truck Number:**  00001214

**Debris Monitor:**  DebrisTech, LLC

**Removal Type:**  Loose          **CY Conversion:**          4.1

**Transit Time**

### Load Info        13:33        ### Disposal Info

**Timestamp:**  4/17/2017 5:36:10 PM     —     **Timestamp:**  4/18/2017 7:09:20 AM

**Location:**  31.3245, -89.2683          **Location:**  31.2435, -89.2336

**Load Monitor:**                          **Disposal Monitor:**

Andra Jones                               Brian Marsh







www.DebrisTech.com

Case 2:26-cv-03945    Document 1-1    Filed 06/09/26    Page 645 of 811



# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## e-Ticket
### Hurricane Michael Debris Removal

**Ticket:** 500318706

**Truck:** 00006576







www.DebrisTech.com

**Prime Contractor:**

CrowderGulf

**Truck Owner:**

Hauling Away

**Monitoring Firm:**

Landfall Strategies

**Timestamp:** 7/17/2019 10:37:54 AM

**Debris Type:** Leaner     **Tree Size:** 20

**Coordinates:** 30.1675, -85.6443

**Address:** 1030 E 11th St

**Monitor:** Joshua Smith

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



### DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

**Truck Certification Form**

## *Lee County, GA Hurricane Michael Debris Removal*
## *Leesville, GA*

*Current*          Truck Number 00006406          7 of 9

| | |
|---|---|
| Truck Owner: Lee County Commissioner | Truck Type: Self Loader |
| Truck Tag State: GA   Truck Tag Number: GV4626L | Sub Code: LEECNTY |
| Trailer Tag State: ___   Trailer Tag Number: ___ | Capacity (CY): 30 |
| Owner Truck No: 810 | |

144"

100.58"

72"

30 CY
88 " Width

42"

240"



**Bed Hoist** (Inches)

L1: ____   L2: ____

W: ____   H: ____

**End Radius** (Inches)

R: ____   H: ____

**Bottom Radius** (Inches)

R: ____   L: ____

Measured By: Dennis Cruthirds          Date Measured: 3/4/2019 9:08:01 AM

www.DebrisTech.com

Case 2:26-cv-03945    Document 1-1    Filed 06/09/26    Page 647 of 811



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## *City of Selma, AL*
## *Hurricane Zeta Debris Removal*

# Punch List



**Record Number:**

012821103245781

**Truck:**           **Timestamp:**

00009470            1/28/2021 10:32:39 AM

**Prime Contractor:**

DRC Emergency Services

**Subcode:**          **Truck Owner:**

DRCPRIM              Frank Middleton

**Monitoring Firm:**

DebrisTech, LLC

**Coordinates:**   32.4073, -87.0245

**Address:**   723 Selma Ave

**Monitor:**   Toi Shuntil Mcclinton



www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Section 4 : References





# ASHLAND - BOYD COUNTY - CATLETTSBURG OFFICE OF EMERGENCY MANAGEMENT

**2039 MAIN STREET W.  ASHLAND, KY 41102      OFFICE (606) 393-1801 FAX (606) 739-0025**
www.boydcoem.net

| TIM ENGLAND | HAROLD HOLLEY | JASON QUEEN | GREGORY PRIDDY |
|---|---|---|---|
| EXECUTIVE DIRECTOR | CHIEF DEPUTY DIRECTOR - OPERATIONS | FEMA COORDINATOR | DEPUTY DIRECTOR - ADMINISTRATION |

June 14, 2021

To Whom It May Concern:

Re: Debris Tech

The Boyd County Fiscal Court appreciates the efforts of Debris Tech in assisting our county with the clean-up tasking in the aftermath of the 2021 Ice Storm that significantly impacted Eastern Kentucky. It is without reservation that I am writing this letter of recommendation on behalf of the residents of Boyd County, Kentucky.

The personnel of Debris Tech were extremely professional as well as specifically trained in the utilization of the reporting techniques required by FEMA for this type of incident. Debris Tech staff worked closely with our debris removal team, thereby ensuring that the removal and reporting process maximized efficiencies to the complete removal of all storm debris. The data that was assimilated by Debris Tech was extrapolated utilizing methodologies that made it easy to reconcile invoices.

We had a very positive experience with Debris Tech and we highly recommend their services. Please feel free to reach out to me if you have any questions regarding the extremely proficient services that Debris Tech provided the Boyd County Fiscal Court during this incident.

Respectfully,

Jason Queen
FEMA Coordinator

C/C:  Eric Chaney, County Judge Executive
      Tim England, EM Executive Director
      file

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEPARTMENT OF PUBLIC WORKS

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and d

City of

Jacksonville Beach

Operations &

Maintenance Facility

Department of Public

Works

1460-A Shetter Avenue

Jacksonville Beach

FL  32250

Phone: 904.247.6219

Fax: 904.247.6117

www.jacksonvillebeach.org

October 22, 2018

Mr. Brooks Wallace, P. E.
Principal
DebrisTech, LLC (ARX Disaster Management, Inc)
925 Goodyear Blvd.
Picayune, MS 39466

Subject:  Letter of Recommendation

I am very pleased to say that DebrisTech (Formerly ARX Disaster Management, Inc.) is currently under a five (5) year continuing service contract with the City of Jacksonville Beach to provide debris monitoring services during declared emergencies.

In 2016 and 2017 DebrisTech provided debris monitoring services resulting from Hurricanes Matthew & Irma respectively. Members of their staff were very knowledgeable and up to date with all of the FEMA guidelines and regulations, which helped facilitate both of our claims to FEMA. Whenever we had questions, DebrisTech's staff had the answers. DebrisTech's staff worked very closely with our Debris Recovery Contractor and our in-house cleanup crews to make sure all of the debris and related expenses were accounted for and were able to be retrieved after the cleanup was completed. As a result of their efforts, our claims to FEMA went through without a hitch.

Prior to the issuance of DebrisTech's contract, the City of Jacksonville Beach performed debris monitoring with its in house personnel and it turned out to be a total farce. Records were damaged, lost or forgotten and I am positive that the City of Jacksonville never came close to recovering the amount of money that they could have, if they would have had a contractor like DebrisTech to perform the necessary paperwork.

In closing, I would like to state that it has been a pleasure working with all of the members of DebrisTech and I look forward to continue to work with such a well ran organization.

Sincerely,

*Dennis R. Dupries*

Dennis R. Dupries
Construction Project Manager
City of Jacksonville Beach, FL 32250



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

*City of*
# Neptune Beach



**Andrew E. Hyatt**
City Manager

October 23, 2018

To Whom It May Concern:

Re: Debris Tech

The City of Neptune Beach appreciates the efforts put forth by Debris Tech in assisting our city with the clean-up effort in the aftermath of Hurricane Irma. It is with great pleasure that I am writing this letter of recommendation on behalf of the residents of Neptune Beach, Florida.

The entire staff of Debris Tech was professional and trained properly in the reporting techniques required by FEMA. The Debris Tech staff worked closely with our debris removal team making the removal and reporting process efficient all the way to the complete removal of all storm debris. The data provided was presented in a manner that made it easy to reconcile invoices.

We had a very positive experience with Debris Tech and we highly recommend their services. Please let me know if you have any questions regarding the services Debris Tech provided the City of Neptune Beach.

Respectfully,

Leon Smith
Director of Public Works

116 First Street • Neptune Beach, Florida 32266-6140
(904) 270-2400 x 31 • FAX (904) 270-2526

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

David Stevens, Chairman
Bill Watson, Vice-Chairman
Joel Williams, Commissioner
Charles Jordan, Commissioner
Kelly S. Spratt, Commissioner

Adam S. Poppell, III, County Attorney
Richard E. Braun, Jr., Deputy County Attorney
John "Patrick" Zoucks, County Manager
Shawn Jordan, Deputy County Manager
Sherrell D. Davis, County Clerk



**McIntosh County Board of Commissioners**
P.O. Box 584 • 1200 North Way • Darien, Georgia 31305 • 912-437-6671 • FAX 912-437-6416

October 24, 2018

To Whom It May Concern

   In the aftermath of Hurricane Irma McIntosh County contracted with Debris Tech for monitoring debris removal. The staff of Debris Tech were very professional, and they were knowledgeable in the requirements of FEMA and GEMA. They kept detailed records during this event and when FEMA had questions about submitted, debris removal documentation, Debris Tech was always available to answer questions, and provide additional information on documenting debris. There was never a "let me get back to you on that" response.

   In the event of another disaster McIntosh County would not hesitate to contact Debris Tech to monitor operations for the county. It was a pleasure working with them and we would recommend their services to anyone in need.

Sincerely,

*Ty S. Poppell*

Director McIntosh County EMA
/ Public Safety / Homeland Security
/ County Safety Coordinator / CODE Enforcement
1019 Production Row
PO Box 584
Darien, Ga. 31305
Phone: 912-437-5170
Cell: 912-258-1343

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# City of Mustang

## Council-Manager Form of Government

405-376-4521    1501 N. Mustang Road,    Mustang, Oklahoma    73064

Debris Tech,

The City of Mustang could not be any more pleased with the monitoring services we have received from Debris Tech. Their attention to detail and ability to provide data in real time has assisted the City of Mustang in providing accurate information for reports as well as providing it to our citizens. Debris Tech is second to none in their customer service and we appreciate their efforts in delivering a quality product to the City of Mustang.

Thank you,

Justin Battles
Assistant City Manager
City of Mustang, OK

*A City with a Vision*

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Section 5 : Hourly Rates & Additional Information



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COST PROPOSAL FORM
Debris Monitoring Proposal

The hourly labor rates shall include all applicable overhead and profit. All non-labor related project costs will be billed to the County at cost without mark-up. All Per Diem Expenses shall be billed directly to the County at a rate not to exceed the GSA Per Diem Allowance for the project area. The rates listed below shall be straight time rates. All hours in excess of 40 per week shall be billed at 1.5 times the straight time rate.

### DISASTER DEBRIS MONITORING SERVICES

| POSITIONS | HOURLY RATES |
| --- | --- |
| Project Manager | $85.00 |
| Operations Manager | $75.00 |
| Field Supervisors | $65.00 |
| Load Site Monitors | $45.00 |
| Debris Site/Tower Monitors | $45.00 |



## EQUAL EMPLOYMENT OPPORTUNITY (EEO) & Affirmative Action (AA) POLICY

DebrisTech shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, ancestry, national origin, place of birth, age, marital status, or handicap.

DebrisTech shall take affirmative action in accordance with the terms outlined in its proposal and the provisions of this contract to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, ancestry, national origin, place of birth, age, marital status, or handicap. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

DebrisTech agrees to post in conspicuous places, available to employees and applicants, notices to be provided by the city setting forth the provisions of the nondiscrimination clauses.

1. **Policy** - DebrisTech is an equal opportunity employer. No person is unlawfully excluded from consideration for employment because of race, color, religious creed, national origin, ancestry, sex, age, veteran status, martial status or physical challenges. This policy includes affirmative action in the area of placement, promotion, transfer, rate of pay and termination. The policy applies not only to recruitment and hiring practices, but also includes affirmative action in the area of placement, promotion, transfer, rate of pay and termination. Executive, management and supervisory levels have the responsibility to further the implementation of this policy and ensure conformance by subordinates. Any employee who engages in discrimination will be subject to suspension or termination. Any supervisory or managerial employee who knows of such behavior and fails to take immediate and appropriate corrective action will also be subject to disciplinary action. Any individual who is the target of discrimination is encouraged to discuss the matter with the Department Director. Any individual who feels such a discussion would be or has been futile, unsatisfactory or counterproductive should contact the Human Resources Department. A member of the Human Resource staff will be designated to investigate the claim. The accused individual may be suspended pending the outcome of the investigation. Retaliation against claimants will not be tolerated.

2. **Dissemination of Policy Within DebrisTech** - DebrisTech will maintain appropriate steps to ensure that all employees understand the company's obligation under this policy and specifically instruct supervisory personnel in their responsibilities for carrying out this policy.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3. **Affirmative Action Program** - DebrisTech will maintain an Affirmative Action Program designed to ensure that there will be no discrimination on the basis of race, color, religion, sex, national origin, marital status, age or disability, etc.

4. **Responsibility for Program** - DebrisTech will designate one of its officials as equal opportunity compliance officer for executing this agreement, including liaison with the staff of the Human Relations Council.

5. **Hiring Practices** - DebrisTech will maintain hiring practices designated to achieve a reasonable representation of minority and female employees at every job level.

6. **Testing** - DebrisTech will review its testing procedures to see that they are kept up to date and reflect standard and acceptable testing practices.

7. **Recruitment Sources** - DebrisTech will specifically notify all sources of recruitment, employment agencies, placement bureaus, colleges, universities, labor unions, etc., that it does not discriminate on the basis of race, religion, color, sex, national origin, marital status, age or disability, etc.; that the company actively solicits minority group applicants and that it will discontinue the use of sources where it appears that direct or indirect discriminatory practices exist.

8. **Changes in Employee Status** - DebrisTech will review all procedures relating to transfer, upgrading, downgrading and lay-off, to ensure that all such actions are taken without regard to race, religion, color, sex, national origin, marital status, age or disability, etc.

9. **Training** - DebrisTech will cooperate with available resources in utilizing training programs designed to admit minority group members and females to regular employment with the company.

10. **Suppliers and Subcontractors** - DebrisTech shall obtain written assurance that these requirements have been read and they fully agree to this Affirmative Action Program, from all suppliers and/or subcontractors involving an expenditure requiring City Commission approval. Further, those suppliers and/or subcontractors agree to become a part of the full implementation of said program.

DebrisTech is proud to be an equal opportunity employer. We are committed to providing equal employment opportunities to you and all other persons without regard to race, creed, color, religion, national origin, sex, marital status, citizenship status, age, veteran status or disability. Furthermore, we will not tolerate any form of discrimination or harassment of our employees by co-workers, supervisors, customers, or vendors. This commitment extends to our policies on recruiting, advertising, hiring, placement, promotion, training, transfer, wages, benefits, termination and all other privileges, terms and conditions of employment.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

Print or type. See Specific Instructions on page 3.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**DebrisTech, LLC**

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC

☐ C Corporation

☐ S Corporation

☐ Partnership

☐ Trust/estate

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ **P**

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**925 Goodyear Blvd.**

Requester's name and address (optional)

**6** City, state, and ZIP code

**Picayune, MS 39466**

**7** List account number(s) here (optional)

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

**or**

**Employer identification number**

2 7 – 3 3 6 2 9 0 6

### Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**
Signature of U.S. person ▶ *[signature]*

Date ▶ January 1, 2021

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)



**A SUBSIDIARY OF BANCORPSOUTH BANK**

February 12, 2021

RE:    DebrisTech, LLC

To Whom It May Concern:

Per your request for evidence of bond ability, this letter is to advise you that DebrisTech, LLC is set up for bonding with NAS Surety Group.

Our company represents DebrisTech, LLC for all their bonding needs and has found them to be an outstanding client. Based on their past experience, we will consider single jobs of $30,000,000 with an aggregate program of $50,000,000.

Issuance of final bonds will be subject to standard underwriting at the time of the final bond request, which will include but not be limited to the receipt of current financial information, acceptability of the contract documents, bond forms, and financing. The Surety and BXS Insurance, Inc. along with their agents and owners accept no liability to you or any third party for failure to issue any bonds.

If I can be of additional assistance, please do not hesitate to call.

Sincerely,

David R. Fortenberry
Vice-President

16 Thompson Park, Hattiesburg MS (601) 554-7300 · www.bxsi.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# First National Bank
## Of Picayune

### "Your Hometown Bank"
**Since 1947**

Date: May 12, 2021

Re: DebrisTech, LLC

To Whom It May Concern:

This is to confirm that the above referenced customer is a valued borrower and depositor of the bank. We have handled various financial needs of this customer since the company's inception.

The borrower currently maintains a $3,600,000.00 business line of credit and a business demand deposit account. Both accounts are handled in a satisfactory manner.

This company is deemed to be credit worthy from every aspect of our credit underwriting and thus a level one borrower. Based on knowledge of this customers financial strength, the borrower has the capability to finance the anticipated volume of work for a minimum of 45 days without interference or a slowdown in the work whatsoever.

With this letter, we can also confirm that the accounts held and the transactions made by the customer have all been to our satisfaction. During the transactions and operations with our bank, we have not faced any problems of any sort and would entertain future requests from this customer in a most favorable manner.

Should there be any questions, please do not hesitate to call.

David B. Hemeter, President
**First National Bank of Picayune**
Email: dbhemeter@fnbop.com

FROM THE DESK OF DAVID B. HEMETER, PRESIDENT, FIRST NATIONAL BANK OF PICAYUNE
121 EAST CANAL ST., P. O. BOX 848, PICAYUNE, MS 39466  PHONE (601) 749-3220  FAX (601) 798-4796

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
8/31/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Laurie McCrea |
|---|---|
| BXS Insurance<br>16 Thompson Park<br>Hattiesburg MS 39401 | PHONE (A/C, No, Ext): 601-554-7327    FAX (A/C, No): 601-550-6160 |
| | E-MAIL ADDRESS: laurie.mccrea@bxsi.com |

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| INSURED    DEBRINC-01 | INSURER A : Continental Casualty Company | 20443 |
| DebrisTech, LLC<br>925 Good Year Blvd<br>Picayune MS 39466 | INSURER B : Navigators Insurance Company | 42307 |
| | INSURER C : Travelers Casualty Insurance Co of America | 19046 |
| | INSURER D : National Union Fire Ins of LA | 32298 |
| | INSURER E : Accident Fund Ins Co of America | 10166 |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER: 1281382921    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | Y | Y | B6020088716 | 11/9/2020 | 11/9/2021 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE  X  OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY  X PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | Y | Y | BA5R3388531 | 11/9/2020 | 11/9/2021 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY  X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| C | UMBRELLA LIAB  X OCCUR | Y | Y | EBU035719245 | 11/9/2020 | 11/9/2021 | EACH OCCURRENCE | $ 5,000,000 |
| | X EXCESS LIAB   CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED   RETENTION $ | | | | | | | $ |
| E | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY    ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? Y/N  N (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | Y | WCV619920801 | 11/4/2020 | 11/4/2021 | X PER STATUTE  OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| | Professional Liability Pollution Liability Included Claims Made Policy Form | | | CM20DPLZ032UEIV | 9/15/2020 | 9/15/2021 | Each Claim Aggregate Deductible | $1,000,000 $1,000,000 $15,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES  (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
THE FOLLOWING COVERAGES/PROVISIONS/ENDORSEMENTS ARE PROVIDED TO CERTIFICATE HOLDER(S), ANY PERSON(S) OR ORGANIZATION(S) ONLY WHEN THE NAMED INSURED HAS AGREED TO DO SO IN A WRITTEN CONTRACT/AGREEMENT -
General Liability:
Blanket Additional Insured (Form SB145932F 6-16) coverage provided applying on a primary and non-contributory basis (Form SB145932F 6-16 ),
Blanket Waiver of Subrogation (Form SB145932F 6-16)
Policy will have to be endorsed to add 30 days notice of cancellation except for non-payment, in which case 10 days will be given (Form SB147052C 6-16).
Liability assumed in an "Insured Contract" as defined by Form SB147062-E 4-14)
See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

AGENCY CUSTOMER ID: DEBRINC-01

LOC #: _____

# ADDITIONAL REMARKS SCHEDULE

Page __1__ of __1__

| AGENCY | NAMED INSURED |
|---|---|
| BXS Insurance | DebrisTech, LLC<br>925 Good Year Blvd<br>Picayune MS 39466 |

| POLICY NUMBER | |
|---|---|

| CARRIER | NAIC CODE |
|---|---|
| | |
| | EFFECTIVE DATE: |

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ___25___   **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Automobile Liability :
Blanket Additional Insured (Form CA2048 /13) coverage provided applying on a primary and non-contributory basis (Form CAT474 02/16), Blanket Waiver of Subrogation (Form CA0444 10-13).
Policy will have to be endorsed to add 30 days notice of cancellation except for non-payment, in which case 10 days will be given - Endorsed to policy (Form CA140327B 07/11).

Workers Compensation:
Blanket Waiver of Subrogation (Form WC000313)
30 days notice of cancellation except for non-payment, in which case 10 days will be given will be endorsed to policy (WC9906R4).

Umbrella:
Blanket Additional Insured (Form G15057 6-05) with coverage provided applying on a primary and non-contributory basis and Waiver of Subrogation. Coverage is excess follow form of scheduled underlying policies: General Liability, Automobile Liability and Employers Liability (workers compensation) (Form UM0001 11/01). Policy will have to be endorsed to add 30 days notice of cancellation except for non-payment in which case 10 days will be given.

Professional (Errors & Omissions) Liability - Claims Made Form
Project Name/Number: RFP: 080-2099901-RN

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents

# Gmail

**MPIN : Dtech2012**

Debra McCormick <debra@debristech.com>

---

## Fwd: Your DUNS Lookup Request for DEBRISTECH, LLC

**Debra McCormick** <debra@debristech.com>                              Tue, Nov 14, 2017 at 3:53 PM
To: Brooks Wallace <brooks@debristech.com>

On Nov 14, 2017, at 3:49 PM, Brooks Wallace <brooks@debristech.com> wrote:

<unknown.jpg>

**Brooks Wallace, P.E.** / President
brooks@debristech.com

**DebrisTech /** Office: 601-799-1037 / Cell: 601-916-1113
925 Goodyear Blvd., Picayune, MS  39466
www.debristech.com

> Begin forwarded message:
>
> **From:** "Dun & Bradstreet" <DandB@click.dandb.com>
> **Subject: Your DUNS Lookup Request for DEBRISTECH, LLC**
> **Date:** September 2, 2017 at 4:50:29 PM AST
> **To:** brooks@debristech.com
> **Reply-To:** "Dun & Bradstreet" <reply@click.dandb.com>

Having trouble seeing this email? <u>View it online</u>



# dun & bradstreet

---

**09/02/2017**

**Brooks Wallace,**

The following is the DUNS number for **DEBRISTECH, LLC**:
DUNS number: **078693755**

If this is **YOUR COMPANY**, take advantage of **CreditBuilder™**, our next generation credit building solution.

**With CreditBuilder, you can**

Get unlimited access to your business credit file

Ensure you are always aware of the most current D&B information your banks, suppliers, competitors and customers are using to evaluate your business

Get alerts when there are changes to your business credit file

Benchmark your company's credit scores against your industry and key

Enhance your D&B credit scores and ratings by adding good payment history to your credit profile

If you are looking for information on **ANOTHER COMPANY**, consider purchasing a **Business Information Report™**. Reduce the risk of unpaid bills by evaluating the credit risk of another company before doing business with them.

**With a Business Information Report you can**

Get unlimited access to your business credit file

Ensure you are always aware of the most current D&B information your banks, suppliers, competitors and customers are using to evaluate your business

Get alerts when there are changes to your business credit file

Benchmark your company's credit scores against your industry and key competitors

Enhance your D&B credit scores and ratings by adding good payment history to your credit profile

Call **1-800-700-2733**, Monday through Friday, 8:00 AM to 6:00 PM local time or email us at **CustomerSupport@DandB.com**.

**Sincerely,**

**Dun & Bradstreet**

Please add dandb@click.dandb.com to your email address book to ensure delivery of our emails to your inbox.

This is a notification regarding your product subscription with Dun & Bradstreet. If you have any questions, email us at customersupport@DandB.com.

Privacy and Terms of Service Notice: Your privacy is important to us; please see our Privacy Policy and Terms of Service.

©Dun & Bradstreet, Inc. 2017. All rights reserved.
1250 Valley Brook Avenue, Suite 102 Lyndhurst, NJ 07071

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**CONTACT US**

**A**    925 Goodyear Blvd, Picayune, MS 39466

**W**    DebrisTech.com

**C**    1-601-916-1113

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT
# 9

DocuSign Envelope ID: 0529F588-0882-452F-9614-863CFD23590D

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# Commonwealth of Pennsylvania

# Governor's Office

## PROCLAMATION OF DISASTER EMERGENCY

### August 31, 2021

WHEREAS, ongoing monitoring and projections made at my discretion by associated state and national weather services have disclosed that the Commonwealth of Pennsylvania will experience the aftereffects of Hurricane Ida; and

WHEREAS, Hurricane Ida has the potential to cause widespread and heavy rains throughout Pennsylvania, which in turn poses a serious threat of flash and riverine flooding and other adverse impacts throughout the Commonwealth; and

WHEREAS, Hurricane Ida's heavy rains, and risk of flooding may result in extensive damage to roads, streets, bridges, private homes, businesses, utilities, and may cause other adverse impacts upon the general population of Pennsylvania; and

WHEREAS, this emergency event caused by Hurricane Ida is of such magnitude or severity as to render essential the Commonwealth's supplementation of county and municipal efforts and resources and the activation of all applicable state, county, and municipal emergency response plans; and

WHEREAS, the Commonwealth of Pennsylvania has enacted the Emergency Management Assistance Compact (EMAC) into law and codified it at 35 Pa. C.S. §§ 7601-7604, in order to provide for mutual aid between states during an emergency that is duly declared by the Governor of the affected state.

NOW THEREFORE, pursuant to Article IV, Section 20 of the Pennsylvania Constitution, I do hereby proclaim the existence of a general disaster emergency related to the after effects of Hurricane Ida in the entirety of the Commonwealth and authorize and direct that the Pennsylvania Emergency Management Agency Director, or designee, assume command and control of all statewide emergency operations and that all Commonwealth departments and agencies, under the direction of the Pennsylvania Emergency Management Agency Director, or designee, utilize all available resources and personnel as is deemed necessary to cope with the magnitude and severity of this emergency event pursuant to the provisions of section 7301 of the Emergency Management Services Code, 35 Pa. C.S. § 7301.

1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FURTHER, I hereby transfer $2,000,000 in unused appropriated funds to the Pennsylvania Emergency Management Agency for Emergency Management Assistance Compact expenses related to this emergency, to be increased or decreased as conditions require pursuant to the provisions of section 7604(a) of the Emergency Management Services Code, 35 Pa. C.S. § 7604(a). In addition, I hereby transfer $5,000,000 in unused appropriated funds, to be increased or decreased as conditions require, to the Pennsylvania Emergency Management Agency pursuant to section 1508 of the Act of April 9, 1929, P.L.343, No. 176 (the Fiscal Code), 72 P.S. § 1508. The aforementioned funds shall be used for expenses authorized and incurred related to this emergency. These funds shall be credited to a special account established by the Office of the Budget. I hereby direct that any funds transferred herein that remain unused after all costs related to this emergency have been satisfied shall be returned to the General Fund.

FURTHER, all Commonwealth agencies purchasing supplies or services in response to this emergency are authorized to utilize the emergency procurement procedures set forth in section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. § 516. This Proclamation shall serve as the written determination of the basis for the emergency under 62 Pa. C.S. § 516; and

FURTHER, I hereby direct the Pennsylvania Emergency Management Agency to staff the Commonwealth Response Coordination Center for the duration of this emergency event, and to augment it with personnel from other Commonwealth agencies and departments. I also authorize the Pennsylvania Emergency Management Agency to direct and coordinate the emergency response, recovery, and mitigation activities of other Commonwealth agencies and departments as deemed necessary to deal with the exigencies of this disaster emergency through implementation of the State Emergency Operations Plan; and

FURTHER, I hereby authorize the Secretary of Transportation to use all available equipment, resources, and personnel of the Department of Transportation, in whatever manner that she deems necessary, to ensure that all federal-aid and state highways in the areas that may be affected by the emergency event are cleared of snow, debris and any other obstructions resulting from this event and to ensure that highways, bridges, roadbeds, and related facilities and structures that may sustain damage in the disaster affected areas are immediately repaired, maintained, reconstructed, or replaced, or that new construction is undertaken where necessary. In addition, I hereby waive any laws or regulations that would restrict the application and use of the Department's equipment, resources, and personnel to assist local jurisdictions in the repairs and clearing and removal of snow, debris and other types of obstructions from non-state-owned highways. This assistance to local jurisdictions may be provided solely at the discretion of the Secretary of Transportation. This assistance, however, does not apply to privately owned highways, roads, streets, or other types of property; and I hereby authorize the Secretary of Transportation, in her sole discretion, to waive any provision of the Vehicle Code or any other law or regulation which she is authorized by law to administer or enforce as may be necessary to respond to this emergency event; and

FURTHER, if investigations made on my behalf determine that the Commonwealth is in need of greater flexibility in the application of state and federal motor carrier regulations to accommodate utility operators and truck drivers in the transporting of fuel, food or other commodities across the state to provide emergency relief and repairs during this event, I hereby direct the Department of Transportation to waive any laws or federal or state regulations related to drivers of commercial vehicles; and

FURTHER, pursuant to the powers vested in me by the Constitution and laws of this Commonwealth, specifically 51 Pa. C.S. § 508, I hereby authorize the Adjutant General of Pennsylvania to place on state active duty for the duration of this disaster emergency proclamation, such individuals and units of the Pennsylvania National Guard, as requested by the Pennsylvania Emergency Management Agency, to alleviate the danger to public health and safety caused by this emergency event; and

2

DocuSign Envelope ID: 0529F588-0882-452F-9614-863CFD23590D

FURTHER, I hereby authorize the Commissioner of the Pennsylvania State Police to use all available resources and personnel of the Pennsylvania State Police, in whatever manner he deems necessary, to aid in the recovery aspects related to all interstate and other federal and state highways in the Commonwealth to address this emergency event; and

FURTHER, I hereby direct that the emergency response, recovery, and mitigation aspects of the Commonwealth and all applicable county, municipal, and other emergency response plans be activated and that all state, county, and municipal actions taken to implement those plans be coordinated through the Pennsylvania Emergency Management Agency; and

FURTHER, I hereby suspend the provisions of any other regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder, or delay necessary action in coping with this emergency event. All Commonwealth agencies may implement their emergency assignments without regard to procedures required by other laws, except mandatory constitutional requirements, pertaining to the performance of public work, entering into contracts, incurring of obligations, employment of temporary workers, rental of equipment, purchase of supplies and materials, and expenditures of public funds; and

STILL FURTHER, I hereby urge the governing bodies and executive officers of all political subdivisions that may be affected by this emergency event to act as necessary to meet the current exigencies as legally authorized under this proclamation, including by the employment of temporary workers; by the rental of equipment; and by entering into such contracts and agreements as may be required to meet the emergency, all without regard to those time-consuming procedures and formalities normally prescribed by law, mandatory constitutional requirements excepted.



GIVEN under my hand and the Seal of the Governor this thirty-first day of August in the year of our Lord two thousand twenty-one, and of the Commonwealth the two hundred and forty-sixth.

TOM WOLF
Governor

3

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## DISASTER DECLARATION

WHEREAS, on September 1, 2021, heavy rains as a result of remnants of Hurricane Ida are expected to significantly affect the County causing flooding, severe damage and the potential for suffering to the persons and property of Montgomery County; and

WHEREAS, the potential flooding throughout the County may endanger the health, safety and welfare of a substantial number of persons and businesses residing in Montgomery County and threatens to create problems greater in scope than Montgomery County may be able to resolve; and

WHEREAS, emergency management measures are required to reduce the severity of this disaster and to protect the health, safety and welfare or affected residents in Montgomery County;

NOW, THEREFORE, we the undersigned Commissioners of Montgomery County, pursuant to the provisions of Section 7501 of the Pennsylvania Emergency Management Services Code, (35 PA C.S.), as amended do hereby declare the existence of a disaster emergency in Montgomery County.

FURTHER, we direct the Montgomery County Department of Public Safety to coordinate the activities of the emergency response, to take all appropriate action needed too alleviate the effects of this disaster, to aid in the restoration of essential public services, and to take any other emergency response action deemed necessary to respond to this disaster emergency.

This Declaration shall take effect on September 2, 2021 at 0900 hrs.

Commissioners:

Attest

_Lee A. Soltysiak_

Lee A. Soltysiak, Chief Operating Officer

Valerie A. Arkoosh, MD, MPH, Chair

Kenneth E, Lawrence, Jr., Vice Chair

Joseph C. Gale

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 10

The Wayback Machine - https://web.archive.org/web/20211215203724/https://debristech.com/company-profile/



- Home
- COMPANY PROFILE
- Technology
- News
- Contact Us

Select Page

Search …

# COMPANY PROFILE



## COMPANY PROFILE

### DebrisTech, LLC

DebrisTech provides disaster recovery guidance to our clients across the country utilizing our in-house developed Electronic Debris Management System. DebrisTech provides quality personnel management and debris monitoring services, along with real time access to all aspects of debris removal operations through the DebrisTech Central Information Database. Debris Removal Monitors, equipped with our tracking devices, keep a bullet-proof digital record from start to finish.

Modeled after proven debris monitoring methods, DebrisTech replaces hand written tickets with real time data collection devices, raising the bar for documentation and security. Built-in automated fraud detection and audit tools reduce the risk of fraudulent activities and minimize the potential of costly de-obligations. The system can also provide agencies, such as FEMA or the Inspector General, real time access to the data. This access allows auditors to begin their task early, meaning quicker reimbursement and recovery.

DebrisTech takes pride in cultivating personal, lasting relationships with our Clients. We realize that most of our Clients call on us during times of distress and we recognize the tremendous responsibility associated with accurately and thoroughly documenting the debris removal process. DebrisTech is committed to providing the attention and service that is second to none.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## EXPERIENCE

## EXPERIENCE

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



DebrisTech has helped communities across the country pick up the pieces after major disasters. Our team members have lived through hurricanes and other disasters, and we've seen first-hand what it means to a community and it's residents. Our mission is to alleviate the burden of monitoring the process of the debris removal so that the leaders and residents of stricken communities can focus on each other and begin to heal, and ensuring that all costs incurred are eligible for reimbursement by FEMA. Debris removal monitoring is a very engaged process requiring focus and understanding of many areas of operation and federal guidelines.

Since 2010, DebrisTech, LLC has served 48 different Counties and Municipal Governments. In 2017 alone, DebrisTech provided Debris Monitoring Services to 20 Clients in 7 different States, in response to 7 Federally Declared Disasters. Our experience is very recent and very relevant to the scope of services outlined in the RFP. Our Firm has never had a contract terminated and all of our Clients have received 100% of their reimbursement for all work we have performed.

Our work in Florida and Georgia after Hurricanes Matthew and Irma, along with our experience and success with the very complex Puerto Rico Projects, has proven that DebrisTech is a leader in the Debris Removal Monitoring Industry. These projects consisted of monitoring over 450 crews which removed millions of yards of debris to many different disposal and staging sites. We documented the removal of many types of debris, including vegetative debris, C&D debris, hazardous trees and stumps. All of this debris was documented from Cradle to Grave to provide clear documentation of the removal only eligible storm generated debris. A list of recently completed projects and associated references is included in the following table.

## Puerto Rico DTOP

### Service Dates:

- November 2017 – Present

On September 20, 2017, Puerto Rico, the American Territory roughly 1,000 miles off the coast of Florida, was assaulted by the tenth most intense storm recorded in the Atlantic Ocean. Hurricane Maria swept across the 3,500 sq miles Island leaving devastation in its wake. That record-setting storm left more than 90% of the island in the dark; with a debris field that encompassed all of Puerto Rico. The Government of Puerto Rico elected to divide the Island into 5 Zones and hired two, third party private consultants to Monitor and Document the removal and disposal of the storm generated debris. DebrisTech was selected to monitor the East and the North DTOP zones. These zones experienced the first effects of the destructive waves and winds brought on by Maria. Utilizing DebrisTech's EDMS to monitor and record the Contractor's activities, the local government is able to track and manage their recovery in these zones with access to real-time information. DebrisTech mobilized within 24 hours after Notice to Proceed while amassing a staff of 40 trained monitors and a management staff of 16 full-time DebrisTech employees keeping pace with the local government's desire to begin the recovery process as soon as possible. DebrisTech is honored to be considered one of the top 2 firms in our respected field based on our past and current performances aiding cities, counties, states, and territories across the country in recovering from their own unexpected natural disasters. Due to the amount of personnel demand over a sustained period, coupled with agreed upon payment terms, this project is a shining example of DebrisTech's ability to engage in multi-million dollar endeavors across the country.

COMPANY PROFILE | DebrisTech

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



## "The Beaches" – Florida

**Service Dates:**

- October 2016 -January 2017
- October 2017 – January 2018

In 2014 the City of Jacksonville Beach procured DebrisTech to provide debris monitoring services until 2019. This pre-procured contract and their approved debris management plan have allowed them to be fully prepared for the last 3 major hurricanes. DebrisTech was contractually required to be in the EOC within hours of each storm's passing to begin the first push and the required debris removal documentation.Upon activation in 2016 for Hurricane Matthew, DebrisTech was recognized as a necessity by two neighboring beach cities, Neptune Beach and Atlantic Beach. These cities utilized the cooperative purchasing clause in Jacksonville Beach's RFP to enter into an agreement with DebrisTech to provide debris monitoring services in October of 2016. DebrisTech was responsible for documenting every hazardous limb and tree, along with every load of storm-generated debris, from these 3 cities. DebrisTech also documented the removal of this debris to its final resting place in the haul out phase.After Irma in 2017, DebrisTech was able to monitor and document the removal of all eligible storm-generated debris, along with hundreds of hazardous trees and limbs, from the public right of way for all 3 cities. Because of the geographic proximity of these cities, DebrisTech was able to leave 1 project manager to service and address any concerns brought up by each city.

## Work History



## WORK HISTORY

| Event | Client |
|---|---|
| Tornado 2019 | City of McComb, MS |
| Tornado 2019 | Monroe County, MS |
| Tornado 2019 | City of Columbus, MS |
| Hurricane Michael 2018 | Wiregrass Electric Coop |
| | Baker County, GA |
| | Lee County, GA |
| | Miller County, GA |
| | Mitchell County, GA |
| | Panama City, FL |
| | Bay County, FL |
| Hurricane Florence 2018 | Pamlico County, NC |
| | Town of Hope Mills, NC |
| | Cape Carteret, NC |
| Hurricane Maria 2017 | Puerto Rico Department of Transportation and Public Works |
| | Puerto Rico Aqueduct and Sewer Authority |
| Hurricane Irma 2017 | McIntosh County, GA |
| | Forsyth County, GA |
| | Bibb County, GA |
| | Jacksonville Beach, FL |
| Hurricane Harvey 2017 | Matagorda Co., TX |
| Tennessee Straight Line Winds 2017 | City of Memphis, TN |
| Mississippi Straight Line Winds 2017 | Holmes County, MS |
| | City of Durant, MS |
| | Yazoo County, MS |
| | Montgomery County |
| Jan Tornado 2017 | City of Hattiesburg |
| | Lamar County |
| Hurricane Matthew 2016 | Jacksonville Beach, FL |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3/17/25, 10:19 PM                                    COMPANY PROFILE | DebrisTech

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

|  |  |
|---|---|
|  | Atlantic Beach, FL |
|  | McIntosh County, GA |
| Summer Floods 2016 | Tangipahoa Parish, LA |
|  | City of Central, LA |
|  | City of Baker, LA |
|  | City of Clinton, LA |
| Spring Floods 2016 | Tangipahoa Parish, LA |
|  | Caldwell Parish, LA |
| Tornado 2015 | Marshal County, MS |
|  | Benton County, MS |
| Tornado 2014 | Marion County, MS |
|  | City of Tupelo, MS |
|  | Itawamba County, MS |
|  | Winston County, MS |
|  | City of Pearl, MS |
|  | Lamar County, MS |
| EF5 Tornado 2013 | Moore, OK |
|  | Mustang, OK |
| Super Storm Sandy | Nassau County, NY |
|  | Long Beach, NY |
|  | Town of Hempstead, NY |
|  | Village of Garden City, NY |
| Hurricane Isaac 2012 | Lincoln County, MS |
|  | Pearl River County, MS |

## Our Team



**Brooks Wallace, P.E.**

President
b3lineicon|b3icon-envelope|□|Envelope

## CONTACT

brooks@debristech.com
b3lineicon|b3icon-graduation|□|Graduation

## Education

University of Mississippi
Bachelor of Science, Civil Engineering
b3lineicon|b3icon-medal|□|Medal

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Experience**

DebrisTech. LLC
2010 – Present
Founder/Creator

Dungan Engineering, P.A.
2002 – Present
Principal Engineer

Brooks R. Wallace, P.E. created DebrisTech in 2010 in response to a need for real-time auditing of debris removal projects. He has a vast array of experience in the field of civil engineering and in debris removal monitoring. Working as an engineer on numerous projects in South Mississippi, including the aftermath of Hurricane Katrina, he was able to identify vulnerabilities and inefficiencies in the process of debris removal operations and monitoring. He realized that the technology was available to provide real-time data to FEMA and municipal supervisors overseeing cleanup efforts while creating a database of information that could be referenced at any time for compliance purposes. Utilizing the technology currently available, Mr. Wallace developed the software platform for what has evolved into a system that is revolutionizing the process of debris monitoring and compliance.

A civil engineer by trade, Mr. Wallace has dealt with countless municipal and county projects involving infrastructure upgrades and the modernization of local and regional maps and surveys. He has worked with law enforcement agencies, municipal governments, state agencies, and FEMA on projects ranging from smart growth plans to large-scale utility and resource redesigns.

Mr. Wallace will perform contractual negotiations, contractor invoicing, software development, and asset/personnel assignment. He is proficient in preparation planning, analysis, monitoring procedures, and personnel management. The technology he developed, along with previous experience, creates an invaluable leader for the DebrisTech team.

## Disasters Worked

2018 DR-4406 Hurricane Michael(AL)
2018 DR-4400 Hurricane Michael (GA)
2018DR-4399 Hurricane Michael (FL)
2018 DR-4393 Hurricane Florence(NC)
2017DR-4339 Hurricane Maria (PR)
2017 DR-4338 Hurricane Irma (GA)
2017 DR-4337 Hurricane Irma (FL)
2017 DR-4332 Hurricane Harvey(TX)
2017 DR-4320 Straight-line Winds (TN)
2017 DR-4314 Straight-line Winds (MS)
2017 DR-4297 Tornadoes(GA)
2017 DR-4295 Tornadoes (MS)
2016 DR-4284 Hurricane Matthew (GA)
2016 DR-4283 Hurricane Matthew (FL)
2016 DR-4277 Flooding (LA)
2016 DR-4263 Flooding (LA)
2015 DR-4248 Tornadoes (MS)
2015 DR-4247 Ice Storm (OK)
2015 DR-4205 Tornadoes (MS)
2015 Avian Influenza (IA)
2014 DR-4175 Tornadoes (MS)
2013 DR-4117 Tornadoes (OK)
2013 DR-4101Tornadoes (MS)
2012 DR-4085 Hurricane Sandy (NY)
2012 DR-4081 Hurricane Isaac (MS)
2008 DR-1786 Hurricane Gustav (LA)
2005 DR-1602 Hurricane Katrina (MS)

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Ryan Holmes, P.E.**

Principal
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

ryan@debristech.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

Bachelor of Science Civil Engineering
University of Mississippi, 2004
b3lineicon|b3icon-medal|□|Medal

**Positions**

- Principal & Owner
  DebrisTech
  2012 – Present

- Principal Engineer
  Dungan Engineering, P.A.
  2007 – Present

Ryan A. Holmes is a licensed engineer and Project Manager at DebrisTech. Collateral duties include business development, project management, and marketing. Mr. Holmes has nearly 10 years of diversified civil engineering experience. Mr. Holmes is uniquely talented, drawing from his experience with municipal, county, and state governments, along with private clients. Mr. Holmes has worked on numerous debris removal and disaster recovery projects. He worked on several project along the Mississippi coast in the aftermath of Hurricane Katrina. Most recently, Mr. Holmes assisted several communities in the recovery of Hurricane Isaac in Mississippi and Superstorm Sandy in New York. Utilizing DebrisTech's cutting edge technology, Mr. Holmes has successfully assisted the aforementioned communities with "cradle to grave" documentation of debris collection and disposal.

With DebrisTech, Mr. Holmes has helped cities and communities address their recovery needs through expertise, technology and knowledge. Past experience together with these skills make Mr. Holmes a valuable asset to DebrisTech. We provide vision and leadership for our clients, integrating new technology and delivery of unparalleled Debris Monitoring and Compliance.

DebrisTech has offered an opportunity for Mr. Holmes to showcase his diversified talents to provide practical applications of cutting edge technology in a way that is easily deployable and repeatable. He intends to utilize his skills dealing with municipalities and government agencies to raise the standards of Debris Monitoring Services for all companies and strives to be a leader in the industry.

Case 2:26-cv-03945 Document 1-1 Filed 06/09/26 Page 682 of 811

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Les Dungan**

Principal
b3lineicon|b3icon-envelope|□|Envelope

## CONTACT

les@dunganeng.com
b3lineicon|b3icon-graduation|□|Graduation

## Education

Bachelor of Science Civil Engineering
Mississippi State University, 1987
b3lineicon|b3icon-medal|□|Medal

## Positions

- Principal & Owner
  DebrisTech
  2010 – Present

- Principal Engineer
  Dungan Engineering, P.A.
  1993 – Present

H. Les Dungan, III, P.E., P.S. has 27 years of experience in the field of civil engineering. With a career that began in the government ranks with time working with the Mississippi Department of Environmental Quality and Natural Resources Conservation Service, he now serves as a self-employed consultant to various counties and municipalities in South Mississippi. Mr. Dungan has served as County Engineer for Jefferson Davis County and City Engineer for the Town of Prentiss for 20 years. He has also served as County Engineer for Pearl River County for 15 years.

Mr. Dungan has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricane Katrina, Mr. Dungan was able to provide the technical support needed in order for Pearl River County to have the confidence to use local contractors to perform the immense clean-up operation.

As a civil engineer, Mr. Dungan has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on projects ranging from bridge replacement to water treatment plants.

With DebrisTech, Mr. Dungan hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage,along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC. leader for the DebrisTech team.

Case 2:26-cv-03945　　Document 1-1　Filed 06/09/26　Page 683 of 811



**Jeff Dungan**

Principal
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

jeff@dunganeng.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

Bachelor of Science Civil Engineering
Mississippi State University, 1988
b3lineicon|b3icon-medal|□|Medal

**Positions**

- Principal & Owner
  DebrisTech
  2010 – Present

- Principal Engineer
  Dungan Engineering, P.A.
  1993 – Present

Jeff J. Dungan, P.E., P.S. has 26 years of experience in the field of civil engineering. With a career that began with Anderson Engineering in Columbia, Mississippi, he now serves as co-founder and Principal with Dungan Engineering, PA serving counties and municipalities in South Mississippi. Mr. Dungan has served as County Engineer for Lawrence, Walthall and Marion County and City Engineer for the Town of Tylertown for over 15 years. He has also served as County Engineer in Lincoln County for the past 8 years.

Mr. Dungan has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricanes Katrina, Gustav and Isaac, Mr. Dungan was able to provide the technical support needed by many local governments throughout the south. His services enabled these local governments to have the confidence to use local contractors to perform the immense clean-up operation efficiently and at a reasonable cost.

As a civil engineer, Mr. Dungan has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on many types of projects, such as roadway construction and maintenance, bridge replacements, water and waste-water treatment plants, industrial buildings and airports.

With DebrisTech, Mr. Dungan hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage, along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Lee Mock**

Principal
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

jeff@dunganeng.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

Bachelor of Science Civil Engineering
Mississippi State University, 1994

Bachelor of Business Administration
University of Mississippi, 1990

Associate of Arts
Pearl River Community College, 1988

b3lineicon|b3icon-medal|□|Medal

**Positions**

- Principal & Owner
  DebrisTech
  2010 – Present

- Principal Engineer
  Dungan Engineering, P.A.
  1994 – Present

Mr. Mock has 20+ years of experience in the field of civil engineering. With a natural bent for precision, a keen attention to detail, and driven to work with both efficiency and excellence, Mr. Mock embodies the company-wide commitment to solving problems and creating solutions for every project and every client.

Mr. Mock has dedicated his career to serving the engineering needs of the entities and individuals that have placed their trust in him. He has a vast array of experience in the field of civil engineering and debris removal monitoring. Working on numerous projects in South Mississippi with disaster related services, including the aftermath of Hurricanes Katrina and Issac.

As a civil engineer, Mr. Mock has planned and administered the construction of various kinds of transportation and utility infrastructure type projects. He has worked with both counties and municipalities in South Mississippi on projects ranging from bridge replacement and dam rehabilitation to water and wastewater treatment plant designs.

With DebrisTech, Mr. Mock hopes to help cities and communities recover from disasters more quickly and efficiently, in order for the return of normal life to come as soon as possible. His desire to assist and his ability to manage, along with his previous experience, create a valuable addition to the team which is DebrisTech, LLC.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**Tyler Williamson**

Project Manager
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

twilliamson@debristech.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

University of Mississippi
Bachelor of Science in Business Administration, Managerial Finance

Hinds County Community College
Associate of Arts

b3lineicon|b3icon-medal|□|Medal

**Experience**

DebrisTech , LLC
Project Manager – Operations Manager-2015 – Present
Data Manager – Field Monitor – Field Supervisor – 2014
Tyler Williamson is a Project Manager with DebrisTech. Collateral duties include overseeing the daily operations of the assigned projects, including coordinating the recovery efforts with the client, FEMA PA consultants, local, state and federal agencies. He has exceptional documentation practices and excels in strategical planning. Mr. Williamson has several years of experience with DebrisTech at nearly every position in the company. He has worked on more than 30 debris removal and disaster recovery projects. Currently, he is leading our efforts in Puerto Rico with the training and supervision of hundreds of debris monitors, managing data, and producing daily reports. Mr. Williamson has helped cities and communities address their recovery needs through expertise, technology and knowledge. Utilizing past experience, together with these ever developing skills, make him a valuable asset to DebrisTech.

**Disasters Worked**

2018 DR-4399 Hurricane Michael (FL)
2017 DR-4339 Hurricane Maria (PR)
2017 DR-4338 Hurricane Irma (GA)
2017 DR-4337 Hurricane Irma (FL)
2017 DR-4320 Straight-line Winds (TN)
2017 DR-4314 Straight-line Winds (MS)
2017 DR-4297 Tornadoes (GA)
2016 DR-4284 Hurricane Matthew (GA)
2016 DR-4283 Hurricane Matthew (FL)
2016 DR-4277 Flooding (LA)
2015 Avian Influenza (IA)
2014 DR-4175 Tornadoes (MS)

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**John McNeese**

Project Manager
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

jmcneese@debristech.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

University of Mississippi
Bachelor of Science, University Studies
b3lineicon|b3icon-medal|□|Medal

**Experience**

DebrisTech, LLC
2012 – Present
Project Manager

Wallace Environmental
2010-2011
Project Manager

TL Wallace Construction
2010
Project Manager

Holiday Construction
2005-2006
Project Manager
Equipment Operator

Independent Contractor
1997-2016
Commercial/Residential/Farm and Land Appraiser

John McNeese is a Project Manager and has been working with the DebrisTech management team since 2012. He began as an instrumental part in leading the recovery efforts in Moore, Ok following the aftermath of one of the most devastating tornadoes in US history. Having an extensive background in communications, cost evaluation and construction, John excelled as a liaison between the client and contractor, aiding in the reimbursement process involved with federal funding. Prior to DebrisTech, John had been involved in recovery efforts as a debris contractor following Hurricane Katrina in 2005 and a project manager during the BP Oil Spill in 2010. Both of these events are considered two of the most historically devastating disasters along the Mississippi Gulf Coast. Mr. McNeese has since served as a project manager in Puerto Rico following Hurricane Maria, overseeing more than 450 employees and approximately 100 million dollars in debris removal costs. He is currently serving as a project manager for DebrisTech in Florida, Alabama and Georgia, following Hurricane Michael.

**Disasters Worked**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2018 DR-4406 Hurricane Michael(AL)
2018 DR-4400 Hurricane Michael (GA)
2018DR-4399 Hurricane Michael (FL)
2018 DR-4393 Hurricane Florence(NC)
2017 DR-4339 Hurricane Maria (PR)
2017 DR-4314 Straight-line Winds (MS)
2017 DR-4295 Tornadoes (MS)
2016 DR-4277 Flooding (LA)
2013 DR-4117 Tornadoes (OK)
2013 DR-4101Tornadoes (MS)
2012 DR-4081 Hurricane Isaac (MS)
2010 Deepwater Horizon BP Oil Spill (MS)
2005 DR-1602 Hurricane Katrina (MS)

**Dennis Cruthirds**

Project Manager
b3lineicon|b3icon-envelope|□|Envelope

**CONTACT**

dennis@debristech.com
b3lineicon|b3icon-graduation|□|Graduation

**Education**

Emergency Management Institute – FEMA certified
IS-00008.a, IS-00019.15, IS-00020.15, IS-00021.15,
IS-00022, IS-00026, IS-00027, IS-00029, IS-00033.15,
IS-00042, IS-00100.b, IS-00100.pwb, IS-00100.fda,
IS-00107.15, IS-00144, IS-00207, IS-00247, IS-00250.a,
IS-00265, IS-00293, IS-00324.a, IS-00325, IS-00346,
IS-00366, IS-00362.a, IS-00386, IS-00395, IS-00403,
IS-00420, IS-00520, IS-00522, IS-00546.a, IS-00547.a,
IS-00548, IS-00551, IS-00558, IS-00613, IS00632.a,
IS-00634, IS-00660, IS-00662, IS-00701.a, IS-00702.a,
IS-00703.a, IS-00706, IS.00720, IS-00775, IS-00801,
IS-00802, IS-00804, IS-00808, IS-00809, IS-00810,
IS-00811, IS-00813, IS-00003, IS-00005.a, IS-00008.a, IS-00011.a, IS-00015.b, IS-00101.c, IS-00102.c,
IS-00103, IS-00405, IS-00906, IS-00907, IS-00908,
IS-00909, IS-00912, IS-00914
b3lineicon|b3icon-medal|□|Medal

**Experience**

DebrisTech, LLC
2012 – Present
Operations Manager
Project Manager

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Dungan Engineering, P.A.
2007 – 2018
CMT Lab Manager
CMT Inspector

2005 – 2008
Field Monitor
Field Supervisor
Operations Manager

Dennis Cruthirds is a Project Manager with DebrisTech and was a former, long time employee of Dungan Engineering. His duties include the daily operations of the project, quality assurance/quality control of monitoring operations, the documentation of employee time, and delivering updates to the client's representative. Mr. Cruthirds has 12 years of experience in construction material testing and 14 years of debris monitoring. He brings a wealth of knowledge, capabilities, and experience to our clients and has worked on numerous debris removal monitoring and disaster recovery projects. During his career, Mr. Cruthirds has successfully managed the monitoring of millions of cubic yards of debris for some of the most catastrophic disasters across the nation. He is currently serving as a project/site manager in Puerto Rico, after the effects of Hurricane Maria. His personality affords him a perfect relationship with contractors, as well as our clients

## Disasters Worked

2018 DR-4400 Hurricane Michael (GA)
2018DR-4399 Hurricane Michael (FL)
2017DR-4339 Hurricane Maria (PR)
2017 DR-4332 Hurricane Harvey(TX)
2017 DR-4314 Straight-line Winds (MS)
2017 DR-4295 Tornadoes (MS)
2016 DR-4277 Flooding (LA)
2016 DR-4263 Flooding(LA)
2015 DR-4205 Tornadoes (MS)
2014 DR-4175 Tornadoes (MS)
2013 PP Tornadoes (OK)
2012 DR-4085 Hurricane Sandy (NY)
2012 DR-4081 Hurricane Isaac (MS)
2008 DR-1786 Hurricane Gustav (LA)
2005 DR-1602 Hurricane Katrina (MS)

Designed By **Relevant Design** | Powered By **Creativity**

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 11



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# 21-43 - Debris Management Monitoring Firm
## Scoring Summary

## Active Submissions

| Supplier | Total 100 pts | A - Proper Documentation 0 pts | A - Proper Documentation Pass/Fail | B - Technical Evaluation 70 pts | B - Consultant Experience 20 pts |
|---|---|---|---|---|---|
| DebrisTech, LLC | 93.17 | 0 | Pass | 64.17 | 19.33 |
| Thompson Consulting Services, LLC | 80.92 | 0 | Pass | 58.92 | 18.67 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| B-2 Project Approach 20 pts | B-3 Capability Capacity and Availability 20 pts | B-4 Automated Debris Tracking and Reporting Systems (ADMS) Capabilities 10 pts | B-5 Other Supporting Information 10 pts | Cost 30 pts | Cost 30 pts |
|---|---|---|---|---|---|
| 18.67 | 17.33 | 9.333 | 8.667 | 29 | 29 |
| 16.67 | 16 | 8 | 8 | 22 | 22 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Proposal Score Comments

## DebrisTech, LLC - Scoring Comments

### A-1 - Proper Documentation - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Katie Walsh | Pass | Meets the requirement(s) | Vendor submitted required Purchasing documentation |

### B-1 - Consultant Experience - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 10 / 10 | Strongly fits desired attribute(s) | Experience noted throughout disasters in US more than demonstrates capabilities of vendor |



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Heather Stem | 9 / 10 | Strongly fits desired attribute(s) | Consultant had a long list of experience and with different weather events. |
| Billy Messerschmidt | 10 / 10 | Well-supported claim(s) | High level of recent experience |

## B-2 - Project Approach - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 10 / 10 | Meets or exceeds my expectations | Approach to debris management tracking provides a full proof method of tracking efforts on a county wide approach |
| Heather Stem | 9 / 10 | High level of detail in response | Section 3 outlines the approach for the County. Backup processes when electronics can not be used. |
| Billy Messerschmidt | 9 / 10 | High level of detail in response | detailed response |



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## B-3 - Capability, Capacity, and Availability - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 9 / 10 | Strongly fits desired attribute(s) | Use of multiple resources / contractors and local resources to provide services |
| Heather Stem | 9 / 10 | Meets or exceeds my expectations | Meets our capability needs |
| Billy Messerschmidt | 8 / 10 | High level of detail in response | Good capacity for technology, but appears to be low on standby staffing |

## B-4 - Automated Debris Tracking and Reporting Systems (ADMS) Capabilities - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 10 / 10 | Meets or exceeds my expectations | Automated system provides detailed reports and realtime tracking of DM efforts |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Heather Stem | 8 / 10 | Strongly fits desired attribute(s) | real-time ADMS with GIS capabilities |
| Billy Messerschmidt | 10 / 10 | Strongly fits desired attribute(s) | High level of detail |

## B-5 - Other Supporting Information - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 8 / 10 | Strongly fits desired attribute(s) | Nothing to note |
| Heather Stem | 8 / 10 | Strongly fits desired attribute(s) | Ticket examples |
| Billy Messerschmidt | 10 / 10 | Well-supported claim(s) | Good recommendation letters. |

## C-1 - Cost - Reviewer Scores

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 9 / 10 | Strongly fits desired attribute(s) | comparable |
| Heather Stem | 10 / 10 | Well-supported claim(s) | Compared to the other contractor pricing is better. |
| Billy Messerschmidt | 10 / 10 | Well-supported claim(s) | Good rates |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# Thompson Consulting Services, LLC - Scoring Comments

## A-1 - Proper Documentation - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Katie Walsh | Pass | Meets the requirement(s) | Vendor submitted required Purchasing documentation |

## B-1 - Consultant Experience - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 9 / 10 | Strongly fits desired attribute(s) | presented more than adequate experience |
| Heather Stem | 9 / 10 | Meets or exceeds my expectations | Mets our needs and variety of disasters |
| Billy Messerschmidt | 10 / 10 | Well-supported claim(s) | Seem to have extensive relevant experience. |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## B-2 - Project Approach - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 8 / 10 | High level of detail in response | detailed response and references to other projects |
| Heather Stem | 8 / 10 | Meets or exceeds my expectations | Meets our approach |
| Billy Messerschmidt | 9 / 10 | High level of detail in response | Detailed project approach |

## B-3 - Capability, Capacity, and Availability - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 7 / 10 | Partially meets my expectations | some doubt about availability of resources in NE US |
| Heather Stem | 8 / 10 | Meets or exceeds my expectations | Meets our capability needs |



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Billy Messerschmidt | 9 / 10 | Well-supported claim(s) | Seem to have readily available staff to accommodate multiple contracts at once. |

## B-4 - Automated Debris Tracking and Reporting Systems (ADMS) Capabilities - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 7 / 10 | Partially meets my expectations | level of detail not present on system |
| Heather Stem | 9 / 10 | Meets or exceeds my expectations | Can be used outside of cellular networks. |
| Billy Messerschmidt | 8 / 10 | Well-supported claim(s) | Appears to have good tracking capabilities |

## B-5 - Other Supporting Information - Reviewer Scores

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 8 / 10 | Strongly fits desired attribute(s) | adequate information present |
| Heather Stem | 8 / 10 | Other | Met our needs |
| Billy Messerschmidt | 8 / 10 | Other | Good level of detail |

## C-1 - Cost - Reviewer Scores

| Reviewer | Score | Reason | Comments |
|---|---|---|---|
| Jason Wilson | 8 / 10 | Strongly fits desired attribute(s) | comparable |
| Heather Stem | 7 / 10 | Other | Costs are higher than other proposal |
| Billy Messerschmidt | 7 / 10 | Partially meets my expectations | Some on the high side |



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 12

**ELIGIBILITY DETERMINATION MEMORANDUM**
**MONTGOMERY (County)**

FEMA-4618-DR-PA                                        PA ID 091-99091-00

| Applicant Type | ☐ State Agency   ☒ Local Government   ☐ Tribe   ☐ Private Nonprofit | | |
|---|---|---|---|
| **Grants Manager:** *Only fill out this section if the project is in Grants Manager.* | | **EMMIE:** *Only fill out this section if the project worksheet is in EMMIE.* | |
| Project No. | 661999 | EMMIE Project Worksheet No. | |
| Version No. | 0 | Version No. | |
| Damage Inventory No. | 1205170 | EMMIE Project Cost | $ |
| | | Total Amount Obligated | $ |
| Project Title | CAT A Debris Operations County Wide | | |
| Project Size | ☒ Large<br>☐ Small *(Potentially subject to Net Small Project Overrun appeal)* | Category of Work | A – Debris Removal |

**Issue(s):**

| Amount at Issue | $14,028,597.81 | Eligibility Issue Type(s) | ☐ Applicant Eligibility<br>☒ Facility Eligibility<br>☒ Work Eligibility<br>☒ Cost Eligibility |
|---|---|---|---|
| Amount Denied | $7,513,536.36 | | |
| Issue Keyword(s) | Facility Eligibility, Emergency Measures Eligibility, Unimproved Property | | |

**Project Description:**

During the incident period of August 31, 2021 through September 05, 2021, remnants of Hurricane Ida caused extensive damage throughout Pennsylvania. On September 10, 2021, a major disaster declaration (FEMA-4618-DR-PA) was issued by the President, which authorized FEMA's Public Assistance (PA) program for twelve Pennsylvania counties, including Montgomery County.

The Applicant (Montgomery County) reported that heavy flooding caused by Hurricane Ida resulted in multiple types of disaster-related debris throughout Montgomery County. On February 11, 2022, on behalf of the Applicant, FEMA prepared Grants Manager Project (GMP) 661999 for debris removal costs (DI 1205170). The Applicant is requesting reimbursement of $14,028,597.81 from the FEMA PA program for completed countywide debris removal costs, of which $7,513,536.36 is under eligibility review.

The Applicant is requesting reimbursement under Emergency Work (Category A - Debris Removal) for countywide debris removal costs listed below:[1]

   259,978.70 cubic yards (CY) of Vegetative debris from roads and public property
   14,633.80 CY of Construction and Demolition (C&D) debris from roads and public property
   1,867.00 each (EA) of Hanging Limb debris from roads and public property
   13,733.00 EA of Hazardous Leaning Tree debris from roads and public property

---

[1] *See* DDD, Scope & Cost Summary

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

158.00 EA of Stump debris from roads and public property
309.00 EA of White Good debris from roads and public property
135.00 Units of Household Hazardous Waste debris from roads and public property
239.00 EA of E-Waste debris from roads and public property
EA of Tire debris from roads and public property and 38,421.80 CY of Vegetative debris from waterways.

According to the Applicant, all work was completed between September 07, 2021 and February 05, 2022.[2] Due to the work being completed, no FEMA site inspections were performed and FEMA formulated the project utilizing documentation provided by the Applicant.

On December 05, 2019, the Applicant entered into a bid standby contract with DRC Emergency Services LLC (Contractor) (DRC) for DRC to provide Montgomery County with Disaster Debris Clearance and Removal Services.[3] The initial DRC contract[4] provided removal services for construction debris; white goods; hazardous materials; and vegetative debris created by flooding conditions.

On September 05, 2021,[5] the Applicant activated the DRC contract to provide debris management services to all Montgomery County municipalities impacted by Hurricane Ida as part of the Montgomery County Department of Public Safety (MCDPS) Debris Management Plan (DMP). Also on September 05, 2021,[6] the Applicant entered into an agreement with DebrisTech LLC (Contractor 2) to partner with DRC and provide debris monitoring services as needed.[7]

According to the Applicant[8], the debris removal work performed was necessary to "remove any hazard created by fallen vegetative debris deemed hazardous to public safety, including along creeks and rivers running through Montgomery Country Parks and municipal parks, specifically along location in Lower Perkiomen and Central Perkiomen Valley Parks; Perkiomen Trail; Tannerie Run Park; and Wissahickon Valley Park".

In support of their claim, the Applicant provided supporting documentation that included live links to more than a thousand load tickets (stored on an external server) as well as summaries for Right of Way (ROW) Vegetative and C&D load tickets;[9] Haul Out Vegetative and C&D load tickets;[10] waterway and Land-based Vegetative debris removal load tickets;[11] hazardous stumps load tickets (with locations);[12] and hazardous trees load tickets (with locations).[13] On April 25, 2022, the Applicant also provided documents that broke down Contract Removal Costs and Debris Quantities,[14] and provided a Contract Cost Summary.[15]

---

[2] *See* DDD, Scope & Cost. DDD Preview
[3] *See* DR-4618PA_PW661999 - Contract Emergency Contract DebrisTech Extension to 12.19.2021.docx.pdf
[4] *See* DR-4618PA_PW661999 Contract Exhibit B Statement of Work 2019 Removal.pdf
[5] *See* DR-4618PA_PW661999 - Contract Emergency Contract DebrisTech.pdf
[6] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf
[7] See DR-4618PA_PW661999 - Contract Emergency Contract DebrisTech.pdf
[8] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf
[9] *See* DR-4618PA_PW661999 Ticket Summary ROW-ALL_2021_09_08__2022_02_05.xls.xlsx
[10] *See* DR-4618PA_PW661999 Ticket Summary HaulOut-All_2021_09_08__2022_02_05.xls.xlsx
[11] *See* DR-4618PA_PW661999 Ticket Summary Waterway_2021_09_08__2022_02_05.xls.xlsx
[12] *See* DR-4618PA_PW661999 Ticket Summary Stumps-ALL_2021_09_08__2022_02_05.xls.xls
[13] See DR-4618PA_PW661999 Ticket Summary Trees-ALL_2021_09_08__2022_02_05.xls.xlsx
[14] *See* Contract Debris Removal Costs Debris Quantities April 25 2022.xlsx
[15] *See* DR-4618PA_PW661999 Contract Summary Debris 4.25.22.xlsx

The Applicant stated[16] that due to ongoing damage assessments taking place following Hurricane Ida, the original DRC standby contract was amended to provide "land-based waterway debris collection to remove downed vegetative debris in municipal and county parks and trails and along severely impacted waterways to prevent future flooding" using "specialized equipment." The amendment [17] authorized DRC to remove "storm related debris resulting from Hurricane Ida from County waterways."[18]

Costs submitted by the Applicant for review were consolidated by FEMA into the following groupings: [19]

> Tree and Limb Direct Related Costs
> Veg. Hauling, Reduction and Disposal Indirect Related Cost
> Monitoring Costs
> C&D Related Cost
> Waterway Debris Cost

FEMA analyzed randomly assigned representative samples[20] of the categories listed above to establish cost and work eligibility for the debris removal activities performed. Of the 2,498 Tree and Limb Direct Related Costs line-item sample that FEMA reviewed, 88.36 percent could not be verified as addressing a storm-related immediate threat to public safety based on the information provided,[21] resulting in the cost reimbursement eligibility reductions to both this category and items from additional related categories, as listed below:

Cost Categories Sampled and Cost Reductions Applied:

> Tree and Limb Direct Related Costs:
> o 88.36 percent of the sample was found to be ineligible, resulting in a reduction of $2,099,150.60 from claimed cost of $2,235,620.00.
> Veg. Hauling, Reduction and Disposal Indirect Related Costs:
> o 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $1,678,842.92 from claimed costs of $5,723,915.10.
> Monitoring Costs:
> o 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $442,936.87 from claimed costs of $1,510,166.92.
> C&D Related Costs:
> o No reduction from claimed costs of $1,126,289.84.

In accordance with the amendment to the DRC contract and scope of work, the Applicant also submitted costs for removing 38,421.80 CY of Vegetative debris from County Waterways, including increased costs for specialized equipment and labor.

> Waterway Debris Costs:
> o One hundred percent of the sample was found to be ineligible resulting in $3,292,605.96 being subtracted from claimed costs, effectively reducing reimbursement eligibility of Waterway Debris Costs to zero.

---

[16] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf
[17] *See* DR-4618PA_PW661999 Contract Amendment DRC C22-0166_DRC LLC 22-C.049 Dec 2021-Dec 2022.pdf
[18] *See* DR-4618PA PW661999 21-C.498_DRC LLC Contract Amendment_11.18.2021.pdf
[19] *See* 661999 Validation Summary Sheet.xlsx
[20] *See* PAPPG at 100, 103,
[21] *See* CRC Validation.xlsx

Page 3 of 9

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

On June 30, 2022, FEMA issued a Request for Information (RFI) (RFI-PRJ-72042)[22] asking that the Applicant provide documentation supporting allowable contractor costs; a Scope of Work listing equipment for waterway debris removal; documents proving that the Applicant had legal responsibility for debris removal for listed waterways; and documentation identifying the specific locations for water debris removal, and methods of water debris removal utilized.

On July 22, 2022, the Applicant provided supporting documentation, including contract amendments;[23] procurement documents;[24] an Intrastate Mutual Aid agreement;[25] and a Debris Removal Request for Proposal (RFP).[26] In addition, a narrative document[27] was provided that outlined the debris removal activities performed, and offered justifications for costs submitted, stating that the removal of the waterway debris was necessary to prevent future flooding; to protect public safety; and required specialized equipment and additional labor support due to the complexity of the task due to the debris being "off the beaten track" and "within a county or municipal park or near a maintained trail."

On November 14, 2022, the Applicant provided a testimonial from DebrisTech that claimed that in addition to posing a threat to public safety, the removal of trees and tree limbs shown in load tickets, not only addressed an immediate threat to public safety, but also addressed a threat to the economic recovery of the impacted community due to negatively impacting residents' and visitor's access to "thousands of acres of public open space, parks, historic sites, and trails," and Montgomery County maintained "local waterways that are a part of the County's Park system and provide recreational service." [28]

In support of this statement, DebrisTech also provided a link to an interactive map[29] that provided a visual of the location of claimed removed debris. However, the map shows that the claimed debris was removed from what appears to be unimproved land, and as such, did not appear to meet the requirements of addressing an immediate threat as claimed, or being necessary to save lives, protect public health and safety, protect improved property or eliminate or lessen an immediate threat of additional damage.

**Issue(s):**

Whether the identified damage is eligible for Public Assistance funding?

Whether the identified Facility (s) are eligible for Public Assistance funding?

Whether work - debris removal or emergency work - is necessary to eliminate immediate threats to life, public health, safety, or significant damage to improved property?

---

[22] *See* RFI-PRJ-72042
[23] *See* DR-4618PA PW661999 21-C.498_DRC LLC Contract Amendment_11.18.2021.pdf; DR-4618PA PW661999; C.98_DRC LLC Contract Amendment_02.17.2022.pdf; DR-4618PA PW661999 C22-0166_DRC LLC Contract Amendment 3.4.2022.pdf ; and DR-4618PA PW661999 C22-0285_DRC LLC Contract Amendment_4.21.2022.pdf
[24] *See* DR-4618PA PW661999 Prince William - DRC Procurement.pdf
[25] *See* DR-4618PA_PW661999 2008 Act 93 - PA General Assembly.pdf
[26] *See* DR-4618PA_PW661999 RFP 19-23 Disaster Debris Management, Clearance and Removal Services.Final.pdf
[27] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf
[28] *See* Montgomery County Hurricane Ida Debris Response.pdf
[29] *See* Montgomery County Hurricane Ida Debris Response.pdf

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Applicable Statutes, Regulations, and Policies in Effect as of the Declaration of the Emergency or Disaster:**

Robert T. Stafford Disaster Relief and Emergency Assistance (Stafford) Act, as amended, 42 U.S.C. §§ 5121, et seq.

Stafford Act § 403(a)(3) Essential Assistance, (42 U.S.C. 5170(b))

Stafford Act § 406, Repair, Restoration, and Replacement of Damaged Facilities, (42 U.S.C. 5172)

Stafford Act Stafford Act § 407, (a), (1) and (2), Debris Removal (42 U.S. Code § 5173)


Title 44 of the Code of Federal Regulations (C.F.R.) (2021)


44 C.F.R. § 206.222 - *General Applicant Eligibility*

44 C.F.R. § 206.223(a)(3*) - General Work Eligibility*

44 C.F.R. § 206.221(c)  - *Definitions, Immediate Threat*

44 C.F.R. § 200.224 (a) - *Debris Removal*

44 C.F.R. § 206.225  - *Emergency Work*

44 C.F.R. § 206.201(c) - *Facility*


FEMA Policy:

Public Assistance Program and Policy Guide, Version 4 (PAPPG) (June 01, 2020)

*PAPPG*, at 55, Chapter 4: General Work and Facility Eligibility, Section II.   Facility Eligibility

*PAPPG*, at 92-93, Chapter 6 Cost Eligibility, Section XVII. Surveys to assess or locate Damage or Debris Impacts

*PAPPG,* at 100- 103, Chapter 7: Emergency Work Eligibility, Section I. Debris Removal (Category A)

*PAPPG*, at 111, Chapter 7: Emergency Work Eligibility, Section II. Emergency Protective Measures (Category B), B. Protecting Improved Property

*PAPPG,* at 64, Chapter 5: Damage and Impact Information, Section III Site Inspections and Obtaining Damage Information, B. Site Inspections.

*PAPPG, at 99,* Chapter 7: Emergency Work Eligibility, Section II. Emergency Protective Measures (Category B),

**Analysis:**

*Eligible Facility:*

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

FEMA is authorized to provide grant funding to a state or local government for the repair, restoration, reconstruction, or replacement of a public facility damaged or destroyed by a major disaster.[30]  However unimproved property, such as a hillside or slope, forest, natural channel bank, is ineligible[31]. In general, a facility must first be determined eligible in order for work to be considered eligible.

A natural feature may be an eligible facility if it is improved and maintained and meets all of the following conditions: 1) the natural feature has a designed and constructed improvement to its natural characteristics, such as a terraced slope or realigned channel, 2) the constructed improvement enhances the function of the unimproved natural feature, and 3) the applicant maintains the improvement on a regular schedule to ensure that the improvement performs as designed.[32]

However, the Applicant describes the debris removed as being located "off the beaten track"[33] and images of the debris removal activities [34] supplied by the Applicant appear to show that the debris removal activities in question took place on "natural unimproved lands"[35]  and are therefore not eligible under Category A Debris Removal[36] or Category B Emergency Protective Measures.[37]

*Immediate threat and damaged caused by the event:*

FEMA is authorized to provide PA funding to local governments for certain emergency work regardless of facility eligibility,[38] including emergency protective measures, as long as they eliminate or lessen immediate threats to lives, public health or safety, or eliminate or lessen immediate threats of significant addition damage to improved public or private property through measures which are cost effective.[39] An immediate threat is a threat of additional damage or destruction from an event which can reasonably be expected to occur within five years.[40]

The Applicant is responsible for showing work is required due to an immediate threat resulting from the declared incident or to address damage caused by the declared incident. The Applicant must demonstrate that the debris causing an immediate threat was generated by the declared incident during the declared incident period. FEMA may require pre-incident photographs of the impacted site or facility; and or documentation supporting pre-disaster condition of the facility (e.g., facility maintenance records, inspection/safety reports) to validate damages.[41]

The Applicant provided access to more than a thousand images of the claimed debris removed (including but not limited to trees, tree limbs and waterway debris), with accompanying location markers.  However, during FEMA's review, tickets reviewed failed to provide sufficient

---

[30] Stafford Act § 406(a)(1)(A), 42 U.S.C. § 5172(a)(1)(A) (2021).

[31] 44 C.F.R. § 206.201(c).

[32] 44 C.F.R. § 206.201(c); *Public Assistance Program and Policy Guide*, FP-104-009-2 (Version 4) (June 1, 2020) [herein *PAPPG*], at 181-182.

[33] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf

[34] *See* DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf

[35] *See* PAPPG at 100

[36] *See PAPPG* at 99

[37] Id

[38] Stafford Act § 403(a)(3); 44 C.F.R § 206.201(b).

[39] 44 C.F.R § 206.225(a)(3); *PAPPG*, at 136.

[40] 44 C.F.R § 206.221(c); *PAPPG*, at 111.

[41] PAPPG at 51-52.

Page 6 of 9

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

evidence that debris removal work performed[42] presented an immediate threat to public safety, and therefore eligibility of work claimed could not be verified using the provided documentation.

The supporting documentation did not sufficiently demonstrate that all claimed costs related to Tree and Limb Direct Related Costs; Veg. Hauling, Reduction, and Disposal Indirect Related Costs; Monitoring Costs; and Waterway Debris Costs caused an immediate threat.[43]

The information provided by the Applicant does not meet the FEMA's definition of immediate threat, as imminent danger, or threat to improved, private or public property or to save lives; protect public health and safety; protect improved property; eliminate or lessen an immediate threat of additional damage; or justify the need for specialized equipment and labor. In addition, the documentation provided failed to support the need or usage of specialized equipment or labor.

Accordingly, of the $14,028,597.81 claimed for GMP 661999, $7,513,536.36 has been found to be ineligible for reimbursement under the PA program and is therefore denied.

**Eligibility Determination:   ☒ Partially Approved   ☐ Denied**

On review, FEMA identified costs totaling $7,513,536.36 for which the Applicant has not provided sufficient documentation to demonstrate that costs claimed were related to emergency measures necessary to address an immediate threat or justify the need for specialized equipment and labor. The Applicant also failed to establish that the reviewed Facilities are improved property to be considered eligible.

Accordingly, the identified damages and associated costs under review are found to be not eligible for Public Assistance reimbursement.

**<u>Notice of Right to Appeal:</u>**

The Applicant may appeal this determination to the Regional Administrator, pursuant to Title 44 of the Code of Federal Regulations § 206.206. If the Applicant elects to file an appeal, the appeal must: 1) contain documented justification supporting the Applicant's position, 2) specify the monetary figure in dispute, and 3) cite the provisions in federal law, regulation, or policy with which the Applicant believes the initial action was inconsistent.

The appeal must be submitted to the Pennsylvania Emergency Management Agency (Recipient) by the Applicant within 60 days of its receipt of this determination. The Recipient's transmittal of that appeal, with recommendation, is required to be submitted to FEMA Region III within 60 days of the receipt of the Applicant's letter. If you have any questions, please contact the Pennsylvania Emergency Management Agency's representative, Jonathan Skripka, at jskripka@pa.gov or via Grants Portal.

---

[42] *See* 661999 Validation Summary Sheet.xlsx
[43] See 661999 Validation Summary Sheet.xlsx "Reductions" tab; CRC Validation.pdf; DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf; DR-4618PA PW661999 Prince William - DRC Procurement.pdf

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Preparation and Review:**

Preparer: Aaron Verkist, Infrastructure Branch Director

AARON L VERKIST
Digitally signed by AARON L VERKIST
Date: 2023.09.20 09:24:04 -04'00'

Signature: _____    Date: _____

PA Management: James Falone, Deputy Federal Coordinating Officer Signature:

JAMES M FALONE
Digitally signed by JAMES M FALONE
Date: 2023.09.22 06:50:50 -04'00'

Date: _____

**Document Index:**

| Document Description | File Name |
|---|---|
| Contract: Debris Tech Contract | DR-4618PA_PW661999 - Contract Emergency Contract DebrisTech.pdf |
| Contract: Debris Tech Extension | DR-4618PA_PW661999 - Contract Emergency Contract DebrisTech Extension to 12.19.2021.docx.pdf |
| Contract: SOW 2019 DRC Contract | DR-4618PA_PW661999 Contract Exhibit B Statement of Work 2019 Removal.pdf |
| Ticket: ROW Items | DR-4618PA_PW661999 Ticket Summary ROW ALL_2021_09_08__2022_02_05.xls.xlsx |
| Ticket: Haul Out Items | DR-4618PA_PW661999 Ticket Summary Haul OutAll_2021_09_08__2022_02_05.xls.xlsx |
| Ticket: Water Way Debris Items | DR-4618PA_PW661999 Ticket Summary Waterway_2021_09_08__2022_02_05.xls.xlsx |
| Ticket: Stumps Items | DR-4618PA_PW661999 Ticket Summary StumpsALL_2021_09_08__2022_02_05.xls.xls |
| Ticket: Trees Items | DR-4618PA_PW661999 Ticket Summary Trees-ALL_2021_09_08__2022_02_05.xls.xlsx |
| Excel Spread Sheet: Debris Quantities and Cost | Contract Debris Removal Costs Debris Quantities April 25 2022.xlsx |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

| | |
|---|---|
| Excel Spread Sheet: Contract Cost Summary | DR-4618PA_PW661999 Contract Summary Debris 4.25.22.xlsx |
| FEMA Project Validation Sheet: | 661999 Validation Summary Sheet.xlsxe |
| FEMA CRC Validation Spreadsheet: | CRC Validation.xlsx |
| FEMA CRC Validation Response: | CRC Validation-Response 11-14-2022_E-Ticket.xlsx |
| Contract: DRC Contract Amendment | DR-4618PA_PW661999 Contract Amendment DRC C22-0166_DRC LLC 22-C.049 Dec 2021-Dec 2022.pdf |
| Contract: DRC Contract Amendment | DR-4618PA PW661999 21-C.498_DRC LLC Contract Amendment_11.18.2021.pdf |
| DRC Contract Amendments: | DR-4618PA PW661999 21-C.498_DRC LLC Contract Amendment_11.18.2021.pdf; DR-4618PA PW661999; C.98_DRC LLC Contract Amendment_02.17.2022.pdf; DR-4618PA PW661999 C22-0166_DRC LLC Contract Amendment 3.4.2022.pdf ; and DR-4618PA PW661999 C22-0285_DRC LLC Contract Amendment_4.21.2022.pdf |
| Procurement Documentation: | DR-4618PA PW661999 Prince William - DRC Procurement.pdf |
| Document: Intrastate Mutual Aid | DR-4618PA_PW661999 2008 Act 93 - PA General Assembly.pdf |
| Debris Management Document: | DR-4618PA_PW661999 RFP 19-23 Disaster Debris Management, Clearance and Removal Services.Final.pdf |
| Debris Tech RFI Response: | Montgomery County Hurricane Ida Debris Response.pdf |
| RFI Response: Debris Narrative | DR4618PA PW661999 - Montgomery County Debris Narrative 07-22-2022.pdf |
| Request For Information (RFI) | RFI-PRJ-72042 |

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 13



**MONTGOMERY COUNTY**
**BOARD OF COMMISSIONERS**

KENNETH E. LAWRENCE JR. CHAIR
JAMILA H. WINDER, VICE CHAIR
JOSEPH C. GALE

**FINANCE OFFICE**
MONTGOMERY COUNTY COURTHOUSE • PO BOX 311
NORRISTOWN, PA 19404-0311

610-278-3437
FAX: 610-278-3069
www.MONTCOPA.org

DEAN J. DORTONE
CHIEF FINANCIAL OFFICER

November 20, 2023

Mr. Jonathan Skripka
Governor's Authorized Representative
Pennsylvania Emergency Management Agency
1310 Elmerton Avenue
Harrisburg, PA   17110

Re:     Notice of First Appeal
        Denial of Eligibility, Category A Work
        FEMA-4618-DR-PA, GM-661999
        Montgomery County, PA (Applicant ID: 091-99091-00)

Dear Mr. Skripka:

In an email sent September 22, 2023, FEMA transmitted a Determination Memorandum to Montgomery County, PA ("Applicant"), denying eligibility for approximately $7,513,536.36[1] in claimed Category A Emergency Protective Measures for Grants Manager project # 661999 (See Attachment A). The purpose of this project is to reimburse Montgomery County for the costs of debris management work county-wide, where the claimed costs for such debris work were accrued in Montgomery County's countywide owned and operated Parks system, on unincorporated area within the county, and in incorporated municipalities within the county (with the overwhelming majority of the subject debris picked up in the County's parks). According to the Determination Memorandum, deductions based on purported ineligibility of the facilities, work and cost were made across two discrete "categories," specifically, "category 1" refers to trees, limbs and other land-based vegetative debris costs, and "category 2" refers to what FEMA calls "Waterway Debris." From the determinations of ineligibility of facilities, work and cost, Montgomery County brings this First Appeal, by timely filing same with the Pennsylvania Emergency Management Agency.

**General Discussion of Eligibility – Category A Work**

In any discussion of eligibility in the Public Assistance Program, there is a multi-tiered hierarchy of eligibility criteria, where the underlying level must be satisfied before the analysis moves to the next-higher level. The appropriate hierarchy for Category A Work is discussed on page 97 of FEMA's Public Assistance Program and Policy Guide ("PAPPG") v.4 – Effective June 1, 2020, and proceeds (in order) as: 1. Applicant. 2. Facility, 3. Immediate Threat, 4. Work, and 5. Cost.

---

[1] Note that the amounts of the reductions expressed on Page 3 of the Determination Memorandum Analysis actually add up to $7,513,536.35.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the case at hand, FEMA has not disputed that Montgomery County is an eligible applicant, as they are a County government, and an instrumentality of the government of the Commonwealth of Pennsylvania. As such, the first tier of eligibility noted above is satisfied. Although the next 3 tiers of eligibility (Facility, Immediate Threat and Work) will be discussed at length in following sections of this First Appeal, it is worth noting here that although FEMA checked the box for "Cost Eligibility" as an issue on page 1 of the Determination Memorandum's Analysis section, no true issue of eligibility for "Cost," which typically turns on Cost Reasonableness, has been mentioned in the Determination Memorandum itself. To this end, FEMA has in its possession copies of the Montgomery County pre-event contracts, as well as bid documentation for the procurement process, which show that by common definitions, the publicly bid prices for the subject work should be considered reasonable in nature. From this, Montgomery County is unsure as to what else FEMA could be looking for in regard to a showing of "Eligible Cost," as indicated on the first page of the Determination Memorandum's Analysis. As it is a fundamental concept underlying due process that an Appellant has the right to know what defect they need to appeal, and as FEMA has not specified how the Montgomery County application fails in regard to Cost Eligibility, it will be assumed here that the "Eligible Cost" box was either checked off in error, or that Montgomery County will be allowed to take leave at a later time in order to address the Eligible Cost issue, should such an issue actually exist, within the parameters of this First Appeal action. In either case, from this point forward in the Appeal, it will be assumed that "Eligible Cost" does not represent an impediment to the FEMA Regional Administrator adjudicating the Appeal, and awarding relief, in Montgomery County's favor.

## A. Debris in Montgomery County's Parks

### Scope of the Montgomery County, PA, Parks System

Montgomery County, PA, is a large, suburban county within the Philadelphia, PA, Metropolitan Statistical Area. It's census-certified population was 856,553 as of April of 2020.[2] As a public amenity for the resident population, as well as for visitors to the area, Montgomery County operates and maintains an extensive system of parks, trails, historical sites, and other recreational facilities within its geographic borders (See Attachment B). The centerpiece of this Parks system is a series of trails, which is generally made up of 3 "Trailsheds"[3], as well as a system of rivers and streams from which fishing and boating are allowed. Collectively, the size of the Montgomery County Parks system stretches to more than 6,000 acres of public open space, with more than 60 miles of regional trails.[4] In 2020, the Montgomery County Parks system recorded over 2 million users/visitors,[5] which is approximately 2.5 times the overall number of visitors to the Washington Monument that year.[6] In short, the area maintained for, and utilized by, the general public within the Montgomery County, PA, Parks system is much larger than simply the immediate area of the 3 major trails, and of the rivers themselves.

### Category 1 – Trees, Limbs and Other Land-Based Debris

---

[2] See 2020 U.S. Census Quick Facts available at:
https://www.census.gov/quickfacts/fact/table/montgomerycountypennsylvania/PST045222
[3] A made-up term used to convey that much as in the case of a watershed, where smaller river, creek and stream tributaries flow into a larger main river that outflows from the region, in the case of Montgomery County, the 3 main trails are all intersected by smaller feeder-trails, which themselves branch out, allowing hikers and other trail users access to a much larger general area than simply the main trail itself.
[4] See Press Release dated April 15, 2021, available at: https://www.montgomerycountypa.gov/CivicAlerts.aspx?AID=3507
[5] Id.
[6] See History Channel This Day in History Report, available at:
https://www.history.com/this-day-in-history/washington-monument-completed

2

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

On page 3 of the Determination Memorandum Analysis section, FEMA notes that a total deduction was made from Montgomery County's Public Assistance claim in the amount of $4,220,930.39 in regard to Trees, Limbs and other Land Based-Debris, without breaking down what portion of the amounts declared ineligible were associated with parks, and which portion were associated with non-park unincorporated public lands.[7] Fortunately, such a breakdown is immaterial in the overall consideration of this Appeal, as all cases will eventually be addressed. To reconcile the eligibility of these overall deductions taken within the Montgomery County Parks system, it will be necessary to discuss these debris streams in regard to the 3 unsettled tiers of eligibility: Facility, Immediate Threat, and Work.

### Facility Eligibility

As part of the Determination Memorandum, FEMA has not disputed that the subject Trees, Limbs and other Land-Based Debris were deposited, trimmed, collected, etc..., from the Montgomery County Parks system property. Instead, FEMA disputes whether the lands where this work was completed makes up an eligible "natural feature" or not. From the PAPPG, a natural feature may be an eligible facility if it is improved and meets all of the following conditions:

1. The natural feature has a designed and constructed improvement to its natural characteristics,
2. The constructed improvement enhances the function of the unimproved natural feature, and
3. The applicant maintains the improvement on a regular schedule to ensure that the improvement performs as designed.[8]

In the case at hand, the natural feature is the system of trails and abutting areas described earlier in this Appeal document as the 3 "Trailsheds." In regard to all of the 60+ miles of trails located in the Montgomery County Park system, the trails have been cut out of the natural features of the land, smoothed, landscaped (certain areas only), and in certain heavily trafficked areas, creature comforts, such as water fountains and lights have been installed. This meets requirement #1 above. It is difficult to believe that anyone would dispute that these improvements enhance the functions of the unimproved land that the trails pass over and through, as is required by #2 above, in that these improvements are solely responsible for the utility of the trail system to hikers and other novice and/or occasional users. Finally, Montgomery County maintains a strict maintenance schedule for smoothing, repairs to, and clearing of overgrowth that could decrease the overall use of the trail system.

As the trail system (the "Trailsheds") meet the requirements laid out by the PAPPG, there is no reason for FEMA to deny Facility Eligibility. In fact, the only reason why FEMA has made this determination in the first place was from an errant comment by a contractor, who was not familiar with what the "Facilities" that FEMA would/should actually be looking at were, which stated that the debris removal was "off the beaten track."[9] While it is true that the debris removal was often handled within the woods, that does not change the fact that for Public Assistance purposes, the eligible facility was at their feet, which photographs of damage in the air (Leaners and Hangers) would not typically show.

### Immediate Threat Posed by the Debris

---

[7] $2,099,150.60 for Trees and Limbs, $1,678,842.92 for Hauling, Reduction and Disposal indirect costs, and $442,936.87 for Monitoring Costs. Based on the percentages being the same, it is assumed that the deductions for Monitoring would be returned if the underlying Hauling, Reduction and Disposal indirect costs were returned to the project.
[8] See FEMA PAPPG, v.4, pages 181-182.
[9] See Determination Memorandum Analysis Section, page 6.

3

Under the PAPPG, v.4. "Immediate Threat" is defined as: "the threat of additional damage or destruction from an incident that could reasonably be expected to occur within 5 years of the declared incident."[10] In the case at hand, debris was scattered all over the Montgomery County Parks' trails and areas immediately adjacent to active trails, dangerous limbs were broken off and hanging over and next to active trails, and trees had fallen and threatened to fall over, in and abutting these same active trail areas. In such a scenario, it is not necessary to look 5 years down the timeline to see what threats this could pose; instead one must simply look to the day after the event where the trails were opened back up to the public to see how such debris could pose an immediate threat to lives, public health and safety, especially when much of this debris "looks like" what one would otherwise expect to see on and abutting a trail system, except that the debris is not secured, and can shift, move, fall, etc..., unexpectedly, to the detriment (and potential injury) of those nearby utilizing the trails.

### Work Eligibility

In general, there are 4 requirements for Work to be considered Eligible under the FEMA Public Assistance Program. First, the work must be required as a direct result of the declared major disaster. Second, the work must be performed in the designated disaster area declared by the President. Third, the work must be the Legal Responsibility of the Applicant at the time of the disaster. Finally, there must not be a policy that expressly determines the work to be ineligible.

For the project at hand, it has not been disputed by FEMA that the first two of these criteria are met. In other words, FEMA has not disputed that the high winds and torrential rain caused by the remnants of Hurricane Ida deposited the subject debris, and caused damage to trees resulting in Leaners and Hangers. Additionally, FEMA has not disputed that the subject work took place in Montgomery County, PA, which was declared for Public Assistance under DR-4618.

While FEMA did ask a question regarding the Legal Responsibility for work completed on "Waterway Debris," FEMA has not disputed the Legal Responsibility that Montgomery County has to clear debris from its Park system, thus meaning that the third criteria for Work Eligibility is not at issue in this section of the Appeal. Finally, regarding the fourth criteria, FEMA is likely hanging their argument on the fact that the PAPPG does state that debris removed from natural, unimproved land, such as heavily wooded areas and unused areas, is ineligible.[11] While this is a true statement, in that this is what the PAPPG says, it is not consistent with the case developed above that shows that the facility being dealt with in this case is not unimproved land (the trails and creature-comforts are the improvements), nor is the area unused. As such, the case for the Montgomery County trails does not fit within the PAPPG-based exclusion.

Based on the analysis provided above for debris Category 1, the issues of eligibility that could possibly have been under question, have been settled in Montgomery County's favor. The Applicant is Eligible. The Facility is Eligible, when looked at through the proper lens. The work was in response to an Immediate threat. The Work itself is Eligible, and FEMA has not actually raised a question of Cost Eligibility. As all 5 "steps" on the Eligibility pyramid have been met, there is no reason for FEMA to withhold the $4,220,930.39 previously considered ineligible, when looking at Trees, Limbs and Other Land-Based Debris.

### Category 2 – "Waterway Debris"

---

[10] See FEMA PAPPG, v.4, page 97.
[11] See PAPPG, v.4, page 100.

4

On page 3 of the Determination Memorandum Analysis section, FEMA notes that a total deduction was made from Montgomery County's Public Assistance claim in the amount of $3,292,605.96 in regard to Waterway Debris, which happened to be the entire amount claimed for this type of debris. As the rivers and streams that cut through the Montgomery County Parks system are generally considered to be "non-navigable waterways," a separate set of analyses must be made from the general eligibility analyses undertaken in Category 1 above.

In regard to debris in the waterways, the PAPPG notes that "Debris deposited by the incident may obstruct a natural waterway (that is, a waterway that is not improved or maintained) or a constructed channel, including flood control works. In these cases, removal of the debris from the channel is eligible if the debris poses an immediate threat, such as when the debris:

- Obstructs, or could obstruct, intake structures;

- Could cause damage to structures, such as bridges and culverts; or

- Is causing, **or could cause**, flooding to improved public or private property during the

occurrence of a 5-year flood." (emphasis added)[12]

It is important to note that by the wording of the policy noted above (use of the word "or"), an Applicant must meet only one of the three conditions noted above, not all three simultaneously, for such a natural waterway (the facility at issue) to be eligible. In the case of the Montgomery County Parks system, the concern was that the third condition could take place due to the waterway-borne debris; that improved public property could be subject to flood damage during the occurrence of a 5-year flood. As discussed above, the waterway system that cuts through the Montgomery County Parks property is host to a wide variety of aquatic recreational opportunities. This has resulted in the construction of benches, piers, sidewalks, and other improvements along the riverine shoreline, which would be damaged/destroyed by such flooding (especially by undermining effects when floodwaters end up under the improvements). Whether or not it was reasonable for Montgomery County officials to fear such flooding can be answered simply by looking at the historic record of flood-type disasters in the area. In the 10 years prior to Hurricane Ida (in 2021), Montgomery County had been included in 3 Federal Emergency or Major Disaster declarations where flooding was possible: DR-4099 (declared January 10, 2013), EM-3367 (declared February 6, 2014) and DR-4267 (declared March 23, 2016), which shows the reasonableness of such an assumption (that flooding was possible, and that the newly deposited Waterway debris would only make it worse).

While under the policy laid out in the PAPPG above the debris work in the Montgomery County Parks System's waterways should be determined to be eligible, there is one final note in the Determination Memorandum that requires addressing regarding the waterborne debris, which is the allegation that specialized equipment and labor was required to remove much of this debris. Montgomery County is surprised by this finding by FEMA, and is unsure why FEMA believes this to have been the case, when in fact, the only equipment that was utilized for waterway debris removal was generally human musclepower, along with chains used to snag/drag the debris. On occasion standard motorized equipment, of the type used in standard debris operations was used to drag the debris out of the water, but this was hardly any sort of "specialized equipment."

Of course, the above analysis for Waterborne Debris eligibility only is relevant if the Applicant has Legal responsibility for the debris removal in question. The answer to this question is not always clear-cut, as different states have different policies regarding control of waterways, and FEMA questioned the nature of Montgomery County's Legal Responsibility in the RFI that was issued on June 30, 2022. In Pennsylvania, the state owns all river and stream beds within its geographic borders, but the care and maintenance of same has been delegated to local

---

[12] See PAPPG, v.4, page 104.

5

governments in implementing the Commonwealth form of state government.[13] Beyond this general delegation of authority, Pennsylvania has codified a process whereby absolute authority to remove debris from rivers and streams in emergency situations,[14] and has also codified a general policy that established a duty on local governments to keep clean unpolluted rivers and streams for the benefit of the citizens.[15] The sum total of this legislation is that it is clear that not only did Montgomery County have the right to take the debris management actions that they did, they had a legal duty to do so as well.

Based on the analysis provided above for debris Category 2, the issues of eligibility that could possibly have been under question, again have been settled in Montgomery County's favor. As the Work is expressly eligible under FEMA policy (i.e. – no Facility Eligibility or Immediate Threat analysis need be undertaken), the type of equipment used was reasonable for the conditions existing, and the Applicant had Legal Responsibility for conducting the Work, there is no reason for FEMA to withhold the $3,292,605.96 previously considered ineligible, when looking at Waterway Debris.

## B. Debris in Non-Park Unincorporated Areas of Montgomery County

As noted earlier in this appeal, on page 3 of the Determination Memorandum Analysis section, FEMA notes that a total deduction was made from Montgomery County's Public Assistance claim in the amount of $4,220,930.39 in regard to Trees, Limbs and other Land Based-Debris, without breaking down what portion of the amounts declared ineligible were associated with parks, and which portion were associated with non-park unincorporated area within the county.[16] Fortunately, the breakdown is somewhat immaterial, as the analysis below, which is similar to the analysis provided above for land-based debris in the parks, will show that such debris is generally eligible under existing FEMA regulation and policy. As with the land-based debris in the parks, to reconcile the eligibility of these overall deductions, it will be necessary to discuss this debris stream in regard to the 3 unsettled tiers of eligibility: Facility, Immediate Threat, and Work.

### Facility Eligibility

As part of the Determination Memorandum, FEMA has not disputed that the subject Trees, Limbs and other Land-Based Debris in this section of the analysis were deposited, trimmed, collected, etc..., from non-park, unincorporated public land within the geographic borders of Montgomery County. Instead, FEMA seems to continue the dispute over whether the lands where this work was completed makes up an eligible "natural feature" or not. Unfortunately, this is the incorrect standard against which FEMA should be evaluating the subject properties.

In the case at hand, Montgomery County took care to only effect debris removal work on non-park, unincorporated public land within the county when that land abutted against improved property (either private or public property). As improved property abutted the property where debris management

---

[13] The State Agency that nominally controls this delegation is the Pennsylvania Department of Environmental Protection. See https://www.dep.pa.gov/Citizens/My-Water/PrivateWells/Pages/Stream-Maintenance.aspx for a number of state-provided reference materials designed to assist local governments in implementing stream/river maintenance policies.

[14] See 35 P.A.C.S. § 7303.

[15] See Pennsylvania's "Clean Streams Law" as amended. Typically used to in modern efforts to prevent water pollution, the duty also applies to debris in the water, whether naturally deposited or deposited by man.

[16] $2,099,150.60 for Trees and Limbs, $1,678,842.92 for Hauling, Reduction and Disposal indirect costs, and $442,936.87 for Monitoring Costs. Based on the percentages being the same, it is assumed that the deductions for Monitoring would be returned if the underlying Hauling, Reduction and Disposal indirect costs were returned to the project.

6

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

activities took place, the "facility" can no longer be considered a "natural feature" under the policy established in the PAPPG. As such, the consideration of whether the subject work took place on an eligible facility simply falls back to the default rules for facility eligibility, which hinges on whether or not the Applicant had legal responsibility for the subject property.

Here, it is undisputed that the County performed the questioned work on non-park, public land in the unincorporated area of the County. Under Pennsylvania's Commonwealth form of government, this is land that the County has expressed control over, and there really is no question about Montgomery County having Legal Responsibility over the subject property.

As the debris removed from non-park, public unincorporated lands within the County meet the requirements laid out for Facility Eligibility under FEMA regulation and policy, there is no reason for FEMA to deny Facility Eligibility.

### Immediate Threat Posed by the Debris

Under the PAPPG, v.4. "Immediate Threat" is defined as: "the threat of additional damage or destruction from an incident that could reasonably be expected to occur within 5 years of the declared incident."[17] In the case at hand, on those portions of non-park, public unincorporated land where debris management activities were completed, debris was scattered on the ground, dangerous limbs were broken off and hanging over the subject property, and trees had fallen and threatened to fall over, in areas that were abutting public and private improved property (see discussion in the preceding sub-section of this appeal). In such a scenario, it is not necessary to look 5 years down the timeline to see what threats this could pose; instead one must simply look immediately at the location and nature of this debris (et-al) to see the imminent threat that was posed to the public and to improved property. From the moment the storm winds and rain receded,  the County's children, and other unsuspecting residents and/or visitors, were threatened by this debris that was located on public land next to homes, parks, commercial centers, private fences, and other forms of private and public infrastructure. This, by definition, satisfies the requirement of "Immediate Threat" under FEMA policy.

### Work Eligibility

In general, there are 4 requirements for Work to be considered Eligible under the FEMA Public Assistance Program. First, the work must be required as a direct result of the declared major disaster. Second, the work must be performed in the designated disaster area declared by the President. Third, the work must be the Legal Responsibility of the Applicant at the time of the disaster. Finally, there must not be a policy that expressly determines the work to be ineligible.

For the project at hand, it has not been disputed by FEMA that the first two of these criteria are met. In other words, FEMA has not disputed that the high winds and torrential rain caused by the remnants of Hurricane Ida deposited the subject debris, and caused damage to trees resulting in Leaners and Hangers. Additionally, FEMA has not disputed that the subject work took place in Montgomery County, PA, which was declared for Public Assistance under DR-4618.

While FEMA did ask a question regarding the Legal Responsibility for work completed on "Waterway Debris," FEMA has not disputed the Legal Responsibility that Montgomery County has to clear debris from its non-park public unincorporated lands, thus meaning that the third criteria for Work Eligibility is not at

---

[17] See FEMA PAPPG, v.4, page 97.

7

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

issue in this section of the Appeal. Finally, regarding the fourth criteria, FEMA is likely hanging their argument on the fact that the PAPPG does state that debris removed from natural, unimproved land, such as heavily wooded areas and unused areas, is ineligible.[18] While this is a true statement, in that this is what the PAPPG says, the nature of the subject property being "natural, unimproved land" has already been addressed and rebuffed as part of the "Facility Eligibility" sub-section under Section "B" of this appeal. As such, FEMA's case for the non-park, public unincorporated lands within Montgomery County does not fit within the PAPPG-based exclusion.

Based on the analysis provided above for, the issues of eligibility that could possibly have been under question, have been settled in Montgomery County's favor. The Applicant is Eligible. The Facilities are Eligible, when looked at through the proper lens. The work was in response to an Immediate threat. The Work itself is Eligible, and FEMA has not actually raised a question of Cost Eligibility. As all 5 "steps" on the Eligibility pyramid have been met, there is no reason for FEMA to withhold the portion of the $4,220,930.39 previously considered ineligible that was attributed to debris removed from non-park, public unincorporated land within Montgomery County.

## C. Debris Removed in Incorporated Municipalities Within Montgomery County

In the Commonwealth of Pennsylvania, each resident is a citizen of the Commonwealth, a citizen of the County they reside in, and (if applicable) a citizen of the municipality they reside in. Under law and policy in Pennsylvania, the roles of government stack on top of each other, sometimes to the point that functions are exclusive to one level of government (below the Commonwealth level), and sometimes to the point that functions are shared between levels of government (below the Commonwealth level). In this system, Emergency Management is typically thought of as a shared function, with the Counties having the responsibility to "assist municipalities within their jurisdiction in all aspects of Emergency Management."[19] Thus, Counties in Pennsylvania have inherent and concurrent authority to render response and/or recovery assistance within their borders, and thus have the inherent ability act as the Applicant for those services so rendered under the Stafford Act, including for Debris Management efforts.

In the recovery efforts for DR-4618, Montgomery County was requested by a few of its municipalities to manage and implement Debris Management activities within the municipalities, and then to act as the Applicant in any recovery available under the Stafford Act. Fortunately, both for the ease of argument, and for the ease of comprehension, the scenarios under which this Debris Management within municipalities occurred, mirror the argument to be utilized as to why the Debris Management efforts are eligible under current FEMA regulation and policy; all the reviewer needs to do is to consider the appropriate case study, and look at the correct argument proffered earlier in this Appeal, while substituting the County's inherent right to act under its Emergency Management powers (under PA law and policy) as it's basis for Legal Responsibility, rather than the Constitutional powers inherent to the County under the Commonwealth form of government. In other words:

- If the Debris Management efforts claimed by Montgomery County took place in a municipal park or a municipal waterway, then look to the argument in Section A, category 1 or 2 (as appropriate).
- If the Debris Management efforts claimed by Montgomery County took place in non-park or non-waterway areas within a municipality, then look to the argument in Section B of this appeal.
- The arguments vary from above (Sections A and B) only in regard to understanding that the Legal Responsibility devolves from different powers, but still gets the analysis to the same place.

---

[18] See PAPPG, v.4, page 100.
[19] See: https://www.pema.pa.gov/County-EMC/Pages/default.aspx.

8

As such, even in the case where Montgomery County performed Debris Management efforts in a municipality within its borders, these efforts are eligible for Stafford Act reimbursement as a matter of FEMA regulation and policy.

**Relief Requested**

Through this First Appeal, Montgomery County has showed that it's debris management activities in response to the damage caused by the remnants of Hurricane Ida, were in compliance with FEMA's regulations and policy. As such, there is no reason why the deductions taken by FEMA, and expressed in the Determination Memorandum received on September 22, 2023, should be allowed to stand. Accordingly, Montgomery County asks the FEMA Region 3 Administrator to restore the previously removed total of $7,513,536.36.

**Conclusion**

Mr. Skripka, Montgomery County appreciates any assistance that your office will be able to provide during the eventual review of the record and crafting of the official Recipient's letter to FEMA in support of this request. If you have any questions regarding this matter, please contact me at {Signatory's phone number} or {Signatory's email address}. Thank you.

Sincerely,

Dean J. Dortone
Chief Financial Officer
610.278.5943
Dean.Dortone@MontgomeryCounty PA.gov

Attachments:    (A) Determination Memorandum Received by Applicant on September 22, 2023
                (B) System Map of Montgomery County Parks

9

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 14

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

U.S. Department of Homeland Security
Federal Emergency Management Agency
Region 3

One Independence Mall
615 Chestnut Street, 6th floor
Philadelphia, PA  19106-4404



Region 3-Recovery                    June 25, 2024

**SENT VIA EMAIL**

Lawrence D. West
Governor's Authorized Representative
Pennsylvania Emergency Management Agency
1310 Elmerton Avenue
Harrisburg, PA 17110
lawwest@pa.gov

Dean J. Dortone
Chief Financial Officer
Montgomery County Board of Commissioners
Montgomery County Court House
P.O. Box 311
Norrstown, PA 19404-0311
Dean.Dortone@MontgomeryCountyPA.gov

Re:  First Appeal – Montgomery County, PA ID: 091-99091-00, FEMA-4618-DR-PA, Grants
     Manager Project (GMP) 661999, Facility Eligibility, Work Eligibility, Cost Eligibility,
     Emergency Measures Eligibility, Unimproved Property.

Dear Lawrence D. West and Dean J. Dortone:

This letter is in response to a letter from Pennsylvania Emergency Management Agency
(PEMA/Recipient) dated November 20, 2023, which transmitted the referenced first appeal on
behalf of Montgomery County (Applicant).  The Applicant is appealing the U.S. Department of
Homeland Security's Federal Emergency Management Agency's (FEMA) denial of Public
Assistance program funding in the amount of $7,513,536.36 for debris removal (Category A) from
county public parks and waterways.

As explained in the enclosed analysis, I have determined that the Applicant has failed to demonstrate
that its debris removal operations and associated costs are eligible for Public Assistance program
funding. Accordingly, I am denying this appeal.  This letter constitutes the official notification of
this determination to the Applicant.

Lawrence D. West and Dean J. Dortone
June 25, 2024
Page 2

Under the Robert T. Stafford Disaster Relief and Emergency Assistance Act and applicable regulations, the Applicant is entitled to appeal this decision.[1]  If the Applicant elects to file a second appeal, it must: 1) contain documented justification supporting the Applicant's position, 2) specify the monetary figure in dispute, and 3) cite the provisions in federal law, regulation, or policy with which the Applicant believes the initial action was inconsistent.

The Applicant must submit the second appeal to the Recipient within 60 days of receipt of this letter. The Recipient's transmittal of that appeal, with recommendation, is required to be submitted to my office within 60 days of receipt of the Applicant's appeal.  My office will transmit the second appeal to FEMA headquarters.

Alternatively, the Applicant may seek arbitration pursuant to Section 423 of the Stafford Act, as amended by Section 1219 of the Disaster Recovery Reform Act (DRRA).  To determine eligibility for arbitration, see Title 44 of the Code of Federal Regulations (44 C.F.R.) § 206.206 Appeals.  The Applicant must submit its request for arbitration simultaneously to the PEMA, the FEMA Regional Administrator, and the Civilian Board of Contract Appeals (CBCA). The CBCA's rules of procedure for Section 423 arbitrations can be found at 48 C.F.R. part 6106 and on the CBCA's website at www.cbca.gov.

If the Applicant elects not to submit a second appeal request or request for arbitration within 60 days from the issuance of the first appeal decision, this decision is the final agency determination on the matter, and the Applicant will no longer be able to appeal or arbitrate the matter.

If the Applicant or PEMA has any questions regarding this matter, please contact L. Michelle Breeland, Public Assistance Program Management Branch Chief, at lorra.breeland@fema.dhs.gov.

Sincerely,

**MARYANN E TIERNEY**    Digitally signed by MARYANN E
TIERNEY
Date: 2024.06.25 16:33:44 -04'00'

MaryAnn E. Tierney
Regional Administrator
FEMA Region 3

Enclosure:
First Appeal Analysis

---

[1] *See* Robert T. Stafford Disaster Relief and Emergency Assistance Act § 423, 42 U.S.C. § 5189a (2018), Title 44 Code of Federal Regulations (44 C.F.R.) § 206.206 (2021) and FEMA Public Assistance Appeals and Arbitration Policy FP 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 (Feb. 24, 2022) for a full description of appeal rights and requirements.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**FIRST APPEAL ANALYSIS**
**Montgomery County, PA ID 091-99091-00**
**FEMA-4618-DR-PA, Project 661999**
**Facility Eligibility, Work Eligibility, Cost Eligibility, Emergency Measures Eligibility,**
**Unimproved Property.**

**Background**

During the incident period of August 31, 2021, through September 5, 2021, remnants of Hurricane Ida caused extensive damage throughout the Commonwealth of Pennsylvania. On September 10, 2021, a major disaster declaration (FEMA-4618-DR-PA) was issued by the President, authorizing the U.S. Department of Homeland Security's Federal Emergency Management Agency (FEMA) Public Assistance (PA) program for twelve Pennsylvania counties, including Montgomery County.

Montgomery County (Applicant) reported that heavy flooding caused by Hurricane Ida resulted in multiple types of disaster-related debris throughout the county. On February 11, 2022, on behalf of the Applicant, FEMA prepared Grants Manager Project (GMP) 661999 for debris removal costs (DI 1205170). According to the Applicant, all work was completed between September 07, 2021, and February 05, 2022.[2] Due to the work being completed, no FEMA site inspections were performed and the Applicant submitted documentation to support its claim. FEMA selected to formulate the project utilizing documentation provided by the Applicant and utilizing a sampling methodology pursuant to PA policy.[3] The Applicant requested reimbursement of $14,028,597.81 from the FEMA PA program for completed countywide debris removal costs, of which $7,513,536.36 is being appealed by the Applicant.

On June 30, 2022, during the project development phase, FEMA issued a Request for Information (RFI)[4] for the following: (1) documentation supporting allowable contractor costs, (2) a scope of work listing equipment for waterway debris removal, (3) documents proving that the Applicant had legal responsibility for debris removal for listed waterways, and (4) documentation identifying the specific locations for water debris removal and the methods of water debris removal utilized. The Applicant responded on July 22, 2022 with supporting documentation that included contract amendments, procurement documents, an Intrastate Mutual Aid agreement, and a debris removal Request for Proposal (RFP). In addition, a narrative document was provided that outlined the debris removal activities performed stating that the removal of the waterway debris was necessary to prevent future flooding, protect public safety, and required specialized equipment and additional labor support due to the complexity of the task caused by the debris being "off the beaten track" and "within a county or municipal park or near a maintained trail."

---

[2] See Grants Manager Project, 661999, DDD, Scope, & Cost Summary.
[3] The Applicant informed FEMA that all debris removal activities were completed prior to FEMA conducting any site inspections. The Applicant submitted thousands of debris removal tickets. Therefore, FEMA selected to develop the project by referring to the documentation the Applicant provided to support its claim, and FEMA further reviewed the documentation by reviewing a sampling of the provided debris removal tickets for immediate threat eligibility.; Public *Assistance Sampling Procedure*, at 1, (March 31, 2022) [hereinafter *PASP*].
[4] See Grants Manager Project, 661999, Request for Information, RFI-PRJ-72042 (June 30, 2022) [hereinafter *1st RFI*].

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In a Determination Memorandum (DM) dated September 22, 2023, FEMA partially denied the Applicant's project (GMP 661999) in the amount of $7,513,536.36.[5] The issues addressed in the DM concerned: (1) whether the claimed damage was eligible for PA funding, (2) whether the facility(ies) are eligible for PA funding, and (3) whether the debris removal work was necessary to eliminate an immediate threat to life, public health, safety, or improved public or private property. In a sample review of debris removal activities, FEMA found the following:

**Cost Categories Sampled and Cost Reductions Applied:**

• Tree and Limb Direct Related Costs: 88.36 percent of the sample was found to be ineligible, resulting in a reduction of $2,099,150.60 from claimed cost of $2,235,620.00.

• Veg. Hauling, Reduction and Disposal Indirect Related Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $1,678,842.92 from claimed costs of $5,723,915.10.

• Monitoring Costs: 29.33 percent of the sample was found to be ineligible, resulting in a reduction of $442,936.87 from claimed costs of $1,510,166.92.

• Construction & Demolition Related Costs: No reduction from claimed costs of $1,126,289.84.

• Waterway Debris Costs: One hundred percent of the sample was found to be ineligible resulting in $3,292,605.96 being subtracted from claimed costs, effectively reducing reimbursement eligibility of Waterway Debris Costs to zero. 38,421.80 Cubic Yards of Debris.

FEMA identified costs totaling $7,513,536.36 which the Applicant did not provide sufficient documentation to demonstrate were related to emergency measures necessary to address an immediate threat or justify the need for specialized equipment and labor. The Applicant also failed to establish that the reviewed facilities were improved property. Accordingly, the identified damages and associated costs under review were found to be ineligible for Public Assistance reimbursement.

The DM was viewed by the Applicant in Grants Portal on September 22, 2023.

*First Appeal*

On November 22, 2023, the Pennsylvania Emergency Management Agency (PEMA/Respondent) transmitted a First Appeal by letter dated November 20, 2023, on behalf of

---

[5] Determination Memorandum from Infrastructure Branch Director, Federal Emergency Management Agency to Governor's Authorized Representative, Pennsylvania Emergency Management Agency and Deputy Director, Montgomery County, (September 22, 2023) [hereinafter *DM*].

the Applicant.[6] The Applicant, by letter dated November 20, 2023, is appealing FEMA's partial denial of GMP 661999 in the amount of $7,513,536.36.[7] The Applicant argues that its debris removal operations are eligible Category A emergency protective measure work under the PA program. The Applicant categorized its debris removal activities into two areas of debris removal: (1) removal of trees, limbs, and other land-based debris in Montgomery County's park system and in certain unincorporated and incorporated areas of Montgomery County, and (2) waterway debris spread throughout rivers and streams that cut through the Montgomery County Parks system.

The Applicant claims that FEMA does not dispute the debris at issue is a result of the declared incident and that there is no dispute as to its legal responsibility to remove debris from county parks within Montgomery County. As to facility eligibility, the Applicant argues that Montgomery County park trails are an eligible natural feature including the adjacent natural forested lands within the parks. The Applicant further explains that although debris removal was often performed in the woods, those adjacent lands should be considered an eligible natural feature. The Applicant states that it maintains a strict maintenance schedule for smoothing, repairing, and clearing overgrowth that could decrease the overall use of the trail system.[8] As part of its argument to support that an immediate threat existed, the Applicant discusses how limbs and fallen trees on the natural forested land adjacent to active trails could pose an immediate threat to lives and public safety where the debris is not secure.

The Applicant argues that its waterway debris removal activities are eligible because the removed debris could have posed a risk of flooding to improved public property during the occurrence of a 5-year flood. The Applicant makes general statements in its appeal that an immediate threat exists where improvements within the county park system and along waterways could be damaged if another 5-year flood should occur. The Applicant does not provide any documentation or other information to discern what waterway debris may have been present prior to the declared incident from debris which may have been deposited within the waterways or embankments along the waterways by the declared incident. The Applicant reasons that because FEMA has not disputed whether the removed debris was a direct result of the disaster, the Applicant is not required to present documentation or otherwise demonstrate whether the removed debris was a result of the declared disaster. The Applicant generally states that it has legal responsibility to remove waterway debris, and that the Commonwealth of Pennsylvania owns all river and stream beds within the Commonwealth's borders. The Applicant further explains that through general policy and legislation the Applicant had absolute authority and legal responsibility to conduct its debris removal activities.

The Applicant addresses a statement by FEMA in the DM that specialized equipment and labor was utilized to remove waterway debris. The Applicant explained that no specialized equipment

---

[6] Recipient First Appeal Letter from Governor's Authorized Representative, Pennsylvania Emergency Management Agency to Regional Administrator, Federal Emergency Management Agency, (November 20, 2024) [hereinafter *Recipient Appeal Letter*].

[7] Applicant First Appeal Letter from Chief Financial Officer, Montgomery County to Governor's Authorized Representative, Pennsylvania Emergency Management Agency, (November 20, 2024) [hereinafter *Applicant Appeal Letter*].

[8] *Applicant Appeal Letter*, at 3.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

was used. Instead, the Applicant asserts that human muscle power and chains was used to snag and drag debris, and on occasion motorized equipment was used to remove debris from waterways. However, in its April 12, 2024, response to a Request for Information (discussed below), the Applicant states:

> "Specifically, in regard to what has been referred to as "waterway debris removal," the County took no actions at all in regard to sunken debris below the waterline. Where the County refers to "waterway debris removal," this should be read as including only debris that was deposited along river and stream banks, as well as debris that fell in such a way that it hung over the surface of these waterways."[9]

The Recipient supports the Applicant's appeal and recommends that FEMA favorably reconsider its initial decision.[10]

On February 8, 2024, during the first appeal process, FEMA issued a Request for Information (Appeal RFI) to the Applicant [11] for the following: (1) documents supporting maintenance of wooded areas adjacent to trails, (2) documentation regarding the reasonableness of the claimed costs of the debris removal operations from wooded areas, (3) documentation that the Applicant had legal authority for its debris removal activities from wooded areas, and (4) documentation explaining the basis for each claim of immediate threat. The Appeal RFI also requested the following documentation related to the Applicant's debris removal from waterways and waterway embankments: (1) documentation that other federal agencies did not have legal responsibility or jurisdiction for the waterway debris removal, (2) documentation the Applicant had legal responsibility to remove debris located in an unincorporated area within Montgomery County, (3) documentation detailing the pre-incident condition of waterways and waterway embankments, (4) documentation establishing the waterways and waterway embankments are improved and maintained improvements, (5) documentation regarding the reasonableness of the claimed costs of the debris removal from waterways and waterway embankments, and (6) documentation explaining a basis for each claim of immediate threat from waterways and waterway embankments.

On April 12, 2024, the Applicant provided a response with supporting documentation to FEMA's RFI by letter dated April 11, 2024, including several attachments.[12] The Applicant's response did not provide detailed schedules of maintenance as it stated, but did provide sample trail maintenance records with invoices and discussed that maintenance of the trail system was performed prior to the disaster. The Applicant discussed its legal authority to remove debris both

---

[9] Applicant's Response to Request for Information Letter from Chief Financial Officer, Montgomery County Board of Commissioners Recovery Division Director, to Branch Chief, Public Assistance Program Management, Federal Emergency Management Agency, at 3, Bullet 5 (February 8,2024) [hereinafter *Appeal Response to RFI 2*].

[10] *Recipient Appeal Letter*, at 1.

[11] Request for Information Letter from Recovery Division Director, Federal Emergency Management Agency to Governor's Authorized Representative, Pennsylvania Emergency Management Agency and Chief Financial Officer, Montgomery County Board of Commissioners, (February 8,2024) [hereinafter *Appeal RFI*].

[12] Applicant RFI Response Letter from Chief Financial Officer, Montgomery County Board of Commissioners to Branch Chief, Public Assistance Program Management, Federal Emergency Management Agency, (April 12, 2024) [hereinafter *Appeal RFI Response*].

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

from county trail systems and county waterway embankments citing Pennsylvania law and policy which conferred legal responsibility to the Applicant. The Applicant provided statements as to immediate threats it believes the debris located adjacent to trails and waterway embankments may impact in the future. The Applicant provided photos of debris on trails and along waterway embankments. The Applicant also discussed the reasonableness of the costs of the debris removal activities and provided copies of its contracts with vendors and a contract from another county.

## Discussion

*Issue One (Eligible Facility)*

FEMA is authorized to provide PA funding for debris removal as long as it is in the public interest, i.e. necessary to eliminate immediate threats to life, public health, and safety, to eliminate immediate threats of significant damage to improved property, or to ensure economic recovery of the affected community to the benefit of the community-at-large.[13] Removal of debris from improved public property and public rights-of-way is eligible.[14] Improved property means a structure, facility or item of equipment which was built, constructed, or manufactured.[15] Debris removal from agricultural land or natural, unimproved areas is ineligible.[16]

An eligible facility includes a publicly owned trail system or an improved and maintained natural feature.[17] A natural feature is improved and maintained if it meets all of the following conditions: (1) the natural feature has a designed and constructed improvement to its natural characteristics, such as a terraced slope or realigned channel; (2) the constructed improvement enhances the function of the unimproved natural feature; and, (3) the applicant maintains the improvement on a regular schedule to ensure that the improvement performs as designed.[18] Ineligible facilities includes unimproved property such as a hillside or slope, forest, and natural channel bank.[19]

Here, as part of its supporting documentation for the project, the Applicant submitted location data and photos of the removed debris. FEMA reviewed a sampling of documentation submitted and previously found that the debris removal operations at issue in this appeal were performed by the Applicant in natural unimproved forested lands adjacent to improved and maintained trail systems, in unincorporated and incorporated areas of Montgomery County, and along natural water channel embankments. FEMA again reviewed the sampled documentation and affirms its previous determination. The Applicant contends that the parks as a whole, including natural unimproved forested lands adjacent to the trail systems, should be considered natural improved and maintained facilities.

---

[13] Robert T. Stafford Disaster Relief and Emergency Assistance Act §§ 403(a), 407(a), 42 United States Code §§ 5170b(a), 5173(a) (2018); Title 44 Code of Federal Regulations (44 C.F.R.) § 206.224(a) (2019).

[14] *Public Assistance Program and Policy Guide*, FP 104-009-2, at 99 (June 1, 2020) [hereinafter *PAPPG*].

[15] 44 C.F.R. § 206.221(d).

[16] *PAPPG*, at 100.

[17] *PAPPG*, at 55-56, 179.

[18] *Id.* At 55.

[19] *Id.*

The Applicant submitted maintenance documents which show that the improved trail systems were maintained. However, none of the submitted documentation demonstrates maintenance of the natural unimproved forested lands prior to the disaster. The Applicant also submitted documentation which showed the locations and photos of the debris which was removed. That documentation shows the removed debris was located off the trail system and located in unimproved forested lands. There is nothing in the record to suggest that the forested lands adjacent to the trail systems where debris was removed are improved and maintained natural features. The Applicant has not shown that the natural unimproved forested lands adjacent to the trail systems have a designed or constructed improvement to their natural characteristics, such as a terraced slope. Additionally, the Applicant has not demonstrated there are existing improvements to the natural unimproved forested lands that required maintenance on a regular schedule to ensure that the improvement performed as designed. Therefore, the natural unimproved forested lands do not constitute eligible improved and maintained natural features. As such, the debris removal from these areas is not eligible for funding under the PA program.

As to natural unimproved waterway embankments, the analysis is essentially the same as above as there is nothing in the record to suggest that the waterway embankments are improved and maintained natural features. The Applicant does not contend that the waterway embankments have a designed or constructed improvement to their natural characteristics, such as a terraced slope. Lastly, the Applicant has not demonstrated there are existing improvements to the natural unimproved waterway embankments that required maintenance on a regular schedule to ensure that the improvement performed as designed. Therefore, the natural unimproved waterway embankments do not constitute eligible improved and maintained natural features. As such, the debris removal from natural unimproved waterway embankments is not eligible for PA.

*Issue Two (Immediate Threat and Damage Caused by the Event)*

FEMA is authorized to provide Public Assistance (PA) funding for debris removal from publicly owned lands when it is necessary to eliminate the immediate threat to life, public health and safety, or improved property.[20] When Applicants submit a significant number of documents to support claims for assistance, FEMA may select a representative sample to review.[21] Additionally, if an Applicant submits a significant number of damaged sites. To expedite the process, in lieu of FEMA inspections at all sites, the Applicant may submit damage information and documentation for FEMA to validate using this sampling methodology.[22]

Debris removal and emergency protective measures are only eligible if the work addresses an immediate threat.[23] An immediate threat is the threat of additional damage or destruction from an incident that can reasonably be expected to occur within five years of the declared incident.[24]

---

[20] Robert T. Stafford Disaster Relief and Emergency Assistance (Stafford) Act § 407(a), Title 42, United States Code (42 U.S.C.) § 5173(a) (2018); Title 44, Code of Federal Regulations (44 C.F.R.) § 206.224(a) (2018); *PAPPG,* at 103.
[21] PASP, at 1. Public *Assistance Sampling Procedure*, at 1, (March 31, 2022) [hereinafter *PASP*].
[22] *PASP*, at 1; *PAPPG*, at 64.
[23] *PAPPG*, at 97.
[24] 44 C.F.R. § 206.221(c); *PAPPG*, at 43.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Eligible vegetative debris may include tree limbs, branches, stumps, or trees that are still in place, but damaged to the extent they pose an immediate threat. These items are ineligible if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over improved property or public-use areas, such as trails, sidewalks, or playgrounds.[25] For flood incidents specifically, an immediate threat is a threat from a five-year flood (a flood that has a 20 percent chance of occurring any given year).[26] The applicant must provide more than statements or opinions to substantiate its claims; documentation or other evidence supporting its position must be submitted.[27] The burden to substantiate appeals with documented justification falls exclusively to the Applicant and hinges upon the Applicant's ability to not only produce its own records, but to clearly explain how those records support the appeal.[28]

According to the administrative record, the Applicant completed its debris removal operations from September 7, 2021, through February 5, 2022. On February 11, 2022, FEMA prepared GMP 661999 for debris removal costs. Because debris removal operations were completed FEMA site inspections were not warranted. FEMA selected to formulate the project through documentation provided by the Applicant utilizing a sampling methodology pursuant to PA policy. FEMA utilized random sampling for this project and validated a minimum of 20% of leaning trees and hanging limbs. This project had a total of 13,426 line items related to cutting trees and limbs of which 2,827 (21.06%) were reviewed. FEMA's review found that 2,498 of the 2,827 line items reviewed (88.36%) did not pose an immediate threat. Also reviewed were 38,421 cubic yards of vegetative debris removed from waterway embankments which was also found not to pose an immediate threat.

The Applicant claims debris removed from natural unimproved forested lands adjacent to improved and maintained trail systems in Montgomery County could have posed an immediate threat to the public and improved property. An examination of debris documentation provided by the Applicant, including photos and corresponding latitude and longitude coordinates of removed debris, showed the removed debris was not on, adjacent to, or hanging over public-use trails or improved property as required by FEMA policy to be eligible.[29] An examination of the removed debris indicated that the debris was removed from natural unimproved forested lands which does not demonstrate an immediate threat existed and therefore the debris removal is ineligible. Further, the submitted documentation does not provide evidence that the removed debris was a result of the disaster. The burden is on the Applicant to show through documentation that debris which may pose an immediate threat is a result of the disaster. Here, the information provided by the Applicant does not demonstrate the existence of an immediate threat as defined in FEMA regulations and policy.

---

[25] *PAPPG*, at 101.
[26] *PAPPG*, at 43.
[27] FEMA Second Appeal Analysis, *Brunswick*, FEMA-4451-DR-MO, at 3 (Mar. 21, 2022).
[28] 44 C.F.R. § 206.206(a); FEMA Second Appeal Analysis, *N.Y. / Env't Prot., Dept. of*, FEMA-4020-DR-NY, at 3 (July 21, 2020).
[29] See CRC Validation Summary Sheet General Debris Documentation. For review Google Earth was used by entering the provided latitude and longitude coordinates to determine and view locations through satellite imaging and surrounding areas for eligibility.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In addition, the Applicant states in its appeal that the debris removed from waterways potentially posed an immediate threat to public property such as benches, piers, sidewalks, and other improvements constructed along the riverine. That debris could cause flooding to improved public or private property during the occurrence of a 5-year flood. The Applicant does not provide any factual information or documentation of prior maintenance of waterway channel embankments, including hydraulic studies or engineering reports dated prior to or after the declared incident to support its claim that the removed debris could cause flooding during the occurrence of a 5-year flood event. The Applicant has indicated clearly that no waterborne debris was removed from waterways and no specialized equipment was used to remove debris from waterways. The Applicant did conduct debris removal operations from natural unimproved waterway embankments. FEMA reviewed the documentation that the Applicant submitted in support of its appeal to determine if the Applicant demonstrated that the debris removed from natural unimproved waterway embankments meets the definition of an immediate threat. The submitted documentation does not provide evidence substantiating that the removed debris was a result of the disaster. As stated above, the supporting documentation submitted by the Applicant, including photos and locations of the removed debris, indicate that the debris was removed from natural unimproved waterway embankments which does not equate to an immediate threat. Therefore, the information provided by the Applicant does not meet FEMA's definition of immediate threat as defined in FEMA regulations and policy.

**Conclusion**

The Applicant has failed to demonstrate that the debris removal operations appealed here are eligible for Public Assistance funding. Therefore, this appeal is denied in the amount of $7,513,536.36.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 15



# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:** 500844925
**Truck:** 00011605

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**    10/29/2021 1:10:03 PM
**Debris Type:**  Leaner    **Tree Size:**    25
**Facility at Risk:**    Lukens Park
**Facility Type:**    Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:**   40.1772, -75.1428

**Monitor:**    Nicole Briana Hubert

*Nicole*





www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### Hurricane Ida Debris Removal



**Ticket:** 500844997
**Truck:** 00011605

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:**    10/29/2021 8:38:04 AM

**Debris Type:**    Leaner    **Tree Size:**    28

**Facility at Risk:**    Lukens Park

**Facility Type:**    Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:**    40.1767, -75.1431

**Monitor:**    Nicole Briana Hubert

*Nicole*






www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:**    500845070
**Truck:**     00011608






www.DebrisTech.com

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**    11/9/2021 3:01:21 PM

**Debris Type:**  Leaner    **Tree Size:**    14

**Facility at Risk:**   Kohler Park

**Facility Type:**    Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:**  40.2059, -75.1832

**Monitor:**     Tiffany Michelle Johnese

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## *e-Ticket*
## *Hurricane Ida Debris Removal*

**Ticket:** 500845077
**Truck:** 00011608

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 11/9/2021 1:34:34 PM

**Debris Type:** Leaner **Tree Size:** 10

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:** 40.2071, -75.1805

**Monitor:** Tiffany Michelle Johnese




www.DebrisTech.com




Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket

## Hurricane Ida Debris Removal

**Ticket:** 500848106
**Truck:** 00012139



**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic / Looks Great
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:** 9/30/2021 8:51:50 AM

**Debris Type:** Leaner   **Tree Size:** 13

**Facility at Risk:** John James Audubon

**Facility Type:** Publicly Maintained Park

**Justification:**
 Split Trunk

**Coordinates:** 40.1311, -75.4439

**Monitor:** DONALD KELLY JR



www.DebrisTech.com



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:** 500848279
**Truck:** 00012140



**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic / Looks Great
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**    9/29/2021 8:34:09 AM

**Debris Type:**    Hanger

**Facility at Risk:**    Lower Perkiomen Valley

**Facility Type:**    Publicly Maintained Park

**Justification:**
 Limbs or branches pose an immediate
 threat

**Coordinates:**    40.1261, -75.4452

**Monitor:**        BENJAMIN ARMSTRONG







www.DebrisTech.com



# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:** 500848445
**Truck:** 00011605



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**     10/24/2021 11:44:36 AM

**Debris Type:**   Leaner    **Tree Size:**    21

**Facility at Risk:**   Lukens Park

**Facility Type:**     Publicly Maintained Park

 **Justification:**
  Broken Canopy

**Coordinates:**   40.1760, -75.1438

**Monitor:**       Brian Keith Moore Jr







www.DebrisTech.com





# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:** 501004713
**Truck:** 00012096



**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/21/2021 9:33:18 AM

**Debris Type:** Leaner    **Tree Size:** 9

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:** 40.2047, -75.1827

**Monitor:** Kreider Kent Henderson




www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket
## *Hurricane Ida Debris Removal*

**Ticket:** 501004855
**Truck:** 00012096



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/18/2021 1:32:21 PM

**Debris Type:** Hanger

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Limbs or branches pose an immediate threat

**Coordinates:** 40.2054, -75.1807

**Monitor:** Kayla Leann Ulmer





www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:** 501004887
**Truck:** 00012140



**Prime Contractor:**
DRC Emergency Services

**Truck Owner:**
Mid Atlantic / Looks Great

**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/21/2021 4:25:07 PM

**Debris Type:** Leaner    **Tree Size:** 39

**Facility at Risk:** Rose Valley Preserve

**Facility Type:** Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:** 40.1744, -75.1920

**Monitor:** ANTHONY LEWIS





www.DebrisTech.com

# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:** 501005023
**Truck:** 00012096

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/18/2021 5:13:14 PM

**Debris Type:** Hanger

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Limbs or branches pose an immediate
threat

**Coordinates:** 40.2047, -75.1805

**Monitor:** Kayla Leann Ulmer




www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:**   501005202
**Truck:**    00012140



**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic / Looks Great
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**   10/5/2021 3:57:10 PM

**Debris Type:**   Hanger

**Facility at Risk:**   Lower Perkiomen Valley

**Facility Type:**   Publicly Maintained Park

**Justification:**
 Limbs or branches extend over the public ROW

**Coordinates:**   40.1275, -75.4451

**Monitor:**   Kreider Kent Henderson







www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## e-Ticket
### *Hurricane Ida Debris Removal*

**Ticket:** 501005721
**Truck:** 00012096

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/20/2021 3:16:41 PM

**Debris Type:** Leaner   **Tree Size:** 18

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:** 40.2041, -75.1830

**Monitor:** Kayla Leann Ulmer




www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:**     501066410

**Truck:**     00011606







**Prime Contractor:**
DRC Emergency Services

**Truck Owner:**
Mid Atlantic Tree

**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:**     10/27/2021 3:13:59 PM

**Debris Type:**    Hanger

**Facility at Risk:**    Kohler Park

**Facility Type:**     Publicly Maintained Park

**Justification:**
Limbs or branches extend over the public ROW

**Coordinates:**    40.2045, -75.1803

**Monitor:**      ANTHONY LEWIS

www.DebrisTech.com



# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:** 501066602
**Truck:** 00011604



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:**    10/27/2021 8:13:23 AM

**Debris Type:**  Leaner    **Tree Size:**    14

**Facility at Risk:**    Power Line Trail

**Facility Type:**    Publicly Maintained Trail

**Justification:**
Leaning at an angle greater than 30 degrees

**Coordinates:**    40.1743, -75.1443

**Monitor:**    SINDRELL MAURICE





www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## *e-Ticket*
### *Hurricane Ida Debris Removal*

**Ticket:** 500754093
**Truck:** 00011606

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:** 11/5/2021 11:03:35 AM

**Debris Type:** Leaner   **Tree Size:** 12

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:** 40.2038, -75.1858

**Monitor:** Benjamin Armstrong





www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## e-Ticket
### Hurricane Ida Debris Removal

**Ticket:**    500759815
**Truck:**    00012140

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic / Looks Great
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**    10/1/2021 12:34:24 PM

**Debris Type:**    Hanger

**Facility at Risk:**    Schuylkill Canal Towpath

**Facility Type:**    Publicly Maintained Trail

**Justification:**
 Limbs or branches pose an immediate
 threat

**Coordinates:**    40.1275, -75.4827

**Monitor:**    MARQUEZ RASHARD







www.DebrisTech.com

# DEBRISTECH
ELECTRONIC DEBRIS MANAGEMENT SYSTEM

## e-Ticket
### Hurricane Ida Debris Removal



**Ticket:** 500766959
**Truck:** 00012096




**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:** 10/20/2021 8:21:14 AM

**Debris Type:** Leaner    **Tree Size:** 27

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:** 40.2040, -75.1824

**Monitor:** Kayla Leann Ulmer

www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## *e-Ticket*
### *Hurricane Ida Debris Removal*

**Ticket:** 500839839
**Truck:** 00011605




**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/24/2021 1:43:44 PM

**Debris Type:** Leaner     **Tree Size:** 31

**Facility at Risk:** Lukens Park Trail

**Facility Type:** Publicly Maintained Trail

**Justification:**
Broken Canopy

**Coordinates:** 40.1761, -75.1443

**Monitor:** Brian Keith Moore Jr



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

www.DebrisTech.com



# e-Ticket
## Hurricane Ida Debris Removal

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**Ticket:**    500840302
**Truck:**     00011605



**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**    11/1/2021 12:55:17 PM

**Debris Type:**   Leaner    **Tree Size:**    14

**Facility at Risk:**   Lukens Park

**Facility Type:**    Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:**   40.1755, -75.1398

**Monitor:**    Tiffany Michelle Johnese







www.DebrisTech.com



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# DEBRISTECH
### ELECTRONIC DEBRIS MANAGEMENT SYSTEM
## *e-Ticket*
### *Hurricane Ida Debris Removal*

**Ticket:**  500840532
**Truck:**  00011605




www.DebrisTech.com

**Prime Contractor:**
 DRC Emergency Services
**Truck Owner:**
 Mid Atlantic Tree
**Monitoring Firm:**
 DebrisTech, LLC

**Timestamp:**  11/2/2021 9:30:49 AM

**Debris Type:**  Leaner    **Tree Size:**    8

**Facility at Risk:**  Lukens Park

**Facility Type:**    Publicly Maintained Park

**Justification:**
 Broken Canopy

**Coordinates:**  40.1749, -75.1396

**Monitor:**    RILEY DRAKE HODGES



Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



# e-Ticket
## Hurricane Ida Debris Removal

**Ticket:** 500844471
**Truck:** 00011602



**Prime Contractor:**
DRC Emergency Services
**Truck Owner:**
Mid Atlantic Tree
**Monitoring Firm:**
DebrisTech, LLC

**Timestamp:** 10/19/2021 2:34:02 PM

**Debris Type:** Leaner **Tree Size:** 21

**Facility at Risk:** Kohler Park

**Facility Type:** Publicly Maintained Park

**Justification:**
Broken Canopy

**Coordinates:** 40.2049, -75.1800

**Monitor:** Sharmaine Iola Farrare





www.DebrisTech.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 16



**MONTGOMERY COUNTY**
**BOARD OF COMMISSIONERS**

JAMILA H. WINDER, CHAIR
NEIL K. MAKHIJA, VICE CHAIR
THOMAS DIBELLO

**FINANCE OFFICE**

MONTGOMERY COUNTY COURTHOUSE • PO BOX 311
NORRISTOWN, PA 19404-0311

610-278-3437
FAX: 610-278-3069
www.MONTGOMERYCOUNTYPA.GOV

DEAN J. DORTONE
CHIEF FINANCIAL OFFICER

August 23, 2024

Mr. Lawrence D. West
Governor's Authorized Representative
Pennsylvania Emergency Management Agency
1310 Elmerton Avenue
Harrisburg, PA   17110

Re:    Notice of Second Appeal
       Denial of Eligibility, Category A Work
       FEMA-4618-DR-PA, GM-661999
       Montgomery County, PA (Applicant ID: 091-99091-00)

Dear Mr. West:

In a First Appeal Determination dated June 25, 2024, the FEMA Regional Administrator for Region 3 denied the First Appeal request for relief from Montgomery County, PA ("Applicant"), sustaining FEMA's denial of eligibility for approximately $7,513,536.36[1] in claimed Category A Emergency Protective Measures for Grants Manager project # 661999 (See Attachment A). The purpose of this project was to reimburse Montgomery County for the costs of debris management work county-wide, with the breakdown in reductions to the project categorized as:

| Cost Category | % Ineligible | Original Claimed Amount | Reduction Taken by FEMA |
|---|---|---|---|
| Tree and Limb Debris Direct Costs | 88.36% | $2,235,620.00 | $2,099,150.60 |
| Vegetative Hauling, Reduction and Disposal Indirect Costs | 29.33% | $5,723,915.10 | $1,678,842.92 |
| Monitoring Costs | 29.33% | $1,510,166.92 | $442,936.87 |
| Construction and Demolition Debris Costs | 0.00% | $1,126,289.84 | $0.00 |
| Waterway Debris Costs | 100.00% | $3,292,605.96 | $3,292,605.96 |
| TOTAL | n/a | $13,888,597.82 | $7,513,536.35 |

---

[1] Note that the amounts of the reductions expressed in the determination Memorandum actually add up to $7,513,536.35.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

In the First Appeal Determination denying relief, The Regional Administrator determined that the above reductions were taken where Montgomery County failed to demonstrate that its debris removal operations, and associated costs, were eligible for funding under FEMA's Public Assistance program. The Regional Administrator's staff noted in the First Appeal Analysis that the documentation submitted by Montgomery County along with the First Appeal, and in response to a First Appeal RFI, was insufficient to overturn FEMA's determination that work had occurred on natural/unimproved forest lands adjacent to improved and maintained trails, along natural water channel embankments, and in areas of incorporated and unincorporated Montgomery County where the County had legal authority to conduct debris operations. From this determination, Montgomery County timely brings this Second Appeal.

Please note that Montgomery County intends to continue to work on assembling justification data and documentation to support this Second Appeal, and will file a supplement with the Recipient at a mutually-agreed upon time within the Recipient's 60-day endorsement/transmittal period.

### General Discussion of Arguments on Second Appeal

To begin, Montgomery County believes that between both the original First Appeal, as well as the First Appeal RFI, that it has submitted enough documentation to support its claims, and upon which FEMA Headquarters staff can overturn the Regional Administrator's denial. To this point, Montgomery County hereby incorporates by reference all arguments and submittals previously made as part of the original First Appeal, as well as the First Appeal RFI response.

Should FEMA Headquarters staff not accept the above premise that the First Appeal responses were sufficient to grant the First Appeal on their own, then Montgomery County will focus its Second Appeal efforts on two of the cost categories where reductions were taken:

1. Tree and Limb Debris Direct Costs, where reductions were taken in the amount of $2,099,150.60, and
2. Waterway Debris Costs, where reductions were taken in the amount of $3,292,605.96.

### Tree and Limb Direct Costs

FEMA's assertion to date has been that the overwhelming majority of the County's tree & limb debris direct costs were accrued in trimming, cutting and removing debris from natural/unimproved forest lands which are categorically ineligible under existing FEMA policy. The County believes that to this charge, it has simply failed to provide FEMA documentation that shows the accessibility of areas where work was completed; Montgomery County's formal trail system has literally hundreds of offshoots that do not show appropriately on maps at the resolutions that have been presented in prior iterations of the submitted documentation. The County's contractors did not send men into natural forested areas to drag out felled trees by hand and foot (with trees weighing thousands of pounds, that in and of itself would have been a Herculean effort); instead, all of the areas where vegetative debris was collected and removed were accessible by at a minimum, all-terrain vehicles ("ATV's"), if not by the contractor's debris trucks, which implies that they were reachable by the public through the above-referenced

offshoots to the formally established trails. In the final Second Appeal filing, Montgomery County will provide additional documentation to support this claim.

*Waterway Debris Costs*

In regard to waterway debris, FEMA has determined that Montgomery County has not met its burden to prove that debris removed from natural/unimproved waterway embankments meets its definition of an "Immediate Threat."[2] To this end, Montgomery County will again provide documentation to clarify the argument it has been making, to include (among other documentation): a list of approximately 30 bridges imperiled by such debris, summaries of damage to those bridges in this event by waterway embankment debris, as well as other documentation needed to validate FEMA's definitional existence of an "Immediate Threat."

*Summary*

Again, should FEMA Headquarters staff not agree with the County's plea to approve the arguments made on First Appeal, the County will focus its new/enhanced arguments on Second Appeal attempting to recapture as much of the $5,391,756.56 reduction taken by FEMA for the cost categories of: Trees & Limbs Debris Direct Costs, and Waterway Debris Costs. As noted above, the County is still developing these arguments, and will submit an enhanced Second Appeal letter to the Recipient within the Recipient's 60-day endorsement and transmittal period.

## Conclusion

Mr. West, Montgomery County appreciates any assistance that your office will be able to provide during the eventual review of the record and crafting of the official Recipient's letter to FEMA in support of this Second Appeal. If you have any questions regarding this matter, please contact me at my office at Montgomery County's facilities. Thank you.

Sincerely,

**Dean J. Dortone**
**Chief Financial Officer**

Attachments:   (A) Second Appeal determination letter dated Jun

---

[2] For these purposes, an "Immediate Threat" being that the removed debris could itself cause flooding during the occurrence of a 5-year flood.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 17

U.S. Department of Homeland Security
500 C Street, SW
Washington, DC 20472



March 4, 2025

**SENT VIA EMAIL**

David R. Padfield, Acting Director
Pennsylvania Emergency Management
Agency
1310 Elmerton Ave
Harrisburg, PA 17110

Dean J. Dortone
Chief Financial Officer
Montgomery County
PO Box 311
Norristown, PA 19404

Re: Second Appeal – Montgomery County, PA ID -091-99091-00 FEMA-4618-DR-PA, Grants
Manager Project (GMP) 661999, Public Interest

Dear Dean Dortone and David Padfield:

This is in response to Pennsylvania Emergency Management Agency (Recipient) letter dated,
September 27, 2024, which transmitted the referenced second appeal on behalf of Montgomery
County (Applicant). The Applicant is appealing the U.S. Department of Homeland Security's
Federal Emergency Management Agency's (FEMA) denial of $7,513,536.36 for debris removal.

As explained in the enclosed analysis, I have determined the Applicant has not demonstrated the
claimed debris removal was in the public interest. Therefore, this appeal is denied.

This determination is the final decision on this matter pursuant to 44 C.F.R. § 206.206, **Appeals**.

Sincerely,

Robert M. Pesapane
Director, Public Assistance

Enclosure

cc: Lillian Hutchinson
      Acting Regional Administrator
      FEMA Region 3

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**SECOND APPEAL ANALYSIS**
**Montgomery County, PA ID 091-99091-00**
**FEMA-4618-DR-PA, Grants Manager Project 661999**
**Public Interest**

## Background

During the incident period of August 31 through September 5, 2021, Hurricane Ida caused damage throughout Pennsylvania.[1] Montgomery County (Applicant) requested $14,028,597.81 in Public Assistance (PA) funding for county-wide contracted debris removal work completed between September 7, 2021 and February 5, 2022, which was associated with public rights of way (ROWs), parks, trails, and rivers/streams. The claimed work and associated costs included: trimming/cutting trees and limbs; removing and hauling debris; and reducing, monitoring, and disposing of the debris. The Applicant provided load tickets, documents which provided contract removal costs and debris quantities, and a contract cost summary.

FEMA reviewed the claimed work and costs using a sampling methodology. FEMA approved $6,515,061.45 in costs that were associated with removing debris from public ROWs.[2] However, in a Determination Memorandum dated September 22, 2023, FEMA denied $7,513,536.36, finding the Applicant had not demonstrated the vegetative debris associated with the remaining locations presented an immediate threat.[3] FEMA noted that the Applicant had provided access to more than a thousand images of the claimed debris removed, with location markers, and it determined these debris removal activities were related to natural unimproved property.

*First Appeal*

On November 20, 2023, the Applicant submitted a first appeal. The Applicant stated that debris removal activities were associated with a series of trails and a system of rivers and streams that were all located within its parks. The Applicant first stated that trees and limbs that were trimmed or cut and vegetative debris removed from the parks' trails posed an immediate threat to lives and public health and safety because the debris could potentially shift, move, or fall on people nearby who were using the trails, causing injury. The Applicant next asserted that the vegetative debris associated with the rivers and streams that cut through the parks' system posed an immediate threat because the debris could have caused flooding to improved public property (for example, benches, piers, sidewalks, and other improvements along the riverine shoreline).

FEMA submitted a Request for Information to the Applicant on February 8, 2024, seeking documentation that explained the basis or presence of each immediate threat claimed and which indicated there was a basis for a specific immediate threat to lives, public health and safety, or of additional damage or destruction to public or private property from the declared incident. FEMA also requested documentation that demonstrated the Applicant maintained the wooded area adjacent to the trails. The Applicant responded on April 11, 2024. The Applicant provided sample trail maintenance schedules, as well as photographs of debris on trails and river/stream embankments. The Applicant clarified that debris associated with the rivers/streams referred to debris that was along and/or overhanging the rivers/streams.

---

[1] The President issued a major disaster declaration on September 10, 2021.
[2] *See* Grants Manager Project 661999, Damage, Description, and Dimension.
[3] The administrative record references trees, limbs, and other land-based debris, but the administrative record reflects that the debris in question is vegetative in nature.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

On June 25, 2024, the FEMA Region 3 Regional Administrator denied the requested $7,513,536.36. FEMA found that the Applicant had not demonstrated the debris at issue posed an immediate threat. FEMA noted the debris documentation provided by the Applicant, including photographs and corresponding latitude and longitude coordinates of removed debris, showed the removed debris was not on, adjacent to, or hanging over public-use trails or improved property. Rather, FEMA found the debris was removed from natural unimproved forested lands and natural unimproved river/stream embankments.

*Second Appeal*

On September 20, 2024, the Applicant submitted a second appeal. Regarding the trails, the Applicant asserts that its parks contain hundreds of trail offshoots or "micro-trails" which it states do not show appropriately on maps due to resolution limitations, but are accessible to visitors, and therefore, debris located there caused an immediate threat to the general public. Regarding the debris located near the rivers/streams, the Applicant argues that the debris could have caused future damage to the Applicant's bridges. Specifically, the Applicant stated that an overwhelming percentage of the total debris removed would have been subject to being swept into the rivers/streams at virtually any time from strong storms, thereby placing its bridges in danger.[4] Lastly the Applicant provides maps with a high-level overview of the Applicant's townships that include manually inserted colored dots to indicate the general locations/areas of debris it states were dangerous. The Recipient forwards the Applicant's appeal, with its support, in a letter dated September 24, 2024.

**Discussion**

FEMA may provide PA funding for debris removal activities that are in the public interest, such as removal that is necessary to eliminate immediate threats: (1) to lives, public health, and safety; or (2) of significant damage to improved public or private property.[5] "Immediate threat" is the threat of additional damage or destruction from an incident that can reasonably be expected to occur within five years of the declared incident.[6] Removal of debris from improved public property is eligible.[7] Debris removal from natural, unimproved land, such as heavily wooded areas, is ineligible.[8] Eligible vegetative debris may include tree limbs, branches, stumps, or trees that are still in place, but damaged to the extent they pose an immediate threat.[9] These items are not eligible if the debris is in a natural area and does not extend over improved property or public-use areas.[10] It is the applicant's responsibility to provide documentation to substantiate its claim as eligible and to clearly explain how those records support the appeal.[11]

---

[4] The Applicant also argues that it acted reasonably and in good faith in its debris removal activity.
[5] Robert T. Stafford Disaster Relief and Emergency Assistance Act § 407(a), Title 42 United States Code § 5173(a) (2018); Title 44 of the Code of Federal Regulations (C.F.R.) § 206.224(a) (2020); *Public Assistance Program and Policy Guide*, FP 104-009-2, at 99 (June 1, 2020) [hereinafter *PAPPG*].
[6] *PAPPG*, at 97.
[7] *Id.* at 99.
[8] *Id.* at 100.
[9] *Id.* at 101.
[10] *Id.*
[11] *See* 44 C.F.R. § 206.206(a); *PAPPG*, at 63-64; *City of Pembroke Pines,* FEMA-4673-DR-FL, at 2 (Nov. 25, 2024).

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

The Applicant first asserts that it removed debris from "micro-trails" throughout its parks because the debris caused an immediate threat to park visitors using those trails. However, the Applicant's documentation does not support this assertion. Unlike the public-use trails documented in the Applicant's maintenance schedule, the location coordinates for the micro-trails' debris removal correspond to natural, unimproved open and forested lands. The Applicant provides photographs of debris in these natural environments, which do not demonstrate that debris removal operations from these areas were necessary to eliminate an immediate threat to life, public health and safety, or improved property.

The Applicant asserts that debris located near rivers and streams posed an immediate threat of damage to improved property, specifically, bridges. However, the photographs provided by the applicant do not substantiate its assertion, as the Applicant does not identify the bridges in the photographs, nor do the photographs show how close the debris is to the bridges, or demonstrate the threat of additional damage or destruction from an incident that can reasonably be expected to occur within five years of the declared incident. The Applicant's general assertions do not substantiate that the debris removal operations associated with the rivers/streams were necessary to eliminate immediate threats of significant damage to improved property.

**Conclusion**

The Applicant has not demonstrated that the claimed debris removal was in the public interest. Therefore, this appeal is denied.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 18

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non confidential information and documents.

**From:** Mark Stafford <mstafford@drcusa.com>
**Sent:** Monday, January 3, 2022 8:41 PM
**To:** Colleen Carmichael <ccarmichael@rkk.com>
**Cc:** John Mehl <JMehl@slsco.com>; JWilson@montcopa.org
**Subject:** White Marsh

**EXTERNAL EMAIL:**    Do not click links or open attachments unless you trust the 'Sender' and know the content is safe.

Hello Colleen

My name is Mark Stafford and I am a V.P. with DRC Emergency  Services, LLC.   As you may be aware, DRC has agreed to pay for your Firm's services relating to:

1.  An immediate erosion control plan for the approx.. 11 acres in the White Marsh area of Montgomery County.  DRC is self- performing this portion of the plan and should be complete this week.
2.  A restoration plan for the same area (re-plant etc.)

Please provide me with your cost estimate for these services or perhaps you would prefer to call me at the cell number below.

Thank you Colleen

MS



Mark Stafford
**DRC Emergency Services**
A: 110 Veterans Memorial Blvd, STE 515 | Metairie, LA 70005
P: 504.482.2848   M: 504.415.7945   F: 504.482.2852
E: mstafford@drcusa.com   W: www.drcusa.com

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 19

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY
BOARD OF COMMISSIONERS**

KENNETH E. LAWRENCE, JR., CHAIR
JAMILA H. WINDER, VICE CHAIR
JOSEPH C. GALE, COMMISSIONER



**OFFICE OF THE SOLICITOR**

MONTGOMERY COUNTY COURTHOUSE • PO BOX 311
NORRISTOWN, PA 19404-0311

610-278-3033
FAX: 610-278-3069
WWW.MONTCOPA.ORG

RAYMOND MCGARRY
INTERIM SOLICITOR

PHILIP W. NEWCOMER
CHIEF OF LITIGATION
PHILIP.NEWCOMER@MONTGOMERYCOUNTYPA.GOV
DIRECT DIAL: 610-292-5030

February 8, 2024

*Via Federal Express*
Mr. Mark Stafford
DRC Emergency Services, LLC
110 Veterans Memorial Blvd., Suite 515
Metairie, LA 70005

> **Re:     County of Montgomery, Pennsylvania
>             Damage to Whitemarsh Site – Notice of Dispute**

Dear Mr. Stafford,

This office represents the County of Montgomery, Pennsylvania ("County") in all litigation matters. As you know, DRC Emergency Services, LLC ("DRC") performed work within and for the County as a debris removal contractor following Hurricane Ida's impact upon the County. This work included removal of eligible vegetative debris in County parks and other areas designated by the County. Unfortunately, in the course of its work, DRC entered a County-owned property that was not designated by the County for debris removal and essentially clear-cut the property, leaving this environmentally sensitive creek-side site virtually bereft of vegetation.

The location in question (the "Whitemarsh Site") was, but no longer is, a largely wooded property. It consists of approximately 11 acres located in Whitemarsh Township, adjacent to the Fort Washington State Park, between Skippack Pike (PA Route 73) and the Wissahickon Creek at Tax Parcel No. 650010666006, outlined in red on the tax map below:



The Whitemarsh Site

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

2

DRC personnel began removal of trees and other vegetation at the Whitemarsh Site without proper notice to and approval by appropriate County officials.  Further, DRC's removal activities far exceeded the scope of work for the removal of hazardous leaning trees, set forth in Section 2.11 of DRC's contract, which required that:

> For hazardous leaning trees to be removed and eligible for reimbursement, the tree must satisfy a minimum of one (1) of the following requirements:
> a. The tree has more than fifty (5O) percent of the crown damaged or destroyed (requires written documentation from an arborist).
> b. The tree has a split trunk or broken branches that expose the heartwood.
> c. The tree has fallen or been uprooted within a public use area.
> d. The tree is leaning at an angle greater than thirty (30) degrees.

Section 2.11.1 (Eligible Hazardous Leaning Trees).  These limited standards do not justify the outright deforestation wrought by DRC.

The County is in possession of drone footage of the Whitemarsh Site depicting its condition after Hurricane Ida but prior to DRC's vegetative debris removal there.  When compared to drone footage taken after DRC's activities, it is beyond reasonable dispute that DRC far exceeded its allowable scope of work to denude the Whitemarsh Site of nearly all trees and other vegetation. For example, here is a screenshot from the "before" drone footage, showing the vegetation that existed on the Whitemarsh Site looking in a southeastern direction:



As points of reference, Skippack Pike is seen at the left side of this "before" photo, and the Wissahickon Creek is seen in the upper right corner of the photo.

Now, compare the following "after" screenshot.  The pavement of Skippack Pike is seen in the upper left corner, and the Wissahickon Creek is seen in the upper left corner.  What was once a wooded lot between those points of reference has been largely stripped of its vegetation:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3



DRC's devastation of the Whitemarsh site extended across the entire tract.  Here are side-by-side "before" and "after" photos looking at the side of the property bordered by the Wissahickon Creek and adjacent to the State Park:

 

And here are side-by-side "before" and "after" photos of the Whitemarsh Site looking toward the Wissahickon Creek as it passes under Skippack Pike to the right:

 

4

The full "before" and "after" videos are even more compelling – powerfully demonstrating that a green, wooded, environmentally sensitive property used by the public to access the Wissahickon Creek was reduced to the appearance of a war zone. This was not Hurricane Ida's devastation of the Whitemarsh Site; it was DRC's devastation of the Site.

Instead of being given advance notice of DRC's work at the Whitemarsh Site, County officials first learned of DRC's activity there from complaints raised by the public. The Pennsylvania Department of Environmental Protection and the Montgomery County Conservation District also raised serious concerns with the County about DRC's adverse environmental impact at the Site. The County made these complaints and concerns known to DRC, and DRC admitted responsibility for its damage to the Whitemarsh Site in several ways:

- You, Mark Stafford, a Vice President of DRC, acknowledged DRC's responsibility by memorably exclaiming, "I'll tote the note!" during a meeting with County officials.
- DRC implemented limited emergency soil erosion controls and seeded and mulched the Site in an insufficient effort to mitigate the environmental damage they caused.
- You, Mark Stafford, also agreed in an email dated January 3, 2022 that DRC would pay for the work of an engineering firm hired by the County (RK&K Engineering) to develop an erosion control plan and a restoration plan for the approximately 11 acre Site:



DRC has since reneged on its promise to pay such costs. DRC has breached its contract with the County for disaster debris and removal services, adopted by Resolution 19.C349 of the Montgomery County Board of Commissioners and amended thereafter. DRC far exceeded its scope of work at the Whitemarsh Site, damaging the County, its taxpayers and the public. The County was forced to incur the expense of an engineering firm to develop an erosion control plan and a restoration plan for the Whitemarsh Site, and the County has incurred and will incur considerable costs for erosion control and site restoration. Moreover, irreparable damage has been done to a natural resource devoted to the public's use and enjoyment.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5

The Montgomery County Board of Commissioners is committed to righting this wrong, through litigation if necessary. Before embarking down that road, which would undoubtedly be a costly one for DRC, the County is willing to consider the amicable resolution of this dispute. Please let me know within thirty (30) days of the date of this letter whether DRC is willing to enter into negotiations to resolve this matter. If I do not hear from DRC or its counsel within that time-frame, the County will proceed to litigation.

Sincerely,

Philip W. Newcomer

PWN/srh

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



**MONTGOMERY COUNTY
BOARD OF COMMISSIONERS**

KENNETH E. LAWRENCE, JR., CHAIR
JAMILA H. WINDER, VICE CHAIR
JOSEPH C. GALE, COMMISSIONER

**OFFICE OF THE SOLICITOR**

MONTGOMERY COUNTY COURTHOUSE • PO BOX 311
NORRISTOWN, PA 19404-0311

610-278-3033
FAX: 610-278-3069
WWW.MONTCOPA.ORG

RAYMOND MCGARRY
INTERIM SOLICITOR

PHILIP W. NEWCOMER
CHIEF OF LITIGATION
PHILIP.NEWCOMER@MONTGOMERYCOUNTYPA.GOV
DIRECT DIAL: 610-292-5030

February 8, 2024

*Via Federal Express*
DebrisTech, LLC
Attn: Brooks R. Wallace
925 Goodyear Boulevard
Picayune, MS 39466

Re:    **County of Montgomery, Pennsylvania
Damage to Whitemarsh Site – Notice of Dispute**

Dear Mr. Wallace,

This office represents the County of Montgomery, Pennsylvania ("County") in all litigation matters.  As you know, DebrisTech, LLC ("DebrisTech") performed disaster debris monitoring services within and for the County following Hurricane Ida.  This work included monitoring of the debris removal contractor's ("DRC") removal of eligible vegetative debris in County parks and other areas designated by the County.  Unfortunately, in the course of this work, DRC entered a County-owned property that was not designated by the County for debris removal and essentially clear-cut the property, leaving this environmentally sensitive creek-side site virtually bereft of vegetation.  All of this occurred while DebrisTech was monitoring DRC's operations.

The location in question (the "Whitemarsh Site") was, but no longer is, a largely wooded property.  It consists of approximately 11 acres located in Whitemarsh Township, adjacent to the Fort Washington State Park, between Skippack Pike (PA Route 73) and the Wissahickon Creek at Tax Parcel No. 650010666006, outlined in red on the tax map below:



The Whitemarsh Site

2

DRC personnel, while monitored by DebrisTech, began removal of trees and other vegetation at the Whitemarsh Site but without proper notice to and approval by appropriate County officials. DRC's removal activities far exceeded the scope of work for the removal of hazardous leaning trees, set forth in Section 2.11 of DRC's contract, which required that:

> For hazardous leaning trees to be removed and eligible for reimbursement, the tree must satisfy a minimum of one (1) of the following requirements:
> a. The tree has more than fifty (5O) percent of the crown damaged or destroyed (requires written documentation from an arborist).
> b. The tree has a split trunk or broken branches that expose the heartwood.
> c. The tree has fallen or been uprooted within a public use area.
> d. The tree is leaning at an angle greater than thirty (30) degrees.

Section 2.11.1 (Eligible Hazardous Leaning Trees). These limited standards do not justify the outright deforestation wrought by DRC under DebrisTech's watch.

The County is in possession of drone footage of the Whitemarsh Site depicting its condition after Hurricane Ida but prior to DRC's vegetative debris removal there. When compared to drone footage taken after DRC's activities, it is beyond reasonable dispute that DRC far exceeded its allowable scope of work to denude the Whitemarsh Site of nearly all trees and other vegetation. For example, here is a screenshot from the "before" drone footage, showing the vegetation that existed on the Whitemarsh Site looking in a southeastern direction:



As points of reference, Skippack Pike is seen at the left side of this "before" photo, and the Wissahickon Creek is seen in the upper right corner of the photo.

Now, compare the following "after" screenshot. The pavement of Skippack Pike is seen in the upper left corner, and the Wissahickon Creek is seen in the upper left corner. What was once a wooded lot between those points of reference has been largely stripped of its vegetation:

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

3



The devastation of the Whitemarsh site extended across the entire tract. Here are side-by-side "before" and "after" photos looking at the side of the property bordered by the Wissahickon Creek and adjacent to the State Park:

 

And here are side-by-side "before" and "after" photos of the Whitemarsh Site looking toward the Wissahickon Creek as it passes under Skippack Pike to the right:

 



4

The full "before" and "after" videos are even more compelling – powerfully demonstrating that a green, wooded, environmentally sensitive property used by the public to access the Wissahickon Creek was reduced to the appearance of a war zone. This was not Hurricane Ida's devastation of the Whitemarsh Site; it was DRC/DebrisTech's devastation of the Site.

Instead of being given advance notice of DRC/DebrisTech's work at the Whitemarsh Site, County officials first learned of the work occurring there from complaints raised by the public. The Pennsylvania Department of Environmental Protection and the Montgomery County Conservation District also raised serious concerns with the County about the work's adverse environmental impact at the Site. The County made these complaints and concerns known to DRC, and DRC admitted responsibility for the damage to the Whitemarsh Site in several ways:

- Mark Stafford, a Vice President of DRC, acknowledged DRC's responsibility by memorably exclaiming, "I'll tote the note!" during a meeting with County officials.
- DRC implemented limited emergency soil erosion controls and seeded and mulched the Site in an insufficient effort to mitigate the environmental damage they caused.
- Mark Stafford also agreed on DRC's behalf in an email dated January 3, 2022 that DRC would pay for the work of an engineering firm hired by the County (RK&K Engineering) to develop an erosion control plan and a restoration plan for the approximately 11 acre Site:



**From:** Mark Stafford <mstafford@drcusa.com>
**Sent:** Monday, January 3, 2022 8:41 PM
**To:** Colleen Carmichael <ccarmichael@rkk.com>
**Cc:** John Mehl <JMehl@slsco.com>; JWilson@montcopa.org
**Subject:** White Marsh

EXTERNAL EMAIL: Do not click links or open attachments unless you trust the 'Sender' and know the content is safe.

Hello Colleen

My name is Mark Stafford and I am a V.P. with DRC Emergency Services, LLC. As you may be aware, DRC has agreed to pay for your Firm's services relating to:

1. An immediate erosion control plan for the approx.. 11 acres in the White Marsh area of Montgomery County. DRC is self- performing this portion of the plan and should be complete this week.
2. A restoration plan for the same area (re-plant etc.)

Please provide me with your cost estimate for these services or perhaps you would prefer to call me at the cell number below.

Thank you Colleen

MS

Mark Stafford
DRC Emergency Services
A: 110 Veterans Memorial Blvd, STE 515 | Metairie, LA 70005
P: 504.482.2848   M: 504.415.7945   F: 504.482.2852
E: mstafford@drcusa.com   W: www.drcusa.com

DRC's repeated acknowledgments of responsibility are important here because DebrisTech was supposed to review and monitor DRC's admittedly faulty work. Moreover, DebrisTech was required to scrupulously document DRC's debris removal activities through an electronic ticketing system that generated photographs, GPS coordinates and time-stamps for each tree removed from the Whitemarsh Site. DRC could not have done the damage it wrought to the Whitemarsh Site unless DebrisTech personnel were asleep at the wheel. I am not using that

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

5

expression solely in a metaphorical sense. A County Parks supervisor who came to the Whitemarsh Site observed a DebrisTech monitor asleep in a vehicle as DRC's tree removal work was occurring.

DebrisTech allowed DRC to far exceed its scope of work at the Whitemarsh Site, damaging the County, its taxpayers and the public. The County was forced to incur the expense of an engineering firm to develop an erosion control plan and a restoration plan for the Whitemarsh Site, and the County has incurred and will incur considerable costs for erosion control and site restoration. Moreover, irreparable damage has been done to a natural resource devoted to the public's use and enjoyment.

The Montgomery County Board of Commissioners is committed to righting this wrong, through litigation if necessary. Pursuant to Section 10 of the September 5, 2021 Agreement between the County and DebrisTech, this letter constitutes written notice of a dispute between the parties. I look forward to hearing from DebrisTech or its counsel concerning the scheduling of a face-to-face meeting in Norristown, Pennsylvania to be held within 30 days in an effort to reach an amicable resolution of this matter.

Sincerely,

Philip W. Newcomer

PWN/srh

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 20

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**MONTGOMERY COUNTY
BOARD OF COMMISSIONERS**

JAMILA H. WINDER, CHAIR
NEIL K. MAKHIJA, VICE CHAIR
THOMAS DIBELLO, COMMISSIONER

**OFFICE OF THE SOLICITOR**
MONTGOMERY COUNTY COURTHOUSE • PO BOX 311
NORRISTOWN, PA 19404-0311

610-278-3033
FAX: 610-278-3069
WWW.MONTGOMERYCOUNTYPA.GOV

RAYMOND MCGARRY
INTERIM SOLICITOR

PHILIP W. NEWCOMER
CHIEF OF LITIGATION
PHILIP.NEWCOMER@MONTGOMERYCOUNTYPA.GOV
DIRECT DIAL: 610-292-5030

April 9, 2024

*Via Email & U.S. Mail*
Ryan J. O'Beirne
Butler Snow LLP
P.O. Box 6010
Ridgeland, MS  39158-6010

Re:    **Montgomery County, PA v. DebrisTech, LLC**

Dear Ryan,

I write on behalf of the County of Montgomery ("County"), pursuant to Paragraph 10(b) of the September 5, 2021 Agreement between the County and DebrisTech, LLC ("DebrisTech"), to request non-binding mediation of the matter set forth in the County's February 8, 2024 Notice of Dispute.  Pursuant to the terms of Paragraph 10(b), the mediation shall take place in Norristown, PA before a single mediator selected by the parties, with the parties sharing equally in the fees of the mediator.

The County further requests that DebrisTech agree to the participation of the debris removal contractor, DRC Emergency Services LLC, as a party to the mediation.

Sincerely,

Philip W. Newcomer

PWN/srh
cc:  Raymond McGarry, Solicitor

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# EXHIBIT 21



## Dilworth
## Paxson LLP

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DIRECT DIAL NUMBER:                                                     Timothy Ford
(215) 575-7017                                                     tford@dilworthlaw.com

August 4, 2025

Cary Des Roches, Esq. (cdr@desrocheslaw.com)
Law Office of Cary A. Des Roches
225 Phosphor Avenue
Metairie, Louisiana 70005

> **Re:**   **County of Montgomery, Pennsylvania**
> **Damages to Additional Sites—Notice of Additional Dispute**

Dear Mr. Des Roches:

As you know, I represent the County of Montgomery, Pennsylvania ("County") related to DRC Emergency Services, LLC's ("DRC's") performance under a Contract for Disaster Debris Clearance and Removal Services and subsequent cleanup efforts undertaken after Hurricane Ida ("Contract"). The County hired DRC as its disaster recovery contractor. On February 8, 2024, the County sent your client a Notice of Dispute regarding the Whitemarsh Site, County-owned property that was not designated by the County for debris removal but was essentially clear-cut. On April 9, 2024, the County sent a letter requesting non-binding mediation of that dispute.

Since that letter, FEMA denied the County's appeal of the denial of reimbursement of more than $7.5 million in debris removal costs. The County attempted a second appeal of FEMA's denial, but FEMA denied the second appeal because more than $7.5 million in debris removal was not "in the public interest." In light of FEMA's denials of the County's appeals, in the course of reviewing data related to the dispute over cleanup of the Whitemarsh site, the County discovered that substantially more trees were removed than justified at other County properties under the scope of work and applicable FEMA and FHWA regulations. For example, DRC was required to follow "current stipulated requirements . . . of the FEMA Public Assistance Grant Program" "during the course of a debris removal project." Contract Scope of Work at 1.

1650 Market Street, Suite 1200  •  Philadelphia, PA 19103  •  215-575-7000  •  Fax: 215-754-4603
Pennsylvania • New Jersey • New York • Delaware

www.dilworthlaw.com

#125135490v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Cary Des Roches, Esq.
August 4, 2025
Page 2

DRC was responsible for assisting the County's reimbursement efforts (*see* Scope of Work Section 2.1.1), yet FEMA denied the County's reimbursement request and its subsequent appeals. In its "First Appeal Analysis," FEMA identified costs totaling $7,513,536.36 for which the [County] did not provide sufficient documentation to demonstrate were related to emergency measures necessary to address an immediate threat or justify the need for specialized equipment or labor." *First Appeal Analysis*, FEMA-4618-DR-PA, PA ID 091-99091-00, Montgomery County, GMP 661999 ("First Appeal Analysis"). DRC was responsible for adhering to disaster debris removal guidelines and to remove debris that fit squarely within the requirements established by FEMA.

The First Appeal Analysis rejected the County's request for reimbursement based on two criteria. First, "debris removal from agricultural land or natural, unimproved areas" is ineligible. As part of its scope of work, DRC was required to remove only debris generated from the named disaster. DRC was also responsible for adhering to the strict operational guideline for debris removal, i.e., hazardous leaning trees required at least 50% of the crown damaged or destroyed. *See* Scope of Work Section 2.11.1. For hazardous limbs to eligible for payment, the limb should have been, among other requirements, located on "improved public property." If DRC had questions regarding the scope of disaster debris removal, it was also required to "direct any questions regarding County standards[,] policies[,] or procedures" to designated County personnel.

DRC's failure to adhere to the County's operational requirements and FEMA's Public Assistance Grant Program Guide resulted in DRC traversing into otherwise natural, unimproved areas to remove trees that fell outside of FEMA's guidelines for disaster recovery efforts. For example, FEMA classifies "ineligible facilities" as "unimproved property, such as a hillside or slope, forest, and natural channel bank." FEMA determined that the County's requests for reimbursement attached documentation that showed debris removal operations in "natural unimproved forested land adjacent to improved and maintained trail systems, . . . and along natural water channel embankments." First Appeal Analysis at 5; *see, e.g.*, below.



#125135490v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Cary Des Roches, Esq.
August 4, 2025
Page 3

In the images below, for example, DRC removed these trees as posing an immediate threat; however, their locations do not demonstrate an overhang over eligible facilities, but instead are in unimproved property and over natural channel banks.



Second, FEMA requires that debris removal from public lands pose "an immediate threat of additional damage or destruction within five years of the declared incident." *First Appeal Analysis* at 6. According to FEMA, tree limbs, branches, stumps or trees are "ineligible" for reimbursement "if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over improved property or public-use areas, such as trails, sidewalks, or playgrounds." *Id.* at 7.

FEMA's examination of debris documentation, including photos and longitude and latitude coordinates of removed debris "showed the removed debris was not on, adjacent to, or hanging over public-use trails or improved property as required by FEMA." In many instances, trees were removed from unimproved land that did not overhang public-use trails. Thus DRC failed to properly oversee removal operations or otherwise raise such pertinent questions to the County for clarification. Ultimately, DRC's failure to follow the parties' Contract thwarted the County's reimbursement efforts.

#125135490v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Cary Des Roches, Esq.
August 4, 2025
Page 4



The County's investigation revealed over-harvesting of trees in several areas, including Deep Meadows Park, Lukens Park, Kohler Park, Rose Valley Preserve, John James Audubon Park, and Perkiomen Trail. These properties are largely wooded natural areas of unimproved land. While trails and sidewalks snake through many of these parks, DRC was required to obtain the necessary documentation to demonstrate the removed trees, branches, or debris "extended over improved property or public-use areas" and were caused by an eligible disaster. The vast majority of the photographic evidence collected fails to demonstrate, at a minimum, how the collected debris is eligible for reimbursement. Indeed, in the County's second FEMA appeal, FEMA concluded that the County did "not substantiate its assertion" that "debris located near rivers and streams posed an immediate threat of damage to improved property, specifically, bridges."

Based on the documentation received by the County, DRC's debris removal activities fell far below the standard outlined in the Scope of Work. The County's investigation and analysis revealed  that debris removal operations were performed in natural unimproved forested lands adjacent to improved and maintained trail systems, in unincorporated and incorporated areas of

#125135490v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Cary Des Roches, Esq.
August 4, 2025
Page 5

the County, and along natural water channel embankments. DRC's failure to properly perform has thus cost the County over $7.5 million in un-reimbursable costs.

The Montgomery County Board of Commissioners believes that it can most efficiently address these concerns through the existing mediation process. Please let me know  as soon as possible if you can meet within thirty days to attempt to resolve this Dispute.  If I do not hear from you within that timeframe, the County will proceed with litigation.

Sincerely,

Timothy J. Ford

#125135490v1



## Dilworth Paxson LLP

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DIRECT DIAL NUMBER:                                                          Timothy Ford
(215) 575-7017                                                          tford@dilworthlaw.com

August 4, 2025

Andrew J. Fuga, Esq. (ajfuga@burnswhite.com)
Burns White
1001 Conshohocken State Road, Suite 1-515
West Conshohocken, PA 19428

      **Re:**    **County of Montgomery, Pennsylvania**
              **Damages to Additional Sites—Notice of Dispute**

Dear Mr. Fuga:

As you know, I represent the County of Montgomery, Pennsylvania ("County") related to DebrisTech's performance under a 2021 Independent Contractor Agreement related to disaster recovery cleanup efforts undertaken after Hurricane Ida. The County hired DebrisTech to oversee disaster recovery cleanup and, among other things, "[m]onitor recovery contractor operations" and "improve efficiency and speed up recovery work." On February 8, 2024, the County sent your client a Notice of Dispute regarding the Whitemarsh Site, County-owned property that was not designated by the County for debris removal but was essentially clear-cut. On April 9, 2024, the County sent a letter requesting non-binding mediation of that dispute.

Also on April 9, 2024, the County shared with your client a summary of damages. In that summary, the County reserved its right to present a separate Notice of Dispute addressed to the denial of FEMA reimbursement. Since that summary, FEMA denied the County's appeal of the denial of reimbursement of more than $7.5 million in debris removal costs. The County attempted a second appeal of FEMA's denial, but FEMA denied the second appeal because more than $7.5 million in debris removal was not "in the public interest." In light of FEMA's denials of the County's appeals, in the course of reviewing data related to the dispute over cleanup of the Whitemarsh site, the County discovered that substantially more trees were removed than justified at other County properties under the scope of work and applicable FEMA and FHWA regulations. For example, DebrisTech was responsible for facilitating communication among all relevant agencies to support the County's reimbursement services, yet FEMA denied the County's reimbursement request and its subsequent appeals.

1650 Market Street, Suite 1200 • Philadelphia, PA 19103 • 215-575-7000 • Fax: 215-754-4603
Pennsylvania • New Jersey • New York • Delaware

www.dilworthlaw.com

#125134073v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Andrew J. Fuga, Esq.
August 4, 2025
Page 2

In its "First Appeal Analysis," FEMA identified costs totaling $7,513,536.36 for which "the [County] did not provide sufficient documentation to demonstrate were related to emergency measures necessary to address an immediate threat or justify the need for specialized equipment or labor." *First Appeal Analysis*, FEMA-4618-DR-PA, PA ID 091-99091-00, Montgomery County, GMP 661999 ("First Appeal Analysis"). DebrisTech was responsible for collecting and preparing any pertinent reports "required for reimbursement by FEMA." Scope of Services § A(m).

The First Appeal Analysis rejected the County's request for reimbursement based on two criteria. First, "debris removal from agricultural land or natural, unimproved areas" is ineligible. As part of its monitoring activities, DebrisTech was required to "monitor recovery contractor operations." DebrisTech's failed to monitor recovery contractor operations in accordance with FEMA's disaster recovery regulations to ensure efficient and speedy recovery. *See* Scope of Services § A(f). This failure to monitor resulted in recovery contractors traversing into otherwise natural, unimproved areas to remove trees that fell outside of FEMA's guidelines for disaster recovery efforts. For example, FEMA classifies "ineligible facilities" as "unimproved property, such as a hillside or slope, forest, and natural channel bank." FEMA determined that the County's requests for reimbursement attached documentation that showed debris removal operations in "natural unimproved forested land adjacent to improved and maintained trail systems, . . . and along natural water channel embankments." First Appeal Analysis at 5; *see, e.g.*, below.



In the images below, for example, DebrisTech monitors tagged these trees as posing an immediate threat; however, their locations do not demonstrate an overhang over eligible facilities, but instead are in unimproved property and over natural channel banks.

#125134073v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Andrew J. Fuga, Esq.
August 4, 2025
Page 3



Second, FEMA requires that debris removal from public lands pose "an immediate threat of additional damage or destruction within five years of the declared incident." *First Appeal Analysis* at 6. According to FEMA, tree limbs, branches, stumps or trees are "ineligible" for reimbursement "if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over improved property or public-use areas, such as trails, sidewalks, or playgrounds." *Id*. at 7.

FEMA's examination of debris documentation, including photos and longitude and latitude coordinates of removed debris "showed the removed debris was not on, adjacent to, or hanging over public-use trails or improved property as required by FEMA." In many instances, trees were removed from unimproved land that did not overhang public-use trails. Thus DebrisTech failed to properly monitor recovery contractor operations and capture appropriate documentation to support the County's reimbursement efforts.



#125134073v1

Case# 2026-03871-14 Docketed at Montgomery County Prothonotary on 05/27/2026 4:45 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Andrew J. Fuga, Esq.
August 4, 2025
Page 4



The County's investigation revealed over-harvesting of trees in several areas, including Deep Meadows Park, Lukens Park, Kohler Park, Rose Valley Preserve, John James Audubon Park, and Perkiomen Trail. These properties are largely wooded natural areas of unimproved land. While trails and sidewalks snake through many of these parks, DebrisTech was required to monitor recovery efforts and obtain the necessary documentation to demonstrate the removed trees, branches, or debris "extended over improved property or public-use areas." The vast majority of the photographic evidence taken by DebrisTech fails to demonstrate how removed trees extended over improved property. Indeed, in the County's second FEMA appeal, FEMA concluded that "the photographs provided by the applicant do not substantiate its assertion" that "debris located near rivers and streams posed an immediate threat of damage to improved property, specifically, bridges . . . as the Applicant does not identify the bridges in the photographs, nor do the photographs show how close the debris is to the bridges, or demonstrate the threat of additional damage or destruction from an incident that can reasonably be expected to occur within five years of the declared incident."

Based on the documentation received by the County, DebrisTech's monitoring activities fell far below the standard outlined in the Scope of Services. The County's investigation and analysis also revealed that debris removal operations were performed in natural unimproved forested lands adjacent to improved and maintained trail systems, in unincorporated and incorporated areas of the County, and along natural water channel embankments. DebrisTech's failure to monitor has thus cost the County over $7.5 million in un-reimbursable costs.

The Montgomery County Board of Commissioners believes that it can most efficiently address these concerns through the existing mediation process. Please let me know as soon as possible if you can meet within thirty days to attempt to resolve this Dispute. If I do not hear from you within that timeframe, the County will proceed with litigation.

Sincerely,

Timothy J. Ford

#125134073v1

Case# 2026-03871-0 Docketed at Montgomery County Prothonotary on 02/27/2026 3:34 PM, Fee = $304.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

COUNTY OF MONTGOMERY PENNSYLVANIA

vs.

DRC EMERGENCY SERVICES LLC
DEBRISTECH LLC

NO.  2026-03871

## PRAECIPE FOR SUMMONS

To the Prothonotary:

Issue Summons in Civil Action in the above case.

ORIGINAL SIGNATURE RETAINED BY THE FILING PARTY

_____
Signature

TIMOTHY FORD, ESQ.
_____
Filing Party

325290
_____
ID Number

DILWORTH PAXSON LP
_____
Firm Name

1650 MARKET STREET, SUITE 1200
PHILADELPHIA, PA 19103
_____
Address

(215) 575-7017
_____
Phone

Date: 02/27/2026

## WRIT OF SUMMONS

TO: Defendant(s)

You are notified that the Plaintiff(s) has / have commenced an action against you.



_____
Prothonotary, Montgomery County

By: Trowbridge George

Clerk / Deputy

Date: 02/27/2026
(6/02)

Addresses must be included for all parties.

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

COUNTY OF MONTGOMERY PENNSYLVANIA

vs.

DRC EMERGENCY SERVICES LLC

NO.  2026-03871

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document <u>commencing an action</u> in the Montgomery County Court of Common Pleas.  The information provided herein is used solely as  an aid in tracking cases in the court system.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney:  TIMOTHY FORD, ESQ., ID: 325290

Self-Represented (Pro Se) Litigant ☐

**Class Action Suit**    ☐ Yes    ☒ No

**MDJ Appeal**    ☐ Yes    ☒ No

**Money Damages Requested** ☒

**Commencement of Action**:

Writ of Summons

**Amount in Controversy**:

More than $50,000

## Case Type and Code

Contract:

Buyer Plaintiff

**Other:**

Case# 2026-03871-0 Docketed at Montgomery County Prothonotary on 02/27/2026 3:34 PM, Fee = $304.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2026-03871-0 Docketed at Montgomery County Prothonotary on 02/27/2026 3:34 PM, Fee = $304.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA – CIVIL DIVISION**

COUNTY OF MONTGOMERY, PENNSYLVANIA
One Montgomery Plaza
425 Swede Street, 8th Floor
Norristown, Pennsylvania 19404,

*Plaintiff,*

*v.*

DRC EMERGENCY SERVICES, LLC
2 North Jackson Street
Suite 605
Montgomery, AL 36104

*and*

DEBRISTECH, LLC
923 Goodyear Boulevard
Picayune, Mississippi 39466,

*Defendants.*

No. _____

**PRAECIPE FOR SUMMONS**

To the Prothonotary:

Issue Summons in Civil Action in the above case.

Writ of Summons shall be forwarded to ☑Attorney / ☐Sheriff

Date: February 27, 2026

**DILWORTH PAXSON LLP**

By: /s/ *Timothy J. Ford*

Timothy J. Ford, Esq.
(Pa. ID. No. 325290)
1650 Market Street, Suite 1200
Philadelphia, PA 19103
(215) 575-7000
tford@dilworthlaw.com
Attorney for Plaintiff

#125475939v2

Case# 2026-03871-0 Docketed at Montgomery County Prothonotary on 02/27/2026 3:34 PM, Fee = $304.50. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA – CIVIL DIVISION

COUNTY OF MONTGOMERY,
PENNSYLVANIA
One Montgomery Plaza
425 Swede Street, 8th Floor
Norristown, Pennsylvania 19404,

*Plaintiff,*

*v.*

DRC EMERGENCY SERVICES, LLC
2 North Jackson Street
Suite 605
Montgomery, AL 36104

*and*

DEBRISTECH, LLC
923 Goodyear Boulevard
Picayune, Mississippi 39466,

*Defendants.*

No. _____

### WRIT

TO:  <u>DRC EMERGENCY SERVICES, LLC, 2 North Jackson Street, Suite 605, Montgomery, Alabama 36104, and DEBRISTECH, LLC, 923 Goodyear Boulevard, Picayune, Mississippi 39466</u>

You are notified that the Plaintiff, County of Montgomery, Pennsylvania, has commenced an action against you.

**SEAL**                    **NOAH MARLIER, PROTHONOTARY**

Date:  _____     by:  _____
                                            Agent / Deputy

Address must be included for all parties.

#125475939v2

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

Case# 2026-03871-1 Docketed at Montgomery County Prothonotary on 03/18/2026 11:08 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COUNTY OF MONTGOMERY PENNSYLVANIA
vs.
DRC EMERGENCY SERVICES LLC
DEBRISTECH LLC

NO.  2026-03871

## PRAECIPE FOR APPEARANCE

TO THE PROTHONOTARY:

Please enter my appearance for

DEBRISTECH, LLC

in the above case.

Date: 03/18/2026

ORIGINAL SIGNATURE  RETAINED BY THE FILING PARTY
Signature

ANDREW J FUGA, ESQ.
Filing Party

200721
ID Number

BURNS WHITE LLC
Firm Name

100 FOUR FALLS - SUITE 1-515, 1001 CONSHOHOCKEN STATE ROAD
Address

WEST CONSHOHOCKEN, PA 19428

(484) 567-5738
Phone

Case# 2026-03871-1 Docketed at Montgomery County Prothonotary on 03/18/2026 11:08 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | : COURT OF COMMON PLEAS |
| | : OF MONTGOMERY COUNTY |
| Plaintiff | : |
| | : |
| | : CIVIL ACTION |
| vs. | : JURY TRIAL DEMANDED |
| | : |
| DEBRISTECH LLC, | : NO: 2026-03871 |
| | : |
| DRC EMERGENCY SERVICES LLC | : |
| | : |
| Defendants | : |

## ENTRY OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Defendant, *Debristech, LLC,* in the above matter.

**BURNS WHITE LLC**

Date: March 18, 2026           By:  _____

Andrew J. Fuga, Esquire
*Attorney for Defendant,*
*Debristech, LLC*

Case# 2026-03871-2 Docketed at Montgomery County Prothonotary on 03/18/2026 11:08 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**                        *Attorneys for Defendant,*
By: Andrew J. Fuga, Esquire                *Debristech, LLC*
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

| | | |
|---|---|---|
| COUNTY OF MONTGOMERY, | : | COURT OF COMMON PLEAS |
| | : | OF MONTGOMERY COUNTY |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| DEBRISTECH, LLC; | : | NO: 2026-03871 |
| | : | |
| DRC EMERGENCY SERVICES, LLC | : | |
| | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Andrew J. Fuga, Esquire, counsel for Defendant, *Debristech LLC, certify* that on March 18, 2026 a true and correct copy of the Entry of Appearance was served on the following via e-filing only:

Timothy Ford, Esquire
Jerry R. Desiderato, Esquire
DILWORTH PAXSON LP
1650 Market Street, Suite 1200
Philadelphia, PA
TFORD@DILWORTHLAW.COM
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiff*

DRC Emergency Services, LLC
2 North Jackson Street, Suite 605
Montgomery, AL 36104
*Defendant*

Andrew J. Fuga, Esquire

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

Case# 2026-03871-3 Docketed at Montgomery County Prothonotary on 03/18/2026 11:26 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COUNTY OF MONTGOMERY PENNSYLVANIA
vs.
DRC EMERGENCY SERVICES LLC
DEBRISTECH LLC

NO. 2026-03871

## PRAECIPE FOR APPEARANCE

TO THE PROTHONOTARY:

Please enter my appearance for

DEBRISTECH, LLC

in the above case.

Date: 03/18/2026

ORIGINAL SIGNATURE  RETAINED BY THE FILING PARTY
Signature

ALEXANDRA TOTARO, ESQ.
Filing Party

338162
ID Number

BURNS WHITE
Firm Name

1001 CONSHOHOCKEN STATE ROAD, STE 1-515
Address

WEST CONSHOHOCKEN, PA 19428

484-567-5789
Phone

Case# 2026-03871-3 Docketed at Montgomery County Prothonotary on 03/18/2026 11:26 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY |
| Plaintiff | |
| vs. | CIVIL ACTION JURY TRIAL DEMANDED |
| DEBRISTECH LLC, | NO: 2026-03871 |
| DRC EMERGENCY SERVICES LLC | |
| Defendants | |

## ENTRY OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly enter my appearance as co-counsel on behalf of Defendant, *Debristech, LLC,* in the above matter.

Date: March 18, 2026

**BURNS WHITE LLC**

By: _____
Alexandra C. Totaro, Esquire
*Attorney for Defendant,*
*Debristech, LLC*

Case# 2026-03871-4 Docketed at Montgomery County Prothonotary on 03/18/2026 11:26 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

|  |  |
|---|---|
| COUNTY OF MONTGOMERY,<br><br>Plaintiff<br><br>vs.<br><br>DEBRISTECH, LLC;<br><br>DRC EMERGENCY SERVICES, LLC<br><br>Defendants | COURT OF COMMON PLEAS<br>OF MONTGOMERY COUNTY<br><br>CIVIL ACTION<br>JURY TRIAL DEMANDED<br><br>NO: 2026-03871 |

## CERTIFICATE OF SERVICE

I, Alexandra C. Totaro, Esquire, counsel for Defendant, *Debristech LLC, certify* that on March 18, 2026 a true and correct copy of the Entry of Appearance was served on the following via e-filing only:

Timothy Ford, Esquire
Jerry R. Desiderato, Esquire
DILWORTH PAXSON LP
1650 Market Street, Suite 1200
Philadelphia, PA
TFORD@DILWORTHLAW.COM
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiff*

DRC Emergency Services, LLC
2 North Jackson Street, Suite 605
Montgomery, AL 36104
*Defendant*

Alexandra C. Totaro Esquire

Case# 2026-03871-5 Docketed at Montgomery County Prothonotary on 03/18/2026 11:26 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | : COURT OF COMMON PLEAS |
| | : OF MONTGOMERY COUNTY |
| Plaintiff | : |
| | : CIVIL ACTION |
| vs. | : JURY TRIAL DEMANDED |
| | : |
| DEBRISTECH LLC, | : NO: 2026-03871 |
| | : |
| DRC EMERGENCY SERVICES LLC | : |
| | : |
| Defendants | : |

## JURY DEMAND

**TO THE PROTHONOTARY:**

Defendant, *Debristech, LLC*, hereby demands a trial by jury of twelve (12) jurors.

**URNS WHITE LLC**

Date: March 18, 2026        By: _____

Andrew J. Fuga, Esquire
Alexandra C. Totaro, Esquire
*Attorneys for Defendant,*
*Debristech, LLC*

Case# 2026-03871-5 Docketed at Montgomery County Prothonotary on 03/18/2026 11:26 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY |
| Plaintiff | |
| | CIVIL ACTION |
| vs. | JURY TRIAL DEMANDED |
| DEBRISTECH, LLC; | NO: 2026-03871 |
| DRC EMERGENCY SERVICES, LLC | |
| Defendants | |

## CERTIFICATE OF SERVICE

I, Andrew J. Fuga, Esquire, counsel for Defendant, *Debristech LLC, certify* that on March 18, 2026 a true and correct copy of the Jury Demand was served on the following via e-filing only:

Timothy Ford, Esquire
Jerry R. Desiderato, Esquire
DILWORTH PAXSON LP
1650 Market Street, Suite 1200
Philadelphia, PA
TFORD@DILWORTHLAW.COM
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiff*

DRC Emergency Services, LLC
2 North Jackson Street, Suite 605
Montgomery, AL 36104
*Defendant*

Andrew J. Fuga, Esquire

Case# 2026-03871-6 Docketed at Montgomery County Prothonotary on 03/18/2026 12:18 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | : COURT OF COMMON PLEAS |
| | : OF MONTGOMERY COUNTY |
| Plaintiff | : |
| | : |
| | : CIVIL ACTION |
| vs. | : JURY TRIAL DEMANDED |
| | : |
| DEBRISTECH LLC, | : NO: 2026-03871 |
| | : |
| DRC EMERGENCY SERVICES LLC | : |
| | : |
| Defendants | : |

## JURY DEMAND

**TO THE PROTHONOTARY:**

Defendant, *Debristech, LLC*, hereby demands a trial by jury of twelve (12) jurors.

**URNS WHITE LLC**

Date: March 18, 2026           By: _____

Andrew J. Fuga, Esquire
Alexandra C. Totaro, Esquire
*Attorneys for Defendant,*
*Debristech, LLC*

Case# 2026-03871-6 Docketed at Montgomery County Prothonotary on 03/18/2026 12:18 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | |
|---|---|
| COUNTY OF MONTGOMERY, | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY |
| Plaintiff | |
| vs. | CIVIL ACTION JURY TRIAL DEMANDED |
| DEBRISTECH, LLC; | NO: 2026-03871 |
| DRC EMERGENCY SERVICES, LLC | |
| Defendants | |

## CERTIFICATE OF SERVICE

I, Andrew J. Fuga, Esquire, counsel for Defendant, *Debristech LLC, certify* that on March 18, 2026 a true and correct copy of the Jury Demand was served on the following via e-filing only:

Timothy Ford, Esquire
Jerry R. Desiderato, Esquire
DILWORTH PAXSON LP
1650 Market Street, Suite 1200
Philadelphia, PA
TFORD@DILWORTHLAW.COM
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiff*

DRC Emergency Services, LLC
2 North Jackson Street, Suite 605
Montgomery, AL 36104
*Defendant*

Andrew J. Fuga, Esquire

Case# 2026-03871-7 Docketed at Montgomery County Prothonotary on 03/18/2026 12:18 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**BURNS WHITE LLC**
By: Andrew J. Fuga, Esquire
I.D. No. 200721
By: Alexandra C. Totaro, Esquire
I.D. No. 338162
1001 Conshohocken State Road, STE 1-515
West Conshohocken, PA 19428
Ph: (484) 567-5700

*Attorneys for Defendant,*
*Debristech, LLC*

| | | |
|---|---|---|
| COUNTY OF MONTGOMERY, | : | COURT OF COMMON PLEAS OF MONTGOMERY COUNTY |
| Plaintiff | : | |
| | : | CIVIL ACTION |
| vs. | : | JURY TRIAL DEMANDED |
| DEBRISTECH, LLC; | : | NO: 2026-03871 |
| DRC EMERGENCY SERVICES, LLC | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Andrew J. Fuga, Esquire, counsel for Defendant, *Debristech LLC, certify* that on March 18, 2026 a true and correct copy of the Entry of Appearance was served on the following via e-filing only:

Timothy Ford, Esquire
Jerry R. Desiderato, Esquire
DILWORTH PAXSON LP
1650 Market Street, Suite 1200
Philadelphia, PA
TFORD@DILWORTHLAW.COM
jdesiderato@dilworthlaw.com
*Attorneys for Plaintiff*

DRC Emergency Services, LLC
2 North Jackson Street, Suite 605
Montgomery, AL 36104
*Defendant*

Andrew J. Fuga, Esquire

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

Case# 2026-03871-8 Docketed at Montgomery County Prothonotary on 03/20/2026 3:12 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COUNTY OF MONTGOMERY PENNSYLVANIA
vs.
DRC EMERGENCY SERVICES LLC
DEBRISTECH LLC

NO.  2026-03871

## PRAECIPE FOR APPEARANCE

TO THE PROTHONOTARY:

Please enter my appearance for

DEBRISTECH, LLC

in the above case.

Date: 03/20/2026

ORIGINAL SIGNATURE  RETAINED BY THE FILING PARTY
Signature

JOHN C MCMEEKIN II, ESQ.
Filing Party

81250
ID Number

RAWLE & HENDERSON LLP
Firm Name

CENTRE SQUARE WEST , 1500 MARKET ST. 19TH FLR
Address

PHILADELPHIA, PA 19102

(215) 575-4324
Phone

Case# 2026-03871-8 Docketed at Montgomery County Prothonotary on 03/20/2026 3:12 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**RAWLE & HENDERSON LLP**
By: John C. McMeekin II, Esquire
I.D. No. 81250
By: Orville R. Walls, III, Esquire
I.D. No. 81223
1500 Market Street
Center Square West – 19th Floor
Philadelphia, PA 19102
(215) 575-4324

*Attorneys for Defendant,*
*DebrisTech, LLC.*

| | |
|---|---|
| COUNTY OF MONTGOMERY, PENNSYLVANIA<br>One Montgomery Plaza<br>425 Swede Street, 8th Floor<br>Norristown, Pennsylvania 19404,<br><br>*Plaintiff,*<br><br>*v.*<br><br>DRC EMERGENCY SERVICES, LLC<br>2 North Jackson Street<br>Suite 605<br>Montgomery, AL 36104<br><br>*and*<br><br>DEBRISTECH, LLC<br>923 Goodyear Boulevard<br>Picayune, Mississippi 39466,<br><br>*Defendants.* | COURT OF COMMON PLEAS<br><br>MONTGOMERY COUNTY<br><br><br><br>No. 2026-03871 |

## ENTRY OF APPEARANCE

Kindly enter the appearance of John C. McMeekin II, Esquire and Orville R. Walls III, Esquire on behalf of Defendant, DebrisTech, LLC, in the above-captioned matter.

RAWLE & HENDERSON, LLP

BY:_____
John C. McMeekin II, Esq.
Orville R. Walls III, Esq.
*Attorneys for Defendant,*
*DebrisTech, LLC*

Date: March 20, 2026

#20305083-1

Case# 2026-03871-9 Docketed at Montgomery County Prothonotary on 03/20/2026 3:12 PM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**RAWLE & HENDERSON LLP**
By: John C. McMeekin II, Esquire
I.D. No. 81250
By: Orville R. Walls, III, Esquire
I.D. No. 81223
1500 Market Street
Center Square West – 19th Floor
Philadelphia, PA 19102
(215) 575-4324

*Attorneys for Defendant,*
*DebrisTech, LLC.*

COUNTY OF MONTGOMERY, PENNSYLVANIA
One Montgomery Plaza
425 Swede Street, 8th Floor
Norristown, Pennsylvania 19404,

*Plaintiff,*

v.

DRC EMERGENCY SERVICES, LLC
2 North Jackson Street
Suite 605
Montgomery, AL 36104

*and*

DEBRISTECH, LLC
923 Goodyear Boulevard
Picayune, Mississippi 39466,

*Defendants.*

No. 2026-03871

## CERTIFICATE OF SERVICE

I, John C. McMeekin II, Esquire, hereby certify that the foregoing Entry of Appearance was filed on this date, March 20, 2026, through electronic case filing system, and will be served upon the attorney of record for each party registered to receive electronic service.

RAWLE & HENDERSON, LLP

BY: _____
John C. McMeekin II, Esq.
Orville R. Walls III, Esq.
*Attorneys for Defendant,*
*DebrisTech, LLC*

Date: <u>March 20, 2026</u>

#20305083-1

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

Case# 2026-03871-10 Docketed at Montgomery County Prothonotary on 03/24/2026 11:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

COUNTY OF MONTGOMERY PENNSYLVANIA

vs.

DRC EMERGENCY SERVICES LLC
DEBRISTECH LLC

NO.  2026-03871

## PRAECIPE FOR APPEARANCE

TO THE PROTHONOTARY:

Please enter my appearance for

<u>PLAINTIFF</u>

in the above case.

Date: <u>03/24/2026</u>

<u>ORIGINAL SIGNATURE  RETAINED BY THE FILING PARTY</u>
Signature

<u>STANFORD B PONSON, ESQ.</u>
Filing Party

<u>322548</u>
ID Number

<u>DILWORTH PAXSON LLP</u>
Firm Name

<u>1650 MARKET ST</u>
Address

<u>PHILADELPHIA, PA 19103</u>

<u>215-575-7000</u>
Phone

Case# 2026-03871-10 Docketed at Montgomery County Prothonotary on 03/24/2026 11:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA – CIVIL DIVISION**

COUNTY OF MONTGOMERY, PENNSYLVANIA,

*Plaintiff,*

v.

DRC EMERGENCY SERVICES, LLC

*and*

DEBRISTECH, LLC,

*Defendants.*

No. 2026-03871

## ENTRY OF APPEARNCE

Please enter the appearance of Stanford B. Ponson, Esquire, as counsel on behalf of Plaintiff, County of Montgomery, Pennsylvania, in the above-captioned matter.

Dated: March 23, 2026

/s/ *Stanford B. Ponson*
Stanford B. Ponson, Esquire
(Pa. ID 322548)
DILWORTH PAXSON LLP
1650 Market Street
Suite 1200
Philadelphia, PA 19103
215-575-7000
sponson@dilworthlaw.com
*Attorneys for Plaintiff*

#125519829v1

Case# 2026-03871-11 Docketed at Montgomery County Prothonotary on 03/24/2026 11:28 AM, Fee = $0.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA – CIVIL DIVISION**

| | |
|---|---|
| COUNTY OF MONTGOMERY, PENNSYLVANIA, <br><br> *Plaintiff,* <br><br> *v.* <br><br> DRC EMERGENCY SERVICES, LLC <br><br> *and* <br><br> DEBRISTECH, LLC, <br><br> *Defendants.* | No. 2026-03871 |

**<u>CERTIFICATE OF SERVICE</u>**

I, Stanford B. Ponson, Esquire, certify that a true and correct copy of my Entry of Appearance was submitted to be filed and served on all counsel of record via the Court's ECF system.

Dated: March 23, 2026

/s/ *Stanford B. Ponson*

Stanford B. Ponson, Esquire
(Pa. ID 322548)
DILWORTH PAXSON LLP
1650 Market Street
Suite 1200
Philadelphia, PA 19103
215-575-7000
sponson@dilworthlaw.com
*Attorneys for Plaintiff*

#125519829v1

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

COUNTY OF MONTGOMERY PENNSYLVANIA

V.                                                                      No: 2026-03871

DRC EMERGENCY SERVICES LLC, ET AL.,

## CIVIL CASE MANAGEMENT ORDER

AND NOW, this **30th day** of **April 2026,** the following Order is entered pursuant to Local Rule of Civil Procedure 200(4): Trial Readiness:

1. **Fact Discovery**: All fact discovery shall be completed within **eighteen months** from the date of commencement of this action (or from date of transfer of the action from another jurisdiction).

   Further discovery shall not be permitted except upon showing of extraordinary circumstances and with leave of Court. The failure to strictly comply with the provisions of this Order may result in the imposition of sanctions including, but not limited to, an Order of Preclusion or Non-Pros.

2. **Plaintiff Expert Reports**: All plaintiff's expert reports, if any, shall be served within **nineteen months** from the date of commencement of this action (or from date of transfer of the action from another jurisdiction).

3. **Defense Expert Reports**: All defense expert reports, if any, shall be served within **twenty months** from the date of commencement of this action (or from date of transfer of the action from another jurisdiction).

4. **Dispositive Motions**: All dispositive motions shall be filed within **twenty-one months** from the date of commencement of this action (or from date of transfer of the action from another jurisdiction).

5. This case shall be added to the Court's Civil Trial Inventory promptly after the deadline for filing dispositive motions if no timely dispositive motion is filed. If timely dispositive motions are filed, this case shall be promptly added to the Court's Civil Trial Inventory following decision on all dispositive motions.

6. Plaintiff shall serve a copy of this Order immediately upon any party that is subsequently served with process or joined in the action and any attorney that subsequently enters an appearance for such a party.

*For the Court:*

Michael R. Kehs, Esquire
Court Administrator

If a recipient of this order has no prior notice of the above captioned matter, they may contact Deputy District Court Administrator Andrea Grace, Esq. Andrea.Grace@montgomerycountypa.gov

2026-03871-0013 4/30/2026 10:08 AM # 15382243
Rcpt#Z5063255 Fee:$0.00 Order - Other
Main (Public)
MontCo Prothonotary

RULE 236 NOTICE PROVIDED ON 04/30/2026